UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

2006 JAN 17  P 5: 35

| | |
|---|---|
| Joseph T. Carmack ) <br> ) <br> Plaintiff, Pro Se ) <br> ) <br> v. ) <br> ) <br> Massachusetts Bay Transportation ) <br> ) <br> Authority ) <br> ) <br> and ) <br> ) <br> Massachusetts Bay Commuter Railroad ) <br> ) <br> Company ) <br> ) <br> Defendants ) <br> ) | Civil Action No. 05-11430 PBS |

**PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO DEFENDANT MBCR'S <u>MOTION TO DISMISS</u>**

The Plaintiff, Joseph T. Carmack ("Plaintiff"), herby states that for purposes of Defendant Massachusetts Bay Commuter Railroad Co.'s ("MBCR" and "Defendant MBCR") Motion to Dismiss, the following facts, in whole or in part, are in dispute[1]

1. Plaintiff was employed by the National Railroad Passenger Corporation ("Amtrak") in October 1979. [*Defendant MBCR's Attachment A, Pl. Second Am. Compl. Docket No. 03-12488-PBS Paragraph 12*][2].

2. In 1996, Plaintiff was accepted as a Locomotive Engineer and ultimately Certified by Amtrak as a Locomotive Engineer. *Exhibits R* and T.

---

[1]    Some of these 'facts' are included herein only for the purposes of this motion, but may not be admitted by Plaintiff at trial. Plaintiff reserves his right to contest them should trial be necessary.

[2] For purposes of this opposition only, Plaintiff stipulates the same "well-pleaded" facts that Defendant MBCR has accepted for purposes of their Motion to Dismiss (Motion to Dismiss, Footnote 3).

1

(31)

3. In 2002, after an investigation held in accordance with the CBA, Plaintiff was terminated by Amtrak *[Defendant MBCR's Attachment A, Pl. Second Am. Compl. Docket No. 03-12488-PBS Paragraph 12, 128, 331 & 363; Attachment B, Pl. Petition for Review Docket No. 05-10185-PBS, Paragraph 41 and Exhibit U]*.

4. Plaintiff appealed his termination through his union, The International Brotherhood of Locomotive Engineers ("BLE"); Plaintiff's appeal was denied; and Plaintiff subsequently petitioned this Honorable Court for review of the Public Law Board's award (*See Docket No. 05-10185-PBS* and *Plaintiff Exhibit K*).

5. After termination from his position, Plaintiff continued to file time claims in person at North Station in Boston and South Station in Boston in accordance with the CBA (*Plaintiff Exhibit I*).

6. The term for the local organizations of the BLE is division. The division that represents commuter rail in Boston (and of which Plaintiff was a member) was Division 57 ("BLE-57").

7. Most Grievances in BLE Division 57 are processed as Time Claims. The BLE on Amtrak and MBCR provides for only two means for adjustment of grivances. The initial step provided by the CBA is for the agrieved employee to file for monetary damages. Parallel to a claim for Damages, the Greivant (or his Representative) begins negotiation of the specifics of his claim by means of the machinery ouytlined by the *Railway Labor Act* ("*RLA*") for adjustment of "minor disputes". The process for handling of the time claim for damages is outlined in *CBA Rule 20. Exhibit S*. The only other rule for adjustment of grievances is *CBA Rule 21. Exhibit S. Rule 21* of the *CBA*, "Discipline and Investigation" outlines the detailed arbital scheme for adjustment of Discipline. This is a strictly defensive machinery.

8. Plaintiff's termination from Amtrak stems from a Medical Disqualification of Plaintiff by Plaintiff's Supervisor, Michael J. O'Malley, with concurrence from the Amtrak Medical Director, Dr. Timmie Pinsky. *Exhibits V and W*. Mr. O'Malley was hired by MBCR on or about June 2003.

9. Plaintiff was medically disqualified from his position as Locomotive Engineer on May 4, 2005 when Plaintiff's superior, O'Malley, received an electronic mail letter from Amtrak's Manager of Health Services stating that Plaintiff should be medically disqualllified pending and FFD exam. *Exhibit V*. Dr. Pinsky stated that Plaintiff's grievances and written union discussion "raised the index of suspicion" indicating that Plaintiff was suffering from a "severe psychiatric disorder". *Exhibit W*.

10. Plaintiff asserts continued membership in the BLE *[Plaintiff's Exhibit H, BLE Statutes Section 25 Para. (C) and BLE Constitution Section 28 Para. (H)(7)]*.

11. The *BLE Constitution* requires the Local Committee of Adjustment and the General Committee of adjustment to assist members with grievances. *Exhibit H.* However, the Constitution does not allow the Local Committee or its chairman to act on any grievance without approval of the Division in session. In order to get approval from the Division, the grievant would need to subject his grivance to discussion and vote. BLE-57 refers to activities so authorized as "division actions".

12. After termination from Amtrak, Plaintiff frequently passed through South Station in Boston on his way to file unemployment claims with the Railroad Retirement Board in Boston. *Exhibits G and P.*

13. Plaintiff often encountered Amtrak employees on these occasions and often was engaged in casual conversation with those employees. On occasion, Plaintiff would also file time claims in a claim box designed for that purpose or leave his belongings with a fellow employee in the employee lounge. *Exhibit P.*

14. In mid-August 2002, while Plaintiff was walking through South Station on his way to the Railroad Retirement board, Plaintiff encountered a commuter rail employee, Ms. Cheri Thompson. Plaintif asked Ms. Thompson some questions related to a complaint Plaintiff filed with the Massachusetts Commission Against Discrimination. *Exhibits P and X.*

15. Plaintiff's superiors learned about the encounter and sent Plaintiff a letter which warned Plaintiff that his "presence in employee areas at North or South Station is trespassing". The letter also warned Plaintiff that Amtrak was pursuing "legal guidance relative to [Plaintiff's] contact with Amtrak employees on Amtrak/MBTA railroad property", *Exhibit A.*

16. After consulting with BLE representatives Richard Prone and Michael O'Bryan and pursuant to their suggestions, Plaintiff responded to Amtrak's trespassing letter with a letter asserting union privilege in those areas.

17. Plaintiff also claimed rights of free association in the stations generally. *Exhibit B.*

18. A few weeks later, however, Mr. O'Bryan refused to assist Plaintiff with his claims, *Exhibit J).*

19. Beginning in May 2003, Plaintiff accepted a "conditional offer of employment" from MBCR. MBCR's offer was in accordance with the *CBA between MBCR and BLE Part I, section 4*; *Exhibit Q.*

20. The letter included explicit instructions to return the letter by May 15, 2003: "The signed letter, the Pre-Employment Medical Questionnaire, and the medical record authorization form must be completed and returned to MBCR, with a copy to the BLE General Chairman, no later than May 15, 2003. ... **MBCR shall have no**

3

**further employment obligations to individuals who fail or decline to return the required documentation or who decline to take the drug and alcohol tests.** Therefore, it is imperative that you return the documentation to MBCR by May 15th.", *Plaintiff Exhibit. $C_1$* (emphasis in original).

21. MBCR received the required documents from Plaintiff on May 15, 2003 by Certified Mail 7001 1940 0005 7197 9945, *Plaintiff Exhibits $C_1$ and $C_2$*.

22. The requirement for the completion and return of these documents was mandated by the CBA, *CBA between MBCR and BLE Part I, section 4: Exhibit Q*.

23. The requirement also qulaifies employees with MBCR/BLE agreement rights: "Those employees who timely complete[d] the process described in this paragraph are referred to hereinafter as 'eligible employees'" (*id.*).

24. Sometime later in the month, the Plaintiff received a bidding packet from MBCR, including instructions. The bidding packet and instructions were sent to the Plaintiff pursuant to *CBA between MBCR and BLE Part I, section 4, paragraph B* (*Exhibit Q*).

25. The packet included a list of engineer jobs, bidding materials and instructions requiring that "All bids must be received by June 4, 2003". MBCR received a completed bid from the Plaintiff on May 27, 2003 (*Plaintiff Exhibit $C_3$*).

26. Having completed the application process, Plaintiff expected to covered by the *CBA*. From May 15, 2003 until July 1, 2003 Plaintiff made repeated calls to MBCR to make arrangements for a drug test. Plaintiff had several conversations during this time with Human Resources official Dennis Coffey and the MBCR Labor relations Manager Christa Cupernall (now Christa Phillips). Mr. Coffey told the Plaintiff that he had no knowledge of his previous history with Amtrak. Plaintiff also attempted to confer with Mr. Michael O'Malley, who had been a superior of the Plaintiff's at Amtrak. At some point during this time the Plaintiff received a list of awards. The Plaintiff was not listed on the MBCR Roster. The Plaintiff was not listed with an assigned position. Plaintiff failed to make contact with Mr. O'Malley and by July 1, 2003 both Coffey and Phillips had told Plaintiff that they didn't have time to address his interest in MBCR. *Exhibit P*.

27. At times on Amtrak and MBCR, an engineer will be in an "unassigned" status. In these instances an Engineer is required, within a specified amount of time, to "exercise his seniority" or forfeit it. MBCR engineer who were unassigned on July 1, 2003 hhad 5 days to exercise thir seniority or forfeit their jobs with MBCR.

28. Traditionally, Engineers in Division 57. exercise seniority by "displacement". An engineer "bumps" or "displaces" a vacant position. Alternatively, an engineer may choose to "bump" a junion employee of a position that the engineer prefers over

4

the vacant position. In turn, the displaced employee becomes unassigned and displaces whichever job he prefers until the vacant position is filled or a most junior employee is laid off.

29. When an engineer displaces a position, the employee is normally required to "physically displace" a position. The employee reports to work at the report time of the position that the employee wishes to displace and the displacing employee hads the newly displaced employe and the supervisor a "displacement notice" which advises the junior employee and the supervisor in writing of the displacement.

31. On or about May 6, 2003, Plaintiff received a letter from BLE General Chairman Mark Kenny. The letter told of the Public Law Board's denial of Plaintiff's claims against Amtrak, (*Plaintiff's Exhibit K*).

32. During the Months of May and June Plaintiff made phone calls to the National Mediation Board ("NMB"), a government organization mandated by the *Railway Labor Act (45 U.S.C. 151 et. seq.)* which appointed the "neutral" member of the public law board (System Board of Adjustment No. 928, "Board"). Finally, Plaintiff discussed his options with the NMB's Public Information officer, Mr. Don West (*Plaintiff's Exhibit P*).

33. Mr. West agreed that, in spite of the Board's negative decision against Plaintiff, Plaintiff had *CBA* grievance options that would allow Plaintiff to bring specific elements of the decision before National Railroad Adjustment Board, but Plaintiff would need his union's support to do that (*Plaintiff's Exhibit P*).

34. In June 2003, the Plaintiff attended a meeting of the BLE at which only three other members were present. At the meeting, Plaintiff raised a number of issues pursuant to outstanding "Time Claims" on Amtrak and Plaintiff's pending employee status with MBCR. The members present refused to discuss Plaintiff's grievances because the Local Chairman wasn't present. In addition, the member who chaired the meeting informed the Plaintiff that the Local Chairman, Mr. O'Bryan, planned to oppose the Plaintiff's membership in the BLE. (*Plaintiff's Exhibit P.*).

35. On July 1, 2003, Plaintiff went to North Station to contact members of the BLE in order to approach members directly and solicit assistance and support regarding his claims and grievances. Plaintiff had no car and no phone list. The only way to contact other engineers to canvas votes for division action regarding his time claims and grievances was by contacting other engineers at stations. Plaintiff brought copies of an information letter which contains the heading "Open Letter to Division-57" and details facts and arguments concerning his grievances. On the reverse side of the letter is a fact sheet which the Plaintiff called a "Leaflet" which included the words "BLE ALERT! ATTN. ALL LOYAL UNION EMPLOYEES OF MBCR IN ANY UNION!" The back page also included the words: "PLEASE POST AND DISTRIBUTE!", (*Plaintiff's Exhibit E*).

36. North and South stations have very large internal waiting areas, pedestrian traffic areas, waiting areas, market areas and lounge areas were people congregate. There are a number of entrances and exits. Engineers and train service personnel congregate in these areas on and off duty. Engineers and train service personnel have lengthy break periods between rush hours (three or four hours) when they are considered to be off duty.

37 Engineers, on and off duty, congregate inside the stations and only occasionally exit the outer environs of the stations. If they leave the station, they usually take a train to the employee rest lounges in the yards at the Boston Engine Terminal (North Station) or Service and Inspection Facility "S and I" at Southampton Street Yard (South Station). Or they enter the employee lounge or the 'quiet room' located at the basement at South Station. (In addition to the basement at South Station there are employee lounges and 'quiet rooms' at both yards.

38. After the Plaintiff entered the station, he began talking to BLE members and others. The Plaintiff handed over copies of his "open letter" to some of the people who were speaking to the Plaintiff, After some time, Trainmaster Jacqueline Boumel called the MBTA police. Answering Ms. Boumel's call, Officer Robert Pavia of the MBTA police approached Plaintiff and questioned Plaintiff regarding Plaintiff's activities. Officer Pavia specifically asked Plaintiff about Plaintiff's union affiliation and the union issues Plaintiff was raising in his open letter. The officer threatened to search the Plaintiff. Following the threat, the Plaintiff surrendered the Plaintiff's "Rail Pass" to officer Pavia. At approximately 4:15 PM, Officer Pavia evicted the Plaintiff from the station. Officer Pavia warned the Plaintiff that Plaintiff would be arrested if Plaintiff returned to North Station (*Plaintiff's Exhibits G and P*)..

39. On or about August 30, 2005, Plaintiff spoke to MBTA trial counsel Jonathan Feltner. Mr. Feltner told Plaintiff that, per contract with MBCR, MBTA gives controlling authority over North and South stations to MBCR.

**Respectfully submitted,**

Date: January 17, 2006

Joseph T. Carmack, Plaintiff, Pro Se.
398 Columbus Ave, PMB 130
Boston, MA  02116-6008
Work: 617/727-2310 ext. 7045 Home: 617/536-0772 Pager w/voice mail:  617/798-6466

**Certificate of Service**

6

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Robert K. Blaisdell, Attorney for the Massachusetts Bay Commuter Railroad Co. at One Beacon Street, Suite 1320 Boston, Massachusetts 02108-3113

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Todd Valicenti, Attorney for Massachusetts Bay Transportation Authority at 10 Park Plaza Room 3910, Boston, MA 02116.

DATED: January 17, 2006

Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave, PMB 130
Boston, MA 02116-6008

Work: 617/727-2310 ext. 7045 Home: 617/536-0772 Pager w/voice mail: 617/798-6466

I, Joseph T. Carmack, hereby certify that I have on January 17, 2006 served a true copy of the foregoing document by First Class U.S. Mail to Stephen A Hughes, Attorney for the Defendant, National Railroad Passenger Corporations at One Liberty Square - 6th Floor, Boston, MA 02109.

DATED: January 17, 2006

Joseph T. Carmack
Plaintiff, Pro Se
398 Columbus Ave, PMB 130
Boston, MA 02116-6008
Work: 617/727-2310 ext. 7045
Home: 617/536-0772
       Pager w/voice mail: 617/798-6466