UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,        )
                                    )
         Plaintiff,       )
    v.                        )
                                  )     CIVIL ACTION
MASSACHUSETTS BAY     )  NO. 05-11430-PBS
TRANSPORTATION AUTHORITY  )
and MASSACHUSETTS BAY    )
COMMUTER RAILROAD COMPANY,  )
                                  )
        Defendants.     )

# REPORT AND RECOMMENDATION ON
# DEFENDANT MBCR'S MOTION TO DISMISS

September 22, 2006

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff Joseph T. Carmack ("Mr. Carmack") has brought two actions, pro se,

challenging his termination from employment as a locomotive engineer for the National

Railroad Passenger Corporation ("Amtrak") and his subsequent treatment during his

efforts to be reinstated.  The first action, Civil Action No. 03-12488-PBS, was brought

against Amtrak only.  Discovery has been ongoing in that matter (the "Amtrak case") and

Amtrak has filed a motion for summary judgment, which is presently pending before the

court.

In the instant case, filed in 1995, Mr. Carmack has sued the Massachusetts Bay

Transportation Authority ("MBTA") and the Massachusetts Bay Commuter Railroad

Company ("MBCR").  Each of these defendants has filed a motion to dismiss the

complaint against it pursuant to Fed. R. Civ. P. 12(b)(6).  The instant Report and

Recommendation relates to MBCR's motion (Docket No. 15), by which MBCR is

seeking dismissal of all fifteen counts of the plaintiff's First Amended Complaint.[1]

     For the reasons detailed below, this court recommends to the District Judge to

whom this case is assigned that MBCR's motion to dismiss (Docket No. 15) be

ALLOWED IN PART and DENIED IN PART.  Specifically, this court recommends that

the Railway Labor Act claim asserted against MBCR in Count I, and the claims set forth

against MBCR in Counts II-IX and XI-XV be dismissed, but that MBCR's motion to

dismiss otherwise be denied.  Thus, the only remaining claims against MBCR would be

Mr. Carmack's claims pursuant to 42 U.S.C. § 1983 and the Massachusetts Civil Rights

Act, Mass. Gen. Laws ch. 12, § 11, which are asserted in Count I, and Mr. Carmack's

claims for discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12112, and the Rehabilitation Act, 29 U.S.C. § 701, which are asserted in Count X.

## II.  <u>STATEMENT OF FACTS</u>

     When ruling on a motion to dismiss, the court must accept as true all well-pleaded

facts, and give the plaintiff the benefit of all reasonable inferences.  <u>See</u> <u>Cooperman v.</u>

<u>Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999).  "Ordinarily, of course, any considera-

---

[1] In a separate Report and Recommendation issued on September 1, 2006, this court recommended that MBTA's motion to dismiss Counts II-XV of the First Amended Complaint be allowed.

tion of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).[2] Applying this standard to the instant case, the relevant facts are as follows.

## The Parties

Mr. Carmack was employed by Amtrak as a Locomotive Engineer on Massachusetts commuter rail trains from December 1996 until his termination by Amtrak on May 13, 2002. (Am. Compl. ¶¶ 13, 121). Mr. Carmack has been a member of the union, the Brotherhood of Locomotive Engineers ("BLE"), since 1998. (Id. ¶ 14). Defendant MBTA is a state agency that was established pursuant to Massachusetts statutory law. (Id. ¶ 3). It is responsible for the administration of transportation services throughout the Commonwealth. (Id.). During the time Mr. Carmack was employed as a Locomotive Engineer, Amtrak operated commuter rail services pursuant to a contract with MBTA. (Id. ¶ 10). In the Fall of 2002, defendant MBCR replaced Amtrak, and entered into a contract with MBTA whereby MBCR agreed to take over the operation of commuter rail services within the Commonwealth of Massachusetts beginning on July 1, 2003. (Id. ¶ 9). MBCR is a for profit corporation, which is organized under the laws of Massachusetts. (Id. ¶ 4). Both MBCR and Amtrak maintain collective bargaining agreements with the BLE. (Id. ¶ 12).

---

[2] Because MBCR's motion to dismiss has not been converted into a motion for summary judgment, this court will not consider the substantial factual record submitted by the plaintiff.

In Counts I and X of his First Amended Complaint, Mr. Carmack is seeking to hold MBCR liable for the conduct of its own personnel.  In Counts II-IX and XI-XV, Mr. Carmack is seeking to hold MBCR liable, apparently based on a theory of successor liability, for actions taken solely by Amtrak employees during the time when Mr. Carmack worked for Amtrak.  (See id. § IV at p. 5 (alleging "successor and joint liability claims" against the defendants for Amtrak's actions)).  However, Mr. Carmack has not alleged any facts showing that MBCR had any contractual relationship with Amtrak or was otherwise affiliated with Amtrak.

### Circumstances Leading to Plaintiff's Discharge from Employment

According to Mr. Carmack, the events leading up to his allegedly wrongful termination from Amtrak began in the Spring of 2001.  Specifically, on or about April 4, 2001, Mr. Carmack wrote a letter to the BLE's Local Chairman and other union members in which he "expressed belief in spiritual forces exerting positive and negative moral, spiritual and ethical influence of human beings."  (Id. ¶ 161).  Shortly thereafter, Gerrard L. DeModena, one of the plaintiff's supervisors at Amtrak, began an oral and written "campaign portraying Plaintiff as a violent, dangerous and mentally unstable person who has threatened Mr. DeModena."  (Id. ¶ 29).  Mr. DeModena allegedly conspired with other named Amtrak employees to falsely and maliciously portray Mr. Carmack.  (Id. ¶ 32).  In addition, Mr. DeModena and other named Amtrak employees allegedly distributed written materials wrongfully characterizing the religious beliefs expressed in Mr. Carmack's April 4, 2001 letter as indicative of a mental impairment and falsely

4

describing the plaintiff's mental condition and ability to perform his job.  (Id. ¶¶ 34-41, 163-65).  Mr. DeModena was an Amtrak employee at the time when these events occurred; however, Mr. Carmack asserts that Mr. DeModena "became subsumed into the operations of MBCR on or about July 1, 2003."  (Id. ¶ 28).  Mr. Carmack also asserts, throughout the Amended Complaint, that these and other allegedly wrongful actions were taken by agents, servants and employees of the "Defendants."  (See e.g., id. ¶¶ 32, 39, 164).

In April 2001, members of the Amtrak Threat Assessment Response Team ("TART") responded to Mr. DeModena's complaint that Mr. Carmack had threatened him, and evaluated materials that reportedly had been written by Mr. Carmack.  (Id. ¶¶ 51-52).  Although the TART team was unable to assess a threat or any cause for Mr. Carmack to be disciplined, it determined, based upon Mr. DeModena's representations, that the plaintiff should undergo a psychological examination.  (Id. ¶¶ 53-54).  Thereafter, on about May 3, 2001, Amtrak's Medical Director, Dr. Tim Pinsky, allegedly prepared and disseminated medical reports that falsely and maliciously characterized Mr. Carmack's mental condition.  (Id. ¶ 62).  Dr. Pinsky also allegedly directed Amtrak's Manager of Health Services to inform Mr. DeModena and other Amtrak employees that Dr. Pinsky "deemed Plaintiff medically disqualified pending a psychiatric evaluation and psychological testing."  (Id. ¶ 63).  As a result, Mr. Carmack was medically disqualified from service as a Locomotive Engineer for the commuter rail on May 4, 2001.  (Id. ¶ 66).

Following the plaintiff's disqualification, Amtrak ordered Mr. Carmack to undergo psychiatric evaluations and extensive psychological testing by Dr. Russell Vasile, a psychiatrist. (Id. ¶¶ 76-77). However, the plaintiff believed, based upon the advice of his own physician, that such testing would prove medically harmful, and he notified his superiors at Amtrak, as well as Drs. Vasile and Pinsky, of his concerns. (Id. ¶¶ 78, 87, 101-106). Mr. Carmack also sought reasonable accommodations that would limit the extent of the testing and any disclosures resulting therefrom, but Amtrak rejected his requests and suggestions for such accommodations. (Id. ¶¶ 89-94; 101-116). Instead, according to Mr. Carmack, Amtrak wrongfully charged him with insubordination for failing to submit to the testing. (Id. ¶¶ 116-17). On May 13, 2002, following a hearing by a "Hearing Officer in service to Amtrak," Amtrak fired Mr. Carmack for insubordination. (Id. ¶¶ 115-122).

### MBCR's Refusal to Hire the Plaintiff

On May 6, 2003, nearly one year after Mr. Carmack's termination from Amtrak, MBCR's General Manager offered Mr. Carmack a job as a locomotive engineer. (Id. ¶ 15). According to Mr. Carmack, the offer was in accordance with his seniority and with MBCR's agreement with the BLE. (Id.). Mr. Carmack "accepted employment with MBCR and submitted appropriate application materials to MBCR." (Id. ¶ 16). However, when MBCR awarded the locomotive engineer positions on June 24, 2003, it omitted Mr. Carmack from the award list. (Id. ¶ 17). Mr. Carmack alleges that MBCR wrong-fully failed to hire him based on information from employees who were former agents of

Amtrak that the plaintiff was violent and dangerous as a result of mental illness. (Id. ¶ 128).

### Plaintiff's Eviction from North Station

On July 1, 2003, Mr. Carmack went to North Station in Boston in order "to contact other union members to solicit assistance and support to enforce plaintiff's seniority rights in accordance with [the] MBCR/BLE agreement, the Railway Labor Act and the Constitution of [the BLE]" and to hand out written informational materials to other union members. (Id. ¶¶ 20-21). North Station is one of two hub stations in Boston from which MBCR operates commuter trains. (Id. ¶ 11). According to Mr. Carmack, he remained in the public access areas of the station. (Id. ¶¶ 20, 22).

Allegedly, after Mr. Carmack had arrived at North Station and had spoken to a few union members in the public access areas of the facility, MBCR's Transportation Manager called the MBTA police in order to have Mr. Carmack removed. (Id. ¶ 22). In response to the call, an MBTA police officer approached the plaintiff and confiscated some of his informational materials. (Id. ¶ 23). After establishing that Mr. Carmack's materials concerned union issues and union agreement matters, the officer evicted the plaintiff from the public access areas of North Station. (Id. ¶ 24). Mr. Carmack also alleges that the MBTA police officer warned him that he would be charged with trespassing and arrested if he were discovered at any MBTA stations. (Id. ¶ 25).

In Count I of the Amended Complaint, Mr. Carmack asserts that MBCR's participation in his eviction from North Station violated his federal and state civil rights,

as well as his rights under the Railway Labor Act.  Additionally, when the Complaint is

read liberally, it appears that in Count X, Mr. Carmack is asserting that MBCR's failure

to hire him based on information that he was dangerous due to mental illness constituted

unlawful discrimination in violation of the ADA and the Rehabilitation Act.  (See id.

¶ 128).  The remaining claims, including those asserted in Counts II-IX and in Counts

XI-XV, only relate to conduct by Amtrak employees that took place prior to the time

when MBCR entered into its agreement with MBTA to operate the commuter rail.  Thus,

Mr. Carmack asserts that because of the actions of Mr. DeModena and others in

disseminating oral and written information portraying the plaintiff as dangerous and

mentally unstable, Amtrak's attempts to perform psychiatric evaluations and psychologi-

cal testing without any accommodation to the plaintiff, and Amtrak's decision to

discharge Mr. Carmack for insubordination, he is entitled to damages for slander, libel

and defamation (Count II), invasion of privacy (Count III), unlawful discrimination

(Counts IV-VII), harassment (Count VIII), retaliation (Count IX), wrongful interference

with union activities and safety campaigns (Count XI), unfair labor practices (Count XII),

discrimination on the basis of religion (Count XIII), intentional infliction of emotional

distress (Count XIV) and wrongful discharge in violation of public policy (Count XV).

This court finds that in Count I, Mr. Carmack has failed to state a claim against MBCR

under the Railway Labor Act.  This court also finds that Mr. Carmack has failed to state

claims against MBCR in Counts II-IX and XI-XV.  However, MBCR is not entitled to

dismissal of the federal and state civil rights claims asserted against it in Count I or the

ADA and Rehabilitation Act claims asserted against it in Count X.

### III.  <u>ANALYSIS</u>

#### A.    <u>Standard of Review</u>

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.

Thus, when confronted with a motion to dismiss, the court accepts as true all well-

pleaded facts and draws all reasonable inferences in favor of the plaintiff.  <u>Cooperman</u>,

171 F.3d at 46.  "Dismissal under Fed. R. Civ. P. 12(b)(6) is only appropriate if the

complaint, so viewed, presents no set of facts justifying recovery."  <u>Id.</u>; <u>Conley v.</u>

<u>Gibson</u>, 355 U.S. 41, 45-48, 78 S. Ct. 99, 101-103, 2 L. Ed. 2d 80 (1957).

Under the liberal notice pleading standard established by Fed. R. Civ. P. 8(a), a

plaintiff is required to submit "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Accordingly, "[p]laintiffs only are

obligated to set forth in their complaint factual allegations either direct or inferential,

regarding each material element necessary to sustain recovery under some actionable

legal theory."  <u>Raytheon Co. v. Cont'l Cas. Co.</u>, 123 F. Supp. 2d 22, 26-27 (D. Mass.

2000) (quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988)).  "The

Rules 'do not require a claimant to set out in detail the facts upon which he bases his

claims.'"  <u>Id.</u>  (quoting <u>Leatherman v. Tarrant County Narcotics Intelligence &</u>

<u>Coordination Unit</u>, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)).

Nevertheless, "[t]he pleading requirements, though 'minimal' are not 'non-existent.'

Modern notions of 'notice pleading' notwithstanding, a plaintiff is nonetheless required to set forth factual allegations, either direct or inferential, *respecting each material element necessary to sustain recovery under some actionable legal theory*." Rumford Pharmacy, Inc. v. City of E. Providence, 970 F.2d 996, 998 (1st Cir. 1992) (internal citations omitted; emphasis in original).   When these principles are applied to the instant case, this court concludes that MBCR's motion to dismiss should be allowed with respect to the Railway Labor Act claim set forth in Count I and to Counts II-IX and XI-XV. However, MBCR has not demonstrated that its motion should be allowed with respect to the state and federal civil rights claims asserted in Count I or to the discrimination in hiring claim set forth in Count X.

**B.     Count I: Federal Civil Rights Claim Pursuant to 42 U.S.C. § 1983**

**1.     Claims Under 42 U.S.C. § 1983 in General**

In Count I of his First Amended Complaint, Mr. Carmack asserts a claim against MBCR, pursuant to 42 U.S.C. § 1983, for alleged violations of his constitutional rights. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quotations and citation omitted).  It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "To prevail in a § 1983 claim, plaintiffs 'must allege facts sufficient to support a determination (i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States.'" Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005) (quoting Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 32 (1st Cir. 1996)) (alteration in original).  In the instant case, MBCR contends that Mr. Carmack's § 1983 claim should be dismissed because the plaintiff has failed to allege that MBCR was a governmental agency or was acting under color of state law, and instead has alleged that MBCR is a "for profit corporation."  (Def.'s Mem. (Docket No. 16) at 7).

As described below, this court finds that Mr. Carmack has alleged sufficient facts to support a claim that MBCR was acting under color of state law when it participated in his eviction from North Station.  Accordingly, this court recommends that the defendant's motion to dismiss the § 1983 claim set forth in Count I be denied.

### 2.    "Under Color of Law" Requirement

The substance of Mr. Carmack's § 1983 claim against MBCR is that the defendant violated his First Amendment rights to freedom of speech, association and assembly by seeking his eviction from the public access areas of North Station when he was attempting to communicate with other union members and distribute written materials.

11

(Am. Compl. ¶¶ 20-26). However, "[b]ecause section 1983 does not reach private actions," Mr. Carmack must show that "the conduct at issue in this case may be fairly attributable to the State."[3] Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R., 84 F.3d 487, 491 (1st Cir. 1996) (internal quotations and citations omitted). See also Yeo v. Town of Lexington, 131 F.3d 241, 248 n.3 (1st Cir. 1997) ("The question whether [plaintiff] even has a First Amendment right to assert depends on whether there is state action."). This may be accomplished by establishing that the defendant was not a private entity but an extension of the government engaged in direct state action. See Barrios-Velazquez, 84 F.3d at 491-92 (analyzing whether defendant was a private party or an arm of the state engaged in direct state action). Alternatively, the plaintiff may establish that even if the defendant is a private organization, "the actions that give rise to the instant case may still be fairly attributed to the state as indirect state action." Id. at 491. Accordingly, "actions of private entities can sometimes be regarded as governmental action for constitutional purposes." Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378, 115 S. Ct. 961, 964, 130 L. Ed. 2d 902 (1995). While Mr. Carmack has not specifically asserted that MBCR was acting under color of state law

---

[3] "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R., 84 F.3d 487, 491 (1st Cir. 1996) (quoting Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S. Ct. 2764, 2769-70, 73 L. Ed. 2d 418 (1982)). Consequently, "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the State?" Id. (internal quotations omitted).

when its Transportation Manager allegedly requested that the MBTA police remove him

from the public access areas of North Station, he has alleged facts that could give rise to a

finding of indirect state action.[4]

In evaluating whether the conduct of an otherwise private actor constitutes indirect

state action,

> courts conventionally have traveled a trio of analytic avenues,
> deeming a private entity to have become a state actor if (1) it
> assumes a traditional public function when it undertakes to
> perform the challenged conduct, or (2) an elaborate financial
> or regulatory nexus ties the challenged conduct to the State,
> *or* (3) a symbiotic relationship exists between the private
> entity and the State.

Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir. 1999). The satisfaction

of any one of these tests requires a finding of indirect state action. Barrios-Velazquez, 84

F.3d at 493. In addition, where "[t]he nominally private character of [an organization] is

overborne by the pervasive entwinement of public institutions and public officials in its

composition and workings, and there is no substantial reason to claim unfairness in

applying constitutional standards to it," the conclusion is that there is state action.

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 298, 121 S. Ct.

---

[4] Mr. Carmack has not alleged any facts to suggest that MBCR is a direct state actor. For example, he has not alleged that MBCR is a state agency or that it was created by the government for the purpose of furthering governmental objectives and is controlled by the government. See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 398, 115 S. Ct. 961, 974, 130 L. Ed. 2d 902 (1995) (finding Amtrak to be part of the government for purposes of the First Amendment notwithstanding a statutory disclaimer of government agency status where it was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees.").

924, 932, 148 L. Ed. 2d 807 (2001). See also Evans v. Newton, 382 U.S. 296, 299, 86 S.

Ct. 486, 488, 15 L. Ed. 2d 373 (1966) ("Conduct that is formally 'private' may become so

entwined with governmental policies or so impregnated with a governmental character as

to become subject to the constitutional limitations placed upon state action."). The

inquiry, under any of these theories, is necessarily fact-intensive, and the ultimate

conclusion regarding state action must be based on the particular facts and circumstances

of the case. See Brentwood Acad., 531 U.S. at 298, 121 S.Ct. at 932; Perkins, 196 F.3d

at 18. This court finds that Mr. Carmack has alleged enough facts to support a claim that

MBCR was a state actor based on the traditional public function and symbiotic

relationship theories.

### Traditional Public Function Analysis

"The public function analysis is designed to flush out a State's attempt to evade its

responsibilities by delegating them to private entities." Perkins, 196 F.3d at 18-19. In

order to show that the actions of a private defendant are fairly attributable to the state

under such a theory, "a plaintiff must show more than the mere performance of a public

function by a private entity; [he] must show that the function is one *exclusively* reserved

to the State." Id. at 19. Although the government involves itself in many types of

activities, including the operation of passenger trains, "few of those activities come

within the State's exclusive preserve." Perkins, 196 F.3d at 19. The courts have held that

certain functions, including "the administration of elections, the operation of a company

town, eminent domain, peremptory challenges in jury selection, and, in at least limited

circumstances, the operation of a municipal park," are exclusively reserved to the State. Id. (quoting United Auto Workers v. Gaston Festivals, Inc., 43 F.3d 902, 907 (4th Cir. 1995)). Ordinarily, a plaintiff's attempt to expand this list involves "an uphill climb." Id. Nevertheless, at this early stage in the litigation, the facts alleged regarding the circumstances of Mr. Carmack's eviction from North Station are adequate to support a claim that MBCR was engaged in a traditional public function.

Mr. Carmack's allegations are similar to the facts asserted in Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F. Supp. 65 (D. Mass. 1990). In that case, the court held that security guards employed by a private corporation performed a traditional public function when they arrested citizens who were distributing leaflets and holding a protest on public walkways. Citizens to End Animal Suffering, 745 F. Supp. at 70-72. Although the property was leased to a private entity, the walkways on which the plaintiffs wished to protest were encumbered by an easement for public access. Id. at 70. In finding that the defendant's security guards were state actors, the court determined that the walkways were "similar to public streets, the regulation of which is a 'public function.'" Id. at 71. The court also concluded:

> here, the [defendant] is acting as more than a private contractor. Its function goes beyond the mere maintenance of a public way. By prohibiting protesters from assembling in the lanes, the [defendant] is deciding who can use the public easement, and under what circumstances they can use it. Rather than acting as a private contractor, therefore, the function performed by the [defendant] is more akin to that of a policeman. This, it seems, is a function that has traditionally been the exclusive domain of the state.

Id. at 71-72.

Here, Mr. Carmack alleges that MBCR's Transportation Manager acted in concert with MBTA police to evict Mr. Carmack from the public areas of North Station while he was soliciting assistance from fellow union members and attempting to hand out written materials. (Am. Compl. ¶¶ 20-24). Thus, like the defendant in Citizens to End Animal Suffering, the MBCR was not acting simply as a private contractor operating commuter trains, but was deciding who could use the public access areas of the commuter rail station and the circumstances under which they could use such areas.[5] Under the liberal notice pleading standards of Fed. R. Civ. P. 8(a), these allegations are sufficient to assert a claim that MBCR was acting under color of state law.

## Symbiotic Relationship Analysis

Additionally, when the facts alleged in the Amended Complaint, as well as all reasonable inferences derived therefrom, are viewed in the plaintiff's favor, this court

---

[5] MBCR argues that the claims based on Mr. Carmack's eviction from North Station should be dismissed because MBCR's duties under its contract with MBTA involved the operation and management of the commuter rail services, but did not include an ownership interest in or control over MBTA property. (Def.'s Mem. at 7). Whether or not MBCR had actual authority to regulate access to North Station, Mr. Carmack has adequately alleged that MBCR exercised enough control over the property to have him removed from the premises. Moreover, MBCR's argument that even if it did own the property, the plaintiff could legally be barred from North Station because he would have been trespassing on private property is also unpersuasive. Even if the public access areas of North Station were considered a nonpublic forum, any restrictions on the plaintiff's right of access under the First Amendment would need to be reasonable. See Citizens to End Animal Suffering, 745 F. Supp. at 75 ("restrictions in a nonpublic forum need only be reasonable to be valid"). Mr. Carmack's allegations that he was evicted simply for visiting the public access areas of North Station and communicating with union members are adequate at this stage of the proceeding to assert a claim of unreasonableness.

finds that they are sufficient to support a claim of state action under a symbiotic

relationship analysis.[6]  Under this test, a private party's acts may be attributable to the

state where "the government 'has so far insinuated itself into a position of

interdependence with (the private entity) that it must be recognized as a joint participant

in the challenged activity.'" Perkins, 196 F.3d at 21 (quoting Burton v. Wilmington

Parking Auth., 365 U.S. 715, 725, 81 S. Ct. 856, 862, 6 L. Ed. 2d 45 (1961)) (alteration

in original).  Thus, the examination "concentrates . . . on the nature of the overall

relationship between the State and the private entity." Id.  Although a finding of

symbiosis should be based on "the totality of the circumstances, the case law suggests

some factors to which courts typically attach special weight.  The most salient of these is

the extent to which the private entity is (or is not) independent in the conduct of its day-

to-day affairs." Id.  "Relatedly, the circumstances surrounding a private entity's use of

public facilities warrant careful attention." Id.  Another key factor is whether and to what

extent the State knowingly shared in profits derived as a result of the challenged conduct.

Id.  However, "the lack of that financial characteristic is not necessarily dispositive.  The

---

[6]  The symbiotic relationship test was first articulated by the Supreme Court in Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961).  Since that time, "the Court has either distinguished or ignored Burton's broadest language[,]" thereby calling into question the extent to which it remains good law.  Perkins, 196 F.3d at 20.  Nevertheless, because Burton has never been overruled, and the First Circuit has declined to rule on whether the parameters of the symbiotic relationship test have in fact been narrowed, this court will assume that it remains intact.  See id. at 20 ("we need not determine today either the extent to which Burton remains good law or whether the parameters of what constitutes state action may change depending on the nature of the right at issue.").  See also Barrios-Velazquez, 84 F.3d at 494-95 (applying the symbiotic relationship test as set forth in Burton).

test is one of interdependence and joint participation, rather than one of financial enrichment."  Rodriguez-Garcia v. Davila, 904 F.2d 90, 98 (1ˢᵗ Cir. 1990).

Certain of the facts alleged in the plaintiff's First Amended Complaint are similar to facts that the court in Citizens to End Animal Suffering considered significant to its determination that the relationship between the defendant and the City of Boston was "sufficiently interdependent to be considered 'symbiotic'" and that constitutional scrutiny of the defendant's actions was warranted.  Citizens to End Animal Suffering, 745 F. Supp. at 74.  In particular, in that case the court found it significant that the defendant leased its property from the City and that the City reserved for public access and passage the walkways on which the plaintiffs wished to protest.  Id. at 73.  It also found it especially important that the City derived an economic benefit from the defendant's restrictions on the use of the walkways.  Id.

In the present case, Mr. Carmack has alleged facts indicating that MBCR conducts its commuter rail operations on property owned by the MBTA, which is a state agency. (Am. Compl. ¶¶ 3, 11, 22-25).  He also has alleged that the area of North Station in which he was attempting to communicate with union members and from which he was evicted was a public access area.  (Id. ¶ 24).  Under Citizens to End Animal Suffering,  these facts provide significant indicia of state action.  Although Mr. Carmack has not alleged any facts suggesting that the MBTA derived an economic benefit from MBCR's decision to restrict the plaintiff's access to North Station, such facts are not critical to a finding of symbiosis.  See Barrios-Velazquez, 84 F.3d at 494 (lack of financial enrichment not

18

controlling).  Consequently, Mr. Carmack should have the opportunity to develop the factual record in order to show why the actions of MBCR should fairly be attributable to the state based on a symbiotic relationship theory.

For these reasons, this court recommends that Mr. Carmack's claims under 42 U.S.C. § 1983 in Count I not be dismissed.

### C.    Count I: Claim Under Mass. Gen. Laws ch. 12, § 11

Mr. Carmack also claims, in Count I of his Amended Complaint, that the actions of MBCR in ordering his removal from North Station violated his civil rights under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11.[7]  MBCR is seeking dismissal of this claim pursuant to 28 U.S.C. § 1367(c)(3), which authorizes the district courts to "decline to exercise supplemental jurisdiction" over state law claims when "the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3).  As detailed above, this court does not recommend dismissal of all of Mr. Carmack's federal claims.  Therefore, MBCR's motion to dismiss the state civil rights claim contained in Count I should be denied.

### D.    Count I: Railway Labor Act Claim

---

[7]  Mass. Gen. Laws ch. 12, § 11H provides in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."  Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

In Count I, Mr. Carmack also asserts that the actions of MBCR in connection with his eviction from North Station violated the Railway Labor Act, 45 U.S.C. §§ 151 et seq. ("RLA").  In particular, Mr. Carmack asserts that the defendants' conduct interfered with his rights as a member of the BLE to associate with other union members.  (Pl.'s Mem. (Docket No. 29) at 4).  MBCR argues that this claim should be dismissed because the RLA only applies to employees and Mr. Carmack was never an employee of MBCR. This court agrees that the protections of the RLA extend only to employees of a carrier and that Mr. Carmack has failed to state a claim for relief under the statute.

The RLA was designed "to facilitate collective bargaining and to achieve industrial peace" between interstate carriers and their employees.  Int'l Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 47, 99 S. Ct. 2121, 2125, 60 L. Ed. 2d 698 (1979).  See also Nelson v. Piedmont Aviation, Inc., 750 F.2d 1234, 1236 (4th Cir. 1984) ("The purpose of the [RLA] is to establish the mechanics for collective bargaining between interstate carriers and their employees through freely selected representatives of both parties").  One of the statute's stated purposes is "to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization . . . ."  45 U.S.C. § 151a.  Thus, under the RLA, "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing."  Id. § 152 Fourth.

20

Mr. Carmack has not alleged any facts that would support an inference that he was an employee of MBCR at the time of the alleged incident at North Station.  The RLA defines an "employee" to include:

> every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Surface Transportation Board....

45 U.S.C. § 151 Fifth.  Mr. Carmack's eviction from North Station occurred on July 1, 2003, seven days after MBCR failed to award him a position as a locomotive engineer. (Am. Compl. ¶¶ 17, 20).  Indeed, the apparent purpose of Mr. Carmack's visit to North Station was to solicit assistance and support from other members of the BLE in order to enforce what Mr. Carmack asserts was his right to employment with MBCR.  (Id. ¶ 20). Nothing in the Amended Complaint suggests that Mr. Carmack was  "in the service of a carrier" or was performing any work for MBCR at the time of the eviction from North Station.  Therefore, Mr. Carmack is not entitled to the protections of 45 U.S.C. § 152 Fourth, prohibiting an employer from interfering with an employee's right to organize. See Nelson, 750 F.2d at 1236 (protections afforded to "employees" under the Railway Labor Act do not extend to job applicants and plaintiff could not maintain a claim arising out of a failure to hire).

Mr. Carmack argues that his status as an employee is not relevant to his claim under the RLA because the statute provides protections to his "representative," as defined in 45 U.S.C. § 151 Sixth, and that, as a member of the BLE, those protections apply to

him. (Pl.'s Mem. at 4). The term "representative" is defined in the RLA as "any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151 Sixth. Although the term "representative" does include labor unions, Mr. Carmack has not pointed to any provision of the statute that would forbid MBCR's treatment of him based solely upon his membership in the BLE. Accordingly, this court recommends that MBCR's motion to dismiss Mr. Carmack's claim under the RLA be dismissed.[8]

### E.    Counts II-XV: Claims Based on a Theory of Successor Liability

MBCR is seeking dismissal of the remaining claims set forth in the First Amended Complaint at Counts II-XV on the grounds that all of the claims relate solely to the actions of Amtrak and MBCR is not a corporate successor to Amtrak.[9] In response to MBCR's motion, Mr. Carmack argues only that:

> Defendants are mutually bound to causes for action with Defendant
> National Railroad Passenger Corporation in case filed in this

---

[8] MBCR argues that even if the RLA applied to Mr. Carmack, its decision to have him evicted from North Station would be justified because Mr. Carmack was trespassing on private property. (Def.'s Mem. at 10-12). Because this court finds that the plaintiff has failed to state a claim under the RLA, this court declines at this time to address this argument. However, this court notes that based on the allegations set forth in the Amended Complaint, it can be inferred that the public access areas of North Station were not located on private property, but on property that was owned by the Commonwealth of Massachusetts. (See Am. Compl. ¶¶ 3, 25 (suggesting that North Station was owned by the MBTA, which is a state agency)).

[9] Page 5 of the Amended Complaint contains the following heading: "IV. Successor and Joint Liability Claims for Actions of Previous Employer of Plaintiff, National Railroad Passenger Corporation." Therefore, when the Amended Complaint is viewed liberally, it appears that Mr. Carmack is seeking to hold MBCR liable, under a theory of successor liability, for actions taken by Amtrak employees that allegedly led to Mr. Carmack's termination by Amtrak.

> Honorable Court as 03-12488-PBS.  Therefore, justice requires
> Defendants to answer to relative charges in this complaint in order
> that Plaintiff may seek full remedy to the same occurrences and
> omissions.

(Pl.'s Mem. at 4).  When viewed in Mr. Carmack's favor, Count X appears to state a

claim against MBCR based on the actions of MBCR and not, as the defendant contends,

based solely on the actions of Amtrak.  Consequently, this court recommends that

MBCR's motion be denied with respect to that claim.  However, because the remaining

claims concern conduct that involved only Amtrak personnel, and nothing in the

complaint supports a theory that MBCR is a successor of Amtrak, or is otherwise jointly

liable for the actions of Amtrak's employees, this court recommends that the defendant's

motion be granted with respect to Counts II-IX and XI-XV.

In Count X, Mr. Carmack alleges, among other things, that "[o]n or about July 1,

2003, Defendants denied Plaintiff's right to a position as Locomotive Engineer in

commuter rail service on information from employees who were former agents of Amtrak

that Plaintiff is violent and dangersous (sic) due to mental illness."  (Am. Compl. ¶ 128).

He also alleges that "Defendants have disrespected Plaintiff's individual dignity, personal

responsibility, self-determination, and pursuit of meaningful career in violation of the

Rehabilitation Act of 1973: 29 U.S.C. § 701(c)(1)" and that "[a]s a direct and Proximate

result of Defendants' actions: . . . Plaintiff is deprived of gainful employment in his

chosen profession and discriminated against Plaintiff by reason of disability in regard to

discharge of Plaintiff in violation of 42 U.S.C. § 12112."  (Id. ¶ 129).  When viewed

liberally, it appears that in Count X, Mr. Carmack is seeking to hold MBCR liable for

alleged discrimination in hiring rather than simply as a successor to Amtrak.

Accordingly, MBCR has not shown that it is entitled to dismissal of Count X based on its

lack of a successor relationship with Amtrak.[10]

In contrast, Counts II-IX and XI-XV allege no wrongdoing on the part of MBCR.

Even the most liberal reading of the First Amended Complaint compels the conclusion

that no MBCR personnel were involved in the conduct that forms the basis of the claims

asserted in these Counts.[11]  Furthermore, Mr. Carmack has asserted no facts from which it

can be inferred that MBCR is a corporate successor to Amtrak.

The plaintiff alleges that MBCR took over responsibility for the operation of the

commuter rail services within Massachusetts pursuant to a contract with MBTA.  (Am.

---

[10]  MBCR also argues that Counts II-XV should be dismissed under the "prior pending action doctrine," which recognizes the court's inherent power to dismiss or stay an action in favor of prior litigation presenting the same claims and issues.  See Continental Time Corp. v. Swiss Credit Bank, 543 F. Supp. 408, 410 (S.D.N.Y. 1982).  In general, the prior pending action rule requires common parties and issues.  See Conant v. Sherwin L. Kantrovitz, P.C., 29 Mass. App. Ct. 998, 563 N.E.2d 247, 249 (1990).  Consequently, the doctrine is inapplicable to the claim asserted against MBCR in Count X because MBCR is not a party to the Amtrak case and Mr. Carmack has not alleged a claim in that case based on MBCR's failure to hire him.  See Second Amended Complaint (Docket No. 26) in Civil Action No. 03-12488-PBS.  Moreover, assuming Mr. Carmack was able to allege wrongdoing on the part of MBCR in Counts II-IX and XI-XV of his First Amended Complaint in this action, because MBCR is not a party to the Amtrak case and is not seeking to be named as a party to that action, MBCR would not be able to avoid liability for any such wrongdoing under the prior pending action doctrine.

[11]  Although the plaintiff alleges that Mr. DeModena "became subsumed into the operations of MBCR on or about July 1, 2003," all of the conduct complained of in Counts II-IX and XI-XV occurred when Mr. DeModena and the other named employees were working for Amtrak.  (Am. Compl. ¶ 28).

Compl. ¶¶ 4, 9).  However, Mr. Carmack has not alleged that MBCR had any contractual agreement with Amtrak, and nothing in the First Amended Complaint suggests that there was a sale or other transaction that could give rise to a predecessor-successor relationship between Amtrak and MBCR.  See Whitmore v. O'Connor Mgmt., Inc., 156 F.3d 796, 799 (8th Cir. 1998) (refusing to impute liability in case where "there was no sale of a business creating a predecessor-successor relation between the two corporations").  "[A] vital requirement when applying the theory of successorship liability . . . is that there must be some type of sale, merger, or consolidation.  There must be some type of privity between the predecessor and successor employer."  Korlin v. Chartwell Health Care, Inc., 128 F. Supp. 2d 609, 614 (E.D. Mo. 2001).  None of the plaintiff's allegations suggests that any such relationship existed between MBCR and Amtrak.  Accordingly, this court recommends that Counts II-IX and XI-XV be dismissed.

## IV.  CONCLUSION

For the reasons detailed above, this court finds that Count I of the First Amended Complaint fails to state a claim against MBCR under the Railway Labor Act.  This court also finds that Counts II-IX and XI-XV fail to state a claim against MBCR.  Accordingly, this court recommends to the District Judge to whom this case is assigned that MBCR's motion to dismiss (Docket No. 15) be ALLOWED IN PART and DENIED IN PART and

that Mr. Carmack be allowed to pursue only his federal and state civil rights claims asserted in Count I and his claims asserted in Count X against MBCR.[12]

        / s / Judith Gail Dein
        Judith Gail Dein
        United States Magistrate Judge

---

[12]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).