UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>    Plaintiff<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD COMPANY,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 05-11430-PBS<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT MBTA'S OPPOSITION TO PLAINTIFF'S MOTION
### TO AMEND PLAINTIFF'S FIRST AMENDED COMPLAINT

### OVERVIEW

      Defendant Massachusetts Bay Transportation Authority ("MBTA") hereby opposes the Plaintiff, Joseph T. Carmack's Motion to Amend Plaintiff's First Amended Complaint and respectfully requests that this Honorable Court deny said motion. As grounds therefore, the MBTA states that the Plaintiff's proposed amendments are futile in that they fail to state claims against the MBTA upon which relief can be granted. See Glassman v. Computervision Corp., 90 F.3d 617, 622-623 (1st Cir. 1996).

      The Plaintiff is seeking to resurrect Counts II through XV of his First Amended Complaint, which were dismissed as against the MBTA via Order entered by the Court on September 26, 2006, adopting the Magistrate Judge's Report and Recommendation on the MBTA's Motion to Dismiss ("MBTA Report"), on the grounds that the wrongdoings alleged therein did not relate to the MBTA. MBTA Report at 2. The Plaintiff should not be permitted to so amend, as the allegations that the Plaintiff sets forth against the MBTA in Counts II through XV of his proposed Second Amended Complaint are virtually identical to the allegations that he set forth against the MBTA in his First Amended Complaint. The allegations are wholly unrelated to the MBTA in that they neither involve, nor even pertain to the MBTA.

      Additionally, the new claims that are asserted against the MBTA in the Plaintiff's proposed Second Amended Complaint fail to state causes of action against the MBTA upon which relief can be granted. The Plaintiff alleges in Counts II through XV of his proposed Second Amended Complaint that the actions of the National Railroad Passenger Corporation ("Amtrak") with regard to the Plaintiff's employment were taken "under color of state law" and, as a result, the MBTA is jointly liable with Amtrak under 42

U.S.C. § 1983 for those actions. (Pl. Memo. at 4-5). Said claims, however, are barred by the three (3) year statute of limitations for 42 U.S.C. § 1983 claims in Massachusetts. See Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991). Furthermore, Amtrak was not, as a matter of law, "acting under color of state law" when it took action with regard to the Plaintiff's employment which culminated in his discharge on May 13, 2002 and, as a result, the MBTA cannot be jointly liable with Amtrak under 42 U.S.C. § 1983 for said actions.

To the extent that the Plaintiff alleges that the MBTA violated his rights under the Urban Mass Transportation Act of 1964 ("UMTA"), 49 U.S.C. § 1601 et seq. (renamed Federal Transit Act ("FTA"), 49 U.S.C. § 5301 et seq.) and, particularly, § 13(c) of the UMTA (now codified at 49 U.S.C. § 5333(b)) in connection with Amtrak's termination of his employment (Pl. Memo. at 8-9; Pl. proposed Second Amend. Compl. 4, 9-16 and 21), said claim must fail. The Plaintiff's employment was terminated as a result of his own conduct and not as a result of any federal assistance received by the MBTA and, as a result, he is not entitled to the protections of § 13(c). See 49 U.S.C. § 5333(b).

The Plaintiff also alleges that the MBTA "accepted liability" for damages he allegedly incurred, apparently as a result of Amtrak's actions with regard to his employment, and that the MBTA agreed to indemnify the Massachusetts Bay Commuter Railroad Company ("MBCR") for his damages that continued after July 1, 2003 and that, as a result, the MBTA is jointly liable for said damages. (Pl. proposed Second Amend. Compl. 33 and Counts II-XV). Said claim must fail as any such indemnification provisions would not provide the Plaintiff with a cause of action against the MBTA. Furthermore, the MBTA, by contract with Amtrak, is not responsible for injury or damage to Amtrak employees.

The Plaintiff's Motion to Amend his First Amended Complaint should be denied with respect to the claims previously dismissed and with respect to all new claims, as same fail to state causes of action against the MBTA upon which relief can be granted.

**STANDARD**

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Id. "This directive is tempered by the principle that leave to make proposed amendments that would be futile may be denied." Graham v. Smith, 219 F.R.D. 206, 208 (D. Me. 2004), citing Glassman, supra, 90 F.3d at 622. " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman, supra, 90 F.3d at 623. "In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." Id. In so doing, the Court accepts as true all well-pleaded allegations and gives the Plaintiff the benefit of all reasonable inferences and "[d]ismissal under Fed.R.Civ.P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

"Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters." Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 1990). "[W]here, as here, there is no merit in the proposed amendments, leave to amend should be denied." Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990).

**PREVIOUSLY DETERMINED CLAIMS**

Counts II through XV of the Plaintiff's proposed Second Amended Complaint, which are virtually identical to Counts II through XV of the Plaintiff's First Amended Complaint,[1] fail to state claims against the MBTA upon which relief can be granted. It should be noted that Counts II through XV of the Plaintiff's First Amended Complaint were dismissed via Order entered by the Court on September 26, 2006, adopting the MBTA Report, on the grounds that the wrongdoings alleged therein did not relate to the MBTA. MBTA Report at 2.

The Seventh Circuit in Ross v. City of Waukegan, 5 F.3d 1084 (7th Cir. 1993) held, in affirming the District Court's refusal to allow the plaintiff in that matter to file a third amended complaint against the city, after having previously affirmed the District Court's dismissal of the city, stated, "[u]pon examination of the first complaint filed in this action and our earlier opinion . . . we believe that these allegations are within the ambit of our earlier decision and therefore further consideration of them at this point through the device of an amended complaint is precluded." Id. at 1088 (internal citation omitted). "It is not an abuse of discretion to refuse a request to amend when the proferred amendment merely restates the same facts using different language, or reasserts a claim previously determined". Wakeen v. Hoffman House, Inc., 724 F.2d 1238, 1244 (7th Cir. 1983).

As the MBTA stated in its Reply Brief in support of its Motion to Dismiss Counts II through XV of the Plaintiff's First Amended Complaint, the MBTA contracted with Amtrak for the latter to provide commuter rail services for the former. The contract, entitled "Operating Agreement Between Massachusetts Bay Transportation Authority And National Railroad Passenger Corporation" ("the contract") became effective September 1, 1995 and was extended through June 30, 2003.

The contract explicitly provided that Amtrak was an independent contractor for the MBTA and not its agent. Section 5(a) of the contract, a copy of which is attached hereto as Exhibit A, states that, "[i]n the performance of its obligations under this Agreement, *Amtrak is an independent contractor for, and not an agent of, the MBTA*."

---

[1] In Counts II through XV of the Plaintiff's First Amended Complaint, any reference to the MBTA was by virtue of generalized references to "Defendants". In his proposed Second Amended Complaint, the Plaintiff has replaced the generalized references to "Defendants" with references to MBTA or MBTA and MBCR. The Plaintiff also added 14 paragraphs throughout his proposed Second Amended Complaint alleging that the MBTA "accepted liability" for his damages allegedly caused by Amtrak and "agreed to indemnify MBCR" for his damages continuing after July 1, 2003.

(emphasis added).[2]  Section 5(a) of the contract states that, "Amtrak shall be responsible for the management and operation of the Agreement Services . . . ." which term is defined in section 1(2) as "the operation of commuter rail services by Amtrak . . .."  Section 3(f) of the contract states that, "Amtrak shall provide all personnel necessary to operate and manage the Agreement Services . . .."  Section 5(e)(1) of the contract states that, "Amtrak shall . . . furnish all . . . personnel necessary for the performance of this Agreement, none of whom shall be employees of the MBTA.  All operating and other personnel of Amtrak and of Amtrak's subcontractors involved in any aspect of providing the Agreement Services or performing Amtrak's other obligations under this Agreement shall be subject to the direction, supervision, and control of Amtrak, and not the MBTA."  Lastly, section 5(e)(2) states that, "[a]ll such personnel will be employees of Amtrak . . .."

The fact that Amtrak was under contract with the MBTA to provide commuter rail services is of no consequence in this matter.  Amtrak was an independent contractor for the MBTA, not its agent.  The MBTA is, therefore, not responsible for Amtrak's actions with regard to the Plaintiff's employment.  The Plaintiff is not, and never was, an employee of the MBTA; he was an employee of Amtrak.  In fact, the Magistrate Judge, in her MBTA Report, noted, "[i]t is clear from the complaint, and not otherwise disputed, that Mr. Carmack was never employed by the MBTA." MBTA Report at 4.  Additionally, the Magistrate Judge noted, "[e]ven the most liberal reading of the complaint compels the conclusion that no MBTA personnel were in any way involved in the conduct which forms the basis of Counts II-XV of the First Amended Complaint" Id. at 9.  A liberal reading of the Plaintiff's proposed Second Amended Complaint does not permit a different conclusion.  The allegations set forth in Counts II through XV of the Plaintiff's proposed Second Amended Complaint pertain to events that occurred on or before May 13, 2002, while the Plaintiff was employed by Amtrak.  Said Counts focus solely on the actions of Amtrak and its employees.  None the MBTA's employees or agents are specifically identified therein.  The actors specifically identified in said Counts are, or were, employees of Amtrak; they are not, and were not, employees of the MBTA.  No MBTA employee or agent was involved in any of the events referred to in Counts II through XV of the Plaintiff's proposed Second Amended Complaint.

The MBTA is, therefore, not liable for the actions of Amtrak with regard to the Plaintiff's employment.  The Magistrate Judge, in her MBTA Report, noted that, "[t]here are no allegations in the complaint which would support a conclusion of joint liability.  There are no allegations that even imply that the MBTA is liable for Amtrak's relationships with Amtrak's employees.[ ]  Nor are there any contentions that would support a conclusion that the MBTA controlled or was in any way involved with any of the challenged conduct."  MBTA Report at 9-10.  A liberal reading of the Plaintiff's proposed Second Amended Complaint does not permit a different conclusion.

---

[2] The Magistrate Judge, in her MBTA Report stated, "[t]he fact that Amtrak, and later MBCR, provided commuter rail services to the MBTA under contract is not in dispute . . ..  While not necessary to a ruling on the motion to dismiss, this court concludes that the contract could be considered in connection with the motion since courts have made narrow exceptions to the requirement that the record be limited to the complaint 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  MBTA Report at 3, n.2, citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Counts II through XV of the Plaintiff's proposed Second Amended Complaint are futile in that they fail to state claims against the MBTA upon which relief can be granted.

### 42 U.S.C. § 1983 – STATUTE OF LIMITATIONS

The statute of limitations for 42 U.S.C. § 1983 claims in Massachusetts is three (3) years. See Street, supra, 936 F.2d at 39. All claims asserted in Counts II through XV of the Plaintiff's proposed Second Amended Complaint under 42 U.S.C. § 1983 pertain to incidents that occurred on or before May 13, 2002, while the Plaintiff was employed by Amtrak. The Plaintiff filed his original Complaint on June 30, 2005, more than three (3) years later and, as a result, said claims are barred by the statute of limitations. All claims asserted in Counts II through XV of the Plaintiff's proposed Second Amended Complaint under 42 U.S.C. § 1983 are, therefore, futile in that they fail to state causes of action against the MBTA upon which relief can be granted. Additionally, many of the claims set forth in said Counts do not allege the deprivation of federal rights, which is another required element of a cause of action under 42 U.S.C. § 1983.

### AMTRAK ACTING "UNDER COLOR OF STATE LAW"

The Plaintiff is attempting to circumvent the dismissal of Counts II through XV of his First Amended Complaint by arguing that Amtrak, in taking those actions against him with regard to his employment, was acting "under color of state law" within the meaning of 42 U.S.C. § 1983 and that this somehow transforms Amtrak's employees, presumably as a matter of law, into also being employees of the MBTA.[3] In fact, however, it is clear that Amtrak was not acting "under color of state law" or as a "state actor" in its actions relative to the Plaintiff,[4] and the motion for leave to amend should accordingly be denied.

"A private entity's conduct is not actionable under section 1983 if the challenged action results from the exercise of private choice and not from state influence or coercion." Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 492 (1st Cir. 1996), citing Lebron v. National R.R. Passenger Corp., 513 U.S. 374 (1995). Since Amtrak was not a Massachusetts state agency, but was, instead, an independent contractor, the state action question turns upon "whether the conduct at issue . . . may be nonetheless fairly attributed to the state." Barrios-Velazquez, supra, 84 F.3d at 492; see Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974). The First Circuit has identified three possible bases for such an attribution: (1) traditional

---

[3] In connection with this argument, the Plaintiff has sprinkled his proposed Second Amended Complaint with allegations that employees of Amtrak who allegedly took actions against him were also employees of the MBTA. The Plaintiff makes clear in his supporting memorandum, however, that he does not mean those allegations to be taken literally. Rather, his theory is that the actions by Amtrak of which he complains were taken "under color of state law" within the meaning of 42 U.S.C. § 1983 and, accordingly, can be imputed to the MBTA so as to make the MBTA jointly liable with Amtrak under 42 U.S.C. § 1983. (Pl. Memo in Support of Pl. Motion to Amend., at 4-5).

[4] Whether a private entity is acting "under color of state law" within the meaning of 42 U.S.C. § 1983 involves the same inquiry as whether "state action" is present so as to implicate the Fourteenth Amendment. Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).

5

public function analysis; (2) nexus test; and (3) symbiotic relationship.  See <u>Perkins v. Londonderry Basketball Club</u>, 196 F.3d 13 (1st Cir. 1999).  As a matter of law, the Plaintiff satisfies none of those tests.[5]

       1. <u>Traditional Public Function Analysis</u>

In order to satisfy the "traditional public function" analysis, it is not enough to show that a private actor performed what could be characterized as a "public function;" many private entities do that.  Rather, the Plaintiff must show that Amtrak assumed powers "*traditionally exclusively* reserved to the state."  <u>Barrios-Velazquez</u>, supra, 84 F.3d at 493-94, quoting <u>Rodriques v. Furtado</u>, 950 F.2d 805, 813 (1st Cir. 1991) (emphasis added).  The list of such traditionally exclusively public functions, whose performance by a private entity constitutes state action, is a short one and is limited to such traditional attributes of state sovereignty as holding elections for political office and exercising the power of eminent domain.  See, e.g., <u>Jackson</u>, supra, 419 U.S. at 352-53.  One who desires to expand that list has an "uphill climb."  <u>Perkins</u>, supra, 196 F.3d at 19.

The MBTA is not aware of any decision holding that the provision of mass transportation service is a traditionally exclusively public function.  To the contrary, several reported cases have held that the provision of such services is not a traditional public function.  See <u>Thomas v. Cannon</u>, 751 F.Supp. 765, 768 (N.D. Ill. 1990) (private corporation under contract with transit authority to provide regional transportation services not performing a traditional public function and, therefore, not acting under color of state law); <u>Mineo v. Transp. Management of Tennessee</u>, 694 F.Supp. 417 (M.D. Tenn. 1988) (same); <u>Arrendondo v. Laredo Municipal Transit System</u>, 581 F.Supp. 868, 870 (S.D. Tex. 1984) (same).  Moreover, the Supreme Court has held, relatedly, that the operation of commuter railroads, in particular, has traditionally been a function of private industry, not of state or local governments, and thus is not a "traditional governmental function" immune from federal regulation under the Tenth Amendment.  <u>United Transp. Union v. Long Island R.R.</u>, 455 U.S. 678, 684-86 (1982); see also <u>Bester v. Chicago Transit Authority</u>, 887 F.2d 118, 122-23 (7th Cir. 1989) (transit authority did not perform traditional public function so as to afford it exemption from FLSA); <u>Alewine v. City Council of Augusta</u>, 699 F.2d 1060, 1066-68 (11th Cir. 1983*),* cert. denied, 470 U.S.

---

[5]  The fact that the Magistrate Judge has found that the Plaintiff alleged sufficient facts to state a claim that MBCR was acting "under color of state law" with respect to its participation in the police's alleged eviction of the Plaintiff from public areas of North Station on July 1, 2003, see Report and Recommendation on Defendant MBCR's Motion to Dismiss (September 22, 2006) ("MBCR Report") at 11, does not mean that the Plaintiff has also stated a claim that Amtrak was acting "under color of state law" in the very different context, upon which Counts II through XV are based, of Amtrak's employment-related dealings with the Plaintiff (in which the MBTA had no involvement) up to and including his discharge on May 13, 2002.  In her MBCR Report, the Magistrate Judge relied upon the allegations in Count I that MBCR, in 2003, called upon and acted in concert with the MBTA police to evict the Plaintiff from North Station, emphasizing that, according to those allegations, "MBCR *was not acting simply as a private contractor operating commuter trains, but was deciding who could use the public access areas of the commuter rail station and the circumstances under which they could use such areas*."  MBCR Report at 16 (emphasis added).  That was not the case, of course, with respect to the Plaintiff's earlier employment relationship with Amtrak that forms the basis and context for the present motion.

1027 (1985) (same); Dove v. Chattanooga Area Regional Transp. Authority, 701 F.2d 50, 51 (6th Cir. 1983) (same); Kramer v. New Castle Area Transit Authority, 677 F.2d 308, 309-10 (3rd Cir. 1982), cert. denied, 459 U.S. 1146 (1983) (same).[6]

      To the extent that the Plaintiff argues that M.G.L. c.161A, § 3(i)[7] grants the MBTA the exclusive right to provide mass transportation service in the area constituting the authority, said argument is incorrect as a matter of fact and law.  The phrase "on an exclusive basis," when taken in context, means that the MBTA, in providing mass transportation service in the area constituting the authority, is not subject to the jurisdiction and control of the Department of Telecommunications and Energy ("DTE"), except as to safety of equipment and operations, or any city, town or other licensing authority, except as is otherwise provided.  This "exclusivity" provision pertains to the MBTA's authority to act without being subject to the jurisdiction and control of the DTE and municipalities; it does not grant the MBTA the exclusive right to provide mass transportation service in the area constituting the authority as the Plaintiff argues.  The Plaintiff's interpretation of M.G.L. c.161A, § 3(i) would only have been correct had the first sentence began with language to the effect of "[t]o exclusively provide mass transportation service . . .."; however, such is not the case.  The MBTA's reading is bolstered by the second sentence of M.G.L. c.161A, § 3(i), which, referring to the MBTA Board of Directors, states that the board shall determine the character and extent of services and facilities to be furnished and that, in those respects, "their authority *shall be exclusive* and shall not be subject to the approval, control or direction of any state, municipal or other department . . .." Id. (emphasis added.)

      Furthermore, privately owned or controlled carriers are not prohibited from providing mass transportation service in the area constituting the authority provided that they obtain the proper licenses.  As the last sentence of M.G.L. c.161A, § 3(i) states, "[n]othing contained in this paragraph shall be construed as exempting any privately owned or controlled carrier, whether operating independently, jointly or under contract with the authority, from obtaining any license required under section 1 of chapter" 159A.

---

[6] The tradition of private companies providing mass transportation occurred historically in Massachusetts as well as nationally.  See, e.g., Eastern Massachusetts Street Ry Co. v. MBTA, 350 Mass. 340 (1966) (existing private transportation companies protected by the MBTA's enabling statute (which was enacted in 1964), M.G.L. c.161A, §§ 3(j), 5(k).

[7] M.G.L. c. 161A, § 3(i) states, "[t]o provide mass transportation service, whether directly, jointly or under contract, on an exclusive basis, in the area constituting the authority and without being subject to the jurisdiction and control of the department of telecommunications and energy in any manner except as to safety of equipment and operations and, with respect only to operations of the authority with equipment owned and operated by the authority, without, except as otherwise provided in this chapter, being subject to the jurisdiction and control of any city or town or other licensing authority; provided, that schedules and routes shall not be considered matters of safety subject to the jurisdiction and control of said department. Except as otherwise provided in this chapter, the board shall determine the character and extent of the services and facilities to be furnished, and in these respects their authority shall be exclusive and shall not be subject to the approval, control or direction of any state, municipal or other department, board or commission except the advisory board as provided in this chapter. Nothing contained in this paragraph shall be construed as exempting any privately owned or controlled carrier, whether operating independently, jointly or under contract with the authority, from obtaining any license required under section 1 of chapter 59A".  (It should be noted that said section contains a typographical error in that the last sentence should properly cite section 1 of chapter 159A, not 59A).

7

Id. M.G.L. c.159A, § 1 is entitled, "Motor vehicles providing public transportation; license; fee; rules and regulations; appeal from denial of license."

Since other privately owned or controlled carriers may provide mass transportation service in the area constituting the authority, the MBTA is not, and cannot be, the exclusive provider of mass transportation service in that area. Consequently, the Plaintiff does not satisfy the "traditional public function" analysis.

Moreover, a private entity can be a state actor under "traditional public function" analysis only if the private entity "assumes a traditional public function *when it undertakes to perform the challenged conduct*." Perkins, supra, 196 F.3d at 18 (emphasis added). Thus, even if the provision of mass transportation service were a traditional exclusive public function (which it is not), the "challenged conduct" – here, Amtrak's handling of its relationship with its own employee (the Plaintiff) – would remain a private personnel matter, not the performance of a public function. See, e.g., Rendell-Baker, supra, 457 U.S. 830 (holding that the employment decision of the private high school, which was under contract with the state to educate maladjusted high school students, to discharge the plaintiff teacher did not involve state action); Blum v. Yaretsky, 457 U.S. 991, 1011-12 (1982) (holding that even if respondents' characterization of the state's duties to provide nursing care as a traditional public function were correct, "it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public"). As the First Circuit articulated the point in another teacher discharge case, "We believe that by exclusive function the Court had in mind that where a function was exclusively the state's it could not be permitted, by delegation, to escape its responsibilities. If there were responsibilities in the present case, they would relate to students, and not to teachers. Except as their conduct might affect their students, the state had no concern with defendant's teachers." Johnson v. Pinkerton Academy, 861 F.2d 335, 338 (1st Cir. 1988). So here, even if the state had "traditional public function" responsibilities to provide mass transportation service in this case (which it did not), those responsibilities would relate to the traveling public, not to Amtrak's employees. When Amtrak undertook its employment dealings with its own employee (the Plaintiff), up to and including the termination of his employment, it did not assume or perform a traditional public function.

    2. Nexus Test

In order to find state action on this basis, the Plaintiff must show a "*close nexus* between the State and *the challenged action* of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." Perkins, supra, 196 F.3d at 19 (emphasis added). This requires more than the state's passive acquiescence in, or mere approval of, the challenged conduct; the Plaintiff must show that the state has exercised coercive power or has provided such significant encouragement that the challenged conduct may fairly be attributed to the state. Id. at 19, citing Blum, supra, 457 U.S. at 1004.

Moreover, under nexus test, the "focal point is the connection between the State and *the challenged conduct,* not the broader relationship between the State and the private entity." Perkins, supra, 196 F.3d at 19-20 (emphasis added). "The challenged action . . . may be fairly treated as that of the State itself . . . *only* when it can be said that the State is *responsible* for *the specific conduct* of which the plaintiff complains . . . . The test is whether the government exercised coercive power or provided such significant encouragement that the *complained-of* misconduct . . . must be deemed to be the conduct of the government." Barrios-Velazquez, supra, 84 F.3d at 493, quoting Blum, supra, 457 U.S. at 1004 (emphasis added).

In Rodriguez-Garcia v. Davila, 904 F.2d 90 (1st Cir. 1990), the court affirmed the dismissal for lack of state action of a complaint by discharged employees of a company that had contracted to provide management services to the Puerto Rico Maritime Shipping Authority. The court held that "the provision of services to a state entity does not establish state control, even where, as here, the private contractor's sole business is the performance of public contracts." Id. at 97, citing Rendell-Baker, supra, 457 U.S. at 841. The test is "whether the government *exercised coercive power or provided such significant encouragement* that the choice to fire appellants must be deemed to be that of the government." Rodriguez-Garcia, supra, 904 F.2d at 97 (emphasis added). "The challenged action of the [private] entity . . . may be fairly treated as that of the State itself . . . only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains." Id. at 97, quoting Blum, supra, 457 U.S. at 1004 (emphasis added). See also Rendell-Baker, supra, 457 U.S. at 841 (holding that personnel decisions of a largely publicly-funded private school were not state action because they "were not compelled or even influenced by any state regulation").

Here, there is no allegation or suggestion that the MBTA was responsible in any way for the personnel actions, up to and including discharge, that Amtrak took against the Plaintiff – no MBTA regulation, no coercive power and no encouragement of any kind are alleged – indeed, there is no allegation that the MBTA was even aware of the Plaintiff's existence or of Amtrak's actions affecting him.[8]

3. <u>Symbiotic Relationship</u>

The question presented under this approach is whether the state has so far insinuated itself into interdependence with the private contractor that it should be

---

[8] Leaving aside, of course, the allegations in the proposed Second Amended Complaint that the complained-of employees of Amtrak were also employees of the MBTA at the time that they took the challenged actions; but, as noted above, those allegations are not factual assertions – the Plaintiff has already made clear that he knows that those individuals were in fact Amtrak employees and not MBTA employees – upon which the Plaintiff seeks to base a finding of state action. They reflect, instead, the proposed result of plaintiff's legal theory, set forth in his supporting memorandum, that a finding that Amtrak was acting "under color of state law" will lead the Court to treat those Amtrak employees legally (albeit counterfactually) as also being MBTA employees for purposes of joint liability under 42 U.S.C. § 1983.

9

recognized as a joint participant in the challenged activity. Perkins, supra, 196 F.3d at 21.[9]  "A true symbiosis is predicated on interdependence and joint participation."  Id.

Here, Amtrak was a private, independent contractor with a garden-variety contractual relationship with the state similar to that of many other public contractors. There was no unusual "entwinement" or "entanglement" of the MBTA with Amtrak that would lead to the conclusion that the challenged conduct of Amtrak was fairly attributable to the MBTA.

Under Perkins, the "symbiotic relationship" test looks to the totality of the circumstances, but some factors tend to be more salient than others.  "The most salient of these is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs." Perkins, supra, 196 F.3d at 21.  There is no basis here for concluding that Amtrak was not independent in the conduct of its day-to-day affairs, including its personnel actions.

Another factor noted by Perkins, "with caveats," is "whether (and if so, to what extent) the [state] knowingly shared in the profits spawned by the [private entity's] discriminatory conduct." Perkins, supra, 196 F.3d at 21.  Significantly, Perkins affirms that this factor is only relevant, however, with respect to "profits arising from the challenged conduct, rather than from the relationship as a whole," and notes that "the challenged conduct must be indispensable to the financial success of the joint project." Id. at 21.  Here, obviously, the challenged conduct – Amtrak's employment-related dealings with the Plaintiff, up to and including his discharge – were not a profit-making activity, so this factor is of no help to the Plaintiff.

In conclusion, these three tests are directed to the question of whether the conduct allegedly causing the deprivation of a federal right is "fairly attributable to the state."  In this situation, there are no allegations that properly would support such a conclusion.  In particular, there is no allegation of any MBTA influence over, involvement with, or even awareness of, Amtrak's employment decisions with respect to the Plaintiff.  Accordingly, the Plaintiff's motion for leave to amend based upon the proposition that Amtrak's actions were taken "under color of state law" and that, as a result, the MBTA may be jointly liable with Amtrak under 42 U.S.C. § 1983 for those actions should be denied.[10]

---

[9] As Perkins notes, it is an open question whether the symbiotic relationship test is still good law.  The MBTA submits that Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961), properly understood, covers an exceedingly narrow field and has no proper application beyond the unique situation where the state sets up a shell intended to permit it to effectively practice and profit from systematic racial discrimination (or, perhaps, similarly core violations of the Fourteenth Amendment), which is not, and could not be, alleged here.  Nevertheless, since Perkins and the Magistrate Judge, in her MBCR Report, have addressed a more generalized "symbiotic relationship" analysis, the MBTA does so in the text as well.

[10] It should be noted that Amtrak, which denies that it violated the Plaintiff's rights, has moved for summary judgment on the Plaintiff's underlying claims against it.  See Carmack v. National Railroad Passenger Corporation, Civil Action No. 03-12488-PBS.  To the extent that the Court adjudges that Amtrak's challenged actions did not violate the Plaintiff's rights, issue preclusion will prevent the Plaintiff from relitigating those claims against the MBTA.

10

**49 U.S.C. § 5333(b)**

Any allegation that the Plaintiff asserts against the MBTA in his proposed Second Amended Complaint pursuant to § 13(c) of the UMTA (renamed FTA), now codified at 49 U.S.C. § 5333(b) ("49 U.S.C. § 5333(b)" or "13(c)"), is without merit and futile, as any such allegation fails to state a claim against the MBTA upon which relief can be granted.

"The UMTA was enacted in response to the 'increasingly precarious financial condition of a number of private transportation companies across the country' whose collapse could leave communities without adequate mass transportation." Amalgamated Transit Union, AFL-CIO v. Brock, 809 F.2d 909, 911 (D.C. Cir. 1987), quoting Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union, 457 U.S. 15, 17 (1982). "In an effort to assure that these communities would continue to have mass transportation services, the Act authorizes the Secretary of Transportation to award federal funds to local governments that have acquired privately owned transit companies." Amalgamated, supra, 809 F.2d at 911. "Recognizing, however, that 'public ownership might threaten existing collective-bargaining rights of unionized transit workers employed by private companies', Congress provided in section 13(c) that federal assistance may not be provided under the Act unless the Secretary of Labor certifies that 'fair and equitable arrangements' have been made 'to protect the interests of employees *affected by such assistance*.'" Id, quoting Jackson, supra, 457 U.S. at 17 and, then current, 49 U.S.C. § 1609(c) and referring to, then current, 49 U.S.C. § 1602(e)(4) (emphasis added).

The UMTA/FTA enables state and local agencies to obtain federal assistance to finance mass transportation service. 49 U.S.C. § 5333(b)(1) provides, in pertinent part, that "[a]s a condition of financial assistance . . . the interests of employees *affected by the assistance* shall be protected under arrangements the Secretary of Labor concludes are fair and equitable." Id. (emphasis added). 49 U.S.C. § 5333(b)(2) specifies five (5) varieties of provisions that must be included in such arrangements. It provides, in pertinent part, that "[a]rrangements under this subsection shall include provisions that may be necessary for . . . (C) the protection of individual employees against a worsening of their positions related to employment . . . (E) assurances of priority of reemployment of employees whose employment is ended or who are laid off . . .." 49 U.S.C. § 5333(b)(2)(C) and (E). Such protections/assurances are only provided if an employee's position is worsened or if an employee's employment is ended as a result of the receipt of federal assistance.

In United Transp. Union, AFL-CIO v. Brock, 815 F.2d 1562 (D.C. Cir. 1987), the court, in interpreting 49 U.S.C. § 1609(c) [the predecessor of 49 U.S.C. § 5333 (b)(1), which then read, "'fair and equitable arrangements are made . . . to protect the *interests of employees affected by such assistance,*'" United, supra, 815 F.2d at 1564 (emphasis in

11

the original), quoting 49 U.S.C. § 1609(c),][11] stated, "[t]he plain import of the [ ] quoted phrase is that the only interests protected by section 13(c) are those affected by the financial assistance sought." <u>Id</u>.  The issue in <u>United</u> was whether § 13(c) entitled "transit employees to a reinstatement of collective bargaining rights lost for reasons wholly unrelated to the Act [referring to the UMTA] seven years before the public transit authority applied for federal assistance." <u>Id.</u> at 1562.  The court concluded that it did not, stating that, "[t]he loss was wholly unrelated to the UMTA and, therefore, was not then, and could not have been, '*affected*' by federal assistance." <u>Id.</u> at 1565 (emphasis added).

Adverse effects to employees trigger § 13(c) protections only if they result from the federal assistance.  § 13(c), by its very language, requires that, for employees to be entitled to its protections, there must be a nexus between the adverse employment action and the receipt of federal assistance.  Employees are entitled to the protections of § 13(c) only if their positions are worsened as a result of the grantee's receipt of federal assistance, not if their positions are worsened as a result of some other reason, such as their own conduct in connection with their employment.

Amtrak charged the Plaintiff with insubordination and terminated his employment. (Pl. First Amend. Compl., 122-123).  The Plaintiff's employment was terminated as a result of his own conduct, not as a result of the MBTA's receipt of any federal assistance.  Accordingly, there is no nexus between said termination and the receipt of any federal assistance.  The Plaintiff's loss of his job was "wholly unrelated" to the UMTA and said termination was, consequently, not affected by the receipt of any federal assistance.  Therefore, any allegation that the Plaintiff asserts against the MBTA in his proposed Second Amended Complaint pursuant to § 13(c) is without merit and futile.

Additionally, § 13(c) does not provide a basis to allege the deprivation of a federally guaranteed right protected under 42 U.S.C. § 1983.  <u>Jackson</u>, supra, 457 U.S. at 29, n.12.

## INDEMNIFICATION

The Plaintiff alleges in his proposed Second Amended Complaint that, by contract, the MBTA "accepted liability" for damages he incurred, apparently as a result of Amtrak's actions with regard to the termination of his employment and that, by contract, the MBTA "agreed to indemnify MBCR against damages continuing after July 1, 2003 resulting from Amtrak's actions."  (Pl. proposed Second Amend. Compl. 33 and Counts II-XV).

Whether the MBTA agreed to indemnify either Amtrak or MBCR is irrelevant to the claims that the Plaintiff sets forth in his proposed Second Amended Complaint against the MBTA, as such provisions do not provide the Plaintiff with a separate cause

---

[11] 49 U.S.C. §5333(b)(1) reads nearly the same, stating, ". . . the interests of employees *affected by the assistance* shall be protected under arrangements the Secretary of Labor concludes are fair and equitable." <u>Id.</u> (emphasis added).

12

of action against the MBTA. Any action with regard to indemnification would involve the MBTA and Amtrak and/or MBCR, not the Plaintiff.

Even if the Plaintiff had a cause of action against the MBTA on that basis, the contract between Amtrak and the MBTA contained an indemnity clause for the benefit of the MBTA that specifically provided that the MBTA was not responsible for injury or damage to Amtrak employees. Section 15(b) of the contract, the relevant portion of which is attached hereto as <u>Exhibit B</u>, provides that, ". . . Amtrak undertakes and agrees to indemnify, defend, and hold harmless MBTA . . . without regard to negligence or fault, for damages or liability for injury or damage to . . . Amtrak employees engaged in the provision of Agreement Services . . .."

The MBTA is, therefore, neither liable, nor responsible for the actions of Amtrak with regard to the Plaintiff's employment. Accordingly, the MBTA is neither liable, nor responsible for the damages that the Plaintiff allegedly sustained as a result of Amtrak's alleged treatment of him. The Plaintiff's claims in this regard are futile in that they state no cause of action against the MBTA upon which relief can be granted.

## CONCLUSION

For the reasons set forth above, the MBTA respectfully requests that this Honorable Court deny the Plaintiff's Motion to Amend his First Amended Complaint on the grounds that the Plaintiff's proposed amendments are futile in that they fail to state claims against the MBTA upon which relief can be granted.

Additionally, the MBTA respectfully requests that this Honorable Court issue an Order prohibiting any further amendments to the Complaint.

Respectfully submitted
For the MBTA
By its attorney,

**CERTIFICATE OF SERVICE**

I, Todd M. Valicenti, hereby certify that I have caused a copy of the foregoing document to be served by first class mail, postage prepaid, upon *pro se* Plaintiff, Joseph T. Carmack, 398 Columbus Avenue, PMB 130, Boston, MA 02116, on this 25th day of January 2007.

/s/Todd M. Valicenti
Todd M. Valicenti

/s/ Todd M. Valicenti
Todd M. Valicenti
BBO# 632800
Assistant General Counsel
MBTA Legal Dept.
Ten Park Plaza, Suite 7760
Boston, MA 02116
Tel: (617) 222-4579
E-mail: tvalicenti@mbta.com

Dated: January 25, 2007

**CERTIFICATE OF COMPLIANCE WITH LR 7.1(A)(2)**

I, Todd M. Valicenti, hereby certify that I conferred with the *pro se* Plaintiff, Joseph T. Carmack, on the 27th day of December 2006, in a good faith attempt to resolve or narrow the foregoing issues.

/s/Todd M. Valicenti
Todd M. Valicenti

OPERATING AGREEMENT BETWEEN

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

AND NATIONAL RAILROAD PASSENGER CORPORATION

SEPTEMBER 1, 1995

revenue vehicles arising out of the operation of such vehicles.

(C) The MBTA-owned non-revenue vehicles shall be replaced on an as-needed basis over the term of this Agreement, pursuant to a schedule to be agreed upon by the parties, by vehicles to be leased or otherwise acquired by Amtrak. The lease or other cost of such replacement vehicles is not included in the Annual Fixed Price set forth in Section 7(a), and shall be separately reimbursed pursuant to Section 7(d) of this Agreement.

(2)(A) Amtrak shall lease or otherwise acquire, on or before the Commencement Date, all other non-revenue vehicles required to carry out the Agreement Services.

(B) Except with respect to Excluded Conduct of the MBTA (as described in Section 15(d)), Amtrak shall be responsible for all physical damage to non-revenue vehicles acquired under this paragraph (2) or to the replacement vehicles described in paragraph (1)(C).

(C) The cost of the lease or acquisition of the non-revenue vehicles described in subparagraph (A) of this paragraph shall be included in the Annual Fixed Price set forth in Section 7(a) of this Agreement.

(D) If any non-revenue vehicle leased or otherwise acquired by Amtrak is damaged, destroyed, or otherwise becomes unavailable for use during the term of this Agreement, Amtrak may replace such vehicle at its sole cost.

(3) Upon termination of this Agreement, the MBTA shall assume the lease or otherwise acquire at fair market value any non-revenue vehicle leased or acquired by Amtrak pursuant to this subsection.

SEC. 5. PROJECT MANAGEMENT.

(a) <u>In General.</u> -- Amtrak shall be responsible for the management and operation of

18

the Agreement Services and for performing its other obligations under this Agreement, subject to the supervision and oversight of the MBTA as provided in this Agreement. In the performance of its obligations under this Agreement, Amtrak is an independent contractor for, and not an agent of, the MBTA.

(b) **Local Management.** -- (1) Amtrak shall, subject to the approval of the MBTA, designate a General Manager, who shall be resident in the Boston metropolitan area. Amtrak agrees that the General Manager will be delegated sufficient authority from Amtrak so as to be able to exercise day-to-day decisionmaking on all operational and business matters relating to the performance of this Agreement. Amtrak further agrees that the General Manager shall be assigned exclusively to the MBTA commuter rail operations and shall not perform functions in connection with any other Amtrak service.

(2) The General Manager shall (A) have the principal responsibility for directing and coordinating Amtrak's performance of its obligations under this Agreement; (B) serve as Amtrak's liaison with the MBTA; (C) attend assessment meetings with the MBTA's Deputy Chief for Railroad Operations or other senior staff, as requested; and (D) be available at such other times as the MBTA may direct to consult with representatives of the MBTA.

(3) Amtrak agrees that it will designate and give notice to the MBTA of an Acting General Manager who shall have full authority to discharge the responsibilities of the General Manager under this Agreement in his or her absence.

(c) **Management Personnel.** -- In order to perform the services required by this Agreement, Amtrak will provide, at a minimum, personnel performing the following functions: (1) general management, (2) management of operations; (3) equipment

19

other of any insurance coverage changes that would affect such other party's coverage thereunder.

(g) <u>Claims Filing.</u> -- The MBTA and Amtrak agree to cooperate fully with one another in the filing of claims with and recovering payments due from the parties' insurers in connection with the Agreement Services.

(h) <u>Material Breach.</u> -- The MBTA and Amtrak agree that the failure of a party to procure or maintain insurance required under this Section constitutes a material breach of the Agreement by that party.

SEC. 15. INDEMNIFICATION AND LIABILITY

(a) <u>MBTA Indemnity.</u> -- Except as otherwise provided in this Section, the MBTA undertakes and agrees to indemnify, defend, and hold harmless Amtrak (including its directors, officers, agents, or employees) for all damage and for all liability arising out of the provision of the Agreement Services, without regard to fault or negligence of Amtrak; provided, however, that the indemnity of the MBTA shall be limited to $75,000,000 per occurrence.

(b) <u>Amtrak Indemnity.</u> -- Except as otherwise provided in this Section, Amtrak undertakes and agrees to indemnify, defend, and hold harmless MBTA (including its directors, officers, agents, or employees), without regard to negligence or fault, for damages or liability for injury or damage to: Amtrak employees engaged solely in the provision of intercity service; Amtrak employees engaged in the provision of Agreement Services; Amtrak intercity passengers; Amtrak property; third parties involved in an accident with an Amtrak intercity train only; and Service Property in an accident involving only an Amtrak intercity