UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK, ) | |
| Plaintiff, *pro se* ) | |
| v. ) | C.A. No. 05-11430-PBS |
| ) | |
| MASSACHUSETTS BAY ) | |
| TRANSPORTATION AUTHORITY ) | |
| and MASSACHUSETTS BAY ) | |
| COMMUTER RAILROAD, ) | |
| Defendants ) | |

**DEFENDANT MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I. <u>INTRODUCTION</u>

The Defendant Massachusetts Bay Commuter Railroad, LLC ("MBCR" or "Defendant"),
hereby submits this memorandum in support of its motion for summary judgment on all counts
remaining against it in this action, pursuant to Fed.R.Civ.P. 56.

In this matter, the Plaintiff asserted various claims against the Massachusetts Bay
Transportation Authority ("MBTA") and MBCR. Following rulings on a series of motions to
dismiss and amend the complaint, two causes of action remain. In Count I, the Plaintiff alleges
that MBCR and the MBTA violated his federal and state civil rights when an MBTA police
officer, to guard against a potential threat to the public safety, evicted him from North Station on
July 1, 2003. In Count X, the Plaintiff asserts that MBCR violated the Rehabilitation Act when it
failed to hire him as a locomotive engineer in June 2003. MBCR submits that, based upon the
undisputed material facts, summary judgment should be entered in its favor dismissing all the
remaining claims against it.[1]

---

[1] *Report and Recommendation on Defendants' Motions to Dismiss and Order on Plaintiff's Motion to Amend First
Amended Complaint*, Docket Item No. 58, dated 08/14/07, adopted 11/26/07 (hereinafter "*MBCR R&R 08/14/07*");

## II.  STATEMENT OF FACTS

MBCR's factual statement is set forth in its Statement of Material Facts, attached hereto as (the "SMF").

## III.  STANDARD OF REVIEW

Summary judgment shall be granted where the evidence reveals "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Motions for summary judgment are used to "pierce the pleadings and to access the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir., 1990) (quoting Fed.R.Civ.P. advisory committee's note). Furthermore, "in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323 (1st Cir. 1996) (internal citations omitted).

## IV.  ANALYSIS

**A.    SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF MBCR ON COUNT I, VIOLATION OF CIVIL RIGHTS.**

In Count I of his First Amended Complaint, the Plaintiff asserts a claim against MBCR, pursuant to 42 U.S.C. § 1983 ("Section 1983"), for alleged violations of his constitutional rights. As the Magistrate pointed out, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  MBCR R&R 09/22/06, at 10 (citing *Graham v. Connor*, 490 U.S. 386, 393-94, (1989) (quotations and citation omitted)).  Section 1983 states:

---

*Report and Recommendation on Defendant MBCR's Motion to Dismiss*, Docket Item No. 38, at 2; dated 09/22/06 and adopted 10/11/06.  (hereinafter "*MBCR R&R 09/22/06*").

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983. "To prevail in a § 1983 claim, plaintiffs 'must allege facts sufficient to support a determination (i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States.'" *Cepero-Rivera v. Fagundo,* 414 F.3d 124, 129 (1st Cir. 2005) (quoting *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 32 (1st Cir. 1996)). The Plaintiff's § 1983 claim should be dismissed because the evidence demonstrates that MBCR was not a governmental agency and was not acting under color of state law. Moreover, the evidence also demonstrates that MBCR was not responsible for the Plaintiff's removal from North Station, as that decision and action was taken by MBTA police. SMF at ¶ 57. In addition, the Plaintiff did not have a right to engage in disorderly or threatening behavior, especially in a non-public forum. Finally, even if the MBTA police action was somehow attributable to MBCR, such action was reasonable and did not violate Plaintiff's rights.

## 1. MBCR Did Not Act Under Color of Law as Required Under 42 U.S.C. § 1983.

As the Magistrate noted, the substance of the Plaintiff's § 1983 claim against MBCR is that MBCR violated his First Amendment rights to freedom of speech, association and assembly by seeking his eviction from the public access areas of North Station when the Plaintiff, who had been terminated from his employment with the National Railroad Passenger Corporation ("Amtrak"), was attempting to communicate with other union members and distribute written materials regarding his termination.[2] However, "[b]ecause section 1983 does not reach private

---

[2] *MBCR R&R 09/22/06* at 13.

actions," the plaintiff must show that "the conduct at issue in this case may be fairly attributable to the State."[3] *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R.*, 84 F.3d 487, 491 (1st Cir. 1996) (internal quotations and citations omitted). See also *Yeo v. Town of Lexington*, 131 F.3d 241, 248 n.3 (1st Cir. 1997) ("The question whether [plaintiff] even has a First Amendment right to assert depends on whether there is state action."). This may be accomplished by establishing that the defendant was not a private entity but an extension of the government engaged in direct state action. See *Barrios-Velazquez,* 84 F.3d at 491-92 (analyzing whether defendant was a private party or an arm of the state engaged in direct state action). The Magistrate concluded, however, that MBCR was not engaged in direct state action, and the facts after discovery do not suggest a different conclusion.[4]

Alternatively, even if the defendant is a private organization, "the actions that give rise to the instant case may still be fairly attributed to the state as indirect state action." *Id*. at 491. Accordingly, "actions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron v. Nat'l R.R. Passenger Corp*., 513 U.S. 374, 378 (1995). While the Plaintiff has not specifically asserted that MBCR was acting under color of state law when its transportation manager asked the MBCR train dispatcher to contacted the MBTA police regarding the Plaintiff's presence at North Station, the Magistrate did conclude that issue warranted further factual analysis.[5]

In evaluating whether the conduct of an otherwise private actor constitutes indirect state action, the courts analyze whether (1) the entity assumed a traditional public function when it performed the challenged conduct, (2) an elaborate financial or regulatory nexus ties the challenged conduct to the State, or (3) a symbiotic relationship exists between the private entity

---

[3] *Id.*
[4] *Id.* at 13.
[5] *Id.* at 12-13.

and the State.  *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18 (1st Cir. 1999).  The

satisfaction of any one of these tests requires a finding of indirect state action.  *Barrios-*

*Velazquez*, 84 F.3d at 493.  The inquiry, under any of these theories, is necessarily fact-intensive,

and the ultimate conclusion regarding state action must be based on the particular facts and

circumstances of the case.  See *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531

U.S. 288, 298, 121 S. Ct. 924, 932, 148 L. Ed. 2d 807 (2001); *Perkins,* 196 F.3d at 18.  However,

the Supreme Court has held that "[a]cts of private contractors do not become acts of the

government by reason of their significant or even total engagement in performing public

contracts."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).  As the Magistrate determined that

the "elaborate financial or regulatory nexus" test did not apply,[6] MBCR will address the

traditional public function and symbiotic relationship theories, below.

### a. MBCR Did Not Perform a "Public Function" in Connection with the Defendant's Removal From North Station.

As the Magistrate Judge outlined, in order to show that the actions of a private defendant

are fairly attributable to the state under the public function theory, "a plaintiff must show more

than the mere performance of a public function by a private entity; [he] must show that the

function is one exclusively reserved to the State."  *Perkins*, 196 F.3d at 19.  Although the

government involves itself in many types of activities, including the operation of passenger

trains, "few of those activities come within the State's exclusive preserve."[7]

In her September 22, 2006 Report and Recommendation, the Magistrate Judge allowed

the Plaintiff to develop the record in order to advance claims that MBCR took on a traditional

public function when it determined "who could use the public access areas of the commuter rail

---

[6] *MBCR R&R 9/22/06* at 14.
[7] *Id.*

station and the circumstances under which they could use such areas."[8]   In particular, the Magistrate Judge relied on this court's decision in *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, in which security guards who arrested individuals protesting in a public byway were found to have taken on a public function.[9]   The facts now on record distinguish *Citizens to End Animal Suffering* from the present controversy and therefore its reasoning would be misapplied in this case.   MBCR did not make the ultimate determination to remove the Plaintiff from North Station, but merely brought the actions of the Plaintiff to the attention of MBTA police, and therefore MBCR cannot be considered a state actor under § 1983.   SMF at ¶¶ 47, 48, 49, 50, 52, 53, 57, 59, 60.

In *Citizens to End Animal Suffering*, the actions of security guards employed by the defendant Marketplace were considered state actions for purposes of a § 1983 claim on the theory that the security guards regulated access to a public easement, thereby giving their conduct the character of a "public function".   *Citizens*, 745 F.Supp. at 70-72.   In analogizing the security guard's actions to those of both the police and legislature, which are exclusive state functions, the court reasoned that the defendant Marketplace – which *employed* the security guards and *at whose direction the security guards acted* – is deciding who can use the public easement, and under what circumstances they can use it.   *Id.* at 71-72.   Therefore, the arresting and handcuffing of protestors by the security guards *at the direction of their employer*, the defendant Marketplace, meant that, "rather than acting as a private contractor, the function performed by the [defendant] Marketplace is more akin to that of a policeman."   *Id.* at 72.   Later this court took its analysis further, noting that, "Unlike the policeman who merely executes decisions of policy, defendant [Marketplace] here is actually *making* those policy decisions.

---

[8] *Id.* at 16.
[9] *Id.*, citing *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (1990).

Defendant's role is thus more like that of a legislature, which is even more clearly an exclusive state function." *Id.* (emphasis in original).

However, action of a police or legislative nature was never taken by MBCR or its employees in response to the Plaintiff's activities at North Station on July 1, 2003. SMF at ¶ 60. Ultimately, unlike the defendants in *Citizens to End Animal Suffering,* MBCR was not deciding who could access North Station or what they could do there. The record reflects that MBCR Trainmaster Jacqueline Boumel was made aware of the Plaintiff's presence at North Station when an unidentified engineer brought the Plaintiff's flyer to her attention.[10] SMF at ¶ 45. Ms. Boumel knew that the Plaintiff had been terminated by Amtrak and was not employed by MBCR,[11] and interpreted the flyer to mean that the Plaintiff was possibly planning to seize control of a commuter rail locomotive,[12] but was primarily concerned with the smooth operation of the trains during rush hour on the first day that MBCR began operating the commuter rail.[13] SMF at ¶¶ 2, 46, 50, 52. Ms. Boumel contacted her supervisor to determine what action should be taken to address the perceived threat.[14] SMF at ¶ 47. Ms. Boumel's supervisor contacted the MBCR train dispatcher, who called the MBTA police dispatcher.[15] SMF at ¶ 48. There is nothing to suggest that MBCR or Ms. Boumel had any authority upon which to demand that the Plaintiff be evicted from the premises – this was clearly a decision made by and within the control of the MBTA police. SMF at ¶¶ 49, 60, 61. In fact, Ms. Boumel also stated under oath that she did not care whether the Plaintiff was asked to leave North Station; her only concern was "to continue the rush hour peacefully."[16] SMF at ¶ 50. Furthermore, once the MBTA police

---

[10] Exhibit 21, *Transcript of Deposition of Jacqueline Boumel*, 213: 12-17 (April 2, 2008) ( "*Boumel Dep.*").
[11] *See Boumel Dep.* 218: 7-24; 219: 1-24; 231: 7-8.
[12] *See Id.* 214: 8-24; 215: 1.
[13] *See id.* 307: 8-14.
[14] *See id.* 236: 20-22 ("I called the train dispatcher and asked them what I should do.").
[15] *See Boumel Dep..* 236: 21-24; 237: 1-2; 291: 1-24.
[16] *Boumel Dep.* 307: 8-14.

arrived, MBCR had no involvement with the Plaintiff's removal and no trespass order.  SMF at ¶¶ 53, 57, 59.  When asked if it was important to her that the Plaintiff be ordered to leave the station, Ms. Boumel responded, "It was out of my hands by then.  Once the police are called, it's out of my hands."[17]  SMF at ¶ 60.  Finally, Ms. Boumel's uncontroverted testimony makes clear that neither MBCR nor its employee requested that the Plaintiff be barred from the premises for twenty-four hours: "That was between [Plaintiff] and the police.  I didn't ask for the no trespass order."[18]  SMF at  ¶¶ 60, 61.

Ms. Boumel's testimony is corroborated by that of MBTA Police Detective Robert Pavia.  Detective Pavia stated that he was dispatched at approximately 4:16 PM on July 1, 2003 to respond to a report of a disorderly man at North Station.[19]   SMF at ¶¶ 49, 51.  Detective Pavia proceeded to the scene where he located Ms. Boumel, whom, he said, informed him that an ex-Amtrak employee (the Plaintiff) was handing out flyers and appeared to be attempting to disrupt service.[20]  SMF at ¶¶ 51, 52.  Detective Pavia then proceeded to conduct his own independent investigation of the situation.[21]  SMF at ¶ 53.  He requested identification from the Plaintiff, he reviewed the content of the flyer, and he attempted to have the Plaintiff explain his actions.[22]  SMF at ¶ 53.  Detective Pavia independently concluded that the flyer was threatening, and for the safety of commuter rail passengers, ordered the Plaintiff to temporarily leave the premises.[23]  SMF at ¶¶ 53, 54, 55, 56, 57, 62, 63.   During his deposition, Detective Pavia offered the following summary of his actions in relation to this case:

---

[17] *Id.* 308: 19-23.
[18] *Id.* 311: 22-23.
[19] *See* Exhibit 23, *Transcript of Deposition of Detective Robert Pavia*, 44: 15-21 (Feb. 21, 2008) ( "*Pavia Dep.*").
[20] *See Pavia Dep.* 44: 15-21; *see also Boumel Dep.* 311: 1-4.
[21] *See Pavia Dep.* 54: 19-24.
[22] *See id.* ("I believe I walked up to [Plaintiff], talked to [Plaintiff].  I believe I probably would have asked for identification, asked what Plaintiff was doing.  I know I had asked Plaintiff for a copy of the flyer itself….").
[23] *Id.* 68: 11-24.

> I was dispatched there because somebody called, said that somebody was being disorderly and passing out threatening pamphlets.  That's what I was there for.  When I looked at the pamphlets and I found them, that they could definitely be interpreted as threatening *it was at that time that I decided that [Plaintiff was] going to have to leave the property* and stop passing out these pamphlets.

(Emphasis added).[24]    SMF at ¶¶ 49, 53, 57, 59, 62.    It is therefore clear that the decision to remove the Plaintiff from North Station was made solely by, and at the discretion of, the MBTA Police.  The authority to order such an action was also solely that of the MBTA Police, as Detective Pavia explained to the Plaintiff during his deposition; "as an official of the MBTA I have the right to tell you that you have to leave."[25]

The record demonstrates that MBCR's sole concern in this matter was its ability to conduct commuter rail operations as scheduled.  When the Plaintiff arrived and the prospect of a disruption in operations surfaced, MBCR simply contacted the MBTA Police to ensure that any such incident would be averted.  SMF at ¶¶ 46, 47, 48. Unlike the active measures taken by the security guards employed by the defendant Marketplace in *Citizens to End Animal Suffering*, MBCR employees simply brought objectionable conduct to the attention of the police for review.[26]  SMF at ¶ 48.  MBCR employees took no direct action to eject the Plaintiff from the premises, and claimed neither the authority to remove the Plaintiff from North Station, nor an interest in denying him access to the facility.  SMF at ¶¶ 50, 60, 61.

By bringing the Plaintiff's potentially harmful actions to the attention of the police, not only did MBCR act properly, but it served the public's interests as well.  The First Circuit has recognized the "strong public interest in encouraging people to bring possible wrongdoing to the

---

[24] *Pavia Dep.* 58: 13-20.

[25] *Id.* 76: 22-24.

[26] In this regard, the actions of MBCR are more directly analogous to those of the defendant in *Carey v. Continental Air Lines*, 823 F.2d 1402 (10th Cir., 1987).  In *Carey*, the Tenth Circuit found that an airline worker who called police in order to eject a striking airline worker did <u>not</u> act under color of law by reporting the trespass.  *Id.*  Courts within the First Circuit have favorably cited *Carey* on multiple occasions, including the *Citizens to End Animal Suffering* decision upon which the Magistrate Judge based her Report and Recommendation.  *See Citizens to End Animal Suffering*, 75 F.Supp. at 72; *see also Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d at 254.

authorities' attention." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249 (1st Cir. 1996). "Consequently, when a private party, acting in good faith, reports suspected criminal activity to the police, the cutlass of the federal civil rights statute remains in its scabbard." *Id.* Here, Trainmaster Boumel was legitimately concerned that the Plaintiff's threats to "displace" a train may have meant that he intended to board the engineer's cab of a train and drive it away. SMF at ¶ 52. Therefore, as MBCR's conduct in relation to the Plaintiff's removal from North Station was a good faith effort to report suspicious activity, MBCR cannot be subjected to a federal civil rights claim.

**b. MBCR Does Not Share a "Symbiotic Relationship" With The State.**

In addition to the "public function" basis for allowing the Plaintiff's § 1983 claim to proceed, the Magistrate Judge permitted the parties to develop facts to determine whether MBCR's actions could be attributable to the state on the basis of a "symbiotic relationship" between the two.[27] Citing the standard articulated in *Perkins v. Londonderry Basketball Club*, the Magistrate noted that this analysis hinges on whether "the government has so far insulated itself into a position of interdependence with (the private entity) that it must be recognized as a joint participant in the challenged activity."[28] *Perkins* calls for a review of the totality of the circumstances surrounding the link between a private entity and the government, and stresses the "extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs." *Perkins*, 196 F.3d at 21. The First Circuit also stated in *Perkins* that the symbiotic relationship analysis "concentrates…on the nature of the overall relationship between the state and the private entity." *Id.* However, the Supreme Court has held that "[a]cts of private contractors do not become acts of the government by reason of their significant or even total

---

[27] *MBCR R&R 09/22/06*, Docket Item No. 38, at 17.
[28] *Id.*, citing *Perkins v.Londonderry Basketball Club*, 196 F.3d 13 (1st Cir., 1999)(internal citations omitted).

engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). This finding undercuts the applicability of a symbiotic relationship test in the context of a government subcontractor such as MBCR.

As the Magistrate noted, in *Citizens to End Animal Suffering* the determination that the relationship between the defendant and the City of Boston was "sufficiently interdependent to be considered 'symbiotic" was based upon a number of factors. *Citizens to End Animal Suffering*, 745 F. Supp. at 74. In particular, the court found it significant that the defendant leased its property from the City and that the City reserved for public access and passage the walkways on which the plaintiffs wished to protest. *Id.* at 73. It also found it especially important that the City derived economic benefit from the defendant's restrictions on the use of the walkways. *Id.*

The relationship between the MBTA and MBCR was established for the record through the testimony of the MBTA's Director of Railroad Operations, Mr. John D. Ray.[29] SMF at ¶ 14. Mr. Ray explained that, "[the] MBTA is a public agency that hired…MBCR…to operate the commuter rail service."[30] SMF at ¶ 14(a). Mr. Ray stated that, "MBCR is an independent contractor to the MBTA."[31] SMF at ¶ 14(b). It was also established that MBCR is not an agent of the MBTA.[32] SMF at ¶ 14(b). The autonomy of MBCR is further exhibited by its control over its personnel decisions and its exclusive supervisory authority over its employees.[33]

Unlike the evidence in *Citizens to End Animal Suffering,* which clearly established a symbiotic relationship between the defendant and the City of Boston, here the Plaintiff has offered no evidence to show that MBCR and the MBTA share the same kind of interdependence.

---

[29] *See generally* <u>Exhibit 10</u>, *Transcript of Deposition of John D. Ray* (April 30, 2008) ("*Ray Dep.*").
[30] *Ray Dep.* 74: 24; 75: 1-2.
[31] *Id.* 153: 8-21.
[32] *Id.*
[33] *Id.* at 155: 8-17 (Mr. Ray stated that the MBTA does not have involvement in the hiring or firing of MBCR personnel, and that the MBTA does not have supervisory authority over MBCR employees.).

Particularly, there are no allegations or evidence to suggest that MBCR leased property from the MBTA, or that MBCR was operating its own business.  To the contrary, there is ample evidence to prove that MBCR is an independent contractor of the MBTA.  SMF at ¶ 14(b).  Specifically, the Operating Agreement between the MBTA and MBCR stated that " [i]n the performance of its obligations under this Agreement, Contractor is an independent contractor for, and not an agent of, the MBTA."[34]  Therefore, while MBCR works closely with the MBTA, it cannot be said that MBCR shares a "symbiotic relationship" that would make actions taken by MBCR imputable to the state.

### c.  <u>Officer Pavia Acted Reasonably, and Did Not Violate Plaintiff's Rights</u>.

Even in the case of public property, the rights of access, and to communicate with other people, are not unlimited, especially in a non-public forum.  (As set forth in the MBTA's Memorandum, North Station is a non-public forum.)  Property owners are permitted to establish reasonable restrictions, and are especially permitted to take reasonable action in the face of a potential threat.  *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980); *Paff v. Kaltenbach,* 204 F.3d 425, 437 (3d Cir. 2000).

The Plaintiff had no constitutionally protected right to act in a disruptive and threatening manner.  As the MBTA points out in its memorandum, the First Amendment does not permit threatening words or conduct in a crowded railway station implicating the public safety.  See e.g. *Virginia v. Black,* 538 U.S. 343, 358-9 (2003); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572 (1942).  Both MBCR Trainmaster Jackie Boumel and MBTA Officer Pavia believed that the Plaintiff was being potentially disruptive of the commuter rail service, and expressed an intent to take over or "displace" a train.  SMF at ¶¶, 46, 52, 53, 56.  Indeed, the Plaintiff's "leaflet" not only specifically made that point, but also added fairly incendiary language,

---

[34] <u>Exhibit 3</u>, *Operating Agreement Between MBCR & MBTA*, 02/19/03, at § 11.1 ("*Operating Agreement*").

including an exclamation that "Guildenstern is Dead!"  SMF at ¶¶ 42, 54.  As Officer Pavia correctly pointed out, "disorderly or threatening behavior would be a prohibited activity that would cause [Plaintiff] to be issued a trespass warning and ejected from the property."[35]  SMF at ¶ 62.  This was, by any objective standard, a reasonable response to the situation.

### 2.  MBCR Did Not Act By "Threats, Coercion or Intimidation" as Required Under M.G.L. ch. 12 §§ 11H, 11I.

The record establishes that the Plaintiff cannot prevail on a state civil rights claim against MBCR.  The Massachusetts Civil Rights Act was drafted to offer a broader range of protections than its federal counterpart, and applies to private actors who, by means of "threats, intimidation, or coercion," interfere with a right protected under the state or federal Constitutions.  M.G.L. ch. 12 §§ 11H, 11I; *Batchelder v. Allied Stores International*, 393 Mass. 819, 823 (1984).  To establish a claim under the Act, a plaintiff must allege and prove (1) that his "exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of the Commonwealth, has been interfered with, or attempted to be interfered with," and (2) that the interference or attempted interference was by "threat, intimidation or coercion." M.G.L. c. 12, §§ 11H, 11I; *see also Appleton v. Town of Hudson,* 397 Mass. 812, 817 (1986).

First, as previously noted, the Plaintiff's conduct at North Station was not Constitutionally-protected under the First Amendment.  Similarly, the Plaintiff has no statutorily-protected right under the Railway Labor Act, as this Court dismissed the Plaintiff's RLA claim.[36]

More important, however, there is no allegation or evidence to suggest that MBCR interfered with or took any action against the Plaintiff that could be considered threatening,

---

[35]  *See* Ex. 23,  *Pavia Dep.* 75: 12-15.
[36]  *See MBCR R&R 09/22/06,* at 20.

coercive or intimidating.[37]   Conversely, there is ample evidence showing an absence of MBCR involvement surrounding the Plaintiff's removal from North Station.   Specifically, the Plaintiff indicated that he had no problem with Boumel when he recalled saying to her "I'm okay with what [Officer Pavia's] doing, Jackie."[38]   SMF at ¶ 61.   Furthermore, the Plaintiff spoke about his concern for Boumel when he stated that "I wanted her to be able to do her job and feel comfortable about doing her job, and I didn't want her to feel like I was getting in the way of her doing her job."[39]   Finally, although not attributable to MBCR, the Plaintiff's own account of his interaction with Officer Pavia suggests a cordial, non-threatening interaction:   Plaintiff was "invited" to walk with Officer Pavia towards the exit; Officer Pavia "advised" the Plaintiff of his right to distribute flyers off of MBTA property; and, Officer Pavia "explained" the nature of the trespass order to the Plaintiff.[40]   SMF at ¶¶ 58, 59,

Even if Officer Pavia's actions could be imputed to MBCR, a state civil rights claim is barred by the reasonableness of both Officer Pavia's interpretation of the Plaintiff's leaflet as threatening, and his subsequent decision to issue a twenty-four hour no trespass order to the Plaintiff.   SMF at ¶¶ 53, 58, 59.   Without any claim of threats, intimidation or coercion by MBCR, and without a factual record to support such allegations, the Plaintiff's claim under the Massachusetts Civil Rights Act cannot be sustained.

**B.     SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF MBCR COUNT X, ALLEGED VIOLATION OF THE FEDERAL REHABILITATION ACT.**

---

[37] *See* <u>Ex. 21</u>, *Boumel Dep.* 302: 4-10.  Ms. Boumel had no recollection of even speaking to Plaintiff throughout the course of events leading to his removal.  *Id.*  However, Ms. Boumel testified that she remembers that Plaintiff "didn't seem upset" with her.  *Id.* 305: 12-13.  *See also Complaint*, at 6-7 (Plaintiff makes no mention of *any* interaction with MBCR employees in relation to his removal).

[38]  *See* <u>Exhibit 19</u>, *Transcript of Deposition II of Joseph T. Carmack,* 70: 22-3 (April 29, 2008) (hereinafter "*Carmack Dep. II*").

[39] *See Carmack Dep. II,* 71: 11-13.

[40] *See* <u>Exhibit 1</u>, *Affidavit of Joseph T. Carmack*, dated July 12, 2003, at ¶ 58 (hereinafter "Carmack Aff.").

Plaintiff alleges that he was denied a position with MBCR on the basis of disability in violation of the federal Rehabilitation Act, 29 U.S.C. § 794 (the "Act"). Summary judgment is appropriate with respect to this claim because MBCR is not a recipient of federal funding as required under the Act, and because Plaintiff has not offered evidence to establish a prima facie case of disability discrimination as required under the Act. In particular, the Plaintiff has not shown that he was "otherwise qualified" for the position he sought. In fact, because the Plaintiff had been terminated from Amtrak, he failed to meet the most basic prerequisite for consideration for a position with MBCR – active employment with Amtrak.

1. **MBCR Is Not a Recipient of federal Funds.**

The Federal Rehabilitation Act makes it illegal for "any program or activity receiving Federal financial assistance" to discriminate against a handicapped person "solely by reason of his handicap." 29 U.S.C. § 794. However, application of the Rehabilitation Act to an employer is based on "an arrangement in the nature of contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *United States Dept. of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 605 (1986) (citing *Soberal-Perez v. Heckler*, 707 F.2d 36, 41 (1983)). Under this scheme, the Rehabilitation Act's obligations become "part of the [recipient's] decision whether or not to 'receive' federal funds." *Paralyzed Veterans of America*, 477 U.S. at 606. In its *Paralyzed Veterans of America* decision, the Supreme Court distinguished airports, which were the direct recipients of federal financial assistance, from commercial airlines that operated out of those airports but still benefitted from this assistance: "The statute covers those who receive aid, but does not extend as far as those who benefit from it." *Id.* at 607 (distinguishing *Grove City College v. Bell*, 465 U.S. 555 (1983)).

There is nothing in the record to indicate that MBCR received federal funding, either directly or indirectly. This crucial fact is established by deposition testimony from the MBTA's Deputy Budget Director, Mr. Charles A. Passanisi, Jr.[41] SMF at ¶ 15. Mr. Passanisi described the relationship between the MBTA and MBCR as contractual in nature, and noted that, "[o]n the member MBCR fixed price contract, there was no federal financial assistance flowing to [MBCR]."[42] SMF at ¶¶ 15(a), 15(b), 15(c). Mr. Passanisi explained at length that the bulk of the federal financial assistance that the MBTA receives is used for capital improvements, with some monies specifically earmarked, such as the designation of funds received from the Department of Homeland Security for safety measures.[43] The MBTA segregates its rail operating budget from its capital budget, and pays MBCR out of "MBTA funds only" without any federal assistance being redirected to MBCR.[44] SMF at ¶ 15(b), 15(c).

Even if it were possible to show that MBCR was paid from MBTA funds that contained indirect federal transportation grants, (which, again, the Plaintiff has not shown), MBCR would still fall outside the purview of the Rehabilitation Act, as the nature of MBCR's relationship with the MBTA is that of a contractor being compensated at fair market value for services rendered. See *Hamilton v. Ill. Cent. R.R.*, 894 F. Supp. 1014 (S.D. Miss. 1995). In Hamilton, the defendant, Illinois Central Railroad ("ICR"), a private for-profit rail company, was hired by the state of Mississippi to construct and improve various grade crossings. *Id*. The project was partially paid for with federal funds from the Federal Highway Administration. *Id*. The defendant ICR challenged the applicability of the Rehabilitation Act, and the court held that the Act did not apply to ICR, despite the fact that the federal government was the ultimate source of the funds

---

[41] *See generally* <u>Exhibit 11</u>, *Transcript of Deposition of Charles A. Passanisi, Jr.* (hereinafter "*Passanisi Dep.*").
[42] *See Passanisi Dep.* 37: 1-24; 38: 1-16.
[43] *Id.* at 40-43.
[44] *Id.* 47: 24; 48: 1-9.

ICR received. *Id*. As the Hamilton court noted, "purely compensatory payments pursuant to a contract for services do not constitute federal financial assistance." *Id*. (citing *DeVargas v. Mason & Silas-Mason*, 911 F.2d 1377, 1383 (10th Cir. 1990)).

Like ICR, MBCR is a contractor being paid fair market value for services rendered, and does not itself receive federal grants or subsidies. Therefore, the Rehabilitation Act is inapplicable to MBCR, and the Plaintiff's claim thereunder should be dismissed.

2.  **The Plaintiff Was Not "Otherwise Qualified" For The Position with MBCR.**

Even if the Plaintiff was able to establish that the Rehabilitation Act applied in this case, to obtain relief under the Rehabilitation Act he would still need to establish a prima facie case of discrimination. The Rehabilitation Act sets out that "no *otherwise qualified individual* with a disability in the United States … shall, *solely by reason of his or her disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C § 794 (emphasis added). The District Court for Massachusetts has stated that failure to meet the minimum requirements for employment renders someone 'not otherwise qualified' under the Rehabilitation Act. In its *Fiumara v. Trustees of Harvard College* decision, the District Court found that the plaintiff bus driver, who failed to maintain his commercial driver's license in accordance with his job description, was unqualified to return to his job following a medical leave of absence. *Fiumara v. Trustees of Harvard College,* 526 F.Supp.2d 150 (2007). The Court found that the collective bargaining agreement in *Fiumara* clearly established that a current commercial driver's license was an absolute requirement for employment, and thus the plaintiff's termination was valid. *Fiumara v. Trustees of Harvard College,* 526 F.Supp.2d at 159.

Like the plaintiff in *Fiumara*, who failed to meet the licensing requirement for employment, the record establishes that the Plaintiff's termination by Amtrak rendered him not "otherwise qualified" for employment with MBCR pursuant to the terms of the Implementing Agreement between MBCR and the Plaintiff's union, the Brotherhood of Locomotive Engineers ("BLE").[45] SMF at ¶¶ 8, 9, 18, 19,  Although the Plaintiff asserts that despite his termination from Amtrak he somehow remained an Amtrak "employee" and was therefore eligible for a position with MBCR pursuant to the BLE Implementing Agreement, the terms of the Agreement itself demonstrate otherwise.  SMF at ¶¶ 31, 34, 35. The Implementing Agreement between MBCR and BLE only required offers to be made to "active" employees of Amtrak, which the Plaintiff was not either at the time he received the Conditional Offer of Employment Letter from MBCR, or when he sent an acceptance letter to MBCR.  SMF at ¶¶, 7, 8, 9, 11. 17, 18, 29, 30, 31, 35.  Specifically, the Implementing Agreement established that "qualified engineers" were limited to passenger engineers with prior rights to Amtrak work Zone CS-1, those in work Zone CS-1 as of the date of the agreement, and all others working in the Boston Crew.[46]  SMF at ¶ 20.

Furthermore, the language of the Conditional Offer of Employment letter, which was mistakenly sent to the Plaintiff, supports the already proven fact that only active employees were entitled to employment with MBCR.[47]  SMF at ¶ 29.  Specifically, it states that "this offer of employment is conditioned upon your holding sufficient seniority on an Amtrak Work Zone CS-1 or Work Zone 1 roster in accordance with the agreement between MBCR and BLE."[48]  SMF at ¶ 20.  Despite the present tense of the letter, the Plaintiff claims that his response to the letter

---

[45] *See Generally* <u>Exhibit 4</u>, *Implementation Agreement Between MBCR and BLE* (hereinafter "*BLE Implementing Agreeement*").
[46] *See generally* <u>Ex. 4</u>, *BLE Implementing Agreement.*
[47] *See generally* <u>Exhibit 12</u>,  Declaration of Dennis Coffey dated June 10, 2008 (hereinafter "C*offey Decl.*") (Outlining the process used by the MBCR Transition Team to create a roster of qualified employees, and explaining the mistaken delivery of a letter to the Plaintiff).
[48] *See* generally <u>Exhibit 14</u>, *Letter from Kevin Lydon to Joseph Carmack* dated May 6, 2003 (hereinafter "*Lydon Letter*").

alone sufficed to force MBCR to employ him, when in reality the offer was conditioned upon his active employment with Amtrak.[49]    SMF at ¶¶ 24, 25, 33, 35.   The absolute requirement of current employment with Amtrak was further highlighted by the portions of the letter stating "we are looking forward to employing you and <u>other</u> members of the <u>current</u> commuter rail workforce, and we know that with the experience of the <u>current</u> team we can accomplish our goal of continually improving the quality of service."[50]   SMF at ¶ 24.   At best, Plaintiff came closest to qualifying for a sort of 'reserve' status under the BLE Implementing Agreement, which stated that otherwise eligible, qualified engineers

> who are inactive for the entire application and bidding period by reason of sickness, temporary or occupational disability, <u>disciplinary suspension or dismissal</u>, military leave, leave of absence . . . revocation of engineer certification, or vacation, shall have the right to make application within five (5) days of their <u>return to active status</u>.

Ex. 4, BLE Implementing Agreement, Part I.4.E. (emphasis added).   SMF at ¶ 21.   However, the Plaintiff had been terminated by Amtrak on May 13, 2002, the termination was upheld by the Special Board of Arbitration ("SBA") on January 31, 2003, and the termination became "final and binding" with the BLE's ratification of the SBA decision on April 21, 2003.   SMF at ¶¶ 7, 8, 9, 10, 11, 12.   Even the BLE considered the matter closed.[51]   SMF at ¶ 12.   As the Plaintiff's termination from Amtrak was final, he did not even qualified for this 'reserve' language.   In short, the Plaintiff had no standing whatsoever for a transitional position with MBCR.

Given the unambiguous requirement of active employment, the fact that the Plaintiff was not employed by Amtrak at the time of the change in ownership clearly proves that he was not qualified for a position with MBCR.

3.   **<u>The Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination</u>.**

---

[49] <u>Ex. 12</u>,  *Coffey Decl.* at 1, ¶ 5; 2, ¶¶ 8, 13.
[50] *See* <u>Ex.14</u>,  *Lydon Letter*.
[51] *See* <u>Exhibit 29</u>, *Letter from Kenney (BLE) to Carmack regarding decision of SBA No. 928*, dated 5/6/03.

Even if the Plaintiff could establish an issue of fact regarding whether he is a qualified individual with a disability, the Plaintiff has still failed to present any evidence in support of the third prong of a case for disability discrimination, which requires a showing that he was discharged solely based upon his disability.   The Plaintiff has adduced no evidence to show that the decision by MBCR not to hire him was based upon his disability.   As the foregoing demonstrates, the Plaintiff was not hired because he was not an Amtrak employee entitled to the Conditional Offer of Employment.[52]   SMF at ¶¶ 31, 32.   Indeed, the declaration of the person processing the transitional applications – Dennis Coffey – demonstrates that the only reason that the Plaintiff was not offered a position with MBCR was because he was not an employee of Amtrak.[53]   SMF at ¶¶ 31, 32.   The Plaintiff's termination from Amtrak prior to the change in ownership between Amtrak and MBCR rendered him not "otherwise qualified" for a position with MBCR.   SMF at ¶¶ 7, 8, 9, 10, 11, 12, 13.   As such, no claim based on the Rehabilitation Act can be advanced against MBCR, and summary judgment is appropriate regarding Count X.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, MBCR is entitled to summary judgment in its favor on all remaining counts in this case, and the matter should be dismissed in its entirety as to MBCR.

---

[52] *See* <u>Ex. 12</u>, Coffey Decl. at 2 ¶¶ 13, 14.
[53] *Id.* at 2 ¶ 14.

Respectfully Submitted,
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY,
By its attorneys,

/s/ Robert K. Blaisdell
Robert K. Blaisdell, BBO #568060
Donoghue, Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, Massachusetts  02108
(617) 598-6700

Dated:  June 18, 2008

**<u>CERTIFICATE OF SERVICE</u>**

**I, Robert K. Blaisdell, hereby certify that I have caused copies of the foregoing document to be served upon by first class mail, postage prepaid to be served upon *pro se* Plaintiff Joseph T. Carmack, 592 Tremont Street, Boston, MA, this 18th day of June, 2008.**

**<u>/s/ Robert K. Blaisdell</u>**
**Robert K. Blaisdell**

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
_____
                              )
JOSEPH T.  CARMACK,           )
         Plaintiff, pro se    )
                              )
v.                            )          C.A. No. 05-11430-PBS
                              )
MASSACHUSETTS BAY             )
TRANSPORTATION AUTHORITY      )
and MASSACHUSETTS BAY         )
COMMUTER RAILROAD,            )
         Defendants           )
_____)
```

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 1

```
* * * * * * * * * * * * * * * * * * * * * *
      In Re: Joseph T. Carmack        *
                                      *
              v.                      *
                                      *        AFFIDAVIT
                                      *
      Massachusetts Bay Transportation *
                Authority             *
                                      *
* * * * * * * * * * * * * * * * * * * * * *
```

## INTRODUCTION

1. Joseph T. Carmack, hereinafter referred to as plaintiff is resident of Massachusetts residing at 592 Tremont Street Apt. 5, Boston, MA 02118.


2. The Massachusetts Bay Transportation Authority (MBTA, also hereinafter referred to as defendant) is a state agency which owns and operates public transportation throughout eastern Massachusetts.


3. Massachusetts Bay Commuter Rail (MBCR, also herinafter referred to as the "carrier") is a private agency contracted by the defendant to operate commuter rail transportation in Massachusetts beginning July 1, 2003.


4. The Brotherhood of Locomotive Engineers is a collective bargaining organization representing commuter rail locomotive engineers, including plaintiff, on the Massachusetts commuter rail system in accordance with the Railway Labor Act (USCA 45 ss. 151 et. seq.)


## BACKGROUND

5. In May 2002 plaintiff was terminated from employment with Amtrak in his capacities as Locomotive Engineer.

6. Termination was not "final and binding" and was still open to dispute resolution under the terms of the Railway Labor Act and the Amtrak BLE agreement.

7. With knowledge that plaintiff was continuing to seek union assistance in his case, on August 20, 2002, Amtrak sent plaintiff a warning that he would be charged with trespassing if he was to enter any employee areas at North or South Stations (Exhibit A)

8. On August 31, 2002, Plaintiff sent a response to Amtrak (Exhibit B) claiming legal right to "public access" in North and South stations and rights of "freedom of association" with other union members as per the Railway Labor Act (USCA 45 ss. 151 et. seq.).

9. In early May 2003, the Brotherhood of Locomotive Engineers ratified a collective bargaining agreement with MBCR in preparation for MBCR to begin operating commuter rail service on July 1, 2003.

10. The new MBCR/BLE agreement, in combination with the existing Amtrak/BLE agreement, is to cover commuter rail engineers who had been employed by Amtrak, including the plaintiff.

11. Plaintiff was considered an "eligible employee" in accordance with the MBCR/BLE agreement.

12. Plaintiff successfully completed the requirements of agreement which included completing an application, medical questionnaire and completing a "bid" or list of job preferences to be awarded by seniority in accordance with MBCR/BLE agreement (Exhibits $C_1$, $C_2$ and $C_3$)

13.  When publishing awards, MBCR failed to award plaintiff in accordance with seniority as per MBCR/BLE and Amtrak/BLE agreements.

14.  Plaintiff began attempting to contact MBCR officials when bids were published beginning on or about June 19, 2003.

15.  Plaintiff ultimately submitted a grievance concerning the matter (Exhibit D).

## FACTS OF COMPLAINT

16.  On July 1, 2003, MBCR began operating Massachusetts commuter rail and plaintiff managed to contact MBCR officials by phone to discuss his grievance and right to a job.

17.  After several phone conversations in which officials revealed that they did not take issue with plaintiff's agreement rights, the Labor Relations officer advised plaintiff that MBCR had made an agreement with defendant which required that employees resolve issues with Amtrak prior to assuming positions on MBCR.

18.  Plaintiff felt this position clearly qualified him for payment and cause to file "time claims" in accordance with BLE agreements.

19.  The BLE union representative was refusing to assist plaintiff.

20.  In order to protect his rights, plaintiff felt it important to report to North Station to go on record with other union members as available for duty and needing

assistance to file "time claims" for rightful compensation in accordance with BLE agreements.

21. Plaintiff prepared and photocopied an announcement (or leaflet) printed in single sheets on both sides to hand to engineers at North Station (Exhibit E).

22. Plaintiff arrived at North Station approximately 3:55 PM on July 1, 2003 to talk to other union employees and distribute his announcement.

23. At approximately 4:15 PM plaintiff was approached by a white male of approximately 5'7", approximately 230 lb. and wearing an MBTA police uniform with a "buzz" haircut. Said white male is hereinafter referred to as "Officer Pavia" for purposes of this report and in accordance with MBTA Police report Journal No. 03019163 (Exhibit F).

24. Officer Pavia asked plaintiff what plaintiff was doing.

25. Plaintiff explained that he was handing leaflets to other union members.

26. Officer Pavia asked plaintiff; "And what makes you think you can do that here?"

27. Plaintiff: "This is a place of public access".

28. Officer Pavia: "No, actually, it's not. The station is owned by the MBTA."

29. Officer advised plaintiff he was trespassing, asked plaintiff to give officer Pavia a leaflet and asked plaintiff for identification. Officer Pavia specifically complained about the language on the leaflet and mentioned particularly the word "displacing".

30. Officer Pavia asked Plaintiff if plaintiff was an employee and Plaintiff explained that plaintiff is an employee in accordance with the plaintiff's collective bargaining agreement, but that it was an issue of contention.

31. Plaintiff assumed that Officer Pavia was becoming increasingly angry and assured the officer that the plaintiff would comply with whatever the officer asked of him, but that plaintiff wanted to answer his questions honestly.

32. Officer Pavia announced to plaintiff that Officer Pavia was going to give plaintiff a trespass order, insisted that plaintiff stand in a certain spot and asked plaintiff; "When was the last time you were arrested?"

33. Plaintiff answered: "The 1983 bus strike" as officer walked away and entered and exited several offices.

34. After a period of time, Officer Pavia returned to the plaintiff with trainmaster Boumel and began complaining about the words in the leaflet again, but officer Pavia seemed unsure what was precisely objectionable. Finally, Officer Pavia reiterated his previous claim that plaintiff was creating a disturbance.

35. Plaintiff was beginning to feel that a written report would substantiate that the carrier was preventing plaintiff from resolving grievances, time claims and disputes in

accordance with the Railway Labor Act. This would particularly be so if a written report mentioned Ms. Boumel.

36. In order to reassure her, Plaintiff explained to Ms. Boumel; "I'm OK with everything he's doing, Jackie, he's just making my point for me".

37. Although plaintiff was not pleased with having to leave the station or desist from leafleting or communicating with other union members, he felt it important that all parties understand that plaintiff was not being confrontational.

38. Ms. Boumel seemed pleased with the reassurance and shrugged her shoulders and went back into the office.

39. Officer Pavia invited plaintiff to walk with him toward the exit and officer Pavia explained that plaintiff was banned from all MBTA stations for 24 hours. Officer Pavia advised plaintiff that if plaintiff returned plaintiff could be arrested, plaintiff could be charged with trespassing and plaintiff could be served with a restraining order and/or an injunction. Officer Pavia explained that if plaintiff had a problem with any of the officer's orders, plaintiff would have to file a complaint in court. Officer Pavia advised Plaintiff that it was okay to hand out leaflets outside the MBTA stations off of station property, but if any leaflets ended up on MBTA property, plaintiff would be "responsible". When plaintiff asked what plaintiff could do about it if he wasn't allowed to enter the station, Officer Pavia merely repeated the statement.

40. Plaintiff left the station without receiving any written document.

41. Plaintiff called MBTA headquarters and asked for a copy of the report.

42.  MBTA advised plaintiff he could retrieve a copy from the station after 24 hours.

43.  After a failed attempt to retrieve such a report, plaintiff called the MBTA Police station again and the MBTA police finally sent a report in the mail which arrived on July 9, 2003.

I hereby certify that the above statement is a true statement recording events that I have witnessed.

Affiant _Joseph T. Carmack_ Joseph T. Carmack

Date: JULY 12, 2003

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　　C.A. No. 05-11430-PBS |

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11430-PBS

JOSEPH T. CARMACK,
                    Plaintiff,

vs.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY and MASSACHUSETTS BAY
COMMUTER RAILROAD COMPANY,
                    Defendants.

DEPOSITION OF JOSEPH T. CARMACK, taken
pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Defendant,
Massachusetts Bay Transportation Authority,
before Simonne J. Elwood, R.P.R. and a Notary
Public in and for the Commonwealth of
Massachusetts, at the office of Smith & Duggan
LLP, Two Center Plaza, Boston, Massachusetts,
commencing on Monday, April 28, 2008 at
2:50 p.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

Vol. 1 - 31

J. CARMACK

| | | |
|---|---|---|
| 1 | | became a dispatcher in 1992 or 1993? |
| 2 | A | Yes.  1992.  You said 1993.  I think it was |
| 3 | | 1993. |
| 4 | Q | You think it was 1993? |
| 5 | A | Yeah, I'm pretty sure. |
| 6 | Q | Okay.  And who employed you as a dispatcher? |
| 7 | A | Amtrak. |
| 8 | Q | And were you a member of a different union |
| 9 | | when you became a dispatcher? |
| 10 | A | Yeah.  Something called the American Train |
| 11 | | Dispatchers Division. |
| 12 | Q | That's the name of the union? |
| 13 | A | Yes. |
| 14 | Q | Did you do any work for that union in your |
| 15 | | tenure as a dispatcher? |
| 16 | A | No. |
| 17 | Q | Were you an officer of the union? |
| 18 | A | No. |
| 19 | Q | How long were you a dispatcher? |
| 20 | A | I think three years. |
| 21 | Q | So until sometime in 1996? |
| 22 | A | Yes, December of 1996.  Well, no.  It would |
| 23 | | have been the fall of 1996 sometime.  My |

Vol. 1 - 32

J. CARMACK

| | | |
|---|---|---|
| 1 | | seniority date as an engineer was December of |
| 2 | | 1996, but I was -- I was still, technically, |
| 3 | | a dispatcher, but I had maintained my |
| 4 | | seniority date on a leave of absence from |
| 5 | | sometime in November; sometime in November. |
| 6 | Q | So you think you -- and you think that |
| 7 | | November date is the date that you actually |
| 8 | | stopped working as a dispatcher? |
| 9 | A | Yeah.  I was on a leave of absence. |
| 10 | Q | Were you involved in any grievances when you |
| 11 | | were a dispatcher? |
| 12 | A | Well, there was a discipline.  There was a |
| 13 | | disciplinary hearing. |
| 14 | Q | What was your involvement with the |
| 15 | | disciplinary hearing? |
| 16 | A | I was in training as a dispatcher, and I |
| 17 | | think this was in 1993.  I was training with |
| 18 | | a dispatcher by the name of Mark Bennett, and |
| 19 | | he got up from the -- the radio, the radio |
| 20 | | area in the control panel. |
| 21 | Q | I'm sorry.  Where is this? |
| 22 | A | Okay.  I'm sorry. |
| 23 | Q | That's all right.  If you can take it a step |

Vol. 1 - 57

J. CARMACK

| | | |
|---|---|---|
| 1 | | some kind of term, I think, but it was |
| 2 | | locomotive engineer.  I was hired as a |
| 3 | | locomotive engineer. |
| 4 | Q | Your concept is an apprentice or a trainee or |
| 5 | | something like that? |
| 6 | A | Yeah. |
| 7 | Q | When did you become an actual locomotive |
| 8 | | engineer as opposed to a trainee or an |
| 9 | | apprentice? |
| 10 | A | Well, it's complicated because you get what |
| 11 | | is called student certification.  I got that |
| 12 | | on December 20th of 1996, but they -- and |
| 13 | | after that, you just run trains with another |
| 14 | | passenger engineer until they decide to |
| 15 | | certify you, and they made me wait a long |
| 16 | | time. |
| 17 | Q | Do you remember when it was? |
| 18 | A | Yeah.  I think it was May of '78. |
| 19 | Q | You mean May of '98? |
| 20 | A | I'm sorry.  '78 is on the brain, I guess. |
| 21 | | '98.  1998.  May of 1998. |
| 22 | Q | And were you a member of the union; of a |
| 23 | | union? |

Vol. 1 - 68

J. CARMACK

1          locomotive engineer in May of 1998 working

2          for Amtrak; and at some point prior to 1998

3          becoming a member of the Brotherhood of

4          Locomotive Engineers, is that correct?

5     A    Yes.

6     Q    And you were employed by Amtrak until May

7          13th, 2002, is that correct?

8     A    Yeah.  That was Amtrak's understanding.

9     Q    Now, I'm asking you:  Is that a correct

10         statement of fact?

11    A    Well, I'm not sure if it's the 13th or the

12         17th, but Amtrak continuously publishes the

13         date, the 13th.  I think it's, you know, --

14    Q    So what you're saying is you're not sure

15         whether it was May 13th or May 17th; but on

16         one those two dates in 2002, Amtrak

17         terminated your employment?

18    A    Yes.

19    Q    And you admit that?

20    A    Yes.  I should -- I would like to add the

21         caveat that it was subject -- the termination

22         was subject to union agreement.  So it's kind

23         of -- I'm not sure what termination means is

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

———————————————————
)
JOSEPH T. CARMACK,                           )
        Plaintiff, *pro se*          )
                       )
v.                                           )          C.A. No. 05-11430-PBS
                       )
MASSACHUSETTS BAY                            )
TRANSPORTATION AUTHORITY                     )
and MASSACHUSETTS BAY                        )
COMMUTER RAILROAD,                           )
        Defendants                   )
———————————————————)

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 4

# AGREEMENT

## By and Between

## MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY

## And

## BROTHERHOOD OF LOCOMOTIVE ENGINEERS

---

WHEREAS, the Massachusetts Bay Commuter Railroad (hereinafter "MBCR") has agreed to assume certain responsibilities for the operation of the Commuter Passenger Railroad for the Massachusetts Bay Transportation Authority (hereinafter "MBTA"), effective July 1, 2003;

WHEREAS, it is the desire of the parties to this Agreement to avoid any interruption of service in the interests of the public and to minimize impact on the commuter rail employees of Amtrak, the operator of MBTA Commuter Railroad prior to July 1, 2003;

WHEREAS, the assumption of this operation will result in the establishment by MBCR of comparable positions necessary to perform certain work formerly performed by commuter rail employees of Amtrak as the operator; and

WHEREAS, MBCR intends to offer employment with MBCR to certain commuter rail employees of Amtrak.

NOW, THEREFORE, IT IS AGREED:

## PART I

1. MBCR recognizes the Brotherhood of Locomotive Engineers (hereinafter "BLE" or "Organization") as the bargaining representative of the Passenger Engineers to be employed in the service covered by this Agreement.

2. The Rules Agreement effective October 26, 1982, as amended, presently in effect between Amtrak and the Brotherhood of Locomotive Engineers and applicable to employees performing service on the MBTA Commuter Railroad, will continue to apply to the operations and service which MBCR is to provide the MBTA Commuter Railroad except as specifically provided herein.

A. Nothing in this Agreement is intended or shall be construed to provide additional pay, benefits, or coverage of specific Rules Agreement provisions to MBCR employees which were not applicable to them during their employment with Amtrak, except as specifically provided herein.

B. The adoption by MBCR of the current Rules Agreement provisions between the BLE and Amtrak, as amended herein, satisfies the obligation of MBCR under Exhibit 7, Section 3.B., of the Agreement between MBCR and MBTA dated February 19, 2003 ("Operating Agreement").

3. The service covered by this Agreement will be a single, separate seniority district and the employees securing a position in accordance with this Agreement will be placed on a separate seniority roster identified as the "MBCR Commuter Service Seniority District Roster."

4. On or before May 1, 2003, MBCR will deliver, by certified mail, return receipt requested, to the home address of all qualified engineers defined in Paragraph B. below, a conditional offer of employment, along with other required documents (such as those described in Side Letter No. 1). These documents must be completed and returned to MBCR, by the date set forth therein (postmark to govern), with a copy to the BLE General Chairman, in order for the employee to be eligible for further participation in the employment process set forth in this Agreement. MBCR shall have no further employment obligations to individuals who fail or decline to return the requisite completed documents within the time prescribed. Those employees who timely complete the process described in this paragraph are referred to hereinafter as "eligible employees."

A. MBCR will provide the General Chairman of the Organization with not less than thirty (30) days written notification of MBCR's assumption of the operation, which notice will list the estimated number of positions to be established by MBCR. Nothing in this Agreement is intended to impose an obligation upon MBCR to establish minimum staffing levels or requirements.

B. The positions to be established by MBCR will be advertised on or before June 1, 2003, also by mail, for a period of fifteen (15) calendar days via special bulletin notice to the following employees:

    i.    All Passenger Engineers with prior rights to Amtrak work Zone CS-1.

    ii.    All other Passenger Engineers working in Amtrak work Zone CS-1 as of the date of this Agreement.

iii.   All other Passenger Engineers working in the Boston Crew Base in Work Zone 1.

The advertisement of positions will show the MBCR headquarters location, run description, starting time, rest days, rate of pay, etc. The bulletin notice will contain the following statement:

"This will serve as notice that these positions will be established on MBCR for the MBTA Passenger Railroad operation effective 12:01 a.m., July 1, 2003. Bids will be accepted only from employees who have declared their eligibility by bidding on the Special Bulletin No. _____ dated _____. Only those bids postmarked or personally delivered to the office of the undersigned and receipt obtained within seven calendar days of the date of this notice will be accepted."

C.   Eligible applicants will be accepted in seniority order based upon their standing on the current Amtrak Passenger Engineers' National Seniority Roster; provided, however, that a Passenger Engineer with prior rights to Amtrak Work Zone CS-1 shall be placed on the MBCR Roster in the same relative order as he stands on the Work Zone CS-1 Prior Rights Roster. Passenger Engineers identified on the Work Zone CS-1 Prior Rights Roster with so-called "prior, prior rights" will maintain standing on the MBCR Roster consistent with such rights.

D.   Eligible employees who apply for but are unable to secure a position under this Agreement, prior to MBCR assuming the service, will be placed in a MBTA Commuter Service application pool and, as positions become available, they will be offered Passenger Engineer positions which they must accept or relinquish their rights to employment as Passenger Engineers. Upon accepting such positions, they will be placed on the MBCR roster in the same relative standing they would have been given if they had been a successful bidder during the original application period.

E.   Eligible, qualified Passenger Engineers, as set forth in B. above, who are inactive for the entire application and bidding period by reason of sickness, temporary or occupational disability, disciplinary suspension or dismissal, military leave, leave of absence to take a full time union position with BLE or a management position related to MBTA Commuter Railroad service, revocation of engineer certification, or vacation, shall have the right to make application within five (5) days of their return to active status. Such Passenger Engineers possessing sufficient seniority to have been selected in accordance with Paragraph C., above, will be placed on the MBCR Roster as if they had been in

active status during the original application period, and will exercise their seniority in accordance with the applicable provisions of the Rules Agreement. Those Passenger Engineers in this category who, upon return to active status, lack sufficient seniority to have been selected in accordance with Paragraph C., above, will be placed in the application pool with the same relative standing they would have had if they had been in active status during the original application period.

Note: With the exception of those employees on vacation during the application and bidding period, the provisions of Part II, Item 1.B.(1) of this Agreement shall not apply to employees in this status on the effective date of the Agreement.

F. Employees who were granted leaves of absence to take promotion to non-agreement management positions on Amtrak unrelated to MBTA Commuter Railroad service shall retain the right to exercise their seniority pursuant to sub-section E., above, for a period of two (2) years commencing July 1, 2003. If after the expiration of that two-year period such employees have not returned to service on MBCR on a position represented by the Brotherhood of Locomotive Engineers, such rights will be extinguished.

5. Existing Rules Agreement provisions pertaining to disapproval of employment application will not be applicable to those employees who accept employment with MBCR pursuant to the terms of this Agreement

6. Compensated days and years of service currently recognized by Amtrak shall be used in determining eligibility for vacation and personal leave days entitlements for employees who accept a position with MBCR pursuant to this Agreement. The Company anticipates it will receive information from Amtrak outlining such information, as well as the number of vacation and personal leave days each employee has accrued but has not taken for the calendar year. An individual employee who disputes the correctness of the information provided by Amtrak may request further review. In the event of disagreement, the Local Chairman and the Manager-Labor Relations will meet for the purpose of informally resolving the dispute.

7. MBCR recognizes its obligation pursuant to the Operating Agreement between MBCR and MBTA to provide health and welfare benefits substantially equivalent to those in effect on June 30, 2003. MBCR has sought input and participation from the Organization in its fulfillment of this obligation.

8. There shall be no pyramiding or duplication of any benefit(s) in the application of any portion of this Agreement.

# PART II

1. It is understood and acknowledged that the Brotherhood of Locomotive Engineer is currently engaged in wage and rules negotiations with Amtrak pursuant to notices served under Section 6 of the Railway Labor Act (hereinafter "RLA") upon Amtrak on or about December 30,1999, and counter-proposals served by Amtrak upon the Organization. In that regard, the parties agree as follows:

   A. By executing this Agreement, it is agreed and understood that any and all outstanding notices served under Section 6 of the RLA by and between the Organization and Amtrak shall have no standing as between the parties to this Agreement. The Organization represents that such notices have not been settled with Amtrak. The parties agree that MBCR has no obligation with respect to retroactive wage or other settlement monies, if any, which the Organization may believe are owed to the employees covered under this Agreement by their predecessor employer (Amtrak). This Agreement shall not be construed as a relinquishment by the Organization of its rights to pursue payment of any such monies from Amtrak for the period preceding July 1, 2003.

   B. The basic wage rates in effect for all job classifications and positions in effect on June 30, 2003, shall be assumed by MBCR as the basic rates of pay in effect upon assumption of the service on July 1, 2003. These rates of pay include COLA adjustments totaling 59 cents per hour which were in effect on June 30, 2003, and will be rolled into the basic rates on July 1, 2003, prior to the application of the general wage increase described in sub-paragraph (2) below. Thereafter, the following shall apply:

   (1) Implementation Incentive

   Subject to the conditions set forth below, effective on the date of MBCR's assumption of the MBTA Commuter Railroad service, each eligible employee covered by this Agreement will be entitled to a lump sum implementation incentive of one thousand dollars ($1,000). This incentive is subject to approval and appropriation of the MBTA. This incentive is further subject to the Organization commencing the ratification process forthwith. The Organization acknowledges and agrees that MBCR may commence the application and hiring process for BLE members during this ratification process. The Company will make all reasonable efforts to pay the incentive within 30 days from July 1, 2003.

seniority date as of the date they first commence the classroom phase of the training program. However, it is understood that a trainee will not be permitted to exercise seniority or work as a passenger engineer until successful completion of the entire training program, including qualifying on the physical characteristics of the entire service area, at which time the conditional seniority date will become permanent, and the employee will be considered a qualified locomotive engineer. Where two (2) or more employees are certified who have the same conditional date, they will be ranked based on their earliest retained seniority date at MBCR. Employees without prior service at MBCR will be ranked based on the date and time they report to the medical examiner."

B. Rule 5 – Seniority Roster of the current Rules Agreement is modified to the extent that sub-paragraph a. shall read as follows:

"a. A roster showing dates entered service, seniority dates, promotion dates, prior rights (if any), and seniority standing will be posted in a conspicuous place at all crew bases for the information of Passenger Engineers, with copies to the General Chairman."

C. Rule 6 – Bulletins And Assignments of the current rules Agreement is modified to the extent that the first paragraph of sub-section n. is eliminated and the following inserted in its place:

"n. All positions will be readvertised twice per year in April and October, coincident with the change of time. Applications must be submitted in writing by 12:00 Noon on the fifteenth day prior to the change of time, and awards will be effective at 12:01 a.m. on the Monday following the change of time."

Part IV

1.    Any dispute or controversy with respect to the interpretation, application or enforcement of the provisions of this Agreement which has not been resolved by the parties within thirty (30) days may be submitted by either party to a Special Board of Adjustment for final and binding decision thereon as provided by Section 3, Second of the Railway Labor Act.

2.    This Agreement shall become effective July 1, 2003, and shall continue in effect thereafter unless or until changed pursuant to the terms of the Railway Labor Act, as amended.

Signed at Boston, Massachusetts this _____ day of _____, 2003.


For the Organization:                    For the Company:


_____              _____
General Chairman, BLE                    Manager-Labor Relations, MBCR


                                         _____
                                         General Manager, MBCR

Side Letter No. 1
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and BLE relating to MBCR assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations it was agreed, without prejudice to the positions of either party concerning MBCR's right to require pre-employment physicals, MBCR will modify its pre-employment medical requirements to the following extent:

1. Amtrak commuter rail employees will be required to sign a release instructing and authorizing Amtrak to provide MBCR with a copy of the employee's Amtrak medical records. The Amtrak employee will also be required to complete MBCR's Pre-employment Medical Questionnaire. Should MBCR's Medical Department determine that additional information is required as a result of the information provided on that Questionnaire, the employee will be required to request his/her physician to provide such additional information. Any further action in this area, which may include a physician examination by a MBCR-designated physician, will be handled on a case-by-case basis in accordance with the provisions of the applicable Rules Agreement.

2. The Amtrak commuter rail employee will be required to undergo drug and alcohol testing. Any employee testing positive for a controlled substance will be provided the opportunity, upon his/her request, for a split sample test at the employee's expense, by a testing facility selected by MBCR which will use another testing method that is specific for the substance(s) detected in the initial test.

3. In the event of a confirmed positive result, the employee may not be accepted for employment with MBCR. The employee may, at no cost to MBCR, seek self-recovery and/or provide a satisfactory test result within 45 days from the date of deferral. Upon such timely presentation, the employee will then be eligible to complete the employment process set forth in the Agreement. Upon such employment, seniority and other rights will be governed by the provisions of Part I, Section 3(A) of this Agreement. As a condition of employment, the employee will be required to agree and comply with the instructions set forth in the Prevention Program Companion Agreement.

Side Letter No. 1
Page 2

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

_____
General Chairman, BLE

Side Letter No. 2
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and BLE relating to MBCR assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations the Organization expressed concern over MBCR's stated intent to acquire copies of Amtrak's discipline records covering each employee hired by MBCR and consideration of past records in any future instances of administration of discipline. Pursuant to these discussions, the parties agreed that such records would not be used or considered commencing July 1, 2003, except for the following:

1. Employees with a previous Rule G violation that resulted in a Waiver Agreement and probationary period that is still in effect on July 1, 2003, will be considered still bound by the terms of such arrangement when employed on MBCR. This will include, but not be limited to, obligations of ongoing participation in EAP counseling, follow-up/random testing, and/or any other condition agreed to in conjunction with the Waiver Agreement. Upon completing the probationary requirements, the provisions of the Rule G Bypass and Prevention Program Companion Agreements will apply.

2. This Agreement does not supercede any action which MBCR may be required to take under the provisions of the CFR, federal or other laws, or regulations imposed by the FRA.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

_____
General Chairman, BLE

Side Letter No. 3
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and BLE relating to MBCR's assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations we discussed the matters of Safety and Training Programs. The Organization and MBCR emphasized their commitment to continuing these discussions formally and informally throughout the term of this Agreement.

This will confirm MBCR stated to the Organization during our negotiations that safety is of the utmost importance to MBCR, and it is the Company's intention to implement a comprehensive and effective safety program on the property at the earliest possible date. The Company recognizes the critical importance of partnering with the Organization in the formulation and execution of its safety effort, and your Organization will be contacted at the earliest opportunity to meet and discuss this matter in greater depth. In particular, MBCR and the Organization are committed to establishing a joint management/labor safety committee to meet periodically and discuss those issues related to safety.

This will also confirm that MBCR and the Organization discussed the importance of developing a comprehensive and effective training program for engineers. MBCR is committed to developing a thorough training program that combines both locomotive simulator training and extensive on-the-job training. MBCR will seek the input of the Organization as it continues to develop and modify its engineer training programs.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

_____
General Chairman, BLE

Side Letter No. 4
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and the BLE relating to MBCR's assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our discussions it was acknowledged that certain modifications of the Rules Agreement are necessary in order to accommodate the administrative structure on MBCR. Specifically, Rule 20 (Time Limit on Claims) and Rule 21 (Discipline and Investigation) require adjustment. Accordingly, the Manager – Labor Relations and the General Chairman will agree to commence discussion and adopt such mutually agreed upon changes prior to July 1, 2003. Those administrative adjustments will be incorporated as an addendum to this Side Letter.

Additionally, the parties agreed meet after July 1, 2003, to reach an understanding regarding how unresolved grievances will be adjudicated. Among the items to be addressed at this meeting will be the Organization's request to establish a standing Special Board of Adjustment and an expedited arbitration board for the handling of unresolved discipline appeals.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager – Labor Relations

AGREED:

_____
General Chairman, BLE

14

Side Letter No. 5
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and the BLE relating to MBCR's assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our discussions the Organization advanced desired modifications to the procedures for administering the Guaranteed Extra Board. It was agreed that the representatives would meet within 90 days of July 1, 2003, or on a date otherwise agreed, to review calling procedures and discuss issues which may have arisen after the transition.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

_____
General Chairman, BLE

Side Letter No. 6
April 17, 2003

Mr. Mark B. Kenny
General Chairman
Brotherhood of Locomotive Engineers

Dear Mr. Kenny:

This has reference to the Agreement entered into this date between MBCR and the BLE relating to MBCR's assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations the parties agreed that the protection of the legitimate privacy interests of MBCR employees is a shared concern. Accordingly, except where prohibited by law, MBCR agrees that employee information, including but not limited to information contained in an employee's personnel and medical files, shall not be disseminated to the MBTA until such time as the MBTA agrees in writing not to disclose such employee information to any other party.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

_____
General Chairman, BLE

16

# APPENDIX I

## Cost of Living Allowance and Adjustments Thereto After July 1, 2008

### Section 1 – Cost-of-Living Allowance and Effective Dates of Adjustments

(a) A cost of living allowance shall be payable in the manner set forth in and subject to the provisions of this Part, on the basis of the "Consumer Price Index for Urban Wage Earners and Clerical Workers (Revised Series) (CPI-W)" (1967=100), U.S. Index, all items – unadjusted, as published by the Bureau of Labor Statistics, U.S. Department of Labor, and hereinafter referred to as the CPI. The first such cost-of-living allowance shall be payable effective January 1, 2009 based, subject to paragraph (d), on the CPI for September 2008 as compared with the CPI for March 2008. Such allowance, and further cost-of-living adjustments thereto which shall become effective as described below, shall be based on the change in the CPI during the respective measurement periods shown in the following table, subject to the exception provided in paragraph (d)(iii), according to the formula set forth in paragraph (e).

## Measurement Periods

| Base Month | Measurement Month | Effective Date of Adjustment |
|---|---|---|
| March 2008 | September 2008 | January 1, 2009 |
| September 2008 | March 2009 | July 1, 2009 |

Measurement Periods and Effective Dates conforming to the above schedule shall be applicable to periods subsequent to those specified above during which this Article is in effect.

(b) While a cost-of-living allowance is in effect, such cost-of-living allowance will apply to straight time, overtime, vacations, holidays and to special allowances in the same manner as basic wage adjustments have been applied in the past, except that such allowance shall not apply to duplicate time payments, including arbitraries and special allowances that are expressed in time, miles or fixed amounts of money.

(c) The amount of the cost-of-living allowance, if any, that will be effective from one adjustment date to the next may be equal to, or greater or less than, the cost-of-living allowance in effect in the preceding adjustment period.

(d) (i) <u>Cap</u>. In calculations under paragraph (e), the maximum increase in the CPI that shall be taken into account shall be as follows:

| **Effective Date Of Adjustment** | **Maximum CPI Increase That May Be Taken Into Account** |
|---|---|
| January 1, 2009 | 3% of March 2008 CPI |
| July 1, 2009 | 6% of March 2008 CPI, less the increase from March 2008 to September 2008 |

Effective Dates of Adjustment and Maximum CPI Increases conforming to the above schedule shall be applicable to periods subsequent to those specified above during which this Article is in effect.

(ii) <u>Limitation</u>. In calculations under paragraph (e), only fifty (50) percent of the increase in the CPI in any measurement period shall be considered.

(iii) If the increase in the CPI from the base month of March 2008 to the measurement month of September 2008 exceeds 3% of the March 2008 base index, the measurement period that will be used for determining the cost-of-living adjustment to be effective the following January will be the 12-month period from such base month of March; the increase in the index that will be taken into account will be limited to that portion of the increase that is in excess of 3% of such March base index; and the maximum increase in that portion of the index that may be taken into account will be 6% of such March base index less the 3% mentioned in the preceding clause, to which will be added any residual tenths of points which had been dropped under paragraph (e) below in calculation of the cost-of-living adjustment which shall have become effective January 1, 2009 during such measurement period.

(iv) any increase in the CPI from the base month of March 2008 to the measurement month of March 2009 in excess of 6% of the March 2008 base index will not be taken into account in the determination of subsequent cost-of-living adjustments.

(v) The procedure specified in subparagraphs (iii) and (iv) will be applicable to all subsequent periods during which this Article is in effect.

(e) <u>Formula</u>. The number of points change in the CPI during a measurement period, as limited by paragraph (d), will be converted into cents on the basis of one cent equals 0.3 full points. (By "0.3 full points" it is intended that any remainder of 0.1 point or 0.2 point of change after the conversion shall not be counted.)

The cost-of-living allowance in effect on June 30, 2009 will be adjusted (increased or decreased) effective July 1, 2009 by the whole number of cents produced by dividing by 0.3 the number of points (including tenths of points) change, as limited by paragraph (d), in the CPI during the applicable measurement period. Any residual tenths of a point resulting from such division will be dropped. The result of such division will be added to the amount of the cost-of-living allowance in effect on June 30, 2009 if the CPI will have been higher at the end than at the beginning of the measurement period, and subtracted therefrom only if the index will have been lower at the end than at the beginning of the measurement period and then, only, to the extent that the allowance remains at zero or above. The same procedure will be followed in applying subsequent adjustments.

(f)   Continuance of the cost-of-living allowance and the adjustments thereto provided herein is dependent upon the availability of the official monthly BLS Consumer Price Index (CPI-W) calculated on the same basis as such Index, except that, if the Bureau of Labor Statistics, U.S. Department of Labor should, during the effective period of this Article, revise or change the methods or basic data used in calculating such Index in such a way as to affect the direct comparability of such revised or changed index with the CPI-W during a measurement period, then that Bureau shall be requested to furnish a conversion factor designed to adjust the newly revised index to the basis of the CPI-W during such measurement period.

## Section 2 – Payment of Cost-of-Living Allowances

(a)   The cost-of-living allowance that becomes effective January 1, 2009 shall be payable to each employee commencing on that date.

(b)   The increase in the cost-of-living allowance effective July 1, 2009 pursuant to Section 1 of this Part shall be payable to each employee commencing on that date.

(c)   The increase in the cost-of-living allowance effective January 1, 2010 pursuant to Section 1 of this Part shall be payable to each employee commencing on that date.

(d)   The procedure specified in paragraphs (b) and (c) shall be followed with respect to computation of the cost-of-living allowances payable in subsequent years during which this Article is in effect.

(e)   In making calculations under this Section, fractions of a cent shall be rounded to the nearest whole cent; fractions less than one-half cent shall be dropped and fractions of one-half cent or more shall be increased to the nearest full cent.

## Section 3 – Application of Cost-of-Living Allowances

The cost-of-living allowance provided for by Section 1 of this Part B will be payable as provided in Section 2 of this Part and will not become part of basic rates of pay. Such allowance shall be applied as follows:

(a) <u>Hourly Rates</u> – Add the amount of the cost-of-living allowance to the hourly rate of pay produced by application of Article I.

(b) <u>Application of Wage Increases</u> – The increase in wages produced by application of the cost-of-living allowances shall be applied in accordance with the wage or working conditions agreement in effect between each carrier and its employees represented by the Organization signatory hereto. Special allowances not included in said rates and arbitraries representing duplicate time payments will not be increased.

## Section 4.

The arrangements set forth in this Appendix I shall remain in effect according to the terms thereof until revised by the parties pursuant to the Railway Labor Act.

(End of Appendix)

Exhibit R



# NATIONAL RAILROAD PASSENGER CORPORATION

The NRPC, pursuant to Section 49 CFR part 240, has determined

Carback, J. T.
NAME

**TO BE QUALIFIED AS A CLASS 1 ENGINEER**

| HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR | SEX | DATE OF BIRTH |
|--------|--------|-----------|-----------|-----|---------------|
| 5' 8" | 164 | BROWN | GREEN | M | 12/ 8/1953 |

HEARING RESTRICTIONS: NONE

VISUAL RESTRICTIONS: CORRECTIVE LENSES

SOCIAL SECURITY NO.: 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

CERTIFICATE NO.: 6333

DATE ISSUED: 1/13/2000 EXPIRATION DATE 1/13/2003

## CLASSES OF SERVICE

1. Train Service Engineer
2. Locomotive Servicing Engineer
3. Student Engineer
4. Train Service Engineer/Mechanical Facility Only

## RIDE DATA

Date: 2-22-00 Signature:

Date: 3-24-00 Signature:

Date: 8-17-00 Signature:

Date: 3-7-01 Signature:

Date: Signature:

Date: Signature:

Date: Signature:

Date: Signature:

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 5

# AGREEMENT

## By and Between

## MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY

### And

## ITS EMPLOYEES REPRESENTED BY THE
## JOINT COUNCIL OF CARMEN, HELPERS,
## COACH CLEANERS AND APPRENTICES

---

WHEREAS, the Massachusetts Bay Commuter Railroad, LLC (hereinafter "MBCR") has agreed to assume certain responsibilities for the operation of the Commuter Passenger Railroad for the Massachusetts Bay Transportation Authority (hereinafter "MBTA"), effective July 1, 2003;

WHEREAS, it is the desire of the parties to this Agreement to avoid any interruption of service in the interests of the public and to minimize impact on the commuter rail employees of Amtrak, the operator of MBTA Commuter Railroad prior to July 1, 2003;

WHEREAS, the assumption of this operation will result in the establishment by MBCR of comparable positions necessary to perform certain work formerly performed by commuter rail employees of Amtrak as the operator; and

WHEREAS, MBCR intends to offer employment with MBCR to certain commuter rail employees of Amtrak,

NOW, THEREFORE, IT IS AGREED:

## PART I

1. MBCR recognizes The Joint Council of Carmen, Helpers, Coach Cleaners and Apprentices ("Organization" or "JCC") as the bargaining representative of the employees in the service covered by this Agreement.

2. The Rules Agreement effective February 1, 1977, as amended, presently in effect between the Organization and Amtrak and applicable to employees performing service on the MBTA Commuter Railroad, will continue to apply to the operations and service which MBCR is to provide the MBTA Commuter Railroad except as specifically provided herein.

2

    A. Nothing in this Agreement is intended or shall be construed to provide additional pay, benefits, or coverage of specific Rules Agreement provisions to MBCR employees which were not applicable to them during their employment with Amtrak, except as specifically provided herein.

    B. The adoption by MBCR of the current Rules Agreement provisions between the JCC and Amtrak, as amended herein, satisfies the obligation of MBCR under Exhibit 7, Section 3.B., of the Agreement between MBCR and MBTA dated February 19, 2003 ("Operating Agreement").

3.  Prior to ratification of this Agreement, MBCR will provide the Organization with written notification, which will list the number of positions to be established by MBCR on July 1, 2003. Nothing in this Agreement is intended to impose an obligation upon MBCR to establish minimum staffing levels or requirements.

4.  The service covered by this Agreement will be a single, separate seniority district and the employees securing a position in accordance with this Agreement will be placed on a separate seniority roster identified as the "MBCR Commuter Service Seniority District Roster."

    A. Employees who are on discharge pending appeal, leave of absence (other than those addressed in sub-paragraph B. below) or disability during the transition period shall be subject to the provisions of this Agreement the same as if they had been in active service on the effective date of assumption of service. Should any such employee return to active service, such return to service shall be in conformity with the governing Rules Agreement.

    Note: The provisions of Part II, Item 1.B.(1) of this Agreement shall not apply to employees in this status on the effective date of the Agreement.

5.  All Amtrak employees on the Amtrak Seniority Roster for TWU Local 2054 and BRC Local 6315, Northeast Corridor, New England Division, will receive, by certified mail, return receipt requested, a conditional offer of employment, along with other required documents (such as those described in Side Letter 1). The documents must be completed and returned to MBCR by the date set forth therein (which shall be no fewer than 14 calendar days from the date MBCR mailed the documents), with a copy to the appropriate Organization representative, in order for the individual to continue the employment process. MBCR shall have no further employment obligations to individuals who fail or decline to complete the requisite documents within the time prescribed (post mark to govern) or who refuse to take the required drug and alcohol testing described in Side Letter 1.

    a. In addition to the information above, the mailing shall also contain a list of the positions to be established by MBCR and a description of the

process that must be followed in bidding for those positions. The positions list will include the job identification, location, tour of duty, meal period, rest days, rate of pay, and primary duties.

b. Bids will only be accepted from employees active within the JCC carmen craft and class and only for positions for which the employee is currently qualified in the same craft and class in which such employees were active during the advertising period. Assignments to positions will be made on a straight seniority basis among all of the employees covered by this Agreement.

c. After all positions have been awarded pursuant to the above procedures, effective July 1, 2003, the seniority of all employees hired by MBCR in the carmen craft and class will be listed on a single roster, with said employee's seniority based upon the employee's seniority date on the Amtrak Seniority for TWU Local 2054 and BRC Local 6315, Northeast Corridor, New England Division. Employees who maintained prior rights on the Amtrak roster will retain prior rights on the MBCR roster.

6. Assignment will be made within fourteen (14) calendar days after the close of the advertising period. Awards will be made effective as of 12:01 a.m., July 1, 2003.

7. Employees on the applicable Amtrak roster who apply for but are not awarded a position under this Agreement, prior to MBCR assuming the performance of service, will be placed in an application pool. Until July 1, 2004, as positions become available in MBTA Commuter Railroad service, such Amtrak employees will be offered positions for which qualified in the same craft and class at which time they must accept or relinquish their rights to employment. Upon accepting such position and passing the necessary entrance to service requirements described in Side Letter No. 1, they will receive a new seniority date in the same manner as new employees receive seniority dates pursuant to the applicable provisions of the Rules Agreement. The employee's former oldest seniority date shall be used only for determining entry rates and eligibility for vacation, sick leave, and personal leave benefits. An active Amtrak employee who fails to submit a bid for a position advertised pursuant to Section 5, above, will be considered as having declined MBCR's offer of employment and will not have any demand or contractual right to any position subsequently advertised on MBCR for MBTA Commuter Railroad service.

8. Existing Rules Agreement provisions pertaining to probationary period will not be applicable to those employees who accept employment with MBCR pursuant to the terms of this Agreement. Such provisions will remain applicable to all new employees represented by the Organization signatory hereto.

4

9.   Compensated days and years of service currently recognized by Amtrak shall be used in determining entry rates, and eligibility for vacation and personal leave days entitlements for employees who accept a position with MBCR pursuant to this Agreement. The Company anticipates it will receive information from Amtrak outlining such information, as well as the number of vacation and personal leave days each employee has accrued but has not taken for the current calendar year. An individual employee who disputes the correctness of the information provided by Amtrak may request further review. In the event of disagreement, the Local Chairman and the Manager-Labor Relations will meet for the purpose of informally resolving the dispute.

10.  MBCR recognizes its obligation pursuant to the Operating Agreement between MBCR and MBTA to provide health and welfare benefits substantially equivalent to those in effect on June 30, 2003. MBCR has sought/obtained input and participation from the Organizations in its fulfillment of this obligation.

11.  There shall be no pyramiding or duplication of any benefit(s) in the application of any portion of this Agreement.

## PART II

1. It is understood and acknowledged that the JCC is currently engaged in wage and rules negotiations with Amtrak pursuant to notice served under Section 6 of the Railway Labor Act (hereinafter "RLA") upon Amtrak on or about November 1, 1999, and counter-proposals served by Amtrak upon the Organization. In that regard, the parties agree as follows:

A.   By executing this Agreement, it is agreed and understood that any and all outstanding notices served under Section 6 of the RLA by and between the Organization and Amtrak shall have no standing as between the parties to this Agreement. The Organization represents that such notices have not been settled with Amtrak. The parties agree that MBCR has no obligation with respect to retroactive wage or other settlement monies, if any, which the Organization may believe are owed to the employees covered under this Agreement by their predecessor employer (Amtrak). This Agreement shall not be construed as a relinquishment by the Organization of its rights to pursue payment of any such monies from Amtrak for the period preceding July 1, 2003.

B.   The base wage rates in effect for all job classifications and positions in effect on June 30, 2003, shall be assumed by MBCR as the base rates of pay in effect upon assumption of the service on July 1, 2003. These rates of pay include COLA adjustments totaling 59 cents per hour that were in effect on June 30, 2003, and which will be rolled into the basic rates on July 1, 2003

5

prior to the application of the first general wage increase described in subparagraph (2) below. Thereafter, the following shall apply:

(1) Subject to the conditions set forth below, effective on the date of MBCR's assumption of the MBTA Commuter Railroad service, each eligible employee covered by this Agreement who fully and successfully participates in MBCR's employment process and who becomes an MBCR employee on July 1, 2003 will be entitled to a lump sum implementation incentive adjustment of one thousand dollars ($1,000). This payment is subject to commencement of the Organization's ratification process for this Agreement on or before, May 15, 2003 and successful completion of the ratification process on or before June 13, 2003. The Organization acknowledges and agrees that MBCR may commence the application and hiring process for its members during this ratification period. The Company will make all reasonable efforts to pay this adjustment within thirty (30) days of July 1, 2003.

(2) First General Wage Increase

Effective July 1, 2003, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of five percent (5 %).

    (a)   Disposition of Fractions

    Rates of pay resulting from application of this Section B. which end in a fraction of a cent will be rounded to the nearest whole cent; fractions less than one-half cent will be dropped, and fractions of one-half cent or more will be increased to the nearest full cent.

    (b)   Application of Wage Increases

    The increase in wages provided in this Section B. will be applied in accordance with the wage or working conditions agreement in effect. Special allowances or other pay elements expressed in fixed rates or amounts will not be increased.

(3) Second General Wage Increase

Effective July 1, 2004, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of three percent (3 %). The increase provided in this Section will be applied in the same manner as provided in Section (2) hereof.

(4) Third General Wage Increase

6

Effective July 1, 2005, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of one and one-half percent (1½ %). The increase in this Section will be applied in the same manner as provided in Section (2) hereof.

(5) Fourth General Wage Increase

Effective January 1, 2006, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of two and one-half percent (2½ %). The increase provided in this Section will be applied in the same manner as provided in Section (2) hereof.

(6) Fifth General Wage Increase

Effective July 1, 2006, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of one and one-half percent (1½ %). The increase in this Section will be applied in the same manner as provided in Section (2) hereof.

(7) Sixth General Wage Increase

Effective January 1, 2007, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of one and one-half percent (1½ %). The increase in this Section will be applied in the same manner as provided in Section (2) hereof.

(8) Seventh General Wage Increase

Effective July 1, 2007, the hourly base rates of pay of employees covered by this Agreement shall be increased in the amount of five percent (5 %). The increase in this Section will be applied in the same manner as provided in Section (2) hereof.

C. Except to the extent set forth in Part II 1.B., the existing COLA provisions between the JCC and Amtrak shall have no further force and effect. Effective July 1, 2008, Appendix I shall become effective. Any COLA adjustment which

may be applied in accordance with Appendix I shall not be rolled into base rates without future negotiations and agreement between the parties.

D. The purpose of this Part II is to fix the general level of compensation during the period of the Agreement. No party to this Agreement shall serve, prior to October 1, 2007 (not to become effective before July 1, 2008) any notice or proposal for the purpose of changing the subject matter of the provisions of Part II of this Agreement or which proposes matters covered by the proposals of the Organization cited in Paragraph 1 of this Section.

## Part III

1.    Any dispute or controversy with respect to the interpretation, application or enforcement of the provisions of this Agreement which has not been resolved by the parties within thirty (30) days following final conference on such matter may be submitted by either party to a Special Board of Adjustment for final and binding decision thereon as provided by Section 3, Second of the Railway Labor Act.

2.    This Agreement shall become effective July 1, 2003, and shall continue in effect thereafter unless or until changed pursuant to the terms of the Railway Labor Act, as amended.

Signed at Boston, Massachusetts this 19 day of June , 2003, subject to final ratification by the JCC and MBCR.

For JCC:

Chairman, Joint Council of Carmen,

Helpers, Coach Cleaners and

Apprentices; and

Assistant General President,

Brotherhood Railway Carmen

For MBCR:

Manager-Labor Relations, MBCR

8

Vice Chairman, Joint Council of Carmen,    General Manager, MBCR

Helpers, Coach Cleaners and

Apprentices; and

Director, Railroad Division

Transport Workers Union of America

Side Letter No. 1
May 6, 2003

Mr. Marvin Napier
Chairman
Joint Council of Carmen

Mr. Charles Moneypenny
Vice Chairman
Joint Council of Carmen

Gentlemen:

This has reference to the Agreement entered into this date between MBCR and JCC relating to MBCR assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations it was agreed, without prejudice to the positions of either party concerning MBCR's right to require pre-employment physicals, that MBCR will modify its pre-employment medical requirements to the following extent:

1. Amtrak employees will be required to sign a release instructing and authorizing Amtrak to provide MBCR with a copy of the employee's Amtrak medical records. The Amtrak employee will also be required to complete MBCR's Pre-employment Medical Questionnaire. Should MBCR's Medical Department determine that additional information is required as a result of the information provided on that Questionnaire, the employee will be required to request his/her physician to provide such additional information. Any further action in this area, which may include a physician examination by a MBCR-designated physician paid for by MBCR, will be handled on a case-by-case basis in accordance with the provisions of the applicable Rules Agreement.

2. The Amtrak commuter rail employee will be required to undergo a drug and alcohol screen. Any employee testing positive for a controlled substance will be provided the opportunity for confirmation testing at the employee's expense. Upon request, such employee is entitled to have a confirmation test conducted on the same sample at a medical facility selected by MBCR using another method that is specific for the substance(s) detected in the initial test.

3. In the event of a confirmed positive result on a drug and/or alcohol screen, the employee may not be accepted for employment with MBCR. The employee may, at no cost to MBCR, seek self-recovery and/or provide a satisfactory test result within 45 days from the date of deferral. Upon such timely presentation, the employee will then be eligible to complete the employment process set forth in the Agreement. Upon such employment, seniority and

Side Letter No. 1
Page 2

other rights will be governed by the provisions of Part I, Section 4(A) of this Agreement.  As a condition of employment, the employee will be required to agree to and comply with the instructions set forth in the Prevention Program Companion Agreement.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

AGREED:

Chairman, JCC

Vice Chairman, JCC

11

Side Letter No. 2
May 6, 2003

Mr. Marvin Napier
Chairman
Joint Council of Carmen

Mr. Charles Moneypenny
Vice Chairman
Joint Council of Carmen

Gentlemen:

This has reference to the Agreement entered into this date between MBCR and JCC relating to MBCR assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations the Organization expressed concern over MBCR's stated intent to acquire copies of Amtrak's discipline records covering each employee hired by MBCR and consideration of past records in any future instances of administration of discipline. Pursuant to these discussions, the parties agreed that such records would not be used or considered commencing July 1, 2003, except for the following:

1. Employees with a previous Rule G violation that resulted in a Waiver Agreement and probationary period that is still in effect on July 1, 2003, will be considered still bound by the terms of such arrangement when employed on MBCR. This will include, but not be limited to, obligations of ongoing participation in EAP counseling, follow-up/random testing, and/or any other condition agreed to in conjunction with the Waiver Agreement. Upon completing the probationary requirements, the provisions of the Rule G Bypass and Prevention Program Companion Agreements will apply.

2. This Agreement does not supercede any action which MBCR may be required to take under existing federal or other laws or regulations (e.g., FRA).

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager-Labor Relations

12

Side Letter No. 2
Page 2

AGREED:

_____
Chairman, JCC

_____
Vice Chairman, JCC

Side Letter No. 3
May 6, 2003

Mr. Marvin Napier
Chairman
Joint Council of Carmen

Mr. Charles Moneypenny
Vice Chairman
Joint Council of Carmen

Dear Sir:

This has reference to the Agreement entered into this date between MBCR and JCC relating to MBCR's assumption of operation of the MBTA commuter Railroad service on July 1, 2003.

This Side Letter responds to your request for a statement of the Company's position regarding maintaining existing force levels going forward after July 1, 2003.

The Company is obligated under the Operating Agreement with MBTA to establish, on July 1, 2003, employment positions equal to the number in existence and filled on March 1, 2002. The Company is also obligated to initially fill all such positions, in seniority order, from the applicable commuter rail seniority rosters, to the extent there are sufficient eligible employees to do so. The Company fully intends to honor these obligations.

After July 1, 2003, the Operating Agreement is clear that as and when such positions become vacant, it is the Company's prerogative to fill such vacancies. The Operating Agreement is equally clear that the number of positions initially required to be established is not intended to impose a minimum staffing level for the future.

In response to the concerns expressed by the Organization, the Company advised that it intends to preserve the March 1, 2002, level of positions, so long as those Eligible Union Employees assigned to them on July 1, 2003, continue to occupy them. It is the Company's intent that any reduction in positions below that level will be accomplished through the normal attrition of that initial work force or as services are adjusted. It is the Company's intent to aggressively seek force account and other work which would preserve or even increase the number of craft positions currently maintained; however, even should those efforts not prove successful, the Company intends to adhere to the attrition arrangement described herein.

14

Side Letter No. 3
Page 2

I trust the foregoing adequately addresses the concerns expressed during our negotiations.

Yours truly,

Manager-Labor Relations

AGREED:

Chairman, JCC

Vice Chairman, JCC

15

Side Letter No. 5
May 6, 2003

Mr. Marvin Napier
Chairman
Joint Council of Carmen

Mr. Charles Moneypenny
Vice Chairman
Joint Council of Carmen

Gentlemen:

This has reference to the Agreement entered into this date between MBCR and the JCC relating to MBCR's assumption of operation of the MBTA Commuter Railroad service on July 1, 2003.

During our negotiations it was agreed to amend the Rules Agreement to the extent that a compensatory ("bank") day will hereinafter constitute compensation for the purposes of bridging a holiday in accordance with the Holiday Agreement. The observance of compensatory time remains subject to the needs of service and requires approval by the appropriate supervisor.

If the foregoing adequately and accurately outlines our understanding in this matter, please so indicate by signing in the space provided for that purpose below.

Yours truly,

Manager – Labor Relations

AGREED:

Chairman, JCC

Vice Chairman, JCC

17

Side Letter No. 4
May 6, 2003

Mr. Marvin Napier
Chairman
Joint Council of Carmen

Mr. Charles Moneypenny
Vice Chairman
Joint Council of Carmen

Dear Gentlemen:

This has reference to the Agreement entered into this date between MBCR and JCC relating to MBCR's assumption of operation of the MBTA commuter Railroad service on July 1, 2003.

During our discussions your Organization expressed a desire to establish a line of progression for promotion to positions as Carmen from the ranks of Coach Cleaners as an alternative to hiring externally.

As discussed, MBCR would be willing to commit to such a process, provided the Company develops qualification standards and other measures to insure that only qualified applicants would be promoted. MBCR is willing to meet with the Organization subsequent to July 1, 2003, for the purpose of attempting to reach mutual agreement on developing such a process.

I trust the foregoing adequately addresses the concerns expressed during our negotiations.

Yours truly,

Manager-Labor Relations

AGREED:

Chairman, JCC

Vice Chairman, JCC

16

## APPENDIX I

### Cost of Living Allowance and Adjustments Thereto After July 1, 2008

### Section 1 – Cost-of-Living Allowance and Effective Dates of Adjustments

(a) A cost of living allowance shall be payable in the manner set forth in and subject to the provisions of this Appendix, on the basis of the "Consumer Price Index for Urban Wage Earners and Clerical Workers (Revised Series) (CPI-W)" (1967=100), U.S. Index, all items – unadjusted, as published by the Bureau of Labor Statistics, U.S. Department of Labor, and hereinafter referred to as the CPI.  The first such cost-of-living allowance shall be payable effective January 1, 2009 based, subject to paragraph (d), on the CPI for September 2008 as compared with the CPI for March 2008. Such allowance, and further cost-of-living adjustments thereto which shall become effective as described below, shall be based on the change in the CPI during the respective measurement periods shown in the following table, subject to the exception provided in paragraph (d)(iii), according to the formula set forth in paragraph (e).

### Measurement Periods

| Base Month | Measurement Month | Effective Date of Adjustment |
|---|---|---|
| March 2008 | September 2008 | January 1, 2009 |
| September 2008 | March 2009 | July 1, 2009 |

Measurement Periods and Effective Dates conforming to the above schedule shall be applicable to periods subsequent to those specified above during which this Appendix is in effect.

(b) While a cost-of-living allowance is in effect, such cost-of-living allowance will apply to straight time, overtime, protected rates, vacations, holidays and personal leave days in the same manner as basic wage adjustments have been applied in the past, except that such allowance shall not apply to special allowances and arbitraries representing duplicate time payments.

(c) The amount of the cost-of-living allowance, if any, that will be effective from one adjustment date to the next may be equal to, or greater or less than, the cost-of-living allowance in effect in the preceding adjustment period.

(d) (i) Cap.  In calculations under paragraph (e), the maximum

18

increase in the CPI that shall be taken into account shall be as follows:

| Effective Date Of Adjustment | Maximum CPI Increase That May Be Taken Into Account |
|---|---|
| January 1, 2009 | 3% of March 2008 CPI |
| July 1, 2009 | 6% of March 2008 CPI, less the increase from March 2008 to September 2008 |

Effective Dates of Adjustment and Maximum CPI Increases conforming to the above schedule shall be applicable to periods subsequent to those specified above during which this Appendix is in effect.

(ii)  Limitation.  In calculations under paragraph (e), only fifty (50) percent of the increase in the CPI in any measurement period shall be considered.

(iii)  If the increase in the CPI from the base month of March 2008 to the measurement month of September 2008 exceeds 3% of the March 2008 base index, the measurement period that will be used for determining the cost-of-living adjustment to be effective the following July will be the 12-month period from such base month of March; the increase in the index that will be taken into account will be limited to that portion of the increase that is in excess of 3% of such March base index; and the maximum increase in that portion of the index that may be taken into account will be 6% of such March base index less the 3% mentioned in the preceding clause, to which will be added any residual tenths of points which had been dropped under paragraph (e) below in calculation of the cost-of-living adjustment which shall have become effective January 1, 2009 during such measurement period.

(iv)  any increase in the CPI from the base month of March 2008 to the measurement month of March 2009 in excess of 6% of the March 2008 base index will not be taken into account in the determination of subsequent cost-of-living adjustments.

(v)  The procedure specified in subparagraphs (iii) and (iv) will be applicable to all subsequent periods during which this Appendix is in effect.

(e)  Formula.  The number of points change in the CPI during a measurement period, as limited by paragraph (d), will be converted into cents on the basis of one cent equals 0.3 full points.  (By "0.3 full points" it is intended that any remainder of 0.1 point or 0.2 point of change after the conversion shall not be counted.)

The cost-of-living allowance in effect on June 30, 2009 will be adjusted (increased or decreased) effective July 1, 2009 by the whole number of cents produced by dividing by 0.3 the number of points (including tenths of points) change, as limited by paragraph (d), in the CPI during the applicable measurement period. Any residual tenths of a point resulting from such division will be dropped. The result of such division will be added to the amount of the cost-of-living allowance in effect on June 30, 2009 if the CPI will have been higher at the end than at the beginning of the measurement period, and subtracted therefrom only if the index will have been lower at the end than at the beginning of the measurement period and then, only, to the extent that the allowance remains at zero or above. The same procedure will be followed in applying subsequent adjustments.

(f) Continuance of the cost-of-living allowance and the adjustments thereto provided herein is dependent upon the availability of the official monthly BLS Consumer Price Index (CPI-W) calculated on the same basis as such Index, except that, if the Bureau of Labor Statistics, U.S. Department of Labor should, during the effective period of this Appendix, revise or change the methods or basic data used in calculating such Index in such a way as to affect the direct comparability of such revised or changed index with the CPI-W during a measurement period, then that Bureau shall be requested to furnish a conversion factor designed to adjust the newly revised index to the basis of the CPI-W during such measurement period.

## Section 2 – Payment of Cost-of-Living Allowances

(a) The cost-of-living allowance that becomes effective January 1, 2009 shall be payable to each employee commencing on that date.

(b) The increase in the cost-of-living allowance effective July 1, 2009 pursuant to Section 1 of this Appendix shall be payable to each employee commencing on that date.

(c) The increase in the cost-of-living allowance effective January 1, 2010 pursuant to Section 1 of this Appendix shall be payable to each employee commencing on that date.

(d) The procedure specified in paragraphs (b) and (c) shall be followed with respect to computation of the cost-of-living allowances payable in subsequent years during which this Appendix is in effect.

## <u>Section 3 – Application of Cost-of-Living Allowances</u>

The cost-of-living allowance provided for by Section 1 of this Appendix will be payable as provided in Section 2 of this Appendix and will not become part of basic rates of pay. Such allowance shall be applied as follows:

(a) <u>Hourly Rates</u> – Add the amount of the cost-of-living allowance to the hourly rate of pay produced by application of Part II B(2) through (8).

(b) <u>Daily Rates</u> – Determine the equivalent hourly rate by dividing the established daily rate by the number of hours comprehended by the daily rate. The amount of the cost-of-living allowance multiplied by the number of hours comprehended by the daily rate shall be added to the daily rate produced by application of Part II B(2) through (8).

(c) <u>Weekly Rates</u> – Determine the equivalent hourly rate by dividing the established weekly rate by the number of hours comprehended by the weekly rate. The amount of the cost-of-living allowance multiplied by the number of hours comprehended by the weekly rate shall be added to the weekly rate produced by application of Part II B(2) through (8).

(d) <u>Monthly Rates</u> – Determine the equivalent hourly rate by dividing the established monthly rate by the number of hours comprehended by the monthly rate. The amount of the cost-of-living allowance multiplied by the number of hours comprehended by the monthly rate shall be added to the monthly rate produced by application of Part II B(2) through (8)

(e) <u>Minimum Daily Increases</u> – the increase in rates of pay described in paragraphs (a) through (d), inclusive, shall be not less than eight times the applicable increase per hour for each full time day of eight hours, required to be paid for by the rules agreement. In instances where under the existing rules agreement an employee is worked less than eight hours per day, the increase shall be determined by the number of hours required to be paid for by the rules agreement.

(f) <u>Application of Wage Increases</u> – The increase in wages produced by application of the cost-of-living allowances shall be applied in accordance with the wage or working conditions agreement in effect between each carrier and its employees represented by the Organization signatory hereto. Special allowances not included in said rates and arbitraries representing duplicate time payments will not be increased.

## Section 4

The arrangements set forth in this Appendix I shall remain in effect according to the terms thereof until revised by the parties pursuant to the Railway Labor Act.

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ )<br><br>JOSEPH T.  CARMACK,<br>        Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>        Defendants<br>_____ ) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 6

# NATIONAL MEDIATION BOARD

## SPECIAL BOARD OF ADJUSTMENT NO. 928

BROTHERHOOD OF LOCOMOTIVE ENGINEERS      )
      ) Case No. 382
and      )
      ) Award No. 382
NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)  )

Martin H. Malin, Chairman & Neutral Member
M. B. Kenny., Employee Member
L. C. Hriczak, Carrier Member

Hearing Date: September 23, 2002

**STATEMENT OF CLAIM:**

Claim of Amtrak Passenger Engineer.J. T. Carmack for the rescinding of the discipline imposed of "Dismissal in all capacities effective immediately" as stated in the decision letter of May 13, 2002 under the signature of Assistant General Manager-Commuter Operations Francis J. O'Connor, Jr., and restoration to service with full seniority and vacation rights unimpaired, with full compensation for time lost, full credit toward vacation entitlement, health and welfare benefits during the period held out of work, and clearing Claimant's personal records of any reference to the alleged violation.

**FINDINGS:**

Special Board of Adjustment No. 928, upon the whole record and all the evidence, finds and holds that Employee and Carrier are employee and carrier within the meaning of the Railway Labor Act, as amended; and, that the Board has jurisdiction over the dispute herein; and, that the parties to the dispute were given due notice of the hearing thereon and did participate therein.

On September 10, 2001, Claimant was directed to report for an investigation on September 17, 2001. The notice charged Claimant with violating Amtrak's Standards of Excellence, Professional and Personal Conduct, by failing to comply with the direction of the Director of Operations to appear for and cooperate with a fitness for duty evaluation on August 27, 2001.

The hearing was postponed to and begun on April 4, 2002. The hearing continued on April 23 and 24, 2002, and was completed on May 7, 2002. On May 13, 2002, Carrier advised Claimant that he had been found guilty of the charges and dismissed from service.

The record reflects that on April 11, 2001, the Division Road Foreman found a packet of

40 - 50 pages on his desk that was entitled, "Letters from Hell." Claimant was the apparent author of most of the material in the packet, including a parody of Shakespeare's Hamlet, in which the Road Foreman was cast as Rozencrantz and the Local Chairman was cast as Guildenstern, two characters who were killed. The packet also included a letter addressed, "Dear God," which stated, "I hear a fat lady singing," and was closed by "Lucifer, Prince of Darkness." The packet also contained correspondence and related material concerning a dispute Claimant had with Carrier concerning a prior disciplinary action taken against him and material critical of the Local Chairman. The Road Foreman interpreted the packet as a threat against him and reported the matter to the Threat Assessment and Response Team (TART).

The Director of Labor Relations, in his capacity as a member of the TART, determined that the documents should be reviewed by Carrier's Medical Department. He forwarded a small portion of the packet, approximately five pages, consisting of the pages that the Road Foreman had found threatening, to the Medical Department. Carrier's Medical Officer for the Northeast Corridor reviewed the documents and determined that Claimant should be medically disqualified pending a fitness for duty examination.

By letter dated May 4, 2001, the Director of Operations notified Claimant that he had been medically disqualified pending a fitness for duty exam and that he was being withheld from service with pay. By letter dated May 17, 2001, the Director of Operations instructed Claimant to appear for a fitness for duty exam with a Boston doctor on June 4, 2001. The doctor appears, from the record, to be board certified in psychiatry and neurology.

Claimant canceled the June 4, 2001, appointment and refused to reschedule it. By letter dated June 8, 2001, the Director of Operations notified Claimant that, in light of his actions, his status was changed to medically disqualified without pay, and ordered him to contact the Medical Department by June 15, 2001, to reschedule the fitness for duty exam. The letter warned Claimant that his failure to do so would subject him to "charges of insubordination, which, if proved, could result in your permanent dismissal from service."

On June 27, 2001, Claimant appeared at the doctor's office with the Local Chairman. Claimant refused to submit to a psychiatric examination. The doctor notified Carrier's Medical Officer by letter dated July 16, 2001. By letter dated July 24, 2001, the Director of Operations advised Claimant that he was making "one last effort to resolve this matter," and directed Claimant to schedule another appointment with the doctor. The letter further warned Claimant, "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate this evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly other contrary activities."

Claimant and the doctor agreed to an appointment for August 27, 2001. However, by letter dated August 28, 2001, received by Carrier's Medical Department on September 4, 2001, and conveyed to the Director of Operations on September 5, 2001, the doctor advised that Claimant refused to present for the evaluation. Claimant apparently refused to participate in the

evaluation because Claimant objected to the doctor sharing the results with Carrier's Medical Officer on the ground that such action would breach physician-patient confidentiality.

There is no question that Claimant did not comply with the Director of Operation's order of July 24, 2001. Although Claimant testified that he complied by scheduling another appointment with the doctor, it is clear that the order went beyond literally scheduling another appointment and also required Claimant to appear, cooperate with the doctor and not frustrate the evaluation. Claimant clearly did not cooperate and did frustrate the evaluation.

The Organization's position is two fold. First, the Organization contends that the charges were not timely. Second, the Organization maintains that Claimant was not obligated to comply with the order.

Rule 21.d.1 of the Agreement provides, in relevant part:

A Passenger Engineer directed to attend a formal investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven days from the date of the act or occurrence or in cases involving stealing or criminal offense within seven days from the date the Carrier becomes aware of such act or occurrence.

We agree with the Organization that Rule 21.d.1 clearly distinguishes between stealing and criminal offenses on the one hand and all other disciplinary acts or occurrences on the other. It is only in cases of the former that the time limit for providing notice of the charges runs from the date of Carrier's knowledge. Insubordination is not stealing and it is not criminal. Therefore, the time limit starts to run with the act of occurrence, not with Carrier's knowledge of it.

However, we do not agree with the Organization's argument that the charge in the instant case was untimely. The critical question is when was the act or occurrence completed. The Organization maintains that the act or occurrence was complete on August 27, 2001, when Claimant refused to submit to the fitness for duty examination. We do not agree.

Insubordination is a very serious offense that usually results in dismissal. The essence of the offense is not only the failure to comply with an instruction but also the belligerent affront to supervisory authority. Indeed, it is the affront to supervisory authority, the "in your face" character of the offense, that is the source of its seriousness and the justification for the severity of the discipline usually imposed. The affront to authority cannot occur until the supervisor who issued the order is notified of the subordinate's refusal to comply. Had Claimant called the Director of Operations on August 27, 2001, and told the Director he would not cooperate with the examination, the time limits would have run from that date. However, the affront to the Director's authority did not occur until the Director was notified that Claimant had not cooperated with the examination; thus the offense was not complete until September 5, 2001. Accordingly, we conclude that the charge was timely.

-3-

Much of the Organization's contention that Claimant's refusal to comply with the order was not insubordinate consisted of an attack on the order itself. The Organization argued that the Road Foreman overreacted to a humorous parody and noted that the Local Chairman did not consider the parody threatening. The Organization complained that the Medical Director decided to disqualify Claimant and have him examined based on only five pages of a much longer packet that were taken out of context. The Organization further contended that after the Medical Officer disqualified Claimant, Claimant's personal physician wrote that Claimant was qualified for service, thus triggering Rule 25's procedure for a mutually selected third doctor to examine Claimant, rather than a referral to a doctor unilaterally selected by Carrier's Medical Office.

None of these arguments provide a defense to the charge of insubordination. The general rule in labor relations is that an employee, confronted with a directive that he believes violates the Agreement or is otherwise improper, must obey now and grieve later. Claimant deliberately failed to do so.

There is an exception to this general rule which is recognized in Carrier's Standards of Excellence as "when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property." The Organization introduced several letters from Claimant's doctor that stated that submission to the fitness for duty exam would have been medically harmful to Claimant. Claimant's doctor did not testify and the record contains no evidence of the basis for her opinion. The Hearing Officer discounted the probative value of the letters and we find that she acted properly in doing so.

Accordingly, we conclude that Carrier proved the charge by substantial evidence. The claim must be denied.

## AWARD

Claim denied.

_Martin H. Malin_

Martin H. Malin, Chairman

_L. C. Hriczak_

L. C. Hriczak,
Carrier Member

_Mark B. Kenny_

M. B. Kenny,
Employee Member

Dated at Chicago, Illinois, January 31, 2003.

-4-

National Railroad Passenger Corporation, Two South Station, Boston, MA. 02110-2215



September 10, 2001

### NOTICE OF FORMAL INVESTIGATION
CERTIFIED MAIL 7000 0600 0028 6411 2762

FILE NO: 01-049

Mr. Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA 02116

Dear Mr. Carmack:

You are hereby directed to appear for a formal investigation indicated below:

|        |                   |
|--------|-------------------|
| Date:  | September 17, 2001 |
| Time:  | 11:30AM            |
| Place: | 253 Summer Street  |
|        | 2nd Floor          |
|        | Boston, MA. 02110  |

This notice is issued in connection with the occurrence (s) outlined below:
On Friday, September 7, 2001, the Customer Service/Commuter Rail Transportation Office was contacted by Amtrak's Medical Director's Office, and informed that you failed to appear for an appointment with Dr. Vasile on August 27, 2001, at 4:00 P.M., a date and time negotiated and agreed by both of you.

**Charge I:**    Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, at 4:00 P.M., you allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination".

Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled *Professional and*



*Personal Conduct'*, specifically Teamwork, which reads in pertinent part:
"[F]ollowing instructions ....you must comply with all company and departmental
policies, procedures and rules as well as all instructions, directions and orders from
supervisors and managers."

You may produce any witness you so desire and you may be accompanied by a
representative as provided for in your current and governing agreement without
expense to the National Passenger Corporation.

All requests for postponement of this investigation must be handled through the Division
Hearing Office at 617-345-7667 or by U.S. Mail at 253 Summer Street, Boston, MA.
02210.

Very Truly Yours,

M.J. O'Malley
Director of Operations

Cc:    Hearing Officer
       F.J. O'Connor Jr., Charging Officer
       Dr. Russell G. Vasile M.D., Company Witness
       Dr. T. Pinsky, Company Witness
       Mr. M.J. O'Bryan, BLE Representative

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T.  CARMACK,<br>             Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>             Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 7

# DECISION LETTER

May 13, 2002

Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA  02116

File No.: 01-049

Dear Mr. Carmack:

By Notice of Investigation, dated September 10, 2001, you were charged with the following:

> Charge I:    Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, and at 4:00 P.M., you allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination."

> Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled 'Professional and Personal Conduct', specifically Teamwork, which reads in pertinent part: "[F]ollowing instructions . . ..you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers."

The undersigned-hearing officer conducted an investigation into the above-quoted charges on the following dates: April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, after one postponement at the request of your Organization. You were present throughout the entire proceeding and represented by your BLE Representative, Richard Prone.

Testimony adduced and documentation submitted established the following:

1. At all times during your employment, Amtrak's Standards of Excellence were in effect and applicable to you, as they are to all Amtrak employees.
2. Carrier maintains a Workplace Violence Policy (PERS −42). The policy's stated purpose is to "establish guidelines and protocols for the handling of threats or acts of violence in the Amtrak workplace." Threats, under the policy, can include written communications or acts to instigate or encourage violence. The policy indicates that "even without an actual threat, employees should report any behavior they have witnessed which they regard as threatening or violent . . .."

3. On April 11, 2001, Joseph DeModena, Division Road Foreman for Commuter Service, found a large packet of written materials, entitled "Letters From Hell", on his desk. According to Mr. DeModena, he did not know how the packet got on his desk, but the majority of the materials within the packet were authored by you.

4. Mr. DeModena testified that he found portions of the packet to be very disturbing. Specifically, he noted the parody of Hamlet, which included a casting page which was addressed to God and provided that "this play has a messy ending more to my liking" and was signed under the name, "Lucifer". The parody had Mr. DeModena cast as Rosencrantz, a character who is murdered.

5. Mr. DeModena testified that he reported the situation to Lou DePhillips, Director of Labor Relations by phone that day because he found the materials disturbing and threatening. He was provided a complaint form that he completed the next day.

The Organization argues that Mr. DeModena had no reason to feel threatened by the material. First, they note that the material was not directed at Mr. DeModena. The material was related to an internal union dispute between you and BLE local president, Mr. O'Bryan. They note that the material had been written several months earlier. While that may be true, I find no reason to discredit Mr. DeModena's testimony regarding his perception of the materials. He found them on his desk and had previous disputes with you. Therefore, the vague nature of the materials, especially the parody, in which his character was murdered, and your commentary that you liked this ending better than the Shakespearean history plays, could reasonably cause a person to feel threatened. The workplace violence policy is clear that the nature of reportable incidents includes a broad range of behaviors and threats do not have to be imminent.

6. The evidence established that Mr. Lou DePhillips, Labor Relations Director, is a member of the Threat Assessment and Review Team (TART), which is charged with evaluating workplace violence complaints and determining what, if any, action should be taken. Mr. DePhillips testified that he reviewed the materials left on DeModena's desk and consulted with fellow TART team members, Captain Smith of the Amtrak Police and Suzanne Allen, Director of Human Resources. He stated that he came to the conclusion that the materials should be reviewed by the Medical Department. Both Ms. Allen and Detective Smith corroborated this account.

7. The evidence established that initially, Dr. Pinsky, Medical Director for the Northeast Corridor, was provided with only a select number of pages from the "Letters from Hell" packet. Dr. Pinsky testified that he reviewed the selected pages at their request. He found them disturbing and questioned your fitness for duty. As a result, he concurred that you should be disqualified from service pending a fitness for duty examination. The Medical Department notified Mr. O'Malley of this finding by email communication on May 3, 2001.

8. By letter dated May 4, 2001, Mr. O'Malley, Director of Operations for Commuter Rail, advised you that you were being held out of service, with pay, pending a fitness for duty examination, based upon the writings that were submitted to Dr.

Pinsky. An appointment with Dr. Vasili was arranged for you by the Medical Department for June 4, 2001. You were advised of this appointment by letter dated May 17, 2001.

9. On June 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that you had canceled the appointment with Dr. Vasili. As a result, Mr. O'Malley wrote you a letter on June 8, 2001 in which he advised you that as a result of your canceling the appointment, your pay status was changed to "without pay". In addition, he advised you that you needed to reschedule the appointment.

10. On June 27, 2001, you went to Dr. Vasili's office with your local President, Mike O'Brien. After discussing your concerns about confidentiality and the need for a psychiatric examination, you refused to submit for the evaluation.

11. On July 24, 2001, Mr. O'Malley advised you by letter that he was providing you one last opportunity to attend the fitness for duty examination. His letter advised:

> "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate the evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly contrary activities. If you have any doubts or questions as to what is expected, please contact me at (717) 222-3650."

12. On September 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that a letter from Dr. Vasili was being sent to him. The letter, which was received by the Medical Department on September 4, 2001, indicated that you refused to undergo the exam.

While you testified that you did not specifically refuse, I find that the conditions you placed upon the exam constituted a refusal.

13. Based upon the record as a whole, I find sufficient evidence to sustain the charge against you. Carrier's Medical Director determined that a fitness for duty exam was necessary based upon his review of materials that contained references to Amtrak supervisors and co-workers. After several attempts to have you undergo the examination, you failed to do so, even after being warned that such failure would be considered insubordination.

The Organization argues that Mr. DeModena's complaint was an attempt to get back at you for causing him problems. While there was evidence that you had been counseled for operational incidents, I do not find that to be sufficient to determine that Mr. DeModena manufactured this incident. While it is not clear how the "Letters from Hell" were delivered to Mr. DeModena, it is reasonable that upon finding them, Mr. DeModena would consider them disturbing and threatening, especially if you and he had been having any kind of difficulties. The materials in question contain dark humor that has the potential to be interpreted in many ways. The fact that Mr. DeModena was cast in the role of a character that is murdered could reasonably cause him concern. The workplace violence policy

contains a broad range of behaviors that it encourages employees to report. I find it reasonable that Mr. DeModena would choose to do so.

The fact that the TART team submitted only the portion of the materials found on Mr. DeModena's desk that concerned him does not prove the incident to be manufactured either. Dr. Pinsky was clear that he found all the materials disturbing and maintains that he believes a fitness for duty examination is necessary in your case.

Although the May 11, 2001 email indicates that Mr. DePhillips suggested a course of action that included a fitness for duty examination and included a consideration of what would happen if you refused to undergo the exam, there was no other evidence provided that would indicate that the evidence was manufactured. In fact, the email was sent to Dr. Pinsky and he chose a course of action slightly different from the one promoted by Mr. DePhillips.

The determination that a fitness for duty examination was the proper course of action, rather than use of the EAP or some other form of counseling, appears to be within the purview of options contemplated under PERS-42. The policy clearly states that it contains guidelines and not a road map of steps that need to be followed. Moreover, the policy specifically spells out a role for the Carrier's Medical Director. Under the policy the Medical Director "provides guidance on fitness for duty evaluations and analyzes documentation for medical related issues" and "reviews and coordinates medical information from outside medical resources." Thus, the role played by Dr. Pinsky is fully consistent with the dictates of PERS-42.

I also find no merit to the Organization's claim that Rule 25 contained within the BLE Agreement was violated. Rule 25 provides:

     b.     When it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a medical examination. Passenger Engineers held out of service by the Corporation because they are medically unable to perform service may have an examination by a doctor of their own choosing without expense to the Corporation. In case of disagreement on the . . . the two doctors will select a third doctor, who is a specialist in the medical area involved, and the decision of the majority of the three as to the Passenger Engineer's fitness will be final. . . .

Rule 25 provides for the employee to have an exam by a physician of their own choosing only after the Carrier's physician determines that they are medically unable to perform their job. Since Dr. Vasili did not examine you, no such finding was ever made. Rather, you were being held out of service pending a determination. Therefore, it was premature to seek your physician.

While the Organization argues that Dr. Pinsky's decision to disqualify you pending a fitness for duty examination constituted the determination of the Carrier's physician, I find that reading of the contract to be wrong. Dr. Pinsky did not examine you. Rather, he reviewed a situation (your writings) and found that there was a question about whether you were fit for duty. As a result, he disqualified you pending a FFD exam.

Finally, I do not find sufficient justification for your decision not to comply with Mr. O'Malley's directive to you to undergo the fitness for duty examination. Amtrak's Standards of Excellence Provide, in pertinent part:

> "Therefore, you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers.
>
> The only exception to the above requirement arises when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property."

Refusal to obey a directive is justified only when compliance will cause clear and imminent danger. While I credit your testimony that you had fears regarding the confidentiality of the exam and the repercussions of the exam on you, I do not find them to be the type of clear and imminent harm contemplated under the Standards of Excellence. The examination results would have been reported to Amtrak's Medical Department. Thus there was no objective harm that could result. Being held out of service based upon the finding is not a danger as defined under the standards of excellence.

Nor do I find Dr. Anne Gurion's notes sufficient evidence that complying with the fitness for duty exam would result in imminent danger to you. Dr. Gurion's May note indicates that she agreed "with Mr. Carmack that a forced, nonconfidential psychiatric consultaon would be inadvisable for medical reasons". This letter provides no basis to determine what type of harm you would face. Moreover, the May 30, 2001 letter suggests she bases this opinion on your representation of what the exam would entail. Given the documentation from Dr. Vasili, I don't believe that you properly characterized the exam to Dr. Gurion and, therefore, her opinion seems based upon incomplete information.

14. Finally, although you apparently refused to meet with Dr. Vasili on August 28, 2001, the information was not forwarded to the Medical Department until September 4, 2001 and to Mr. O'Malley on September 5, 2001. While Rule 21 of the BLE agreement provides that charges must be issued within seven days of the incident, unless it is a criminal offense, I cannot find that the Carrier had any undue delay in this case. First, because the incident involved a medical examination, Mr. O'Malley would not have any ability to determine your

compliance until he received information from the Medical Department. He received it on September 5, 2001, the date the charges were issued.

Based on the foregoing, I find that Carrier proved the charges against you. A copy of the transcript and copy of the exhibits are enclosed.

Signed:

_Deborah M. Gaines_                    5-13-02
Deborah M. Gaines                       Date
Hearing Officer

Cc: R. Prone
    W. Rae
    M. O'Connell

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ——————————————— )  |  |  |
| JOSEPH T.  CARMACK, )  |  |  |
| Plaintiff, *pro se* )  |  |  |
| )  |  |  |
| v. )  | C.A. No. 05-11430-PBS |  |
| )  |  |  |
| MASSACHUSETTS BAY )  |  |  |
| TRANSPORTATION AUTHORITY )  |  |  |
| and MASSACHUSETTS BAY )  |  |  |
| COMMUTER RAILROAD, )  |  |  |
| Defendants )  |  |  |
| ——————————————— )  |  |  |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 8

BASED ON THE FINDINGS OF THE HEARING OFFICER IN THIS CASE, AND
IN CONSIDERATION OF THE SERIOUS NATURE OF THE PROVEN
OFFENSE, I HEREBY ASSESS THE FOLLOWING DISCIPLINE:

### DISMISSAL IN ALL CAPACITIES
### EFFECTIVE IMMEDIATELY

Please return any and all items of Company property,
Including your Rail Travel Privilege Pass, to this office
as soon as possible.

Francis J. O'Connor Jr.
Assistant General Manager
Commuter Operations
253 Summer Street
Boston, MA 02210

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T.  CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 9

BEFORE THE
NATIONAL MEDIATION BOARD


NOTICE OF OPERATING AGREEMENT  BETWEEN
MASSACHUSETTS BAY COMMUTER
RAILROAD CO., LLC  AND
<u>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY</u>


In accordance with sections 19.0 through 19.3 of the Representation Manual, Massachusetts Bay Commuter Railroad Co., LLC ("MBCR") hereby provides notice of an Operating Agreement dated February 19, 2003  (the "Operating Agreement") between MBCR and the Massachusetts Bay Transportation Authority ("MBTA").  As described below, MBCR will begin providing commuter rail transportation service in the Boston area on July 1, 2003 pursuant to the Operating Agreement.

In December, 2002, the MBTA selected MBCR to operate the MBTA commuter rail system in the Boston area.  Amtrak currently provides commuter rail service in Boston in accordance with an agreement between Amtrak and the MBTA.  Pursuant to the Operating Agreement, MBCR is scheduled to take over operation of the system from Amtrak and begin MBCR's operations as of July 1, 2003.

The Operating Agreement requires MBCR to conduct its relations with its employees in accordance with the provisions of the Railway Labor Act.  In addition, more specifically, MBCR must (1) offer employment to ~~all of the~~ current employees of Amtrak who are engaged in the commuter rail operations in Boston, (2) recognize the Amtrak unions as the representatives of such employees for purposes of collective bargaining and (3) negotiate collective bargaining agreements with such unions in order to provide wages and working conditions that are substantially equivalent to the wages

and working conditions under the current collective bargaining agreements between Amtrak and such unions. Exhibit 7 attached to the Operating Agreement defines the terms and conditions that will constitute the initial terms and conditions of employment unless MBCR and the respective unions agree otherwise.

In accordance with the Operating Agreement, MBCR has recognized the following unions as the collective bargaining representatives of the employees whom such unions now represent at Amtrak:

American Railway and Airway Supervisors Association
  (Maintenance of Way Division)
American Railway and Airway Supervisors Association
  (Maintenance of Way Division)
Brotherhood of Locomotive Engineers
American Train Dispatchers Department
Brotherhood of Maintenance of Way Employees
Brotherhood of Railroad Signalmen
International Association of Machinists
International Brotherhood of Boilermakers
International Brotherhood of Electrical Workers
National Conference of Firemen and Oilers
Transport Workers Union and Brotherhood Railway Carmen
Sheet Metal Workers International Association
Transportation Communications International Union
United Transportation Union (conductors)

MBCR and each of these unions have commenced and are continuing negotiations, and ~~implementing~~ transition agreements have been signed by MBCR and certain of the unions. MBCR plans to extend employment offers, to be effective as of July 1, 2003, to current Amtrak employees in accordance with the Operating Agreement and the arrangements reached with the respective unions.

The Railroad Retirement Board has determined that MBCR is a "covered employer" within the meaning of the Railroad Retirement Act and the Railroad

Unemployment Insurance Act.  A copy of the Railroad Retirement Board's decision is attached as Exhibit A.  In addition, MBCR has petitioned the Surface Transportation Board to request clarification of MBCR's status as a rail carrier.  The petition, a copy of which is attached as Exhibit B, is pending.

As required by section 19.3 of the Representation Manual and section 1.201 of the Board's rules, this Notice is being served on representatives of each of the unions listed above.  The Board is invited to contact the undersigned counsel for MBCR to the extent that the Board requires additional information.

Respectfully submitted,

MASSACHUSETTS BAY COMMUTER
  RAILROAD CO., LLC

By its Attorney,

_____
James E. Howard
1 Thompson Square, Suite 201
Charlestown, Massachusetts 02129
Telephone: 617-886-9322
Facsimile: 617-8 86-9324
e-mail: jehoward@worldnet.att.net

Dated: May __, 2003

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T. CARMACK, | ) | |
| Plaintiff, *pro se* | ) | |
| | ) | |
| v. | ) | C.A. No. 05-11430-PBS |
| | ) | |
| MASSACHUSETTS BAY | ) | |
| TRANSPORTATION AUTHORITY | ) | |
| and MASSACHUSETTS BAY | ) | |
| COMMUTER RAILROAD, | ) | |
| Defendants | ) | |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 10

# Copy of Transcript

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

        Plaintiff, *Pro Se*

    Vs.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,
    and
MASSACHUSETTS BAY COMMUTER RAILROAD CO.

        Defendants.

CIVIL ACTION NUMBER:
05-11430-PBS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### 30 (b)(6) DEPOSITION OF MBTA

### GIVEN BY JOHN D. RAY

April 30, 2008
9:10 a.m.

Jack Daniel Court Reporting and Video
100 Franklin Street
Boston, Massachusetts

Amanda Stevens, Notary Public and Certified Shorthand Reporter
within and for the Commonwealth of Massachusetts



**Jack Daniel**
**Court Reporting & Video Services**

Technologies you can use  •  Experience you can Trust

100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039  •  Toll Free: 866.814.0039  •  Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

74

1  to as MBCR trains in all communications

2  regarding that train.

3      Q.  But are they also MBTA trains?

4      A.  MBTA equipment.  You know, it's

5  MBTA commuter rail service.

6      Q.  Well, then what's the difference

7  between calling something MBTA equipment

8  and an MBTA train?

9      A.  Well, when the dispatchers refer to

10 or talk to a train -- an M -- commuter

11 rail train coming out of Fitchburg, it

12 will be MBCR Train Number, you know, 402,

13 404 whatever.  It's never referred to as

14 MBTA commuter rail train or MBTA in any

15 way, it's always MBCR as the railroad ID

16 number on the train.

17     Q.  Is it an MBTA service?

18     A.  Yes.

19     Q.  But it's an MBCR train?

20     A.  Yes.

21     Q.  What's the distinction between MBCR

22 and MBTA in that -- in terms of the

23 service?  What the service is?

24     A.  MBTA is a public agency that hires



Direct Dial:    617.557.0039
Toll Free:     866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

75

1  -- that hired MBT -- MBCR, excuse me, to

2  operate the commuter rail service.

3      Q.  Is there a difference between

4  providing a service and operating a

5  service, that you know of?  Just if I use

6  those terms; provide a service as opposed

7  to operating a service, are those two

8  different things to you?

9      A.  Yes.

10     Q.  What is the difference?

11     A.  In this instance here, the MBTA

12  could be providing a service to the, you

13  know -- the passengers by hiring MBCR to

14  operate trains for the passengers to ride

15  on.

16     Q.  Okay.  So in that instance, you're

17  considering the MBTA the provider and MBCR

18  the operator?

19     A.  Yeah.  MBCR has an operating

20  agreement with the MBTA to operate the

21  commuter rail service.

22     Q.  Are you familiar with that

23  agreement?

24     A.  Yes.



Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

152

1  about changes and he didn't know.

2              MR. WITHERBY:  Well, let me

3  ask my question.

4              MR. CARMACK:  Yeah, I am.

5  I'm just telling you I'm objecting to it.

6              MR. WITHERBY:  Normally what

7  you do is wait until the end of the

8  question.

9       Could you read the beginning of the

10  question for me?

11              (Question read)

12       BY MR. WITHERBY:

13       Q.  Do you know whether the

14  configuration of North Station was the

15  same on July 1, 2003 as it is today?

16       A.  I know it is not the same.

17       Q.  And the new construction that

18  expanded the lobby area -- or onto the

19  tracks and platforms, were those tracks

20  and platforms there on July 1, 2003?

21       A.  Yes.

22       Q.  And do you know who owned the area

23  that was lobby area in North Station on

24  July 1, 2003?


**Jack Daniel**
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

153

1    A.  I don't.

2    Q.  Mr. Ray, Mr. Carmack asked you a

3  number of questions about the operating

4  agreement between MBCR and MBTA that was

5  entered into in early 2003.  I'd like to

6  ask you some more questions about that

7  agreement.

8        Do you know whether -- what the

9  relationship between MBTA and MBCR is, as

10 defined by that agreement?

11    A.  That MBCR is an independent

12 contractor to the MBTA.

13    Q.  Do you know whether that agreement

14 provides whether or not MBCR is an agent

15 of the MBTA?

16        MR. CARMACK:  I'm going to

17 object to that question.

18        MR. WITHERBY:  You may

19 answer.

20    A.  I believe it says that they are not

21 an agent of the MBTA.

22    Q.  Do you know who is required to

23 supply the personnel for operating the

24 commuter rail service under the agreement?


**Jack Daniel**
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

154

1    A.   MBCR is.

2    Q.   Do you know whether the operating

3   agreement provided that those personnel

4   would or would not be employees of the

5   MBTA?

6    A.   I think it prohibits them from

7   being employees of the MBTA.

8    Q.   Under the agreement, does the MBTA

9   have any involvement in hiring or firing

10  of contract or personnel of MBCR?

11   A.   No.

12   Q.   Does --

13            MR. CARMACK:   I'm going to

14  object to the question.

15            MR. WITHERBY:   What's the

16  basis of your objection?

17            MR. CARMACK:   Well, I

18  essentially asked that question already.

19            MR. WITHERBY:   I don't think

20  you did.

21            MR. CARMACK:   I asked it in

22  the context of a document that you didn't

23  want me to ask him about.   But that's

24  fine.   I'm just telling you I'm objecting.


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

155

1          MR. WITHERBY:  Well, you

2    asked him whether he was familiar with

3    that particular document and he said he

4    wasn't.

5          MR. CARMACK:  Okay.  Go

6    ahead.

7          BY MR. WITHERBY:

8     Q.  I'm asking him if he -- if the

9    MBTA under the agreement and -- or, in

10   fact, has involvement in the hiring or

11   firing of MBCR contracting personnel --

12   contractor personnel.

13    A.  No, the MBTA doesn't.

14    Q.  Does the MBTA have supervisory

15   authority over the MBCR's contractor

16   personnel?

17    A.  No.

18    Q.  Did the MBTA have any involvement

19   with whether or not the plaintiff in this

20   action, Mr. Carmack who has been

21   questioning you, was hired to a position

22   at MBCR in 2003?

23    A.  Could you ask that again?

24    Q.  Did the MBTA have any involvement


**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

—————————————————— )
                                            )
JOSEPH T.  CARMACK,                         )
            Plaintiff, *pro se*             )
                                            )
v.                                          )          C.A. No. 05-11430-PBS
                                            )
MASSACHUSETTS BAY                           )
TRANSPORTATION AUTHORITY                    )
and MASSACHUSETTS BAY                       )
COMMUTER RAILROAD,                          )
            Defendants                      )
—————————————————— )

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 11

# Copy of Transcript

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

       Plaintiff, *Pro Se*

  Vs.                         CIVIL ACTION NUMBER:
                                       05-11430-PBS

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,
    and
MASSACHUSETTS BAY COMMUTER RAILROAD CO.

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## 30 (b)(6) DEPOSITION OF MBTA

### GIVEN BY CHARLES ANTHONY PASSANISI, JR.

April 30, 2008
12:42 p.m.

Jack Daniel Court Reporting and Video
100 Franklin Street
Boston, Massachusetts

Amanda Stevens, Notary Public and Certified Shorthand Reporter
within and for the Commonwealth of Massachusetts



Technologies you can use • Experience you can Trust

100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

26

1      But the Commonwealth was the

2  guaranteer [*sic*] -- or guarantor of the

3  bonds.  Now, under forward-funding, the

4  MBTA is -- actually guaranties the bonds.

5  I think that is a pretty significant

6  difference.

7      Q.  Yeah, um-hmm.  So then the money --

8  it says if the MBTA could -- gets money

9  more directly now and has a -- it controls

10  the budget.

11          MR. WITHERBY:  I'll object

12  to the characterization.

13          MR. CARMACK:  Okay.  Well,

14  I'm just trying to understand, excuse me

15  for that, so...

16      BY MR. CARMACK:

17      Q.  Is there any difference in the

18  source of the money with forward-funding?

19      A.  Yeah.

20      Q.  With -- prior to forward-funding

21  came -- the funding came directly from the

22  legislature?

23      A.  Right.  It was embedded in the

24  state's annual fiscal budget.  We had a


Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

27

1    line item and a state budget, you know.

2    This money is going to the MBTA.

3          Under forward-funding, you have

4    dedicated revenue sources now, so we are

5    getting, you know -- we are getting

6    nothing out of the -- you know, we are

7    getting no money from the state for our

8    operating budget now.

9      Q.   Where does it come from?

10     A.   It comes from the dedicated sales

11   tax revenue -- so we're getting one

12   percent.  You know, they gave us two

13   dedicated sources, local assessments and

14   dedicated sales tax, the one penny out of

15   the five cents; and then we have our own

16   revenue sources.

17     Q.   What are those revenue sources?

18     A.   Fare revenues.

19     Q.   Okay.  Same ones we talked about

20   before.

21     A.   Yes, right.

22     Q.   Did -- is there any financial

23   assistance in those revenue sources?

24          MR. WITHERBY:  When you say



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

28

1  financial assistance, are you talking about

2  federal financial assistance?

3                    MR. CARMACK:  No.  Any kind

4  of financial assistance.  It could be

5  state.

6                    MR. WITHERBY:  Do you

7  understand the question?

8      A.  No.  Right.  No, there's no --

9      Q.  Okay.

10          Is there federal financial

11  assistance?

12      A.  Well -- well, there can be at

13  times.

14      Q.  But not always?

15      A.  That's correct.

16      Q.  Why would there be financial

17  assistance?

18      A.  Because the Authority has the

19  ability to request money, to request

20  federal financial assistance through the

21  grant program.

22      Q.  Um-hmm.  Isn't -- aren't those

23  grants made on a regular basis?

24                    MR. BLAISDELL:  Objection.



Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

29

1        BY MR. CARMACK:

2        Q.  Is there a congressional timing as

3   to when those grants can be made?   A US

4   congressional timing?

5        A.  The -- well, the -- what I would

6   say is this, each federal program has, you

7   know, time lines associated with that

8   money -- when you have to apply for it

9   by.

10       Q.  And the disbursements of that money

11  is made at regular intervals, like five

12  years, one year or two years?

13       A.  No.  We -- as we incur costs, we

14  can bill the feds for their share.

15       Q.  Now your responsibilities for

16  billing those costs are separated between

17  capital projects and operation projects --

18  transportation projects, right?   Or are

19  they?

20       A.  Say that question again.

21       Q.  Is there a difference between finan

22  -- the financing -- federal financial

23  assistance to capital projects and federal

24  financial assistance to transportation



**Jack Daniel**
**Court Reporting & Video Services**
Technologies you can use  •  Experience you can Trust

Direct Dial:        617.557.0039
Toll Free:          866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

36

1  operating budget; revenues and expenses.

2  We take in revenues, and then those

3  revenues flow through the general ledger;

4  and, obviously, we incur costs so, you

5  know, schematic cash flow.

6      Q.  And then you make those payments --

7  make those payments.

8      A.  Right.

9      Q.  But are you going to tell me that

10  there is no federal financial assistance

11  in the revenue sources of the operating

12  budget?

13      A.  There can be.

14      Q.  Do you know what those sources are?

15      A.  Yes, I do.

16      Q.  What are they?

17      A.  The -- typically on the revenue

18  side in the past, but not always, we have

19  gotten money for preventive maintenance

20  costs incurred on the bus and subway side.

21      In addition, we have received

22  federal money in the past to do what we

23  call the job access reverse commute

24  program and I'm giving you an example.



Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

37

1          We typically start our service at
2    five o'clock in the morning.  And what
3    we did is we started service earlier to
4    bring out to the -- you know, to bring
5    workers out to the airport; so we'd start
6    service, say, at four because, obviously,
7    the airport -- you know, it's basically a
8    24/7 operation.
9          Q.  What budget does payments to Mass.
10   Bay Commuter Rail come from?
11         A.  It gets paid out of -- the payments
12   get paid out of operating cash.
13         Q.  Is that the same thing as the
14   operating budget?
15         A.  Yes.
16         Q.  Okay.  And that's -- that includes
17   federal financial assistance, or does it?
18         A.  Well, no.  There is no -- in this
19   instance on the member MBCR fixed price
20   contract, there was no federal financial
21   assistance flowing to them.
22         Q.  And the MBTA does not pay them with
23   federal financial assistance?
24         A.  No, not on a fixed price contract.



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

38

1    Q.  The federal financial assistance

2  that the MBTA receives, where does that

3  come from?

4    A.  There are -- we get money through,

5  basically -- our primary sources of

6  federal funding is the Section 5307, or

7  the urban formula program, Section 5309,

8  fix a guardway, or referred to as the rail

9  mod.

10       And, then, we do get money

11  occasionally under other FTS programs.

12  The Section 5309, bus and bus-related

13  facility improvements.  Then, like I

14  talked about earlier, I want to say it was

15  the job access reverse commute was like

16  Section 30, you know, 3037.

17    Q.  These are sections of the

18  Interstate Commerce Act?

19    A.  I don't know what they are.

20    Q.  The Federal Transit Act?

21    A.  I really don't know.  I can't

22  answer.

23    Q.  You just know we call them -- that

24  you call them Section 5307.


Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

39

1      A.  Right.  And then we do get money

2  that gets put into our Section 5307

3  account, you know, if we have a project

4  that's being funded through congested

5  mitigation and air quality or surface

6  transportation program funds which are FH

7  -- Federal Highway Administration money.

8      Q.  That could be also for rail

9  transportation?

10     A.  That's correct.

11     Q.  Surface transportation.

12     A.  Right.

13     Q.  But that would still be more like

14  -- is that routine maintenance?

15     A.  Well, I mean, you know, typically

16  on SEMAC funding, congested mitigation and

17  air quality, you have to show a benefit

18  for the environment.

19         We've gotten money under that

20  program to build parking lots, say, at

21  some of our suburban stations.  In

22  addition, we just -- we are in the process

23  of buying new switch locomotives for our

24  yards because I guess the ones that we had



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

40

1    at the facilities were *circa* 1950.

2            So I mean, you know, typically

3    you've got to prove -- it's a competitive

4    process and you've got to prove that there

5    is a benefit to the environment.

6        Q.  Does any of that money go to the

7    Boston Engine Terminal?

8        A.  What money?

9        Q.  The federal -- the 5307, 5309, *et*

10   *cetera*?

11       A.  My understanding --

12       Q.  It would probably be 5307 I think.

13       A.  No.  No, I think the BET -- the

14   Boston Engine Terminal was rebuilt back

15   whenever, and we used -- I want to say

16   5309 funding.  We did use federal funding

17   to rebuild the Boston Engine Terminal.

18       Q.  But none of that funding goes

19   towards routine maintenance or operations,

20   that you know of.

21       A.  What money?

22       Q.  The 5307, 5309, 5308.  I mean, they

23   start at 5301.

24       A.  Right, I know.  What I'd say is



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

41

1  this 5307 can go towards preventive

2  maintenance.

3      Q.  And do you know about funding for

4  operations?

5      A.  What do you mean about funding for

6  operations?

7      Q.  Well, you don't know about the

8  Federal Transit Act, but you know these

9  5307 categories.

10      A.  Right, right.

11      Q.  Are any of these 5300 categories

12  used in the day-to-day -- financing the

13  day-to-day operations of commuter rail?

14      A.  No.

15      Q.  Are you sure of that?

16      A.  I am sure.

17      Q.  Does all the federal money that you

18  know of come from these 5300 programs?

19      A.  No, we get other federal money.

20      Q.  What's the other federal money?

21      A.  We get Department of Homeland

22  Security funds.  We get money -- they call

23  it the transit security grant program.  We

24  also get money for ferry systems.



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

42

1    Q.  Do you know if the Massachusetts

2 Bay Commuter Rail gets any of that money?

3    A.  No, they don't.

4    Q.  The federal -- under this forward-

5 funding -- I just want to go into these

6 categories that this money comes from.

7    A.  Yup.

8    Q.  When you say non-revenue sources --

9    A.  Yup.

10    Q.  -- what are those?

11    A.  That would be as I stated earlier,

12 concessions, rental, sale of land,

13 investment income.

14    Q.  And others were fares and sales

15 tax.

16    A.  Right.

17    Q.  And those are revenue sources?

18    A.  That's correct.

19    Q.  And then, separate from all of

20 that, is federal financial assistance, the

21 5300 procurements that we were talking

22 about.

23    A.  No.  If we -- as I stated earlier,

24 we have in the past gotten money for


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

43

1  preventative maintenance on the bus and

2  subway side.  If that money were to come

3  in, it would record -- it would be

4  recorded as federal income, and that's

5  considered non-operating income.

6      Q.  Well, these -- and those -- these

7  are in the 5300 categories that you're

8  talking about?

9      A.  Right.  And that's considered

10 revenue from other sources.

11     Q.  But all I'm trying to do there is

12 separate it from those other things that

13 you mentioned.

14     A.  Right.

15     Q.  You have these other sources and

16 that's what you're calling it.

17     A.  Right.  And that's really other

18 sources, all part of the bottom line.

19     Q.  But included in that are these 5300

20 sources that you're talking about?

21     A.  But only in that one instance.

22     Q.  So you don't know of any of the

23 MBTA receiving any money under the 5300

24 other than that?



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

46

1    Q.  So that's some of the requirements

2  that you're talking about.

3    A.  Right.

4    Q.  Part of it is specifying what

5  you're requesting if for.

6    A.  Right.  I mean, you fill out a

7  grant application, you have to have a

8  scope of work.

9    Q.  And that scope of work never

10  includes operations -- or does it ever

11  include operations, I should say?

12    A.  It does include -- if we do

13  preventative maintenance, it would include

14  operations.

15    Q.  But only for preventative

16  maintenance --

17    A.  Right.

18    Q.  -- not -- not daily operations.

19    A.  Right.

20    Q.  Okay.  Are -- what -- are there

21  any conditions that are put on the T for

22  this federal funding?

23    A.  When we file a grant application we

24  do have to be consistent with the master



**Jack Daniel**
**Court Reporting & Video Services**
Technologies you can use  •  Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

47

1  agreement.

2      Q.  Do you know of any requirements

3  regarding the labor force that the federal

4  government makes upon the T in order to

5  receive those funds?

6      A.  No.

7              MR. CARMACK:  I think I'm

8  satisfied with this witness.

9              MR. WITHERBY:  I have to

10 consult with the witness briefly.

11             (Recess)

12             MR. WITHERBY:  Okay.  I

13 just have a couple questions Mr.

14 Passanisi.

15     **EXAMINATION**

16     **BY-MR.WITHERBY:**

17     Q.  Turning your attention to the

18 spring of 2003, you're aware, are you not,

19 that the MBTA and MBCR agreed to an

20 agreement for MBCR to operate the MBTA's

21 commuter rail system starting July 1,

22 2003?

23     A.  That is correct.

24     Q.  Did the MBTA make any payments to



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

48

1  MBCR under that agreement or any other

2  agreement prior to July 1, 2003, or for

3  any work that was done prior to July 1,

4  2003?

5       A.  Yes, they did make payments.

6       Q.  And were those payments made out of

7  state funds or MBTA funds only?  Or did

8  they include any federal funds?

9       A.  They were MBTA funds only.

10       Q.  My other question for you is:  At

11  the very end of Mr. Carmack's questioning,

12  you -- he asked you a question about

13  whether there were federal requirements

14  that the government made -- that the

15  federal government made applicable as to

16  conditions to the MBTA's receipt of

17  federal funds; do you remember that

18  question?

19       A.  Yes, I do.

20       Q.  Okay.  In answering that question

21  that you -- I believe you said something

22  like you weren't aware of any such

23  requirements.  Is it fair to say that that

24  response was informed by your prior



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

49

1  response?  Which is that the conditions on

2  the T required observing the requirements

3  of the master agreement?

4     A.  That would be correct.

5     Q.  And does the master agreement set

6  forth a number of federal regulatory

7  requirements, many of them statutory

8  requirements?

9     A.  Yes, it does.

10     Q.  And the T does agree to abide by

11  those requirements; is that correct?

12     A.  Yes, we do.

13          MR. WITHERBY:  That's all

14  the questions I have.

15     Mr. Blaisdell?

16          MR. BLAISDELL:  I have no

17  questions, thank you.

18          MR. CARMACK:  Okay.  I do.

19     **FURTHER EXAMINATION**

20     **BY-MR.CARMACK:**

21     Q.  You just said that the master

22  agreement has some requirements in it that

23  are required by the federal government.

24     A.  Yes.



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
JOSEPH T.  CARMACK,                 )
           Plaintiff, pro se        )
                                    )
v.                                  )          C.A. No. 05-11430-PBS
                                    )
MASSACHUSETTS BAY                   )
TRANSPORTATION AUTHORITY            )
and MASSACHUSETTS BAY               )
COMMUTER RAILROAD,                  )
           Defendants               )
_____)
```

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

## <u>DECLARATION OF DENNIS COFFEY</u>

The undersigned, being duly sworn, deposes and states as follows:

1. I hereby certify that I, Dennis Coffey, am manager of business development with HNTB Corporation, ("HNTB"), and have been employed by HNTB since August 8, 1998.

2. I make this statement based on my personal knowledge of the following facts.

3. In 2003, HNTB was a sub-contractor to the Massachusetts Bay Commuter Railroad, Inc. ("MBCR") to provide, among other things, advice and assistance regarding the transition of the operation of the Massachusetts Bay Transportation Authority ("MBTA") commuter rail from the National Railroad Passenger Corporation ("Amtrak") to MBCR (the "Transition"). Pursuant to this arrangement, I acted as Manager of Human Resources.

4. MBCR was scheduled to assume operation of the MBTA commuter rail on July 1, 2003.

5. In connection with the Transition, and pursuant to agreements between MBCR and the several railroad labor organizations, including the Brotherhood of Locomotive Engineers ("BLE") (the "BLE Implementing Agreement"), MBCR agreed to make conditional job offers to employees who were actively working for Amtrak at that time.

6. Consequently, HNTB and certain MBCR officials (the "Transition Team") prepared a "Conditional Offer of Employment Letter" (the "Conditional Offer Letter"), to be signed by MBCR General Manager Kevin Lydon. A true and accurate copy of such a letter is attached hereto as <u>Attachment A</u>.

7. To my knowledge, Mr. Lydon had very little, if anything, to do with the preparation of the Conditional Offer Letter, its distribution, or any follow-up with offerees. Mr. Lydon's role regarding the letters was merely to sign each one as the legal representative of MBCR.

8. The Conditional Offer Letter was to be sent to various classes of current Amtrak employees who were in active status, including locomotive engineers. To meet this obligation, the Transition Team required from Amtrak a list of its qualified employees and their addresses. However, Amtrak management (in Philadelphia, Washington, D.C. and Boston) was extremely conservative in terms of employee privacy, and was reluctant to provide any "personnel file" data.

9. Consequently, to initially identify the names and addresses of Amtrak personnel who would receive Conditional Offer Letters, the Transition Team relied upon employee rosters that were maintained by the various employee unions, such as the BLE, among others. A true and accurate [redacted] copy of one such BLE roster is attached hereto as Exhibit B.

10. The Transition Team did not consider the rosters supplied by the BLE or any other union to be dispositive of a person being "qualified" for an offer of employment with MBCR. Amtrak did eventually provide lists of names of employees who had been or were engaged in the MBTA commuter rail service. This listing, together with the addresses supplied by the unions, served as the basis for initial offers of employment. Going forward, however, these lists were supplemented and corrected based on discussions with both Amtrak managers and labor union representatives.

11. During the course of preparing for the transition names were added to or dropped from the group of "qualified" personnel as new information became available. For example, the Transition Team learned that some employees who were on Amtrak's initial list were not in fact on "active" status with Amtrak because they were injured, on military leave, or were removed for disciplinary infractions. Some employees had even been separated from Amtrak, but nonetheless showed up on the initial listing from Amtrak.

12. After mailing the initial round of Conditional Offer Letters, I received a telephone call from Joseph Carmack, who indicated he received one of the Letters. I remember the call because Mr. Carmack made a point to tell me all the things that he thought were wrong with Amtrak's operations, and that he was willing to help MBCR to address these problems.

13. I thanked Mr. Carmack for his interest, and contacted MBCR Manager of Labor Relations Christa [Cuppernall] Phillips to confirm Mr. Carmack's status with Amtrak. Ms. Phillips informed me that Mr. Carmack had been terminated by Amtrak. Consequently, Mr. Carmack was ineligible for the employment offer from MBCR.

14. As a result, Mr. Carmack was not placed on a locomotive engineer roster with MBCR as he did not meet the eligibility requirements set forth in the Conditional Offer Letter and in the BLE Implementing Agreement.

Subscribed to and sworn under the pains and penalties of perjury this 10th day of June, 2008.

Dennis Coffey

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOSEPH T.  CARMACK,             )
          Plaintiff, pro se     )
                                )
v.                              )          C.A. No. 05-11430-PBS
                                )
MASSACHUSETTS BAY               )
TRANSPORTATION AUTHORITY        )
and MASSACHUSETTS BAY           )
COMMUTER RAILROAD,              )
          Defendants            )
_____)
```

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 13

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T. CARMACK,<br>Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

## DECLARATION OF KEVIN LYDON

The undersigned, being duly sworn, deposes and states as follows:

1. I hereby certify that I, Kevin Lydon, at all times relevant to this matter was the General Manager with Massachusetts Bay Commuter Railroad, Inc. ("MBCR").

2. I make this statement based on my personal knowledge of the following facts.

3. In 2003, MBCR was involved in the transition of the operation of the Massachusetts Bay Transportation Authority ("MBTA") commuter rail service from the National Railroad Passenger Corporation ("Amtrak") to MBCR (the "Transition").

4. MBCR was scheduled to assume operation of the MBTA commuter rail on July 1, 2003.

5. In connection with the Transition, and pursuant to an agreement between MBCR and the Brotherhood of Locomotive Engineers ("BLE") (the "BLE Implementing Agreement"), MBCR agreed to make conditional job offers to employees who were actively working for Amtrak at that time.

6. Consequently, HNTB and certain MBCR officials (the "Transition Team") prepared a "Conditional Offer of Employment Letter" (the "Conditional Offer Letter"), to be signed by me as MBCR General Manager. A true and accurate copy of such a letter is attached hereto as <u>Attachment A</u>.

7. I was not personally involved with the preparation of the Conditional Offer Letter, its distribution, or any follow-up with offerees. My role regarding the letters was merely to sign each one as the legal representative of MBCR.

8. Other than signing the Conditional Offer Letter on behalf of MBCR, I had no involvement in the hiring of employees during the Transition.

9. Specifically, I had no knowledge that a Conditional Offer Letter had been sent to Joseph Carmack or that he had responded to the Letter.  I was not involved in the processing of his application, or the determination that Mr. Carmack was not an eligible employee under the terms of the BLE Implementing Agreement.

*<remainder of page intentionally blank>*

Subscribed to and sworn under the pains and penalties of perjury this ___10___$^{TH}$ day of June, 2008.

Kevin Lydon

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

)
JOSEPH T. CARMACK,                             )
            Plaintiff, *pro se*                    )
)
v.                                             )          C.A. No. 05-11430-PBS
)
MASSACHUSETTS BAY                              )
TRANSPORTATION AUTHORITY                       )
and MASSACHUSETTS BAY                          )
COMMUTER RAILROAD,                             )
            Defendants                          )
)

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 14



**MBCR**

*Massachusetts Bay
Commuter Railroad Company*

May 6, 2003

**PERSONAL AND CONFIDENTIAL**

**VIA CERTIFIED MAIL**

J. T.Carmack
398 Columbia Avenue
PMB 130
Boston, MA 02116-6008

Subject : Conditional Offer of Employment

Dear J.T. Carmack,

As you know, the Massachusetts Bay Commuter Railroad Company (MBCR) and the Brotherhood of Locomotive Engineers agreed to a collective bargaining agreement, subject to the ratification process of the organization. We were very pleased to reach this agreement and we look forward to a productive and cooperative relationship with the BLE. As the union ratification process proceeds, the BLE will provide you with the details of the collective bargaining agreement, including wage information.

At this time, MBCR is pleased to extend to you a conditional offer of employment as a locomotive engineer effective July 1, 2003. **This offer of employment is conditioned upon your holding sufficient seniority on an Amtrak Work Zone CS-1 or Work Zone 1 (Boston Crew Base) roster in accordance with the agreement between MBCR and the BLE and your successful completion of the following:**

(1)    Your completion of the enclosed Pre-Employment Medical Questionnaire and Amtrak medical record authorization form. The authorization form will authorize Amtrak to provide MBCR with any medical records that you may have on file with Amtrak. Rather than require a new physical exam for all employees, MBCR will use employees' responses to the questionnaire and employees' previous medical records, wherever possible, to demonstrate that employees are fit to work as required by the MBTA.

(2)    Your successful completion of drug and alcohol tests before your employment commences. For your convenience, MBCR will conduct employee enrollment and benefit enrollment meetings from May 12th to May 23rd. At these meetings you will have the opportunity to complete the required documentation and drug and alcohol testing. There will be informational flyers posted throughout the commuter rail and MBTA facilities that list times and locations of the meetings.

---

32 Cobble Hill Road  •  Suite 3  •  Somerville, MA  02143-4431  •  Tel 617-772-4980  •  Fax 617-591-0257  •  Web www.mbcr.net

The signed letter, the Pre-Employment Medical Questionnaire, and the medical record authorization form must be completed and returned to MBCR, with a copy to the BLE General Chairman, no later than May 15, 2003. We have enclosed two addressed stamped envelopes for your convenience. **MBCR shall have no further employment obligations to individuals who fail or decline to return the required documentation or who decline to take the drug and alcohol tests.** Therefore, it is imperative that you return the documentation to MBCR by May 15th.

A separate package and letter will be sent to you that describe the bidding process and will include a bulletin listing the assignments under advertisement. This package and letter will also explain the rights and options for individuals who accept this conditional offer of employment but who may not hold sufficient seniority to retain a position on the initial advertisement.

We are looking forward to employing you and other members of the current commuter rail workforce upon commencement of our management of the MBTA Commuter Rail Service on Tuesday, July 1, 2003. The first day of service will be an extremely important one for MBCR and for the commuting public. Our focus on delivering quality service will begin that day and will continue throughout the life of our agreement with the MBTA.

We know that with the experience of the current team we can accomplish our goal of continually improving the quality of service. MBCR is committed to working in full cooperation with the MBTA to provide superior commuter rail services and your contribution to this endeavor will certainly make it a success. We sincerely hope that you accept this conditional offer of employment and continue with the employment process.

If you have any questions about this conditional offer of employment or any other aspect of employment with MBCR, please do not hesitate to contact Dennis Coffey at (617) 772-4992.

Yours truly,

Kevin Lydon
General Manager

I accept this conditional offer of employment and wish to continue to participation in the employment process with MBCR:

Name: Joseph J. Carmack    JOSEPH T. CARMACK    SSN: 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

Signed: Joseph Carmack    Date: 5/14/2003

CERTIFIED MAIL :
MBCR - 7001 1940 0005 7197 9945
BLE - 7001 1940 0005 7198 0200
*32 Cobble Hill Road, Suite 3, Somerville, MA 02143-4431*

**Conditional Offer of Employment Checklist**

Send the following to MBCR in the enclosed postage-paid envelope addressed to MBCR by May 15, 2003:

    ____   A signed copy of this letter

    ____   Signed and Completed Medical Questionnaire

    ____   Signed Authorization for Medical Records from Amtrak

[An addressed, postage-paid envelope to the BLE General Chairman is also enclosed for your convenience in sending the General Chairman copies.]



# MBCR

Massachusetts Bay
Commuter Railroad Company

## AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION

1. I hereby authorize Amtrak to disclose and to provide copies of the following specified health information from my employment records.

2. Name: JOSEPH T. CARMACK                Date of Birth: 12/8/53

   Address: 398 COLUMBUS AVE PMB 130, BOSTON, MA 02116-6008
           Street                   City           State       Zip

3. Information to be disclosed to:    Massachusetts Bay Commuter Railroad Company, LLC
   Attention: Human Resources Department
   32 Cobble Hill Road
   Somerville, Massachusetts 02143

4. Disclose all health records related to or obtained during my period of employment, including all records related to drug and alcohol testing.

5. The above information is disclosed for the purposes of employment.

6. I understand I may revoke this authorization at any time if such a request is provided in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law.

7. This authorization expires on JANUARY 1, 2004.

PLEASE KEEP RECORDS
CONFIDENTIAL TO THE
FULL EXTENT APPLICABLE
BY LAW.

Joseph T. Carmack
Signature

JOSEPH T. CARMACK
Printed name

MAY 14, 2003
Date

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
SSN

A:\HealthRecordAuthorization.doc

5/7/2003



**MBCR**

*Massachusetts Bay*
*Commuter Railroad Company*

32 Cobble Hill Road,
Suite 3
Somerville, MA  02143-4431
USA

# Mobilization Pre-Employment Medical Questionnaire

The form is designed to provide MBCR's Medical Director with basic information regarding employee fitness for duty and will be retained by Health Resources.

| | |
|---|---|
| Date: MAY 14, 2003 | Date of Birth: Dec. 8, 1953 |
| Name: JOSEPH T. CARMACK | Social Security #: 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 |
| Address: 398 Columbus Ave. PMB 130 | |
| City: Boston | Personal Physician: Dr. Jonathan Appelbaum |
| State: MA | Union Affiliation: BLE |
| Zip: 02116-6008 | |
| Home Phone: 617/536-0772 | |
| Business Phone: 617/798-6466 | |

**Are you aware of any health or medical conditions that would prohibit or restrict you from performing the essential duties of your posted job?**

YES _____          NO ___✓_____

**If YES, please describe:**

_____

_____

## MEDICAL HISTORY

**Have you ever had any of the following?  (check appropriate boxes)**

☐ Angina          ☐ Epilepsy/Seizure          ☐ Stroke          ☐ Diabetes
☐ High Blood Pressure          ☐ Heart Attack          ☐ Asthma

Comments:

NO, I HAVEN'T.

THIS IS THE ONLY PAGE OF QUESTIONAIRE
RECEIVED IN PACKET.     JOSEPH T. CARMACK

*Joseph T. Carmack*

5/7/2003

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 15

| First | MI | Last Name | |
|---|---|---|---|
| Wayne | | Daley | BLE Local |
| R. | | Darinski | BLE Local |
| W. | A. | Davidson | BLE Local |
| Michael | | Demers | BLE Local |
| J. | A. | Deyeso, Jr. | BLE Local |
| James | S. | Dimond, Jr. | BLE Local |
| Vincent | | Dirusso | BLE Local |
| A. | R. | Doherty | BLE Local |
| Charlene | M. | Doto | BLE Local |
| John | L. | Doyle | BLE Local |
| R. | J. | Duggan, Jr. | BLE Local |
| K. | N. | Durand | BLE Local |
| R. | H. | Evans, Jr. | BLE Local |
| P. | W. | Finneral | BLE Local |
| Kennon | D. | Foster | BLE Local |
| R. | C. | Fowkes | BLE Local |
| Jonathan | D. | Fry | BLE Local |
| Chris | | Frye | BLE Local |
| E. | P. | Frye | BLE Local |
| W. | M. | Gagne | BLE Local |
| D. | A. | Geary | BLE Local |
| L. | S. | Goddard | BLE Local |
| R. | A. | Gomes | BLE Local |
| A. | J. | Gray | BLE Local |
| Virginia | A. | Greeley | BLE Local |
| M. | E. | Grinter | BLE Local |
| E. | C. | Grundstrom | BLE Local |
| D. | P. | Allen | BLE Local |
| S. | J. | Andrews | BLE Local |
| W. | N. | Aubut | BLE Local |
| W. | F. | Babin | BLE Local |
| T. | I. | Bagley | BLE Local |
| C. | L. | Barnard | BLE Local |
| R. | E. | Beal, Jr. | BLE Local |
| KyM | | Berry | BLE Local |
| F. | B. | Blatchford | BLE Local |

000296

| First | M.I. | Last Name | Union |
|---|---|---|---|
| Jesse | | Boggs, Jr. | BLE Local |
| R. | M. | Bongiorno | BLE Local |
| K. | L. | Bukoski | BLE Local |
| J. | P. | Burgess | BLE Local |
| J. | H. | Burke | BLE Local |
| J. | W. | Carbone | BLE Local |
| J. | T. | Carmack | BLE Local |
| P. | C. | Chaput | BLE Local |
| D. | S. | Clarke | BLE Local |
| Landy | | Clarke | BLE Local |
| Patrick | | Corneau | BLE Local |
| J. | P. | Corcoran | BLE Local |
| James | F. | Covino | BLE Local |
| S. | H. | Cowen | BLE Local |
| T. | G. | Crowell | BLE Local |
| G. | R. | Crowley | BLE Local |
| R. | J. | Curran | BLE Local |
| D. | M. | Curran | BLE Local |
| G. | H. | Curran | BLE Local |
| W. | L. | Harris | BLE Local |
| C. | | Hayhurst | BLE Local |
| Brian | F. | Hayhurst | BLE Local |
| V. | | Held | BLE Local |
| Bruce | K. | Herrick | BLE Local |
| T. | T. | Hobson | BLE Local |
| G. | | Holm | BLE Local |
| Chris | S. | Jeffrey | BLE Local |
| M. | A. | Johnson | BLE Local |
| R. | G. | Joseph | BLE Local |
| J. | J. | Keating | BLE Local |
| John | W. | Kelley | BLE Local |
| D. | E. | Kelley | BLE Local |
| S. | J. | Kelly | BLE Local |
| J. | F. | Kelsey | BLE Local |
| W. | L. | Kempton | BLE Local |
| R. | | Kimball | BLE Local |
| Stephen | R. | King | BLE Local |
| D. | | Kinne | BLE Local |

000297

| | | | |
|---|---|---|---|
| D. | E. | Knowlton | BLE Local |
| S. | E. | Kwasny | BLE Local |
| David | | Lankford | BLE Local |
| James | | Lankford | BLE Local |
| J. | M. | Lauzon | BLE Local |
| M. | C. | Layman | BLE Local |
| D. | P. | Leavitt | BLE Local |
| A. | M. | LeBlanc | BLE Local |
| Brian | N. | Lecuyer | BLE Local |
| D. | S. | Leeman | BLE Local |
| J. | D. | Letourneau | BLE Local |
| R. | | Letourneau | BLE Local |
| S. | | Letourneau | BLE Local |
| P. | A. | Lipp | BLE Local |
| D. | A. | MacLeod | BLE Local |
| A. | E. | MacMillian, Jr. | BLE Local |
| T. | E. | Madden | BLE Local |
| J. | D. | Mahoney | BLE Local |
| A. | T. | Manix | BLE Local |
| W. | J. | Marsden, Jr. | BLE Local |
| W. | H. | Matta, III | BLE Local |
| Kneigel | | McDowall | BLE Local |
| R. | T. | McGrath | BLE Local |
| D. | F. | McGuire | BLE Local |
| W. | F. | McLaughlin, Jr. | BLE Local |
| D. | G. | McNall | BLE Local |
| R. | J. | Meehan | BLE Local |
| M. | J. | Melchionda | BLE Local |
| J. | L. | Milton | BLE Local |
| R. | L. | Milton | BLE Local |
| Shawn | | Monahan | BLE Local |
| J. | P. | Morin | BLE Local |
| D. | J. | Murphy | BLE Local |
| Wes | | Nau | BLE Local |
| W. | H. | Nutter | BLE Local |
| G. | S. | O'Brien | BLE Local |
| M. | J. | O'Bryan | BLE Local |

000298

| | | | |
|---|---|---|---|
| T. | J. | O'Keefe | BLE Local |
| J. | D. | O'Leary | BLE Local |
| C. | A. | Obremski | BLE Local |
| T. | F. | Obremski | BLE Local |
| J. | M. | Oser | BLE Local |
| Sean | M. | Parrett | BLE Local |
| J. | D. | Patch | BLE Local |
| Scott | | Pereira | BLE Local |
| D. | A. | Pierce | BLE Local |
| J. | F. | Porter | BLE Local |
| John | | Powell | BLE Local |
| Daniel | | Proulx | BLE Local |
| G. | H. | Raynor | BLE Local |
| J. | A. | Reilly | BLE Local |
| G. | M. | Richards | BLE Local |
| W. | L. | Rines | BLE Local |
| R. | P. | Ring | BLE Local |
| R. | E. | Ripley, Jr. | BLE Local |
| C. | A. | Roy | BLE Local |
| Stephen | M. | Sarno | BLE Local |
| W. | E. | Scappace | BLE Local |
| Byron | C. | Scott | BLE Local |
| B. | A. | Shaughnessy | BLE Local |
| R. | E. | Slade | BLE Local |
| Karl | A. | Smith | BLE Local |
| A. | T. | Smyth | BLE Local |
| Melissa | | Standberry | BLE Local |
| H. | E. | Stillings | BLE Local |
| M. | A. | Storsteen | BLE Local |
| R. | J. | Stukus | BLE Local |
| M. | J. | Sullivan | BLE Local |
| S. | M. | Sullivan | BLE Local |
| J. | | Sylvain | BLE Local |
| P. | A. | Taylor | BLE Local |
| J. | P. | Tolman | BLE Local |
| J. | T. | Trevisani, Jr. | BLE Local |
| C. | M. | Trotta | BLE Local |

000299

000300

| | | | BLE Local |
|---|---|---|---|
| W. | E. | Vail | BLE Local |
| E. | D. | Viérra | BLE Local |
| John | | Vigevani | BLE Local |
| Peter | | Watson | BLE Local |
| L. | A. | Williams | BLE Local |
| R. | A. | Wolstencroft | BLE Local |
| T. | J. | Wright | BLE Local |
| D. | M. | Rebello | BLE Local |
| Jose | | Galvez | |

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
                                    )
JOSEPH T.  CARMACK,                 )
            Plaintiff, pro se        )
                                    )
v.                                  )          C.A. No. 05-11430-PBS
                                    )
MASSACHUSETTS BAY                   )
TRANSPORTATION AUTHORITY            )
and MASSACHUSETTS BAY               )
COMMUTER RAILROAD,                  )
            Defendants               )
                                    )
```

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 16

# Copy of Transcript

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

        Plaintiff, *Pro Se*

    VS                      CIVIL ACTION NUMBER: 05-11430-PBS

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
-and-
MASSACHUSETTS BAY COMMUTER RAILROAD CO.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## DEPOSITION OF

## CHRISTA CUPPERNULL PHILLIPS

April 22, 2008
2:13 p.m.

Jack Daniel Court Reporting & Video Services, Inc.
100 Franklin Street
Boston, Massachusetts

Ayako Odanaka, Notary Public, Certified Shorthand Reporter and Registered Professional
Reporter within and for the Commonwealth of Massachusetts



Technologies you can use    Experience you can Trust
100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039    Toll Free: 866.814.0039    Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

150

1 with anything during June and July of

2 2003, hearing my name or being consulted

3 about me regarding anything?

4          (Deponent viewing document)

5    A.  I don't recall specifically that we

6 spoke.  But in the end, I mean, the

7 correlation is between the award and your

8 status at that time --

9    Q.  But you just --

10    A.  -- so that's how it all --

11    Q.  You're just basing that on what

12 you're hearing from me now though, right?

13 You know when I said that I asked you

14 about the status, you're trying to define

15 what I was saying before.  So what I'm

16 saying, did you hear from anybody, any

17 other person, any administrator --

18    A.  Mm-hmm.

19    Q.  -- did you hear about me from

20 anyone else, administrator or employee,

21 discussing me or my activities around the

22 months of June and July, or May; May

23 through the end of July?

24    A.  It probably would have been Mr.



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

151

1 Coffey.

2    Q.  Okay.  And do you remember talking

3 to Mr. Coffey about me?  Do you remember?

4 I'm just asking --

5    A.  Mm-hmm.

6    Q.  -- if you remember?

7    A.  Mm-hmm.

8    Q.  You do remember discussing me with

9 Mr. Coffey?

10    A.  I must have discussed you with Mr.

11 Coffey.  Details, I cannot remember.

12    Q.  Why do you think you would have

13 discussed me with Mr. Coffey?

14    A.  Because he received direct

15 inquiries from you.

16    Q.  And you're basing that on what you

17 see here, because I'm asking you if you

18 specifically remember talking to Dennis

19 Coffey about me.  I'm just asking if you

20 remember.

21    A.  Then I don't.

22    Q.  Okay.  Yeah.  You don't remember

23 talking --

24    A.  I can't remember details on that.



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:  617.557.0039
Toll Free:  866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>       Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)       C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 17

CERTIFIED MAIL # 7002 2030 0007 1956 1849

Joseph T. Carmack
398 Columbus Ave. PMB 130
Boston, MA 02116-6008

June 28, 2003

Kevin Lydon
General Manager
Massachusetts Bay Commuter Railroad Company
32 Cobble Hill Road, Suite 3
Somerville, MA 02143-4431

Dear Mr. Lydon,

    Thank you for your kind offer of employment with Massachusetts Bay Commuter Railroad Company, allowing me to participate in the bidding process in accordance with the MBCR/BLE agreement and qualifying me as a passenger engineer eligible employee in accordance with the MBCR/BLE agreement. Please be advised that with this letter I graciously accept this offer with the deepest and most heartfelt gratitude matching the deepest and most heartfelt kindness and consideration of your offer.

    Enclosed, please find documents of interest regarding your offer which I feel certain will allow us to succeed in our mutual endeavors to restore me to service as passenger engineer with full rights and privileges in accordance with the MBCR/BLE Agreement.

    I sincerely remain, and always will be:

your friend and neighbor,

*Joe Carmack*

Joe Carmack
MBCR/BLE Passenger Engineer

cc: BLE Division 57 members

THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS
DIVISION 57

```
* * * * * * * * * * * * * * * * * * * * *
Joseph T. Carmack - employee        *
                                    *
        v.                          *
                                    *           GRIEVANCE
                                    *             and
Michael. J. O'Malley, Gerard L      *       DEMAND FOR RELIEF
DeModena, William.C. Rae. and       *
Lou DePhillips, et al               *
                                    *
* * * * * * * * * * * * * * * * * * * * *
```

This grievance is submitted to the Massachusetts Bay Commuter Rail Company
(MBCR, hereinafter referred to, likewise, as the carrier) and said grievance is submitted
by the employee to be resolved in accordance with the requirements of the Railway Labor
Act (particularly, but not limited to USCA 45 SS 151 et. seq.), the terms and conditions
of the MBCR/BLE agreement and the terms and conditions of the AMTRAK/BLE
agreement.

## INTRODUCTION

1. Joseph T. Carmack, hereinafter referred to as "employee", is an "eligible
employee" for position of Locomotive Engineer under the terms and conditions of the
MBCR/BLE agreement.


2. Michael J. O'Malley, Gerard. L. DeModena, Lou DePhillips and William C.
Rae, hereinafter referred to as "wrongdoers" for purposes of this grievance have been
employees of Amtrak to whom employee has been subject to administrative control as a
commuter rail locomotive engineer employee of Amtrak.

## FACTS OF GRIEVANCE

3. On April 11, 2001, Gerard L. DeModena approached Lou DePhillips and
falsely accused the employee of workplace violence.


CERTIFIED MAIL #7002 2030 0007 1956 1849

4. Mr. DePhillips supplied Mr. DeModena with a "Workplace Violence Report Form" which Mr. DeModena completed and submitted to Mr. DePhillips on April 12, 2001 (Exhibit A).

5. In response to the foregoing, Mr. Michael J. O'Malley disqualified the employee from service under the false pretense of a medical condition (Exhibit B).

6. In response to the foregoing,  Mr. William C. Rae initiated proceedings to have the employee terminated from his position as Amtrak commuter rail Locomotive Engineer under the false charge of insubordination.

7. As a result of the foregoing, the employee was terminated from his position as Amtrak commuter rail Locomotive Engineer (Exhibits C and D).

8. Wrongdoers Michael J. O'Malley, Gerard L. DeModena, Lou DePhillips and William C. Rae all did knowingly, willingly, and intentionally engage in actions described herein in order to cause harm to the employee and the Massachusetts commuter rail service.

9. Wrongdoers' actions herein described has resulted in severe damage and continued threat to: health, welfare and livelihood; civil and constitutional rights; Amtrak/BLE agreement rights; MBCR/BLE agreement rights; and such damage was caused upon employee by wrongdoers' actions.

10. Wrongdoers' actions herein described have given employee cause for civil action in accordance with: 1st Amendment constitutional free speech and religion rights;

CERTIFIED MAIL #7002 2030 0007 1956 1849

employment protections afforded by Title VII of the American Civil Rights Act of 1964 against discrimination based on religion; the Americans with Disabilities Act; and that action on such cause is necessary in order for restoration and remedy of employee.

11. Wrongdoers' actions herein described have resulted in the failure of MBCR to honor the rights and privileges of employee in accordance with the MBCR/BLE agreement including, but not limited to, seniority and bid award.

12 Wrongdoers' actions herein described will give employee cause for civil action against MBCR beginning July 1, 2003 in accordance with: 1st Amendment constitutional free speech and religion rights; employment protections afforded by Title VII of the American Civil Rights Act of 1964 against discrimination based on religion; and the Americans with Disabilities Act: and that action on such cause is necessary in order for restoration and remedy of employee.

13. Wrongdoers' actions herein described has and will endanger health and safety of other employees under carrier's administrative control.

14. Wrongdoers' actions herein described has and will endanger the health, welfare and safety of the Massachusetts commuter rail service for which carrier is responsible.

15. Wrongdoers' actions herein described has and will endanger the health, welfare and safety of the passengers of Massachusetts commuter rail service for which carrier is responsible.

CERTIFIED MAIL #7002 2030 0007 1956 1849

## DEMAND

Wherefore, as protection of Massachusetts commuter rail service, it is hereby demanded that wrongdoers Michael J. O'Malley, Gerard L. DeModena, Lou DePhillips and William C. Rae all be immediately dismissed in all capacities in service to the carrier and that such dismissal be in accordance with the Amtrak Workplace Violence Policy prescribed penalties for fraudulent application of Amtrak Workplace Violence policy.

## NATURE OF RELIEF SOUGHT

In accordance with the foregoing, in order to protect the Massachusetts commuter rail service: the health, safety, and welfare of the Massachusetts commuter rail service; the health safety and welfare of the employees of the Massachusetts commuter rail service; the health safety and welfare of the passengers of the Massachusetts commuter rail service; the integrity and welfare of the business of Massachusetts commuter rail service; from cause for civil action; it is hereby demanded that the employee be immediately restored to service with the carrier: with full rights and privileges in accordance with MBCR/BLE agreement; including but not limited to full seniority and bid award in accordance with AMTRAK/BLE 2001 seniority roster, Amtrak/BLE agreement and MBCR/BLE agreement.

This grievance is in order and it should be allowed.

This grievance is submitted to the carrier this ___ day of _____, 2003.

Signature of the employee _____. Date_____

Signature for the carrier _____. Date:_____

Signature of Witness _____. Date: _____

CERTIFIED MAIL #7002 2030 0007 1956 1849

THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS
DIVISION 57

```
* * * * * * * * * * * * * * * * * * * * * *
   In the matter of                        *
Joseph T. Carmack - employee               *
                                           *
         v.                                *         PROPOSAL
                                           *
Michael. J. O'Malley, Gerard. L.           *
DeModena, William C.. Rae,               . *
Lou DePhillips, et al.                     *
                                           *
* * * * * * * * * * * * * * * * * * * * * *
```

In order to expedite the employee's immediate restoration to service with the carrier with full rights and privileges in accordance with MBCR/BLE agreement including, but not limited to, full seniority and bid award in accordance with MBCR/BLE agreement and Amtrak/BLE agreement; and in partial fulfillment of demand set forth in the matter of Joseph T. Carmack v. Michael J. O'Malley, et al., the employee hereby makes the following proposal:

Resolved, that employee be awarded bid award in accordance with bid application received by carrier on May 28, 2003: and that such bid application was and such bid award shall be in accordance with rights, privileges and provisions of MBCR/BLE Agreement and Amtrak/BLE Agreement.

Resolved, that employee will be permitted to begin requalification and recertification process to commence no later than July 1, 2003.

Resolved, that during the period of requalification and recertification process to commence on July 1, 2003, employee will receive from the carrier cash advance valued at half-rate hourly passenger engineer's rate; and that said half-rate hourly passenger

CERTIFIED MAIL #7002 2030 0007 1956 1849

engineer's rate will be calculated from full rate hourly passenger engineer's rate; and that such full rate will be in accordance with MBCR/BLE agreement; and that said cash advance be calculated at no more than 40 hours per week; and that said cash advance will accrue interest at percentage rate yet to be determined and agreed upon between employee and carrier; and that said cash advance will continue as set forth above until employee is fully requalified and recertified in accordance with Federal Railroad Administration rules and regulations and NORAC rules and regulations; and that at such time as employee is requalified and recertified, employee's debt to carrier as described above shall be deferred from employee's full rate hourly passenger engineer's wages as described above to be received by employee in accordance with MBCR/BLE agreement; and said deferral shall be served to employee's accrued debt to carrier until carrier is fully compensated and restored for carrier's consideration to employee and Massachusetts commuter rail service; and that said deferral will be at a rate equal to and no greater than half of the full  hourly rate at which employee renders service to the carrier and Massachusetts commuter rail service in accordance with MBCR/BLE Agreement.

This proposal is hereby agreed to this _____ day of _____, 2003.

signature of employee:_____      Date:

for the carrier:_____      Date:

CERTIFIED MAIL #7002 2030 0007 1956 1849

THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS
DIVISION 57

```
* * * * * * * * * * * * * * * * * * * * * *
 In the matter of                      *
Joseph T. Carmack - employee           *
        v.                             *          MEMORANDUM
Michael. J. O'Malley, Gerard. L.       *        OF LEGAL REFERENCE
DeModena, William C.. Rae,          .  *
Lou DePhillips, et al.                 *
                                       *
* * * * * * * * * * * * * * * * * * * * * *
```

The following items are offered to the carrier in re: Joseph T. Carmack v. Michael

J. O'Malley, et. al:

    1. Rule 21 (k) paragraph 5 of the Amtrak/BLE Agreement reads in part:

        The Board will render a final and binding decision as

        promptly as possible, but not later than 30 days after the

        case is presented before the Board.

    2. Case No. 382 was presented before SBA 928 on September 23, 2002.

    3. The decision of Award No. 382 was rendered by SBA 928 "later than 30 days after the case [was] presented before the Board."

    4. Award no 382 is not a "final and binding" decision rendered by the Board in accordance with the Amtrak/BLE agreement and the MBCR/BLE agreement.

    5. The First Division of the National Railroad Adjustment Board failed "to make an award in a dispute referred to it". (USCA 45 SS 153 [q]).

CERTIFIED MAIL # 7002 2030 0007 1956 1849

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

KEVIN LYDON
GENERAL MANAGER
MASSACHUSETTS BAY
COMMUTER RAILROAD
32 COBBLE HILL ROAD
SUITE 3
SOMERVILLE, MA 02143-4931

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

7002 2030 0007 1956 1849

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

————————————————————————
                                        )
JOSEPH T.  CARMACK,                      )
            Plaintiff, *pro se*           )
                                        )
v.                                       )                 C.A. No. 05-11430-PBS
                                        )
MASSACHUSETTS BAY                        )
TRANSPORTATION AUTHORITY                 )
and MASSACHUSETTS BAY                    )
COMMUTER RAILROAD,                       )
            Defendants                    )
————————————————————————)

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 18

Joseph T. Carmack
Boston, MA  02116-6008
617/536-0772, voice mail  617/798-6466
June 30, 2003

Dennis Coffey, MBCR Human Resources
Dear Mr. Coffey,

Well, here's the rest of my application.

I'm hoping you won't be too alarmed with this.  I know, full well, that you don't want to get up and go firing people whom you know can help you in a very important and trying time.  We can talk about anything.  But, what I need you to believe, and I genuinely think Mr. O'Malley will confirm this, is that I am nothing other than sincere about my desire to focus on the quality and safety of the service.  I also believe that MBCR is genuinely prepared to focus on these important matters.

What makes me controversial, is that I don't think I can be effective unless I work among the ranks.  I get the up close view at what is wrong and how to fix it.  And, as a dedicated union member, I can raise important issues of quality of service.  I know people will listen.  I believe we can fix our unions and redirect their focus.  It should be obvious to people, that being fired has allowed me to focus on union failures.

There is a dual purpose to my bizarre humor.  First and foremost, it is to ridicule with satire our adversarial nature.  And when I ridicule our adversarial nature in a provocative way, it dispels a lot of anger and blows off a lot of steam.   When anger is sublimated and we laugh at ourselves, there's no longer any anger.  When the anger disappears, people realize that there are serious and dangerous problems that we need to address.  With me around, I think your unions will change, but unions have to work that out independently.

I love the railroad.  And there is nothing like Massachusetts commuter rail.  But if we can't work together, I will be fine.  For somebody like me, this city and this state offer huge satisfying opportunities.  And those opportunities would be a heck of a lot easier to deal with,  but they wouldn't give me the moral satisfaction that contributions to commuter service give me.  I work on a sense of civic pride and social responsibility.  To me, there is nothing more satisfying.

Nonetheless, we need to find common ground.  I believe we can, but,  if not, I will walk away and you will be losing a valuable asset.  Think it over, and please get back to me one way or the other.  I think you should take some time and talk to me.  I know it would be a pleasure for me.

sincerely,

Joe Carmack

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>     Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 19

1

Exhibits:    2
Volume:     II
Pages:      77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11430-PBS

JOSEPH T. CARMACK,
          Plaintiff,

vs.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
and MASSACHUSETTS BAY COMMUTER RAILROAD
COMPANY,
          Defendants.



DAY 2 - CONTINUED DEPOSITION OF JOSEPH T.

CARMACK, taken pursuant to Notice under the applicable

provisions of the Federal Rules of Civil Procedure on

behalf of the Defendant, Massachusetts Bay

Transportation Authority, before Karen-Marie Fahey, PVR

and Notary Public, in and for the Commonwealth of

Massachusetts, at Smith & Duggan LLP, Two Center Plaza,

Boston, Massachusetts, 02108, on Tuesday, April 29,

2008, commencing at 3:45 p.m.

**NEAL A. SALLOWAY - COURT REPORTERS**
**FIVE CARDIGAN ROAD**
**WEST PEABODY, MA 01960**
**781-581-3993 - 978-535-0313 - FAX  978-536-3142**

5

**DIRECT EXAMINATION**

Q.    **(By Mr. Witherby)** Good afternoon, Mr. Carmack.

A.    Good afternoon.

Q.    I would like you to turn your attention to July 1, 2003.  Were you at North Station on that date?

A.    I did go to North Station on July 1, 2003.

Q.    Did you go there to speak to anyone in particular?

A.    No, I don't think so.  I didn't know, you know, who would be there when.  I just knew that there would be Brotherhood of Locomotive Engineers members there.

Q.    So it's fair to say you went there to speak to BLE engineers?

A.    Yes.

Q.    And when did you arrive?

A.    I'm not sure, but I'm going to guess 3:30ish, maybe.  I'm not 100 percent sure.

Q.    Okay.  And who did you speak with?

A.    A number of people.  I can't remember a lot of specific names.

Q.    Do you remember any?

A.    Yes.  I think -- I remember Chuck Trotter coming by; I probably spoke to him, maybe, five seconds.  Dennis Hardy; he was not a BLE member.  I think I spoke with Sue

27

1    copy of the grievance that I had prepared for Mr. Lydon after

2    I had spoken with Dennis Coffey on several occasions, and --

3    I mean, it was prepared after I had spoken with Dennis Coffey

4    and after I had spoken with Christa Cuppernall.

5              I had been trying to contact Mr. O'Malley, and

6    so I may have had it with me that day and given it to Tommy.

7    Q.    On July 1?

8    A.    On July 1, 2003.  And whether or not I gave him the

9    document that you just handed to me, I'm not sure.  It -- And

10   the reason is is that he was in such a bad mood.  I just

11   didn't want to get very pushy with him, and I thought that --

12   Although now, -- Now, I think that that grievance was very

13   sloppy, it was better to do something than nothing.

14             I -- I thought that -- that he would respond

15   more -- I mean, that he -- that he would -- That's something

16   he would respond to, and that it would help him understand

17   what my position was; that I wasn't trying to get -- I wasn't

18   just leaning -- you know, being Kenney's slave as it were.

19   Q.    So on July 1, 2003, it's fair to say that you

20   brought some copies of this flyer that has been marked as

21   Exhibit No. 16 to North Station, wouldn't it?

22   A.    That's a definite yes, because I -- I prepared this

23   in, you know, like, five minutes.

28

1     Q.   How many copies do you think you brought in order

2  of magnitude?

3     A.   A lot more than I needed.  I think I told -- There

4  was a problem.  I went to the place where I had a mail drop,

5  you know, that -- You probably recall 398 Columbus Avenue,

6  and then me using that as an address.  I had used it for many

7  years, and they had a copy machine there.

8         So after I typed the document, on my way to

9  North Station, I stopped there because it was on my way to

10  the Back Bay stop, and I had trouble with the machine, and I

11  didn't -- and it was, you know, jamming up on me, and, you

12  know, I was in a hurry.

13         So the lady -- One of the women there that

14  worked there came to help me, and she said, "Well, how many

15  copies do you want?"  And I just off the top of my head said,

16  "100."  I remember saying, "100."  I said, "I don't know.

17  You know, how much does it cost?"

18         You know, I mean, I knew that they had flat

19  rates, so I said -- I knew there was a flat rate for 100, so

20  I said 100.

21     Q.   So you brought 100 with you?

22     A.   Yeah.

23     Q.   100 copies?

48

1  all, I'm objecting to the form of your question, was he an

2  engineer, and then when you said that I asked him, was he an

3  engineer.  I didn't -- I never said that I asked him that, I

4  don't think, or intended to say that.  What I had asked him

5  was he a BLE member, not an engineer.

6          And also, I'm not sure I called what I had in

7  my hands a leaflet.  I had a tendency to refer to these

8  things as sort of this -- most of this stuff that I had

9  addressed to union members as open letters; and I,

10 originally, intended this to be like an open letter, but

11 it's -- I mean, I -- That's -- That's just what -- the way I,

12 normally, communicate to union members, and it says, "Open

13 Letter," on it.

14     Q.    Okay.  So you -- When you're referring to Exhibit

15 16, --

16     A.    Exhibit 16, yeah.

17     Q.    -- your view of what that is is an open letter?

18     A.    Yes.

19     Q.    And when you were talking about Mr. Leavitt, you

20 asked him if he was a BLE member?

21     A.    Yes.

22     Q.    And the reason why is you wanted to give the open

23 letter to the BLE members?

1       A.    Yeah, yeah.  But, I mean, I was being -- I was --

2    I -- I -- I was trying to -- What's the word for it -- scope

3    him out, kind of, in terms of his attitudes towards the BLE

4    because he had, at one time, had a representation for, you

5    know, high level of union consciousness.

6             And that had -- He also had a reputation of

7    that changing, but I don't -- I think, in many ways, Mr.

8    Enigma -- I mean, Mr. Leavitt was an enigma to a lot of

9    people.

10      Q.    I'm going to hand you a document and ask if you can

11   identify that?  There may be two copies.  **(Indicating)**

12      A.    Yes.  I identify this as part of -- You know, --

13   Okay.  This is something that was prepared after 2003.  It's

14   an affidavit -- After July 1, 2003, rather, that I prepared

15   for -- to be a record of what happened, my specific memory of

16   everything that had happened.  **(Indicating)**

17            In fact, I think I had made notes.  This is

18   about the encounter with the police officer, the MBTA police

19   officer, and I was, generally, in the habit of important

20   events at the time, of writing things down.  **(Indicating)**

21            And this -- this was, probably, made -- Well,

22   obviously, it was made on July 12, but I wanted to put it

23   on -- you know, in typewritten form.  **(Indicating)**

70

1  gave him your ID, you gave him the leaflet, and he went into

2  the office; is that --

3      A.   Uh-huh.

4      Q.   -- fairly accurate?

5           And then he came out of the office, and you

6  had a conversation about the contents of Exhibit 16?

7      A.   Yeah.

8      Q.   And then you went back into the office?

9      A.   I -- He went back into the office; did you say,

10  "He," or me?

11     Q.   Yes, he.

12     A.   Yes, he went back in the office.

13     Q.   That is correct; you never went in the office?

14     A.   No.

15     Q.   Okay.  And he came out with Ms. Boumel; is that a

16  fair statement?

17     A.   Yeah.  At one time, he came out, and, I believe,

18  she either came out with him or right after him.

19     Q.   Okay.  Tell me what the conversation, as best you

20  remember it, that occurred when you and Officer Pavia and Ms.

21  Boumel were there together outside of the office?

22     A.   All I remember saying is, "I'm okay with what he's

23  doing, Jackie.  He's just making my point for me."  And I may

71

1    have something about O'Bryan, but I'm not sure.

2        Q.    If you said anything about O'Bryan, what -- What

3    was it that you're not sure that you said about O'Bryan?

4        A.    Well, that I have a grievance.

5        Q.    I see.

6        A.    That -- You know, just that I have a grievance

7    since -- You know, I was trying to deflect her concerns.  I

8    just wanted her to know that nobody's going to be causing any

9    trouble here, that I did not want her to be -- to have to be

10   concerned about me.

11            I wanted her to be able to do her job and feel

12   comfortable about doing her job, and I didn't want her to

13   feel like I was getting in the way of her doing her job.

14       Q.    You felt that she was concerned?

15       A.    Yeah.

16       Q.    Okay.  Now, turning to Paragraph 39 of this

17   exhibit, the first sentence says, "Officer Pavia invited

18   plaintiff to walk with him toward the exit, --"

19       A.    Uh-huh.

20       Q.    "-- and Office Pavia explained that plaintiff was

21   banned from all MBTA Stations for 24 hours."

22       A.    Uh-huh.

23       Q.    Is that an accurate statement?

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T.  CARMACK,<br>       Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 20

# BLE ALERT!

# ATTN. ALL LOYAL UNION EMPLOYEES OF MBCR IN ANY UNION!

### RELEVANT FACTS TO THIS MATTER

1. Joseph T. Carmack has been a loyal BLE member since 1998.
2. On May 4, 2001 Amtrak medically disqualified engineer Joseph T. Carmack without ever advising Engineer Carmack of medical basis for disqualification.
3. Engineer Carmack was placed on Medical Leave of Absence as indicated on Amtrak/BLE Seniority Roster 2001 and 2002.
4. On May 13, 2002 Amtrak terminated Engineer Carmack for insubordination.
5. On September 23, 2002 System Board of Adjustment 926 heard Engineer Carmack's case no. 382.
6. System Board of Adjustment 926 rendered its decision no earlier that January 31, 2003.
7. Award for SBA-926 was not rendered within 30 days as per BLE Rule 21.
8. On or before May 15, 2003 Massachusetts Bay Commuter Railroad (MBCR) received Application from Engineer Carmack as per part I of MBCR/BLE agreement.
6. On or before May 28, 2003 MBCR received completed Bid from Engineer Carmack as per Part I of MBCR/BLE agreement.
7. MBCR failed to award position to Engineer Carmack as an "eligible employee" in accordance with Seniority Rights established as per rules 5 of AMTRAK/BLE agreement.
8. Effective July 1, 2003 Engineer Carmack must exercise his seniority or lose all rights in accordance with MBCR/BLE agreement.
9. J. Carmack will make displacement on Run 820 on July 1, 2003 at 4:40 PM.
10. MBCR has failed to respond to discussion attempts by Mr. Carmack on this matter.
11. BLE Division 57 assistance in this matter will be greatly appreciated.

Joe Carmack
Passenger Engineer
BLE Division 57

# PLEASE POST AND DISTRIBUTE!

OPEN LETTER TO DIVISION 57
BIRNAM WOOD REMOVES TO DINSINANE!

This is to advise you that I own an MBCR position in accordance with the MBCR/BLE agreement. I own a job. I'm not asking for one.

My application to MBCR was accepted and I participated in the bidding process according to the agreement. Having done so, I am now an "eligible employee" as legally defined by the MBCR/BLE agreement in accordance with the Railway Labor Act USCA 45 SS 151 et. seq.. I own a job; MBCR simply failed to publish an award.

The agreement doesn't allow the carrier to accept Amtrak discipline. So, my former association with Amtrak is irrelevant. I am returning from a Medical Leave of Absence as per the 2001 Amtrak/BLE roster. O'Bryan is taking me for a fool and Kenny thinks he's tricked me. This is a big opportunity for me. I have worked hard and paid dearly. There is no turning back, now. I will not be intimidated by anyone. You can be for me or against me, but I will press on. I have a job and I'm going to take it.

Not because its a good job, but because its a union job and as long as I'm willing to fight for it, I'll make it a good job. But its hard with all the carrier agents around. I have been putting in valid time claims, but O'Bryan ignores them and tries to justify it by quoting DePhillips. Whose side do you think he's on? This Division has a responsibility to me and I expect to be paid. I can only be paid, if this Division mandates through division action that my time claims be processed in accordance with the MBCR/BLE agreement to the General Committee where I know they will be honored.

I'm reporting on July 1, 2003 to displace the job I own.

I WILL NOT BE DENIED BY O'BRYAN WILL TRY TO TELL YOU I DON'T HAVE RIGHTS OR THAT I'M NOT A UNION MEMBER.

NOW HEAR THIS!                                    O'BRYAN IS LYIN!


I'M BACK!                                    LET'S ROCK!


GUILDENSTERN IS DEAD!

YOUR BROTHER,

JOE CARMACK
NO TITLE NECESSARY

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 21

**Condensed Transcript**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

        Plaintiff,

    VS

                                    CIVIL ACTION NUMBER:
                                    05-11430-PBS

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY AND MASSACHUSETTS BAY
COMMUTER RAILROAD CO.,

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**JACQUELINE M. BOUMEL**

April 2, 2008
10:08 a.m.

Jack Daniel Court Reporting & Video Services, Inc.
100 Franklin Street
Boston, Massachusetts

Ayako Odanaka, Notary Public, Certified Shorthand Reporter and Registered
Professional Reporter within and for the Commonwealth of Massachusetts.



Technologies you can use • Experience you can Trust

100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

### 65

1  and what's the difference between the
2  jobs?
3    A.  One, the conductor is in charge of
4  the train and the crew.  In order to
5  become a conductor, you have to pass a
6  promotion-to-conductor's exam, NORAC.
7    Q.  What's NORAC?
8    A.  Northeast Operating Rules and --
9  something.
10    Q.  Can you describe what its purpose
11  is?
12    A.  It's a book of rules.  Our purpose
13  of it is to -- it governs everything we
14  do.
15    Q.  By "we," you mean conductors?
16    A.  I mean by operations, track
17  departments.  It governs most of the
18  railroad.
19    Q.  So it governs how --
20    A.  It governs train dispatchers, it
21  governs track department, it governs
22  conductors, engineers, assistant
23  conductors.
24    Q.  So it's a general rules on how

### 66

1  trains are conducted and moved and --
2    A.  Operated.
3    Q.  Yeah.  And how the tracks are used.
4    A.  Yes.
5    Q.  So it's just so that everybody is
6  on the same page, so to speak?
7    A.  Yes.
8    Q.  So everybody knows what they're
9  doing.
10    A.  (Deponent nodding).
11    Q.  Okay.  You mentioned earlier a --
12  Okay.
13      Well, back to the conductor, so
14  again -- so the conductor has to learn
15  those rules --
16    A.  Yes.
17    Q.  -- correct?
18      But the assistant conductor does
19  not.
20    A.  The assistant conductor has to
21  learn the rules, but when -- the promotion
22  to conductor, it's more intense and
23  learning more of the signals.
24    Q.  Okay.  Now -- And signals was a

### 67

1  part of what you were talking about the
2  physical characteristics.
3    A.  Yes.
4    Q.  When you're learning physical
5  characteristics, you're learning where all
6  the interlockings are --
7    A.  Yes.
8    Q.  -- and the signals and the tracks.
9  And you also mentioned sidings.
10    A.  Yes.
11    Q.  So it's the physical nature of the
12  track and how it is run --
13    A.  Yes.
14    Q.  -- right?
15      And then the rules governing what
16  happens on those tracks are the operating
17  rules or what you are calling NORAC,
18  correct?
19    A.  Yeah.
20    Q.  Okay.  You did say yes?
21    A.  Yes.
22    Q.  So to be a special duties train
23  master, you don't have to know all those
24  things.

### 68

1    A.  No, I did not.
2    Q.  And to be a train master, do you
3  have to know all those things?
4    A.  Yes.
5    Q.  So a train master is usually
6  formerly a conductor?
7    A.  No.
8    Q.  But they learn to be a conductor
9  or --
10    A.  No.  Any of the train masters can
11  come from any given craft.  It's just one
12  of the things they need to be qualified --
13    Q.  So they have --
14    A.  -- to --
15    Q.  I'm sorry.
16    A.  To be able to apply for the job,
17  it's -- one the qualifications is to be
18  NORAC qualified.  You don't have to be a
19  conductor.
20    Q.  Okay.  So you mentioned a Rick
21  Currier before.
22    A.  Yes.
23    Q.  Okay.  Is he a conductor?
24    A.  No.



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

69

1  Q. Has he ever been a conductor?
2  A. No.
3  Q. But he's your supervisor.
4  A. Yes.
5  Q. What's his title?
6  A. Senior train master.
7  Q. Senior train master.
8     So he's qualified in the operating
9  rules.
10 A. Yes.
11 Q. But he was never a conductor.
12 A. No.
13 Q. Was he an engineer?
14 A. He does have a license to be an
15 engineer, yes.
16 Q. Mm-hmm. Was he an engineer before
17 he was hired in the position?
18 A. No.
19 Q. Do you know where he came from,
20 what he did?
21 A. He was tower operator.
22 Q. Okay. What's a tower operator?
23 A. I can't -- I can't explain that.
24 I don't have enough knowledge about a

70

1  tower operator to know what they do.
2  Q. Do you know where there is one?
3  A. Yes, I know.
4  Q. Where?
5  A. Tower A, Tower H in Waltham.
6  Q. Okay. Okay. These are all
7  physical locations. They are towers that
8  are on the tracks that you have to know
9  about as part of the physical
10 characteristics.
11 A. Yes.
12 Q. Okay. So you have a tower operator
13 at Waltham and you don't know what he
14 does.
15 A. Not entirely, no.
16 Q. Okay. So what is -- Waltham is
17 just a town.
18 A. Waltham is a town. Waltham has
19 stations. Waltham also has an
20 interlocking and tower.
21 Q. It has an interlocking and a tower.
22    So does the -- Is that -- Doesn't
23 -- Isn't the reason the tower's there
24 because of the interlocking?

71

1  A. Yes.
2  Q. So the operator of the -- the tower
3  operator -- Is that what you called him?
4  A. Tower operator. At Waltham, he
5  controls the interlocking.
6  Q. Okay. So the tower --
7  A. The tower operator at Tower A
8  controls nothing except for a bridge.
9  Q. Okay. But he controls something,
10 yeah.
11 A. (Deponent nodding).
12 Q. Mm-hmm. Okay. So -- But the
13 tower operator -- okay. So -- So he
14 gives instructions to the train. You said
15 he gives them train orders.
16 A. He hands them, he doesn't give them
17 himself.
18 Q. Who gives them?
19 A. Train dispatcher.
20 Q. So then the block operator is
21 supervised by a train dispatcher?
22 A. Yes.
23 Q. Okay. So it's the -- What does
24 the train dispatcher do?

72

1  A. I've never been a train dispatcher.
2  I could not explain all their duties.
3  Q. Mm-hmm. But you know something
4  about them. Can you tell me what you
5  know about them?
6  A. They put -- They put the signals
7  in. They know which trains are on which
8  tracks.
9  Q. Mm-hmm.
10 A. They give out Form Ds.
11 Q. Okay. So they control the traffic.
12 A. They control the -- they...
13 Q. They manage the traffic, correct?
14 A. Mm-hmm.
15 Q. Yeah. So they tell -- So -- But
16 you said that when you were -- as a train
17 master, that you were deciding where
18 things go.
19 A. I was deciding where equipment
20 went.
21 Q. Deciding where equipment went.
22 A. Not which -- I gave the equipment
23 and these assignments out after -- After
24 they left the bunker, they were out of my



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

|     | 209 |
| --- | --- |
| 1 | that. |
| 2 | BY MR. CARMACK: |
| 3 | Q.  So who is Joe Carmack? |
| 4 | MR. BLAISDELL:  Objection. |
| 5 | MR. CARMACK:  What is your |
| 6 | objection to saying who is Joe Carmack? |
| 7 | She just read it from that letter. |
| 8 | BY MR. CARMACK: |
| 9 | Q.  Who is that? |
| 10 | MR. BLAISDELL:  What's her |
| 11 | understanding that Joe Carmack would be? |
| 12 | MR. CARMACK:  Yes. |
| 13 | MR. BLAISDELL:  All right. |
| 14 | Asked that way, it's better. |
| 15 | MR. CARMACK:  Fine. |
| 16 | BY MR. CARMACK: |
| 17 | Q.  Who is your understanding of who |
| 18 | Joe Carmack is? |
| 19 | A.  Joseph Carmack. |
| 20 | Q.  Okay.  Now, so the previous letter |
| 21 | was to Joseph Carmack and this one's a |
| 22 | response from Joseph Carmack.  Is it or |
| 23 | can you tell from looking at that? |
| 24 | A.  (Deponent viewing document).  Looks |

|     | 210 |
| --- | --- |
| 1 | like it would be. |
| 2 | Q.  Mm-hmm.  Now, just look -- there's |
| 3 | a page in that letter, it's at Page .10, |
| 4 | that I believe you just looked at and said |
| 5 | it was from Joe Carmack. |
| 6 | A.  (Deponent viewing document).  Okay. |
| 7 | Q.  Can you just read the last two |
| 8 | sentences? |
| 9 | A.  (Deponent viewing document). |
| 10 | Q.  Read them aloud for me. |
| 11 | A.  "If you keep taking the company's |
| 12 | side, you'll never be a real union leader. |
| 13 | All you'd be is a self-interested company |
| 14 | agent infiltrating our ranks, a wolf in |
| 15 | sheep's clothing, a false prophet claiming |
| 16 | to be God." |
| 17 | Q.  Do you remember ever having read |
| 18 | that before? |
| 19 | A.  No. |
| 20 | Q.  Who's Daniel Lauzon?  Daniel |
| 21 | Lauzon, do you know who that is? |
| 22 | A.  He's an engineer. |
| 23 | Q.  Do you remember talking to Daniel |
| 24 | Lauzon about that document in North |

|     | 211 |
| --- | --- |
| 1 | Station? |
| 2 | A.  No, I don't. |
| 3 | Q.  Okay.  That's fine.  Could you have |
| 4 | talked to him about that? |
| 5 | A.  I could have, but, no, I don't |
| 6 | remember talking to him. |
| 7 | Q.  It's fine that you don't remember. |
| 8 | It's okay.  I'm just asking you if you do |
| 9 | and you're telling me that you don't. |
| 10 | A.  (Deponent shaking head). |
| 11 | Q.  But it is possible that you saw it |
| 12 | and you talked to Danny Lauzon about that |
| 13 | document. |
| 14 | A.  It's possible that he showed it to |
| 15 | me and I didn't read it either. |
| 16 | Q.  Mm-hmm.  Mm-hmm.  And it's possible |
| 17 | that you read those two sentences and you |
| 18 | talked to Danny Lauzon about them. |
| 19 | A.  I don't recall. |
| 20 | Q.  You don't recall, but is it |
| 21 | possible that you did? |
| 22 | A.  It's possible. |
| 23 | Q.  Mm-hmm.  And that you had -- maybe |
| 24 | at that time you could have said to Danny |

|     | 212 |
| --- | --- |
| 1 | Lauzon that Mr. O'Bryan has been called |
| 2 | God so times [sic] that maybe sometimes he |
| 3 | thinks he is, something to that effect. |
| 4 | A.  (Deponent shaking head). |
| 5 | Q.  Okay.  All right.  Okay.  I'm just |
| 6 | asking the question and you're saying no, |
| 7 | you're answering no to that question. |
| 8 | A.  No.  No. |
| 9 | Q.  Okay.  Does the date July 1st, |
| 10 | 2003, mean anything to you? |
| 11 | A.  Yes. |
| 12 | Q.  What does it mean? |
| 13 | A.  It's the day MBCR took over the |
| 14 | contract from Amtrak. |
| 15 | Q.  Tell me about that day. |
| 16 | A.  What do you want to know about that |
| 17 | day? |
| 18 | Q.  I want you to tell me what happened |
| 19 | that day.  Tell me, you know, what you |
| 20 | remember about that day. |
| 21 | A.  I went to work.  Rush hour, I was |
| 22 | working the second shift in the afternoon. |
| 23 | Q.  You remember that it was the day |
| 24 | that MBCR took over the service. |



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

213

1    A.  Yes.
2    Q.  You just said that, right?
3    A.  Yes.
4    Q.  From Amtrak.  It was the first day
5    that MBCR took over the service.
6        Now, wouldn't that day stick out to
7    you because it was the first day you
8    worked as MBCR employee?
9    A.  Yes, it does.
10   Q.  Mm-hmm.  What happened that day?
11   Do you remember going to work that day?
12   A.  I remember going to work that day.
13   I remember working that day.  I remember
14   an engineer coming in and telling me you
15   were passing out leaflets in the station
16   saying you were going to displace
17   somebody.
18   Q.  Okay.  And what engineer was that?
19   A.  I don't remember which engineer it
20   was.
21   Q.  But you're sure it was an engineer.
22   A.  Yes.
23   Q.  And what did you have to say about
24   that?  Did you say anything to the

214

1    engineer.
2    A.  I don't remember saying anything to
3    the engineer.  I remember calling the
4    chief train dispatcher.
5    Q.  What about?
6    A.  That you were there passing things
7    out saying you were going to displace the
8    job.  And with a quick glance at it,
9    thought you were actually going to board
10   the train at 4:40 in the afternoon.
11   Q.  So you thought that I was going to
12   board a train.
13   A.  (Deponent nodding).
14   Q.  Why did you think that?
15   A.  Because I believed the leaflet I
16   had said something about displacing a job
17   at 4:40 p.m.
18   Q.  Why would that mean I would board a
19   train?
20   A.  Because that's what time the job
21   would start.
22   Q.  But why would I have to board a
23   train?
24   A.  Because you were going to displace

215

1    the person that was on the train.
2    Q.  Do I need to do that to displace a
3    person that's on the train?
4    A.  I didn't know what you were going
5    to do.
6    Q.  Okay.  So what would it mean to be
7    displacing a person on a train?
8    A.  In the regular channels, it would
9    mean that you were going to call up and
10   bump the job and take it, effective at a
11   certain time and date.
12   Q.  Why wouldn't I do that?
13       MR. BLAISDELL:  Objection.
14       MR. CARMACK:  Well, I mean,
15   she just said -- Why would I need to
16   board a train to do that?  I'm just
17   telling -- asking -- changing the
18   question.
19       BY MR. CARMACK:
20   Q.  Why would I need to board a train
21   to do that?
22   A.  I don't know.
23   Q.  So what led you to believe that I
24   was going to board a train?

216

1    A.  Like I just said, I believed the
2    things -- the paper said you were going to
3    displace such and such a job at 4:40 p.m.
4    Q.  Mm-hmm.  Did it say that I was
5    going to board a train?
6    A.  No.
7    Q.  It did not say that I was going to
8    board a train.
9    A.  No.
10   Q.  And you know that displacing a job
11   means calling a crew dispatcher.
12   A.  Yes.
13   Q.  Okay.  So why wouldn't I just call
14   the crew dispatcher?
15   A.  Because you weren't employed there.
16   Q.  Are you sure?
17   A.  Well, according to run sheets I
18   had, you weren't.  You weren't on any run
19   -- You weren't on any run sheet.
20   Q.  If I didn't have -- If I had a
21   displacement, I wouldn't necessarily be on
22   a run sheet, would I?
23   A.  No, but you probably wouldn't be
24   handing out letters either saying you were



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

| 217 | 219 |
|---|---|

**217**

1  going to displace. Generally, we don't
2  hand out letters when we're going to
3  displace a job.
4  Q. Well, what difference does it make
5  that I did?
6  A. It doesn't.
7  Q. Doesn't make any difference that I
8  did. So I did hand out letters. Do you
9  know why I was handing out letters?
10  A. No.
11  Q. Mm-hmm. Well, it said that I was
12  going to displace a job.
13  A. (Deponent nodding).
14  Q. Mm-hmm. So it's an informative
15  letter.
16  A. Okay.
17        MR. BLAISDELL: Objection.
18        MR. CARMACK: Well, we'll
19  let it speak for itself. If that's what
20  it said -- that's what she says that it
21  said, then I'll let it speak for itself.
22        BY MR. CARMACK:
23  Q. But I'm just clarifying that it's
24  -- it's just an item of information, is it

**219**

1  have seniority -- to exercise my
2  seniority.
3  A. I was employed to be able to make
4  a displacement.
5  Q. And I was not?
6  A. To my recollection, no, you were
7  not employed by Amtrak to be employed by
8  MBCR.
9  Q. And how do you know that MBCR
10  didn't hire me?
11  A. My best reasoning would be because
12  you didn't pick a job.
13  Q. How do you know?
14  A. Because you weren't on a run sheet.
15  You weren't awarded a job.
16  Q. Okay. There's a difference. Okay.
17        So I may not -- If I wasn't
18  awarded a job and I wasn't on a run
19  sheet, that doesn't mean I wasn't hired,
20  does it?
21  A. (Deponent gestured).
22  Q. Answer the question.
23  A. Everybody else that got hired got
24  awarded.

**218**

1  not? It says that -- It's a letter it
2  says that Joe Carmack is going to do --
3  displace a run, make a displacement. And
4  your understanding is that it would be in
5  accordance with seniority rules and he
6  would call a dispatcher.
7  A. No. My accordance [sic] was you
8  were not employed there and you didn't
9  have a right to make the displacement.
10  Q. So I -- But that's your opinion.
11  A. (Deponent nodding).
12  Q. Right?
13        MR. BLAISDELL: Objection.
14  A. Yeah.
15  Q. Where is this information coming
16  from that I don't have a right to? I
17  mean, if you -- you were unassigned
18  yourself, you've made displacements as
19  somebody who's unassigned.
20        Now, you said that I wasn't on your
21  run sheet --
22  A. (Deponent shaking head).
23  Q. -- which means I wasn't assigned,
24  so I'm coming in to displace somebody, to

**220**

1  Q. Mm-hmm. What about if -- Was
2  anybody on a leave of absence?
3  A. I don't know.
4  Q. Could they have been on a leave of
5  absence? Could somebody have been on a
6  leave of absence at that time?
7  A. They could have been.
8  Q. Mm-hmm. And they could come back
9  to work having been on a leave of absence.
10  A. Yes, they could have.
11  Q. Mm-hmm. And perhaps they would see
12  Roger Lenfest or Mike O'Bryan and talk
13  about, you know, their guarantees as union
14  members and talk about whether or not that
15  leave of absence was ending. They would
16  have a displacement, would they not?
17  A. They would, but I believe they had
18  to go to Amtrak first.
19  Q. Why?
20  A. I don't know what the ruling was.
21  Q. So you don't really know, do you?
22  A. No, but I don't recall anybody
23  being on a leave of absence at that
24  particular time.



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use   •   Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

229

1    know of that Mr. Carmack worked --
2    A.   I don't.
3    Q.   -- for commuter rail?
4    A.   I don't.
5    Q.   You don't what?
6    A.   Don't know the last day you worked
7    for commuter rail.
8    Q.   Okay.  Do you know why Mr. Carmack
9    stopped working in commuter rail?
10   A.   No, I don't.
11   Q.   So what you do know, then, is that
12   on July 1st, 2003, Mr. Carmack had been
13   gone and was coming back to work to make
14   a displacement.
15        MR. BLAISDELL:  Objection.
16        MR. CARMACK:  Well, you
17   know, why is there an objection?
18        MR. BLAISDELL:  Because that
19   mischaracterizes her statement.
20        MR. CARMACK:  No, it
21   doesn't.
22        MR. BLAISDELL:  That's not
23   what she said.
24        MR. CARMACK:  No.  Well,

230

1    she saw a piece of paper -- Let me
2    rephrase it then.
3        BY MR. CARMACK:
4    Q.   You saw a piece of paper that says
5    Joe Carmack is going to make a
6    displacement.  Now, you had not seen Mr.
7    Carmack in a while, had you?
8    A.   That's not necessarily true.
9    Q.   Okay.  You knew Joe Carmack was not
10   coming to work.
11   A.   True.
12   Q.   You knew that he was in North
13   Station on July 1st, 2003, saying he was
14   coming to work.
15   A.   Yes.
16   Q.   Saying he was going to make a
17   displacement.
18   A.   Yes.
19   Q.   And you decided that he was not,
20   didn't you?
21   A.   Yes.
22        MR. BLAISDELL:  Objection.
23        MS. LENT:  Objection.
24        MR. BLAISDELL:  Objection.

231

1        MR. CARMACK:  Okay.
2        BY MR. CARMACK:
3    Q.   You said -- okay.
4        Then why couldn't Mr. Carmack make
5    a displacement on July 1st, 2003?  Let's
6    go over it again.
7    A.   Because the information I had was
8    that you had not been hired by MBCR.
9    Q.   But you did not know.
10        MR. BLAISDELL:  But she's
11   answered your question.
12        MR. CARMACK:  No.  Well --
13        MR. BLAISDELL:  Yes, she
14   has, based on her knowledge at the time.
15        MR. CARMACK:  I asked her
16   whether or not she knew.
17        MR. BLAISDELL:  Based on the
18   knowledge at the time.
19        MR. CARMACK:  Right.  Okay.
20   She did not know.
21        MR. BLAISDELL:  That is why
22   you couldn't displace anyone is because
23   you were not an employee.
24        MR. CARMACK:  She also said

232

1    before --
2        BY MR. CARMACK:
3    Q.   I'm going to remind you now that
4    you said before that it was -- that you
5    -- you go to the union because you expect
6    your seniority to be protected.  You don't
7    go to the company; is that correct?
8    A.   True.
9    Q.   Right.  So I could have been in
10   the station expecting my seniority to be
11   protected and telling an engineer that.
12   A.   You could have.
13   Q.   I mean, apparently, I was because
14   an engineer told you that.
15        MR. BLAISDELL:  Objection.
16        BY MR. CARMACK:
17   Q.   An engineer told you that Joe
18   Carmack was handing out leaflets.
19   A.   No.  An engineer brought in the
20   leaflet and gave it to me.
21   Q.   And what did that leaflet say?
22   A.   Word for word, I can't tell you.
23   Q.   You did know that it said that Joe
24   Carmack was going to make a displacement


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:       617.557.0039
Toll Free:         866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

### 233

1   on that day on a certain train.
2       A.  Yes.
3       Q.  And that an engineer had that
4   leaflet.
5       A.  Yes.
6       Q.  What's wrong with that?
7       A.  Like I've said, to my knowledge,
8   you were not entitled to make a
9   displacement.
10      Q.  What difference does it make?  He's
11  contacting an engineer about making a
12  displacement, he's not contacting Jackie
13  Boumel.
14      A.  They contacted me.
15      Q.  Who did?
16      A.  The engineer that handed me --
17      Q.  What did the engineer say?
18      A.  Handed me the leaflet.
19      Q.  Said that Joe Carmack is handing
20  out leaflets.
21      A.  (Deponent nodding).
22      Q.  So why is that important?
23          MR. BLAISDELL:  Objection.
24          MS. LENT:  Objection.

### 234

1           BY MR. CARMACK:
2       Q.  Okay.  Is that important to you?
3       A.  It was important to me because I
4   thought you were going to get on a train
5   and take it out of North Station.
6       Q.  Right.  Again, so why would you
7   assume that?
8           MR. BLAISDELL:  Objection.
9           MS. LENT:  Objection.  She
10  has answered.
11          MR. CARMACK:  Okay.  All
12  right.  Fine.  It's fine.
13          MR. BLAISDELL:  She's
14  answered several times.
15          MR. CARMACK:  It's fine.
16          BY MR. CARMACK:
17      Q.  Okay.  The fact of the matter is,
18  isn't it, Ms. Boumel, that I contacted an
19  engineer about making a displacement and
20  then he told you about it and you reacted?
21      A.  Yes.
22      Q.  Right.  You reacted to my
23  contacting an engineer about a --
24  seniority rights.

### 235

1           MR. BLAISDELL:  Objection.
2           BY MR. CARMACK:
3       Q.  About making a displacement.
4           MR. CARMACK:  Is your
5   objection to the word seniority rights?
6           MR. BLAISDELL:  My objection
7   is that she didn't say is why she
8   reacted, because you -- because you made
9   contact with an engineer.
10          MR. CARMACK:  Well, she said
11  that she reacted because I was going to
12  make a displacement.
13          MR. BLAISDELL:  Exactly.
14  Because you were going to board a train
15  when you weren't an employee.  That's what
16  she's saying.
17          MR. CARMACK:  There's
18  nothing -- She has not said that she knew
19  anything about me boarding a train.
20          MR. BLAISDELL:  She said it
21  four times.
22          MR. CARMACK:  She's assumed
23  it, right?
24          MR. BLAISDELL:  Exactly.

### 236

1           BY MR. CARMACK:
2       Q.  Who told you that I was going to
3   board a train, Ms. Boumel?
4       A.  Nobody told me you were going to
5   board a train.
6       Q.  Right.  So you assumed it.
7       A.  Yes.
8       Q.  You assumed that I was going to
9   board a train.
10          What did you assume that I was
11  going to do when I boarded a train?
12      A.  Run the train.
13      Q.  Did you come out and ask me if
14  that's what I was going to do?
15      A.  No, I did not.
16      Q.  Did you, at every time -- at any
17  time get any information from me
18  indicating that I was going to do that?
19      A.  No, I did not.
20      Q.  So what did you do?
21      A.  I called the train dispatcher and
22  asked them what I should do.
23      Q.  What did the train dispatcher say?
24      A.  I believe that's when we decided to



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

237

1    call the police and ask them to ask you
2    to leave.
3        Q.   And why would you do that?
4        A.   You weren't just contacting one
5    engineer, you were handing out leaflets to
6    all engineers --
7        Q.   Okay.
8        A.   -- as they were coming off trains.
9        Q.   And that's a problem.
10       A.   Yes.
11       Q.   Why is that a problem?
12       A.   Because you're not supposed to be
13   handing -- in the station handing out
14   leaflets without a permit.
15       Q.   Are you sure of that?
16       A.   I'm pretty sure of that.
17       Q.   Mm-hmm.  Now, you said that I was
18   handing out leaflets to engineers.
19       A.   (Deponent nodding).
20       Q.   That's not necessarily arbitrarily
21   handing out leaflets.
22           MR. BLAISDELL:  Objection.
23           BY MR. CARMACK:
24       Q.   Is that arbitrarily handing out

238

1    leaflets?
2        A.   I don't know.
3        Q.   But your concern when you called
4    the dispatcher and talked about calling
5    the police is because I was handing out
6    leaflets to engineers.
7        A.   No.
8            MR. BLAISDELL:  Objection.
9        A.   My concern was you were going to
10   board a train.
11       Q.   That I was going to board a train.
12       A.   (Deponent nodding).
13       Q.   Mm-hmm.  And you never asked me if
14   I was going to do that.
15       A.   No, I did not.
16       Q.   You were concerned that I was going
17   to board a train so you called police.
18   What would be wrong with me boarding a
19   train?
20       A.   Boarding a train in the sense that
21   you were going to go up into the engine
22   and run the train.
23       Q.   Mm-hmm.  What indication did you
24   have that -- did you have that I was

239

1    going to do that?
2        A.   I didn't have an indication.  All I
3    had was that you were going to displace a
4    job.
5        Q.   What I don't understand is why you
6    would make such an assumption.
7        A.   Can't answer for it.
8        Q.   What kind -- Why would you have
9    that kind of reaction about somebody
10   contacting an engineer about meaning to
11   make a -- needing to make a displacement?
12       A.   (Deponent gestured).
13       Q.   You've contacted Roger Lenfest
14   before about your rights as a conductor,
15   right?
16       A.   Yes.
17       Q.   So why shouldn't I be able to
18   contact engineers about my rights as an
19   engineer?  Or should I not be able to?
20   You're saying I need a permit --
21       A.   I'm not saying you need -- you
22   can't do it.
23       Q.   Okay.  You're saying I need a
24   permit to do it.

240

1            MR. BLAISDELL:  Objection.
2            MR. CARMACK:  She just said
3    I needed a permit.
4            MR. BLAISDELL:  She didn't
5    say you needed a permit to contact
6    engineers.  It's not what --
7            THE DEPONENT:  To hand
8    things out in North Station.
9            MR. CARMACK:  She said I
10   needed a permit to give them leaflets in
11   North Station.
12           MR. BLAISDELL:  To hand out
13   leaflets in North Station, not directed at
14   who you're handing them out to.
15           MR. CARMACK:  Mm-hmm.
16   Mm-hmm.
17           BY MR. CARMACK:
18       Q.   Why do you think that I need a
19   permit?  Where do you get that
20   information?
21       A.   Because anyone else in North
22   Station that does anything like that needs
23   a permit.
24       Q.   Where do they get it from?


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

### 297

1    A. No trespass.
2    Q. A no -- Okay. No trespass order.
3    Okay.
4        Now, he told you this -- Was I
5    standing there when he told you that? Did
6    I hear him say that?
7        MR. BLAISDELL: Objection.
8    A. I don't --
9        MR. CARMACK: Well, I'm
10   trying to get the configuration here.
11       MR. BLAISDELL: Well, I
12   understand, but she doesn't know what you
13   heard.
14       MR. CARMACK: Okay.
15       MR. BLAISDELL: That's all.
16   BY MR. CARMACK:
17   Q. Well, what I'm getting at is, where
18   were you at the time when he told you?
19   A. I believe I was standing outside
20   the bubble in front of the doors in Track
21   4.
22   Q. And was I in earshot of his talking
23   to you?
24       MR. BLAISDELL: Objection.

### 299

1    anything -- Did you tell him anything at
2    the time while I was standing there?
3    A. I don't remember if I told him
4    anything at the time.
5    Q. Well, you had been in the station
6    having lots of conversations, right? You
7    said that you'd been talking to a thousand
8    people, right?
9    A. (Deponent nodding).
10   Q. So you were pretty busy in the
11   station, but he was -- he came in the
12   station to talk to you and then you said
13   he talked to me.
14   A. I believe he came --
15   Q. Came into the office --
16   A. -- to me -- came into the office
17   and I pointed out who you were.
18   Q. Mm-hmm. And then he came to talk
19   to me. But you didn't come out with him
20   -- or did you?
21   A. I don't know -- remember. I don't
22   know if I came out with him or if I just
23   came out because I had to go out.
24   Q. Mm-hmm. You had -- You came out

### 298

1        MR. CARMACK: Okay.
2        MR. BLAISDELL: Let's
3    establish a distance.
4        MR. CARMACK: No, that's
5    fine. Yeah. Okay. Yeah, that sounds
6    good. How about -- I was going to do
7    that.
8    BY MR. CARMACK:
9    Q. About how far away was I from you
10   or him?
11   A. About where you are now.
12   Q. Very good. Okay.
13       MR. BLAISDELL: Can --
14   A. Three feet.
15       MR. BLAISDELL: About four
16   feet across this table?
17       MR. CARMACK: Four feet,
18   yeah.
19       MR. BLAISDELL: Four to five
20   feet, for the record.
21       MR. CARMACK: Mm-hmm.
22   BY MR. CARMACK:
23   Q. Now, he told you that I gave him a
24   trespassing order [sic]. Did you give

### 300

1    because you had to go out.
2    A. Yeah.
3    Q. Okay. Do you have any idea about
4    how long Mr. Carmack was in the station
5    after the policeman first showed up to
6    talk to you?
7    A. I'd say less than ten minutes.
8    Q. Less than ten minutes.
9    A. I don't think the conversation was
10   that long.
11   Q. What conversation?
12   A. Between you and the policeman.
13   Q. Mm-hmm. So -- But at some point,
14   you were there during the conversation.
15   Were you there for the whole conversation,
16   the whole ten minutes?
17   A. No.
18   Q. And why is that?
19   A. Because I had work to do.
20   Q. You were busy.
21   A. (Deponent nodding).
22   Q. So at some point after he showed up
23   and after he started talking to me, then
24   you came out and started to talk to -- to



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

301

1  be a part of the conversation, too, or --
2     A.  I don't -- Like I said, I don't
3  know if I came out because I had to go
4  out to check something and you were still
5  there and he talked to me.
6     Q.  Mm-hmm.  But he did talk to you --
7     A.  Yes.
8     Q.  -- right?
9        And you came up to him to talk to
10  him.
11     A.  You were right outside --
12           MR. BLAISDELL:  Objection.
13     A.  -- my office.
14     Q.  Mm-hmm.
15     A.  I don't know that I sought him out
16  to talk to him.
17     Q.  Okay.  But he was already out
18  there.
19     A.  Yes.
20     Q.  And you walked out to talk -- or
21  you walked out for some reason.
22     A.  I just walked out of the office for
23  some reason.
24     Q.  And you end up being told by the

303

1  between you and the police officer and you
2  found out at that time that I was going
3  to be given a no trespass order and that
4  the police officer had taken my ID.
5     A.  Yes.
6     Q.  Those are the two things that you
7  knew at the time.
8     A.  (Deponent nodding).
9     Q.  Now, did you -- Why did you decide
10  to go back into the office?
11           MR. BLAISDELL:  Objection.
12  Can we get just a time frame?
13           MR. CARMACK:  I thought she
14  said that --
15       BY MR. CARMACK:
16     Q.  When did you go back -- Yeah.
17  When did you go back into the office?
18     A.  Probably immediately after I talked
19  to the police officer.
20     Q.  Mm-hmm.  Was that after I was gone?
21     A.  I believe you were still standing
22  there when I went back into the office.
23     Q.  And so was the police officer.
24     A.  Yes.

302

1  police officer that I was being given a no
2  trespass order.
3     A.  Yes.
4     Q.  Mm-hmm.  But you don't remember
5  saying anything to either one of us --
6     A.  No.
7     Q.  -- while you were there?
8     A.  (Deponent shaking head).
9     Q.  Do you remember me saying anything?
10     A.  No.
11     Q.  Okay.  Well, then --
12     A.  It's all pretty much a blur.
13     Q.  No, that's okay.  That's okay.  I
14  understand that.  I'm just trying to at
15  least refresh some of your memory and see
16  what we do know about -- or what you do
17  know about what happened and what you can
18  remember.
19        But, you know, you've -- you seem
20  to be certain that, you know, the police
21  officer came in to you first and then went
22  out alone, and then at some point for some
23  reason or another, you came out of the
24  office and there was some kind of contact

304

1     Q.  The police officer did not go back
2  into the office with you.
3     A.  Not to my knowledge.
4     Q.  Mm-hmm.  So you did go back into
5  the office.  Do you know why you decided
6  to go back into the office?
7     A.  Because it was rush hour and I
8  needed to be there.
9     Q.  Okay.  So you just -- you just
10  happened to be there and you happened to
11  witness things or -- Did you expect that
12  the -- the police officer needed you for
13  anything?
14     A.  Like I said, I don't remember why I
15  left the office and what -- why I went
16  out.
17     Q.  Okay.  So the police officer didn't
18  necessarily ask you to witness it and you
19  don't remember.
20     A.  No.  I don't remember him asking me
21  to witness anything.
22     Q.  Okay.  You just came out and you
23  happened to do so.
24     A.  (Deponent nodding).



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

---

305

1    Q.  Do you remember -- You said -- I
2  think you may have answered this question
3  already.  Do you remember me saying
4  anything to you at all?
5    A.  I don't remember you saying
6  anything.
7    Q.  Do you remember me saying, I'm okay
8  with what he's doing, Jackie, or that it's
9  okay or anything like that?
10   A.  Maybe that's okay or...
11   Q.  Mm-hmm.  So you do remember --
12   A.  I do remember that you didn't seem
13  upset with me.
14   Q.  Right.  Right.  Good.  Okay.
15       So you remember I might have said
16  something to you, you just don't remember
17  what it was.
18   A.  Don't remember what it was.
19   Q.  And you remember specifically that
20  you didn't think that I was upset with
21  you.
22   A.  Yes.
23   Q.  Mm-hmm.  Did you think that I was
24  upset with the police officer?

---

306

1    A.  No.
2    Q.  Yeah.  Okay.  But you don't
3  remember exactly me saying anything to
4  indicate that.
5    A.  No.
6    Q.  Could I have?
7    A.  To indicate what, that you were --
8    Q.  That I was not upset.
9    A.  No.  I don't remember you indicate
10  -- saying anything to indicate that.  It's
11  just your demeanor.  You did not seem --
12   Q.  Yeah.
13   A.  -- upset or agitated.
14   Q.  But you seem pretty confident,
15  right?
16   A.  Yeah.
17   Q.  And so at some point, you went back
18  into the office.
19   A.  Yes.
20   Q.  And you were pretty much, at that
21  point, satisfied that everything was going
22  to be handled and everything was going to
23  be okay --
24   A.  Yes.

---

307

1    Q.  -- right?
2        And that Joe Carmack wasn't going
3  to enter any train.
4    A.  Yes.
5    Q.  And that Joe Carmack was going to
6  leave the station.
7    A.  Yes.
8    Q.  And you wanted Joe Carmack to leave
9  the station.
10   A.  I just wanted to continue the rush
11  hour peacefully.
12   Q.  Mm-hmm.  So it didn't matter to you
13  if I left the station.
14   A.  No.
15   Q.  So if it didn't matter to you that
16  I left the station, then why did you call
17  the -- the dispatcher and why did the two
18  of you decided that -- decide that the
19  police needed to be called?
20       MR. BLAISDELL:  Objection.
21       MR. CARMACK:  Right.
22       MR. BLAISDELL:  We made it
23  very clear that the two of them did not
24  make that decision.

---

308

1        MR. CARMACK:  That they
2  didn't make the decision --
3        MR. BLAISDELL:  The two of
4  them did not make that decision to call
5  the police.
6        MR. CARMACK:  Okay.
7      BY MR. CARMACK:
8    Q.  Somebody made a decision to call
9  the police --
10       MR. BLAISDELL:  Correct.
11   Q.  -- and you don't know why --
12   A.  It was more of my assumption that
13  you were going to --
14   Q.  Mm-hmm.
15   A.  -- go up and physically take
16  control of the train.
17   Q.  So once you were satisfied that I
18  wasn't going to go up and physically take
19  control of the train, why was it important
20  for me to leave the station?
21   A.  It was out of my hands by then.
22  Once the police are called, it's out of my
23  hands.
24   Q.  Okay.  Do you remember telling the

---



Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

### 309

1    policeman that I had threatened anybody?
2    A. No.
3    Q. Do you remember telling the
4    policeman that I created a disturbance?
5    A. No.
6    Q. You only told the policeman, then,
7    that -- or that -- you only told the
8    policeman that if you told him -- Did you
9    tell the policeman at all that I was
10    handing out leaflets?
11    A. I believe it was just the leaflets
12    and the fact -- like I said, about you --
13    I was more afraid that you were going to
14    physically get on a train.
15    Q. So you did say that you were afraid
16    that I was going to get on a train.
17    A. I wasn't -- I was not afraid that
18    you were going to physically hurt somebody
19    or, you know, that kind -- no.
20    Q. You were afraid that I was going to
21    get on a train.
22    A. Yes.
23    Q. So would there have been a problem
24    with me getting on a train?

### 310

1    A. Getting on a train and running the
2    train, not getting -- You can board all
3    the trains you want and be a passenger all
4    you'd like.
5    Q. So what was -- So the purpose of a
6    policeman being there, then, was -- Tell
7    me.
8    MR. BLAISDELL: Objection.
9    MR. CARMACK: Why?
10    MR. BLAISDELL: How would
11    she know if she didn't ask the policeman
12    to be there.
13    MR. CARMACK: Well...
14    BY MR. CARMACK:
15    Q. The purpose of your calling the
16    dispatcher then was because you were
17    afraid that I was going to get on a
18    train. And you gave no indication to the
19    policeman that I was causing a
20    disturbance. Did you give any indication
21    to the policeman that I might board the
22    train?
23    A. I probably did.
24    Q. And you told him that --

### 311

1    A. I showed him this (indicating) and
2    thought that you'd displace -- you were
3    going to actually go up and try to run
4    the train.
5    Q. But you didn't tell them that I had
6    threatened anybody.
7    A. No.
8    Q. So that was your sole concern, that
9    based on that leaflet, you thought that I
10    might board a train and try to run it.
11    A. Yes.
12    Q. Mm-hmm. But you don't remember me
13    talking to the policeman at all about
14    whether or not I did run that train -- or
15    try to run that train or wanted to try to
16    run that train.
17    A. No.
18    Q. So then the bottom line is you
19    don't really know why I was given a no
20    trespass order -- or do you?
21    A. No. That was between -- with the
22    police. I didn't ask for the no trespass
23    order.
24    Q. So for some reason or another, that

### 312

1    policeman decided that I should leave the
2    station.
3    MR. BLAISDELL: Objection.
4    BY MR. CARMACK:
5    Q. You don't know.
6    A. I don't know.
7    Q. You know that he was -- he gave me
8    a trespass order.
9    A. Yeah.
10    Q. He must have decided that I should
11    leave the station if I gave him a --
12    MR. BLAISDELL: Objection.
13    BY MR. CARMACK:
14    Q. What is a no trespass order?
15    A. As what I'm to believe, that you're
16    not allowed on MBTA property.
17    Q. Mm-hmm. Is there any reason why I
18    wouldn't be allowed on MBTA property that
19    you knew of?
20    MR. BLAISDELL: I think it's
21    been asked and answered.
22    MR. CARMACK: Hmm?
23    MR. BLAISDELL: I think it's
24    been asked and answered.

Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

Jacqueline Marie Boumel

April 2, 2008

---

**313**

1  MR. CARMACK: Not in that
2  way.
3  MR. BLAISDELL: Go ahead.
4  A. Why you wouldn't be allowed on -- I
5  don't know why he gave you a no -- that
6  you couldn't come on the property.
7  Q. Okay. I'm going to have you look
8  at this document.
9  A. (Deponent viewing document).
10  MS. LENT: Can we take a
11  quick break so I can use the restroom?
12  MR. CARMACK: Yeah. Can we
13  go off record?
14  MR. BLAISDELL: Sure.
15  MS. LENT: Thank you.
16  (Recess taken).
17  MR. CARMACK: I'm handing
18  Ms. -- Well, I'm going to hand Ms. Boumel
19  another copy of that. What I'm handing to
20  her is MBTA Police Department journal
21  incident report.
22  MR. BLAISDELL: Are we going
23  to mark this as an exhibit in this case?
24  So do we want to call it Exhibit 7?

---

**315**

1  BY MR. CARMACK:
2  Q. Now, have you ever seen this
3  document before?
4  A. (Deponent viewing document). No.
5  Q. But it does say "involved
6  persons" --
7  A. Okay.
8  Q. -- right?
9  Do you see that, where it says
10  "involved persons"?
11  A. (Deponent viewing document). Yes.
12  Q. And it says "Jackie Boumel."
13  A. (Deponent viewing document). Yes.
14  Q. Does it mention a train dispatcher
15  on there anywhere?
16  A. (Deponent viewing document). No.
17  Q. Can you just read aloud for me the
18  narrative?
19  A. (Deponent viewing document).
20  Q. It says "narrative" on one section
21  of that document.
22  MR. CARMACK: Yeah, I
23  understand, but it says -- I'm just saying
24  for the record that it says "narrative" at

---

**314**

1  MR. CARMACK: Well, can we
2  just call it Exhibit Pavia, Exhibit Pavia
3  1?
4  MR. BLAISDELL: If you want
5  to end up using it related to this
6  deposition, you probably need to -- you
7  probably need to identify it.
8  MR. CARMACK: I just had
9  her copy it.
10  MR. BLAISDELL: I know.
11  That's why I was talking to you earlier.
12  MR. CARMACK: All right.
13  Well, that's why I was asking the question
14  earlier. Okay. But, you know, that makes
15  sense.
16  Can we just mark this exhibit?
17  (Exhibit-7, MBTA Police
18  Incident Report, marked for
19  identification).
20  MR. BLAISDELL: And that's
21  Exhibit 7?
22  MR. CARMACK: Seven, Boumel
23  7.
24  ///

---

**316**

1  the bottom half of that document and
2  there's a paragraph there, and I'm going
3  to ask Ms. Boumel to read that paragraph
4  when she's prepared.
5  A. (Deponent viewing document). "At
6  the above date and time, T511 was
7  dispatched to the North Station commuter
8  rail lobby for a report of a disorderly
9  male. Upon my arrival, I was met by
10  Train Master Boumel who stated that an
11  ex-Amtrak employee who was later identified
12  as Carmack, Joseph, was attempting to
13  disrupt service and passing out literature
14  on Platform Number 3. I then made contact
15  with Carmack and told him he needed to
16  leave the property and gave him a trespass
17  order. T511 Pavia."
18  Q. Okay. Can you tell me whether or
19  not you think that paragraph is a true
20  representation of your involvement?
21  A. (Deponent viewing document). That
22  he met me and I told him that you were
23  ex-Amtrak employee, yes.
24  Q. Mm-hmm. Did you tell him that I

---



**Jack Daniel**
Court Reporting & Video Services

Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

317

1    was attempting to disrupt service?
2        A.  I don't believe I said "disrupt
3    service."  I believe I referred to what we
4    have here as Exhibit 5 here as far as the
5    displacement.
6        Q.  Mm-hmm.  That was the literature
7    that was being passed out.
8        A.  True.
9        Q.  So that's true, passing out
10   literature.
11       A.  Yes.
12       Q.  And the literature being that --
13   the one document that is Boumel 5.
14       A.  Yes.
15       Q.  But disrupt service, is that true?
16   It says "attempting to disrupt service."
17       A.  (Deponent viewing document)
18   Attempting to disrupt service.
19       Q.  Mm-hmm.
20       A.  I believed that was an attempt to
21   disrupt service.
22       Q.  What was?
23       A.  I believed myself, at that time,
24   that you were attempting to disrupt

318

1    service by displacing that job at 4:40.
2        Q.  So disrupting service, in your
3    mind, would coincide with my -- what you
4    understood to be my attempting to board
5    and run a train.
6        A.  Yes.
7        Q.  Which you thought that I was going
8    to do.
9        A.  Yes.
10       Q.  And you told him that.
11       A.  Yes.
12           MR. CARMACK:  Okay.  At
13   this point, you don't see any reason for
14   -- Mr. Blaisdell, you don't see any reason
15   to --
16           MR. BLAISDELL:  Are you
17   talking to me?
18           MR. CARMACK:  Yeah.  You
19   don't see any reason to do any cross?
20           MR. BLAISDELL:  I don't
21   believe so.  I think I'd like to --
22           MR. CARMACK:  Yeah, I was
23   going to ask her next.
24           MR. BLAISDELL:  I'd like to

319

1    confer with Attorney Lent before I make
2    that decision.
3            MR. CARMACK:  Yeah.  Can we
4    go off record?  And the two of you can
5    confer and then we'll talk about going
6    back on record again.
7            MR. BLAISDELL:  Are you
8    saying you're done at this point?
9            MR. CARMACK:  No.  I want
10   to -- I want to review my stuff, too.  So
11   I'm going to take the opportunity to
12   review my stuff, too, about it, and then
13   we'll come -- if we need to confer before
14   we go back on record, we can do that.
15   And then we can confer on record.
16           MR. BLAISDELL:  Okay.
17           MR. CARMACK:  Okay.
18           (Recess taken).
19           (Exhibit-8, Letter dated
20   8/20/02, marked for identification).
21           MR. CARMACK:  Back on
22   record.
23           BY MR. CARMACK:
24       Q.  Ms. Boumel, I'm going to hand you a

320

1    document that says "Amtrak" at the top of
2    it.  It's dated August 20th, 2002, to Mr.
3    Carmack.
4        A.  (Deponent viewing document).
5        Q.  Can you tell me if you've ever seen
6    that before?  Just take a chance to look
7    at it and...
8        A.  (Deponent viewing document).
9    Truthfully, the first time I saw this was
10   the first time I met with Mr. Blaisdell.
11       Q.  So you don't remember ever having
12   seen it before.
13       A.  No.  I had never seen it before
14   that.
15       Q.  Do you think it's possible that you
16   had seen it before?
17       A.  No.  I know I hadn't seen it
18   before.
19       Q.  Okay.  Now, you have -- this is a
20   letter from Mr. O'Malley, right?
21       A.  Yes.
22       Q.  And it's to Mr. Carmack, right?
23       A.  Yes.
24       Q.  Okay.  And just -- Can you just


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 22

| Journal No. 03019163 | MBTA POLICE DEPARTMENT *Public Journal Report* | | | | ORI No. MA013250 | |
|---|---|---|---|---|---|---|

| Incident ORDERLY | | Date Reported 07/01/03 | Date Occurred 07/01/03 | Day of Week TUESDAY | Time Occurred 16:15 | Status ACTIVE |
|---|---|---|---|---|---|---|

| Location NORTH STATION CR | | Area ZS | Line COMMUTER RAIL | County SUFFOLK | City/Town BOSTON | Bus Line |
|---|---|---|---|---|---|---|

| Victim T Employee? NO | Disposition PERSON(S) EJECTED | Remarks 395/TRAIN MASTER RE DISORD/OFF ISSUED TRESPASS NOT |
|---|---|---|

| Unit T511 | Officer 1 (511) PAVIA, ROBERT | Officer 2 | Received 16:15 | Dispatched 16:16 | Arrived 16:24 | Cleared 16:43 |
|---|---|---|---|---|---|---|

## NARRATIVE

AT THE ABOVE DATE AND TIME T511 WAS DISPATCHED TO THE NORTH STATION CR LOBBY FOR A REPORT OF A DISORDERLY MALE. UPON MY ARRIVAL I WAS MET BY TRAINMASTER BOUMEL WHO STATED THAT AN EX- AMTRAK EMPLOYEE (WHO WAS LATER IDENTIFIED AS CARMACK, JOSEPH) WAS ATTEMPTING TO DISRUPT SERVICE AND PASSING OUT LITERATURE ON PLATFORM # 3. I THEN MADE CONTACT WITH CARMACK AND TOLD HIM HE NEEDED TO LEAVE THE PROPERTY AND GAVE HIM A TRESPASS ORDER.

   T511/PAVIA

Journal No. 03019163



MASSACHUSETTS
BAY
TRANSPORTATION
AUTHORITY

MBTA Police
240 Southampton Street
Boston, MA 02118

Carmack Joseph
59a Tremont st. Apt 5
Roxbury MA 02118

02118+1654 53

JUL 0 8 03
MA

PB METER
7107009

$2037

U.S. POSTAGE

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T.  CARMACK,<br>        Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 23

1

NUMBER OF PAGES: 81

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JOSEPH T. CARMACK          \*

VS.                        \*          CIVIL ACTION NO:

MASSACHUSETTS BAY          \*          05-11430-PBS

TRANSPORTATION AUTHORITY   \*

VS.                        \*

MASSACHUSETTS BAY          \*

COMMUTER RAILROAD CO.      \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


A DEPOSITION OF ROBERT PAVIA, a WITNESS, taken on

behalf of the PLAINTIFF, pursuant to applicable

provisions of the Massachusetts Civil Procedure, before

Jacquelyn Healey, a Court Reporter and Notary Public in

and for the Commonwealth of Massachusetts at the offices

of Smith & Duggan, LLP, Two Center Plaza, Suite 620,

Boston, Massachusetts, on February 21, 2008, commencing

at  11:05 a.m.


J&K COURT REPORTING SERVICES

P.O. BOX 321, SWAMPSCOTT, MASSACHUSETTS 01907 (781) 593-3950

44

1    Q    Now, you understand that you're called here because of

2         events that happened in North Station on July 1, 2003,

3         correct?

4    A    Yes.

5    Q    Describe those events for me.

6               MR. WITHERBY:  Can you ask a somewhat specific

7         question, please.  I'm going to object to the form of the

8         question

9               MR. CARMACK:  Well, he understands --

10             MR. WITHERBY:  I'm going to object to the form

11        of the question because it's so incredibly open-ended.

12             MR. CARMACK:  I can change it.

13    Q    What happened on July 1, 2003, that it resulted in your

14         being called to testify here today?

15    A    At approximately 16:16, which is 4:16 in the afternoon I

16         was dispatched to the North Station Commuter Rail lobby

17         for a report of a disorderly male.  Upon my arrival I was

18         met by Trainmaster Boumel who stated that an ex-Amtrak

19         employee, who was later identified as Joseph Carmack,

20         yourself, was attempting to disrupt service and was

21         passing out literature on platform three.

22             MR. CARMACK:  Okay, let the record show that

23         Detective Pavia is now reading from a police report, an

24         MBTA police report to describe the events of July 1.

52

1    A    Well, I want to make sure that that's the same as what

2         I'm -- got from you that day.

3              MR. WITHERBY:  She's marked -- the sticker is

4         on that side.

5              MR. CARMACK:  We'll call that side one.

6              MR. WITHERBY:  Call it side one.

7              MR. CARMACK:  Uh-huh.

8    Q    Do you want to look at the exhibit?

9    A    Well, I just want to make sure it's the same as what I

10        saw that day.

11   Q    Why don't you look at the exhibit and we'll swap copies,

12        I'll look at yours while you look at the exhibit.

13   A    The side with the sticker on it, on that side on item

14        number nine, it says "J. Carmack will make displacement

15        on run 820 on July 1, 2003, at 4:40 p.m." which is about

16        15, 16 minutes after I arrived at the station.  That

17        itself to me, 4:40 in the afternoon on a weekday, you're

18        in rush hour, displacement, I have no idea as far as how

19        you're going to make a displacement run.  To me it sounds

20        threatening in one way and at the same time if nothing

21        else I would find it threatening toward the existing crew

22        that was to operate the train.

23             At the time you're not an employee, you had no

24        identification saying that you were a MBCR employee.  I

53

1    had no idea if you were qualified to perform the duties

2    that you were saying you had a right to perform.  And I

3    wasn't going to risk public safety by letting you even

4    enter that train like you said you were -- you had

5    intentions of doing.

6        On the back side of that page there's other things

7    that you state in the pamphlet that you were passing out

8    that are very, what I would find threatening.  I'm just

9    trying to -- "I will not be denied by O'Bryan".  "Now

10   hear this, Guildenstern is dead.  Let's rock".  I find it

11   all very, although vague, very threatening.  You had,

12   like I said, you had no -- nothing to prove that you were

13   an employee, that you had a right to be there.  I have a

14   current MBCR employee or trainmaster, I believe, was her

15   position saying that you were not an employee and at the

16   same time I have you saying that you were going to get on

17   this train and after these threats I never would have let

18   you anywhere near that train.

19   Q   Where does it say I'm going to get on a train?

20   A   I don't know -- or disrupt or however it is.  But, I

21       don't see how you would -- whatever displacement is on

22       run 820 would have to had -- do something with the train,

23       at least that's the way I would look at it.

24   Q   What exactly did Ms. Boumel say to you?

54

1   A   That you were disrupting, being disorderly and passing

2       out flyers on track three.

3   Q   Did she say anything to you about displacement?

4   A   No.

5   Q   Did she say anything to you about me getting on a train?

6   A   I don't remember.

7   Q   Did she complain about any of the language in that

8       pamphlet?

9   A   She said that it was threatening.

10  Q   She just vaguely said it was threatening that's it, she

11      didn't tell you what was threatening?

12  A   I believe so.  But, ----

13              MR. WITHERBY:  If you recall.

14  A   I don't recall.  I just remember her saying

15      "threatening".

16  Q   Did you ask me about it?

17  A   Yes.

18  Q   What did you ask me?

19  A   I believe I walked up to you, talked to you.  I believe I

20      probably would have asked for identification, asked what

21      you were doing.  I know I had asked you for a copy of the

22      flyer itself, which as I've already said I do find

23      although vague that it could definitely be interpreted as

24      threatening whether to other employees or also to the

1       general rider ship who have a right to ride the system

2       without being in fear that an incidence is going to

3       occur.

4  Q   Can you just on the front side of the one with the

5       sticker on it.

6  A   Be alert or BLE Alert, whatever.

7  Q   Yeah.  Can you just read, read six through 11.

8           MR. WITHERBY:  Are you asking him to read it

9       out loud?

10          MR. CARMACK:  Yes, I am.  I am asking him to

11      read it out loud.

12  A   "On or before May 28, 2003, MBCR received completed bid

13      from engineer Carmack as per part one of MBCR BLE

14      agreement.  MBCR failed to award position to engineer

15      Carmack as an eligible employee in accordance with

16      seniority rights established as per rules 5 of Amtrak BLE

17      agreement.  Effective July 1, 2003, engineer Carmack must

18      exercise his seniority, loose all rights in accordance

19      with MBCR BLE agreement.  J. Carmack will make a

20      displacement on run 820 on July 1, 2003, at 4:40 p.m.

21      MBCR has failed to respond to discussion attempts by Mr.

22      Carmack on this matter.  BLE Division 57 assistance in

23      this matter will be greatly appreciated".

24  Q   Where does it say ----

57

1   Q   So, in your mind just tell me what item nine means?

2   A   I think it sounds like you were going to enter the train

3        and somehow exercise what you called your seniority but

4        you were no longer and employee and attempt to work or

5        perform the duties you use to perform when you were an

6        employee seemed confrontational and I wasn't going to

7        risk either a problem with you and the crew that had the

8        right to be there and also risk the public safety of the

9        rider ship who would have been on this train.

10   Q   Now, when you were just telling me about that you

11       mentioned that I would exercise my seniority ----

12            MR. WITHERBY:  Objection.

13            MR. CARMACK:  He mentioned it.

14            MR. BLAISDELL:  I think he said seniority as

15       you understood it.  I don't think he said you were

16       exercising your seniority.

17            MR. CARMACK:  Okay, that's fine.

18   Q   What does that mean to exercise seniority?

19   A   If you were in fact an MBCR employee and you had a

20       position there and you had seniority where maybe --

21       usually it means an earlier date of hire than somebody

22       else, then you would have seniority.  But, because you

23       were not an MBCR employee you did not have seniority or

24       the right to operate or -- I don't even know what your

58

1   position was prior to you -- when you worked for Amtrak.

2   But -- I don't know if you were a conductor or what.

3   But, you had no right to perform any duties on that

4   train.

5 Q So, then, you understand that this document is talking

6   about rights to seniority, rights to seniority.

7     MR. BLAISDELL:  Objection.

8 A I wasn't concerned with anything that had to do with --

9   your union issues were your union issues.  Whatever was

10   going on as far as that goes, that was your thing.  This

11   wasn't the forum for this.  The commuter rail lobby or

12   the tracks, the platform, wasn't the place for this.

13   What I was there for, I was dispatched there because

14   somebody called, said that somebody was being disorderly

15   and passing out threatening pamphlets.  That's what I was

16   there for.  When I looked at the pamphlets and I found

17   them, that they could definitely be interpreted as

18   threatening it was at that time that I decided that you

19   were going to have to leave the property and stop passing

20   out these pamphlets.  That's what I was there for.

21    I wasn't concerned about your union issues.  Your

22   unions were something you needed to deal with, but not in

23   that forum.  My concern was with the public safety and

24   the safe and efficient transportation of the rider ship.

60

| | | |
|---|---|---|
| 1 | | threatening.  But, like I said, I wasn't going to take |
| 2 | | the chance of letting you remain on the property with |
| 3 | | knowing what this says. |
| 4 | Q | So, specifically, then, the way you're interpreting the |
| 5 | | word displacement ---- |
| 6 | A | Let's rock and Guildenstern is dead, I find that |
| 7 | | threatening. |
| 8 | Q | How is that threatening? |
| 9 | A | I don't know who Guildenstern is dead but it very easily |
| 10 | | could mean, I'm going after somebody. |
| 11 | Q | Isn't that past history? |
| 12 | A | I have no idea. |
| 13 | Q | That's what it says? |
| 14 | A | No, it could be forward, too.  You're dead.  That |
| 15 | | person's dead. |
| 16 | Q | Did you ask me about that? |
| 17 | A | I don't recall but looking at this I don't believe so. |
| 18 | | Let's rock.  Like I said, there's a lot of different |
| 19 | | stuff.  Now hear this.  It seemed like you're trying to |
| 20 | | strong arm people, and like I said, to me it's very |
| 21 | | threatening and that's about it. |
| 22 | Q | Is there anything else that you can think of that would |
| 23 | | indicate I was creating a disturbance? |
| 24 | | MR. WITHERBY:  You mean other than the contents |

68

1    Q    So, I couldn't come back at all for 24 hours?

2    A    Correct.

3    Q    So, do I understand correctly it was because of the

4         leaflets --

5    A    Correct.

6    Q    -- specifically, nothing else, it was just because of

7         what the leaflet said that I was being asked to leave the

8         station?

9              MR. WITHERBY:  No, I don't -- I think he

10        testified it was because of all of those.

11   A    The combination of things as far as you were out in an

12        area passing them out where you can't be pass -- doing,

13        like I said, that's not the forum for what you were

14        doing.  It's 4:40 or whatever, 4:24 in the afternoon or

15        4:15, it's rush hour.

16   Q    Passing out leaflets and you said, I think ----

17   A    That's an area for passengers to get to and from the

18        train on the platform which is where I was told you were

19        originally on platform three.  It was a combination of

20        that and the fact that you weren't an employee, you

21        couldn't produce anything to say you were an employee and

22        -- which was contradictory to what you were claiming.

23        So, it was a combination of those things that made

24        me give you the trespass warning and asking you to leave.

75

| | | |
|---|---|---|
| 1 | A | Oh. |
| 2 | Q | What's in that document that you know of without |
| 3 | | reviewing it -- how does that document impact on what you |
| 4 | | did that day? |
| 5 | A | Without reviewing it? |
| 6 | Q | Yeah.  You said you recognized the document. |
| 7 | A | Do you want me to answer the question? |
| 8 | Q | Yes, please. |
| 9 | A | It's a document that has some of the rules, what defines |
| 10 | | commercial and non-commercial activity on the MBTA |
| 11 | | property and what's allowed and what's not allowed.  As |
| 12 | | to the specifics I'd need to read it.  But, very clearly, |
| 13 | | what we consider disorderly or threatening behavior would |
| 14 | | be a prohibited activity that would cause you to be |
| 15 | | issued a trespass warning and ejected from the property. |
| 16 | Q | You mentioned commercial and non-commercial activity? |
| 17 | | What's commercial and non-commercial activity? |
| 18 | A | Non-commercial would be where people are out there, say, |
| 19 | | soliciting signatures or something like that.  Maybe |
| 20 | | public awareness, that type of stuff, charity type stuff |
| 21 | | where money is not involved. |
| 22 | | And then commercial would be like vendors and |
| 23 | | people selling stuff where you have to have permits and |
| 24 | | there's money involved. |

76

1    Q    How does that apply to what you did on July 1, 2003,

2         regarding me?

3    A    I believe I just explained that because what would be

4         considered prohibited behavior would be putting somebody

5         in fear or being disorderly.  That had already occurred,

6         otherwise I wouldn't have called there.  Then also the

7         fact that I had an MBTA or -- not MBTA, a MBCR employee

8         who had already stated that you were on the platform

9         three and I think it's very clear that in these -- in

10        this, you can't be within 15 feet of a platform.  So, you

11        had also violated that.

12   Q    Did you tell me that?

13   A    I had already told you that you were -- by then you were

14        already leaving.

15   Q    So, you never told me that I could be in the ----

16   A    No, you were already in a violation of that.  You had

17        already passed out the flyers that were found

18        threatening.  I also found them threatening and you were

19        already being told to leave.

20   Q    Just tell me what a trespassing order is.  What is a

21        trespassing order?

22   A    Like I explained to you, I believe, already earlier was

23        as an official of the MBTA I have the right to tell you

24        that you have to leave.  If you don't leave you're

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T.  CARMACK,<br>Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 24

National Railroad Passenger Corporation, Two South Station, Boston, MA. 02110-2215



September 10, 2001

NOTICE OF FORMAL INVESTIGATION
CERTIFIED MAIL 7000 0600 0028 6411 2762

FILE NO: 01-049

Mr. Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA 02116

Dear Mr. Carmack:

You are hereby directed to appear for a formal investigation indicated below:

        Date:         September 17, 2001
        Time:         11:30AM
        Place:        253 Summer Street
                        2nd Floor
                        Boston, MA. 02110

This notice is issued in connection with the occurrence (s) outlined below:

On Friday, September 7, 2001, the Customer Service/Commuter Rail Transportation Office was contacted by Amtrak's Medical Director's Office, and informed that you failed to appear for an appointment with Dr. Vasile on August 27, 2001, at 4:00 P.M., a date and time negotiated and agreed by both of you.

**Charge I:**    Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, at 4:00 P.M., you allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination".

Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled *'Professional and*



*Personal Conduct'*, specifically Teamwork, which reads in pertinent part:
"[F]ollowing instructions ....you must comply with all company and departmental
policies, procedures and rules as well as all instructions, directions and orders from
supervisors and managers."

You may produce any witness you so desire and you may be accompanied by a
representative as provided for in your current and governing agreement without
expense to the National Passenger Corporation.

All requests for postponement of this investigation must be handled through the Division
Hearing Office at 617-345-7667 or by U.S. Mail at 253 Summer Street, Boston, MA.
02210.

Very Truly Yours,

M.J. O'Malley
Director of Operations

Cc:     Hearing Officer
        F.J. O'Connor Jr., Charging Officer
        Dr. Russell G. Vasile M.D., Company Witness
        Dr. T. Pinsky, Company Witness
        Mr. M.J. O'Bryan, BLE Representative

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T.  CARMACK, Plaintiff, *pro se* | ) ) ) ) | |
| v. | ) ) | C.A. No. 05-11430-PBS |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY and MASSACHUSETTS BAY COMMUTER RAILROAD, Defendants | ) ) ) ) ) ) | |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 25

National Railroad Passenger Corporation, Two South Station, Boston, MA. 02110-2215



November 9, 2001

M.J. O'Bryan
Local Chairman - BLE
23 Stevens Road
Westborough, Ma. 01581

Dear Mr. O'Bryan,

We have received claims on behalf of J. Carmack. They will be identified as follows:

      BOS-BLE-CS-43/0901 - May 22 - 28, 2001; lost earnings / holiday pay
      BOS-BLE-CS-44/0901 - May 4 - August 11, 2001; lost earnings

We will discuss the claims on a mutually agreeable date and time.

Very truly yours,

L.F. De Phillips
Division Manager
Labor Relations

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 26

NATIONAL RAILROAD PASSENGER CORPORATION

Two South Station,  Boston, MA  02110



August 20, 2002

Mr. Joseph Carmack
398 Columbus Avenue
Apartment # 130
Boston, Massachusetts 02116

Dear Mr. Carmack:

In connection with your recent appearance on the property and probing questions the subject of which was found disturbing, be advised that you are barred from Amtrak/MBTA railroad property.  Your presence in the employee areas at North or South Station is trespassing.

Because of our concerns, the Carrier is pursuing legal guidance relative to your contact with Amtrak employees on Amtrak/MBTA railroad property.

Sincerely yours,

Michael J. O'Malley
Director of Operations
Commuter Rail

Certified Mail Return Receipt Requested 7002 0510 0003 9982 7119



CERTIFIED MAIL

7002 0510 0003 9982 7119

M. J. O'Malley
AMTRAK TRANSPORTATION DEPARTMENT
89 CANAL STREET
BOSTON, MASSACHUSETTS 02114

Joseph Carmack
398 Columbus Avenue
Apartment # 130
Boston, MA 02116

# 130

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOSEPH T.  CARMACK,             )
          Plaintiff, pro se     )
                                )
v.                              )          C.A. No. 05-11430-PBS
                                )
MASSACHUSETTS BAY               )
TRANSPORTATION AUTHORITY        )
and MASSACHUSETTS BAY           )
COMMUTER RAILROAD,              )
          Defendants            )
_____)
```

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 27

CERTIFIED MAIL  #7001 1940 0005 4080 1239
Return Receipt Requested
398 Columbus Ave. #130
Boston, MA  02116

August 31, 2002

Michael J. O'Malley
Amtrak Commuter Rail
89 Canal St.
Boston, MA  02114

Dear Mr. O'Malley:

I am in receipt of your letter of August 20, 2002.  I am unaware of any "appearance on the property" that may concern you, I am puzzled by your reference to "probing questions" and it is inconceivable how any business of mine or appearance at North or South Stations could be found to be "disturbing".

I will remind you that I am a member of the Brotherhood of Locomotive Engineers and have legitimate union business to attend to on Amtrak property.  Your claim of trespass or any action you or the carrier may take against me that may inhibit my pursuit of legal protections would constitute interference prohibited by law (USCA 45 SS 151 et. seq.).

Furthermore, as a legal citizen of the United States of America I have a right to public access at North and South stations and if persons associate with me in said environs such association flows from the rights and privileges enjoyed by mutual citizenship, is protected by law and falls outside the purview of Amtrak/MBTA managerial responsibilities.

In light of these protections and as a consideration, I should like to know of any particular manner of conducting business that you might find less "disturbing".

Your prompt attention to this matter would be greatly appreciated.  Please advise.

Very truly yours,

Joseph T. Carmack

cc:  M. Kenny
     R. Prone
     M. J. O'Bryan
     Members

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. M. J. O'MALLEY.
AMTRAK Commuter Rail
89 Canal St.
Boston Ma. 02114

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) | B. Date of Delivery
| 4-4-02

C. Signature
X _____  ☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
# 7001 1940   0005   4080   1239

PS Form 3811, July 1999        Domestic Return Receipt        102595-00-M-0952

OFFICIAL

(Domestic Mail Only; No Insurance Coverage Provided)

BOSTON, MA  021C
POSTMARK ID: 0209
Postmark Here
SEP 6 2002

Postage          $    0.37
Certified Fee         2.30
Return Receipt Fee    1.75
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees  $  4.42      09/06/02

Sent To  MR. M.J. O'MALLEY - AMTRAK
Street, Apt. No.;  89 CANAL ST.
or PO Box No.
City, State, ZIP+4  BOSTON MA 02114

PS Form 3800, January 2001

7001 1940 0005 4080 1239

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

_____
                                    )
JOSEPH T.  CARMACK,                 )
          Plaintiff, *pro se*       )
                                    )
v.                                  )          C.A. No. 05-11430-PBS
                                    )
MASSACHUSETTS BAY                   )
TRANSPORTATION AUTHORITY            )
and MASSACHUSETTS BAY               )
COMMUTER RAILROAD,                  )
          Defendants                )
_____     )

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 28

CERTIFIED MAIL #7001 1940 0005 7197 9938
Return Receipt Requested
March 30, 2003

Mr. Michael J. O'Bryan
BLE-57
23 Stevens Rd.
Westboro, MA  01581-1429

Dear Brother O'Bryan:

Reference my letter to you of February 20, 2001 in which I insisted that you comply with your obligations as duly accredited representative and Local Chairman of BLE-57 and process my time claims. With this letter I am reiterating that demand. You have continuously collaborated with Labor Relations to sabotage my legal rights to recourse and defense and you have adopted numerous pretexts to account for such corrupt behavior.

Specifically, at the BLE-57 Division meeting in September of 2002, you attempted to challenge the validity of my time claims by implying that the General Committee would reject them. As I explained at the time, the General Committee could not possibly have addressed any claims that it had not received and the decision to pursue claims falls exclusively with the Division and does not initially involve the General Committee. In fact, it is your duty as the chairman of the Local Committee to pursue and submit claims that have been denied and you have continuously refused to do so in the matter of my wage claims since the summer of 2001.

Furthermore, the carrier has accused me of trespassing to prevent me from filing time claims and you have refused to assist me in filing further claims for protection of wages so that I may prevent the trespassing charge. You have also admitted to discussing the matter with carrier Labor Relations officer Lou DePhillips and you have stated that you do not want to submit claims that he does not agree to. You have openly continued to collude with Labor Relations to sabotage my rights as a union member in order to protect the carrier from my legitimate claims and you have sabotaged my right to legitimate defense in accordance with the BLE constitution, the Amtrak/BLE agreement and the Railway Labor Act. Therefore, I will again remind you of your obligations.

When the General Chairman designates you to act as "duly accredited representative" in accordance with Rule 1 of the agreement, it is generally intended that you will represent the BLE in a manner that assists BLE members. It is not intended that you represent the carrier or any manager against BLE members. Furthermore, I will again recall your attention to section 36 of the BLE constitution which reads in part:

> Should a member present a grievance to his division for adjustment, he
> shall receive every assistance from the local and general committee...

M. J. O'Bryan                          2                          3/30/03

    Finally, again referencing my letter to you of February 2001, I will demand that if you cannot comply with your duties to members individually or the division as a whole, please step aside and allow us to fill the position of Local Chairman with someone who has the guts to perform the office loyally and with respect. If you are going to accept election to the position of Local Chairman, please accept the duties that come with it. This is particularly important during this sensitive period of negotiations when members have continuously expressed doubts in the union leadership's ability to represent us. Your examples of collusion have supplied justification for such doubt and our ability to defend the threat to the service and our livelihoods has been compromised as a result. You have a choice to make; either take the union side and fulfill your obligations to the division, or resign and apply for a management position. Decide which side you are on and commit yourself to it. If you decide that you want to commit to the union side, you can begin proving such commitment by processing my time claims without consulting with Labor Relations. If you need assistance, please feel free to call me.

                                           Respectfully,

                                           Joe Carmack

Copies:  BLE-57 Members
           Mark Kenny - BLE General Chairman
           Counsel

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Susan J O'Bryan_    ☐ Agent    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

Susan J O'Bryan    4/1/03

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

1. Article Addressed to:

Mr. Michael J. O'Bryan
BLE-57
23 Stevens Rd.
Westboro, MA  01581-1429

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered    ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7001 1940 0005 7197 9938

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

| | | |
|---|---|---|
| Postage | $ | 0.37 |
| Certified Fee | | 2.30 |
| Return Receipt Fee (Endorsement Required) | | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 4.42 |

Postmark Here

UNIT ID: 0115

Clerk: KRX53

03/31/03

Sent To    Mr. Michael J. O'Bryan

Street, Apt. No.; or PO Box No.    BLE-57, 23 Stevens Rd

City, State, ZIP+4    Westboro, MA  01581-1429

7001 1940 0005 7197 9938

PS Form 3800, January 2001    See Reverse for Instructions

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T.  CARMACK,<br>       Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 29



# Brotherhood of Locomotive Engineers
## General Committee of Adjustment
### AMTRAK

Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Telephone (856) 488-7432
Fax (856) 488-7434

Mark B. Kenny
*General Chairman*

May 6, 2003

CERTIFIED MAIL #  Z 008 342 258
RETURN RECEIPT REQUESTED

Mr. J. T. Carmack
Member - Division 312
Brotherhood of Locomotive Engineers
398 Columbus Avenue # 130
Boston, MA  02116

Dear Sir and Brother:

Unfortunately, your claim against the National Railroad Passenger Corporation relative to NMB Case No. 382 was denied by the majority of SBA 928 upon execution of said decision on April 21, 2002. A copy of same is enclosed herein for your review and files. Awards of this Board are final and binding. You do, however, have the right to seek a review of the subject Award under the provisions of the Railway Labor Act, as amended, and defined in [Title 45, Chapter 8, Section 153, First(q)]. Below, please note the narrowly prescribed limits for judicial review from Section 153, First (q), <u>supra</u>, which read as follows:

"(q)...for failure of the [division] to comply with the requirements of the chapter, for failure of the order to conform, or confine itself, to matters within the scope of the [division's] jurisdiction, or for fraud or corruption by a member of the [division] making the order."

Furthermore, please understand there is a time limitation governing filing for such a review as prescribed by Section 153, First (r) <u>supra</u>, which reads, in pertinent part:

(r) All actions at law based upon the provisions of the section shall be begun within two years from the time the cause of action accrues under the award of the [division of the Adjustment] Board, and not after."



*Serving Since 1863*

Case No. 382
Page 2

Finally, if you decide to file a petition for review of the Award, Section 153, First (p) <u>supra</u>, holds, in part, that you must file in United States District Court:

"...for the district in which [you] reside[s] or in which is located the principal operating office of the carrier, or through which the carrier operates."

Brother Carmack, this letter summarizes certain important rights which you have under the Railway Labor Act in terms of the prescribed review or appeal process. On a more personal note, certainly like yourself at this point, I am more than painfully aware that this negative decision is completely contrary to our expectations in resolving this matter. Given that, I am genuinely disappointed and can fully sympathize with your disappointment and frustration in this outcome. Unfortunately, placing this case before SBA 928 for adjudication is the last and binding step of appeal in accordance with the collectively bargained disciplinary process. Consequently, you are left with little, if any, substantive avenue of recourse at this juncture.

In any event, after you have had the opportunity to review and digest the subject decision, please feel free to call so I can more fully explain your rights and clarify any questions you may have in this regard.

Fraternally yours,

Mark B. Kenny
General Chariman

MBK: sec
Enclosure (1)
cc: R. S. Prone, LC Division 312

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | |
| JOSEPH T.  CARMACK, ) | |
| Plaintiff, *pro se* ) | |
| ) | |
| v. ) | C.A. No. 05-11430-PBS |
| ) | |
| MASSACHUSETTS BAY ) | |
| TRANSPORTATION AUTHORITY ) | |
| and MASSACHUSETTS BAY ) | |
| COMMUTER RAILROAD, ) | |
| Defendants ) | |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 30

J. Carmack
Member - Div. 57
398 Columbus Ave. PMB 130
Boston, MA  02116-6008

June 25, 2003

Mr. Mark B. Kenny                                    Certified Mail
General Chairman                                     Return Receipt Requested
Brotherhood of Locomotive Engineers, GCA - Amtrak
Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002

RE: Special Board of Adjustment 928, Case No. 382

Dear Brother Kenny:

By your letter of May 6, 2003, I note that you have had higher expectations of the outcome of *our* claim before the board. I myself am not as surprised as you are nor am I as disenchanted. However, given your commitment to the principles behind *our* position before the board, I trust that you and the General Committee will stand beside me and support whatever endeavor I engage in that may effectively restore and preserve my right to perform service as Locomotive Engineer.

For my part I have never had much confidence in the board. I don't believe the Railway Labor Act was ever intended to promote the interests of rail organizations; it was designed to constrain the effectiveness of our business in the interests of the carriers and we should not use it as an excuse to limit our opportunities or avenues of recourse. It is obvious that the neutral, Martin Malin was prejudiced in favor of the carrier and his decision makes a number of dodges in order to maintain the narrow focus that the carrier boxed us into. We should always remember, that the "neutrals" selected by the NMB have their own priorities and they are not the BLE's priorities. Furthermore, union bureaucrats are not prevented from colluding with board members when attempting to cloak prejudice against the employee and it is difficult to prove such collusion when it occurs, but the courts have designed avenues to protect employees from discrimination in the representation process that go far beyond the limited scope of judicial review that you referred to in your letter. Besides, there are issues tailored to court protection expressed within the Railway Labor Act itself that you have not mentioned. These are curious omissions. However, for now, I hope to avoid this as a matter of primary concern. As yet, I am not particularly concerned about the actions and decisions made by SBA No. 928 , the First Division of the National Railroad Adjustment Board (NRAB) or the National Mediation Board (NMB). At present, I am hoping we can avoid any concern about the result of case No. 382 or any failures in the representation process. As I intend to highlight in this letter, there are many other options open to *us* in resolving this matter.

Certified Mail # 7002 2030 0007 1956 1832

Also, let me clarify that the arguments the organization made for NMB Case No. 382 were neither *my* arguments nor were they arguments made solely on *my* behalf. NMB case no. 382 was not *my* claim; it was a claim of the organization for the organization and you and Brother O'Bryan intended it as such as early as May 4, 2001. Had I not agreed to this from the outset, Brother O'Bryan would never have had anything to do with my defense. The defense was intended to protect the interests of the organization as a whole over the interests of the individual, but even this laudable priority was undermined by prejudice favoring the individual political interests of Brother Mike O'Bryan over a viable defense of the organization. I don't care to review all the particular sins of Mike O'Bryan, here. Suffice to say that I believe Brother O'Bryan has intentionally and maliciously corrupted the process and he has openly admitted to myself and indicated to others that he was actively working towards my termination from employment with Amtrak. But, Brother O'Bryan merely overreacts emotionally at times (as we all do) and he is a little misguided and ambivalent on certain matters. I could also reiterate the benefit he can be to the division should he so choose, but these are matters of concern for the division and, in the past, you have wisely stated that you prefer to leave the divisions to themselves and focus on the General Committee. This is a noble view and I support it.

Nonetheless, you did involve yourself with NMB case No. 382 at the division level. I assumed that you did so because you rightly considered the attack on me as an attack on the organization as a whole and the General Committee needed to be involved. My right to actively participate within my division in a democratic process was challenged and my livelihood was threatened and has been severely damaged by the slanders and lies of a management scab who has the unmitigated gall to consider himself a union member. In my defense against this assault, I enjoyed the unquestioning support of Brother Mike O'Bryan, General Chairman Brother Mark Kenny and the inimitable Brother Prone. What fool would dare to second guess such a trinity? I am deeply honored by this support. However, this support was tempered by prejudice designed to protect the organization against the representation failures of Brother O'Bryan and Brother Prone admitted this to me during the course of the investigation.

I am not too disappointed about this misguided sabotage of my defense. The BLE is reorganizing to protect itself from such dysfunctional implosions and that process will continue to ameliorate our inadequacies in BLE Division 57 and in the General Committee. In fact, the representation process can allow us to look at flaws of the organization and focus on how they can be corrected. And, to be honest, it is a pleasure to be among union conscious people working together in the spirit of solidarity and learning together and honestly struggling with important issues against our deficiencies and a lack of resources. Having recognized the importance of the opportunity to focus on representation problems, I never set my expectations too high. Do I need to repeat to you that I have no regrets? We may not have made all the points I wanted to make in the investigation, but there are other forums for other issues and I will continue to pursue them. If you genuinely support me, there is good reason to be optimistic. In order to

Certified Mail # 7002 2030 0007 1956 1832

alleviate some of the "disappointment and frustration" that you have experienced (which, contrary to your assertion, I don't share), perhaps you should take a broader view of the situation we are in and see if you can assist me in securing adequate remedy. Ultimately, the *carrier* is responsible for the impasse that we have suffered and I still believe that we can protect ourselves from it with other defenses.

In the meantime, I would ask you to consider the decisions of the carrier and the board as irrelevant as I do. If you take a look behind the words to search for the meaning behind Mr. Malin's decision, you will see there is more to support our favor than meets the eye at first glance. Mr. DeModena intentionally distorted the meaning of the Hamlet document and put words into my mouth. I never said I was "in control" of anything nor intended for anyone to feel threatened. Nor did I change anything "more to my liking". These were intentional distortions allowing the carrier to speak for my state of mind. It was an obvious fabrication that the Hearing Officer herself adopted when she arbitrarily claimed that I liked Hamlet better than the history plays. This was arbitrary on her part and she knew it. It was merely an excuse for her to give credibility to DeModena and Doctor Pinsky. Defense warranted a case charging discrimination, but you, O'Bryan and Prone opposed such a case. Malin sidestepped it. He made no assessment of workplace violence or a threat. He avoids the issue. He merely stated that DeModena "interpreted the packet as a threat against him" and thereby suggests that DeModena's assessment was entirely subjective and arbitrary. Malin and Gaines both based their decisions entirely on the opinion of Doctor Pinsky and accepted his opinion as beyond question in order to avoid discrimination issues raised in the evidence. DeModena asserted that I was suffering from a mental condition by implying that I think I am the devil. He specifically said that was what concerned him. Without going into the particular proofs (some of which I have previously referred you to) DeModena's distortions and the claims for my state of mind reveal discrimination on the basis of religion and disability. DePhillips made it clear that the assumption of a medical condition was what prompted him to send documents to Pinsky. Dr. Pinsky merely accepted DeModena's assertion and both the hearing officer and Malin accepted disqualification without question.

Malin's decision is a Catch-22 and it is intended as such. There is no way, without having spoken privately to the doctor that I can understand that I am sick and the doctor wouldn't talk to me nor did he have a medical basis for disqualification. Again, Malin purposely sidestepped this issue. He makes no mention of my request for my file or Pinsky's refusal. He accepts Pinsky's disqualification even though Pinsky admitted there was no medical grounds for it. Nor can I understand that the doctor can arbitrarily consider me sick without a decision from the board. Apparently, I am suffering from a medical condition without realizing it. What is the defense against that. There is none. The order was designed to sabotage defense from the outset. The only defense is to accept DeModena's assertion that I am ill and defend against the order on the basis of Rule 22 (k), but there is no compulsion to make a claim for Rule 22 (k) until I'm told by the board that I have to accept the arbitrary and capricious assertion that I am suffering from a bona fide illness.

Mark Kenny, BLE Gen. Chairman             4                          June 25, 2003

Nonetheless, the BLE was obligated to recognize and anticipate this defense that would be provided by Rule 22 (k). Rule 22 (k) clearly offers a viable defense. Rule 22 (k) reads as follows:

> A leave of absence is not required when a Passenger Engineer is unable to perform service for the Corporation due to a bona fide sickness or injury.

There was hard material evidence that the carrier considered me to be ill. I gave the organization photocopies of Rule 22 (k) and a copy of the carrier's roster listing me on a "Medical Leave of Absence". If I am on a leave of absence, I am not subject to the carrier's administrative control and I am free to address the illness independently of carrier interference. I wanted to introduce the roster and rule 22(k) as a defense and I advised O'Bryan of my intention to do so in January 2002. I presented an outline of my defense to O'Bryan but he wanted nothing to do with it. O'Bryan blocked that defense and Prone wouldn't talk to me. Prone would only speak, at length, with you and Brother O'Bryan. When I tried to call him, he said he was too busy. In any case, the organization needed to introduce Rule 22(k) and the roster, but it failed to do so.

Given the narrow scope of the charges (relating to a purported medical disqualification and a pretense of insubordination), I can't be certain that I would have ended up with a better result if I had forced a different strategy on the process that was laid before us, but there were obvious errors in the prejudicial defense designed to protect O'Bryan from political damage and legal liability. This was a risky compromise of my defense in an investigation that I should not have been forced to undergo. Besides, the organization was not communicating with me and I had no idea what strategy it was using nor was I allowed input. If there was truly basis for medical disqualification, then Rule 22(k) should have protected me against a direct order, insubordination charges and the requirement to submit to an investigation. If the carrier was still somehow determined to maneuver around these constraints, Malin, at least, would have been forced to respond to the protections.

But, we needn't concern about such failures. No need to fret. The beauty of committed union influence on government is that the Act and the collective bargaining agreement have left us the ability to continue pursuit of protections. At this point, we need to focus on protections afforded in Rules 5, 20, 21 and 22(k) of the Amtrak/BLE agreement, provisions of the BLE/MBCR agreement and the BLE constitution. Furthermore, we should keep in mind protections outlined in Amtrak policy, the Americans with Disabilities Act, US constitutional First Amendment and civil rights Title VII protections of free speech and religion. With these protections, I have devised a plan which will restore my right to perform service. The strategy has three tracks: grievance process and grievance settlement negotiations on Amtrak, grievance process and grievance settlement negotiations on MBCR and Civil rights complaints and settlement negotiations on MBCR and Amtrak. Any of these tracks might work alone, but I intend to use them in tandem. First, I will need your personal support for my right to perform service (in accordance with explanations below) and your continued support for my membership in the BLE.

Certified Mail # 7002 2030 0007 1956 1832

Mark Kenny, BLE Gen. Chairman          5                    June 25, 2003

## BLE MEMBERSHIP

In order to give me political support for membership in BLE Division 57, you may have to do so on legal and agreement grounds which allow you to disregard the negative award relative to NMB case No. 382. Legal grounds should be based primarily on but not limited to USCA 45 SS 153 (i), *Steele v. Louisville Railroad* and *Vaca v. Sipes*. NMB No. 382 was not petitioned with "full statement of the facts and all supporting data bearing upon the disputes" [USCA. 45 SS 153 (i)] nor was it petitioned "without hostile discrimination, fairly, impartially and in good faith." (*Steele v. Louisville Railroad* 323 US at 204). The facts were sabotaged and the charge and procedure were discriminatory. In addition, consider *NLRB v. Knight Morley Corp., C.A.6 1957* in that the Hearing Officer credited my "good faith belief" that O'Malley's order to me was harmful. I don't know why you didn't argue this point as I asked. It would have been better to emphasize the hearing officer's crediting my testimony than emphasizing her crediting DeModena's testimony. If you wanted to discredit DeModena, all you had to do was analyze the distortions in the Workplace Violence Report. As far as the Hearing Officer crediting my testimony, Hriczak was deceptive when he said case 328 before SBA 928 was the wrong forum for the "good faith belief" argument. What forum would be the right forum? Federal Court? The purpose of *NLRB v. Knight Morley* was to prevent that. If he meant that I was required to file complaint directly to the NMB for wrongful discharge, I will try to do that and claim date of occurrence as the date I received the board award in the mail. If the carrier successfully argues against the date of occurrence, then the General Committee will be liable. This is especially the case since I had already warned you about it. I don't understand your trepidation about using legal arguments before the board and I find it suspect. The neutral would be obligated to answer arguments based on court rulings on a board decision. *Knight Morley* is such a ruling. By the way, why did it take until May 13 for me to receive an award that was dated January 31?

The investigation record and my EEOC claim (the materials for which have been copied to you) should supply you with sufficient data to support the legal arguments I have mentioned and you can call me if you need any assistance. I need your support for membership so that I may continue to attend Division meetings, pursue grievances and claims and argue for representation. I would like a written letter of support from you so that I may argue my right to attend the July 9 division meeting in case Brother O'Bryan decides to mount a challenge.

## AMTRAK GRIEVANCE PROCESS

I need to attend a union meeting because I have outstanding time claims since May 4, 2001 which I filed religiously every week until I was accused of trespassing. With your support for the scenario described above, I can initiate new time claims and the others can be argued. It is a matter of division record that the time claims which have been previously filed have delayed argument before labor relations by mutual agreement

Certified Mail # 7002 2030 0007 1956 1832

between O'Bryan and Amtrak Labor Relations Manager Lou DePhillips. Division action can reactivate those claims. Some of these claims have already been denied, but O'Bryan has claimed that the General Committee has mutual agreement with Labor Relations Director Larry C. Hriczak for time limit extension on all claims. This is also a matter of division record. We can leave the older ones at your discretion but I would petition against it. Whatever we do, arguments will focus on Rule 22 (k). I'll send you a draft grievance and synopsis by the weekend.

At some point, we can also initiate Rule 5. My copy of the Seniority Roster lists me with a medical leave of absence and retains my 1996 engine service date. If this has changed, I have an argument to initiate grievance and/or time claim to maintain seniority. This avenue can be extended in accordance with Rule 5 in that the argument can be made that time limits are extended due to illness to whatever time which we decide. For this extension we can offer gratitude to Pinsky, Gaines and Malin at the time we decide to argue the claim. I realize the process for the measures I outline here with Amtrak are largely formalities. We know what stance Amtrak Labor Relations will take. But, these formalities do offer the opportunity to get arguments back before the board and challenge the board itself. I don't need to remind you of the importance of protecting and sustaining union members, do I? We are protecting an individual member and the organization by whatever means is available. Process and argument will also help to restore me through employment with MBCR. But, before I lay that out for you, I would like to offer you a cursory update of my EEOC claim. This also should come into play with an MBCR case.

## AMTRAK AND MY CIVIL RIGHTS CLAIMS

I took a bit of a risk when I initiated my discrimination complaint with the Massachusetts Commission Against Discrimination instead of going directly to the Equal Employment Opportunity Commission. Except for rare cases, civil rights lawyers usually consider it the kiss of death to file a Title VII complaint with a state agency. But, the EEOC scrutinizes its oversight of state decisions more closely with ADA claims and I needed to use the state agency to get the information I wanted on the Workplace Violence Report. The EEOC process would have taken much longer and I would not have gotten the information in time for the Amtrak hearing. If I leave the issue with EEOC, it could take ten years to get a decision and moving the claim to federal court is probably more advantageous. I'm not prepared to do that right now, but I will be prepared soon whether EEOC decides on the case soon or not. I expect to initiate pretrial settlement negotiations with Amtrak General Counsel soon in any case. In other words, with your support I can add the grievance track as a negotiation point and add it to my EEOC track. I need to approach Human Resources concerning workplace violence before I talk to the Law Department, though. I am hoping to get some support from you when I do this. I will update you later. Settlement talks are, of course, primarily another means of restoring me to service with seniority. In the meantime, I would like to get an affidavit from you for what you witnessed last August when Dogerty told you (referring to me) that "this guy thinks he's the Devil." I have reported the incident to EEOC and an affidavit from you would be valuable. Attached please find a copy of my letter to EEOC for guidance.

Another thing I need for my EEOC case and all my negotiations (including grievances) is information on Dr. Pinsky's authority to practice medicine and a record of complaints against him. I don't even know whether he's licensed in Pennsylvania, New Jersey or Delaware (all three perhaps?). The Pennsylvania Board is aware of a Dr. Timmy Pinsky, an Osteopath, but they need me to verify he's the Doctor I want and I will need the address of his business. Can you at least find out where he's registered? I need to file a complaint. If we could have communicated to the Licensing Board before my hearing it could have added substantial weight to my case. Can you help me, please? You know how hard I have tried to get this. The Amtrak Medical Department still won't give me any information. You are in a position to help me. Could you do that? This should be a simple phone call for you. I'm surprised if you have never checked into this. This is important information for every Amtrak Division. How do we even know he is legally qualified to practice medicine and disqualify engineers? Why hasn't this been taken care of? If we had this information, I wouldn't be in the situation I am now. However, I expect Pinsky's failure to communicate to help me get recognized by MBCR as a valid applicant.

## MY APPLICATION TO MBCR

As you are aware, Massachusetts Bay Commuter Rail has included me in the application process of their mobilization to take control of the Massachusetts commuter rail service. In addition, they included me in the bidding process which would indicate that my application was accepted. However, if O'Bryan's report to me is correct, my bid wasn't honored. O'Bryan claims that my inclusion in the process was an oversight. This may be true, or they may have wanted to protect themselves from any 13C claim I may attempt to make. Regardless of the reason, MBCR made me an offer of employment and I accepted it. They included me in the bidding process which indicates that there was nothing in the Amtrak Medical File to justify medical disqualification. With the offer of employment and my acceptance of it, my rights according to the Railway Labor Act and the BLE agreement have been engaged. In accordance with MBCR/BLE agreement, I expect MBCR to answer why my rights haven't been honored. The agreement refers to dismissed employees returning to service; it doesn't say why or how. The agreement doesn't permit MBCR to consider discipline record from Amtrak.

Why weren't my bids honored? Unless Labor Relations got involved and intercepted them, all MBCR could possibly claim is that a Workplace Violence claim was filed against me and they could only make such a claim if DeModena or O'Malley brought it up. I should have an opportunity to answer a workplace violence charge. How are they going to justify my being disqualified from service and omitted from the roster?

I have already attempted to contact Mike O'Malley and Elizabeth Bowdoin to discuss the matter. Right now, Mr. O'Malley is incommunicado because he doesn't even have an office. Ms. Bowdoin is probably too busy to answer my phone messages. I did manage to contact Labor Relations. Christa Cornelius(?) (I never could correctly

remember how to pronounce her last name; hence, I can't spell it, either) was very kind and considerate and willing to discuss the matter. But, she was too busy at the moment and it is only logical that I should approach O'Malley and Human Resources, first. I expect O'Malley will listen to me and I will attempt to get him to advocate. He has said that he didn't perceive a basis for a workplace violence claim and there is no medical disqualification on MBCR. I have stated on the MBCR medical questionnaire (which you have a copy of) that I knew of no medical conditions that would "prohibit or restrict" my ability to perform service. O'Malley has no reason to refuse to advocate for me. Unless O'Bryan interferes (I have advised him to stay out of it), Mr. O'Malley should be understanding.

If I do not succeed with O'Malley, I will approach Human Resources. If I do not succeed with Human Resources, I will approach General Manager Kevin Lydon. I fully expect to succeed before then. If we do not have any medical issues to discuss, I will have an opportunity to explain every analogous detail in the Letters from Hell satire. There is no possible way they can object to it. The good v. evil element clearly relates to the call for loyalty to the integrity of the service that I made in my letter of April 4, 2001 to O'Bryan. How can they object to me calling on engineers and mechanical employees to protect the service? The Hamlet parody within the satire predicts the implosion of Amtrak Commuter Rail and forecasts the success of MBCR by placing Lydon in the role of Fortinbras. The parody shows me as an advocate for MBCR before it even existed. Why would they want to object? How can they say that I want to cause harm to anyone? In order to do that, they have to speak for my state of mind. In order to speak for my state of mind they have to claim that I'm crazy and I think that I am Satan. If they do that, it becomes a civil rights claim. It would be discrimination on the basis of a disability. Any objection to the satire that doesn't focus on my state of mind would constitute discrimination on the basis of religion and union activities if they retaliate. Besides, the last paragraph of the April 4 letter puts me on the side of God when I call O'Bryan a false prophet claiming to be God. In either case they will be liable.

I know that you are loath to discuss civil rights issues and I appear too defensive when I bring it up. But, I wouldn't bring it up until I had no choice and there is nothing wrong with making the case to you, my division and the General Committee that I believe the BLE should advocate for civil rights whenever the issue arises. If I am fired for publicizing (exclusively within the inner workings of the BLE) the Christian principle that some conception of immorality (evil) has power over human conscience, then I am fired for promoting a religious belief. This thread of discrimination runs through my entire predicament from the point of DeModena's claim that I said *I* am in control, through Gaines's claim that I liked Hamlet better than the history plays and on to Malin's prejudicial refusal to allow my doctor's notes as evidence of harm. I would like to be able to count on the BLE's support the next time I or any other member is confronted with a civil rights issue. There is much the BLE could do to settle the discrimination issue quickly to the benefit of all, including the carrier.

As an aside, by the way, if the carrier can protest that my doctor's notes should not be admitted without cross-examination, then Malin should not have accepted Vasile's claim that I declined to submit to an examination. We had no opportunity to cross-examine Vasile and protested. When Malin accepts Vasile's letters as evidence of my declining to submit to examination but refuses to accept my doctor's testimony, isn't this a matter of the SBA 928 order failing "to conform, or confine itself, to matters within the scope of [SBA-928's]jurisdiction" and "fraud...by a member of [SBA 928] making the order"? Perhaps objection will be made that Malin is not officially a member of the first division of the NRAB but a neutral chosen by the NMB. Is that fair? Nonetheless, Hriczak was able to falsely claim that I refused to sign a waiver. Isn't that a case of fraud on the part of the carrier member of the division? Would the BLE or the General Committee support such a claim and offer assistance?

In any case, to return to the matter of negotiating with MBCR, if they do not respect my claim for a position, I will ask for a written response. They cannot make one without providing evidence of discrimination. At the very least, it will be an act of discrimination on the basis of union association and would be cause for direct and immediate appeal to the NMB. I'm hoping that the BLE will support and engage such an appeal.

Judging by the tone of your May 6 letter, direct appeals to the NMB seem unlikely. You seem demoralized and defeated. For my part, I feel fine. The board award had no effect on my digestive tract. There was nothing to it. It was all air. I was aware of a foul and pestilent odor for a moment, but that was easily dispensed with. I just opened a window. I'm a member of the BLE. Why should I be affected by such nonsense? I wondered why you would even sign it. Your accompanying letter does give rise to concern, however. Your attitude makes me wonder about the state of affairs in the general committee, the future for Amtrak and ultimately the future for MBCR.

Why are you so glum? Why are you so prepared to dismiss me? You say that you are disappointed and frustrated? How can this be? You are chairman and legal representative of the most important passenger service organization in the most advanced industrialized nation humanity has ever created. What are you concerned about? The values that you represent as chairman of our organization and the service that the brotherhood provides cannot be bound or defined by archaic legalistic formulations of the bosses, their agents or their government. We are defined and empowered to protect our industry and our livelihoods by the spirit of solidarity and an ineffable sense of truth embodied in our collective human soul: our brotherhood. When I ask you to pose legal arguments, I don't expect the General Committee to start calling up lawyers and file a claim in federal court. But we can use the traditions of genuine democracy and the rule of law as a political tool to bolster our position in the community and begin to reverse the trends in business and politics that have been undermining the effectiveness of our organizations for the past 40 years. We can't afford to go running to lawyers. We can't handle the cost. Nor can we afford the moral cost of abandoning our members. We need to learn how to build the strength of our organization on the division level and train

Mark Kenny, BLE Gen. Chairman                  10                          June 25, 2003

genuine activists to act immediately and forestall any matter that could lead to remedial action that would mire the organization in fruitless litigation. We cannot permit the carriers to take advantage of polarization within Division 57 and cause those implosions to weaken the General Committee. I'm hoping that you will see that the plan of action that I have laid out will afford an opportunity to bind the organization and strengthen it. We have an opportunity to reinforce solidarity in the organization and steel it to face the challenges ahead with Amtrak and MBCR.

The possibilities for Division 57 with MBCR offer great promise. To be honest, the excellent contract that we were awarded in April had already been won by the solidarity of the mechanical crafts before negotiations even started. Our ability to win such a contract and the inception of MBCR itself were founded on the solidarity of the mechanical crafts bound to century old political alliances within the working class communities in Boston. The aloof arrogance of BLE engineers threatened to undermine that solidarity and our alliances. Your contribution, which I recognize came with great effort, commitment and sacrifice, served primarily to hold BLE-57 together against its polarization and in support of the mechanical crafts, their solidarity and their commitment to the future of MBCR. We need to bind BLE-57 to those traditions which would likewise benefit the General Committee and contribute to the future of Amtrak. For over two years, now, Brother Kenny, I have been paying for attempting to make those connections. Obviously, some carrier managers were afraid that I might actually become successful in my endeavors. We can't allow the carriers to tear us apart. I'm doing what I can, but I need you to meet me half way. Don't dismiss me. Don't allow DePhillips and O'Bryan to have me cast aside.

I don't expect you to digest the full bounty of my ideas, but I would like for you to allow them to filter into your mind so that they may be enhanced by your perspective. Consider them and let me know what you can offer. I only have five months, but I don't intend to wait that long. If I am not qualifying with full seniority owning an MBCR position by September 1, 2003, I will be forced to take whatever action legally available that is necessary to protect the interests of Division 57. If you are genuinely as concerned as your May 6, 2003 letter would indicate, I am certain I will have no reason to be disappointed and I can be confident concerning my future as a Locomotive Engineer in Commuter Rail.

I hope to hear from you soon.

Fraternally Yours,

Joe Carmack
No Title Necessary

pc: Members

Certified Mail # 7002 2030 0007 1956 1832

MESSAGE CONFIRMATION                    JUN-25-2003 05:50PM WED

FAX NUMBER :
NAME        :

NAME/NUMBER    :    18564887434
PAGE           :    011
START TIME     :    JUN-25-2003 05:44PM WED
ELAPSED TIME   :    06'25"
MODE           :    G3 STD    ECM
RESULTS        :    [ O.K ]



**Fax Transmission**

To: MARK KENNY BLE - GCA AMIAK      From:

Date: 6/25/03                    Pages: COVER PLUS 10

Fax #: 856/488-7434              Phone #: 617/536-0772

Subject: SBA 928 Award No. 382          VOICE MAIL 617/798-6466

*    URGENT ? IT SHOULD BE.



UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH T.  CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 31

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

<u>BOSTON</u>

```
A.L. WILLIAMS     ESSH-1     MON THRU FRI    SU    410A  SO    744P      SO. HAMPTON
#559  NR          801        RELEASE         SO    1030A SU    250P
                             SH873-873-874-P503-P516-P516SH-R-SHP519-P519-P530-P530SH


G. NEWMAN         ESSH-2     MON THRU FRI    SU    420A  SO    653P      SO. HAMPTON
#189  NR          802        RELEASE         SO    809A  SU    1248P
                             DHSH873-P501-P504-R-913-916-095-096-DH775


G. RAYNOR         ESSH-3     MON THRU FRI    SU    420A  SO    347P      SO. HAMPTON
#56   BM          803        DHSH873-DHP501-P500-795-712-P511-P520-763-764-DH765


PAUL TAYLOR       ESSH-4     MON THRU FRI    SU    420A  SO    325P      SO. HAMPTON
#47   BM          804        SH801-801-PX-806-707-714-P515-P522-DH816SH


F.B. BLATCHFORD   ESSH-5     MON THRU FRI    SU    430A  SO    325P      SO. HAMPTON
#37   BDS         805        DHSH801-901(Protect 902)-904-911-912-809-816-DH816SH


W.H. MATTA        ESSH-6     MON THRU FRI    SU    430A  SO    347P      SO. HAMPTON
#645  NR          806        DHSH801-903-902-747-748-P509-P518-711-718-DH765


R.C. FOWKES       ESSH-7     MON THRU FRI    SU    505A  SO    757P      SO. HAMPTON
#190  NR          807        RELEASE         SO    935A  SU    243P
                             SH743-743-744-793-738-738SH-R-DH764-765-766-919-922-DH777


D.A. MacLEOD      ESSH-8     MON THRU FRI    SU    553A  SO    857P      SO. HAMPTON
#1012 NR          808        RELEASE         SO    821A  SU    210P
                             DH790-831-832-R-P517-P526-769-770-P531-P534-DH779


WILLIAM E. VAIL   ESSH-9     MON THRU FRI    SU    553A  SO    857P      SO. HAMPTON
#1117 NR          809        RELEASE         SO    943A  SU    255P
                             DH790-803-810-R-875-876-P525-P532-777-778-DH779


R.P. RIPLEY       ESSH-10    MON THRU FRI    SU    1240P SO    1126P     SO. HAMPTON
#1100 NR          810        SH615-615-616-879-880-921-924-825-826-826SH
```

EFFECTIVE DATE:  JULY 1, 2003          1
REVISED:         OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS


<u>BOSTON</u>


GREGORY O'BRIEN    ESSH-11    MON THRU FRI    SU    245P  SO    150A    SO. HAMPTON
#684   NR          811        SH813-813-820-925-928-781-782-P539-P540-P540SH


A.T. MANIX         ESSH-12    TUE,WED         SU    115P  SO    107A    SO. HAMPTON
#59    BM          812        SH811-811-818-P529-P536-929-932-932SH
                              THU             SU    440P  SO    140A    SO. HAMPTON
                              DHSH771-771-772-823-824-P537-P538-P538SH
                              FRI             SU    125P  SO    1151P   SO. HAMPTON
                              SH915-915-918-P521-P528-629-628-727-728-728SH
                              SAT             SU    425P  SO    239A    SO. HAMPTON
                              SH1713-1713-1714-1615-1616-P567-P566-P566SH


C.W. HOLM          ESSH-13    TUE,WED         SU    355P  SO    126A    SO. HAMPTON
#1110 NR           813        DH766-917-920-923-926-779-780-729-730-730SH
                              THU             SU    125P  SO    1151P   SO. HAMPTON
                              SH915-915-918-P521-P528-629-628-727-728-728SH
                              FRI             SU    355P  SO    119A    SO. HAMPTON
                              DH766-621-622-775-776-631-630-827-828-828SH
                              SAT             SU    320P  SO    1110P   SO. HAMPTON
                              SHP561-P561-P560-P565-P564-P564SH


B. FITZPATRICK     ESSH-14    WED,THU,FRI     SU    240A  SO    850A    SO. HAMPTON
#1199 NR           814        SH6701-6701(702,708 Equip.-Protect 700,702,
                              704,706)-708-708SH
                              SAT             SU    545A  SO    345P    SO. HAMPTON
                              SH1801-1801-PX-PX-1804-1805-PX-PX-1808-DH1008SH
                              SUN             SU    930A  SO    507P    SO. HAMPTON
                              DHSH2899-2805-PX-PX-2808-P559-P558-P558SH


D. McGONAGLE       ESSH-15    THU,FRI         SU    115P  SO    107A    SO. HAMPTON
#1167 NR           815        SH811-811-818-P529-P536-929-932-932SH
                              SAT             SU    330P  SO    1153P   SO. HAMPTON
                              DHSHP561-1811-PX-PX-1814-1815-PX-PX-1818-1818SH
                              SUN             SU    350P  SO    1220A   SO. HAMPTON
                              SH2811-2811-PX-PX-2814-2717-2718-2718SH
                              MON             SU    318P  SO    1149P   NEEDHAM FAC.
                              WALK-618-773-774-725-726-635-PX


EFFECTIVE DATE:   JULY 1, 2003        2
REVISED:          OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

<u>BOSTON</u>

| B. SCOTT<br>#1441 NR | ESSH-16<br>816 | THU,FRI,MON | SU | 355P | SO | 126A | SO. HAMPTON |
|---|---|---|---|---|---|---|---|
| | | DH766-917-920-923-926-779-780-729-730-730SH |
| | | SAT | SU | 225P | SO | 1242A | SO. HAMPTON |
| | | DHSH1035-1609-1610-P563-P562-1617-1618-1618SH |
| | | SUN | SU | 625P | SO | 146A | SO. HAMPTON |
| | | SH2715-2715-2716-2817-PX-PX-2898-2898SH |

| S.J. ANDREWS<br>#1192 NR | ESSH-17<br>817 | THU | SU | 355P | SO | 119A | SO. HAMPTON |
|---|---|---|---|---|---|---|---|
| | | DH766-621-622-775-776-631-630-827-828-828SH |
| | | FRI | SU | 440P | SO | 140A | SO. HAMPTON |
| | | DHSH771-771-772-823-824-P537-P538-P538SH |
| | | SAT | SU | 440P | SO | 1100P | SO. HAMPTON |
| | | DHSH1011-1059-1060-1041-1042-DHP564SH |
| | | SUN | SU | 445P | SO | 1107P | SO. HAMPTON |
| | | SH2011-2011-2012-2041-2042-2042SH |
| | | MON | SU | 115P | SO | 107A | SO. HAMPTON |
| | | SH811-811-818-P529-P536-929-932-932SH |

| C.L. HARRIS<br>#1104 NR | ESSH-18<br>818 | FRI | SU | 305A | SO | 205P | SO. HAMPTON |
|---|---|---|---|---|---|---|---|
| | | SH703-703-790-745-746-749-750-750SH-DHSH754-757-<br>758-759-760-760SH |
| | | SAT | SU | 600A | SO | 428P | SO. HAMPTON |
| | | DHSHP551-1703-1704-1803-PX-PX-1806-1807-PX-PX-1810-1810SH |
| | | SUN | SU | 640A | SO | 613P | SO. HAMPTON |
| | | SHP553-P553-P552-2707-2708-2809-PX-PX-2812-2812SH |
| | | MON,TUE | SU | 240A | SO | 850A | SO. HAMPTON |
| | | SH6701-6701(702,708 Equip.- Protect 700,702,<br>704,706)-708-708SH |

| D.F. McGUIRE<br>#1193 NR | ESSH-19<br>819 | SAT | SU | 550A | SO | 423P | SO. HAMPTON |
|---|---|---|---|---|---|---|---|
| | | SHP551-P551-P550-P555-P554-1709-1710-1710SH |
| | | SUN | SU | 215P | SO | 1028P | SO. HAMPTON |
| | | SH2711-2711-2712-2813-PX-PX-2816-2816SH |
| | | MON,TUE,WED | SU | 355P | SO | 119A | SO. HAMPTON |
| | | DH766-621-622-775-776-631-630-827-828-828SH |

| VACANCY | ESSH-20<br>820 | SAT | SU | 600A | SO | 413P | SO. HAMPTON |
|---|---|---|---|---|---|---|---|
| | | DHSHP551-1601-1602-1705-1706-P557-P556-DH1710SH |
| | | SUN | SU | 1205P | SO | 1100P | SO. HAMPTON |
| | | SH2807-2807-PX-PX-2810-2713-2714-P565-P564-P564SH |
| | | MON,TUE,WED | SU | 440P | SO | 140A | SO. HAMPTON |
| | | DHSH771-771-772-823-824-P537-P538-P538SH |

EFFECTIVE DATE:  JULY 1, 2003          3
REVISED:         OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

<u>BOSTON</u>

```
J.D. PATCH        ESSH-21    SAT              SU   120P  SO    1232A       SO. HAMPTON
#1187 NR          821        SHP559-P559-P558-1611-1612-1613-1614-1717-1718-DH1618SH
                             SUN              SU   450P  SO     239A       SO. HAMPTON
                             SHP563-P563-P562-P567-P566-P566SH
                             MON,TUE,WED      SU   125P  SO    1151P       SO. HAMPTON
                             SH915-915-918-P521-P528-629-628-727-728-728SH


DONALD HUGGAN     ESSH 22    SUN              SU   920A  SO     423P       SO. HAMPTON
#294  NR          822        SH2899-2899-PX-PX-2806-2709-2710-2710SH
                             MON THRU THU     SU   305A  SO     205P       SO. HAMPTON
                             SH703-703-790-745-746-749-750-750SH-DHSH754-757-
                             758-759-760-760SH
```

<u>EAST JUNCTION FACILITY</u>

```
R.J. DUGGAN       ESEJ-1     MON THRU FRI     SU   401A  SO     711P       EAST JCT FAC.
#34   BDS         823        RELEASE          SO  1000A  SU     305P       READVILLE YARD
                             PX-PX-800-P505-P510-P510X-R-817X-817-PX-PX


J.F. PORTER       ESEJ-2     MON THRU FRI     SU   430A  SO     318P       EAST JCT FAC.
#39   BDS         824        PX-PX-802-797-792-709-716-(Protect 811)-DH811


R.A. WOLSTENCROFT ESEJ-3     MON THRU FRI     SU   513A  SO     747P       EAST JCT FAC.
#36   BDS         825        RELEASE          SO   910A  SU     230P       READVILLE YARD
                             PX-PX-804-804X-R-767X-767-768-819-PX-PX


S.E. KWANSY       ESEJ-4     MON THRU FRI     SU   550A  SO     816P       EAST JCT FAC.
682   NR          826        RELEASE          SO   945A  SU     243P
                             PX-PX-(Protect 806)-PX-808-808SH-R-DH764-
                             619-620-821-PX-PX


R.A. GOMES        ESEJ-5     MON THRU FRI     SU   309P  SO     155A       EAST JCT FAC.
#32   BDS         827        DH818-737-796-627-626-927-930-829-PX-PX
```

```
EFFECTIVE DATE:  JULY 1, 2003          4
REVISED:         OCTOBER 22, 2003
```

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

## FRANKLIN

```
S.E. KELLY        ESFK-1    MON THRU FRI   SU    438A  SO    600P        FRANKLIN
#700   NR         828       RELEASE             SO   1033A  SU    400P
                            WALK-PX-702-905-906-909-910-R-799-PX-WALK
DANIEL CURRAN     ESFK-2    MON THRU FRI   SU    508A  SO    401P        FRANKLIN
#469   NR         829       WALK-PX-(Clear for 704)-706-751-752-752SH-DHSH711
                            -613-614-713

JAMES CORCORAN    ESFK-3    MON THRU FRI   SU    510A  SO    707P        FRANKLIN
#25    BDS        830       RELEASE             SO   1035A  SU    330P        READVILLE YARD
                            WALK-PX-704-607-608-608X-R-719X-719-PX WALK

SHAWN SULLIVAN    ESFK-4    MON THRU FRI   SU    528A  SO    757P        FRANKLIN
#695   NR         831       RELEASE             SO   1040A  SU    325P
                            DHPX-710-753-754-R-977-978-721(Clear for 723-Assist Making UP
                            724)-DH724

K.N. DURAND       ESFK-5    MON THRU FRI   SU    311P  SO    143A        FRANKLIN
#58    BM         832       713-794-723-724-633-632-731-PX-WALK
```

## WORCESTER FACILITY

```
W. McENERY        ESWF-1    MON THRU FRI   SU    441A  SO    721P        WORCESTER FAC.
#1017  NR         833       RELEASE             SO   1140A  SU    428P
                            PX-PX-P502-833-834-755-756-R-P523-PX-PX

W.H. NUTTER       ESWF-2    MON THRU FRI   SU    513A  SO    819P        WORCESTER FAC.
#13    BM         834       RELEASE             SO   1153A  SU    430P
                            PX-PX-P506-805-812-812SH-R-DHSH771-P527(Clear for P529)-
                            PX-PX-PX

MICHAEL O'BRYAN   ESWF-3    MON THRU FRI   SU    542A  SO    201P        WORCESTER FAC.
#12    BM         835       PX-PX-P508-611-612-P513-WALK

J. SYLVAIN        ESWF-4    MON THRU FRI   SU    612A  SO    950P        WORCESTER FAC.
#624   NR         836       RELEASE             SO    957A  SU    255P
                            PX-PX-P512-DH753-R-SH715-715-798-P533-PX-PX

G.C. DAVID        ESWF-5    MON THRU FRI   SU   1248P  SO   1053P        WORCESTER FAC.
#55    BM         837       WALK-P524-815-822-P535-PX-PX
```

EFFECTIVE DATE:  JULY 1, 2003              5
REVISED:         OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

NEEDHAM HEIGHTS FACILITY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| R.T. McGARTH<br>#697 NR | ESNF-1<br>838 | MON THRU FRI | SU | 520A | SO | 408P | | NEEDHAM FAC. |
| | | PX-600-605-606-807-814-761-762-617-WALK | | | | | | |
| DANIEL MURPHY<br>#60 BM | ESNF-2<br>839 | MON THRU FRI | SU | 558A | SO | 643P | | NEEDHAM FAC. |
| | | RELEASE | SO | 1030A | SU | 345P | | READVILLE YARD |
| | | PX-602-907-908-908X-R-623X-623-PX | | | | | | |
| D.M. REBELLO<br>#1016 NR | ESNF-3<br>840 | MON THRU FRI | SU | 644A | SO | 717P | | NEEDHAM FAC. |
| | | RELEASE | SO | 1111A | SU | 416P | | |
| | | PX-604-609-610-610SH-R-DH768-625-PX | | | | | | |
| W.F. McLAUGHLIN<br>#1195 NR | ESNF-4<br>841 | TUE THRU FRI | SU | 318P | SO | 1149P | | NEEDHAM FAC. |
| | | WALK-618-773-774-725-726-635-PX | | | | | | |
| | | SAT | SU | 225P | | 204A | | SO. HAMPTON |
| | | DHSH1035-1711-1712-1813-PX-PX-1816-1719-1798-1798SH | | | | | | |

KINGSTON FACILITY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MICHAEL SULLIVAN<br>#33 BDS | ESKF-01<br>842 | MON THRU FRI | SU | 440A | SO | 343P | | KINGSTON FAC. |
| | | PX-032-033-040-063-062-041-WALK | | | | | | |
| B.B. HELD<br>#1050 NR | ESKF-02<br>843 | MON THRU FRI | SU | 532A | SO | 658P | | KINGSTON FAC. |
| | | RELEASE | SO | 1122A | SU | 340P | | |
| | | PX-034-061-060-R-DH767-SH047-047-PX | | | | | | |
| R.S. PRONE<br>#169 NR | ESKF-03<br>844 | MON THRU FRI | SU | 625A | SO | 540P | | KINGSTON FAC. |
| | | PX-036-005-012-009-016-016SH-SH043-043-PX | | | | | | |
| A. DOHERTY<br>#609 NR | ESKF-04<br>845 | TUE THRU FRI | SU | 1245P | SO | 1055P | | KINGSTON FAC. |
| | | WALK-044-067-066-049-054-055-PX | | | | | | |
| | | SAT | SU | 815A | SO | 600P | | KINGSTON FAC. |
| | | PX-1034-1033-1036-1005-1008-1037-PX | | | | | | |
| EDWARD FRYE<br>#618 NR | ESKF-05<br>846 | THU,FRI,MON | SU | 253P | SO | 1203A | | KINGSTON FAC. |
| | | WALK-048-045-052-027-028-057-PX | | | | | | |
| | | SAT | SU | 345P | SO | 1205A | | KINGSTON FAC. |
| | | WALK-1038-1013-1014-1043-PX | | | | | | |
| | | SUN | SU | 345P | SO | 1205A | | KINGSTON FAC. |
| | | WALK-2038-2013-2014-2043-PX | | | | | | |

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

## KINGSTON FACILITY

```
G.M. RICHARDS      ESKF-06    FRI            SU   644A  SO    128P        KINGSTON FAC.
#1189 NR           847        PX-038-035-042-039-WALK
                              SAT            SU   615A  SO    435P        KINGSTON FAC.
                              PX-1032-1051-1054-1053-1056-1035-WALK
                              SUN            SU   615A  SO    435P        KINGSTON FAC.
                              PX-2032-2001-2004-2053-2056-2035-WALK
                              MON,TUE        SU   505A  SO    651P    MIDDLEBOROUGH FAC.
                              RELEASED       SO  1025A  SU    335P    READVILLE YARD
                              PX-004-P507-P514-DH753-WALK-R-021X-021-PX


WILLIAM KEMPTON    ESKF-07    SUN            SU   815A  SO    600P        KINGSTON FAC.
#14   BM           848        PX-2034-2033-2036-2005-2008-2037-PX
                              MON THRU THU   SU   644A  SO    128P        KINGSTON FAC.
                              PX-038-035-042-039-WALK
```

## MIDDLEBOROUGH FACILITY

```
MICHAEL JEFFERY    ESMF-1     MON THRU FRI   SU   430A  SO    336P  MIDDLEBOROUGH FAC.
#568  NR           849        PX-002-003-010-007-014-014SH-014X-041X-015-WALK

B. LECUYER         ESMF-2     MON THRU FRI   SU   600A  SO    740P  MIDDLEBOROUGH FAC.
#929  NR           850        RELEASE        SO   814A  SU   1250P
                              PX-006-R-065-064-023-PX

J.L. DOYLE         ESMF-3     MON THRU FRI   SU   625A  SO    820P  MIDDLEBOROUGH FAC.
#595  NR           851        RELEASE        SO   915A  SU    230P
                              PX-008-DH750SH-R-SH017-017-020-025-PX

D.R. KINNE         ESMF-4     MON THRU FRI   SU   236P  SO   1206A  MIDDLEBOROUGH FAC.
#572  NR           852        WALK-015-018-019-022-051-056-029-PX

J.D. FRY           ESMF-5     WED,THU,FRI    SU   505A  SO    651P  MIDDLEBOROUGH FAC.
#1022 NR           853        RELEASE        SO  1025A  SU    335P  READVILLE YARD
                              PX-004-P507-P514-DH753-WALK-R-021X-021-PX
                              SAT            SU   621A  SO    431P  MIDDLEBOROUGH FAC.
                              PX-1002-1001-1004-1003-1006-1007-WALK
                              SUN            SU   621A  SO    431P  MIDDLEBOROUGH FAC.
                              PX-2002-P555-P554-P554SH-DHSH2711-2007-WALK

D.A. PIERCE        ESMF-6     SAT            SU   331P  SO   1204A  MIDDLEBOROUGH FAC.
#702  NR           854        WALK-1007-1010-1011-1012-1015-PX
                              SUN            SU   331P  SO   1204A  MIDDLEBOROUGH FAC.
                              WALK-2007-2010-2059-2060-2015-PX
                              MON            SU  1245P  SO   1055P        KINGSTON FAC.
                              WALK-044-067-066-049-054-055-PX
                              TUE-WED        SU   253P  SO   1203A        KINGSTON FAC.
                              WALK-048-045-052-027-028-057-PX
```

EFFECTIVE DATE:  JULY 1, 2003              7
REVISED:         OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

<u>TERMINAL SWITCHERS</u>

B. SHAUGHNESSY    ESYR-1    MON THRU FRI      SU    600A  SO    400P        READVILLE YARD
#52    BM          855       WORKING LIMITS: SOUTHSIDE TERRITORY; NORTH STATION
                            TERMINAL AREA; FITCHBURG ROUTE MAIN LINE NORTH STATION TO
                            HILLS CROSSING, INCLUSIVE;
                            <u>USE 106-1622 ON TIME SLIP</u>

W.N. AUBUT        ESYR 2    MON THRU FRI      SU    400P  SO    359A        READVILLE YARD
#26    BDS         856       WORKING LIMITS: SOUTHSIDE TERRITORY; NORTH STATION
                            TERMINAL AREA; FITCHBURG ROUTE MAIN LINE NORTH STATION TO
                            HILLS CROSSING INCLUSIVE;
                            <u>USE 106-1622 ON TIMESLIP</u>
                            NOTE:(SU 416P  SO  359A WHEN COVERED DAILY FROM EXTRA BOARD)

<u>UTILITY WASH CREW</u>

DOUGLAS CLARKE    ESWC-1    MON THRU FRI      SU    553A  SO    500P  SO. HAMPTON
#42    BM          857       UTILITY WASH TRAIN - DH746 TO STATION REPORT TO TRAIN MASTER
                            WORK AS DIRECTED

J.A. DEYESO       ESWC-2    MON THRU FRI      SU    800P  SO    600A  SO. HAMPTON
#31    BM          868       REPORT TO SOUTH HAMPTON YARD, WORK WITH UTILITY PERSON TO
                            ASSIST IN THE MOVEMENT OF EQUIPMENT TO AND FROM SOUTH
                            HAMPTON YARD AND SOUTH STATION

EFFECTIVE DATE:   JULY 1, 2003        8
REVISED:          OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

HOUSE ENGINEERS (MUST BE QUALIFIED ON PHYSICAL CHARACTERISTICS ON ENTIRE SOUTH SIDE)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| JOHN LETOURNEAU<br>#623  NR | ESHE 1<br>858 | MON THRU FRI | SU | 730A | SO | 600P | SO. HAMPTON |
| P.W.  FINNERAL<br>#44   BM | ESHE 2<br>859 | MON THRU FRI | SU | 700A | SO | 500P | SO. HAMPTON |
| J. CONSTANTINEAU<br>#578  NR | ESHE 3<br>860 | MON THRU FRI | SU | 830A | SO | 700P | SO. HAMPTON |
| T.F. OBREMSKI<br>#53   BM | ESHE 4<br>861 | MON THRU FRI | SU | 330P | SO | 1200A | SO. HAMPTON |
| M. STORSTEEN<br>#1238 NR | ESHE 5<br>862 | MON THRU FRI | SU | 330P | SO | 1200A | SO. HAMPTON |
| VINCENT HAYHURST<br>#51   BM | ESHE 6<br>863 | TUE THRU FRI<br>SAT | SU<br>SU | 845A<br>700A | SO<br>SO | 715P<br>500P | SO. HAMPTON<br>SO. HAMPTON |
| J.L. POWELL<br>#1153 NR | ESHE 7<br>864 | FRI<br>FRI<br>SAT<br>SUN<br>MON | SU<br>SU<br>SU<br>SU<br>SU | 645A<br>1130P<br>330P<br>730A<br>845A | SO<br>SO<br>SO<br>SO<br>SO | 330P<br>730A<br>1130P<br>330P<br>715P | SO. HAMPTON<br>SO. HAMPTON<br>SO. HAMPTON<br>SO. HAMPTON<br>SO. HAMPTON |
| W.L. RINES<br>#50   BM | ESHE 8<br>865 | SUN<br>MON THRU THU | SU<br>SU | 700A<br>645A | SO<br>SO | 500P<br>530P | SO. HAMPTON<br>SO. HAMPTON |
| R.H. EVANS<br>#27   BDS | ESHE 9<br>866 | SUN THRU THU | SU | 1130P | SO | 1000A | SO. HAMPTON |
| J.J. KEATING<br>#23   BDS | ESHE 10<br>867 | SUN THRU THU | SU | 1130P | SO | 1000A | SO. HAMPTON |

EFFECTIVE DATE:   JULY 1, 2003            9
REVISED:          OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS


MUST FILL EXTRA ASSIGNMENTS


XESSH-1          SAT              SU    435A  SO    345P        SO. HAMPTON
1801             SH1799-1799-1702-P553-P552-1605-1606-1607-1608-DH1008SH


XESEJ-1          SAT              SU    518A  SO    345P        EAST JCT. FACILITY
1802             PX-PX-PX-1802-1603-1604-1707-1708-1809


XESHE-1          SAT              SU    730A  SO    330P        SO. HAMPTON
1803             HOUSE ENGINEER   USE 106-1622 ON TIME SLIP


XESEJ-2          SAT              SU    255P  SO    109A        EAST JCT. FACILITY
1804             1809-PX-PX-1812-1715-1716-1817-PX-PX-PX


XESHE-2          SAT              SU    1130P SO    730A        SO. HAMPTON
1805             HOUSE ENGINEER   USE 106-1622 ON TIME SLIP


XESSH-2          SUN              SU    700A  SO    203P        SO. HAMPTON
1806             DHSHP553-2051-2054-2003-2006-2006SH


XESYB-1          SUN              SU    900A  SO    500P        SO. HAMPTON
1807             TERMINAL SWITCHER  USE 106-1622 ON TIME SLIP
                 WORKING LIMITS: ALL SOUTHSIDE TERRITORY; NORTHSIDE
                 TERRITORY TO EXTENT OF QUALIFICATIONS


XESSH-3          SUN              SU    835A  SO    812P        SO. HAMPTON
1808             SH2799-2799-2706-P557-P556-P561-P560-P560SH


XESHE-3          SUN              SU    330P  SO    1130P       SO. HAMPTON
1809             HOUSE ENGINEER


XESSH-4          SUN              SU    750P  SO    204A        SO. HAMPTON
1810             SH2815-2815-PX-PX-2818-2719-2798-2798SH


EFFECTIVE DATE:  JULY 1, 2003              10
REVISED:         OCTOBER 22, 2003

MASSACHUSETTS BAY COMMUTER RAILROAD
M.B.T.A COMMUTER SERVICE
SOUTHSIDE PASSENGER ENGINEERS

GUARANTEED SOUTH SIDE PASSENGER ENGINEER'S EXTRA LIST
(15 POSITIONS)

  E9BSS – GUARANTEED SOUTH SIDE PASSENGER ENGINEER'S EXTRA LIST

| | | | | |
|---|---|---|---|---|
| 1. | WILLIAM CURRAN | #669 | NR | SUN |
| 2. | M.E. GRINTER | #698 | NR | SAT |
| 3. | W. NAU | #1505 | NR | FRI |
| 4. | LANDY CLARKE | #1559 | NR | WED |
| 5. | G.T. HOBSON | #1013 | NR | SUN |
| 6. | P.C. CHAPUT | #1106 | NR | SUN |
| 7. | D.S. LEEMAN | #1107 | NR | SAT |
| 8. | T.J. O'KEEFE | #1146 | NR | SAT |
| 9. | A.J. GRAY | #1184 | NR | SAT |
| 10. | R.M. BONGIORNO | #1185 | NR | SAT |
| 11. | J.H. BURKE | #1200 | NR | THU |
| 12. | J. BOGGS | #1190 | NR | TUE |
| 13. | E.D. VIERRA | #1191 | NR | MON |
| 14. | RONALD P. RING | #1561 | NR | WED |
| 15. | M. STANDBERRY | #1576 | NR | THU |

NOTE:  SERVICE FOR THE FOLLOWING HOLIDAYS WILL OPERATE ON A "SATURDAY" SCHEDULE IN ACCORDANCE WITH THE APPLICABLE TIMETABLE.  ALL CREW MEMBERS WHO HAVE A NORMAL SATURDAY ASSIGNMENT WILL WORK THAT SATURDAY ASSIGNMENT ON SAID HOLIDAYS (EVEN IF HOLIDAY FALLS ON REST DAY).  ALL OTHER ASSIGNMENTS WILL NOT WORK.

  SATURDAY HOLIDAYS:     PRESIDENTS' DAY, INDEPENDENCE DAY

NOTE:  SERVICE FOR THE FOLLOWING HOLIDAYS WILL OPERATE ON A "SUNDAY" SCHEDULE IN ACCORDANCE WITH THE APPLICABLE TIMETABLE.  ALL CREW MEMBERS WHO HAVE A NORMAL SUNDAY ASSIGNMENT WILL WORK THAT SUNDAY ASSIGNMENT ON SAID HOLIDAYS (EVEN IF HOLIDAY FALLS ON REST DAY).  ALL OTHER ASSIGNMENTS WILL NOT WORK.

  SUNDAY HOLIDAYS:     MEMORIAL DAY, LABOR DAY, THANKSGIVING DAY,
                       CHRISTMAS DAY, NEW YEAR'S DAY

REGULAR WEEKDAY SERVICE WILL OPERATE ON:

PATRIOT'S DAY, BUNKER HILL DAY, MARTIN LUTHER KING DAY, COLUMBUS DAY, VETERANS' DAY

EFFECTIVE DATE:  JULY 1, 2003          11
REVISED:         OCTOBER 22, 2003

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

_____
                                        )
JOSEPH T.  CARMACK,                     )
          Plaintiff, *pro se*           )
                                        )
v.                                      )          C.A. No. 05-11430-PBS
                                        )
MASSACHUSETTS BAY                       )
TRANSPORTATION AUTHORITY                )
and MASSACHUSETTS BAY                   )
COMMUTER RAILROAD,                      )
          Defendants                    )
_____)

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 32



# Brotherhood of Locomotive Engineers
## *General Committee of Adjustment*
### *AMTRAK*

Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Telephone (856) 488-7432
Fax (856) 488-7434

**Mark B. Kenny**
*General Chairman*

July 18, 2003

**Certified U. S. Mail - Z 008 342 266**
**Return Receipt Requested**

Mr. J. T. Carmack
No Title Necessary
398 Columbus Avenue
Boston, MA 02116-6008

**Re: SBA 928, Case No. 382**

Dear Brother Carmack:

This is to acknowledge your letter, dated June 25, 2003, received in this office via facsimile June 27, 2003, and also received by certified mail July 1, 2003.

Having reviewed the subject correspondence, while I fully respect your personal opinion right, I wanted to let you know that I am extremely disappointed by many of the assertions you make therein. Some of those being veiled, others more barefaced, and all of which are unfounded as they pertain to the representation provided you by the Brotherhood of Locomotive Engineers at the division and general committee level. Particular exception is taken to those casting unwarranted and equally wrongful aspersions at the performances of Brothers O'Bryan, Prone and former Vice President Cassidy.

Moreover, I also recently had occasion to personally listen to the recorded message left by you on or about July 1st on Brother O'Bryan's phone, wherein you state, "the treasury is mine." Word of you being escorted by MBTA Police from the property has additionally been brought to the attention of this office. Quite candidly, I find your recent behavior more bizarre and unsettling than your correspondence. Therefore, with your best interest in mind, I strongly suggest you refrain from same - if possible.



*Serving Since 1863*

Mr. J. T. Carmack
July 18, 2003
Page 2

In any event, rest assured I fully intend to give the array of issues raised in your letter the attention and consideration they properly deserve. However, the GCA office is presently engaged in preparing a full docket of submissions for SBA 928 early next month, and in contemplating the potentially litigious nature and number of arguments you cite and intimate, I trust you will understand that formalizing an appropriate reply may well take some time, research and effort. Given that, I simply wanted to timely advise that my response will be provided as soon as possible. In the interim, however, since you obviously feel strongly that you were aggrieved by the decision in SBA 928 - Case No. 382, you should clearly understand that you hold the right to inaugurate the course of appeal set forth in my May 6th letter and you should act on that right as you deem appropriate.

Fraternally,

Mark B. Kenny
General Chairman

cc:    E. W. Rodzwicz, FVP
       W. C. Walpert, GST
       R. K. Radek, Vice President
       H. A. Ross, General Counsel
       T. C. Brennan, Staff Counsel
       J. A. Cassidy, Jr., VP (Retired)
       Executive Committee, Amtrak GCA
       M. J. O'Bryan, Local Chairman, Division 57
       R. S. Prone, Local Chairman, Division 312

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | C.A. No. 05-11430-PBS |

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 33

J. Carmack
Member - Div. 57
398 Columbus Ave. PMB 130
Boston, MA  02116-6008

July 22, 2003

Mr. Mark B. Kenny                                    Certified Mail
General Chairman                                     Return Receipt Requested
Brotherhood of Locomotive Engineers, GCA - Amtrak
Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Fax:  856/488-7434

Dear Brother Kenny:

Thank you for responding to my letter of June 25. It was kind of you to respond to me personally. I understand and agree that you are occupied with matters whose import take a priority. Since I share concern that you or the General Committee may be distracted by paranoid reactions to my EEOC case, I feel it is important to make a timely response, in spite of your advice to the contrary.

I have no plans for civil action against the organization nor did I intimate such. It is instructive, however, that you would feel confident in rushing to such a conclusion without calling me. The legal action I was anticipating involved the carrier, not the organization. Also, please be reminded that it was my intention merely to posit legal arguments as political issues. I don't feel it is opportune to iterate a great deal of my perspective at this moment, but I suspect that you are unaccustomed to the type of traditional union politics that motivates me. In any case, your contact with Brother O'Bryan and your acceptance of his perspective indicates that you would not be predisposed to a fair hearing of my ideas. My phone calls to Brother O'Bryan were intended to convince him to address a division matter regarding time claims for which he is responsible. That matter can be addressed by the General Committee just as easily should it become important as an organizational matter, but, for the time being, it is best treated as a political matter for the division to handle at the grievance level. I had wanted to file time claims with a grievance I filed July 1. Enclosed is a copy of that grievance, but I believe the Division should take responsibility for it. For my part, I am confident in my political orientation towards Division 57. It is apparent, however, that Brother O'Bryan is not so confident. Why else would he be wasting time collecting evidence to prejudice your opinion against me? Perhaps, in my defense, I will simply ask you to leave division matters to the division. If you weren't so distracted by O'Bryan's squabbling and the carrier's defamation of my character, you could devote more attention to the business of the General Committee and SBA-928 without fear of potential lawsuits.

The threat of civil action is a danger to which only bureaucratic degeneration of our organization can expose us. Bureaucrats create political chasms and organizational roadblocks between the ranks of membership and the organization leadership in order to promote and protect the privileges of the few. I believe it is best to address this matter politically rather than legally. I tried to "intimate" in my June 25 letter that I didn't feel that politics warranted any advantage to civil action against the organization. I don't even think its likely against the carrier. The matter of the carrier's discrimination tactics is one which I have chosen to address as an individual and as a matter of personal and social concern for health and safety. I was hoping that I would be able to keep you up to date so that at some point I could count on a formal expression of support from the General Committee. My priority is to safeguard the service. I genuinely believe that the welfare and safety of the service is at great risk on many fronts. The service must be protected and I think the course the carriers are on will only destroy it. Only the unions, and particularly the BLE, are in any position to embark on activity that will ensure the future of rail passenger service. If service is to be protected, so must the unions be protected from carrier interference. To take action against the division or the General Committee would be counterproductive. If I was interested in civil action against the BLE, I had a strong case in October 2000 which I could have pursued. But, my concern was and is to address problems politically. My goal is to build the organization, not tear it down.

Nonetheless, I do believe I have strong legal (and political) arguments for continued membership status and the BLE is responsible for continued representation whether individuals accept my constitutional right to membership or not. I will continue to use those arguments in dealing with the carrier and I ask you to refrain from prejudging or characterizing whatever tactic I use to address my individual claims and political purposes. I do not expect you to fully understand a matter that is even difficult for the federal government, but I believe that you should at least consider that the more the carriers attempt to stigmatize me by illegally evicting me from the station or labeling my behavior as "bizarre and unsettling", the more they expose their genuine prejudice and intention to discriminate against me by violating my civil rights. Last September, you made a valiant effort to defend me against the carrier's misguided attempt to curtail my union and speech rights. Why are you changing your position, now?

I am not disappointed in the efforts to defend the organization against slander, discrimination and an attack on our freedom of association. I reiterate, now, for the third time, I have no regrets. But, I would be remiss if I were to shrink from pointing out errors. If our organization wasn't so fractured by bureaucratic maneuvering, you wouldn't be so paranoid and defensive against good faith criticism. We did the best we could and I believe you and Brother Prone were exceptional and acted out of genuine feeling and heart. Brother O'Bryan, on the other hand, was solely motivated by fear and political self-interest. As for Brother Cassidy, of whom I never even heard prior to receiving your July 18 letter, I wasn't even aware he was involved in our defense. That fact alone indicates an obvious bias against me in preparation of the case. If the brothers were so involved with my defense, why were you so afraid to talk to me? Why can't you see the glaring prejudice and discrimination in that fear? Of course, you have no answer to that question.

Mark Kenny, BLE Gen. Chairman           3                    July 22, 2003

Your resistance to my participation was orchestrated by O'Bryan in collusion with the carrier. In the interest of the General Committee, I suggest you begin to try to understand that.

I hope, after receiving this letter, you can relax and focus on the business of the General Committee and SBA-928. For my part, I am also occupied. My work life is starting to get busy with very exciting opportunities. It also looks like I will have the opportunity to complete my second degree next spring and receive a paralegal certificate. In the meantime, I will continue to work with the EEOC and address mental health issues and discrimination with the carrier. I haven't kept you up to date because I wasn't sure how interested you would be. If it becomes a burden for you to be informed, please let me know. In the meantime, I remain:

                              Fraternally,

                              Joe Carmack
                              No Title Available

pc:     R. S. Prone, Local Chairman, Division 312
        H. A. Ross, General Counsel


Suggested Distribution:

        E. W. Rodzwicz,
        W. C. Walpert
        R. K. Radek
        T. C. Brennan
        J. A. Cassidy, Jr.

Certified Mail # 7002 2030 0007 1956 1856

# MESSAGE CONFIRMATION

JUL-24-2003 05:42PM THU

FAX NUMBER :
NAME :

| | | |
|---|---|---|
| NAME/NUMBER | : | 18564887434 |
| PAGE | : | 004 |
| START TIME | : | JUL-24-2003 05:41PM THU |
| ELAPSED TIME | : | 01'44" |
| MODE | : | G3 STD . ECM |
| RESULTS | : | [ O.K ] |

---

J. Cannack
Member - Div. 57
398 Columbus Ave. PMB 130
Boston, MA 02116-6008

July 22, 2003

Mr. Mark B. Kenny                     Certified Mail
General Chairman                      Return Receipt Requested
Brotherhood of Locomotive Engineers, GCA - Amtrak
Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Fax: 856/488-7434

Dear Brother Kenny:

Thank you for responding to my letter of June 25. It was kind of you to respond to me personally. I understand and agree that you are occupied with matters whose import take a priority. Since I share concern that you or the General Committee may be distracted by paranoid reactions to my EEOC case, I feel it is important to make a timely response, in spite of your advice to the contrary.

I have no plans for civil action against the organization nor did I intimate such. It is instructive, however, that you would feel confident in rushing to such a conclusion without calling me. The legal action I was anticipating involved the carrier, not the organization. Also, please be reminded that it was my intention merely to posit legal arguments as political issues. I don't feel it is opportune to iterate a great deal of my perspective at this moment, but I suspect that you are unaccustomed to the type of traditional union politics that motivates me. In any case, your contact with Brother O'Bryan and your acceptance of his perspective indicates that you would not be predisposed to a fair hearing of my ideas. My phone calls to Brother O'Bryan were intended to convince him to address a division matter regarding time claims for which he is responsible. That matter can be addressed by the General Committee just as easily should it become important as an organizational matter, but, for the time being, it is best treated as a political matter for the division to handle at the grievance level. I had wanted to file time claims with a grievance I filed July 1. Enclosed is a copy of that grievance, but I believe the Division should take responsibility for it. For my part, I am confident in my political orientation towards Division 57. It is apparent, however, that Brother O'Bryan is not so confident. Why else would he be wasting time collecting evidence to prejudice your opinion against me? Perhaps, in my defense, I will simply ask you to leave division matters to the division. If you weren't so distracted by O'Bryan's squabbling and the carrier's defamation of my character, you could devote more attention to the business of the General Committee and SBA-928 without fear of potential lawsuits.

Certified Mail # 7002 2030 0007 1956 1856

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK,<br>   Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 34

J. Carmack
Member - Div. 57
398 Columbus Ave. PMB 130
Boston, MA  02116-6008

July 22, 2003

Brotherhood of Locomotive Engineers
General Counsel, H. A. Ross
1370 Ontario Street
Cleveland, Ohio  44113-1702

Dear General Counsel Ross,

Enclosed, please find my response to Brother Kenny's correspondence of July 18, 2003.  I am hoping this response may allay certain concerns expressed.  I am not certain matching Brother Kenny's distribution was necessary.  Please don't hesitate to copy and distribute as you deem appropriate.

Thank you for your patience and consideration regarding this matter.

Sincerely,

Joe Carmack

pc:  M. Kenny, General Chairman - Amtrak, Certified Mail #7002 2030 0007 1956 1856
     R. Prone, Local Chairman - Division 312

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOSEPH T.  CARMACK,             )
           Plaintiff, pro se    )
                                )
v.                              )           C.A. No. 05-11430-PBS
                                )
MASSACHUSETTS BAY               )
TRANSPORTATION AUTHORITY        )
and MASSACHUSETTS BAY           )
COMMUTER RAILROAD,              )
           Defendants           )
_____)
```

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 35

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Civil Action
No: 05-10185-PBS

Joseph Carmack
Plaintiff,

v.

National Mediation Board, Special Board of Adjustments No. 928,
Defendant.

## ORDER OF DISMISSAL

SARIS, D.J.

For failure of the Plaintiff to prosecute the above-entitled action, this case is hereby dismissed without prejudice unless within 30 days from the date of this order Plaintiff shows good cause as to why the action should be reopened.

By the Court,

 /s/ Robert C. Alba 
Deputy Clerk

March 12, 2007

To: All Counsel

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

_____
                                )
JOSEPH T.  CARMACK,             )
          Plaintiff, *pro se*   )
                                )
v.                              )          C.A. No. 05-11430-PBS
                                )
MASSACHUSETTS BAY               )
TRANSPORTATION AUTHORITY        )
and MASSACHUSETTS BAY           )
COMMUTER RAILROAD,              )
          Defendants            )
_____)

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 3A

**COMMUTER RAIL OPERATING AGREEMENT BETWEEN**

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY**

**AND**

**MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY, LLC**

000044

## TABLE OF CONTENTS

SECTION 1.  DEFINITIONS                                          1

SECTION 2.  GENERAL STATEMENT OF OBLIGATIONS.                    11

SECTION 3.  TERM OF AGREEMENT.                                   13

SECTION 4.  CUSTOMER SERVICES.                                   14

SECTION 5.  TRANSPORTATION SERVICES.                             14

SECTION 6.  ENGINEERING SERVICES.                                14

SECTION 7.  MECHANICAL SERVICES.                                 14

SECTION 8.  INCIDENT MANAGEMENT AND NOTIFICATIONS.               14

SECTION 9.  SERVICE PROPERTY, SERVICE EQUIPMENT, AND
            SUPPORT PROPERTY.                                    14

SECTION 10. MAINTENANCE OBLIGATIONS.                             20

SECTION 11. MANAGEMENT AND PERSONNEL.                            26

SECTION 12. HIRING OF EXISTING WORKFORCE.                        33

SECTION 13. LABOR OBLIGATIONS.                                   35

SECTION 14. SECTION 13(c) OBLIGATIONS.                           35

SECTION 15. TRAINING OF CONTRACTOR PERSONNEL.                    36

SECTION 16. NEW SERVICE.                                         38

SECTION 17. SERVICE CHANGES.                                     38

SECTION 18. FORCE ACCOUNT WORK.                                  39

SECTION 19. OTHER REQUIRED WORK.                                 42

SECTION 20. REVENUE GROWTH INCENTIVE.                            43

SECTION 21. COST OF SERVICES AND PAYMENTS.                       44

SECTION 22. PENALTIES.                                           50

SECTION 23. SPECIAL TRAINS.                                      54

SECTION 24. EXCURSION TRAINS.                                    54

i

SECTION 25.  WRECK CLEARING.                                             54

SECTION 26.  QUALITY CONTROL.                                           55

SECTION 27.  REPORTING AND RECORDKEEPING REQUIREMENTS.                  55

SECTION 28.  AUDITS AND INSPECTIONS.                                     57

SECTION 29.  INFORMATION MANAGEMENT.                                     57

SECTION 30.  DRUG AND ALCOHOL TESTING REQUIREMENTS.                     64

SECTION 31.  SYSTEM SAFETY AND SECURITY.                                64

SECTION 32.  PERFORMANCE AND PAYMENT BOND AND INSURANCE.                67

SECTION 33.  INDEMNIFICATION AND LIABILITY.                             70

SECTION 34.  RIGHT TO SUBCONTRACT.                                      71

SECTION 35.  DISPUTE RESOLUTION.                                        72

SECTION 36.  COMPLIANCE WITH LAW.                                       74

SECTION 37.  DISADVANTAGED BUSINESS ENTERPRISES.                        78

SECTION 38.  MARKETING RESPONSIBILITIES.                                80

SECTION 39.  THIRD PARTY ADVERTISING.                                   81

SECTION 40.  TERMINATION.                                               81

SECTION 41.  TRANSITION PROCESS.                                        83

SECTION 42.  FORCE MAJEURE.                                             86

SECTION 43.  REPLACEMENT SERVICES.                                      87

SECTION 44.  COORDINATION WITH OTHER RAIL CARRIERS.                     87

SECTION 45.  PICKETING.                                                 88

SECTION 46.  AMENDMENTS AND REVISED EXHIBITS.                           88

SECTION 47.  ASSIGNMENT.                                                88

SECTION 48.  SUCCESSORS AND ASSIGNS.                                    89

SECTION 49.  OTHER CONTRACTOR AND THIRD PARTY ACCESS.                   89

GSDocs-1200282-8
3/4/2003 4:07 PM

000046

SECTION 50.  NOTICE.                                        89

SECTION 51.  MISCELLANEOUS.                                 90

GSDocs-1200282-6
3/4/2003 4:07 PM

000047

# EXHIBITS

1.   Customer Service Scope of Services
2.   Transportation Scope of Services
3.   Engineering Scope of Services
4.   Mechanical Scope of Services
5.   Information Management
6.   Sample Software License Agreement
7.   Labor provisions
8.   Reports and Deliverables
9.   Direct Costs Billable to MBTA
10.  Penalties
11.  Train Arrival Times
12.  MBTA Customer Bill of Rights
13.  Service Property, Service Equipment and Support Property
14.  Service By Line
15.  Employee Timetable, Rules, etc.
16.  Service Equipment Requirements
17.  Track Outage Request Form
18.  Service Expansions
19.  Excursion Trains
20.  Sample Lease Agreement
21.  Electrical Inspection and Test Procedures
22.  Environmental Specifications
23.  Major Permits for MBTA Facilities
24.  Workmanship and Materials
25.  Car Cleanliness Matrix
26.  Service Equipment Maintenance Guidelines
27.  Layover Facility Guidelines for Facilities Equipped with
     Electrical Layover Stations
28.  Draft Attleboro Line Agreement
29.  Required Subcontract Provisions
30.  Contractor Proposal dated October 11, 2002 (two volume
     document on file with MBTA)
31.  Forms of Required Bonds
32.  Contractor Cost Proposal
33.  Right to Know Law Certification
34.  Certification of Tax Compliance
35.  Child Care and Other Certifications
36.  Contractor's Statement in Connection with M.G.L. c.7, §22C
37.  MBTA Responses to Questions Submitted by Proposers
     During Procurement
38.  Initial Inventory of Support Property and Support Inventory

-iv-

000048

This OPERATING AGREEMENT (the "Agreement") is made and entered into on February 19, 2003, by the Massachusetts Bay Transportation Authority ("MBTA"), a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts, established under the provisions of General Laws, chapter 161A, as amended, and with a principal place of business at 10 Park Plaza, Boston, Massachusetts 02116, and Massachusetts Bay Commuter Railroad Company, LLC ("Contractor"), a limited liability corporation organized and existing under the laws of Delaware (together "the Parties").

WHEREAS, the MBTA is responsible for providing public transportation services in certain areas of the Commonwealth of Massachusetts; and

WHEREAS, the MBTA has elected to provide commuter rail service through a contract with a commuter rail operator and has conducted a comprehensive, multi-phase, open, fair and competitive selection process in order to identify Contractor best able to provide the services in a capable, cost-efficient manner; and

WHEREAS, Contractor submitted a Proposal ("Contractor's Proposal") dated October 11, 2002, in response to the MBTA's Request for Proposals for Commuter Rail Services; and

WHEREAS, the MBTA has determined that Contractor is capable of performing the services described in this Agreement in a cost-effective, reliable and competent manner; and

WHEREAS, the MBTA and Contractor desire to set forth their mutual rights and obligations in connection with the provision of commuter rail service by Contractor for the MBTA in accordance with the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the terms, conditions, and mutual promises hereinafter given, the MBTA and Contractor agree as follows:

## SECTION 1. DEFINITIONS.

For purposes of this Agreement --

"AAR" means the Association of American Railroads.

"ACSES" means the Advanced Civil Speed Enforcement System.

"Actual Revenue" means all Commuter Rail Services Revenue collected, deposited in accordance with this Agreement, and reported as Commuter Rail Transit Revenue on the MBTA Statement of Revenue and Expenses Actuals in any given Agreement Year.

"A.D.A." means the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.

000049

"Agreement" means this Operating Agreement, including all Exhibits and Appendices hereto, and all amendments hereafter entered into by the Parties.

"Agreement Services" means the Engineering, Mechanical, Transportation, Dispatching, Environmental, Information Management, Administrative and Financial, and Customer Services related to and necessary for the performance of the Commuter Rail Services, including without limitation the tasks described in the Scope of Services and other Exhibits, and all other tasks, functions and responsibilities Contractor is obligated to perform under this Agreement.

"Agreement Year" means a twelve-month period commencing July 1 and ending June 30.

"Amtrak" means the National Railroad Passenger Corporation.

"Annual Fixed Price" means the amount that MBTA agrees to pay Contractor each Agreement Year for the performance of Agreement Services. The Annual Fixed Price shall not include compensation for Force Account Work, which shall be reimbursed separately according to the provisions of this Agreement.

"APTA" means the American Public Transportation Association.

"Attleboro Line" means the MBTA rail line, previously acquired by the MBTA from the trustees of the Penn Central Transportation Company, running from South Station in the City of Boston to the Massachusetts-Rhode Island state line.

"Attleboro Line Agreement" means the agreement between the MBTA and Amtrak dated _____, a draft of which is attached hereto as Exhibit 28, Draft Attleboro Line Agreement.

"CETC" means the Centralized Electrification and Traffic Control facility located at South Station in Boston, Massachusetts.

"Change of Control" means any change in the ownership of the Contractor such that any "person" or "group" not currently controlling 51% of the Contractor (each as used in Sections 13(d)(3) and 14(d)(2) of the Securities Exchange Act of 1934, as amended from time to time) either (A) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Securities Exchange Act of 1934 as amended from time to time) directly or indirectly, of voting capital stock of the Contractor (or securities convertible into or exchangeable for such voting capital stock) representing 50.1% or more of the combined voting power of all voting capital stock of the Contractor on a fully-diluted basis; or (B) otherwise has the ability, directly or indirectly to elect a majority of the Board of Directors of Contractor; or (C) any person or two or more persons acting in concert shall have acquired by contract or otherwise or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence on the management or policies of Contractor.

2

"Commencement Date" means July 1, 2003.

"Commuter Rail Employee Positions" means those positions used in the provision of MBTA commuter rail services on March 1, 2002 that were or are subject to being filled through advertisement and award in accordance with applicable collective bargaining agreements.

"Commuter Rail Management Information System" (or "CRMIS") means the integrated network comprising the Computer Network, the Computer Services, the Computer Equipment, the Software, and additional hardware and software provided by the MBTA, all as described in Section 29 herein and Exhibit 5, Information Management, and including without limitation a reliable Internet based e-mail system, wireless communications devices, end-user computers, network servers, storage devices, backup devices, cabling, routers, switches, and incidentals that function together as a platform for the Contractor's performance of the Agreement Services.

"Commuter Rail Services" means the operation of commuter rail trains.

"Commuter Rail Services Revenue" means all funds received from customers for commuter rail service, including Special Trains, whether by cash, check, credit card, debit card or otherwise.

"Computer Equipment" means the hardware, firmware, and all related devices, articles, components, peripherals, materials and incidentals that are necessary for the continuous and proper operation, management and maintenance of the CRMIS.

"Computer Network" means a system of end-user computers, network servers, a network operating system, storage devices, backup devices, peripherals, cabling, routers, switches, wireless communications devices, and incidentals that function together as a platform for operating the CRMIS.

"Computer Services" means the services necessary to develop, operate, manage and maintain a fully operational CRMIS, including without limitation the services and work outlined in Section 29 and Exhibit 5, Information Management.

"Conduct Unbecoming an Employee" means conduct by Contractor Personnel that is not consistent with the objectives and standards established in this Agreement, including without limitation the specific conduct set forth in Section 11.8 herein.

"Contractor Computer Network" means the computer network used by Contractor for the performance of services other than the Agreement Services.

"Contractor General Manager" (or "CGM") means the current occupant of the position described in Section 11.3 herein.

"Contractor Personnel" means Eligible Union Employees and Eligible Management Employees who are hired by Contractor, and all other employees, agents, or subcontractors of

000051

Contractor who are assigned to the performance of Agreement Services. As used in this Agreement, and unless otherwise noted, the term "employee(s)" means Contractor Personnel.

"Contractor's Proposal" has the meaning set forth in the recitals hereto and is incorporated herein as Exhibit 30.

"CRMF" means the MBTA's Commuter Rail Maintenance Facility located at 70 Rear Third Avenue in Somerville, Massachusetts.

"CROCC" means the Commuter Rail Operations Control Center located at 32 Cobblehill Road in Somerville, MA.

"CSXT Boston & Albany Line" means the portion of the rail line owned by CSX Transportation and located between Framingham, Massachusetts and Worcester, Massachusetts.

"Customer(s)" means a commuter rail passenger or person on, preparing to enter onto, or leaving a commuter rail train, the Service Property or the Service Equipment.

"Customer Delay" means any delay or combination of delays that result in a commuter rail train arriving or departing at any station platform after its scheduled arrival or departure time.

"Customer Services" means, without limitation: providing public information regarding schedules, routes, delays and other service disruptions, and all other aspects of Commuter Rail Services; staffing telephone and/or on-line information hotlines; responding to Customer complaints and suggestions for service improvements; all other aspects of communication with Customers; and all responsibilities necessary to assure that Customers experience efficient, high-quality, and courteous Commuter Rail Services; including without limitation all tasks and services described in the Customer Service Scope of Services, Exhibit 1.

"Data" means all records in any database, data record, or other information contained in the CRMIS or used in the performance of Agreement Services, all files generated by the Software and the Third Party Software, and any digital or hard copy reports or other outputs generated by records from any such database, or the results of queries of any such database, or the Software or Third Party Software.

"DBE" means Disadvantaged Business Enterprise, as further defined in 49 C.F.R. pt. 26.

"Delay Reports" means the reports described in the Transportation Scope of Services, Exhibit 2.

"Direct Costs" means direct expenses incurred by Contractor in providing the Agreement Services, associated employee benefits, materials, contracted services, and other costs incurred directly for the benefit of providing the Agreement Services, as more specifically described in Exhibit 9, Direct Costs Billable to the MBTA.

000052

"Director of Railroad Operations" means the current occupant of that position at the MBTA, or the occupant of such other position with the MBTA, who becomes responsible for discharging the Director of Railroad Operations' responsibility for management and oversight of the MBTA's railroad operations or his or her designee.

"Dispatching Services" means, without limitation: control of all trains, track cars and other activities controlled from the MBTA Dispatch Centers, the maintenance and publication of NORAC compatible rule books and associated employee timetables and the provisions of rules and safety supervision services for all MBTA commuter rail lines, as more specifically described in the Transportation Scope of Services, Exhibit 2.

"DOT" means the U.S. Department of Transportation.

"Electrification System" means all equipment or facilities required to provide electric traction, including but not limited to power sources and control systems.

"Eligible Management Employee" means an individual who was employed as of March 1, 2002 on the existing MBTA commuter rail services by the current MBTA commuter rail services provider in a non-represented or exempt managerial or supervisory position below the level or grade of assistant general manager/division engineer or equivalent.

"Eligible Union Employee" means an individual who occupied a position on a commuter rail seniority roster as of the Notice to Proceed Date.

"Emergency" means an event that, in the sole discretion of the MBTA, involves or exposes the MBTA, Contractor Personnel, Customers, or the general public to the risk of service disruption, personal injury, property damage, liability for regulatory noncompliance, or environmental hazard. Emergency includes, but is not limited to (1) derailment; (2) fatality or other incident at a grade crossing; (3) a Customer or employee fatality, or a serious illness or injury to one or more Customers or employees requiring admission to a hospital; (4) an evacuation of a passenger train; (5) vandalism; (6) strike or work stoppage; (7) fire; (8) oil spill or threat of release of hazardous material; or (9) severe weather conditions.

"Engineering Services" means, without limitation and as further described in the Engineering Scope of Services, Exhibit 3: inspecting, managing, repairing, replacing, maintaining and reporting on all of the MBTA's railroad infrastructure except for certain track, signal, bridge, or electrical equipment infrastructure located on or within the Attleboro Line, for which Engineering Services will be performed by Amtrak pursuant to the Attleboro Line Agreement; inspecting, repairing and maintaining track, signals, communications equipment, train control equipment and railroad bridges, except on the Attleboro Line and the CSXT Boston and Albany Line; inspecting, maintaining, repairing and managing structures, buildings, stations and platforms; operating the MBTA's fleet of non-revenue rail vehicles and railroad work equipment vehicles; conducting surveys and track design and construction inspection; maintaining freight-only track and currently unused rights of way; operating and maintaining the MBTA's fleet of non-revenue non-rail vehicles; providing information management, materials management, performance analysis and reporting; maintaining a comprehensive and up-to-date

000053

inventory control system; enforcing third-party warranties; performance of Environmental Services; and completing and undertaking Force Account Work Projects. Such in-progress Force Account Work Projects may include, without limitation: (i) various MHD bridge projects; (ii) Third Party projects involving the MBTA rights-of-way; and (iii) the Central Artery/Third Harbor Tunnel construction project interfaces with the MBTA rights-of-way.

"Engineering Services Plan" means the plan described in the Engineering Scope of Services, Exhibit 3.

"Environmental Services" means, without limitation, the operation, maintenance, and service of all Environmental Systems located throughout the Service Property; the maintenance of all environmental permits, certificates and licenses; the proper disposal of any waste or hazardous material; and all other services related to compliance with all applicable environmental laws and regulations, as further described in the Engineering Scope of Services, Exhibit 3, and Exhibits 22 and 23, Environmental Specifications and Major Permits for MBTA Facilities, respectively.

"Environmental Services Work Item" means any task included in the Engineering Scope of Services, Exhibit 3, and Exhibits 22 and 23, Environmental Specifications and Major Permits for MBTA Facilities, respectively.

"Environmental Subcontractor" means the entity providing certain environmental services as described in the Engineering Scope of Services, Exhibit 3, and Exhibit 22, Environmental Specifications.

"Environmental System" means any system or equipment on the Service Property that is operated or designed to improve environmental quality, or reduce the environmental impacts of MBTA Agreement Services, including but not limited to underground and aboveground tank systems, oil/water separator systems, catch basins, onsite subsurface disposal systems, wastewater pretreatment facilities and wastewater reuse facilities.

"EOTC" means the Massachusetts Executive Office of Transportation and Construction.

"EPA" means the U.S. Environmental Protection Agency.

"Event of Default" means the Contractor's failure to comply with any of the provisions of this Agreement, and its subsequent failure to cure such failure pursuant to the provisions of Section 40.3 of the Agreement.

"Excursion Train" means any train operated by Contractor pursuant to a lease agreement between the MBTA and Contractor.

"Force Account Work" means work that Contractor is obligated to perform as part of this Agreement, but is not included in the Annual Fixed Price, which the MBTA may direct Contractor to complete pursuant to Section 18 herein.

000054

"Force Account Work Project" means any project initiated as Force Account Work pursuant to Section 18 herein.

"FRA" means the Federal Railroad Administration.

"FTA" means the Federal Transit Administration; formerly the Urban Mass Transit Administration or UMTA.

"Good Working Condition" means safe, fully functional, and meeting or exceeding the minimum threshold for MBTA standards or other applicable regulations or standards, as detailed in this Agreement.

"Information Management Plan" means the plan referred to in Section 29 herein.

"Initial Joint Audit" means the audit of the Service Property, Service Equipment, and Support Property performed jointly by the MBTA and Contractor and required by Section 9.3 of this Agreement.

"Management Fee" means the compensation for overhead and profit that is applied to Direct Costs of Force Account Work and Service Changes.

"Material Damage" means damage, other than normal wear and tear to Service Property, Service Equipment, or Support Property, excluding Contractor-owned or leased property or equipment which, in the aggregate for any occurrence, costs more than $25,000 to repair or reconstruct or, if such damage is not repairable, the property that is damaged costs more than $25,000 to replace or reconstruct.

"MBTA" means the Massachusetts Bay Transportation Authority as described in the Recitals herein, and its agents and contractors.

"MBTA Computer Network" means the computer network and CRMIS used by MBTA in conjunction with Agreement Services as well as other MBTA services, as more fully described in Exhibit 5, Information Management.

"MBTA Dispatch Centers" means the MBTA-owned dispatching facilities and towers located at South Station in Boston, Cobblehill Road in Somerville, and Waltham, and any other permanent or temporary control stations designated from time to time by the MBTA.

"MDEP" means the Massachusetts Department of Environmental Protection.

"MDTE" means the Massachusetts Department of Telecommunications and Energy, formerly the Massachusetts Department of Public Utilities or DPU.

"Mechanical Services" means, without limitation and as further described in the Mechanical Scope of Services, Exhibit 4: inspecting, maintaining and repairing of the MBTA commuter rail fleet of passenger coaches and locomotives; maintaining, operating and repairing

000055

non-revenue rail vehicles; providing daily cleaning, inspection, fueling, servicing and repairs of revenue equipment; providing periodic overhauls, and minor upgrading work as required; enforcing Third Party warranties; operating and maintaining non-revenue vehicles; operating the rerailing crane; maintaining a comprehensive and up-to-date inventory control system; providing information management, material management, performance analysis and reporting; and completing and undertaking Force Account Work Projects, including projects in progress by the previous contractor.

"Mechanical Services Plan" means the plan described in the Mechanical Scope of Services, Exhibit 4.

"MHD" or "MassHighway" means the Massachusetts Highway Department.

"Mobilization Period" means the period beginning on the Notice to Proceed Date and ending June 30, 2003.

"Mobilization Services" means, without limitation and as more fully described in the Mobilization Services Agreement between the MBTA and Contractor, all preparation for the commencement of Agreement Services, including taking all steps necessary to establish a seamless transition; preparing all operational plans required by the MBTA; developing or procuring, and implementing the CRMIS; hiring and training Contractor Personnel; developing procedures and internal guidelines; and transitioning equipment and facilities from the previous contractor.

"Monthly Passes" means joint-use tickets honored for transportation on MBTA subways, buses, and harbor ferries as well as the MBTA commuter rail.

"New Service" means any Agreement Services resulting from incorporation of new lines or line extensions after the Commencement Date in to the Service Property by which the MBTA may direct Contractor to provide pursuant to Section 16 herein.

"NORAC" means the Northeast Operating Rules Advisory Committee.

"Notice to Proceed Date" means January 10, 2003, the date on which the MBTA issued to Contractor a Notice to Proceed regarding the performance of Mobilization Services.

"Off-Peak Commuter Periods" means those times not denoted as Peak Periods on the public timetables published by the MBTA.

"On-Time Performance" has the meaning set forth in the Transportation Scope of Services, Exhibit 2.

"Other Contractors" means any contractors hired by the MBTA other than Contractor, or Third Parties.

000056

"Other Required Work" means work related to the Agreement Services that a Third Party desires to subcontract to Contractor, and that the MBTA directs Contractor to perform pursuant to the terms of Section 19 of this Agreement.

"Option Year" means an Agreement Year after the original five-year Term of this Agreement, which the Parties may provide for pursuant to Section 3 of the Agreement.

"Peak Commuter Period" means those times denoted as Peak Periods by shading or other means in the public timetable published by the MBTA.

"Penalty Delay" means any delay or combination of delays that result in a train arriving or departing any station platform more than four minutes and fifty-nine seconds (4:59) after its scheduled time.

"Revenue Target" means the dollar figure calculated in accordance with Section 20 herein.

"Right of Way Assets" means without limitation railroad rights of way, track and structures, surface, subsurface, and aerial property (including utilities), bridges and related structures, and communication and signal systems, which may be added or deleted by the MBTA during the Term of this Agreement, owned or controlled by the MBTA and used by Contractor in providing Agreement Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Change" means an MBTA-directed modification to the then-existing Agreement Services, as detailed in Section 17, but excluding New Service, which is detailed in Section 16 of this Agreement.

"Service Delay" means any occurrence of a train arriving or departing from a station stop ten (10) or more minutes after its scheduled arrival or departure time, which shall trigger the notification procedures detailed in Section 8 of this Agreement, and the Transportation Scope of Services, Exhibit 2.

"Service Disruption" means a delay to one or more trains due to the following causes: Emergencies, wrecks, derailments, fires, fatalities, injuries, serious mechanical problems, or other disruptions that cause a significant impact on service.

"Service Equipment" means the locomotives, rail passenger cars, and non-revenue rolling stock that are owned or controlled by the MBTA and made available for use by Contractor in providing the Agreement Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Property" means the Right of Way Assets, stations and platforms, yards, buildings and offices, parking lots, and other land and facilities, including improvements thereto, that are owned, controlled, or used by the MBTA or Contractor in providing the Agreement

000057

Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Schedules" means the MBTA's schedules for the arrival and departure times of commuter rail trains, as displayed in the public timetables.

"Software" means all custom software and all Third Party Software, including without limitation source code, data files and System Documentation necessary to operate, manage, maintain and, if necessary, regenerate, the integrated CRMIS.

"Southside S&I Facility" means the MBTA's commuter rail storage, inspection and maintenance facility located at Widett Circle in South Boston, Massachusetts.

"Special Train" means a train that is not regularly scheduled and that is operated for passenger service in accordance with Section 23 herein.

"Successor Contractor" means a successor contractor to the Contractor, as more fully described in Section 41 herein.

"Support Inventory" means spare parts, consumables, shop supplies, removed and rebuilt spare parts, capital spares, manuals, forms, keys and other property and materials that may be used or consumed in the provision of the Agreement Services.

"Support Property" means equipment, tools, machines (including the CRMIS, Computer Equipment, and Software), non-revenue vehicles (including automobiles, work equipment), Computer Equipment, and other equipment and materials (including Support Inventory) related to the maintenance of the Service Equipment and Service Property or otherwise used in the provision of the Agreement Services.

"System Documentation" means user documentation and user manuals related to the CRMIS, as more fully described in Section 29.9 herein.

"Termination Date" means the date that this Agreement expires pursuant to Section 3, or is terminated pursuant to Section 40.

"Third Party" means any individual or entity other than the MBTA, Contractor or Other Contractor.

"Third Party Software" means commercial, off-the-shelf software that is part of the integrated CRMIS.

"Transition Services" means all services necessary to ensure a seamless transition between Contractor and a Successor Contractor, as more fully detailed in Section 41 of the Agreement.

· 000058

"Transportation Services" means, without limitation: staffing, management and operation of all MBTA Commuter Rail Services; train operations, train crew management, crew and equipment scheduling; maintaining and publishing all applicable rule books and employee timetables; on-board revenue collection, revenue reporting and security and revenue accounting; service monitoring; information management; performance analysis and reporting; training; enforcing Third-Party warranties; all reporting required by DOT, FRA, U.S. Coast Guard, EPA, MDEP, MDTE, APTA, FTA and other applicable laws, rules and regulations; ticket office staffing, operation and maintenance; customer service, customer information, complaint management and station information; and Dispatching Services, as more fully detailed in the Transportation Scope of Services, Exhibit 2.

## SECTION 2.  GENERAL STATEMENT OF OBLIGATIONS.

2.1    **The Agreement.**  This Operating Agreement, together with the Exhibits incorporated herein, constitutes the entire agreement between the MBTA and Contractor with respect to the subject matter hereof.  The section headings in this Agreement are for convenience and reference only, and shall not be considered in construing this Agreement.

2.2    **Conflict Among Documents.**  If there is any conflict between or among this Agreement and any of the Exhibits hereto (including Contractor's Proposal), the Agreement shall govern.  In the event that any provision of the Agreement (including the Exhibits hereto), is ambiguous, relevant portions of the MBTA's written responses to questions submitted by Proposers during the procurement process that led to the selection of Contractor as the commuter rail services contractor may (among other appropriate evidence) be used to determine the meaning of the ambiguous provisions.  Such written responses are attached hereto as Exhibit 37.

2.3    **Overall Obligations of Contractor.**  Contractor shall provide all Agreement Services in accordance with the terms and conditions of this Agreement, including without limitation the Exhibits hereto.  Where this Agreement requires transmittals, submittals, approvals, notices, or other communications to or from the MBTA, the MBTA means the Director of Railroad Operations or his or her designee.

2.4    **General Representations and Warranties of Contractor.**  Contractor hereby represents and warrants as follows:

(a)    **Corporate Organization.**  Contractor is an entity duly organized, validly existing and in good standing under the laws of Delaware, with full power and authority to carry on its businesses as now conducted and to execute and deliver this Agreement and to carry out the terms hereof.

(b)    **Authorization of Contract.**  The execution and delivery of this Agreement by Contractor and the performance by Contractor of the obligations to be performed hereunder have been duly authorized by all necessary and appropriate corporate or other action. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with, or result in a breach of, or default under, or permit acceleration of any obligation under, any of the terms, conditions, or

000059

provisions of any note, bond, mortgage, indenture, license, material contract or other material instrument or obligation (including without limitation its Certificate of Incorporation and By-laws) to which Contractor is a party, or by which it or any of its properties or assets may be bound or affected; or (ii) violate any order, writ, injunction, decree or statute, or any rule, regulation, permit, license or conditions thereto, the violation of which would have a material adverse consequence on Contractor. This Agreement is a valid and binding obligation of Contractor enforceable in accordance with its terms, subject to equitable principles and bankruptcy and other creditors' rights laws, regulations and rulings.

      (c)    **Compliance with Laws**. Neither Contractor nor, to its knowledge, any of its subcontractors, consultants, agents or suppliers has been charged with or is in material violation of any applicable federal, state and local statutory and common laws, rules, regulations, ordinances, codes and orders governing the operation of its business which have or could have a material adverse affect on the performance of Contractor's obligations hereunder or the performance of any of its subcontractors, consultants, agents or suppliers. Contractor and its subcontractors, consultants, agents and suppliers have and will maintain throughout the Term of this Agreement all necessary rights, authorizations and licenses to provide all equipment, materials and services required by this Agreement.

      (d)    **Litigation**. Contractor hereby warrants there is no action, suit, proceeding at law or in equity by any person or entity, or any arbitration or any administrative or other proceeding by or before (or, to Contractor's knowledge, any investigation by) any governmental or other instrumentality or agency, pending, or to Contractor's knowledge, threatened against or contemplated by Contractor or any of its subcontractors, consultants, agents or suppliers which has or could have a material adverse affect on the performance of Contractor's obligations hereunder or the performance of any of its subcontractors, consultants, agents or suppliers.

      (e)    **Insurance**. Section 32 hereto lists the insurance policies which Contractor shall continuously maintain without interruption and in compliance with its obligations under Section 32 hereof for the term of the Agreement.

      (f)    **Financial Statements**. Contractor has previously furnished to the MBTA its balance sheets and profit and loss statements of its parent companies for their previous two (2) fiscal years (the "Financial Statements"). The Financial Statements were prepared in accordance with generally accepted accounting principles consistently applied, are true and correct and fairly present the financial position of Contractor's parent companies as of their respective dates and the results of their operations for the periods then ended. There has been no material adverse change in the financial position or business operations of Contractor or its parent companies since the date of the Financial Statements.

      (g)    **Bonds**. Section 32 hereof lists all bonds which Contractor shall continuously maintain without interruption and in compliance with its obligations under Section 32, for the Term of this Agreement.

000060

2.5    **Governing Law**.  This Agreement, and the transactions to which it relates, will be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

## SECTION 3.  TERM OF AGREEMENT.

3.1    **Term and Option Years.**

This Agreement shall terminate five (5) years from the Commencement Date (the "Term") unless terminated sooner pursuant to the provisions hereof.  Subject to satisfactory performance by Contractor of the Agreement Services as determined by the MBTA, the MBTA may, in its sole discretion, elect to extend the Term of this Agreement for an additional five (5) Option Years, in two (2) increments, one of two years and one of three years, at the Annual Fixed Price for such additional years set forth in the following paragraph.  In the event that the MBTA decides to exercise either of the option terms, it shall provide Contractor with notice no less than six (6) months prior to the scheduled Termination Date.  The MBTA and Contractor may exercise an option term on shorter notice by their mutual consent.  The MBTA and Contractor may also mutually agree to extend the Agreement for a full five-year term from the original Termination Date (rather than the two and three year option terms described above) at the Annual Fixed Price described in Section 3.2 below.

3.2    **Annual Fixed Price for Option Years.**

If the MBTA chooses to extend the Agreement for one or more option terms, the Annual Fixed Price for the first Option Year (and any subsequent Option Years) will be based upon the Annual Fixed Price for the fifth (5th) year of the Agreement Services, increased or decreased, on a cumulative basis, by the same percentage by which the cost of labor and material, excluding fuel, as reflected in the Annual Indices of Charge-Out Prices and Wage Rates (1977=100), Table A – East, "Material prices, wage rates and supplements combined (excluding fuel)," Series RCR, included in "AAR Railroad Cost Recovery Index" and supplements thereto, issued by the Association of American Railroads, (or if such index ceases to be published, a generally recognized index which is substantially equivalent to same), has increased or decreased in the preceding calendar year.

3.3    **Extension to Avoid Service Interruption.**

In the event that the MBTA determines that a planned transition from Contractor to a subsequent commuter rail contractor threatens to interrupt the commuter rail service, the MBTA may, in its sole discretion, extend the Agreement for up to six (6) months beyond the original Termination Date or the termination date of any option period.  The MBTA shall provide Contractor with as much notice as practicable of its intention to exercise such extension, but in no event shall notify Contractor fewer than twenty (20) days prior to the Termination Date or the termination date of any option period.  If the MBTA exercises such option, Contractor shall be compensated according to the Annual Fixed Price in effect for the twelve (12) months preceding the Termination Date, increased or decreased by the index referenced in the preceding paragraph.

T90JUU

13

## SECTION 4. CUSTOMER SERVICES.

**General Responsibility**. Contractor shall perform all Customer Services provided for in this Agreement, including without limitation the Customer Services Scope of Services, Exhibit 1.

## SECTION 5. TRANSPORTATION SERVICES.

**General Responsibility**. Contractor shall perform all Transportation Services provided for in this Agreement, including without limitation the Transportation Scope of Services, Exhibit 2.

## SECTION 6. ENGINEERING SERVICES.

**General Responsibility**. Contractor shall perform all Engineering Services provided for in this Agreement, including without limitation the Engineering Scope of Services, as Exhibit 3.

## SECTION 7. MECHANICAL SERVICES.

**General Responsibility**. Contractor shall perform all Mechanical Services provided for in this Agreement, including without limitation the Mechanical Scope of Services, Exhibit 4.

## SECTION 8. INCIDENT MANAGEMENT AND NOTIFICATIONS.

In the event of an incident that results in delays or disruptions to commuter rail services, Contractor shall follow those procedures described in the Transportation Scope of Services, Exhibit 2. Responsibilities include but are not limited to notification of appropriate MBTA officials, notification to the public at stations and on-board trains, investigation of delays and disruptions, preparation of reports, and the provisions for substitute transportation, if required.

## SECTION 9. SERVICE PROPERTY, SERVICE EQUIPMENT, AND SUPPORT PROPERTY.

9.1    **Right of Access.**

(a)    The MBTA hereby grants Contractor and its employees, agents and subcontractors the right to enter upon and use the Service Property solely for the purposes of performing Contractor's obligations under this Agreement.

(b)    The MBTA shall use reasonable efforts to ensure that Other Contractors or Third Parties do not unreasonably interfere with Contractor's performance of the Agreement Services and that access by Other Contractors or Third Parties to the Service Property is limited to the degree of access granted by the MBTA or necessary for the performance of the duties of such parties.

9.2    **MBTA's Right to Inspect.** The MBTA and its agents, contractors and subcontractors shall have the right to enter upon the Service Property at any time and without

000062

notice for purposes of inspecting and examining the Service Property, the Service Equipment, or the Support Property, or otherwise monitoring compliance with the terms of this Agreement. The MBTA's representatives shall carry appropriate identification while on the Service Property. The MBTA shall also have the right to obtain any information related to the Agreement Services, or to the Service Property, Service Equipment, or Support Property promptly from any management employee of Contractor.

9.3    **Condition of Property.**  Pursuant to the schedule detailed in the Mobilization Plan provided for in the Mobilization Services Agreement, the MBTA and Contractor shall conduct an Initial Joint Audit of the Service Property, Service Equipment, and Support Property, including Support Inventory.  The purpose of such Initial Joint Audit shall be to identify and establish the condition of the Service Property, Service Equipment, and Support Property and the quantities and condition of the Support Inventory as of the date of the audit.  The MBTA shall in its sole discretion correct, remedy, acknowledge, or resolve any previously hidden defects, missing materials, damage to, or failure of the Service Property, Service Equipment, and Support Property revealed by the Initial Joint Audit so as to comply with applicable safety laws or regulations, provided however that if the results of the Initial Joint Audit determine that certain systemic conditions exist and are of a magnitude that require extraordinary maintenance or repair in order to ensure the normal operation of the Commuter Rail Services, Contractor shall propose an Extraordinary Maintenance and Repair Program to the MBTA for its review, and the Parties shall jointly determine the approach that Contractor shall take with regard to any such required maintenance and repair activities.  Contractor shall correct all other conditions in accordance with the Engineering Scope of Services, Exhibit 3, and the Mechanical Scopes of Services, Exhibit 4.  Within ninety (90) days following the completion of each Initial Joint Audit, Contractor shall submit to the MBTA a "Repair Plan," which shall detail a schedule for Contractor to conduct repairs and upgrades necessary to bring the Service Property, Service Equipment and Support Property other than property as to which the Initial Joint Audit reveals the existence of a systemic condition, up to the standards detailed in the Engineering and Mechanical Scopes of Services.  Contractor shall submit such plan to the MBTA, which shall either approve such plan or direct reasonable changes to such plan within thirty (30) days.

9.4    **Alterations or Modifications.**  Contractor shall not materially alter or modify, except in accordance with this Agreement, any of the Service Property, Service Equipment, or Support Property without the prior written approval of the MBTA.  If Contractor determines that such alteration or modification is necessary, it shall notify the MBTA in writing at least thirty (30) days prior to the date Contractor believes such work should commence, and shall proceed as directed by the MBTA, consistent with Section 31.  Each request from Contractor must describe, in detail, the reason for the proposed modification, the scope of the work, the estimated cost, the labor, materials and equipment needed, and must contain a detailed schematic of the proposed work and a project schedule identifying the start date, completion date, and significant event dates.  At the completion of the work, Contractor shall submit to the MBTA appropriate documentation, including as-built drawings and any other documentation required by law or regulations.  The MBTA or its subcontractors may remove, at the sole cost and expense of Contractor, any unauthorized alteration or modification that is not removed by Contractor within twenty-four (24) hours after notice from the MBTA.

15

000063

9.5    **Contractor's Duty of Care.**

(a)    During the Term of this Agreement, Contractor shall maintain the Service Property, Service Equipment, and Support Property in accordance with the requirements of this Agreement, the Scope of Services, applicable warranties, and applicable law. Upon the termination of this Agreement, Contractor shall deliver the Service Property, Service Equipment, and Support Property to the MBTA in a condition consistent with the maintenance standards detailed in this Agreement, and subject to the damage provisions of Section 9.6. Contractor shall reimburse the MBTA for the actual costs of any repairs to or maintenance of the Service Property, Service Equipment, or Support Property necessary to return the same to the condition, required by the standards detailed in this Agreement, excluding the replacement of obsolete Support Property or capital assets or scheduled overhauls of Service Equipment.

(b)    The MBTA shall have the right to reject any design, workmanship, or material which does not conform to accepted practice or design of the MBTA, OEM, or any vendor supplying materials or components, or to the standards as set forth in this Agreement. Any such rejection shall be corrected by Contractor to the satisfaction of the MBTA. Repeated rejections may be cause for the MBTA to order discontinuance of all or a portion of the Agreement Services, without commensurate relief from applicable penalties, pending resolution satisfactory to the MBTA. The currently accepted practice or design of Contractor, OEM, or any other vendor that, in the written opinion of the MBTA, represents a diminution of value to the user from a previous practice, or design, may be rejected by the MBTA.

(c)    Contractor shall not, without prior MBTA approval, post or affix any signs, notices, bumper stickers, advertisements or documents or materials of any kind that are not necessary for the performance of Agreement Services on the Service Property, Service Equipment or Support Property. Contractor shall not post or affix any political notices or advertisements on the Service Property, Service Equipment, or Support Property, and shall immediately remove any such notices or advertisements. Contractor shall post personal or union communications only on designated bulletin boards.

9.6    **Damage to Service Property, Service Equipment, and Support Property.**

(a)    Responsibility for Material Damage to the Service Property, Service Equipment, and Support Property shall be determined by the MBTA after joint inspection by the MBTA's Chief Mechanical Officer, Chief Engineer, or Chief Facilities Officer and the Contractor General Manager ("CGM") or his or her designee, and, at the discretion of the MBTA, representatives of Third Parties. The determination of the MBTA pursuant to the procedures set forth in the immediately preceding sentence shall be final and binding, subject to the rights of Contractor pursuant to Section 35. Material Damage that will be deemed to have been caused in whole or in part by acts or omissions of Contractor shall be repaired at the Contractor's sole expense, and shall include but not be limited to: (1) mechanical, electrical, or engineering defects not found or not corrected by Contractor during the performance of its work in accordance with the Agreement; (2) improper, inadequate, or temporary repairs, adjustments, cleaning, inspections, and renewals carried out by Contractor; or (3) unfit, inferior, un-inspected, or non-compliant material and overhaul services obtained by Contractor.

16

000064

(b)    In calculating the aggregate amount of damage from any occurrence to determine whether damage is Material Damage, the MBTA and Contractor and shall take into account damage to Service Property, Service Equipment and Support Property and other assets of the MBTA, and substitute transportation and all other costs estimated by the MBTA to be necessary or desirable in order to repair or replace property that has suffered Material Damage. Contractor shall submit to the MBTA within twenty-four (24) hours of the occurrence of any damage that Contractor believes may exceed $10,000 a preliminary report detailing the cause and extent of the damage and estimate of repair costs, and measures undertaken by Contractor to prevent future similar damage. Within thirty (30) days of the occurrence of the damage, Contractor shall submit to the MBTA a report further detailing the final estimate of costs of repair of replacement.

(c)    Material Damage to the Service Property, Service Equipment, or Support Property not caused in whole or in part by Contractor's acts or omissions shall be repaired by Contractor at the MBTA's expense and shall be treated as Force Account Work. The MBTA may, in its discretion, elect to have such work performed by Other Contractors, who may, at the MBTA's discretion, utilize any facility on the Service Property for the performance of such work. Contractor shall not charge such Other Contractor for such use of facilities. Support Property on hand at such facility and used by Other Contractors in the repair of Material Damage shall be replaced by the MBTA or Other Contractors or the appropriate adjustment shall be made to the inventory. In the event that such Force Account Work by Other Contractors affects the Contractor's performance of the Agreement Services, or its use of the Service Property, Service Equipment, or Support Property such that Contractor is unable to comply with the requirements of this Agreement, the MBTA shall waive the penalty assessable as a result of Contractor's failure to comply.

(d)    In the event the MBTA retains Other Contractors to repair Material Damage to Service Equipment, the MBTA shall cause such repairs to be completed promptly. In the event that such repairs are not completed within one (1) year of the date that Contractor notified the MBTA of the Material Damage, the MBTA may adjust the Service Requirements or direct Contractor to remove Service Equipment from storage, as more fully described in the Mechanical Scope of Services, Exhibit 4.

(e)    Contractor may inspect, at its sole discretion and cost, any repairs performed by Other Contractors. In the event that, in the opinion of Contractor, repairs by Other Contractors are not performed in accordance with the standards required of Contractor under this Agreement, Contractor shall notify the MBTA in writing. Any correction or repairs that the MBTA determines should be made by Contractor to Service Property, Service Equipment, and Support Property as a result of inadequate repairs by Other Contractors shall be performed by such Other Contractor at such Other Contractor's sole cost and expense, or performed by Contractor as Force Account Work at the MBTA's sole discretion.

(f)    Where damage to Service Property, Service Equipment, and Support Property does not constitute Material Damage, Contractor shall determine, to its best ability, the extent and cause of the damage, and provide a written report to the MBTA no later than the

17

business day following the date on which the MBTA determined that the damage does not constitute Material Damage. All damage reports filed pursuant to this paragraph must specify in detail the cause and extent of the damage and the measures taken by Contractor to prevent similar future damage. Unless otherwise directed by the MBTA, Contractor shall, within sixty (60) days following submission of a damage report, undertake repairs of the damaged Service Property, Service Equipment, or Support Property at Contractor's sole cost and expense. Contractor shall notify the MBTA upon completion of such repairs.

(g)     Contractor shall promptly repair any damage to the Service Property, Service Equipment, or Support Property caused by derailments, collisions, or Third Parties that materially affects Commuter Rail Services, without regard for cause or responsibility. Contractor shall maintain accurate cost records pertaining to these activities in the event they are eligible for any reimbursement.

(h)     The provisions of this Section do not apply to or otherwise affect the Contractor's obligation to perform routine maintenance as required by this Agreement and the Scope of Services. All costs related to such routine maintenance are included in the Annual Fixed Price.

9.7    **Support Property**.

(a)     Non-Revenue Vehicles used in the Agreement Services shall be subject to the provisions of Section 9.8 rather than this Section.

(b)     The MBTA shall provide to Contractor, on or before the Commencement Date, all existing Support Property. An initial identification of all Support Property is listed in Exhibit 13, Service Property, Service Equipment and Support Property. A complete identification of Support Property will occur at the Initial Inventory and Initial Audit. All Support Property (except for any Contractor-owned specialty equipment identified in Contractor's Proposal) whether in existence on the Commencement Date or hereafter acquired by the MBTA or Contractor, shall be the property of the MBTA. The MBTA may at its sole discretion provide additions to the Support Property during the Term of this Agreement.

(c)     **Replacement of Support Property**.

(1)     Items of Support Property with a replacement value of less than ten thousand dollars ($10,000) that for any reason become unavailable for use in the provision of Agreement Services shall be promptly replaced by Contractor, unless the same is, in the MBTA's reasonable judgment after consultation with Contractor, no longer necessary for the provision of the Agreement Services. The cost of any such replacement made pursuant to this section shall be included in the Annual Fixed Price.

(2)     If, as a result in whole or in part of Contractor's act(s) or omission(s), as determined by the MBTA, an item of Support Property with a replacement cost of ten thousand dollars ($10,000) or more is made unavailable for use in the provision of the

000066

18

Agreement Services, Contractor shall replace such item or reimburse the MBTA for the replacement cost of such item.

(3)    If an item of Support Property with a replacement cost of ten thousand dollars ($10,000) or more is made unavailable for use in the provision of the Agreement Services as a result of causes other than an act or omission on the part of Contractor, the MBTA shall promptly replace such item unless the same is, in the MBTA's reasonable judgment after consultation with Contractor, no longer necessary for the provision of the Agreement Services.

(4)    In the event that Support Property becomes unavailable, as described in paragraphs (1), (2), and (3) above, Contractor shall submit reports to the MBTA within twenty-four (24) hours of the occurrence of such unavailability.

(5)    Contractor shall only use the MBTA's re-railing crane after receiving permission from the MBTA.

9.8    **Non –Revenue Vehicles**.

(a)    **Non-Revenue Vehicles Owned by the MBTA.**

(1)    The MBTA shall provide to Contractor, on or before the Commencement Date, the MBTA-owned Non-Revenue Vehicles identified in Exhibit 13, Service Property, Service Equipment, and Support Property, for Contractor's use in performing the Agreement Services, and may, in its discretion, provide additional vehicles during the Term of this Agreement. The MBTA reserves the right to use MBTA-owned vehicles, or make them available to Other Contractors, if they are not being used for Agreement Services and such use does not interfere with the performance of Agreement Services.

(2)    The MBTA shall not be responsible for damage to MBTA-owned Non-Revenue Vehicles arising out of Contractor's operation of such vehicles, and Contractor shall reimburse the MBTA for any costs incurred by the MBTA. Contractor shall bear full responsibility for repairing or replacing such vehicles. Contractor shall exercise care to obtain the maximum useful life of each vehicle.

(3)    All costs associated with the use of MBTA-owned Non-Revenue Vehicles shall be included in the Annual Fixed Price. The MBTA will replace, at its sole cost, all vehicles listed in Exhibit 13, Service Property, Service Equipment, and Support Property and identified as "Specialized Non-Revenue Vehicles," subject to the damage provisions of Section 9.6. All other MBTA-owned Non-Revenue Vehicles shall be replaced on an as-needed basis over the Term of this Agreement, subject to MBTA approval, by vehicles to be purchased or otherwise acquired by Contractor subject to approval by the MBTA. The cost of such replacement vehicles shall be included in the Annual Fixed Price, and title to such vehicles shall remain with Contractor subject to the provisions of paragraph (5) subsection 9.8(b) below. Contractor shall return the retired vehicles to the MBTA for disposal.

000067

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT
MASSACHUSETTS BAY COMMUTER
RAILROAD COMPANY
MOTION FOR
SUMMARY JUDGMENT**

# EXHIBIT 3B

(b)   **Non-Revenue Vehicles Acquired by Contractor**.

(1)   Contractor shall lease or otherwise acquire, on or before the Commencement Date, all other Non-Revenue Vehicles that Contractor decides are required to carry out the Agreement Services, other than those provided by the MBTA as listed in Exhibit 13, Service Property, Service Equipment and Support Property. The quantity, style and use of such other Non-Revenue Vehicles shall be approved by the MBTA and consistent with standards for publicly funded vehicles.

(2)   Contractor shall be responsible for all damage to Non-Revenue Vehicles acquired under this Section or to the replacement vehicles described in paragraph 1 above, and shall maintain the necessary insurance on all such vehicles.

(3)   The cost of the lease or acquisition of the Non-Revenue Vehicles described in this Section shall be included in the Annual Fixed Price set forth in Exhibit 32 of this Agreement.

(4)   If any Non-Revenue Vehicle leased or otherwise acquired by Contractor is damaged, destroyed, or otherwise becomes unavailable for use during the Term of this Agreement, Contractor shall replace such vehicle at Contractor's sole cost, unless Contractor shall have determined in good faith, after consultation with the MBTA, that such Non-Revenue Vehicle is no longer necessary for the performance of the Agreement Services.

(5)   Any lease or other agreement entered into by Contractor to acquire Non-Revenue Vehicles shall provide that the MBTA may assume the lease or other agreement, and the MBTA may exercise any such provision of such lease or other agreement at any time. Contractor shall, at no cost to the MBTA, also transfer the title of Contractor-acquired vehicles upon direction by the MBTA. Contractor shall retain the use of all such vehicles for the Term of this Agreement.

## SECTION 10.  MAINTENANCE OBLIGATIONS.

10.1   **Maintenance Obligations.**

(a)   Contractor shall inspect, service, repair, and maintain the Service Property, Service Equipment and Support Property in accordance with this Agreement, including without limitation the Engineering Scope of Services, Exhibit 3, and the Mechanical Scope of Services, Exhibit 4, and other Exhibits. Contractor shall, at all times, keep the Services Equipment, Service Property, and Support Property in Good Working Condition.

(b)   Contractor shall (i) comply fully with the terms of any manufacturer's warranty on the Service Property, Service Equipment and Support Property and any other property used in the provision of Agreement Services; (ii) cooperate with the MBTA regarding the fulfillment of any warranty obligations; (iii) administer such warranties on behalf of the MBTA; and (iv) provide the MBTA with any information necessary to the administration of any such warranties at the Termination Date of this Agreement.

00C068

(c)    Within sixty (60) days after the Notice to Proceed Date, Contractor shall develop and submit to the MBTA for approval an Engineering Services Plan and a Mechanical Services Plan, identifying both scheduled maintenance work and maintenance projects to be undertaken by Contractor, and detailing Contractor's specific maintenance schedule for accomplishing such work and projects during the Term of this Agreement, all as identified and further described in the Engineering Scope of Services, Exhibit 3, and the Mechanical Scopes of Services, Exhibit 4.  Contractor shall update such plans on an annual basis not later than February 1 of each Agreement Year and submit to the MBTA for approval, or more frequently as required by significant changes to the plans or as required by the MBTA's Director of Railroad Operations.  Contractor shall also submit for MBTA approval plans for specific service diversions required for maintenance projects.  In addition, the MBTA may request changes to any such plans, and Contractor shall make and agree to implement such proposed changes within ten (10) days of the MBTA's request, or shall suggest, within thirty (30) days of the MBTA's request, alternatives reasonably designed to meet MBTA's needs as stated in its request.  All maintenance activities of Contractor under this Agreement shall be conducted in accordance with the plans referred to in this Section.

(d)    Contractor shall comply with all applicable federal, state, local industry and MBTA safety requirements, regulations, or guidelines relating to the maintenance of the Service Property, Service Equipment, and Support Property including but not limited to safety, environmental and other requirements, regulations, standards, or guidelines promulgated by the FRA, U.S. Coast Guard, EPA, MDEP, APTA, MDTE, FTA, or DOT.

(e)    Contractor shall operate and maintain all Environmental Systems in existence on or in the Service Property or Support Property, as detailed in the Engineering Scope of Services, Exhibit 3.

## 10.2    Materials Management Obligation.

(a)    Contractor shall acquire, store, secure, issue, account for, control and manage the disposal of Support Property and Support Inventory necessary for the provision of Agreement Services.

(b)    Contractor shall manage the purchasing of all Support Property and Support Inventory required to perform the Agreement Services, as described herein.  All Support Property and Support Inventory purchased by Contractor in order to perform the Agreement Services shall be used solely for the purpose of providing the Agreement Services.  Contractor shall not sell, loan, give away or use for purposes other than Agreement Services, Support Property and Support Inventory purchased or obtained for the Agreement Services, without the express written consent of the MBTA.  Title and ownership of such Support Property and Support Inventory shall pass to the MBTA upon purchase by Contractor except as otherwise provided in this Agreement. The Support Property and Support Inventory shall be available for inspection by the MBTA at all times.

(c)    Contractor shall develop and institute, subject to the approval of the MBTA, a materials management process that will optimize efficiency and reduce inventory cost

nn069

through forecasting of replenishment requirements as well as control of all phases of the materials handling function, and that will assure that adequate levels of critical inventory (particularly long lead-time items) are maintained throughout the Term of this Agreement. Contractor shall use the Materials MIS to monitor levels of materials and inventory.

(d) **Storage Location.** Support Inventory must remain on MBTA property unless Contractor receives MBTA approval to store such Support Inventory elsewhere.

(e) **Storage and Handling.** All Support Property and Support Inventory shall be properly handled to prevent damage. Support Property and Support Inventory shall be protected properly during storage. Due care shall be taken to protect Support Property and Support Inventory from the effects of precipitation, heat, sun, cold, damp, and other effects of time and weather. Support Property and Support Inventory shall be stored so that it does not warp, twist, or otherwise distort during storage. The MBTA may reject as non-compliant Support Inventory not stored in conformance with this Agreement. Loss of value due to improper handling or storage of Support Property or Support Inventory shall be the responsibility of Contractor, pursuant to Section 9.6 and Section 9.7.

(f) **Support Inventory Valuation.** The inventory value maintained in the Materials MIS shall be equal to the system average price based on the actual purchase price of the Support Inventory acquired for use in the Agreement Services, and shall be subject to audit and verification by the MBTA or their authorized representatives. The inventory value shall be adjusted to reflect the results of the annual physical inventory described in this Section. At no time during the Term of the Agreement shall the value of the Support Inventory fall below ninety percent (90%) of the value of the Support Inventory on the Commencement Date, unless the MBTA adjusts the inventory value to reflect inventory items that the MBTA adds, at its cost and expense, to the inventory, or removes from the inventory after removing obsolete or otherwise unused inventory items from the inventory. In the event that the MBTA adjusts the total value of the inventory as described in the preceding sentence, Contractor shall ensure that at no time during the Term of the Agreement does the value of the Support Inventory fall below ninety (90%) of the adjusted value of the Support Inventory.

(g) **Physical Inventory and Audit.** Contractor shall conduct an initial physical inventory and annual physical inventory of the Support Inventory and an initial audit and annual audit of the Support Property.

(1) No later than ten (10) days prior to the Commencement Date, the MBTA and Contractor shall complete an initial physical inventory of the Support Inventory and an initial audit of the Support Property to determine the quantities thereof. Such initial inventory and audit shall serve, among other things, as the basis for determining Contractor's compliance with the provisions of Section 41 and MBTA's compliance with the provisions of Section 41. Upon completion of such initial physical inventory and initial audit, a listing of such Support Inventory and Support Property shall be attached to this Agreement as Exhibit 38.

(2) Contractor shall conduct an annual physical inventory of all Support Inventory. The MBTA shall, with the cooperation of Contractor, conduct or cause to be conducted an annual audit of the Support Property.

22

(h)    **Obsolete, Surplus and Scrap Support Property and Support Inventory.** As part of the annual physical inventory and annual audit, and routinely in the course of performing the Agreement Services, Contractor shall identify any Support Property or Support Inventory that is to be considered obsolete, surplus or scrap, provided that the final determination of such status shall be made by the MBTA.

(1)    Obsolete material is Support Inventory that is no longer readily, economically, and commonly available to Contractor, is no longer in the catalog, is no longer a standard item supplied by an Original Equipment Manufacturer ("OEM"), or is made unnecessary by an action of the MBTA. If an item of Support Inventory is deemed obsolete by the MBTA, it may continue to be utilized until depletion, unless the item has been determined to be inappropriate due to safety or other failure considerations. Obsolete material shall be disposed of after approval is obtained from the MBTA.

(2)    Surplus material is Support Inventory for which the annual turnover is less than 0.20 for the past three (3) years, and for which there is more than a five (5) year supply. The inventory in excess of the five (5) year supply may be disposed of with the prior written approval of the MBTA.

(3)    Scrap material is an item of Support Property or Support Inventory where the actual cost to repair or repair-and-return may exceed the economic cost to replace. In such cases, Contractor may scrap the item of Support Property or Support Inventory if Contractor replaces it with a new or completely remanufactured item. Contractor may also scrap-and-replace such units of Support Property and Support Inventory where and when it realizes operating economies from standardized configurations with the prior written approval of the MBTA. For such standardization, Contractor shall use only new or completely remanufactured items.

(4)    Contractor shall, at least annually, dispose of any Support Property and Support Inventory identified as obsolete, surplus, or scrap. Disposal of non-capitalized units of property shall be accomplished through sale by competitive bidding. Capitalized units of property must be disposed of in accordance with instructions from the MBTA. Capitalized units of property include capital spares included with a Service Equipment purchase. Disposal of any obsolete, surplus or scrap Support Property and Support Inventory shall be on a first-in, first-out (FIFO) basis. All Support Property and Support Inventory retained shall be the most recently acquired.

(5)    The proceeds of sales of obsolete, surplus, or scrap Support Property and Support Inventory shall be deposited into an escrow account to be maintained by Contractor and, at the direction of the MBTA, either be remitted to the MBTA or used by Contractor to acquire other Support Property or Support Inventory to be utilized in providing the Agreement Services. Should the disposal include sale to a division, joint partner, or subsidiary of Contractor, the price paid shall be the book value of the material disposed of unless a higher price is received. Contractor shall submit a monthly report detailing all transactions to or from the escrow account. The cost of selling or otherwise disposing of such items shall be included in the Annual Fixed Price for the Agreement Services set forth in Section 21. Contractor shall also

23

credit to the escrow account the amount of any and all proceeds from the routine sale of used inventory items.

(i)    **Inventory Maintenance Plan.** Within sixty (60) days after the Notice to Proceed Date, Contractor shall develop an Inventory Maintenance Plan. The plan should detail the amount of inventory required to maintain the Service Equipment and Service Property. The plan is subject to approval by the MBTA. Such plan shall be updated annually and submitted to the MBTA as part of the corresponding Mechanical Services Plan and Engineering Services Plan.

(j)    **Minimum and Maximum Levels.** Contractor shall determine, subject to MBTA approval, the minimum and maximum levels of each item of Support Inventory to be maintained. The MBTA may, in its sole discretion after consulting with Contractor, direct Contractor to adjust minimum and maximum line item inventory levels.

(k)    **Stocking Levels.** Contractor shall at all times maintain actual levels of Support Inventory that exceeds the MBTA-approved minimum inventory levels. In the event that the MBTA determines that actual Support Inventory levels fall below such MBTA-approved minimum levels, and Contractor fails to correct such deficiency within thirty (30) days of receiving written notice of the deficiency from the MBTA, the MBTA may deduct from Contractor's next monthly payment the cost of acquiring the amount of Support Inventory necessary to bring the actual Support Inventory level up to the MBTA-approved minimum inventory level. Contractor shall not deplete existing stocks to generate working capital for Contractor's benefit. Consumption of existing stocks that results in replacement with consignment material is not permitted without prior written approval from the MBTA.

(l)    **Quality of Materials.** Support Inventory material and services shall be selected to achieve or exceed performance requirements of the Agreement. Services include repairing and overhauling components. All Support Inventory materials to be used in the Agreement Services shall be first quality products and shall conform to OEM specifications. If OEM specifications are not available, then other appropriate specifications or standards (such as AAR, AISI, Aluminum Association, ASTM, AWI, NEC, NFPA, SAE, ASME, or others) should be utilized, unless otherwise specified by the MBTA. Contractor shall not acquire or use materials that would result in a reduction in durability, reliability, safety, regulatory compliance, or operating economy relative to the Service Equipment or Service Property original design or as modified through upgrades or improvements.

(1)    Contractor shall acquire Support Inventory that is identical to and interchangeable with parts, material, circuits, logic, ergonomics and dimensions on the existing MBTA Service Equipment and Service Property. Unless otherwise specified in this Agreement, the requirement for interchangeability shall apply to material used for repairs, maintenance, and replacements. Interchangeability shall be defined by form, fit, and function. The cost, durability, delivery time and appearance are an integral part of function.

(2)    Contractor may recommend substitutions in or changes to configurations of material and spares, however such substitutions or changes shall not lessen the reliability, appearance, availability, operating economy, compliance, or safety of the Service

000072

Equipment or Service Property. Should the MBTA provide approval for such substitution or change, Contractor shall acquire sufficient spare materials for such substitution or change.

       (3)    Contractor shall not remove re-buildable components and replace them with earlier, superseded, obsolete, or discontinued models taken from other sources of Service Equipment, Service Property or supplier inventories. Contractor shall pay particular care that its subcontractors and suppliers of UTEX, repair-and-return, and overhauled components, do not substitute such models of lesser value. Service Equipment that has such substitutions incorporated shall be deemed as placed on Long-Term Hold until the correct component is installed. Provisions regarding Long Term Holds are included in the Mechanical Scope of Services.

       (4)    All Support Inventory purchased for the Agreement Services shall comply with all local, state, and federal regulations.

       (m)    **Materials MIS.** Contractor shall use the Materials MIS to monitor materials management activities. These activities shall include, but not be limited to, maintaining an inventory of all existing materials and parts; optimizing stocking of materials and parts; calculating the costs of materials and parts used for work orders; controlling the ordering of materials and parts; and tracking specific materials, including materials for Force Account Work Projects, serialized components, budgets and project costs as detailed in Section 29.

       The system shall be fully operational and up-to-date within ninety (90) calendar days before the Commencement Date. Contractor also shall ensure that existing MBTA materials management data is loaded into the Materials MIS prior to the Commencement Date.

       Contractor shall separately identify and track materials used for Force Account Work Projects in the Materials MIS.

       (n)    **Failure to Maintain Adequate Levels.** In the event that Contractor fails to perform the necessary maintenance on the Service Property or Service Equipment within the allocated maintenance schedule due to Contractor's failure to maintain an adequate level of inventory, Contractor shall be held liable for the costs associated with such failure to perform such maintenance, including all applicable penalties. Such penalties may include, but not be limited to, Penalties for Late or Cancelled Trains, Penalties for Speed Restrictions, and Penalties for Unavailable Equipment, as detailed in Section 22.

10.3   **Fuel Purchasing.**

       (a)    **Bulk Locomotive Fuel.** The MBTA shall select a locomotive fuel vendor(s) and pay for bulk locomotive fuel that is (i) delivered to the fuel storage tanks located at the Southside S&I Facility and the CRMF and (ii) used in Commuter Rail Services. Contractor shall order and arrange for the delivery of such fuel from the MBTA-approved vendors. Contractor shall monitor, manage and maintain sufficient levels of such fuel, and monitor the quality of the fuel in the storage tanks by performing a chemical analysis thereof. Contractor shall replace at its sole cost any such fuel that is degraded as a result of the Contractor's own conduct or omission(s).

nncn73

(b)    **Other Fuel.** Contractor shall provide or secure, at its own cost and expense, all fuel used by Contractor, including locomotive fuel delivered to outlying points, in the performance of Agreement Services other than fuel dispensed from the storage tanks described in Section 10.3.1 above. All such fuel shall meet or exceed the fuel specifications of the original manufacturers of the equipment.

(c)    **Locomotive Fuel Usage.** Contractor shall provide to the MBTA monthly reports showing fuel usage by locomotive by date, time of day, fueling location, and amount, and a monthly report of fuel purchases by Contractor.

10.4    **Massachusetts Sales Tax.** The MBTA and Contractor agree that, pursuant to M.G.L. c. 64H(tt)(E), Contractor is exempt from Massachusetts Sales Tax on property it purchases that is required to perform Agreement Services. In the event of a change in state law or any other duly authorized legislative, judicial, or regulatory determination that Contractor is required to pay sales tax on such property, the Parties shall enter into a Service Change that compensates Contractor for its increased costs resulting from such determination. The Parties agree that, consistent with M.G.L. c. 64H(tt)(E), Contractor is not entitled to a sales tax exemption on the purchase of any property used to administer, oversee, supply, maintain, or control any of Contractor's own offices, facilities, workshops, vehicles, equipment or business operations. Contractor is responsible for maintaining all appropriate and required records related to the purchase of property required to perform the Agreement Services and for compliance with all applicable tax laws.

## SECTION 11. MANAGEMENT AND PERSONNEL.

11.1    **In General.** Contractor shall be solely responsible for the management of Contractor Personnel, subject to the terms of this Agreement. In the performance of its obligations under this Agreement, Contractor is an independent contractor for, and not an agent of, the MBTA.

11.2    **Meetings with Contractor's Corporate Officers.** Any Contractor corporate officer shall meet with the MBTA's Director of Railroad Operations or any member of the MBTA senior management within ten (10) days of the MBTA's reasonable request.

11.3    **Contractor General Manager.**

(a)    Contractor shall, subject to the prior approval of the MBTA, designate a Contractor General Manager ("CGM") who shall be resident in the Boston metropolitan area, and who shall have professional experience commensurate with the scope of the Agreement Services. Contractor agrees that it will delegate to the CGM sufficient authority to make immediate decisions as necessary to maintain the safe and efficient daily performance of Agreement Services. Contractor further agrees that the CGM shall be assigned exclusively to perform the Agreement Services and shall not perform functions in connection with any other Contractor service or contract. The CGM shall have authority to enter into agreements with the

000074

MBTA for Force Account Work Projects with a value up to $1 million per project, and have authority to approve purchases of up to $1 million within five (5) days. For Force Account Work or purchases in excess of $1 million, Contractor shall obtain the required corporate approval within ten (10) days of the MBTA's request for such approval.

(b)     The CGM shall, among other duties, (1) have principal responsibility for directing and coordinating Contractor's performance of its obligations under this Agreement; (2) serve as Contractor's principal liaison with the MBTA; (3) attend any meeting (including without limitation public meetings) with the MBTA's Director of Railroad Operations or other senior staff, as requested by the MBTA; and (4) be available at such other times as the MBTA may direct, to consult with representatives of the MBTA.

(c)     In the CGM's absence, Contractor will designate an Acting CGM who shall have full authority to discharge the responsibilities of the CGM. Contractor shall fill any vacancy or absence in the CGM's position on an interim basis within three (3) business days of the day on which such absence or vacancy began. In the event of an absence by the CGM in excess of thirty (30) calendar days, the Contractor will submit the name of the Acting CGM within two (2) business days of the date on which the initial absence or vacancy occurs to the MBTA for approval. A vacancy in the CGM position will be filled on a permanent basis, by an individual approved by the MBTA, within sixty (60) calendar days of the date on which the initial absence or vacancy occurs, unless such time period for approval is extended by the MBTA.

11.4    **Management Personnel.**

(a)     In order to perform the Agreement Services, Contractor shall provide senior managers reporting directly to the CGM, who shall be resident in the Boston metropolitan area, and who shall each be responsible for one of the following functions: (1) management of transportation; (2) management of equipment maintenance; (3) management of engineering services ("Contractor's Chief Engineer"); (4) management of finance, accounting, and administration; (5) management of customer service. Contractor shall also designate managers, who shall be resident in the Boston metropolitan area, and who shall report directly to the CGM, who shall be responsible for one or more of the following functions; (6) safety and training management; (7) management of compliance with the Americans with Disabilities Act of 1990; (8) environmental compliance management; (9) management of organizational diversity; (10) management of all warranty compliance; (11) management of quality control; and (12) management of labor relations. Contractor shall submit to the MBTA for approval the names of the individuals it proposes to discharge the functions described above at least thirty (30) days before each individual is to assume responsibility for such functions. An organizational chart of management personnel shall be submitted within sixty (60) days of the Notice to Proceed Date to the MBTA for approval.

(b)     Contractor shall, as stated in Section 11.4(a) above, designate a Customer Service Manager, who shall be resident in the Boston metropolitan area. The Customer Service Manager shall be responsible for oversight of the Contractor's customer service and public information efforts in conducting Agreement Services, as detailed in the Customer Service Scope

000075

of Services, Exhibit 1. The Customer Service Manager shall have sufficient authority and sufficient resources to promptly investigate and resolve customer complaints. The Customer Service Manager shall maintain frequent contact and coordinate efforts with MBTA Railroad Operations and the MBTA's customer service departments. The Customer Service Manager shall be assigned exclusively to address customer service issues.

(c)    The individual occupying each of the positions in Section 11.4(a) above shall have professional experience commensurate with his or her job responsibilities and the scope of Agreement Services.

(d)    Each manager referred to herein shall attend all meetings, including public meetings, requested by the MBTA.

11.5    **Changes in Management Personnel.**

(a)    Contractor and the MBTA agree that the stability of the management team responsible for the performance of Agreement Services is a critical element in successful contract performance. To achieve that objective, Contractor agrees that it will not transfer the CGM or any other manager listed in Section 11.4 for two years after the Notice to Proceed Date, or the date of the MBTA's approval of such manager, whichever is later except (1) as required by any provision of this Agreement, after providing notice to the MBTA, (2) in the event that Contractor terminates such manager for cause, in which case Contractor shall promptly provide notice to the MBTA, or (3) with the prior written consent or at the request of the MBTA.

(b)    Contractor shall submit to the MBTA for approval the names of the individuals it proposes to fill any vacancy in a management position listed in Section 11.4 above at least one day before the individual is to assume interim responsibility for such function or functions, and at least thirty (30) days before the individual is to assume permanent responsibility for such function or functions. In the event an absence or vacancy in any such position occurs, Contractor shall fill such vacancy on an interim basis within three (3) business days of the date on which the absence or vacancy began, and on a permanent basis within sixty (60) calendar days unless the MBTA approves in writing an extension of such time.

(c)    The MBTA reserves the right at any time and in the MBTA's sole discretion to direct that the CGM or the managers listed in Section 11.4 be removed from the performance of Agreement Services, or transferred to another position. Except as detailed in paragraph (d) below, the MBTA shall not reimburse Contractor or any Contractor employee for the costs of such employee's termination, reassignment, or relocation.

(d)    In the event that a Contractor employee files a claim in connection with any action taken by Contractor at the MBTA's direction pursuant to paragraph (c) above, and a court of competent jurisdiction determines that the MBTA acted in violation of law in directing Contractor to take such action in relation to such employee, the MBTA shall indemnify and hold Contractor harmless from and against any damages, fines, or penalties arising from such determination. Contractor shall notify the MBTA within twenty-four (24) hours of the filing of any such claim, and the MBTA may elect to participate in the defense of such claim.

000076

11.6    **Contractor Personnel.**

(a)    Contractor shall, except as otherwise provided in this Agreement, provide and furnish all labor, including administrative, professional, and supervisory personnel, necessary for the performance of Agreement Services, none of whom shall be employees of the MBTA. All Contractor Personnel shall be subject to the direction, supervision, and control of Contractor, and not the MBTA. All such Contractor Personnel shall be assigned exclusively to the performance of Agreement Services and shall not perform functions in connection with any non-Agreement Services, except where Contractor has obtained MBTA's prior written approval to have employees perform other such services. Contractor shall identify any Contractor Personnel who are temporarily reassigned to perform non-Agreement Services. Contractor shall reimburse the MBTA for each day any Contractor Personnel is performing non-Agreement Services pursuant to Section 22 herein.

(b)    All Contractor Personnel will be employees of Contractor or of its subcontractors and, as such, Contractor (or its subcontractors) will be solely responsible for the determination of and payment of wages and benefits and other terms and conditions of employment, except as otherwise provided in this Agreement, and shall comply with any applicable mandatory Federal or State prevailing wage rates, or collective bargaining agreements, as applicable.

(c)    Contractor shall use reasonable efforts through the collective bargaining process to perform the Agreement Services in a manner that improves the cost-effectiveness and quality of the Agreement Services.

11.7    **Employment Laws and Regulations.** Contractor shall be fully responsible for complying with applicable laws and regulations relating to employer's liability; worker's compensation; unemployment insurance; forms of social security or railroad retirement. Except as otherwise provided in Section 33, Contractor will indemnify and hold harmless MBTA for any and all liability, damages, claims, costs (including reasonable attorneys' fees), and other expenses of whatever nature arising from alleged violations by Contractor or its subcontractors of such laws, regulations, rules or procedures.

11.8    **Contractor Personnel Conduct and Discipline.**

(a)    All Contractor Personnel shall be qualified for the work assigned to them and shall perform their duties in a courteous, efficient, safe, and competent manner. Contractor Personnel who fail to meet such requirements shall be deemed to have engaged in Conduct Unbecoming an Employee. Contractor Personnel engaged in the provision of Agreement Services shall not deface, damage, destroy, vandalize or litter rolling stock, station areas, or any other part of the Service Property and Service Equipment, and shall not, while engaged in the performance of Agreement Services, smoke, read personal material, watch or listen to television or other video devices, use other electronic devices (such as cellular phones or personal digital assistants) for personal reasons, sleep or appear to sleep, or fail to perform duties in a timely fashion as assigned. Any such conduct is Conduct Unbecoming an Employee. In addition,

000077

Conduct Unbecoming an Employee shall include, but shall not be limited to, the following conduct or behavior:

(1)    Misconduct towards a Customer or other person on the Service Property, including without limitation abusive, hostile, argumentative, or demeaning behavior.

(2)    Failure to comply with customer service standards, as defined in the Customer Service Scope of Services, Exhibit 1.

(3)    Negligent performance of the Agreement Services.

(4)    Use or possession of illegal drugs or alcohol.

(5)    Use or possession of firearms or other weapons.

(6)    Dishonesty, including without limitation (i) theft, and (ii) the willful failure to accurately complete required reports.

(7)    Disorderly conduct.

(8)    Fighting.

(9)    Insubordination.

(10)   Criminal activity or reasonable suspicion of criminal activity.

(11)   Failure to comply with Contractor's System Safety Program or System Security Plan, or any other act evidencing disregard for safety.

(12)   Failure to collect customer fares on-board trains.

(13)   Vandalism or other intentional damage to Service Property, Service Equipment, Support Property or Third-Party property.

(14)   Failure to adhere to the following procedures:  Contractor Personnel shall not report to work more than sixty (60) minutes prior to the start of their scheduled work shift, and shall leave the Service Property no later than sixty (60) minutes after the end of their scheduled work shift, unless otherwise permitted or required by the MBTA.

(15)   Failure to comply with any regulation, rule, procedure or instructions required to comply with the A.D.A. or other accessibility law or regulation.

000078

(b)    Contractor shall require all Contractor Personnel who interact with Customers or the public, including locomotive engineers who work on-board commuter rail trains, to conduct themselves with courtesy and decorum, dress appropriately for the provision of service to Customers, and wear a clearly visible identification badge containing the employee's first name and badge number at the breast pocket. All Contractor Personnel who interact with Customers or the public, while on duty, shall not eat or drink and shall be clean and attired in uniforms that clearly indicate that they are providing Agreement Services on behalf of the MBTA. Uniform designs for on-board Contractor Personnel must be approved by MBTA. Failure to comply with any requirement of this paragraph shall be deemed Conduct Unbecoming an Employee.

(c)    Contractor shall promptly investigate all reports of Conduct Unbecoming an Employee, and shall institute appropriate corrective measures, which shall include disciplinary action, barring such Contractor Personnel from the Service Property, removing such Contractor Personnel from the performance of Agreement Services, or transferring such Contractor Personnel to a job that does not require interaction with Customers or the public. Contractor shall also take steps to ensure that similar instances of Conduct Unbecoming an Employee will not occur in the future.

(d)    Contractor shall also, at the request of the MBTA, institute corrective measure identified in subparagraph (c) above for any Contractor Personnel who engages in Conduct Unbecoming an Employee, or who the MBTA deems unsatisfactory on any reasonable basis, from entering the Service Property. Such reasonable basis may include the receipt by the MBTA or Contractor of more than three (3) verbal or written complaints regarding conduct of any Contractor Personnel. Such complaints need not be documented by complainants in writing or in person if subsequent investigation by the MBTA or Contractor reveals credible evidence of the veracity of the complaint. Any criminal conviction, or reasonable suspicion of criminal activity, that in the discretion of the MBTA or Contractor, indicates that any Contractor Personnel poses a threat to customers, MBTA employees or the Service Property or Service Equipment, shall constitute Conduct Unbecoming an Employee.

(e)    In the event any Contractor Personnel barred from the Service Property or the performance of Agreement Services pursuant to paragraphs (c) or (d) above disputes such action through arbitration or other authorized proceeding pursuant to a collective bargaining agreement or other authorized process, and such employee prevails in such proceeding, the MBTA shall pay due deference to the results of such proceeding and shall consult with Contractor regarding the appropriate resolution of such dispute, taking into account whether restoration of any such Contractor Personnel to the performance of certain Agreement Services may threaten the public safety, or the provision of customer service in a manner that is consistent with the requirements of this Agreement.

(f)    At all times, Contractor will satisfy its obligation to maintain adequate personnel to provide Agreement Services in conformance with the approved Staffing Plan, regardless of the number employees held out.

11.9    **Availability of Employee Records.**  Contractor shall maintain such records as may be necessary or desirable in order for the MBTA to determine Contractor's compliance with applicable laws and regulations, and to assist in future transitions to a Successor Contractor.  The Parties agree that as of the Notice to Proceed Date, such records consist of: (i) Contractor Personnel lists, including each employee's name, employee number, and badge number (where applicable); (ii) hire dates, (iii) wage and benefit records as to Contractor Personnel engaged in providing Agreement Services, and (iv) the records of all Contractor Personnel regarding drug and alcohol testing, competency tests, qualifications, training, and criminal violations that directly relate to the performance of the Agreement Services.  Unless Contractor demonstrates to the MBTA that applicable law or labor agreements prohibit granting the MBTA access to such records, all such records, or the relevant portions of such records, shall be available for inspection by the MBTA upon its request during Contractor's normal business hours.  Contractor shall provide to the MBTA on or before September 1 of each Agreement Year a report as to the matters referred to in (i), (ii) (iii) and (iv) above for the immediately preceding Agreement Year.  Contractor shall also submit to the MBTA a monthly employment report containing authorized headcount by function and current Contractor Personnel Lists as described in (i) above.  Any information received by the MBTA pursuant to this paragraph shall be accorded any confidential treatment required by law.

11.10    **Competency Tests.**  All employees hired by Contractor or its Subcontractors shall be qualified and experienced in the work for which they are engaged, and shall possess all necessary and current certifications from appropriate regulatory authorities.  No later than sixty (60) days before the Commencement Date, Contractor shall submit to the MBTA a Training Program, detailed in Section 15, that ensures that all Contractor Personnel are capable of performing the Agreement Services for which they are responsible.  All Contractor Personnel identified as deficient in required qualifications will complete necessary training prior to performing Agreement Services.  Contractor shall develop and establish appropriate competency tests and procedures for all Contractor Personnel.  Contractor shall determine, using competency tests or other procedures, that all Contractor Personnel are competent to perform the jobs to which they are assigned.  Contractor shall further require that an employee's promotion or advancement to a higher pay grade be contingent on the employee passing a competency test tailored to that higher pay grade and experience level.

11.11    **Work in Harmony.**  Contractor shall furnish labor that shall work in harmony with all other elements of labor employed in the provision of Agreement Services, and shall work in harmony with Other Contractors engaged in the provision of services to the MBTA in connection with its commuter rail operations, and shall use its reasonable efforts to minimize disputes between itself and such Other Contractors.  The MBTA shall use reasonable efforts to cause Other Contractors engaged by it to work in harmony with Contractor, and shall use reasonable efforts to minimize disputes between Contractor and Other Contractors engaged by the MBTA.  The Contractor acknowledges and agrees that all Contractor Personnel shall conduct themselves at all times in an orderly and proper manner so as not to annoy or offend Customers or other persons using the Service Property or employees of the MBTA, and, further, that the Contractor at the request of the MBTA shall prohibit from entering the Service Property any employee, agent, consultant, supplier, and/or subcontractor who should cause any annoyance or offense.

000080

11.12 **Damage to MBTA Property**. Contractor further covenants and agrees that, in the exercise of the right and privileges granted hereunder, its employees, agents, consultants, suppliers, subcontractors or representatives will not deface or damage the property of the MBTA. Contractor shall assume liability for all such action(s) on the part of its employees, agents, consultants, suppliers, subcontractors or representatives and shall indemnify and hold the MBTA harmless from and against all claims, damages, losses and expenses incurred by the MBTA arising out of such actions.

## SECTION 12. HIRING OF EXISTING WORKFORCE.

12.1 **Establishment and Filling of Union Positions**. Contractor shall establish employment positions for the provision of the Agreement Services equal to the number of Commuter Rail Employee Positions in existence on March 1, 2002 with the then current MBTA commuter rail services provider (the "Workforce Positions"). The number of Workforce Positions to be established by Contractor, by category, shall be as follows:

     (1) Transportation - 509
     (2) Mechanical - 536
     (3) Engineering - 444
     (4) Administration - 11
     (5) CETC - 37
     (6) South Station Information/Ticketing - 16
          Back Bay Information/Ticketing - 8
     (7) Attleboro Line Station Maintenance - 12

Contractor shall initially fill all Workforce Positions in seniority order from the rosters of Eligible Union Employees, and shall fill all vacancies (if Contractor elects to fill such vacancies) during the Term of the Agreement from the rosters of Eligible Union Employees if such rosters have not been exhausted. In the event that Contractor exhausts such rosters or such rosters do not provide employees who are qualified to fill an initial position or a subsequent vacant position, Contractor may fill such positions with employees not on such rosters. Beginning the fourth Friday after the Notice to Proceed Date, Contractor shall provide weekly written updates to the MBTA on the status and progress of the hiring process. Such weekly updates shall include, without limitation, a listing of the existing Amtrak workforce by employee, based on seniority rosters listing Eligible Employees, indicating the following information: whether the employee (a) applied for a position, (b) was interviewed for the position, (c) was offered the position, (d) was not offered a position based on failure of a physical or drug or alcohol testing, (e) accepted or declined the position, and (f) was given a general physical examination and the outcome of any such examination. Contractor shall also list and identify each individual who was offered and accepted a position on Contractor's workforce and who was not previously employed by Amtrak, including a complete and detailed explanation regarding why the position was not filled by an individual who belonged to the existing Amtrak workforce and was on a seniority roster.

000081

Contractor shall keep all Amtrak commuter rail employees who are on disability due to work-related injuries at the time of the workforce transition on the roster of Eligible Union Employees for thirty-six (36) months starting on the Commencement Date. If at any point during that thirty-six months the employee passes a physical and drug/alcohol test as described in Section 12.3(b) below, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position. Contractor shall keep Amtrak commuter rail employees who are on disability due to non-work related injuries or illness at the time of the workforce transition on the roster of Eligible Union Employees for twelve (12) months from the Commencement Date. If at any point during that twelve-month period the employee passes a physical and drug/alcohol test as described in Section 12.3(b) below, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position.

12.2.    **Hiring of Management Employees**. Subject to subsection 12.3 of this Section, Contractor shall offer employment in supervisory and management commuter rail positions to Eligible Management Employees. Each employee hired under this subsection shall be provided pay, health and welfare, retirement, and other benefits equal to those provided to such employee in his or her position with the current MBTA commuter rail services provider. Contractor's obligation under this sub-Section is to afford employment to Eligible Management Employees for a twelve-month period beginning on the Commencement Date. After such period, employment and retention shall be in accordance with the Contractor's personnel policies and procedures.

12.3.    **Workforce Management.**

(a)    The requirements of this Section shall not be construed to (1) impose a mandatory staffing level for the Agreement Services throughout the Term of the Agreement; (2) restrict Contractor's ability to manage the number of positions and size of workforce it determines to be necessary to perform the Agreement Services, as vacancies occur or as services are added or adjusted, during the Term of the Agreement; or (3) restrict Contractor's ability to dismiss employees for cause, during the Term of the Agreement.

(b)    Contractor shall not offer employment to any person who fails to successfully complete (1) drug and alcohol testing and (2) a physical examination tailored to the particular demands or requirements of the position being filled (e.g. a "color blind" condition would render a person ineligible to fill a position as a locomotive engineer). If an Eligible Union Employee or Eligible Management Employee who is not on disability due to a work related injury fails a physical examination during the Mobilization Period, and Contractor does not offer employment to such employee, such employee shall remain on the roster listing eligible employees for twelve (12) months following the Commencement Date. If such employee passes the physical examination during said twelve-month period, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position.

(c)    Contractor shall not offer employment to any person, other than an Eligible Union Employee or Eligible Management Employee, who has been convicted, within the past five (5) years, of a felony.

000082

## SECTION 13. LABOR OBLIGATIONS.

13.1    **General.**  Contractor shall establish its initial terms and conditions of employment in accordance with the mandatory labor terms and conditions set forth in Exhibit 7, Labor Provisions.

13.2    **Collective Bargaining.**  Contractor shall negotiate a collective bargaining agreement that includes, without limitation, the terms and conditions in Exhibit 7, Labor Provisions with each of the labor organizations identified in that Attachment, unless Contractor and a union agree to alternative terms.

13.3    **Initial Discussions.**  No later than ten (10) days after the Notice to Proceed Date, Contractor shall (a) provide written notification to each union listed in Exhibit 7, Labor Provisions, that it has been selected as Contractor; (b) provide each such union with a copy of the mandatory labor terms and conditions set forth in Exhibit 7, Labor Provisions, and a written assurance of Contractor's intention to fully comply with those terms: and (c) commence negotiations with each union.

## SECTION 14. SECTION 13(c) OBLIGATIONS.

14.1    Except as provided in Section 14.2, the MBTA shall be administratively and financially responsible for claims and obligations arising under Section 13(c) of the Federal Transit Act (49 U.S.C. § 5333(b)).

14.2    Contractor shall have liability for any 13(c) claims or obligations concerning the commuter rail workforce that arise out of acts or omissions of Contractor that are not approved in writing by the MBTA or that are not otherwise directed by the MBTA.  Contractor shall cooperate with the MBTA (including, but not limited to, providing employee records and other requested information) in the resolution and defense of any 13(c) claims or disputes for which the MBTA has responsibility, and in the implementation of any 13(c) remedies.

14.3    Contractor shall not assist or encourage any Contractor Personnel to file or otherwise pursue a 13(c) claim against the MBTA, or take any action which is contrary to the interests of the MBTA under Section 13(c), relating to the termination or conclusion of services under this Agreement, any future transition from Contractor to another service provider, or any other action or event relating to this Agreement or commuter rail service.  If Contractor fails to comply with this obligation, Contractor shall be liable to the MBTA for all costs incurred by the MBTA (including attorneys' fees) associated with any 13(c) claims or disputes, or delays in the receipt of FTA grants.

000083

**SECTION 15.  TRAINING OF CONTRACTOR PERSONNEL.**

15.1    **Training Programs**

(a)    Contractor will establish an Annual Training Program Plan to provide comprehensive ongoing training programs for all Contractor Personnel involved in providing Agreement Services, including, without limitation, any training required by the FRA for the performance of Agreement Services.  Such training shall include specific training related to Engineering, Maintenance, Transportation, and Customer Services.  Contractor shall identify in the Annual Training Program Plan, all legally required training and discretionary training for each functional area of the Agreement Services.

(b)    All Contractor Management Personnel involved in providing Agreement Services shall receive a copy of this Agreement and shall attend a four-hour briefing by Contractor regarding the terms of this Agreement no later than sixty (60) days after the Commencement Date.

(c)    Contractor shall provide its training programs within the MBTA's service area, unless it receives prior written approval from the MBTA to hold such training programs elsewhere.  Contractor shall schedule training activities so as to not interfere with its provision of Agreement Services, and in no event shall the number of employees performing Agreement Services in any functional area fall below the staffing levels provided in the MBTA-approved Staffing Plan for that functional area.  If Contractor provides training in excess of the training requirements for the performance of Agreement Services, Contractor Personnel attending such training shall be considered temporarily reassigned pursuant to Section 11.6 and subject to the Employee Performance Penalty.

(d)    Contractor's Safety and Training Manager shall have responsibility for formulating and coordinating all training activities, and who shall be available to meet with the MBTA to review all training needs, programs and reports.  Contractor shall notify the Director of Railroad Operations of all training for new hires, and the Director of Railroad Operations, or his or her designee, may address the new hires during such training.  The MBTA reserves the right to evaluate the effectiveness of Contractor training and retraining programs.

(e)    Contractor shall forward to the MBTA and post all training schedules prominently on the Service Property.  Contractor shall make ten (10) percent of the places in any Contractor-sponsored training program available for individuals employed by the MBTA, Other Contractors, or Third Parties and approved by the MBTA to attend such sessions.  The cost of training such individuals shall be included within the Annual Fixed Price.

15.2    **MBTA Approval.**  All training programs or portions thereof (including the annual training schedule of all Contractor Personnel) provided in connection with the Agreement Services shall be submitted for review and approval by the MBTA by August 1 of each Agreement Year, and will be designed, developed and implemented in accordance with Contractor's Proposal and established professional standards for performance-based instruction. Contractor shall provide MBTA with copies of course descriptions for training designated

000084

specially for the Agreement Services. MBTA shall have the right to inspect copies of all training programs used for Contractor Personnel who are performing Agreement Services.

15.3    **Costs**. The costs of the approved training programs required for performance of the Agreement Services shall be included in the Annual Fixed Price.

15.4    **Failure to Complete Training.** The failure of any Contractor Personnel to successfully complete legally required training included in the approved training schedule shall be the basis for removing such Contractor Personnel from further performance of the Agreement Services requiring such training until the employee successfully completes the required training.

15.5    **Reports.** Contractor will provide the MBTA with a Monthly Training Report, which will list and describe each training session conducted during the month; the number of hours of training completed by each employee; and the names of each employee who participated in each such training session as well as the employee's test results.

15.6    **Operating Rules, Employee Timetable, Special Instructions, Safety Rules, and Dispatching Manual.** Contractor shall develop, maintain, and publish a set of NORAC - compatible operating rule books ("Contractor's Book of Operating Rules") to be consistent with Exhibit 15, Employee Timetables, Special Instructions, Safety Rules, and Dispatching Manual, for all lines dispatched by Contractor under the Agreement Services. Such operating rules shall be subject to review and approval by the MBTA, FRA and other regulatory bodies from time to time. The set of rules and related materials must be approved, printed and ready for distribution to Contractor Personnel prior to the effective date of the materials. Failure to comply with this deadline will result in a penalty to Contractor pursuant to Section 22, of $10,000 per day for every day that approved rules and related materials are not distributed to Contractor Personnel. Contractor shall provide three (3) dozen copies of the materials to the MBTA.

15.7    **Knowledge of Rules.** Train and engine crews, engineering and mechanical personnel, dispatchers and other safety-sensitive personnel critical to safe commuter rail operations shall be qualified on the applicable sections of Contractor's Book of Operating Rules, the Employee Timetable, the Special Instructions, the Safety Rules, Dispatching Manual, Bulletin Notices, Division Safety Notices, the physical characteristics of the applicable routes, and every other document required for the safe operation of the railroad. To be qualified as required herein, Contractor Personnel shall be tested as determined by the Contractor. Contractor Personnel whose familiarity and qualification are deemed acceptable by Contractor shall receive a written certification from Contractor.

15.8    **Operation Lifesaver.** Contractor must provide two or more full-time Operation Lifesaver-qualified instructors who shall offer Operation Lifesaver training to the public, including "train the trainer" programs, to public safety officials, teachers, community groups, and others.

15.9    **Third Party Training.** Contractor shall provide required safety training to Other Contractors or Third Parties who are approved by the MBTA to perform work on the Service Property. The cost of all such safety training shall be included in the Annual Fixed Price.

000085

Contractor shall be responsible for obtaining the recovery, if any, of its cost for such safety training from such Third Parties.

## SECTION 16.  NEW SERVICE.

16.1    **In General**.  The MBTA may, at any time during the Term of this Agreement, direct Contractor to implement New Service pursuant to the provisions of this Section and Section 21.3.

(a)    The MBTA shall notify Contractor of the New Service no fewer than ninety (90) days before the New Service is scheduled to commence.

(b)    Notwithstanding any provision of this Section, MBTA may direct Contractor to operate Agreement Services on the Greenbush Line pursuant to the provisions of Exhibit 18, Service Expansions.  The scope of work for the Greenbush service will be based upon such scope of work contained in Exhibit 18, Service Expansions.  The scope of work that is actually requested by MBTA may differ from the scope of work set forth in Exhibit 18, Service Expansions and therefore Contractor's compensation for the Greenbush service may differ from that set forth in Exhibit 32, Contractor Cost Proposal.  The MBTA and Contractor shall negotiate in good faith before Greenbush service commences, using Contractor Cost Proposal as the starting point for the negotiations.  The Parties anticipated during the RFP process that Greenbush Service would likely commence on July 1, 2005.  In the event such service is temporarily delayed or delayed substantially beyond July 1, 2005, the Parties shall in good faith negotiate appropriate changes to the Annual Fixed Price as a Service Change, notwithstanding anything to the contrary in Section 21.3(d) of this Agreement.  Such negotiations shall commence no later than January 1, 2005 and shall be conducted by taking into account, among other things, Exhibit 32, changes in level of service, changes in any cost factor being considered (including headcounts in particular classifications), Contractor efforts to create cost efficiencies, and other relevant facts that take place between the Commencement Date and July 1, 2005.

(c)    Contractor's compensation for any MBTA-directed New Service other than the Greenbush Service shall be calculated according to the provisions of Section 21.3.

16.2    **Separate Contracting**.  Notwithstanding any other provision of this Agreement, the MBTA reserves the right during the Term of this Agreement to contract separately for, or provide with its own personnel, any New Services that may commence during the Term of this Agreement.

## SECTION 17.  SERVICE CHANGES.

17.1    **General Authority**.  The MBTA may, at any time during the Term of this Agreement, direct Contractor to implement a Service Change.

17.2    **Initiation of Change**.  The MBTA shall notify Contractor of a Service Change and shall describe the same in detail, specifying the date on which the Service Change shall

000086

commence (the "Implementation Date"). Such Implementation Date shall not be less than thirty (30) days after the date of such notice, unless otherwise agreed upon in writing by the Parties or where safety or budgetary constraints require implementation on shorter notice, as determined by the MBTA in its sole discretion.

17.3    **Contractor Response.** Within fifteen (15) days after receiving the notice of Service Change under Section 17.2, Contractor shall provide the MBTA with: (a) a written statement as to the anticipated impact of the Service Change on Contractor's ability to perform the Agreement Services, including any potential cost increase or decrease and any estimated increase or decrease in revenue; and (b) an auditable, itemized proposed budget for such Service Change to perform the Service Change in the most cost effective manner possible. Any increase or reduction in compensation attributable to the Service Change will be governed by the terms of Section 21.3. Notwithstanding the pendency of any negotiations or dispute resolution procedures, Contractor shall proceed to implement the Service Change and shall perform Agreement Services relating thereto in accordance with the implementation schedule established by the MBTA.

## SECTION 18. FORCE ACCOUNT WORK.

18.1    **General Authority.**

(a)    The MBTA may at its discretion direct Contractor to perform Force Account Work.

(b)    All Force Account Work shall be performed in full and strict compliance with all applicable terms and conditions of this Agreement, including the Exhibits hereto and the Scope of Services.

(c)    Contractor shall perform Force Account Work using Contractor Personnel and others as may be necessary, without any impact to any Contractor obligation to provide other Agreement Services. Contractor shall, at no additional cost to the MBTA, use the resources provided for the performance of the Agreement Services in the execution of Force Account Work to the extent that doing so does not interfere with the performance of other Agreement Services.

(d)    Contractor shall assign Contractor Personnel to perform Force Account Work, to the extent that such assignment does not adversely affect the provision of other Agreement Services. If Contractor cannot assign Contractor Personnel to the performance of Force Account Work without adversely affecting the provision of other Agreement Services, Contractor may assign or hire non-Contractor Personnel to the performance of Force Account Work. Compensation for use of Contractor Personnel for Force Account work shall conform to the provisions of Exhibit 9, Direct Costs Billable to the MBTA.

(e)    Contractor shall use available Service Equipment and Support Property for the performance of Force Account Work, as long as such use does not interfere with the performance of other Agreement Services. This shall include such Service Equipment and

000087

Support Property as is made available by relocating or rescheduling other work of a non-critical nature. Contractor shall only provide equipment other than Service Equipment or Support Property for the performance of a Force Account Work Project with prior written approval of the MBTA.

18.2    **MBTA Request.**

(a)    The MBTA shall initiate Force Account Work Projects by delivering to Contractor a Project Initiation ("PI") and/or Change Order ("CO") form. The PI shall include a description of the work to be performed, as well as any plans, specifications and requirements that the MBTA determines should govern the Force Account Work Project.

(b)    In the event of an Emergency or when, in the sole discretion of the MBTA, expeditious response is required, MBTA may orally direct Contractor to undertake necessary Force Account Work, and Contractor shall perform such work in the most expeditious manner possible. The MBTA shall deliver to Contractor written confirmation of the Force Account Work request within forty-eight (48) hours of issuing such oral directive and issue a PI or CO for the Force Account Work as soon as reasonably practicable thereafter.

18.3    **Contractor Response.** Upon request by the MBTA, Contractor shall provide a comprehensive cost proposal for the Force Account Work Project including staffing plans, resource requirements, and itemized, auditable costs in a format approved by the MBTA and consistent with Exhibit 9, Direct Costs Billable to the MBTA. Contractor shall provide this cost proposal to the MBTA as quickly as possible, with a maximum response period of twenty-one (21) days from the date of the request. Contractor shall also provide a definitive schedule that includes important milestones for completing the Force Account Work Project. The costs of the preparation and production of the required cost proposals and schedules are included in the Annual Fixed Price. Contractor shall make every effort to comply with the cost proposals and schedules, and shall notify the MBTA immediately after Contractor becomes aware that a deviation from such proposal or schedule is likely.

18.4    **Initiation of Force Account Work Projects.** Completion of the PI form and signature by Contractor's CGM or his or her authorized representative and the MBTA's duly authorized representative shall constitute an agreement to perform the requested Force Account Work. The cost estimate detailed in the PI shall constitute the amount Contractor is authorized to spend. This amount may only be increased through execution of a CO. Contractor shall perform the Force Account Work according to the schedule detailed in the PI, unless the Parties execute a CO revising such schedule.

18.5    **Changes to Force Account Work Projects.** Changes to a PI for Force Account Work shall be initiated by execution of a CO form. Each proposed CO for a Force Account Work Project shall cite the number of the PI that the CO revises. Completion of the CO form and signature by an authorized representative of the MBTA shall constitute agreement regarding the change. No changes shall be made on the basis of oral requests, except in the event of an Emergency situation as set forth in Section 18.2(b) above.

000088

18.6    **80% Expenditure Notice.** Contractor shall promptly notify MBTA in writing when Contractor has spent or obligated eighty percent (80%) of the funds authorized for a Force Account Work Project. Such notice shall include: a description of the incomplete work and the estimated cost of completing such work; a schedule update; and notice of any unsafe condition or impact on revenue service that may arise if work on the Force Account Work Project ceases before completion. If the MBTA determines that the Force Account Work Project may exceed its approved cost or continue beyond its approved schedule, the MBTA may issue a CO authorizing Contractor to continue the Force Account Work Project based on the new estimate or schedule, or may direct Contractor to terminate the Force Account Work Project as promptly and inexpensively as feasible. Contractor shall have no obligation to perform work on a Force Account Work Project after the cost limit specified in a PI (and any COs that modify such PI) has been reached, with the exception of work that is, in the determination of the MBTA, necessary to prevent or remedy any unsafe condition or to prevent disruption of revenue service.

18.7    **Force Account Work Project Costs.** Contractor shall document all Direct Costs incurred in the performance of Force Account Work, separate from the records Contractor keeps for the costs of providing services included in the Annual Fixed Price. All invoices for Force Account Work Projects submitted by Contractor to MBTA shall include the number of staff-hours and cost of labor expended; the costs of associated employee benefits; quantities and costs of materials consumed; the cost of subcontracted services; equipment usage and associated costs; and any other allowable Direct Costs for performing the Force Account Work Project. To the extent that Contractor Personnel are used in performing Force Account Work Projects, Contractor's cost proposals and invoices shall indicate the number of hours worked by Contractor Personnel that are included in the Annual Fixed Price, and hours worked by Contractor Personnel outside the Annual Fixed Price. Within the cost limit specified in the PI, MBTA shall compensate Contractor for all work actually performed pursuant to the PI, according to the provisions of Section 18 and Exhibit 9, Direct Costs Billable to MBTA.

18.8    **Project Completion.** Upon completion of a Force Account Work Project, or earlier at the sole discretion of the MBTA, the MBTA will issue to Contractor a Project Completion Order. Contractor shall submit all invoices of bills required for compensation under the terms of this Section within ninety (90) days of the date of such order. All claims for compensation made after that time shall be waived by Contractor.

18.9    **Audit and Inspection.**

(a)    Contractor shall ensure that all Force Account Work conforms to all applicable laws, regulations and standards for the performance of Agreement Services, except where different standards are specified in the applicable PI.

(b)    The MBTA shall have the right to have its representative(s) present at the site of a Force Account Work Project for the purpose of inspecting work performed and to ensure that all work is progressing according to the agreed-upon schedule. Inspections may be unannounced and conducted at any location at any time.

000089

(c)    The MBTA shall approve the quality and completeness of all Force Account Work performed by Contractor. Measurement of the adherence to the requirements of this Agreement and the applicable PI shall be evaluated based on the results of inspections performed at the discretion of the MBTA, as described above. Where the Force Account Work does not meet all applicable laws, regulations, or standards, or the applicable PI specifications, the Parties shall meet promptly to determine what additional work should be performed in order to satisfy those requirements. Contractor shall remedy all unsatisfactory Force Account Work at no additional cost to the MBTA.

18.10    **Completion of Force Account Work.**  Upon termination of this Agreement, Contractor shall continue to perform all incomplete Force Account Work only to the extent necessary to remedy any unsafe condition on the Service Property, except as otherwise agreed to by the Parties.

18.11    **Subcontracts.**  Contractor may subcontract Force Account Work if it believes doing so is necessary or efficient. All such subcontracts shall be in accordance with Section 34 of this Agreement.

18.12.    **Annual Force Account Work Plan.**  Contractor shall submit to the MBTA, no later than February 1st of each Agreement Year, an Annual Force Account Work Plan which shall detail Contractor's Force Account Work Projects scheduled for the upcoming year. Such plan shall include a schedule of Force Account Work Projects that the MBTA has directed Contractor to perform. The Force Account Work Plan shall also recommend and prioritize Force Account Work Projects (which may include capital and non-capital projects) which, in Contractor's opinion, would improve the performance of the Agreement Services. Contractor shall include in the Force Account Work Plan ongoing projects such as flagging and support for Third Party activities, such as mechanical support for vehicle advertisement wraps, environmental Force Account Work Project recommendations, and indicate how Contractor will deploy Contractor Personnel dedicated to Force Account Work Projects in the upcoming year.

## SECTION 19.  OTHER REQUIRED WORK.

19.1    **General.**  In addition to the Agreement Services and Force Account Work, Contractor shall perform related work for Third Parties when directed to do so by the MBTA, such as third party training, wreck clearing, support, and support for utility companies working in the right of way.

19.2    **Compensation.**  Contractor shall offer to perform Other Required Work for compensation that is equivalent to the compensation that the MBTA pays Contractor for Force Account Work, and Contractor shall be compensated by the Third Party according to the terms of the agreement between the parties. In the event that the Third Party rejects Contractor's offer to perform the work terms equivalent to those governing Force Account Work, Contractor shall notify the MBTA of the Third Party's rejection of such terms.

000090

# SECTION 20. REVENUE GROWTH INCENTIVE.

20.1    **In General.** No later than ninety (90) days after the end of each Agreement Year, the MBTA shall pay to Contractor a Revenue Growth Incentive in accordance with this Section.

20.2    **Determining the Revenue Growth Incentive.** The Revenue Growth Incentive shall be calculated and paid after the completion of each Agreement Year. The MBTA shall at all times determine fares for all commuter rail service, including but not limited to periodic fare exemptions for special events, educational programs, and Emergencies. Contractor shall collect all Commuter Rail Services Revenue in accordance with the provisions of the Transportation Scope of Services, Exhibit 2. If Actual Revenue for any given Agreement Year exceeds the Revenue Target for that Agreement Year, MBTA will pay Contractor an amount equal to fifty percent (50%) of the difference between the Revenue Target and the Actual Revenue in accordance with the provisions of this Agreement.

20.3    **First Contract Year Revenue Target.** Within ninety (90) days after Commencement Date, the MBTA shall inform Contractor of the Actual Revenue for the immediately preceding fiscal year. The Revenue Target for the first Agreement Year shall be the preceding fiscal year's Actual Revenue plus three percent (3%).

20.4    **Subsequent Contract Years Revenue Target.** The Revenue Target for each Agreement Year after the first Agreement Year shall be the greater of (a) the prior Agreement Year's Revenue Target plus three percent (3%) or (b) the prior Agreement Year's Actual Revenue plus three percent (3%).

20.5    **Railroad Tickets and Joint-Use Passes.** Contractor shall charge and collect fares for commuter rail services, including Monthly Passes, according to the provisions of the Transportation Scope of Services, Exhibit 2. Revenue from the sale of Monthly Passes shall be allocated between commuter rail and other MBTA services as follows: Seventy percent (70%) of the pass value for Zone 1 and Zone 2 passes shall be allocated to commuter rail. For all other joint-use passes, seven dollars ($7) shall be allocated to MBTA local transit services and the remaining amount shall be allocated to commuter rail. All other commuter rail tickets, including one way, round trip, ten (10) and twelve (12) -ride tickets and Zone 1(A) and Zone 1(B) passes, are valid only for commuter rail use, and revenue from the sale of such tickets shall therefore be fully allocated to commuter rail.

20.6    **Reporting and Audits.** Each month the Parties shall exchange reports concerning the Commuter Rail Services Revenue collected during the previous month. The MBTA and Contractor may audit revenue accounts related to ticket sales to verify the revenue collected by each Party each month. In the event an audit is required due to a failure to submit a complete report, the party that failed to submit the report shall reimburse the other party for the cost of the audit.

20.7    **Fare Increases.** If the MBTA increases fares during any given Agreement Year, the Revenue Growth Incentive shall not include the increased revenue from the existing base ridership. To estimate revenue from "pre-existing" riders, the MBTA shall determine what the

000091

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>            Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>            Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>C.A. No. 05-11430-PBS |

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 3C

Revenue Target in the current year would be under the new fare structure. Using available data, the MBTA shall determine the existing fare mix relative to the amount of revenue collected per ticket type. The new fare structure shall then be applied to this fare mix and the equivalent revenue under the new structure shall be determined. This value shall serve as the adjusted Revenue Target for the current year under the new fare structure. These calculations shall assume no change in ridership as a result of a fare increase.

20.8    **New Service or Service Changes.** Contractor and the MBTA agree to share growth in revenue above the overall Revenue Target that is derived from New Service or a Service Change that did not entail added operating or capital costs to the MBTA. In the event that New Service or a Service Change requires an increase or decrease in the Annual Fixed Price, or that the New Service or Service Change results from an MBTA capital investment, the Revenue Target shall be adjusted by the CTPS ridership forecast multiplied by the projected fare. The Revenue Growth Incentive will be based on the Actual Revenue for that year, which will include the increase or decrease in revenue for that year.

20.9    **No Claims for Adjustment.** No provision of this Section shall any way inhibit or prevent the MBTA from changing, modifying, or creating any policies related to the performance of this Agreement. In no event shall Contractor make any claim for an adjustment to the Revenue Growth Incentive based on any act by the MBTA, other than a fare increase or decrease or New Service or Service Change, which might result in a decrease in revenue from the amount of revenue that Contractor might have collected in the absence of such act.

## SECTION 21. COST OF SERVICES AND PAYMENTS.

21.1    **Elements of Contractor Compensation.** Contractor's compensation pursuant to this Agreement shall consist of the following elements, as more fully detailed in this and other sections of this Agreement:

(a)    Annual Fixed Price (for Agreement Services other than Force Account Work), as adjusted by any Penalties, New Service, Service Changes, the operation of extra Special Trains, or other adjustments as provided in this Agreement, and including the snow removal allowance and allowance for maintaining unused rights of way detailed below;

(b)    Compensation for Force Account Work;

(c)    Revenue Growth Incentive, if applicable

21.2    **Annual Fixed Price.**

(a)    The MBTA shall pay Contractor the Annual Fixed Price for each Agreement Year, as specified in Exhibit 32, Contractor Cost Proposal. The Annual Fixed Price includes compensation for all Agreement Services detailed in this Agreement, the Exhibits hereto, and the Scope of Services. The MBTA shall reimburse Contractor separately for Force Account Work according to this Section, Section 18 and Exhibit 9, Direct Costs Billable to the MBTA.

000092

(b)    The Annual Fixed Price shall include payment of all utilities related to Contractor's provision of the Agreement Services as provided in this subsection. In the case of water, gas, and electricity costs, Contractor shall pay such costs for the first Agreement Year.  If during the term of the Agreement the average annual unit cost (as shown on the respective bills) of such utilities for an Agreement Year increases or decreases by more than ten (10) percent from the average annual unit cost for the previous Agreement Year, the MBTA shall adjust the Annual Fixed Price for the year of the increase or decrease to reflect the amount of Contractor's actual utility costs resulting from the total utility cost increase or decrease that is in excess of a ten (10) percent increase.  For the purposes of this subsection, the costs of such utilities for the first Agreement Year will be compared to utility costs for FY 2003.

(c)    The MBTA has negotiated favorable electricity rates, and shall invoice Contractor for its electricity usage associated with the performance of Agreement Services.  In the event that Contractor determines that it can secure more favorable rates than those charged to the MBTA, Contractor may, after receiving MBTA approval, transfer utility service from the MBTA accounts to its own accounts and pay such charges directly.

(d)    Contractor shall include an annual allowance of $750,000 for snow removal overtime in the Annual Fixed Price.  To the extent that Contractor exceeds this amount, the MBTA will pay the differential as Force Account Work. To the extent that Contractor does not spend that amount, the MBTA receive a corresponding credit.

(e)    Contractor shall include an annual allowance of $100,000 for the costs of maintaining unused rights of way in the Annual Fixed Price.  To the extent that Contractor exceeds this amount, the MBTA will pay the differential as Force Account Work. To the extent that Contractor does not spend that amount, the MBTA receive a corresponding credit.

(f)    During the Term of this Agreement, Contractor shall submit monthly invoices for Agreement Services by the tenth (10th) day of each month for which such an installment of the Annual Fixed Price is due.  Each complete invoice shall include: (1) the number of commuter rail trains operated during that month; (2) any penalties to be assessed for operations during that month, along with the corresponding ROSS reports; (3) an itemization, with appropriate supporting documentation, of any charges for Service Changes or Force Account Work performed or to be performed in that month under Sections 21.3 or 21.4 respectively including the number of staff-hours and cost of labor expended; the costs of associated employee benefits; quantities and costs of materials consumed; the cost of subcontracted services; equipment usage and associated costs; and any other allowable Direct Costs for performing the Service Charge or Force Account Work Project; and (4) Contractor's compliance with the reporting requirements, as detailed in Exhibit 8, Reports and Deliverables, as demonstrated using a checklist of all required reports for that month.  In each such invoice, Contractor shall certify in writing that the information provided is factually accurate and verifiable.

000093

(g)     The MBTA may withhold payment of a Contractor invoice if any required monthly report has not been submitted by the tenth (10th) day of each month for which such an installment of the Annual Fixed Price is due.  The MBTA shall notify the Contractor of any incomplete invoice or missing report by the fifteenth day (15th) of that month.  Once the missing report has been submitted by the Contractor, the MBTA shall within two business days of receipt of all such reports pay the amount of the invoice to the Contractor.

(h)     The MBTA shall review each Contractor invoice and shall make appropriate adjustments in the amount of the next monthly payment to Contractor to reflect the amount of any underpayment or overpayment for the month covered by such invoice, and to reflect the reconciliation of penalties payable for such month pursuant to Section 22.

(i)     The MBTA shall pay each such complete invoice by the fifteenth (15th) business day of the month for which such installment of the Annual Fixed Price is due.  Each installment of the Annual Fixed Price shall be equal to one twelfth (1/12th) of the Annual Fixed Price for the applicable Agreement Year (or if the first Agreement Year is shorter than 365 days, a pro rata payment based on a fraction the numerator of which shall be one and the denominator of which shall be the number of 30-day periods in the first Agreement Year), as adjusted by any penalties.

(j)     In the event MBTA does not agree with any item in an invoice submitted by Contractor, it shall promptly notify Contractor of the item with which it disagrees, along with a statement of the reason for its disagreement and its view as to the correct amount payable.  Contractor shall immediately revise any invoice to correct errors identified by the MBTA.  The Parties shall promptly confer on any other items in an invoice to which the MBTA has taken exception.  In the event the Parties are unable to reach agreement, the MBTA shall pay the undisputed portion of such bill, but may withhold from its next monthly payment to Contractor the amount that the MBTA asserts is in excess of the amount that should have been paid.  Any amount withheld that is later determined to be due to Contractor shall bear interest at the Prime Rate as quoted in the "Money Rates" section of <u>The Wall Street Journal</u> (but not to exceed 12%), from the date of withholding to the date of payment.  The MBTA shall not pay interest on withheld payments if the withholding resulted from the Contractor's failure to provide sufficient documentation.

(k)     In the event Contractor does not agree with any item in a monthly payment made by the MBTA, it shall promptly notify the MBTA of the item with which it disagrees, along with a statement of the reason for its disagreement.  The Parties shall meet promptly thereafter to attempt to resolve such disagreement.

(l)     The MBTA shall withhold from the monthly payment for the last month of Agreement Services under this Agreement an amount which the MBTA believes, in good faith, to be sufficient to address any potential overpayments that need to be reconciled in connection with the final invoice, any outstanding Punch List Items, as defined in Section 41, and any outstanding payment issues in connection with Agreement close-out.  Upon termination of this Agreement, Contractor shall submit to the MBTA a final invoice setting forth the information required under paragraph (e) of this subsection, together with any other financial or accounting

000094

information needed for Agreement close out. The MBTA shall pay all amounts in such invoice not in dispute by wire transfer within thirty (30) days after the date of receipt. The Parties shall meet promptly to attempt to resolve any remaining disputed costs or charges or other outstanding issues. Any amount withheld that is later determined to be due to Contractor shall bear interest at the rate described in paragraph (i) from the date of withholding to the date of payment. The MBTA shall not pay interest on withheld payments if the withholding resulted from the Contractor's failure to provide sufficient documentation.

(m)     In the event that the MBTA determines that Contractor's financial stability or ability to perform the Agreement Services during any given month is in doubt, the MBTA may notify Contractor that it will pay Contractor on a weekly or bi-weekly basis until the MBTA determines in its sole discretion that Contractor's financial stability or ability to perform the Agreement Services is no longer in doubt. In such an event, Contractor shall continue to provide monthly invoices pursuant to the provision of this Section.

(n)     In the event of a failure to reach agreement on a disputed invoice or payment described in this Section, either Party may submit the matter to dispute resolution under Section 35 of this Agreement.

### 21.3    Charges for New Service and Service Changes.

(a)     In the event that the MBTA requires Contractor to implement New Service or a Service Change, Contractor shall provide MBTA with an auditable, itemized proposed budget that shows all anticipated changes to Contractor's Direct Costs and Commuter Rail Services Revenue that the Contractor estimates would result from such New Service or Service Change, as detailed in Sections 16 and 17, respectively. In the event that the MBTA directs the Contractor to proceed with such New Service or Service Change, the MBTA shall pay the Contractor the actual additional Direct Costs of the New Service or Service Change, plus a management fee (which includes overhead an profit) of eight percent (8%) of all such additional Direct Costs other than locomotive fuel costs.

(b)     If the New Service or Service Change results in a reduction in Direct Costs, the amount of compensation payable by the MBTA shall be reduced by the amount of any Direct Costs eliminated by the New Service or Service Change, plus the associated eight percent (8%) management fee. If New Service or a Service Change that results in a reduction in Direct Costs is subsequently re-instituted, the MBTA shall compensate Contractor in an amount equal to the amount of the original reduction in Direct Costs plus the associated management fee.

(c)     If the New Service or Service Change remains in place for more than ninety (90) days, the MBTA and Contractor shall agree on a revised Annual Fixed Price. The ninety (90)-day history of actual Direct Costs incurred or reduced due to the New Service or Service Change shall provide the primary basis for determining the price of the New Service or Service Change. The revised Annual Fixed Price shall be evidenced by the execution and delivery by the Parties hereto of an amended Exhibit 32, Contractor Cost Proposal, which shall be appended to this Agreement.

000095

(d)    Contractor and the MBTA shall exercise good faith with respect to the determination of any revised Annual Fixed Price described in paragraph (c) above (with the exception of the Greenbush service), which adjustment to the Annual Fixed Price shall be determined pursuant to Section 16.  In the event the Parties are unable to agree on the revised Annual Fixed Price, the matter shall be submitted to the dispute resolution procedures provided for in Section 35.

(e)    The process and compensation method set forth in this subsection shall also apply in the event of any additional or reduced Direct Costs to Contractor that occur as a result of changes in local, State, or Federal law that may materially impact the cost of performing the Agreement Services.

### 21.4    **Charges for Force Account Work.**

(a)    The MBTA shall pay Contractor the Direct Cost of Force Account Work performed by Contractor pursuant to Exhibit 9, Direct Costs Billable to the MBTA, of this Agreement, plus a management fee (which includes overhead and profit) applied to Direct Costs in accordance with paragraph (b) below.

(b)    The management fee applicable to Force Account Work shall be two percent (2%) of the cost of bulk materials including, not limited to, locomotive fuel, ballast, ties and rail, eight percent (8%) of the Direct Costs other than bulk materials.

(c)    At the request of either Party, the MBTA and Contractor shall negotiate in good faith for purposes of establishing a revised Annual Fixed Price for Force Account Work under subsection 21.3(c), in lieu of utilizing the methodology set forth in this subsection.

### 21.5    **Charges for Operation of Special Trains.**

(a)    The cost of operating fifty (50) Special Trains shall be itemized in Contractor's Proposal and included in the Annual Fixed Price for each Agreement Year. Contractor shall submit a monthly report indicating the number of Special Trains operated in the prior month, the dates and times of those trains, and the number of Special Trains operated year-to-date.

(b)    In the event that the MBTA directs Contractor to operate more than fifty (50) Special Trains in any Agreement Year, the cost of operating such additional Special Trains shall be included as Force Account Work according to the provisions of Section 21.4 above at the cost per Special Train listed in Exhibit 32, Contractor Cost Proposal.  At the conclusion of each MBTA fiscal year, the MBTA shall reimburse Contractor one fiftieth (1/50[th]) of the total Special Train price listed in Exhibit 32 for each Agreement Year for each such extra Special Train.

(c)    In the event that the MBTA directs Contractor to operate fewer than fifty (50) Special Trains in any Agreement Year, Contractor shall refund to the MBTA the cost for each Special Train not operated.  The refund for each Special Train not operated shall be

000096

calculated as one-fiftieth (1/50th) of the total Special Train price listed in Exhibit 32, Contractor Cost Proposal for that Agreement Year.

21.6    **Claims for Additional Compensation**.  Contractor shall notify the MBTA at the earliest possible date of any claim for compensation other than the compensation provided in this Agreement, and shall account for and document the potential costs of such claims.  Contractor shall make no claim for additional compensation for any service that Contractor is obligated to perform as part of the Annual Fixed Price pursuant to the terms of this Agreement.  Any dispute arising under this Agreement and regarding additional compensation shall be made in writing by the Contractor within sixty (60) days after the date the claiming Party knows, or should have known, of the existence of such claims.  Such written notice shall contain a description of the nature of the claim and an itemized estimate of any damages sustained.  After such written notice has been provided, if the MBTA denies or modifies the claim, Contractor may submit the issue to the dispute resolution procedures detailed in the dispute pursuant to Section 35 of this Agreement.  This provision shall not be deemed waived unless the Parties so agree by written agreement.

21.7    **Overpayment.**

(a)    In the event that an audit conducted pursuant to Section 28 results in a determination that an overpayment to Contractor was made, the MBTA shall notify Contractor of such overpayment.  Any such overpayment amount shall be deducted from future MBTA monthly payments, with interest at the rate described in Section 21.2 from the date the overpayment occurred until the date of the first subsequent payment from which such deduction can be taken.  In the event that a determination of overpayment is made after the termination of the Agreement, an equitable adjustment shall be made and Contractor shall promptly refund any such overpayment amount to the MBTA, with interest at the rate described in Section 21.2 from the date the overpayment occurred until the refund date.

(b)    In the event the Parties are unable to reach agreement on an overpayment adjustment within fifteen (15) days after receipt by Contractor of the notice cited in Section 21.7(a), the MBTA may withhold from its next monthly payment to Contractor the amount that the MBTA asserts is in excess of the amount that should have been paid.  Any amount withheld that is later determined to be due to Contractor shall bear interest at the rate described in Section 21.2(i), from the date of withholding to the date of payment.

(c)    In the event the Parties are unable to reach agreement with respect to any dispute arising in connection with the audit or inspection of invoices or records, either Party may invoke the dispute resolution procedures specified in Section 35 of this Agreement.

21.8    **Contractor's Books and Records.**

(a)    Contractor shall keep full and accurate accounting books and records as may be required from time to time by applicable laws and regulations of all revenues and expenses related to the provision of the Agreement Services, in accordance with generally accepted accounting principles, and shall furnish reports as requested by the MBTA, including

nnr097

all reports listed in Exhibit 8, Reports and Deliverables. Contractor shall prepare the commuter rail portion of the MBTA's FTA Section 15 report, in the form required by the FTA, and submit this portion to the MBTA by September 1st of each Agreement Year. Contractor shall also maintain the financial information and data used by Contractor in preparation of supporting statements requesting payment. Contractor further agrees to make all said accounting books and records, and any other written or printed matter pertaining to the Agreement Services, available to the MBTA or its duly appointed representatives and to cause its officers or employees to cooperate fully with the MBTA in explanation of any and all areas therein. Contractor shall keep all records required herein for seven (7) years after the Termination of this Agreement.

(b)    Contractor, being bound by all applicable state and federal regulations, shall make restitution to the MBTA of such amounts of money as are withheld from the MBTA by state, federal, county, or local agencies or organizations due to Contractor's noncompliance with applicable state and federal law, and shall pay a penalty for every such withholding instance, as described in Section 22(g) below.

21.9    **Waiver.** Contractor shall waive any claims for reimbursement for expenses occurred during an Agreement Year that are not submitted to the MBTA within ninety (90) days after the close of such Agreement Year.

## SECTION 22. PENALTIES.

22.1    **Penalties**. The MBTA shall assess monthly performance penalties against Contractor in accordance with this Section and Exhibit 10, Penalties. Any penalties assessed to Contractor shall be deducted from the monthly payment paid by the MBTA to Contractor pursuant to Section 21. The MBTA shall not assess penalties under this Section during the first six (6) months of the Term of this Agreement. The MBTA also shall not assess, during the first eighteen (18) months of the Term of this Agreement, penalties that result from defects in the Service Property, Service Equipment or Support Property discovered during the Initial Joint Audit and that Contractor is required to repair or remedy at its own cost as part of its Repair Plan pursuant to Section 9.3. The total amount of penalties Contractor is obligated to pay under this Section during the twenty-four (24) month period starting January 1, 2004 shall not exceed one million, five hundred thousand dollars ($1,500,000) (the "Penalty Cap"). Starting January 1, 2006, the Penalty Cap for each twelve (12) month period for the remainder of the Term of the Agreement shall be two million dollars ($2 million). In the event that Contractor is assessed penalties in excess of the Penalty Cap during two consecutive years, the Penalty Cap shall be increased for the remaining years of the Agreement by an additional amount equal to the average of the excess penalties assessed during said two consecutive year period. Penalties shall be assessed, without limitation, in the following circumstances:

(a)    **Penalty For Late or Cancelled Trains.** Contractor will be assessed penalties for each unexcused late or cancelled train. Trains will be classified as either on-time, late or cancelled pursuant to Exhibit 11, Train Arrival Times. For each unexcused late or cancelled train, Contractor shall be assessed the following penalties:

000098

| Type of Train | Category of Non-Performance | Penalty per Train |
|---|---|---|
| Peak | Late Train | $500 |
| Peak | Cancelled Train | $2,000 |
| Off-Peak | Late Train | $250 |
| Off-Peak | Cancelled Train | $1,000 |

(b) **Penalty for Consist Compliance.** For each train trip that fails to meet the requirements in the Mechanical Scope of Services, Exhibit 4, and Exhibit 16, Service Equipment Requirements, Contractor shall be assessed the following penalties:

| Type of Train | Penalty |
|---|---|
| Peak | $1,000 per train unavailable |
| Off-Peak | $500 per train unavailable |

(c) **Employee Performance Penalty.** Contractor will be assessed a penalty of $500 for every occurrence that is documented by the MBTA (1) in which Contractor Personnel fails to perform their job responsibilities in accordance with the standards set out in Section 11, including all violations of the standards relating to employee conduct or employee appearance; or (2) the unauthorized or temporary re-assignment of employees.

(d) **Speed Restrictions and Track Outages Penalty.** As detailed in the Engineering Scope of Services, Exhibit 3, Contractor will be assessed a penalty for allowing a temporary speed restriction or track outage to remain in force beyond the approved time window or schedule for its removal, as specified in the subsections below, provided that a penalty will not be assessed if the condition causing the restriction is beyond Contractor's control.

(i) For each day that a temporary speed restriction or track outage is in force beyond the day on the MBTA-approved schedule for its removal, the MBTA shall assess a penalty of $1000 per day.

(ii) For each day that a temporary speed restriction or track outage is in force beyond the time window approved by the MBTA for that day, the MBTA shall assess a penalty of $1000 per day.

(e) **Penalty for Non-Compliance with Accessibility Laws and Policies.** Contractor will be assessed a penalty of $1,000 for each instance documented by the MBTA of the Service Property not being maintained or operated in accordance with the requirements of the Americans with Disabilities Act of 1990 (ADA), Massachusetts state law, or MBTA accessibility policies, as detailed in Section 36.4.

(f) **Inadequate Train Staffing Penalty.** Contractor will be assessed penalties for each train trip that is not adequately staffed and for each failure to submit required reports on train staffing, according to the provisions of the Transportation Scope of Services, Exhibit 2. Contractor's failure to fill the required staffing positions, as defined in the Train Staffing Plan, on any train for reasons other than Force Majeure events shall result in a $500

51

penalty for every on-board train staff position that is not staffed. Discovery by the MBTA or its agents of an unreported, unstaffed on-board train staff position shall result in a $10,000 penalty for each such unstaffed position. Failure by the Contractor to prepare and submit the required daily train staffing reports in a timely manner will result in a $5,000 penalty for each day that the report is delivered late or not delivered.

(g)    **Violations of Regulations or Rules.** Contractor shall pay, and shall not be reimbursed for, any fine imposed on Contractor or its subcontractors, consultants, suppliers or agents by any government authority or regulatory agency as a result of actions or inactions of Contractor or its subcontractors or agents. Contractor shall notify the MBTA of any fine imposed by any government authority or regulatory agency within seven (7) calendar days of Contractor's receipt of notification of such fine. Discovery by the MBTA or its agents of an unreported fine imposed by a government authority or regulatory agency shall result in a $1,000 penalty for each unreported fine. In addition, should the MBTA be fined as a result of actions or inactions of Contractor or its agents, subcontractors, consultants or suppliers, the MBTA shall reduce its next monthly payment to Contractor by the amount of such fine plus a penalty of $1,000.

(h)    **Penalty for Defects in Mechanical Services Performance and Procedures.** Contractor will be assessed a penalty in accordance with Exhibit 10, Penalties, for each occurrence documented by the MBTA of the following: (1) a defect in safety and reliability features; (2) a defect in amenities and comfort features; (3) the discovery by the MBTA of a dirty coach; (4) a "Contractor's Long-Term Hold" on any item of rolling stock; (5) unsatisfactory Mechanical Services procedures, practices, or repairs; or (6) failure to adequately fuel locomotive. Specific standards and guidelines in each of these areas are provided in the Mechanical Scope of Services, Exhibit 4, and other Exhibits.

(i)    **Penalty for Failure to Follow Incident Management Procedures.** The MBTA shall assess a penalty of $500 per occurrence for failure to comply with Incident Management procedures, as specified in the Transportation Scope of Services, Exhibit 2. Contractor shall be assessed a penalty of $1,000 per occurrence for failure to deliver required reports on Service Disruptions, as specified in the Transportation Scope of Services, Exhibit 2.

(j)    **Penalty for Failure to Submit Required Reports or Deliverables or Make Required Information Available.** The MBTA shall assess a penalty of $500 per occurrence for each report or deliverable specified in Exhibit 8, Reports and Deliverables, that was not delivered prior to the time and at the location specified. The MBTA shall also assess a penalty of $500 per occurrence if the required reports were not prepared using the CRMIS approved by the MBTA according to the terms of Section 29. The MBTA shall also assess a penalty of $500 for each instance (but only once per day) in which the MBTA conducts an electronic query for required information specified in Exhibit 8, Reports and Deliverables, using the CRMIS approved by the MBTA according to the terms of Section 29, and finds that the information is missing or out of date.

(k)    **Penalty for Failure to Prepare Operating Rules, Employee Timetable, Special Instructions Safety Rules, and Dispatching Manual.** The MBTA shall assess a

000100

penalty of $10,000 per day for failure to achieve the deadline for preparing and distributing Operating Rules, Employee Timetable, and Special Instructions Safety Rules, as specified in Section 15.

        (l)   **Penalty for Failure to Complete an Environmental Services Work Item on Time.**  In the event that a work item in the Environmental Specification has not been substantially completed by the date stipulated in the Environmental Services Work Plan (or the MBTA approved completion date), as detailed in the Engineering Scope of Services, Exhibit 3, the MBTA shall assess a penalty of $1,000 per day until such time as the work item is completed.  In the event that the MBTA incurs a cost due to the Environmental Subcontractor's failure to complete any work item on time, including fines and penalties issued for failure to comply with any permit condition, the MBTA shall reduce its next monthly payment to Contractor by an amount equal to the cost incurred plus the applicable fine or penalty assessed pursuant to paragraph (g) of this section.

        (m)   **Penalty for Failure to Adhere to Station Cleaning Schedule.**  MBTA shall assess a penalty of $500 per station per day for each day that Contractor fails to perform cleaning of such station in accordance with the approved schedule.

    22.2   **Inflation Adjustment for Option Years.**  In the event that the MBTA exercises one or more Option Years, the amount of all penalties assessed during such year shall be increased or decreased, on a cumulative basis, by the same percentage by which the cost of labor and material, excluding fuel, as reflected in the Annual Indices of Charge-Out Prices and Wage Rates (1977=100) Series RCR, included in "AAR Railroad Cost Recovery Index" and supplements thereto, issued by the Association of American Railroads, (or if such index ceases to be published, a generally recognized index which is substantially equivalent to same), has increased or decreased in the preceding calendar year.

    22.3   **Penalties Resulting From Actions of Other Parties.**  Where Contractor documents to the MBTA's satisfaction that an event that would otherwise result in a penalty was caused in whole or in significant part by actions or omissions of a Third Party or Other Contractor over whom Contractor had no supervisory or other control, the MBTA shall waive the associated penalty in proportion to the degree to which the Third Party or Other Contractor was responsible for the penalizable event.

    22.4   **Contractor Right to Dispute.**  The CGM shall notify the MBTA's Director of Railroad Operations of any disputed penalty and if not otherwise resolved, any dispute with respect thereto shall be resolved in accordance with the procedures set forth in Section 35.

    22.5   **No Waiver.**  Failure by the MBTA to assess and collect a penalty pursuant to this Section shall not constitute a waiver of any future penalty for conduct of the same type, nor waive any other rights that MBTA may have with respect to the facts and circumstances surrounding the act or omission qualifying Contractor to be assessed a penalty.

000101

## SECTION 23.  SPECIAL TRAINS.

23.1    **Authority of MBTA**.  The MBTA may, at any time during the Term of this Agreement, direct Contractor to operate Special Trains, and Contractor shall be obligated to operate such Special Trains in accordance with this Section.  The MBTA shall, whenever possible, provide Contractor with forty-eight (48) hours notice of its need for Special Trains.

23.2    **Costs of Services**.  Contractor shall be expected to operate up to fifty (50) Special Trains each Agreement Year during the Term of this Agreement as part of the Annual Fixed Price, and shall be compensated according to the provisions of Section 21.5.

## SECTION 24.  EXCURSION TRAINS.

(a)    Contractor may request authorization from the MBTA to use Service Equipment and Service Property for the operation of Excursion Trains.  The MBTA may grant such a request if it determines that (i) the operation of the proposed Excursion Train shall not adversely affect the Agreement Services; and (ii) the Service Equipment is available for use.

(b)    Contractor and the MBTA shall enter into a lease agreement for any Excursion Train operated pursuant to this Section, in a form similar to the lease agreement attached hereto as Exhibit 20, Sample Lease Agreement.  Such lease agreement shall provide that Contractor assumes all liability for any damages or claims arising out of such operations, and Contractor shall maintain all necessary insurance.  The lease agreement shall also establish the amount of reimbursement and payment terms for any such Excursion Train under the standard set forth in Exhibit 19, Excursion Trains, as amended or revised.

(c)    All Service Equipment used by the Contractor for the operation of an Excursion Train under this Section shall be returned to service clean, fully operational, and otherwise ready for use in providing the Agreement Services.  In the event that the MBTA deems that any unit of the Service Equipment used for the operation of the Excursion Train is not clean or otherwise not fully operational upon its return by Contractor, Contractor shall reimburse the MBTA an additional amount equal to the daily rental rate per unit of Service Equipment as provided for in the lease agreement for each day that any such unit of Service Equipment is deemed unfit for service.

## SECTION 25.  WRECK CLEARING.

25.1    **General.**  Contractor shall clear wrecks that involve MBTA trains and restore to operation all affected Agreement Services.

25.2    **Specific Other Wrecks.**  The MBTA may direct Contractor to assist in clearing wrecks involving a foreign railroad operating on MBTA property.  The respective rights and obligations of the foreign railroad and the MBTA shall be governed by the terms and conditions of agreements, if any, between the MBTA and that railroad.  Contractor shall be responsible for coordinating with the dispatching railroad where a wreck occurs on territory dispatched by a Third Party.

000102

25.3    **Provision of Alternate Transportation.**  Contractor shall arrange for and coordinate bus, shuttle, or other transportation for commuter rail Customers during Service Disruptions caused by wrecks, as more fully described in the Customer Service Scope of Service, Exhibit 1.

25.4    **Reimbursement.**

(a)    The MBTA shall reimburse Contractor for the Direct Costs incurred in clearing wrecks involving foreign railroads.  Such costs are not included in the Annual Fixed Price and shall be separately reimbursed as Force Account Work.  The MBTA shall not reimburse Contractor for any costs, including costs of alternate transportation, incurred in clearing wrecks caused in whole or in part by Contractor.  Where a wreck involves a foreign railroad operating on MBTA property and the MBTA directs Contractor to assist in clearing the property, Contractor shall support the MBTA's efforts to obtain reimbursement from such other railroad for expenses incurred in clearing the wreck.

(b)    Contractor is required to use wreck-clearing equipment owned by the MBTA and provided to the Contractor as part of the Agreement Services.  In the event that Contractor uses wreck-clearing equipment not owned by the MBTA, Contractor will not be reimbursed unless prior authorization is obtained by the MBTA.

## SECTION 26.  QUALITY CONTROL.

26.1    Contractor shall constantly monitor the quality of its work in all aspects of the Agreement Services.  The integrity of the quality control process shall be preserved via independent audits and by oversight from the Contractor senior manager responsible for quality control.

26.2    Contractor shall submit to the MBTA for approval an annual Quality Control Program that includes Contractor's guidelines for conducting quality control efforts.  The Quality Control Program shall include separate sections describing quality control guidelines and procedures for Engineering and Mechanical Services, which shall be included in the annual Engineering Services Plan and Mechanical Services Plan, respectively.  Contractor shall submit the first Mechanical Services Quality Control Plan on or before April 1, 2003, and the first Engineering Services Quality Control Plan on or before July 1, 2003.  Thereafter, Contractor shall submit to the MBTA for approval updates of the Quality Control Program and its individual components by February 1st of each Agreement Year.

## SECTION 27.  REPORTING AND RECORDKEEPING REQUIREMENTS.

27.1    **In General.**

(a)    Contractor shall keep, store, and maintain, during the Term of this Agreement, including any Option Years, and for seven (7) years after the termination or expiration of this Agreement, full and accurate records of all aspects of its provision of Agreement Services and other activities carried out under this Agreement.  Contractor shall

000103

furnish to the MBTA, without limitation, all reports and records identified in or required by this Agreement, including Exhibit 8, Reports and Deliverables, according to the reporting schedules specified herein.

(b)    During the Term of the Agreement, including any exercised Option Years, Contractor shall keep all records in the Commonwealth of Massachusetts during the Term of the Agreement.

(c)    At the termination or expiration of the Agreement, Contractor shall notify the MBTA of the location at which it will keep all records relating to the provision of Agreement Services, or provide copies or originals of such documents to the MBTA.

27.2    **Financial Records and Reports.**  Contractor shall keep full and accurate accounting records, including source documentation, of all expenses and revenues related to the provision of Agreement Services. All such records shall be prepared in accordance with Generally Accepted Accounting Principles.

27.3    **Required Reports.**  Contractor shall maintain and furnish to MBTA, in writing and in electronic format, the required reports set forth in this Agreement, including without limitation Exhibit 8, Reports and Deliverables, in accordance with the delivery schedules presented in this Section.  Monthly invoices shall not be considered complete if any required reports are missing.

(a)    Daily Reports as designated in Exhibit 8, Reports and Deliverables, that are required to be submitted by Contractor to the MBTA shall be received by the MBTA no later than 7:00 a.m. of the following day.

(b)    Weekly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than close of business on Monday of the following week.

(c)    Monthly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of the submission by Contractor of its monthly invoice to the MBTA.

(d)    Quarterly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of the submission by Contractor of the monthly invoice to the MBTA for the first month of each subsequent quarter.  The first quarter of each Agreement Year shall begin on July 1st.

(e)    Annual Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of Contractor's submission to the MBTA of Contractor's invoice for the first month of the subsequent MBTA fiscal year, unless otherwise specified in Exhibit 8, Reports and Deliverables.

000104

(f)    As Occurs Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than twenty-four (24) hours after the occurrence triggering a report.

(g)    On-Demand Reports as designated in Exhibit 8, Reports and Deliverables, shall be prepared by the MBTA, or by Contractor at MBTA's request, using the CRMIS.

27.4    **Annual Program Plans and Deliverables.**  Contractor shall deliver to the MBTA for approval all Annual Program Plans including, without limitation, those designated in Exhibit 8, Reports and Deliverables, and other deliverables specified by August 1st of each Agreement Year, or on such other schedule as specified.  Due dates for reports have been selected based on seasonal considerations, and to balance Contractor's work flow.   The MBTA shall review each such plan, and shall either approve such plan or, within thirty (30) days of its receipt, direct Contractor to revise such plan.  Contractor shall provide the MBTA with a plan revised accordingly within thirty (30) days of receipt of such revisions from the MBTA.  Initial program plans shall be delivered during the Mobilization Period on the schedule identified in Exhibit 8, Reports and Deliverables.

## SECTION 28.  AUDITS AND INSPECTIONS.

The MBTA may, at any time between 8:00 a.m. and 5:00 p.m. on any business day, conduct an audit and inspection of any and all records and reports kept by Contractor in connection with any aspect of the Agreement Services.  The MBTA shall provide reasonable notice of such audit where such notice is appropriate and practicable given the purposes of such audit.  Contractor shall also permit a designated representative of the MBTA, or at the MBTA's request, a representative of the DOT, the Comptroller General of the United States, or the Massachusetts Executive Office of Administration and Finance, the Massachusetts State Auditor or the Massachusetts Inspector General, to review and examine at any time any and all records kept by Contractor in connection with any aspect of the Agreement Services or to otherwise audit or inspect the quality of work being performed.  Such audits and inspections may be conducted for the Term of this Agreement and for seven (7) years thereafter.  In the event this Agreement is terminated prior to five (5) years from the Commencement Date, the MBTA shall have the right to examine and/or copy original records, as well as the right to take possession of copies of such records.

## SECTION 29.  INFORMATION MANAGEMENT.

29.1    **Commuter Rail Management Information System.**  Contractor shall operate, manage and maintain a Commuter Rail Management Information System ("CRMIS") for the performance of the Agreement Services.  Contractor shall be required to develop, procure and implement, as directed by the MBTA, the CRMIS.  The CRMIS shall be operated, managed and maintained in accordance with the terms of this Agreement, including without limitation Exhibit 5, Information Management.  All Computer Equipment, Software and Third Party Software provided under this Agreement shall comply in all material respects with Exhibit 5, Information Management, as it may be revised by the Parties from time to time.  All Software

000105

and Third Party Software must be operated on Computer Equipment that is (a) owned by the MBTA and (b) located in the Commonwealth of Massachusetts.

29.2 **Information Management Plan.** During the sixty (60) days after the Notice to Proceed Date, Contractor shall evaluate the Computer Equipment owned by the MBTA and in use by the then current commuter rail contractor, and the existing MBTA Computer Network, and submit a detailed and comprehensive Information Management Plan to the MBTA for approval. The Information Management Plan shall provide, at a minimum, (i) an inventory of existing MBTA-owned computer equipment that will be continued in use or reused as part of the CRMIS, (ii) an itemized list of Computer Equipment that Contractor intends to purchase and a proposed schedule for purchase; (iii) an itemized list of all Software the Contractor intends to develop, procure, install and/or use in order to operate, manage and maintain the CRMIS and perform the Agreement Services; (iv) diagrams and specifications for the CRMIS; (v) details of Contractor's intellectual property security procedures; and (vi) resumes of Contractor Personnel responsible for the operation, management and maintenance of the CRMIS. Within thirty (30) days of its receipt, the MBTA shall review and approve the Information Management Plan or provide Contractor with an itemized list of items or issues that Contractor must revise. Contractor shall provide the MBTA with a revised Information Management Plan within thirty (30) days of its receipt of the MBTA's comments. Contractor shall update the information Management Plan annually and submit to the MBTA for approval no later than August 1st of each Agreement Year. The Parties shall revise Exhibit 5 as appropriate to conform to the Information Management Plan, as it may be revised from time to time.

29.3 **Operational Requirements.**

(a) <u>By Contractor</u>. Contractor shall use the CRMIS:

(1) on a day-to-day basis for the input, storage and retrieval of information related to the Agreement Services;

(2) to produce reports required as part of the Agreement Services as described in Section 27 and Exhibit 8, Reports and Deliverables;

(3) to allow and provide real-time access to Data related to the Agreement Services by MBTA staff and computers specifically identified by the Director of Railroad Operations. See Exhibit 5, Information Management; and

(4) for all other tasks and services related to the provision of the Agreement Services as the Contractor sees fit or as contemplated or required in Exhibit 5, Information Management.

For purposes of this Agreement, "real-time access" means that the Contractor must input into the CRMIS, and the CRMIS must make available to the MBTA, information regarding each day's activities or occurrences in the manner described in Exhibit 5, Information Management, as soon as practicable, but no later than twenty-four (24) hours after the activity or occurrence takes place.

000106

(b)    By the MBTA.  The MBTA shall use the CRMIS:

   (1)    to review, inspect and audit Data;

   (2)    to have real-time access to Data; and

   (3)    for all other purposes necessary to fulfill or maintain the MBTA's rights and obligations with regard to the Commuter Rail System.

29.4    **Staffing and Technical Support.**  Contractor shall provide staff who are dedicated solely to Agreement Services and qualified to manage and maintain the CRMIS, including without limitation the performance of all software installation, configuration, operation, maintenance, network administration, data management, disaster recovery, training and end user support necessary to fulfill Contractor's obligations under this Agreement.  Such technical support staff shall work on-site Monday through Friday from 6 a.m. to 7 p.m., except for holidays on which the MBTA does not run full commuter rail service.  During all other hours, a member of the technical support staff shall be on-call and available to respond to technical issues by telephone or remote access, and shall arrive on-site within one hour if necessary.  Contractor may, with the prior approval of the MBTA, subcontract one or more CRMIS tasks, which approval shall not be unreasonably withheld.

29.5    **Backup and Disaster Recovery.**

   (a)    Contractor shall develop, provide, implement, and periodically test a disaster recovery and backup procedure for the CRMIS.  Contractor shall restore Data and network operations in the event of a failure or other occurrence related to the CRMIS that delays or prevents the availability of accurate Data on a real-time basis at all times during the Term of this Agreement in accordance with the standards established in Exhibit 5, Information Management.  Contractor shall, when necessary, restore or regenerate all Software and Data in order to seamlessly operate and maintain the CRMIS.

   (b)    Contractor shall continue to meet reporting and deliverable requirements as described in Section 27 and Exhibit 8, Reports and Deliverables, without regard to the operational statue of the CRMIS or any component thereof.

29.6    **Ownership of Hardware, Software and Data.**

   (a)    Title and ownership of the Computer Equipment and the right to possess and use the Software and Third Party Software shall pass to the MBTA upon purchase by Contractor.  All costs related to implementation of the Information Management Plan shall be paid through the Mobilization Fee.  All other costs shall be included in the Annual Fixed Price.

   (b)    All Software and Third Party Software provided or used by Contractor to perform the Agreement Services, including without limitation custom software developed by or on behalf of Contractor, shall be licensed to the MBTA through the Software License Agreement

000107

incorporated herein as Exhibit 6, Sample Software License Agreement, or on such other terms and conditions as Third Party Software licensors may require.

29.7    **Warranties.**

(a)    <u>System Warranties</u>. Subject to the provisions of this Section 29.7, Contractor hereby warrants CRMIS, as a whole, for the Term of this Agreement (the "CRMIS Warranty Period"), as follows:

(1)    The CRMIS shall comply in all material respects with Exhibit 5, Information Management, as it may be revised from time to time, and shall perform its intended purposes as described in Exhibit 5, Information Management.

(2)    The CRMIS as a whole will be free from any defects in materials or workmanship and shall remain in Good Working Condition, provided, however, that Contractor does not provide any warranty with respect to any component of the CRMIS provided by third parties that are not vendors, suppliers or agents of Contractor, including without limitation dispatching technology provided by Amtrak.

(3)    The CRMIS as a whole does not infringe upon or violate any patent or copyright or trade secret or proprietary right of any other party.

(b)    <u>Equipment Warranties</u>. Contractor shall use commercially reasonable efforts to obtain manufacturer's warranties for the Computer Equipment on terms and conditions that are standard in the industry, as follows:

(1)    The Computer Equipment is free of any defects in materials or workmanship. Contractor shall maintain the Computer Equipment in Good Working Condition deliver and integrate replacement equipment for any Computer Equipment found to be defective during the Term of this Agreement, within five (5) business days of Contractor's becoming aware of such defect.

(2)    The Computer Equipment complies in all material respects with Exhibit 5, Information Management, and is fit for its intended purposes as described in Exhibit 5, Information Management.

(3)    The Computer Equipment does not infringe upon or violate any patent or copyright or trade secret or proprietary right of any other party.

000108

60

(c)    Software Warranties. Contractor shall use commercially reasonable efforts to obtain vendor warranties for the Software and Third Party Software on terms and conditions that are standard in the industry as follows:

(1)    The Software and the Third Party Software are free of any defects. Contractor shall maintain the Software and Third Party Software in Good Working Condition.

(2)    The Software License Agreement grants to the MBTA, as applicable, all rights necessary to operate and maintain the CRMIS free and clear of any rights of any other parties.

(3)    The Software and Third Party Software shall comply in all material respects with Exhibit 5, Information Management, and shall be fit for their intended purposes as described in Exhibit 5, Information Management.

(4)    Neither the Software, the Third Party Software nor any portion thereof infringes upon or violates any patent or copyright or trade secret or proprietary right of any other party.

(5)    The Software shall operate in accordance with the System Documentation.

(d)    Exclusions. The warranties provided for in this Section do not apply (i) if the CRMIS is subject to damage or misuse due to fault or negligence of the MBTA or Third Parties; (ii) to the extent maintenance, modifications or repairs are provided with respect to the CRMIS by the MBTA or Third Parties without Contractor's approval and such services cause damage to the CRMIS or cause Contractor to be unable to perform the services hereunder or to be able to perform the services only at additional costs to Contractor which are not reimbursed by the MBTA, or (iii) to the extent provided in any such warranties..

(e)    Remedies for Breach of Warranty. The MBTA shall notify the Contractor in writing of any breach of any manufacturer's or vendor's warranty. Contractor shall repair or replace at no cost to the MBTA the relevant articles, items, components or materials constituting Computer Equipment and/or Software and Third Party Software so that the CRMIS Computer Equipment, Software and Third Party Software comply with any relevant warranties.. Contractor's duty to repair or replace shall be MBTA's sole and exclusive remedy for any breach of warranty, except that the provisions of this Section shall not restrict or limit the MBTA from exercising any other remedies under this Agreement.

29.8    **Escrow Agreement.** In the event Contractor develops Software for the CRMIS at any time during the term of this Agreement, Contractor and the MBTA shall enter into an Escrow Agreement in a form to be agreed upon by the Parties (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, Contractor will deposit, in CD-ROM version without charge to the MBTA, all information necessary to maintain, operate, update and improve such Software as part of the CRMIS (collectively, "System Information"), all as described in this

000109

Agreement and Exhibit. All System Information will be deposited with an escrow agent chosen by the MBTA (the "Escrow Agent"). System Information shall include all information and specifications obtainable by Contractor from Computer Equipment vendors (to the extent available to Contractor) and in Contractor's possession relating to the Computer Equipment and spare parts; all intellectual property of Contractor relating to the design, manufacture, performance, function, operation and maintenance of the CRMIS, including without limitation all Software object code and Software source code on industry standard media, and source code listings in human readable form of all Software including logic equations for programmable array logic integrated circuits (as well as the compiler or assembler and associated software tools and utilities for said source code so that it may be examined and is executable and modifiable), all design documents, specifications, flow charts, data flow diagrams and other materials or documents which explain the design, performance, function, operation or maintenance of individual software programs and the interaction of software programs within the CRMIS, all test specifications and scripts, test procedures and protocols, test plans and test data for the CRMIS; all maintenance manuals and procedures; all operator manuals; all flowcharts and other design documentation relevant to the design, performance, function, operation or maintenance of the Computer Equipment, the Software, Third Party Software and the CRMIS; parts lists containing sufficient information to procure all Computer Equipment and Third Party Software, all password security codes and any other information and documents necessary to maintain, operate, update and improve the CRMIS.

If Contractor revises or supplements any of the System Information deposited or creates additional System Information, Contractor shall deposit a complete set of such revised, supplemented or additional System Information with the Escrow Agent within thirty (30) days of such revision, supplementation or creation and Contractor shall indicate with each deposit which documents and which pages have been revised, supplemented or added since the last deposit. The Escrow Agreement shall have a term that is coterminous with this Agreement, and Contractor shall be responsible for payment of all costs arising in connection with the maintenance of the escrow referred to in this Section during the term of the Escrow Agreement.

29.9    **System Documentation.** Contractor shall provide the MBTA with copies of user documentation and user manuals with respect to the CRMIS, including all Computer Equipment, Software and Third Party Software (collectively "System Documentation") which are sufficient for the MBTA to use, operate, and maintain the CRMIS. The MBTA, at its own expense, may make additional copies of the System Documentation for its use in operating and maintaining the CRMIS.

29.10    **Restrictions on Use of Data.** All Data used in the performance of the Agreement Services shall become property of the MBTA. Contractor shall not copy, distribute, alter, sell or re-use any Data that is input into or stored on MBTA-owned computer to meet the requirements of this Agreement unless it is for the sole purpose of performing the Agreement Services. Any action taken with such Data outside of normal day-to-day operation shall be done only at the direction of the MBTA.

29.11    **MBTA Proprietary Information.** The MBTA retains all right, title and interest in and to all proprietary data, documentation and copies thereof furnished by it to Contractor

nnn110

hereunder, including all copyright and other proprietary rights therein ("MBTA Proprietary Information"). Contractor, its employees, subcontractors consultants, agents and suppliers shall hold all such information confidential and shall not, without the prior written consent of the MBTA, use, disclose or offer, sell or license or otherwise transfer to others any MBTA Proprietary Information or disclose any MBTA Proprietary Information. Notwithstanding the foregoing, Contractor may provide MBTA Proprietary Information in response to any proper governmental or court demand therefor.

29.12 **Contractor Inventions.** The Contractor hereby grants to the MBTA a perpetual, non-exclusive, irrevocable, royalty-free license to use any and all features of the CRMIS that are developed by Contractor or its employees, subcontractors, consultants, agents or suppliers for the MBTA in accordance with this Agreement (including all patent, copyright, trade secret and other proprietary rights) ("Contractor Inventions").

29.13 **Contractor Indemnification.** Contractor shall indemnify and hold harmless the MBTA, its members, officers, employees and agents from and against any and all claims, demands, causes of action, debts, or other liabilities (including attorneys' fees and expert fees) (a "Claim") made against or owed by the MBTA (which shall be deemed to include its officers, employees, subcontractors, consultants and agents) in any way relating to infringement of or inducement to infringe, patents, copyrights, trademarks, trade secrets or any other third party proprietary rights, arising as a result of the MBTA's use of, or Contractor's supplying, the CRMIS, or any component or components thereof, including the Computer Equipment, Software, or Third Party Software. Contractor shall defend any Claim with counsel designated by the MBTA, provided Contractor has no reasonable objection to such counsel.

29.14 **Contractor Cures for Infringement.** Without limiting the generality of the foregoing or limiting any other remedies of the MBTA, if the CRMIS or any item of Computer Equipment, Software, or Third Party Software or any portion thereof is held to constitute an infringement and its use is or may be enjoined, Contractor shall, at the option of the MBTA: (i) modify (or require that the applicable subcontractor, consultant, agent or supplier modify) the alleged infringing portion of the CRMIS, Computer Equipment, Software or Third Party Software, at Contractor's sole expense, without materially impairing the functionality or performance of the CRMIS, at the option of the MBTA; or (ii) procure for the MBTA, without any cost to the MBTA, a license to use the infringing portion of the CRMIS item of Computer Equipment, Software or Third Party Software.

29.15 **Contractor Notice of Infringement.** Contractor shall immediately inform the MBTA in writing if any subcontractor, consultant, agent or supplier providing goods or services to the MBTA on Contractor's behalf is a party to any actual or threatened litigation involving patent or copyright infringement, trademark violation, antitrust or other trade regulation or proprietary rights claim or is or may become subject to any injunction which may prohibit it from providing Computer Equipment, Software, or Third Party Software. The MBTA may reject any Computer Equipment, Software, or Third Party Software that is the subject to any such litigation or injunction if, in the MBTA's judgment, use thereof would delay the implementation of the CRMIS or be unlawful.

000111

29.16   **Information Management Policies and Procedures.** Contractor Personnel or any other performing any Agreement Services related to the operation, management or maintenance of the CRMIS or the MBTA Computer Network shall comply with the MBTA Data Security Policy, as amended. The MBTA Network Administrator shall be the person designated by the Director of Railroad Operations to interpret information policies and procedures, including determining what software is acceptable to be installed on the CRMIS.

## SECTION 30.  DRUG AND ALCOHOL TESTING REQUIREMENTS.

30.1   **Federal Requirements.** Contractor shall establish appropriate drug and alcohol testing programs for all Contractor Personnel in full compliance with the most stringent interpretation of applicable Federal regulations governing control of drug use and alcohol abuse in railroad and/or transit operations. Contractor shall submit to the MBTA its guidelines for drug and alcohol testing at least sixty (60) days prior to the Commencement Date. Contractor shall update such guidelines annually, and submit to the MBTA for approval, no later than August 1st of each Agreement Year.

30.2   **Additional Testing.** Contractor shall, upon reasonable suspicion and consistent with the MBTA's drug and alcohol testing policy, conduct drug and alcohol testing of any Contractor Personnel not governed by Federal regulations governing drug and alcohol abuse in railroad and/or transit operations.

30.3   **Drug and Alcohol-Free Workplace.** All Contractor Personnel, vendors, visitors, volunteers and subcontractors are to be free of the effects of illegal drugs, alcohol, controlled substances or other prohibited substances when they are on MBTA property or performing Agreement Services. In addition, all such parties are prohibited from using, possessing, selling or distributing any drugs, alcohol, controlled substances or other prohibited substances when they are on the Service Property, MBTA property or performing Agreement Services. Contractor shall advise its employees of this requirement and ensure that employees meet this "fitness for duty" standard. Contractor shall remove violators of this policy immediately from MBTA property and such employee shall, pursuant to Section 11 be held out of performing Agreement Services or any other MBTA contract. Contractor shall immediately assign the disciplined employee's job responsibilities to another qualified employee. Contractor shall furnish the MBTA with a written report documenting the actions taken with regard to any Contractor Personnel who violate this policy within thirty (30) days of the violation. The Contractor hereby accepts all liability arising from violation of this policy by its employees.

## SECTION 31.  SYSTEM SAFETY AND SECURITY.

31.1   **General Obligations.** In performing the Agreement Services, Contractor shall at all times conduct its operations in a safe manner. Contractor shall, at its own expense, promptly take all precautions which are reasonable or necessary to safeguard against risks, and shall make regular safety and security inspections of Service Property, Service Equipment and Support Property, consistent with the System Safety Program detailed herein, and shall keep records of all such inspections.

000112

64

31.2  **System Safety Program**.

(a)  Contractor shall establish an MBTA-approved System Safety Program Plan based on appropriate FRA, FTA, MDTE, APTA and MBTA regulations, standards and guidelines, which will identify, eliminate, minimize, and control safety hazards and their attendant risks. Such plan shall meet all applicable federal and other legal requirements and regulations, and must be provided to the MBTA no less than ninety (90) days before the Commencement Date. Such plan shall include procedures for responding to emergency medical conditions experienced by customers or personnel on-board trains, in stations, or on other Service Property, as well as plans for responding to other incidents that threaten the safety or security of customers or personnel. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA. Contractor shall update such plan annually, and deliver to the MBTA for approval by October 1st of each Agreement Year. Contractor shall also submit triennially to an APTA audit, and shall implement recommended changes as directed by the MBTA.

(b)  To implement such System Safety Program, Contractor shall establish appropriate policies and procedures, lines of authority, levels of responsibility and accountability, and methods of documentation. Upon request by the MBTA, Contractor shall cooperate with any audit of Contractor's System Safety Program Plan conducted by the MBTA or a Third Party acting on behalf of the MBTA.

(c)  Contractor's Safety and Training Manager shall attend quarterly meetings, and other meetings as directed by the MBTA, with the MBTA Safety Department and the Director of Railroad Operations to discuss recent safety-related incidents and concerns, and Contractor's compliance with the System Safety Program. In the event that Contractor becomes aware of an unsafe, non-secure, or potentially unsafe or non-secure condition on the Service Property or Service Equipment, or otherwise related to the Agreement Services, Contractor shall immediately take all actions required to cure such condition, notwithstanding any other provision of this Agreement that requires or permits notice or any other interim measure.

31.3  **System Security Plan.** Contractor shall provide to the MBTA a System Security Plan that shall be updated annually by October 1st of each Agreement Year and shall detail Contractor's security policies, procedures and programs. The System Security Plan shall provide for, without limitation, an identification badge system for Contractor employees; a vehicle control system for Contractor employee vehicles on the Service Property; and a plan for restricting access to stations and facilities. The initial plan shall meet all applicable federal and other legal requirements, regulations, and standards, and must be provided to the MBTA not less than ninety (90) days before the Commencement Date. The Director of Railroad Operations shall, in consultation with the MBTA Police Department, review such System Security Plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

000113

31.4  **Emergency Preparedness Plan.**

(a)  Contractor shall provide to the MBTA a draft of its initial Emergency Preparedness Plan, which shall be consistent with FRA requirements for such plan, no later than ninety (90) days before the Commencement Date. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

(b)  Contractor shall provide to the MBTA drafts of any subsequent Emergency Preparedness Plans, as any subsequent amendments or proposed amendments to such plan, no less than forty-five (45) days before such plan or amendments are submitted to the FRA. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

(c)  Contractor shall cooperate and participate in two (2) MBTA mock accident drills each Agreement Year, at times to be determined by the MBTA.

31.5  **Emergency Response Plan.** Contractor shall, at least ninety (90) days before the Commencement Date, prepare and submit to the MBTA for approval an Emergency Response Plan to effectively address conditions resulting from major storms and other natural occurrences that could disrupt Commuter Rail service. Contractor shall prepare the plan in coordination with the Environmental Services Subcontractor, shall update the plan annually, and shall provide it to the MBTA for approval no later than August 1st of each Agreement Year. The Emergency Response Plan shall detail the specific use and assignment of all resources available and Contractor shall provide additional resources as necessary.

31.6  **Contingency Plan.** No more than sixty (60) days after the Commencement Date, Contractor shall develop and provide to the MBTA for approval (through briefings or other appropriate means) a written contingency plan describing in detail measures to be taken by it to assure continued and uninterrupted performance of the Agreement Services in the event of any strike or work stoppage engaged in by Contractor's employees. Contractor shall update such plan annually, and submit to the MBTA for approval, no later than August 1st of each Agreement Year.

31.7  **Violations.** Contractor shall be solely responsible for the discovery, determination and correction of any and all violations of the System Safety Program, System Security Plan or any other safety or security violation related to the Agreement Services.

31.8  **Employee Non-Compliance.** The failure of any Contractor Personnel to comply with the System Safety Program or System Security Plan, or to otherwise comply with applicable safety requirements, shall be considered Conduct Unbecoming an Employee pursuant to this Agreement.

∩∩∩114

31.9    **Jurisdiction of the MBTA Police Department.**  Contractor acknowledges that the MBTA Police Department has primary responsibility for public safety, security, and law enforcement for the Agreement Services, including all property and vehicles owned, operated or utilized by the MBTA or its agents or independent contractors or representatives.  Contractor shall ensure that its public safety policies and operations are reviewed by and coordinated with the MBTA Police Department.  Contractor is not required to provide its own police force, and any police force provided by Contractor shall be at its sole cost and expense.

## SECTION 32.  PERFORMANCE AND PAYMENT BOND AND INSURANCE.

32.1    **Performance and Payment Bond Requirement.**  Contractor shall secure prior to the Commencement Date a Performance Bond in an amount not less than $15 million ($15,000,000.00), and a Payment Bond of not less than $5 million ($5,000,000.00), or a combined Performance and Payment Bond with such amounts, and shall maintain such bonds during the Term of this Agreement and until the MBTA determines that the contract close-out has occurred.  The Performance Bond and Payment Bond shall be in the form set forth in Exhibit 31, Forms of Required Bonds, and shall be secured through an insurance company or companies authorized to do business in the Commonwealth of Massachusetts or approved by the MBTA.  In lieu of the Performance and Payment Bonds described in this Section, Contractor may secure and maintain "clean and irrevocable" standby letter(s) of credit, provided that such letter(s) of credit grant the MBTA the same security offered by the Performance and Payment Bonds, and that the MBTA approves, in its sole discretion, the form of such letter(s) of credit before such instruments become effective.

32.2    **Contractor Liability Insurance.**  Contractor shall procure and maintain in full force and effect at its sole cost and expense during the Term of this Agreement (including any Option Years) with financially sound and reputable insurance companies, policies of insurance, which shall name the MBTA as an additional insured, and which shall include the following coverages:

(a)    FELA/Workers' Compensation Insurance:  Contractor and each Subcontractor shall procure and maintain FELA or Worker's Compensation Insurance as applicable in accordance with federal or state law.

(b)    Automobile Liability Insurance for bodily injury and property damage with a combined single limit of not less than $5 million covering vehicles owned or leased by Contractor.

(c)    Pollution Liability Insurance of not less than $25 Million per occurrence.

In the case of FELA/Workers' Compensation Insurance, Contractor may, either before the Commencement Date or during the Term of this Agreement, submit to the MBTA for approval a proposal pursuant to which Contractor would self-insure in lieu of securing the insurance policy described in paragraph (a) above.  The MBTA shall review such proposal, including information relevant to Contractor's financial stability and ability to discharge and satisfy any FELA or Workers' Compensation claims for which Contractor is responsible

000115

pursuant to this Agreement. The MBTA shall either approve such proposal, such approval not to be unreasonably withheld, or reject such proposal and provide a description of the reasons for such rejection. At no time during the Term of this Agreement shall Contractor fail to maintain either a FELA/Workers' Compensation insurance policy or an MBTA-approved self-insurance plan.

32.3    **Insurance Policies.**  The insurance specified in this Section shall be secured through insurance companies authorized to do business in the Commonwealth of Massachusetts or approved by the MBTA, and shall be in force on or before the Commencement Date and kept in effect until all work required to be performed under the terms of this Agreement is satisfactorily completed. The MBTA shall be given a minimum of thirty (30) days notice in the event of any change to or cancellation of any insurance required under this Section. The MBTA shall be listed as an "additional insured" on the policies of insurance referred to in Section 32.2, and worker's compensation policies shall include a waiver of subrogation against the MBTA. Such insurance shall be primary to and non-contributory to any insurance or self-insurance maintained by the MBTA. The FELA insurance policy referred to in Section 32.2 (a) shall be subject to a self-insured retention of not less than two hundred and fifty thousand dollars per occurrence. Contractor shall have its insurance companies mail complete copies of the policies required by Section 32.2 to the MBTA within thirty (30) days of such request. All such insurance as is required of the Contractor shall be required of and provided by or on behalf of all subcontractors to cover their work and services. The Contractor shall be held responsible for any modifications, deviations or omissions in the compliance with these insurance requirements by its subcontractors.

32.4    **Period of Coverage.**  Contractor's Insurance under Section 32.2 shall apply to any liability arising on or after the Commencement Date, and shall extend beyond the Termination Date with respect to any event occurring or liability arising during the Term of this Agreement (including any Option Years).

32.5    **Certificates.**  Contractor shall furnish the MBTA with Certificates of Insurance (and, upon request, copies of all required insurance policies, including endorsements and declarations) evidencing compliance with the requirements set forth in Section 32.2 prior to the execution of this Agreement, and annually thereafter. The policies shall be endorsed to (i) provide that the policy shall not be canceled or coverage reduced without thirty (30) days prior to written notice of cancellation to the MBTA; and (ii) name the MBTA and its directors, officers and employees, as additional insureds with respect to occurrences relating to the performance of the Agreement Services.

32.6    **Replacement Policies.**  In the event any insurance policy required by Section 32.2 to be maintained by the Contractor is canceled for any reason or has its aggregate limits impaired by twenty-five percent (25%) or more, then the Contractor shall replace such policy or reinstate the aggregate limits during the notification period with another policy in like amount and coverage protection.

000116

68

32.7    **Material Breach.** The Contractor's failure to procure or maintain insurance required under this Section constitutes a material breach of the Agreement and an Event of Default.

32.8    **MBTA Liability Insurance/Cost Sharing re: Self Insurance.** The MBTA shall procure and maintain in full force and effect during the Term of the Agreement (including any Option Years), at its own cost and expense, excess liability insurance, which shall name Contractor as an additional insured and shall cover Third Party claims against and liabilities of MBTA and Contractor for property damage, bodily injury, personal injury and death arising out of the operation of Agreement Services, with a combined single limit of $75,000,000 per occurrence annually and $75,000,000 in the aggregate annually, including a self-insured retention of not more than $7,500,000 per occurrence. The MBTA may, during the Term of this Agreement, increase the self-insured retention to an amount not more than $10,000,000 per occurrence, and shall provide Contractor with written notice of any such increase. The MBTA shall compensate Contractor for its increased costs associated with the increase in the self-insured retention from $7,500,000 through a Service Changes. Such insurance shall not cover liability for injury, damage to or death of any Contractor Personnel. Contractor and the MBTA shall share equally the cost of all liabilities falling within and paid from the self-insured retention on an equal, "fifty/fifty" basis.

32.9    **Claims Filing.** The MBTA and Contractor agree to cooperate fully with one another in the filing of claims with and recovering payments due from insurers in connection with the Agreement Services.

32.10    **Insurance Review Process.** In consultation with each Party's risk management consultants or insurance brokers, the MBTA and Contractor shall, no later than January 1, 2005, conduct an evaluation of the insurance approach to risk management contained in this Agreement. Such evaluation shall, among other things, consider whether changes in the approach to insurance coverage enhance Contractor accountability, establish a more equitable allocation of risk for both Contractor and the MBTA, and be cost-effective. At any time after the parties have begun such evaluation, if either Party so requests, the MBTA and Contractor shall, instead of engaging their own consultants, jointly procure and share the cost of an independent risk management consultant to conduct the evaluation described below. The MBTA and Contractor shall make modifications to the Operating Agreement and the approach to insurance based upon the recommendations of either their own consultants or insurance brokers or the independent consultants named above, for implementation effective the twenty-fifth (25th) month following the Commencement Date.

32.11    **Property Insurance.** The MBTA shall procure and maintain in full force and effect during the Term of this Agreement (including any Option Years), at its own cost and expense, Property Insurance, which shall name Contractor as an additional insured subject to the terms and conditions of the policy, subject to a current limit of $500,000,000, various sublimits, and a $100,000 per occurrence deductible except for earthquake, flood and wind losses which are subject to a $100,000 per location deductible subject to a maximum of $500,000 per occurrence. The MBTA Property Policy specifically excludes loss or damage caused by or resulting from any collision, upset, impact or derailment of any vehicle, including rolling stock. Contractor shall

000117

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T.  CARMACK,<br>　　　　Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-11430-PBS

**DEFENDANT**
**MASSACHUSETTS BAY COMMUTER**
**RAILROAD COMPANY**
**MOTION FOR**
**SUMMARY JUDGMENT**

# EXHIBIT 3D

bear full responsibility for all losses to Service Property, Service Equipment or Support Property that is damaged while in Contractor's care, custody and/or control in the performance of the Agreement Services, except (a) to the extent otherwise provided in Section 9.6(c) herein, and (b) to the extent that such losses are not recovered from the MBTA's Property Insurance policy for any reason, including but not limited to the application of coverage terms and conditions, deductibles, exclusions, etc. Copies of the MBTA's Property Insurance policy will be made available to Contractor upon request.

32.12  **Terrorism Insurance**.  The MBTA may, at its sole discretion, purchase and maintain optional Terrorism Insurance coverage, either in response to the Terrorism and Risk Insurance Act 2002, or otherwise.  The MBTA shall name Contractor as an additional insured on any such Terrorism Insurance coverage.  The MBTA shall notify Contractor not more than thirty (30) days after the date on which such Terrorism Insurance coverage becomes effective, and shall notify Contractor not less than thirty (30) days before the termination of any such Terrorism Insurance coverage in effect.  The MBTA shall make any such Terrorism Insurance coverage documentation available to Contractor for review upon request.

## SECTION 33.  INDEMNIFICATION AND LIABILITY.

33.1  **Environmental Conditions**.  MBTA agrees to indemnify, defend, and hold Contractor harmless from and against any claims, causes of action, damages, fines or penalties arising with respect to any adverse environmental conditions or environmental impairment which existed in or on the Service Property as of the Commencement Date, or which arise due to events that occurred prior to the Commencement Date, or which arise after the Commencement Date as a result of acts or omissions of the MBTA or any of its directors, officers, agents or subcontractors (other than Contractor).  Contractor agrees to indemnify, defend, and hold the MBTA harmless from and against any claims, causes of action, damages, fines or penalties with respect to any adverse environmental conditions or environmental impairment (a) arising after the Commencement Date but before the Termination Date or after the Termination Date but due to events that occurred after the Commencement Date but before the Termination Date, and (b) created by acts or omissions of Contractor (including its subcontractors or agents), including without limitation acts of vandalism in, on, or about the Service Property.

33.2  **FELA Liability/Workers' Compensation**.  Contractor shall have administrative and financial responsibility for preventing, processing, managing, defending, and discharging all FELA or any other state or federal Workers' Compensation claims arising during the Term of this Agreement and arising either directly or indirectly from the performance of the Agreement Services.  Contractor's responsibility for such claims shall continue after the termination date of this Agreement if such claims arose out of an event occurring during the Term of this Agreement.  The costs of Contractor's compliance with this Section shall be included in the Annual Fixed Price.  Contractor agrees to indemnify, defend, and hold harmless the MBTA, its directors, officers, employees, agents and subcontractors without regard to negligence or fault, from any and all liability for all claims brought by Contractor's employees under FELA or any other Workers' Compensation statute; provided that the aggregate amount paid by Contractor within the deductible or pursuant to a self insurance plan for claims (including defense costs) incurred during each year of the Term of this Agreement shall not exceed $4 million annually

∩∩∩118

except as detailed in the following sentence. To the extent that the aggregate amount paid by Contractor within the deductible or pursuant to a self insurance plan for claims (including defense costs) incurred during each year of the Term of this Agreement exceeds $4 million for each such year, the MBTA shall reimburse Contractor for such amounts in excess of $4 million. The MBTA's obligation to make any payments to which Contractor may be entitled under this Section 33.2 shall survive the termination of this Agreement.

33.3    **Claims Service.**

(a)    MBTA shall investigate, administer, settle and pay all claims for injury, death, or damage arising out of the performance of this Agreement, except for those claims for which Contractor (or any of its subcontractors) is responsible for obtaining insurance under Section 32. In the case of a claim asserted against both Contractor and the MBTA, either Party, in resolving the claim against itself, may in its agreement with the claimant release the other Party from all liability.

(b)    The MBTA and Contractor shall jointly determine, prior to the Commencement Date, practices and procedures for the handling and administering of claims, including the process of selection of counsel and authority to settle claims.

33.4    **Costs Included.** The duties and the indemnities given pursuant to this Agreement shall include the responsibility to pay all legal fees, medical costs, investigative expenses, expert witness fees, and other payments to Third Parties in connection with the handling or resolution of claims.

33.5    **Notice to MBTA.** Contractor shall notify the MBTA's Director of Railroad Operations and General Counsel (c/o the MBTA Law Department Claims Attorney) in writing by Registered Mail within twenty-four (24) hours of learning of any claim to which the MBTA is a party. Such written notice shall describe the nature of the claim and shall itemize an estimate of any damages involved.

33.7    **No Consequential Damages.** In no event shall either Party have any liability to the other on account of consequential damages, lost profits, or punitive damages, whether arising under contract or by virtue of a claim in tort.

## SECTION 34.  RIGHT TO SUBCONTRACT.

34.1    **In General.**

(a)    Contractor may employ subcontractors to perform any of its obligations under this Agreement, except as otherwise stated in this Section; provided, however, that prior written notice to the MBTA shall be required as to each subcontract with the exception of: (1) subcontracts with subcontractors identified in Contractor's Proposal; (2) subcontracts with vendors previously approved by the MBTA; and (3) subcontracts under which the aggregate amount payable to the subcontractor in any twelve-month period is less than $250,000.

000119

Contractor shall remain solely responsible for any work under this Agreement for which it employs subcontractors, and MBTA shall have no obligation to such subcontractors whatsoever.

(b)     All subcontractors shall perform their work in accordance with the applicable terms and conditions of this Agreement, including but not limited to compliance with all health, safety, EEO, and MBTA insurance requirements. All subcontractors shall include the provisions listed in Exhibit 29.

(c)     In the event that the Contractor terminates a subcontractor, the MBTA shall not be liable to Contractor or to such subcontractor for any damages, whether direct, consequential, incidental, liquidated or otherwise, resulting from the termination of such subcontractor. Each subcontract between Contractor and any subcontractor shall include a waiver by the subcontractor of any right to assert any claim against the MBTA on account of such termination.

(d)     Contractor may not subcontract the performance of Commuter Rail Services carried out under this Agreement or the operation of Special Trains or Excursion Trains.

**34.2     Subcontracting for Environmental Services, Hazardous Waste Disposal and Pest Control.** Contractor shall subcontract for the provision of Environmental Services, Hazardous Waste Disposal, and Pest Control Services. In no event shall Contractor or its agents, parent company, or subsidiaries provide such services, except in the case of an Emergency or with the prior written approval of the MBTA.

**SECTION 35. DISPUTE RESOLUTION.**

35.1     **Settlement of Disputes.**

(a)     The Parties shall resolve all disputes relating to the subject matter of this Agreement according to the procedures set forth in

(b)     Both Parties to this Agreement shall make every reasonable effort to settle any dispute concerning the interpretation, application or enforcement of this Agreement by prompt and diligent discussions and negotiations.

35.2     **Informal Consideration by the Parties.** Any dispute that cannot be resolved pursuant to Section 35.1 within thirty (30) business days after it arises (or such other time as the Parties may agree in writing) may be submitted at the written request of either Party to the MBTA's Director of Railroad Operations and the Contractor General Manager. These individuals shall discuss and attempt to resolve the dispute. In the event that the dispute remains unresolved twenty (20) business days after its submission (or such other time as the Parties may agree), the matter may be referred in writing by either Party to the General Manager of the MBTA and Contractor's Chief Executive Officer for consideration. If the dispute still remains unresolved thirty (30) calendar days after its referral to the General Manager and Chief Executive Officer, the matter (a) may be submitted in writing to mediation under Section 35.3 by

000120

agreement of the MBTA and Contractor or (b) either Party may commence litigation by filing an action with the Superior Court for Suffolk County, Massachusetts.

35.3    **Mediation.**  As an alternative to litigation, the MBTA and Contractor may jointly agree to submit any unresolved dispute to an independent mediator under this Section.

(a)    The MBTA and Contractor shall jointly select an independent mediator within twenty-one (21) calendar days after the submittal of a dispute under this paragraph. The independent mediator shall be properly qualified in the subject matter of the dispute.  In the event the Parties are unable to agree upon a mediator, the mediator shall be selected by alternative strikes by each Party from a list of five mediators provided by the American Arbitration Association.

(b)    The independent mediator shall meet with the Parties within twenty-one (21) calendar days after his or her selection to attempt to mediate and resolve the dispute.  If mediation efforts are unsuccessful after sixty (60) days, the mediator shall, after consideration of the Parties' positions and written submittals (if so requested), issue written recommendations for resolution of the dispute. Any such written submittals shall be postmarked by the 10th calendar day after the Parties' last meeting with the mediator. The recommendations of the independent mediator shall be issued within thirty (30) calendar days after the later of the conclusion of mediation or the submittal of written positions.  All meetings and proceedings shall be held in Boston, Massachusetts, at a time and location acceptable to both Parties.

(c)    If a Party rejects the recommendations issued, either Party may pursue all legal remedies available to it by filing an action with the Superior Court for Suffolk County, Massachusetts.  All offers, documents and statements, whether oral or written, made or produced in the course of mediation by either of the Parties, their agents, experts or attorneys, or by the mediator, shall be treated as confidential and inadmissible for any purpose, including impeachment of witnesses, in any litigation or other proceeding involving the Parties, provided that evidence which is discovered by means other than documents and statements made or produced in the course of mediation shall not be rendered inadmissible or non-discoverable.

(d)    The costs and expenses of the independent mediator shall be shared equally by the MBTA and Contractor.  The provisions of this Section may be enforced by any court of competent jurisdiction.

35.4    **Injunctive Relief.**  Notwithstanding any contrary provisions of this Agreement, if either the MBTA or Contractor believes that the other Party has failed to perform any covenant or obligation under this Agreement regarding a matter of substantial importance which, if not promptly corrected, will cause irreparable injury, the aggrieved Party may take such legal action as it deems appropriate and may file immediately any and all pleadings in any state or federal court located in Massachusetts to secure an injunction of such action or inaction pending resolution of the matter pursuant to the dispute resolution procedures set forth in this Section. The Parties agree and acknowledge that any conduct, action, or failure to act by the Contractor that results in a Service disruption for a period longer than twenty-four (24) hours, or conduct, action, or failure to act that in the sole judgment of the MBTA poses a real or potential threat to

000121

Customer or public safety shall be irreparable harm to the MBTA and contrary to the public interest.

35.5    **Interest.**  Where the time period during which interest accrues regarding a matter in dispute is specifically established elsewhere in this Agreement, that time period shall apply for purposes of disputes under this Section.  For any other dispute under this Section, interest shall accrue from the date of the filing of the claim.  Any such interest shall be at the rate described in Section 21.2 of this Agreement.

## SECTION 36.  COMPLIANCE WITH LAW.

36.1    **In General.**  At all times, Contractor will provide Agreement Services in accordance with all local, state, and federal laws, standards, codes, rules, and regulations applicable to the Agreement Services, including without limitation all such standards, codes, rules and regulations relating to safety, as are in existence from time to time, and pursuant to the terms of this Agreement.  MBTA shall not be responsible or liable for Contractor's violations of such laws or regulations.  Contractor shall promptly comply with any specific safety instructions or directions given by any duly authorized agency.  In the event a law or regulation is enacted after the date of Contractor's Proposal which materially increases Contractor's cost of performance of the Agreement Services, Contractor and MBTA shall enter into good faith negotiations in order to amend this Agreement in order to reflect such increased costs, subject in every such case to MBTA's right to terminate this Agreement for convenience pursuant to Section 40.  During the pendency of such negotiations, Contractor shall comply with such recently enacted law or regulation.

36.2    **Compliance with Laws and Regulations.**  Contractor shall keep fully informed and shall comply with the provisions of applicable Federal, State and local laws, standards, codes, rules and regulations which in any manner affect this Agreement and those engaged in the performance of, or employed in connection with, the Agreement Services.  Contractor shall, except as provided in Section 33, indemnify, protect, defend and save harmless the MBTA and its officers, agents and employees from all fines or penalties imposed upon the MBTA or any such person under any such laws, rules, and regulations by any public agency, authority or court having jurisdiction over the Parties hereto, when the imposition of same is attributable to the failure of Contractor to keep fully informed and to comply with its obligations in this regard.

36.3    **Equal Employment Opportunity.**

(a)    Fair Employment Practices.  During the Term of this Agreement the Contractor agrees:

(1)    that it will not discriminate against any employee or applicant for employment because of race, religion, creed, color, sex, national origin, age, disability or sexual orientation. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, religion, creed, color, sex, national origin, age, disability or sexual orientation.  Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or

000122

recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

(2)     that it will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, creed, color, sex, national origin, age, disability or sexual orientation.

(3)     that it will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided advising such labor union or workers' representatives of the Contractor's commitments under this Section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)     that it will comply with applicable provisions of Title VI of the Civil Rights Act, as amended, 42 U.S.C. §2000e and Federal transit laws at 49 U.S.C. §5332, as well as all applicable equal employment opportunity requirements or regulations of the U.S. Department of Labor, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," 41 C.F.R. Parts 60 et seq. (which implement Executive Order no. 11246 "Equal Employment Opportunity," as amended by Executive Order no. 11375; 42 U.S.C.§2000e note), and with any applicable Federal statutes, executive orders, regulations or policies that may in the future affect activities undertaken in the course of the Agreement Services.

(5)     that it will comply with §4 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §623 and federal transit law at 49 U.S.C. §5332, Contractor agrees to refrain from discrimination against present and prospective employees for reason of age. In addition, Contractor agrees to comply with any implementing requirements relating to age discrimination that FTA may issue.

(6)     that it will permit access to its books, records, and accounts by the MBTA and the United States Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders pertaining to fair employment practices. In the event of Contractor's noncompliance with the nondiscrimination clauses of this Agreement or with any of the said rules, regulations or orders, this Agreement may be canceled, terminated, or suspended pursuant to the provisions of Section 40.

(b)     Subcontracts. Contractor shall insert provisions in each subcontract, except subcontracts for standard commercial supplies, raw materials or construction that state the Equal Employment Opportunity policies provided in this Section.

ΩΩΩ123

36.4    **Accommodation of People with Disabilities.**

(a)    Title I Responsibilities.  Contractor shall be solely responsible, at its sole cost and expense, for compliance with the applicable provisions of Title I of the A.D.A. in its employment activities under this Agreement.  In the event that capital improvements or additions to the Service Property, Service Equipment or Support Property are necessary in order for Contractor to achieve such compliance, Contractor shall pay the reasonable costs of such capital improvements or additions as part of the Annual Fixed Price.  Any such capital improvements or additions made by Contractor shall be subject to the prior approval of the MBTA.

(b)    Title II Responsibilities.  The MBTA shall be responsible for compliance with the applicable provisions of Title II of the ADA and its implementing regulations pertaining to the provision of accessible Service Equipment and accessible Service Property, and with any requirement imposed under any agreement between the MBTA and the Massachusetts Architectural Barriers Board, provided that to the extent capital improvements or additions to the Service Property, Service Equipment or Support Property are necessary in order for Contractor to achieve such compliance, the MBTA shall pay the reasonable costs of such capital improvements or additions.  Any such capital improvements or additions made by Contractor shall be subject to the prior approval of the MBTA.  Contractor shall be responsible for operating and maintaining the Service Property and the Service Equipment in compliance with all such ADA and state requirements, and shall be solely responsible for all costs of complying with Title II of the ADA other than the capital improvements or additions discussed above.

(c)    Equal Opportunity.  In accordance with §102 of the Americans with Disabilities Act, as amended, 42 U.S.C. §12112, Contractor agrees that it will comply with the requirements of the U.S. Equal Employment Opportunity Commission, "Regulations to Implement the Equal Employment Provisions of the American with Disabilities Act," 29 C.F.R. Part 1630, pertaining to employment of persons with disabilities.  In addition, Contractor agrees to comply with any implementing requirements relating to disabilities that FTA may issue.

(d)    State and Local Requirements.  Contractor shall be solely responsible for compliance with all applicable state and local access statutes, rules, and regulations.

36.5    **Compliance with Other Specific Laws and Regulations.**  Contractor shall comply without limitation with the following regulations and guidelines:

(a)    Mandatory standards and policies relating to energy efficiency which are contained in the Massachusetts energy conservation plan issued in compliance with the Energy Policy and Conservation Act.

(b)    All applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§1251 et seq., and the Clean Air Act, as amended, 42 U.S.C. §§7401 et seq. Contractor agrees to report to the MBTA each violation thereof that it is required to report to the Environmental Protection Agency and understands and agrees that the MBTA will, in turn, report each such violation as required to assure notification to the FTA and the appropriate regional office of the Environmental

000124

Protection Agency. Contractor also agrees to include such requirements in each permitted subcontract for the performance of the Agreement Services that exceeds $100,000 financed in whole or in part with Federal Assistance provided by the FTA.

(c)    All applicable FTA and FRA regulations, policies, procedures and directives, including without limitation those listed directly or by reference in this Agreement, as the same may be amended or promulgated from time to time during the Term of this Agreement as well as all applicable APTA standards.

(d)    The provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. §§3801 et seq., and the U.S. Department of Transportation regulations entitled "Program Fraud Civil Remedies," 49 C.F.R. Part 31. Upon execution of this Agreement, Contractor shall be deemed to have certified or affirmed the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to this Agreement or the Agreement Services. In addition to other penalties that may be applicable, Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious or fraudulent claim, statement, submission or certification the U.S. government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on Contractor to the extent the U.S. government deems appropriate. Contractor also acknowledges that if it makes, or causes to be made, a false, fictitious or fraudulent claim, statement, submission or certification to the U.S. government under this Agreement, the U.S. government reserves the right to impose the penalties provided for in 18 U.S.C. §1001 and 49 U.S.C. §5307(n)(1) on Contractor, to the extent the U.S. government deems appropriate. Contractor agrees to include the provisions of this Section in each permitted subcontract relating to the Agreement Services, and that such provisions shall not be modified except to identify the subcontractor that will be subject to such provisions.

(e)    The following federal civil rights laws, where applicable: (i) Title VI of the Civil Rights Act, as amended, 42 U.S.C. §2000d, (ii) section 303 of the Age Discrimination Act of 1975, as amended, 42 U.S.C. §6102, (iii) section 202 of the Americans with Disabilities Act of 1990, 421 U.S.C. §12132, (iv) federal transit law at 49 U.S.C. §5332.

(f)    The MBTA has implemented an asbestos abatement program. Contractor shall comply with such program, and ensure that asbestos-containing materials not be employed in future constructions, vehicle renovations, repair and maintenance projects unless it can be proved unequivocally by the manufacturer or contractor that no suitable asbestos-free product exists.

36.6    **Federal Government Not a Party.** The MBTA and Contractor acknowledge and agree that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of the underlying contract, absent the express written consent by the Federal Government, the Federal Government is not a Party to this Agreement and shall not be subject to any obligations or liabilities to the MBTA, Contractor or any other Party (whether or not a Party to this Agreement) pertaining to any matter resulting from this Agreement. Contractor agrees to include the foregoing clause in each permitted subcontract for the performance of the Agreement Services financed in whole or in part with Federal assistance provided by the FTA. Contractor

000125

further agrees that such clause shall not be modified, except to identify the Subcontractor that will be subject to its provisions.

## SECTION 37.  DISADVANTAGED BUSINESS ENTERPRISES.

37.1    **MBTA DBE Policy.**  The MBTA has adopted a Disadvantaged Business Enterprise Policy in accordance with Federal regulations issued by the U.S. Department of Transportation (49 C.F.R. Part 23)  Contractor shall comply with this policy, which provides that Disadvantaged Business Enterprises (DBEs) will be afforded every practicable opportunity to participate in the performance of contracts relating to the MBTA's construction, procurement and professional service activities.

37.2    **Procedures Manual/Other Obligations.**  Contractor shall develop and implement a Comprehensive Organizational Diversity Operations and Procedures Manual. Contractor shall submit a draft Manual to the MBTA within forty-five (45) days of the Notice to Proceed Date.  MBTA shall make such reasonable changes as it deems appropriate and return to Contractor not more than thirty (30) days after its submittal.  Contractor may notify the MBTA if it disagrees with any of the changes.  MBTA will consider Contractor's objections and exercise reasonable judgment in revising the MBTA's requirements.

The Manual will include Contractor's plans, procedures and goals for the implementation of its Affirmative Action/Equal Opportunity Employment obligations as set out in Section 36.3. The Manual will include but not be limited to the following:

- Description of Boston area employment pool analyzed by age, gender, race disability, sexual orientation and national origin.
- Description of the existing Workforce, including without limitation managers, by age, gender, race disability, sexual orientation and national origin.
- Goals for improvement and maintenance the diversity of the workforce in both management and the rank and file.
- Approach and plans for promotion from within and external recruitment to improve and maintain the diversity of the entire workforce.
- Approach and plans for maintaining the diversity of the workforce should Contractor plan a reduction in force through attrition or at any time a reduction in force be required pursuant to Section 12.3.
- Training program and training schedule for managers on managing a diverse workforce, particularly respecting the fair assessment of discipline.
- Training program and training schedule for workforce on working in a diverse workplace.
- Requirement that the Civil Rights Unit track discipline by age, gender, race disability, sexual orientation and national origin; that a representative of the Civil Rights Unit be present in discipline proceedings; and that a copy of all discipline be forwarded to the Civil Rights Unit.
- Format for electronic transmittal of the monthly statistical report.

- Staffing plan and organizational chart for the Civil Rights Unit.

In addition, Contractor shall develop a professional Civil Rights Unit to oversee personnel compliance and provide monthly statistical reports highlighting the workforce profile, hiring and promotion activity and minority and related procurement information. The monthly statistical reports shall include but not be limited to the following:

- Description of Boston area employment pool analyzed by age, gender, race disability, sexual orientation and national origin.
- Description of the existing Workforce as of Commencement Date, including rank and file and managers, by age, gender, race disability, sexual orientation and national origin and the changes in each that have occurred since Commencement Date.
- Progress report on the goals for improvement and maintenance the diversity of the workforce.
- Actual implementation of approach and plans for promotion from with and external recruitment to improve and maintain the diversity of the workforce.
- Actual implementation of approach and plans for maintaining the diversity of the workforce should Contractor plan a reduction in force through attrition or at any time a reduction in force be required pursuant to Section 12.3.
- Progress report on the training program for managers on managing a diverse work force, particularly respecting the fair assessment of discipline.
- Progress report on the training program for rank and file on working in a diverse workplace.
- Analysis of all discipline issued in the report period  by age, gender, race disability, sexual orientation and national origin; documentation of the presence of a representative of the Civil Rights Unit at each discipline proceedings.
- Status report on the staffing and organizational chart for the Civil Rights Unit.

37.3    **Contractor Obligation.**

   (a) In the performance of this Agreement, Contractor shall participate fully with the MBTA in meeting commitments and goals with regard to the maximum utilization of DBEs.

   (b) Both Parties understand and agree that it is the policy of the U.S. Department of Transportation that DBEs as defined in 49 C.F.R. part 23 shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds.  Consequently, the DBE requirements of 49 C.F.R. part 23 apply to this Agreement as long as the requirements remain in effect.

በበበ127

(c)    Contractor agrees to ensure that DBEs as defined in 49 C.F.R. part 23 have the maximum opportunity to participate in the performance of contracts and subcontracts. In this regard Contractor shall take all necessary and reasonable steps in accordance with 49 C.F.R. part 23 to ensure that DBEs have the maximum opportunity to compete for and perform contracts of not less than eleven and one half percent (11 ½%) of the total cost of subcontracts, goods and services purchased or entered into.

### 37.4    **Sanctions for Violations.**

If at any time the MBTA believes that Contractor is in violation of its obligation under this Section, or has otherwise failed to comply with this Section, the MBTA may, in addition to pursuing any other available legal remedy, commence proceedings which may include sanctions. Such sanctions may include, but are not limited to, one or more of the following:

(a)    The suspension of any payment, in whole or in part, due the Contractor until such time as the issues concerning the Contractor's DBE compliance are resolved.

(b)    The MBTA may determine that such violation is an Event of Default, and in the event that Contractor fails to cure such default in accordance with the provisions of Section 40.3 , the MBTA may terminate the Agreement in whole or in part.

### 37.5    **Records and Reports.**

(a)    Contractor shall maintain records of all subcontracts entered into with certified DBE firms, and records of all materials and services purchased from certified DBE suppliers. Such records shall show, at a minimum, the name and business address of such DBE firms and the total dollar amount actually paid to each DBE firm by Contractor. The MBTA may incorporate such reports into requests for MBTA Board of Directors actions and performance reports to such Board.

(b)    Contractor shall submit monthly DBE contract compliance reports documenting DBE utilization.

## SECTION 38. MARKETING RESPONSIBILITIES.

### 38.1    **MBTA Responsibilities.**

(a)    Neither Contractor nor any of its subcontractors, consultants, agents, supplies, and employees shall market the MBTA commuter rail service through advertisements or other public promotions, unless directed in writing to do so by the MBTA.

(b)    Contractor shall support the MBTA in its efforts to inform the public about its commuter rail service. Incident Management and notification of Service Disruptions and Delays are not considered marketing activities, and Contractor shall bear responsibility for such notification pursuant to Section 8 and the Transportation Scope of Services, Exhibit 2.

000128

(c)     The MBTA shall have sole responsibility for communicating with the media, except where the MBTA directs Contractor to support such media communication.

38.2     **Contractor Responsibilities.** The MBTA hires Other Contractors to install and maintain promotional materials or public information notices on the Service Property and Service Equipment. As part of the Annual Fixed Price, the MBTA may direct Contractor to install MBTA-approved promotional materials or public information notices on the Service Property and Service Equipment pursuant to procedures established by the MBTA.

## SECTION 39.  THIRD PARTY ADVERTISING.

The MBTA shall have the sole and exclusive right to utilize or authorize the utilization of stations, rights of way, and the exterior and interior of Service Equipment used or operated in Agreement Services for the display of any written or printed advertising, promotional material, or public information notices. Any revenues from such advertisements, whether or not such advertisements are properly authorized, shall belong exclusively to the MBTA. The MBTA may hire Other Contractors to install and maintain advertising materials on the Service Property and Service Equipment.

## SECTION 40.  TERMINATION.

40.1     **For Convenience/Change of Control.**

(a)     This Agreement may be terminated for convenience at any time by the MBTA in accordance with this Section. The MBTA may also terminate this Agreement at any time upon a Change of Control if, in the MBTA's sole determination, it is in its interests to do so. Any such termination shall be effected by delivery of a notice of termination specifying the date upon which such termination becomes effective, which shall be at least six (6) months after the date of such notice.

(b)     In the event of a termination of this Agreement by the MBTA pursuant to this Section, the MBTA shall pay to the Contractor its actual Direct Costs of closing out the Agreement Services, and any other amounts due and payable to Contractor under this Agreement. Contractor shall promptly submit any claim for reimbursement pursuant to this Section to the MBTA.

40.2     **By Mutual Agreement.** This Agreement may be terminated by mutual agreement of the Parties, upon such terms and condition as the Parties may mutually agree to. Such termination shall be effective in accordance with a written agreement by the Parties. Termination under this section shall not constitute a waiver of the rights of either Party to damages or other remedies related to this Agreement, except to the extent that the agreement terminating this Agreement so specifies.

40.3     **For an Event of Default.** MBTA may, by thirty (30) day advance written notice of an Event of Default to Contractor, (except in the case of (c) or (d) below, in which case no

81

000129

prior notice of termination need be given) terminate this Agreement in any one of the following circumstances:

(a)    If Contractor fails to comply with any of the provisions of this Agreement in accordance with its terms or within the time specified for performance herein, and does not cure an Event of Default within three (3) calendar days if such failure involves any interruption in Commuter Rail Services, or within thirty (30) days for other such failures, or such greater period as the MBTA may authorize in writing, after receipt of notice specifying such failure, and indicating that a failure to remedy the same may result in termination of this Agreement;

(b)    If the MBTA determines that Contractor has obtained any payment hereunder on the basis of a representation that is false in any material respect; or

(c)    If Contractor files a petition for reorganization under Chapter 11 or Chapter 7 of Title 11, United States Code, or if any involuntary petition under either such Chapter is filed against the Contractor and is not dismissed within thirty (30) days, or if Contractor shall become insolvent within the meaning set forth in Section 101 of such title whether or not such a petition is filed by or against Contractor but provided that the MBTA provides thirty (30) days notice of its determination that Contractor is insolvent, or if Contractor makes an assignment or trust mortgage for the benefit of its creditors or if a receiver is appointed for all or a substantial part of the assets of the Contractor or if Contractor is enjoined by any court or regulatory authority from performing any material part of the Agreement Services, or if Contractor's operations are suspended or terminated by an Act of Congress; or

(d)    If the MBTA determines that continued provision of the Agreement Services by Contractor would result in danger, or the potential of danger, to the health or safety of Customers or the general public.

40.4    **Authority to Procure.**  In the event that the MBTA terminates this Agreement pursuant to Section 40.3 above, the MBTA may procure, upon such terms and in such manner as the MBTA may deem appropriate, services or supplies similar to those so terminated, and Contractor shall be liable to the MBTA for any reasonable and necessary excess costs for such similar supplies or services.

40.5    **Termination by Contractor.**  Contractor may terminate this Agreement:

(a)    If MBTA fails to make payment of undisputed amounts properly due hereunder to Contractor for a period of thirty (30) days after the date when due, and such failure continues for thirty (30) days after receipt by the MBTA of written notice from Contractor specifying such failure; or

(b)    If the MBTA fails to perform any of its other obligations under this Agreement and such failure prevents the Contractor from performing the Agreement Services for a period of forty-five (45) days and continues for forty-five (45) days after receipt by the MBTA of written notice from Contractor specifying such failure.

000130

40.6    **Termination Process.**

(a)    Upon receipt of a notice of termination from MBTA, and except as otherwise directed by the MBTA, Contractor shall (1) stop work under the Agreement on the date and to the extent specified in the notice of termination; (2) place no further orders or enter into any subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the Agreement as is not terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination; (4) assign to the MBTA in the manner, at the times, and to the extent directed by the MBTA, all of the rights, titles and interests of Contractor under the orders and subcontracts so terminated; (5) settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts, with the approval or ratification of the MBTA, to the extent the MBTA may require, which approval or ratification shall be final for all the purposes of this Section; (6) transfer title to the MBTA and deliver in the manner, at the times, and to the extent, if any, directed by the MBTA, the fabricated and unfabricated parts, work in progress, completed work, supplies and other material produced as a part of, or acquired in connection with the performance of, the work terminated, and the completed or partially completed plans, drawings, information and other property which, if this Agreement had been completed, would have been required to be furnished to the MBTA; (7) use its reasonable efforts to sell in the manner, at the times, to the extent and at the prices directed or authorized by the MBTA, any property of the types referred to above, provided, however, that Contractor shall not be required to extend credit to any purchaser and may acquire any such property under the conditions prescribed by and at the prices approved by the MBTA, and provided further, that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by the MBTA to Contractor under this Agreement or shall otherwise be credited to the price or cost of the work covered by this Agreement or paid in such other manner as the MBTA may direct; and (8) take such action as may be necessary, or as the MBTA may direct, for the protection and preservation of the property related to this Agreement which is in the possession of Contractor and in which the MBTA has or may acquire an interest.

(b)    Contractor shall, upon termination of this Agreement for any reason, including expiration of its Term as the same may be extended from time to time, cooperate with the MBTA in the transition to a future provider of Agreement Services.

40.7    **Settlement of Claims.**  Except as otherwise provided, settlement of claims by Contractor under this termination clause shall be in accordance with the provisions set forth in 48 C.F.R. Part 49, as amended from time to time.

## SECTION 41. TRANSITION PROCESS.

41.1    **In General.**  The MBTA may be required to conduct a Request For Proposals ("RFP") process prior to the expiration or termination of this Agreement to select a contractor with which MBTA will enter into a new services contract ("Successor Contractor") to provide the Agreement Services commencing upon the expiration of this Agreement. Although Contractor might be the Successor Contractor, the MBTA requires that prospective proposers other than Contractor be provided with the information necessary to prepare complete and competitive bids. To this end, Contractor shall fully cooperate with the MBTA and the

000131

prospective Successor Contractor(s) that are participating in the RFP process in accordance with this Section.

41.2    **Third Party Review of Documents.**  Contractor shall make available to prospective Successor Contractors for review at the Service Property and/or the MBTA's offices, copies of such documents and records as the MBTA shall request, provided that such documents relate to the performance of the Agreement Services.  Contractor shall not be required to provide documents relating to the financial relationship or financial transactions between Contractor and its parent companies.  The MBTA shall reimburse Contractor as Force Account Work for the reasonable reproduction costs incurred in connection with this Section provided that Contractor has given MBTA prior written notice of the estimated costs and the MBTA has issued written approval for such costs.  Contractor shall invoice the MBTA for these costs as Force Account Work.

41.3    **Third Party Inspections of the Service Property.**  Prospective Successor Contractor(s) shall have access to the Service Property, Service Equipment, and Support Property during the RFP process for the purposes of inspecting same so as to understand, without limitation, the operation, maintenance, repair and condition of the Service Property, Service Equipment, and Support Property.  The MBTA shall schedule and conduct the site visits by the Successor Contractor(s) of the Service Property, Service Equipment, and Support Property after consulting with Contractor.  Contractor shall fully cooperate with the MBTA during such site visits and shall make available such personnel and records as the MBTA requests.  Contractor shall permit prospective Successor Contractors to question such Contractor Personnel about the Service Property, Service Equipment, and Support Property, and to examine such records.  Services under this Section are included in the Annual Fixed Price.  The MBTA reserves the right to direct Contractor to conduct the site visits as an additional cost to be invoiced as Force Account Work.

41.4    **Transition Plan.**  The following obligations apply in the event that Contractor is not selected as the Successor Contractor:

(a)    **Successor Contractor Access.**  Contractor shall provide the Successor Contractor full and complete access to the Service Property, Service Equipment, and Support Property in accordance with this Agreement.  Such access shall commence six (6) months prior to the expiration or termination of this Agreement in conjunction with the Successor Contractor's mobilization period, and may include, without limitation, the Successor Contractor having one or more representatives on-site until the expiration or termination of this Agreement.

(b)    **Employment of Existing Personnel.**  Contractor shall provide a list, and resumes, if available, to the MBTA and the Successor Contractor at least six (6) months prior to the expiration or termination of this Agreement.  Contractor shall allow the Successor Contractor to interview any Contractor Personnel for employment purposes.  Contractor agrees that the Successor Contractor has the right to offer employment to any of Contractor Personnel that are on the list prior to the expiration or termination of this Agreement.

000132

41.5.  **Turnover Requirements.**

    (a)    **Operation & Maintenance Records, Manuals, Information Systems and Drawings.**  A minimum of six (6) months prior to the expiration of this Agreement, or, in the event of termination pursuant to Section 40 of this Agreement, within thirty (30) days of the MBTA's notification to Contractor of its intent to terminate the Agreement, Contractor shall provide to the MBTA a complete and accurate inventory of all categories of documents related to the Agreement Services including but not limited to drawings, specifications, calculations, manuals, procedures, reports, databases, and the like.

    (b)    **Support Inventory, Spare Parts and Consumables.**  Upon termination or expiration of this Agreement, Contractor shall remit to the MBTA all Support Inventory, spare parts, and consumables related to the Agreement Services.  The Support Inventory, spare parts and consumables shall be in Good Working Condition.  Prior to the termination or expiration of this Agreement, Contractor shall move to MBTA-owned Service Property and store in a secure manner all Support Inventory, spare parts and consumables, if any, that are not located on the Service Property prior to the expiration of this Agreement.  Contractor shall provide a list of repair and return items not located on MBTA-owned Service Property.

    (c)    **Office Equipment and Supplies.**  Upon expiration or termination of this Agreement, Contractor shall remit to the MBTA all office equipment and supplies maintained on the Service Property and used in performing the Agreement Services.  The office equipment shall be in Good Working Condition.

    (d)    **Service Property, Service Equipment, and Support Property.**  Upon expiration or termination of this Agreement, Contractor shall transfer possession of the Service Property, Service Equipment and Support Property to the MBTA in Good Working Condition.  Upon the expiration or termination of this Agreement, Contractor shall return to the MBTA Support Property that is equivalent in type, value, and condition to the Support Property provided to Contractor by the MBTA under this Agreement, as adjusted by sales or acquisitions pursuant to the Agreement.  Contractor shall pay to the MBTA the fair market value, as determined by the MBTA, of any Support Property not returned to the MBTA in accordance with this paragraph.  The MBTA shall accept the entire inventory and reimburse Contractor for any reasonable increase in the inventory size relative to the limited physical inventory or amount in excess of the Support Property held by the MBTA as of the date of the Initial Joint Audit, as adjusted during the Term of this Agreement pursuant to Section 9.3.  Any Support Property that the MBTA in its discretion determines is in excess of any such reasonable increase in Support Inventory shall become the property of Contractor and shall not be compensated by the MBTA.  Contractor shall compensate MBTA for any decrease in inventory size relative to the initial physical inventory, as adjusted during the Term of the Agreement pursuant to Section 9.3.

    (e)    **Permits.**  All of the existing permits for providing the Agreement Services shall be transferred to the Successor Contractor as of the date such contractor begins providing Agreement Services.

000133

41.6 **Agreement Close-Out Requirements of Final Inspection/Review.** The MBTA may conduct an inspection to determine the status of the requirements for close-out. Within thirty (30) days of such inspection, the MBTA shall deliver in writing to Contractor a list of items where deficiencies were found ("Punch List"). Contractor shall correct such deficiencies within thirty (30) days of receipt of the Punch List. The MBTA may exercise its rights under Contractor's Performance Bond if it determines that Contractor has not complied with the provisions of this Section.

## SECTION 42. FORCE MAJEURE.

42.1 **General.** Each Party will be excused from performance of any of its obligations to the other under this Agreement, where such non-performance is caused by any event beyond the non-performing Party's control which shall include, without limitation, any order, rule, or regulation of any federal, state, or local government body, agency, or instrumentality (other than orders relating to the correction by Contractor of its non-compliance with applicable laws and regulations applicable to the performance of the Agreement Services); natural disaster; or civil disorder, provided, however, that the Party excused hereunder shall use all reasonable efforts to minimize its non-performance and to overcome, remedy, or remove such event in the shortest practical time. Contractor shall use all reasonable efforts to undertake and complete the repair, restoration, or replacement of any property which is necessary for the provision of Agreement Services in accordance with established train schedules, and shall resume normal Agreement Services and performance of its other obligations under this Agreement as soon as reasonably possible. In the event either Party fails or refuses to use all reasonable efforts as aforesaid, the continuation of an event beyond the control of such Party shall not be deemed an excuse for non-performance hereunder.

42.2 **Labor Disputes.** A strike, work stoppage or other labor dispute shall not constitute an event beyond Contractor's control if the Contractor fails as soon as reasonably possible to proceed to obtain an order of a court or administrative agency of competent jurisdiction to prevent the continuation of the same or if Contractor fails to continue to obtain such order or pursue other means of ending such strike, work stoppage or labor dispute if the court or administrative agency initially denies Contractor's or the MBTA's request for such order.

42.3 **Weather Conditions not Force Majeure Events.** Conditions caused by a storm or other weather condition shall not constitute an event beyond the Parties' control for the purposes of this section. The obligations of the Parties in the event of a winter storm shall be in accordance with the provisions of the Engineering Scope of Services, Exhibit 3.

42.4 **Excluded Events.** The events described in paragraphs 42.1 and 42.2 above shall not constitute force majeure events if Contractor knew or should have known about the event or the reasonable possibility of such event in advance of its occurrence, and failed to take preventative or remedial measures to avoid or lessen the impact of such events.

000134

## SECTION 43. REPLACEMENT SERVICES.

43.1    **General.** If Contractor is excused from performing its obligations under this Agreement for any of the reasons listed in Section 40, or in the event of any interruption of commuter rail service resulting from a breach by Contractor of any of its obligations hereunder or any labor disputes involving Contractor Personnel, the MBTA may provide notice to Contractor of its intent to begin providing the Agreement Services, and may provide those services itself with its own or other personnel without liability to Contractor ("Replacement Services"). The MBTA may utilize Replacement Services as a substitute for all or any part of the Agreement Services that Contractor is prevented from performing by virtue of a force majeure event as described in Section 42 or fails or refuses to perform in breach of any provision of this Agreement, and may maintain such Replacement Services in effect until the Contractor is able to resume performance of the Agreement Services in full compliance with this Agreement. In the event that Replacement Services are implemented due to a breach of this Agreement, Contractor shall be liable to the MBTA for the costs of such services. The MBTA shall notify Contractor in writing at least twenty-four (24) hours prior to implementing Replacement Services.

43.2    **Coordination with Contractor's Personnel.** In the event the MBTA elects to provide Replacement Services, it shall take such steps as may be reasonably necessary in order to coordinate the activities of its subcontractors and in-house personnel with the activities of the Contractor Personnel.

43.3    **Pro Rata Reduction in Annual Fixed Price.** During the period in which the MBTA utilizes Replacement Services, Contractor shall be entitled to compensation only for Agreement Services that it actually provides, and the Annual Fixed Price for any month in which the MBTA utilizes Replacement Services shall be reduced on a pro rata basis to reflect that percentage of the total Agreement Services performed as Replacement Services. The MBTA shall determine the pro rata share of Agreement Services actually performed, and shall submit such determination to Contractor. In the event that Contractor disputes the MBTA's determination, the Parties shall resolve such dispute according to the procedures detailed in Section 35.

## SECTION 44. COORDINATION WITH OTHER RAIL CARRIERS.

44.1    **Coordination with Amtrak.**

(a)    Contractor acknowledges that the MBTA and Amtrak have entered into or will enter into an Agreement for Use and Maintenance of the MBTA Attleboro Line (the "Attleboro Agreement"), attached as Exhibit 28. Contractor agrees that it shall perform the Agreement Services in a manner consistent with the Attleboro Agreement.

(b)    Contractor acknowledges that Amtrak intercity dispatching and management staff may be stationed in CETC to dispatch trains operating on the Attleboro Line and trains operating on Amtrak lines in Rhode Island, Connecticut and Western Massachusetts controlled by the CETC facility.

000135

     (c)    Contractor shall directly coordinate with Amtrak intercity staff as necessary to operate and protect MBTA and Amtrak services. Amtrak intercity staff and Contractor senior management shall be prepared and available to meet daily at the CETC dispatching office to discuss matters of mutual interest in the previous days operation, and to plan operations for the current and subsequent days, and MBTA may attend such meetings at its discretion. Amtrak intercity staff and Contractor shall meet at least once every thirty (30) days to discuss operations over the last month and plan for ongoing and future projects and issues requiring coordination, and MBTA may attend such meetings at its discretion.

     44.2   **Coordination with Other Rail Carriers.**  Contractor agrees that it will comply and cooperate with all agreements between the MBTA and other rail carriers operating on the Service Property. The MBTA shall consult with Contractor before amending any existing agreements with other rail carriers or entering into new agreements when such amendments or new agreements would have a material impact on Contractor's performance of Agreement Services. In the event that such amendments or new agreements directly increase Contractor's costs of providing the Agreement Services, the MBTA shall compensate Contractor for its increased costs associated with such amendments or new agreements through a Service Change.

## SECTION 45. PICKETING.

     Contractor shall use all reasonable, legal and practicable means to (i) ensure that all collective bargaining agreements between Contractor and representatives of its employees and those of subcontractors and related companies include provisions prohibiting strikes or other work stoppages, (ii) enforce such provisions, and (iii) promptly obtain judicial or administrative relief in the event of any strike or work stoppage, whether or not in violation of the terms of any collective bargaining agreement. If employees of Contractor, its subcontractors, or related companies picket or otherwise disrupt facilities of the MBTA in connection with a labor dispute between such employees and Contractor, and if Contractor, at the written request of the MBTA, is unable to terminate the picketing or disruption within six (6) hours of receiving such written request, Contractor shall reimburse the MBTA for legal and related expenses incurred by the MBTA in its efforts to terminate such picketing or disruption.

## SECTION 46. AMENDMENTS AND REVISED EXHIBITS.

     This Agreement, including the Scope of Services and all other Exhibits and Appendices hereto and thereto may be amended by written agreement of the Parties from time to time during the Term of this Agreement. All amendments shall be numbered in ordinal sequence and titled accordingly.

## SECTION 47. ASSIGNMENT.

     Contractor's rights, duties and obligations under this Agreement may not be assigned, transferred, or delegated without the prior written approval of the MBTA. If Contractor makes any such assignment, pledge or other such transfer without the prior written consent of the MBTA, this Agreement shall be voidable, at the election of the MBTA. Contractor shall at all

000136

times remain liable for the performance of its obligations hereunder notwithstanding its use of employees, agents, consultants, suppliers, contractors, and subcontractors to perform the same, with or without the approval of the MBTA in any instance.

## SECTION 48.  SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon, and inure to the benefit of any authorized successors and assigns of the Parties hereto.  For this purpose, any Party hereunder entering into an agreement shall obligate any successor or assign to all the terms and conditions of this Agreement.  Any Party hereto, shall remain liable jointly and severally with any successor or assign for any breach of this Agreement which occurred, and any charges or obligations which accrued, prior to the date of the assignment notwithstanding the assumption by the successor or assign of such liabilities, charges, or obligation.

## SECTION 49.  OTHER CONTRACTOR AND THIRD PARTY ACCESS.

49.1  **Permit to Enter.**  The MBTA shall enter into a standard "permit to enter" agreement with any Other Contractor or Third Party to enter on the Service Property.  No Other Contractor or Third Party shall be allowed to enter onto the Service Property without first executing such a permit to enter and without the MBTA or such Third Party notifying Contractor of the proposed activities of such Other Contractor or Third Party.  The MBTA may, in entering into any such agreement with such Other Contractor or Third Party, place reasonable conditions or restrictions on Other Contractors or Third Parties that exceed the normal conditions and restrictions contained in the standard permit to enter.  If the MBTA and Contractor are unable to agree upon a standard permit to enter, then the MBTA may allow Other Contractors or Third Parties access to the Service Property upon such terms and conditions as the MBTA may establish.

49.2  **Government Authorities.**  Contractor shall grant access to the Service Property, Service Equipment, or Support Property to any duly authorized government authorities.  Contractor shall immediately notify an appropriate MBTA official when any state or Federal inspector, law enforcement or emergency personnel enters the Service Property.  In addition, Contractor shall provide the MBTA with copies of all reports furnished to Contractor by any regulatory agency concerning the Agreement Services, within twenty-four (24) hours of Contractor's receipt of such reports.

## SECTION 50.  NOTICE.

All notices pursuant to this Agreement shall be in writing and shall be deemed effective: (a) on the date given if delivered by hand or by facsimile if receipt of such notice is acknowledged by the recipient on a weekday during normal business hours, or on the next succeeding weekday if not given on a weekday, (b) one weekday after delivery to a reputable overnight courier service, and (c) five days after having been deposited with the U.S. Postal Service, postage prepaid.  Notice shall be given:

00013

to the MBTA:

Anna M. Barry
Director of Railroad Operations
MBTA
45 High Street
Boston, MA  02110

to Contractor:

James F. O'Leary
Massachusetts Bay Commuter Railroad Company
148 State Street, Suite 1100
Boston, MA  02109

## SECTION 51.  MISCELLANEOUS.

51.1    **No Waiver.**  No failure on the part of either Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  A waiver of any right or remedy on any one occasion shall not constitute a bar to the exercise or waiver of any such right or remedy on any future occasion. The remedies of the Parties provided herein are cumulative and not exclusive of any remedies provided for by law.

51.2    **Survival.**  The indemnification obligations of Contractor and the MBTA hereunder and all other obligations that arise but which are not satisfied during the Term of this Agreement shall survive the satisfaction of Contractor's obligation to perform the Agreement Services and the termination or expiration of this Agreement.

51.3    **Severability.**  If any term, condition, provision, paragraph, exhibit or amendment hereof shall be held to be invalid, illegal or unenforceable, or shall be held to be pre-empted by federal law or regulation, then, at the option of the MBTA, the remaining terms, conditions, provisions, paragraphs, exhibits or amendments hereof shall remain in full force and effect and their enforceability shall not be impaired by any such invalidity, illegality, unenforceability or pre-emption and the remaining provisions hereof shall nevertheless be binding with the same effect as if the invalid, illegal, pre-empted or unenforceable term, condition, provision, paragraph, exhibit or amendment was not contained therein.

51.4    **No Third Party Beneficiaries.**  Nothing in this Agreement shall be deemed to create any right in any person not a Party hereto other than permitted successors and assigns of a Party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of a Third Party except as aforesaid.

51.5    **No Individual Liability.**  No recourse shall be had by either Party for any claim against any officer, director, stockholder, employee or agent of any other Party alleging personal

liability on the part of such person with respect to performance of the MBTA's or Contractor's obligations under this Agreement.

51.6 **Performance During Disputes.** During the pendency of any dispute between the Parties, the business and the operations to be conducted under this Agreement, to the extent that they are the subject of any such dispute, shall continue to be transacted and used in the manner and form existing prior to the arising of any such controversy.

51.7 **No Benefit to Elected Officials.** The Parties agree that no member of or delegate to the Congress of the United States shall be admitted to any share or part of this Contract or to any benefit arising therefrom. The Parties agree that no member, officer, or employee of the MBTA, the EOTC, or any state or local public body of any city or town within the MBTA's service area, as the same may be expanded from time to time, during his or her tenure shall have any interest direct or indirect, in this Agreement or the proceeds thereof. Contractor hereby certifies that it is not on the U.S. Comptroller General's consolidated list of persons or firms currently debarred for violations of various public contracts incorporating labor standard provisions.

IN WITNESS WHEREOF, the MBTA and Contractor have executed this Agreement on the date above first written.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY


By: _____

Approved as to Form:


By: _____

MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY, LLC


By: _____

000139

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK,                              ) | |
|        Plaintiff, *pro se*              ) | |
| v.                                                            ) | C.A. No. 05-11430-PBS |
|                                                               ) | |
| MASSACHUSETTS BAY                          ) | |
| TRANSPORTATION AUTHORITY         ) | |
| and MASSACHUSETTS BAY                 ) | |
| COMMUTER RAILROAD,                       ) | |
|        Defendants                           ) | |

**MBCR MOTION FOR SUMMARY JUDGMENT**
**TABLE OF CONTENTS: EXHIBITS**

| Doc. No. | Date | Description |
|---|---|---|
| 1. | 6/12/03 | Affidavit of Joseph Carmack |
| 2. | 4/28/08 | Transcript of Deposition of Joseph T. Carmack |
| 3. | 2/19/03 | Operating Agreement Between MBCR and MBTA |
| 4. | 4/17/03 | Implementation Agreement Between MBCR and BLE |
| 5. | 1/03 | Commuter Rail Mobilization Services Agreement between MBTA and MBCR |
| 6. | 1/31/08 | Decision of National Mediation Board Special Board of Adjustment No. 928 on Case No. 382 |
| 7. | 5/13/02 | Decision Letter from Hearing Officer Deborah Gaines to Joseph Carmack |
| 8. | 5/13/02 | Amtrak Letter of Termination from Francis J. O'Connor to Joseph Carmack |
| 9. | 5/03 | Notice of MBCR/ MBTA Operating Agreement to National Mediation Bd. |
| 10. | 4/30/08 | Transcript of Deposition of John D. Ray |
| 11. | 4/30/08 | Transcript of Deposition of Charles Anthony Passanisi Jr. |
| 12. | 6/10/08 | Declaration of Dennis Coffey |
| 13. | 6/10/08 | Declaration of Kevin Lydon |
| 14. | 5/6/03 | Letter from Kevin Lydon to Joseph Carmack |
| 15. | | BLE Roster |
| 16. | 4/22/08 | Transcript of Deposition of Christa Cuppernull Phillips |
| 17. | 6/28/08 | Acceptance Letter from Joseph Carmack to Kevin Lydon: Includes: <ul><li>"Grievance and Demand for Relief": *Carmack v. O'Malley, DeModena, Rae and DePhillips* (not dated)</li></ul> |
| 18. | 6/30/08 | Letter from Joseph Carmack to Dennis Coffey regarding MBCR employment |
| 19. | 4/29/08 | Transcript of Deposition II of Joseph T. Carmack |

| 20. | 7/01/03 | North Station Leaflet created by Joseph Carmack |
|-----|---------|------------------------------------------------|
| 21. | 4/2/08 | Transcript of Deposition of Jacqueline Marie Boumel |
| 22. | 1/1/03 | MBTA Police Department Journal Incident Report Journal No. 03019163 |
| 23. | 2/21/08 | Transcript of Deposition of Detective Robert Pavia |
| 24. | 9/10/01 | Notice of Formal Investigation Letter from Michael O'Malley to Joseph Carmack: |
| 25. | 11/09/01 | Letter from Lou DePhillips (Amtrak) to Michael O'Bryan (BLE) re: Carmack time claims |
| 26. | 8/20/02 | Letter from Michael O'Malley (Amtrak) to Joseph Carmack in response to South Station incident |
| 27. | 8/31/02 | Letter from Joseph Carmack to Michael O'Malley (Amtrak) |
| 28. | 3/30/03 | Letter from Joseph Carmack to Michael O'Bryan (BLE) regarding time claims and O'Bryan's general capacity as BLE officer |
| 29. | 5/06/03 | Letter from Mark Kenny (BLE) to Joseph Carmack regarding decision of SBA No. 928 |
| 30. | 6/25/03 | Letter from Joseph Carmack to Mark Kenny (BLE) questioning neutrality of SBA and validity of Award |
| 31. | 7/01/03 | MBCR/MTBA Commuter Rail "Run Sheet" – Southside Passenger Services |
| 32. | 7/18/03 | Letter from Mark Kenny (BLE) to Joseph Carmack referencing July 1, 2003 incident at North Station |
| 33. | 7/22/03 | Letter from Joseph Carmack to Mark Kenny (BLE) |
| 34. | 7/22/03 | Letter from Joseph Carmack to Ross (BLE) |
| 35. | 3/12/07 | Order of Dismissal of Joseph Carmack v. Special Board of Adjustments, No. 928 |