UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH T. CARMACK,<br>    Plaintiff, *pro se*<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY<br>and MASSACHUSETTS BAY<br>COMMUTER RAILROAD,<br>    Defendants | )<br>)<br>)<br>)<br>)   C.A. No. 05-11430-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The Defendant, Massachusetts Bay Commuter Railroad Company, LLC, hereby states that for the purposes of the Defendant's Motion for Summary Judgment, the following facts are not in dispute.

**I.   PARTIES**

1. The Plaintiff, Joseph T. Carmack, is a natural person who was employed by the National Railroad Passenger Corporation ("Amtrak") as a locomotive engineer from December of 1996 until his termination in May of 2002. Plaintiff's Second Amended Complaint, ¶ 25 (hereinafter "Complaint"); Exhibit 1, Affidavit of Joseph Carmack dated July 12, 2003, ¶ 5 (hereinafter "Carmack Affidavit"); Exhibit 2, Transcript of Deposition of Joseph T. Carmack, 31: 22-23; 32: 1-8; 57: 7-23; 68: 5-19 (April 28, 2008) (hereinafter "Carmack Dep.").

2. The Defendant, Massachusetts Bay Commuter Railroad Company, LLC (hereinafter "MBCR"), is a Delaware Limited Liability Company formed on October 7, 2002, which

1

began operation of the Massachusetts Bay Transportation Authority (hereinafter "MBTA") commuter rail system on July 1, 2003. <u>Exhibit 3</u>, Operating Agreement between MBCR and MBTA, dated February 19, 2003, at 6 (hereinafter "Operating Agreement"); <u>Exhibit 4</u>, Implementation Agreement Between MBCR and the Brotherhood of Locomotive Engineers ("BLE"), dated April 17, 2003, at 1 (hereinafter "BLE Implementing Agreement").

3. The MBTA is an independent body politic and corporate and a political subdivision of the Commonwealth of Massachusetts, organized under Chapter 161A of the Massachusetts General Laws. <u>Ex. 3</u>, Operating Agreement at 1; <u>Exhibit 5</u>, Commuter Rail Mobilization Services Agreement Between MBCR and BLE, dated January 2003, at 2 (hereinafter "Mobilization Agreement"); M.G.L. ch. 161A § 2.

II. **BACKGROUND: PLAINTIFF'S TERMINATION FROM AMTRAK**

4. At all relevant times, the Plaintiff was a member of the Brotherhood of Locomotive Engineers (hereinafter "BLE"), a collective bargaining organization representing commuter rail locomotive engineers. <u>Ex. 4</u>, BLE Implementing Agreement, pt. I. §1, at 1; <u>Ex. 1</u>, Carmack Aff. ¶ 4.

5. On September 10, 2001, Plaintiff received a notice of formal investigation letter advising him that Amtrak was charging him with insubordination for his refusal to report for a psychological examination. <u>Exhibit 6</u>, January 31, 2003 Decision of National Mediation Board Special Board of Adjustment No. 928 on Case No. 382 at 1 (hereinafter "SBA Decision").

6. Pursuant to the BLE collective bargaining agreement with Amtrak (the "Amtrak/BLE CBA"), and the Railway labor Act ("RLA"), hearings were held before a hearing officer on the insubordination charge against Plaintiff on April 4, 23 and 24, 2002, and May 7, 2002.  Ex. 6, SBA Decision at 1; Exhibit 7, Decision Letter from Hearing Officer Deborah M. Gaines to Joseph Carmack dated 5/13/02 (hereinafter "Hearing Officer Decision").

7. On May 13, 2002, Deborah Gaines, an independent hearing officer, found Plaintiff insubordinate.  Ex. 6, SBA Decision at 1; Ex. 7, Hearing Officer Decision.

8. On May 13, 2002 Francis O'Connor, the Assistant General Manager of Commuter Operations at Amtrak, advised Plaintiff that he had been found guilty of insubordination in a termination letter stating the Plaintiff's "DISMISSAL IN ALL CAPACITIES EFFECTIVE IMMEDIATELY".  Ex. 6, SBA Decision, at 1; Exhibit 8, Amtrak Letter of Termination from Francis J. O'Connor to Joseph Carmack, dated 5/13/02 (hereinafter "Termination Letter").

9. Plaintiff acknowledged his termination in his affidavit where he stated that in May, 2002, he was terminated from employment with Amtrak in his capacities as Locomotive Engineer.  Ex. 1, Carmack Aff. ¶ 5.

10. Pursuant to the appeal process established in the Amtrak/BLE CBA and the RLA, the Plaintiff appealed the Hearing Officer Decision to a Special Board of Adjustment for final and binding decision thereon as provided by Section 3, Second of the Railway Labor Act.  45 U.S.C.A. § 153, "Second".

11. The Special Board of Adjustment ("SBA") held a hearing on Plaintiff's appeal on September 23, 2002.  Ex. 6, SBA Decision, at 1.

    a. On January 31, 2003, the SBA issued a decision upholding Plaintiff's termination from Amtrak. Ex. 6, SBA Decision, at 4. The SBA specifically stated that its decision was "final and binding". *Id.*

12. On April 21, 2003, BLE representative Mark B. Kenny signed the SBA order on behalf of the BLE and its member, the Plaintiff. Ex. 6, SBA Decision at 4.

### III.  MBCR ASSUMES OPERATION OF MBTA COMMUTER RAIL

13. On February 19, 2003, the MBTA and MBCR signed an agreement whereby MBCR would assume operation of the MBTA commuter rail service on July 1, 2003. Ex. 3, Operating Agreement; Exhibit 9, Notice of Operating Agreement between MBCR and MBTA to the National Mediation Board, dated May 2003.

14. During his deposition, Mr. John D. Ray, the MBTA's Director of Railroad Operations, provided the following uncontroverted testimony regarding the relationship between MBCR and the MBTA. Exhibit 10, Transcript of Deposition of John D. Ray (April 30, 2008) (hereinafter "Ray Dep."):

    a. The MBTA is a public agency that hired MBCR to operate its commuter rail service. Ex. 10, Ray Dep. 74: 21-24; 75: 1-21.

    b. MBCR is an independent contractor to the MBTA, and is not an agent of the MBTA. Ex. 10, Ray Dep. 153: 8-21; Ex. 3, Operating Agreement at 31.

15. During his deposition, Mr. Charles A. Passanisi Jr., the MBTA's Deputy Budget Director, also provided the following uncontroverted testimony regarding the relationship between MBCR and the MBTA. Exhibit 11, Transcript of Deposition of Charles Anthony Passanisi, Jr. (April 30, 2008) (hereinafter "Passanisi Dep."):

    a. Although the MBTA receives federal funding, that funding is earmarked for certain capital improvements and maintenance; the MBTA does not receive federal funding for operation of its commuter rail. Ex. 11, Passanisi Dep. 27: 3-8; 28: 9-15; 37: 9-12; 41: 3-16; 42: 19-24; 43: 1-10.

    b. MBCR has a contract with the MBTA to operate the MBTA commuter rail; MBCR is paid exclusively by the MBTA for its operation of the commuter rail; MBCR receives no federal funding of its own, and none of the federal funding received by the MBTA is used to pay MBCR for its operating the commuter rail. Ex.11, Passanisi Dep. 37: 9-24; 41: 21-24; 42: 1-3; 48: 6-9.

16. MBCR contracted with HNTB Corporation ("HNTB") as a sub-contractor to MBCR to provide, among other things, advice and assistance regarding the transition of the operation of the MBTA commuter rail from Amtrak to MBCR (the "Transition"). Exhibit 12, Declaration of Dennis Coffey dated June 10, 2008 (hereinafter "Coffey Decl."), ¶ 3.

17. In connection with the Transition, and pursuant to agreements between MBCR and the several railroad labor organizations, including the BLE, MBCR agreed to make conditional job offers to union members who were employed by and actively working for Amtrak at that time. Ex. 12, Coffey Decl., ¶ 5; Exhibit 13, Declaration of Kevin Lydon (hereinafter "Lydon Decl."), ¶ 5.

18. On April 17, 2003, MBCR and the BLE entered into an agreement relating to MBCR's assumption of the operations of the MBTA beginning on July 1, 2003 and conditional offers of employment to BLE union members who were actively working for Amtrak. Ex. 4, BLE Implementing Agreement at 1; Ex. 12, Coffey Decl., ¶ 5; Ex. 13, Lydon

Decl., ¶ 5. The BLE Implementing Agreement included a requirement that MBCR would make a Conditional Offer of Employment to all BLE members employed by and actively working for Amtrak as of May 1, 2003, effective July 1, 2003. Ex. 4, BLE Implementing Agreement, pt. I, § 4, at 2. Ex. 12, Coffey Decl., ¶ 5; Ex. 13, Lydon Decl., ¶ 5.

19. The BLE Implementing Agreement between BLE and MBCR established that the Conditional Offer of Employment would only be made to all "qualified engineers". Ex. 4, BLE Implementing Agreement, pt. I, § 4, at 2.

20. The Agreement specifically defined qualified engineers to only include the following: All Passenger Engineers with "prior" rights to Amtrak work Zone CS-1; all other Passenger Engineers "working" in Amtrak work Zone CS-1 as of the date of this Agreement; All other Passenger Engineers "working" in the Boston Crew Base in Work Zone 1. Ex. 4, BLE Implementing Agreement, pt. I, § 4B i-iii., at 2-3.

21. Furthermore, the BLE Implementing Agreement clarifies that inactive employees will not be granted positions unless and until they return to active status. Specifically, the BLE Implementing Agreement states that

> (e)ligible, qualified Passenger Engineers, who are inactive for the entire application and bidding period by reason of sickness, temporary or occupational disability, disciplinary suspension or dismissal…shall have the right to make application within five (5) days of their return to active status.

Ex. 4, BLE Implementing Agreement, pt. I, § 4E, at 3 (emphasis added).

22. HNTB and certain MBCR officials (the "Transition Team") prepared a "Conditional Offer of Employment Letter" (the "Conditional Offer Letter"), to be signed by MBCR General Manager Kevin Lydon. *See, e.g.*, Exhibit 14, Letter from Kevin Lydon to Joseph

6

Carmack, dated May 6, 2003 (hereinafter "Lydon Letter").  Ex. 12, Coffey Decl., ¶ 6; Ex. 13, Lydon Decl., ¶ 6.

23. Mr. Lydon was not involved with the preparation of the Conditional Offer Letter, its distribution, or any follow-up with offerees.  Mr. Lydon's role regarding the letters was merely to sign each one as the legal representative of MBCR.  Ex. 12, Coffey Decl., ¶ 7; Ex. 13, Lydon Decl., ¶¶ 7, 8.  Other than signing the Conditional Offer Letter on behalf of MBCR, Mr. Lydon had no involvement in the hiring of employees during the Transition.  Ex. 13, Lydon Decl.,¶ 8.

24. Consistent with the terms of the BLE Implementing Agreement and the understanding of all involved, the contents of the Conditional Offer of Employment Letter sent to the Plaintiff reiterated that the offer was only applicable to "current" employees of Amtrak.  Specifically, the letter stated

> We are looking forward to employing you and *other current* commuter rail workforce upon commencement of our management of the MBTA Commuter Rail Service on Tuesday, July 1, 2003.  We know that with the experience of the *current team* we can accomplish our goal of continually improving the quality of service.

Ex. 14, Lydon Letter at 2 (emphasis added).

25. The Conditional Offer Letter was to be sent to various classes of current Amtrak employees who were in active status, including locomotive engineers.  To meet this obligation, the Transition Team required from Amtrak a list of its qualified employees and their addresses.  However, Amtrak management (in Philadelphia, Washington, D.C. and Boston) was extremely conservative in terms of employee privacy, and was reluctant to provide any "personnel file" data.  Ex.12, Coffey Decl., ¶ 8.

7

26. Consequently, to initially identify the names and addresses of Amtrak personnel who would receive Conditional Offer Letters, the Transition Team relied upon employee rosters that were maintained by the various employee unions, such as the BLE, among others. Ex. 12, Coffey Decl.., ¶ 9; Exhibit 15, BLE Roster.

27. The Transition Team did not consider the rosters supplied by the BLE or any other union to be dispositive of a person being "qualified" for an offer of employment with MBCR. Amtrak did eventually provide lists of names of employees who had been or were engaged in the MBTA commuter rail service. This listing, together with the addresses supplied by the unions, served as the basis for initial offers of employment. Going forward, however, these lists were supplemented and corrected based on discussions with both Amtrak managers and labor union representatives. Ex. 12, Coffey Decl., ¶10.

28. During the course of preparing for the transition names were added to or dropped from the group of "qualified" personnel as new information became available. For example, the Transition Team learned that some employees who were on Amtrak's initial list were not in fact on "active" status with Amtrak because they were injured, on military leave, or were removed for disciplinary infractions. Some employees had even been separated from employment with Amtrak, but nonetheless showed up on the initial listing from Amtrak. Ex. 12, Coffey Decl., ¶11.

29. Although Plaintiff was not employed by or working for Amtrak at the time, on May 6, 2003, because of the confusion caused by the inaccurate rosters, MBCR accidentally mailed Plaintiff a Conditional Offer of Employment Letter. Ex. 14, Lydon Letter; Ex. 12, Coffey Decl., ¶ ¶ 13, 14.

30. After mailing the initial round of Conditional Offer Letters, Mr. Coffey received a telephone call from the Plaintiff, who indicated that he had received one of the Letters. Ex., 12, Coffey Decl., ¶12.

31. Mr. Coffey contacted MBCR Manager of Labor Relations Christa [Cupprenall] Phillips to confirm the Plaintiff's status with Amtrak. Ms. Phillips informed Mr. Coffey that the Plaintiff had been terminated by Amtrak. Consequently, the Plaintiff was ineligible for the employment offer from MBCR. Ex. 12, Coffey Decl., ¶ 13.

32. As a result, Mr. Carmack was not placed on a locomotive engineer roster with MBCR as he did not meet the eligibility requirements set forth in the Conditional Offer Letter and in the BLE Implementing Agreement. Ex. 13, Coffey Aff., ¶ 14. "In the end, the correlation is between the award and your status at the time." Exhibit 16, Transcript of Deposition of Christa Cuppernull Phillips, 150: 5-8 (April 22, 2008) (hereinafter "Phillips Dep.")

33. On June 24, 2003 MBCR issued the awards list for engineer positions, but because Plaintiff was not an eligible employee, his name was not on the list. Plaintiff's Second Amended Complaint, ¶ 29; Ex.12, Coffey Decl., ¶ 14.

34. Despite the clear requirement of "active employment" with Amtrak, in a letter dated June 28, 2003 the Plaintiff wrote to MBCR purporting to accept the job offer. Exhibit 17, Acceptance Letter from Joseph Carmack to Kevin Lydon, dated June 28, 2003.

35. Nonetheless, Plaintiff did not appear to seriously dispute the fact that he was not entitled to or qualified for consideration for employment with MBCR when he acknowledged his termination from Amtrak in a letter to Dennis Coffey, in which he stated "it should be obvious to people, that being fired has allowed me to focus on union failures." Indeed,

9

the Plaintiff gave every indication that he knew he was not entitled to consideration for employment by MBCR when he told Mr. Coffey, "if we can't work together, I will be fine", and finally when he said that if the parties could not "find common ground", then "I will walk away . . . ."  Exhibit 18, Letter from Joseph Carmack to Dennis Coffey regarding MBCR Employment, dated 6/30/08.

36. Pursuant to the Operating Agreement, MBCR commenced operation of the MBTA on July 1, 2003.  Ex. 1, Carmack Aff. ¶ 16.

### IV. JULY 1, 2003 INCIDENT AT NORTH STATION

37. On July 1, 2003 at approximately 3:55 p.m., Plaintiff went to North Station in Boston Massachusetts.  Ex. 1, Carmack Aff. ¶ 22; Exhibit 19, Transcript of Deposition II of Joseph T. Carmack, 5: 5-6, 14-16 (Apr. 29, 2008) (hereinafter "Carmack Dep. II").

38. Plaintiff prepared and photocopied a leaflet to hand out to engineers at North Station.  Ex. 1, Carmack Aff. ¶ 21; Ex. 19, Carmack Dep. II, 27: 19-23; 28: 1-23.

39. Plaintiff admitted that "he had written informational materials to hand to fellow union members."  Plaintiff's Second Amended Complaint, ¶ 36; Ex. 19, Carmack Dep. II, 48: 1-23; 49: 1-9.

40. One side of the double-sided leaflet was entitled "Open Letter to Division 57: Birnam Wood Removes to Dinsinane!".  The first paragraph contained the following text:

> I own an MBCR position in accordance with the MBCR/BLE agreement. I own a job.  I'm not asking for one.

Exhibit 20, North Station Leaflet created by Joseph Carmack (hereinafter "North Station Leaflet").

41. A subsequent paragraph on the same side of the Leaflet stated the following:

> There is no turning back, now. I will not be intimidated by anyone. You can be for me or against me, but I will press on. I have a job and I am going to take it.

Ex. 20, North Station Leaflet.

42. Lastly, the Plaintiff ended the "Open Letter" side of his Leaflet with the following text:

> I'm reporting on July 1, 2003 to displace the job I own.
> I WILL NOT BE DENIED BY O'BRYAN WILL TRY TO TELL YOU I DON'T HAVE RIGHTS OR THAT I'M NOT A UNION MEMBER.
> NOW HEAR THIS!
> O'BRYAN IS LYIN!
> I'M BACK!
> LET'S ROCK!
> GUILDENSTERN IS DEAD.

Ex. 20, North Station Leaflet (emphasis in original).

43. The other side of the leaflet entitled "BLE ALERT" stated that "On May 13, 2002, Amtrak terminated Engineer Carmack (Plaintiff) for insubordination". Ex. 20, North Station Leaflet, at line 4.

44. Further down, the Plaintiff wrote that "J. Carmack will make displacement on Run 820 on July 1, 2003 at 4:40 PM." Ex. 20, North Station Leaflet, at line 9.

45. A short while later, an unidentified engineer brought the Plaintiff's Leaflet to the attention of MBCR Trainmaster Jacqueline Boumel. Exhibit 21, Transcript of Deposition of Jacqueline Marie Boumel, 213: 12-22 (Apr. 2, 2008) (hereinafter "Boumel Dep.").

46. After reading the aforementioned references to displacement in the Plaintiff's leaflet, Ms. Boumel felt that the Plaintiff was going to board a train, go up into the engine, and run the train. Ex. 21, Boumel Dep. 214: 11-24; 215: 1; 238: 3-22.

47. Ms. Boumel contacted her supervisor regarding the Plaintiff's leaflet. Ex. 21, Boumel Dep. 214: 2-10.

11

**48.** The Supervisor then contacted the MBCR train dispatcher, who subsequently called the MBTA police dispatcher. Ex. 21, Boumel Dep. 236: 21-24; 237: 1-2; 291: 1-24; Ex. 19, Carmack Dep. 31: 2-10.

**49.** In response to the call, the MBTA dispatcher sent Police Officer Robert Pavia to North Station. Exhibit 22, MBTA Police Department Journal Incident Report, Journal No. 03019163 (June 1, 2003) (hereinafter "MBTA Police Report").

**50.** In her deposition, Ms. Boumel indicated that she took no position on what result she wanted or expected regarding the Plaintiff, indicating that "I just wanted to continue the rush hour peacefully", and that it didn't matter to her if the Plaintiff left the station. Ex. 21, Boumel Dep. 307: 8-14.

**51.** Officer Pavia arrived at approximately 4:16 PM and located Ms. Boumel, who stated that an ex-Amtrak employee [the Plaintiff] was passing out literature on Platform three and attempting to disrupt service by taking over a train. Exhibit 23, Transcript of Deposition of Officer Robert Pavia. 44: 15-21 (Feb. 21, 2008) (hereinafter "Pavia Dep."); Ex. 22, MBTA Police Report; Ex. 21, Boumel Dep. 317: 23-24; 318: 1.

**52.** Ms. Boumel stated that when Officer Pavia arrived "I showed him [the Leaflet] and thought you'd displace – you were going to actually go up and try to run the train." Ex. 21, Boumel Dep. 311: 1-4.

**53.** Officer Pavia approached Plaintiff, conducted an independent investigation of the situation, and ultimately concluded that the Leaflets Plaintiff was distributing were threatening. Ex. 23, Pavia Dep. 54: 19-24; 55: 1-3; 58: 13-20.

54. Specifically, Officer Pavia found the statements "Let's Rock", and "Guildenstern is Dead" very threatening. He interpreted the statement to mean "I'm going after somebody." Ex. 23, Pavia Dep. 60: 6-10.

55. Similarly, Officer Pavia interpreted the Plaintiff's statement "Now Hear This", as an attempt to strong arm people". Ex. 23, Pavia Dep. 60 17-21.

56. Officer Pavia also concluded that the Plaintiff's statement "J. Carmack will make displacement on run 820 on July 1, 2003, at 4:40 p.m." was threatening to both the public, given that it was rush hour on a weekday, and to the engineers and other crew members of the train the Plaintiff threatened to displace. Ex. 23, Pavia Dep. 52: 13-22.

57. Based on a combination of factors, Officer Pavia made an independent decision as an MBTA police officer to remove the Plaintiff from North Station and request that he discontinue handing out the Leaflets. Ex. 23, Pavia Dep. 68: 11-24.

58. Plaintiff admitted that "Officer Pavia invited plaintiff to walk with him toward the exit and Officer Pavia explained that plaintiff was banned from all MBTA stations for 24 hours." Ex. 1, Carmack Aff. ¶ 39.

59. Following their conversation, Officer Pavia escorted the Plaintiff from the MBTA property and gave him a no trespass order. Ex. 22, MBTA Police Report.

60. When asked during her deposition, "why was it important for [Plaintiff] to leave the station?", Ms. Boumel responded, "it was out of my hands by then. Once the police are called, it's out of my hands." Ex. 21, Boumel Dep. 308: 19-23.

61. Ms. Boumel made it quite clear that she "didn't ask for the no trespass order." Ex. 21, Boumel Dep. 311: 22-23. In fact, the Plaintiff did not appear to hold Ms. Boumel

13

responsible for the actions of Officer Pavia, stating "It's OK, Jackie. He's making my point for me."  Ex. 1, Carmack Aff. ¶ 36; Ex. 19, Carmack Dep. 70: 19-23.

62. Officer Pavia testified that he found the Leaflets threatening based on his training which taught him that "what would be considered prohibited behavior would be putting somebody in fear or being disorderly."  Ex. 23, Pavia Dep. 76: 3-5.

63. In explaining his reason for issuing a no trespass order to the Plaintiff, Officer Pavia stated that the Leaflets "seemed confrontational and I wasn't going to risk either a problem with [the Plaintiff] and the crew that has the right to be there and also risk the public safety of the ridership who would have been on this train."  Ex. 23, Pavia Dep. 57: 6-9.

    Respectfully Submitted,
    MASSACHUSETTS BAY COMMUTER
    RAILROAD COMPANY,
    By its attorneys,

    /s/ Robert K. Blaisdell
    Robert K. Blaisdell, BBO #568060
    Donoghue, Barrett & Singal, P.C.
    One Beacon Street, Suite 1320
    Boston, Massachusetts  02108

Dated:  June 18, 2008    (617) 598-6700

**CERTIFICATE OF SERVICE**
I, Robert K. Blaisdell, hereby certify that I have caused copies of the foregoing document to be served upon by first class mail, postage prepaid to be served upon *pro se* Plaintiff Joseph T. Carmack, 592 Tremont Street, Boston, MA, this 18th day of June, 2008.

    **/s/ Robert K. Blaisdell**
    **Robert K. Blaisdell**