UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH T. CARMACK,<br>      Plaintiff,<br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY and<br>MASSACHUSETTS BAY COMMUTER<br>RAILROAD COMPANY,<br>      Defendants | Civil Action No. 05-11430-PBS |

**MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Following a series of rulings on motions to dismiss and to amend the complaint, two analytically distinct sets of claims remain in this case. In Count I, the plaintiff, Joseph T. Carmack, claims that the defendants, the Massachusetts Bay Transportation Authority (MBTA or the Authority) and Massachusetts Bay Commuter Railroad Company, LLC (MBCR), violated his civil rights when an MBTA police officer, to guard against a potential threat to the public safety, told him to leave North Station on July 1, 2003. In Count X, the plaintiff claims that his rights under the Rehabilitation Act were violated when MBCR failed to hire him as a locomotive engineer in June 2003. The MBTA submits that the undisputed material facts demonstrate that the MBTA has not violated any of the plaintiff's rights and that judgment of dismissal, pursuant to Fed. R. Civ. P. 56, should be entered on all remaining claims against the MBTA.

**Statement of Facts**

The Massachusetts Bay Transportation Authority is a "body politic and corporate and a political subdivision of the commonwealth" of Massachusetts, charged by its enabling statute

1

with the authority and responsibility to provide public transportation services within the area of its member cities and towns.  Mass. G.L. c. 161A, §§ 2-3; *see* Massachusetts Bay Transportation Authority's Statement of Undisputed Material Facts Under Local Rule 56.1 (SMF), ¶ 1.  Among the public transportation services that the MBTA provides is an extensive commuter rail service, with hubs in Boston's North and South Stations.  SMF ¶ 2.  On an average weekday, in July 2003, there were 184 commuter rail trips into and out of North Station, carrying a total, on average, of about 50,000 commuter rail passengers.  Most of this activity took place during the morning and evening rush hours.  SMF ¶ 5.

While the MBTA owns the track and the rolling stock, it does not operate the commuter rail service itself.   From January 1, 1987 through June 30, 2003, the National Railroad Passenger Corporation (Amtrak) operated the MBTA's commuter rail service pursuant to a contract with the MBTA.  SMF ¶ 3.

In 2001, Mr. Carmack, who was employed by Amtrak as a locomotive engineer, conveyed to his supervisor a package of materials that his supervisor perceived to contain a threat of workplace violence.  SMF ¶ 8.  Mr. Carmack entitled these materials "Letters from Hell."  They included a letter to God from Lucifer and a Hamlet scenario in which Mr. Carmack assigned the role of Hamlet to himself and assigned to his supervisor and his union representative, respectively, the roles of Rosencrantz and Guildenstern, characters in Shakespeare's play who are murdered at Hamlet's request.  At the end of the scenario, Mr. Carmack wrote in capital letters:  "ROSENCRANTZ AND GUILDENSTERN ARE DEAD." SMF ¶ 9.

Amtrak's Threat Assessment Response Team commenced an investigation.  SMF ¶ 10. Amtrak discharged Mr. Carmack on May 13, 2002, after he refused to undergo a psychiatric

evaluation. SMF ¶ 11. The National Mediation Board, Special Board of Adjustment, upheld his termination in an award dated January 31, 2003. SMF ¶ 12.[1]

Meanwhile, pursuant to a public bidding process initiated in 2002, the MBTA, in February 2003, entered into a written contract with MBCR for MBCR to operate the MBTA's commuter rail service commencing on July 1, 2003 (the Operating Agreement). SMF ¶ 4. Under the Operating Agreement, MBCR undertook to hire employees for its operation of the commuter rail from Amtrak's existing work force. On or about June 24, 2003, MBCR issued awards for its locomotive engineer positions, but did not award a position to Mr. Carmack. SMF ¶ 13. Mr. Carmack claims (in Count X) that MBCR's failure to hire him was based upon information from Amtrak employees that he was violent and dangerous due to mental illness. MBCR has denied that allegation and has stated that Mr. Carmack was ineligible because he was not an Amtrak employee at the time.

On July 1, 2003, at around 4:00 in the afternoon, the onset of the afternoon commuter rush, Mr. Carmack came to North Station with copies of a flyer that he had prepared. SMF ¶ 14. During the time from 3:50 P.M. and 5:15 P.M. on that day, about 7,011 people arrived or departed from North Station on commuter rail trains. SMF ¶ 15. The lobby area of North Station, where departing commuters must wait before their trains are ready for boarding, was considerably smaller than it is today. SMF ¶ 7.

---

[1] Mr. Carmack's petition for judicial review of that decision, *Carmack v. National Mediation Board, Special Board of Adjustment 928,* U.S.D.C. (D. Mass.) Civil Action No. 05-10185 PBS, was dismissed in 2007. Also last spring, this Court entered summary judgment dismissing Mr. Carmack's complaint against Amtrak arising out of these events, *Carmack v. National Railroad Passenger Corporation,* U.S.D.C. (D. Mass.) Civil Action No. 03-12488, reported at 486 F. Supp.2d 58 (D. Mass. 2007).

Mr. Carmack's stated purpose was to solicit, from locomotive engineers he knew who were union members, support for his efforts to enlist the union in his grievance against MBCR. SMF ¶ 16. Mr. Carmack spoke to several locomotive engineers he knew and gave copies of his flyer to a couple of them. SMF ¶ 17.

The flyer was a single sheet of paper printed on both sides. It addressed Mr. Carmack's history with Amtrak and his present personal employment situation with MBCR. These were matters concerning Mr. Carmack's own personal employment situation, *not* matters of public concern. SMF ¶ 18. Moreover, the flyer was replete with potential threats being made by Mr. Carmack. Among other things, it stated:

> I have worked hard and paid dearly. There is no turning back, now. I will not be intimidated by anyone. You can be for me or against me, but I will press on. I have a job and I'm going to take it.
>
> \* \* \* \*
>
> I'm reporting on July 1, 2003 to displace the job I own.
>
> \* \* \* \*
>
> NOW HEAR THIS!        O'BYRAN IS LYIN!
>
> I'M BACK!                    LET'S ROCK!
>
> GUILDENSTERN IS DEAD!
>
> \* \* \* \*
> J. Carmack will make displacement on
> Run 820 on July 1, 2003 at 4:40 PM.

SMF ¶ 19.

An engineer soon alerted the MBCR trainmaster, Jacquline Boumel, and gave her one of Mr. Carmack's flyers. SMF ¶ 20. Ms. Boumel was aware that Mr. Carmack was not an MBCR employee and was not authorized to take over the operation of a train. SMF ¶ 21. She was

4

concerned that Mr. Carmack intended to board and physically take over and run a commuter rail train at 4:40 PM on that day, only minutes away.  SMF ¶ 22.  She called the Chief MBCR Train Dispatcher, who in turn called the MBTA Police.  SMF ¶ 23.

MBTA Police Officer (now Detective) Robert Pavia was dispatched to the scene at about 4:16 PM based upon a report of a disorderly male, and arrived at North Station at about 4:24 PM.  SMF ¶ 24.  Upon his arrival, Officer Pavia talked with the trainmaster, Ms. Boumel, who told him that Mr. Carmack was an ex-Amtrak employee who was attempting to disrupt service and was passing out flyers on Platform # 3.  SMF ¶ 25.  Ms. Boumel told Officer Pavia that Mr. Carmack was not employed by MBCR and was not authorized to run the trains, and that she was concerned that he was going to board and try to run a train.  SMF ¶ 26.  Officer Pavia asked Mr. Carmack to show identification indicating that he was an MBCR employee, which Mr. Carmack could not do.  SMF ¶ 27.

Under all these circumstances and his review of the flyer, Officer Pavia concluded that the flyer contained potentially threatening statements implicating the safety of passengers and operation of the commuter rail trains.  SMF ¶ 28.  Based upon the inflammatory language in the flyer, the fact that Mr. Carmack was threatening to "make displacement" on a 4:40 train in conjunction with the fact that he was not an MBCR employee and the fact that it was only several minutes before 4:40 p.m. in a busy train station, Officer Pavia determined that Mr. Carmack should leave the premises of North Station.  SMF ¶ 29.  Officer Pavia told Mr. Carmack to leave and escorted him to the exit.  SMF ¶ 30.  There is no evidence that any physical contact or physical force was involved.  *Id.*  Officer Pavia told Mr. Carmack that if he returned to MBTA property during the following 24 hours he would be trespassing and would be subject to arrest.  SMF ¶ 31.  Mr. Carmack claims (in Count I) that these events constituted a

5

violation of his First Amendment rights for which the defendants are liable under 42 U.S.C. § 1983 and Mass. G.L. c. 12, § 11*I*.  The defendants deny these claims.

**Prior Proceedings**

**Count I.**  The case was commenced on June 30, 2005; the First Amended Complaint was filed on November 14, 2005.  The MBTA answered Count I of the First Amended Complaint on December 9, 2005.  After this Court allowed MBCR's motion to dismiss the Railway Labor Act claim (but not the federal and state civil rights acts claims) in Count I as against MBCR, the MBTA moved to dismiss the Railway Labor Act claim as against it as well, which this Court allowed on November 27, 2007.  That left pending the federal and state civil rights acts claims.

**Count X.**  The MBTA moved, on December 9, 2005, to dismiss Counts II-XV of the First Amended Complaint as against it.  This Court allowed that motion on September 22, 2006.  On October 10, 2006, this Court allowed MBCR's motion to dismiss it from Counts II-IX and XI-XV, but not Count X.  MBCR then moved further to dismiss Count X as against it, which the Magistrate Judge effectively allowed in part and denied in part.  On November 27, 2007, this Court adopted the recommendation of the Magistrate Judge except for "the issue of whether the MBTA is a joint employer or whether MBCR was its agent."

**Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that has the "potential to affect the outcome of the suit under applicable law."  *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.

1996).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

Motions for summary judgment are intended "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990), that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion."  *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991).  "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *See Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d, 323, 327 (1st Cir. 1996) (citations omitted).

**ARGUMENT**

**I.   SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE MBTA ON THE CLAIM UNDER 42 U.S.C. § 1983**

In Count I of the First Amended Complaint, Mr. Carmack asserts that the MBTA is liable to him under 42 U.S.C. § 1983 on the basis that Officer Pavia's decision to tell him to leave North Station for 24 hours violated his First Amendment rights of free speech and association. There are several independent reasons why summary judgment should be granted to the MBTA on this claim.

A. **Plaintiff Has Not Even Alleged An Unconstitutional MBTA Policy or Custom**

First, liability of state political subdivisions under 42 U.S.C. § 1983 cannot be premised upon the mere fact that the political subdivision employed an individual whose actions are alleged to have violated a plaintiff's federal civil rights. *See Polk County v. Dodson,* 454 U.S. 312, 326 (1981) (official policy must be "the moving force of the constitutional violation" in order to establish the liability of a government body under § 1983); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) (municipalities may be sued under § 1983 for their own unconstitutional or illegal policies, but § 1983 will not support a claim based on a *respondeat superior* theory of liability). In short, a § 1983 claim against a governmental body such as the MBTA requires proof that the political subdivision maintained an illegal policy or custom that caused a deprivation of federal rights. *See, e.g., Wilson v. City of Boston,* 421 F.3d 45, 59-60 (1st Cir. 2005) (municipal liability cannot be premised on *respondeat superior*); *Hathaway v. Stone*, 687 F. Supp. 708, 710-11 (D. Mass. 1988) (requiring demonstration that employee acted pursuant to unconstitutional official policy or custom).

Like counties and municipalities, the MBTA is a public entity established and defined by its enabling act as "a political subdivision of the Commonwealth." Mass. G.L. c. 161A, § 2.[2] The MBTA is managed by a Board of Directors appointed by the Governor and chaired by the Secretary of Transportation and Construction, a member of the Governor's cabinet. *Id.* §§ 1, 7. Clearly the *Monell* rationale underlying the scope of § 1983 liability in the case of municipalities applies with at least as much force to the MBTA. See *Rogan v. Menino*, 973 F. Supp. 72, 76 (D. Mass. 1997) (the MBTA, like a municipality, generally may not be sued under § 1983 for an

---

[2] "'Political subdivision of the Commonwealth' is a term of art traditionally associated with cities, towns, and other units of local government, which are neither the Commonwealth itself nor its agencies." *Daveiga v. Boston Public Health Commission,* 449 Mass. 434, 442 (2007).

injury inflicted by its employee or agent). Thus, in order to establish liability under § 1983, the plaintiff must prove that an official MBTA policy was the driving force behind a deprivation of his federal constitutional rights.

Plaintiff has failed, however, to even allege that the Authority had an illegal policy or custom affecting his First Amendment rights. See *Rochleau v. Town of Millbury*, 115 F. Supp. 2d 173, 178 (D. Mass. 2000) (granting summary judgment on § 1983 claim where plaintiff failed to allege that the town had illegal policy or custom with respect to the conditions at jail or provision of medical care to pre-trial detainees). Moreover, absent evidence that an illegal MBTA policy or custom caused a deprivation of plaintiff's constitutional rights, a single isolated incident such as the plaintiff has alleged here clearly cannot provide the basis for MBTA liability under § 1983. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 821-24 (1985) (single isolated incident of the use of excessive force by a police officer does not establish an official governmental custom or policy attributable to a government policymaker). Summary judgment should, accordingly, be granted to the MBTA dismissing Mr. Carmack's § 1983 claim against it.

      **B.**      **The MBTA's Interim Guidelines on Non-Commercial Expressive Activity Did Not Cause A Deprivation of Plaintiff's First Amendment Rights**

The MBTA has a constitutionally valid and reasonable policy for the exercise of non-commercial expressive activity in its stations, under which Mr. Carmack's activities would arguably be addressed. SMF ¶ 32; *see* Exhibit 13 (MBTA Interim Guidelines on Non-Commercial Expressive Activity). Although the intended use of the platform and lobby areas of North Station is *not* for the expression of ideas or for public gatherings, under the Interim Guidelines, the MBTA does permit non-commercial expressive activity in its stations subject to reasonable, content-neutral time, place and manner restrictions.

North Station is a non-public forum in which the MBTA has allowed limited expressive activity according to its Interim Guidelines.  See *Int'l Society for Krishna Consciousness, Inc. v. Lee, ("ISKCON"),* 505 U.S. 672, 700 (1992) (concluding that airport terminals are non-public forums, despite the fact "that the public spaces in the airports are broad, public thoroughfares full of people and lined with stores and other commercial activities").  Although North Station is generally open to the public, it is not analogous to a public right of way or thoroughfare.  See *ISKCON*, 505 U.S. at 686 ("[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will"); *see also Cornelius v. NAACP Legal Defense & Educ. Fund. Inc.*, 473 U.S. 788, 802 (1985) (government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening up a nontraditional forum for public discourse); *Greer v. Spock*, 424 U.S. 828, 836 (1976) (designated public forum not created "whenever members of the public are free to visit a place owned or operated by the Government").

North Station is closed to vehicles, and pedestrians do not use it as a throughway to another destination.  The function of the lobby area adjacent to the commuter rail platforms is to permit ingress to and egress from MBTA commuter rail trains. SMF ¶ 7.  Its purpose is to facilitate passenger commuter rail travel, *id.,* not to promote free expression.

Because North Station is non-public forum, a reasonableness standard is applied to the Interim Guidelines.  *See New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 24 (1St Cir. 2002) (restriction is reasonable if there is "a plausible basis for distinguishing between restricted activities and allowed activities"); *ISKCON*, 505 U.S. at 688 ("restriction on speech in a non-public forum is 'reasonable' when it is consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it lawfully dedicated"); *Perry*

*Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983). Under this governing standard, the MBTA's Interim Guidelines are constitutionally valid.

The Interim Guidelines on are not an outright ban on protected speech or leafleting at MBTA stations.[3] Rather, they restrict non-commercial expressive speech activity when it creates a dangerous condition or unduly impedes or interferes with operations of the MBTA, *id.* Part II, or when it obstructs pedestrian traffic flow in narrow areas of the stations such as train platforms, *id.* Part III. As these restrictions serve legitimate government concerns, particularly passenger safety, the Interim Guidelines are valid under the First Amendment. See *Hawkins v. City of Denver*, 170 F.3d 1281, 1291 (10th Cir. 1999) (upholding total ban on leafleting in pedestrian walkway because of safety concern during peak traffic times).

Moreover, the record is devoid of any evidence that suggests that the MBTA's Interim Guidelines caused a deprivation of Mr. Carmack's First Amendment rights that was fairly attributable to responsible senior MBTA policymakers. See *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) (municipal liability claim under § 1983 requires proof that municipality maintained a policy or custom which caused, or was the moving force behind, deprivation of constitutional rights); *Tuttle*, *supra,* 471 U.S. at 819 (same). Plaintiff must show "both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989).

---

[3] These guidelines are not the same as those that were struck down by the First Circuit in *Jews for Jesus, Inc. v. MBTA*, 984 F.2d 1319 (1st Cir. 1993). The Interim Guidelines in effect on July 1, 2003, did not mandate a complete ban on non-commercial expressive activities but instead narrowly prescribed time, place and manner restrictions. Indeed, *Jews for Jesus* had already noted that these very restrictions were narrowly drawn restrictions that reasonably satisfy the MBTA's specific public safety concerns. 984 F.2d at 1326.

By all accounts, Mr. Carmack was *not* engaged in "non-commercial expressive activity," as defined by the Interim Guidelines, which focus upon soliciting signatures, distributing leaflets, and publicly addressing transit patrons at a high volume, *for political or non-profit purposes* as defined by G.L. c. 180, § 4 and G.L. c. 55, § 1.  Exhibit 13, at 1.  On the other hand, he doesn't appear to have been engaged in "commercial activity," as defined in the Guidelines, i.e., promoting or selling products or services, or soliciting contributions from transit passengers. *Id.* Based upon Mr. Carmack's own testimony, he was present at North Station in order to solicit support from other locomotive engineers, union members, known to him, regarding his own personal employment disputes with MBCR and Amtrak, SMF ¶ 16, and his flyer addressed his personal employment situation with MBCR.  SMF ¶ 18 and Exhibit 7.  Since Mr. Carmack was neither seeking to engage in public expression on non-commercial matters of public concern, nor seeking to promote or sell products or services to transit patrons, the MBTA Interim Guidelines do not even specifically categorize Mr. Carmack's activity at North Station on July 1, 2003.

Finally, the Guidelines' restrictions, which include prohibiting unlicensed commercial activity in MBTA stations, *see* Exhibit 13 at 2, § I(3)(a), providing that non-commercial expressive activity "may be prohibited for a reasonable period of time" because of emergency or any event creating a dangerous condition or unduly interfering with the rights of transit patrons or impeding the operation of the MBTA, *id.* § II, prohibiting expressive activity on or within 15 feet of platforms or where it may obstruct the pedestrian traffic flow in the usual ingress and egress of passengers, *id.* § III, and providing that such activity "shall not unduly interfere with the safety of transit riders or the public [or] the safe and efficient operation of the transit system," *id.* § IV(1), are all clearly reasonable and valid, content-neutral time, place and manner regulations.  In short, the MBTA's policies on protected First Amendment activity, embodied in

the Interim Guidelines, are entirely reasonable and consistent with the First Amendment. They evidence an MBTA policy to protect First Amendment rights, within certain neutral parameters that are consistent with the Constitution. If plaintiff's First Amendment rights were violated on July 1, 2003, which the MBTA denies, any such violation cannot reasonably be attributed to an unconstitutional policy on the part of the Authority.

> C. **Officer Pavia's Decision To Order Plaintiff To Leave North Station For 24 Hours Was Objectively Reasonable Under the Circumstances**

In any event, Officer Pavia's decision to evict the plaintiff from North Station for a 24-hour period, based upon the information from MBCR and his own review of the flyer, both of which indicated that plaintiff was threatening to take over a commuter rail train at 4:40 PM that afternoon, and the fact that the plaintiff was not an employee of MBCR authorized to operate an MBCR commuter rail train, as well as the fact that it was close to 4:40 PM during rush hour in a busy train station, *see* SMF ¶¶ 19, 24-31; *see also* SMF ¶¶ 7, 15, was objectively reasonable.

First of all, Mr. Carmack's forcefully written leaflet is reasonably understood, in context, as containing threats of violence, which do not enjoy First Amendment protection. *See Virginia v. Black*, 538 U.S. 343, 358-9 (2003) (true threats not protected by the First Amendment); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) (identifying several types of statements that have "never been thought to raise any Constitutional problem"); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (concluding that threats of violence are outside First Amendment protection); *Watts v. United States*, 394 U.S. 705, 707 (1969). *See People v. Janousek*, 871 P.2d 1189, 1193, 1195 (Colo. 1994) (noting forceful language of statement and explicit and implicit threat expressed thereby in determining whether statement constitutes true threat). Although the First Amendment protects non-commercial expressive activity, including

13

informational leafleting, on matters of public concern, *see e.g., International Soc'y for Krishna Consciousness, Inc., v. Lee, (ISKON),* 505 U.S. 672, 677 (1992); *United States v. Grace*, 461 U.S. 171, 176-77 (1983), the right to leaflet is not absolute, *Hill v. Colorado*, 530 U.S. 703, 730 (2000), and the government "need not permit all forms of speech on property it owns and controls." *ISKON*, 505 U.S. at 678. *See Black,* 538 U.S. at 367 (considering context in which statement was made to determine if statement was unprotected true threat).

The flyer that Mr. Carmack was distributing aggressively discussed the manner in which Mr. Carmack claimed that he "owned" and a locomotive engineer job on the commuter rail and intended to "take it" – "I have worked hard and paid dearly.  There is no turning back, now.  I will not be intimidated by anyone.  You can be for me or against me, but I will press on.  I have a job and I'm going to take it."  Mr. Carmack then highlighted in capital letters that stated: "LET'S ROCK" and "GUILDENSTERN IS DEAD."  On the other side, ¶ 9, he stated: "J. Carmack will make displacement on Run 820 on July 1, 2003 at 4:40 PM."  SMF ¶ 19; Exhibit 7.  Moreover, Ms. Boumel, the MBCR trainmaster, testified repeatedly that she understood the flyer to constitute a threat by Mr. Carmack that he intended to take over the operation of a commuter rail train at that time.  SMF ¶¶ 22, 25-26.  The First Amendment does not require that such threats to the public safety be ignored.

Furthermore, according to Mr. Carmack himself, he was at North Station on July 1, 2003, in order to solicit support from union members regarding his own personal employment disputes with Amtrak and MBCR.  SMF ¶¶ 16-18.  This was a purely personal issue that did not implicate a matter of public concern.  In the public employment context, the courts have held that in considering whether First Amendment interests are implicated by a public employee speaking out against his or her employer, if only personal speech is at issue, "its First Amendment value is

14

low." *Fabiano v. Hopkins*, 352 F.3d 447, 453 (1st Cir. 2003) (discussing elements a public employee must show to prevail on a First Amendment claim against his employer); *see also O'Connor v. Steeves*, 994 F.2d 905, 913 (1st Cir. 1993) (noting examples of matters outside scope of public concern such as internal working conditions and matters affecting only the speaker and co-workers); *Connick v. Myers,* 461 U.S. 138, 147 (1983). Under this analogy, Mr. Carmack's flyer – quite apart from its threatening and inflammatory language – cannot be seen as core free speech under the First Amendment. Review of the flyer shows that its content relates to matters wholly affecting Mr. Carmack's own employment status, particularly MBCR's failure to award him a position as a locomotive engineer. SMF ¶ 18 and Exhibit 11.

Additional circumstances that Officer Pavia could properly take into account were Mr. Carmack's proximity to the platforms, the report that he actually had been passing out his flyer on Platform # 3, SMF ¶¶ 24-25, and the crowded nature of the station in a busy rush hour. SMF ¶¶ 7, 15 (*see also* SMF ¶ 6) (about 7,000 passengers arrived or left North Station on a commuter rail train between 3:50 PM and 5:15 M on July 1, 2003).

Based upon the information that MBCR provided, the concerns that MBCR expressed, the inflammatory nature of the flyer, the crowded station busy with the flow of commuters, and the fact that Mr. Carmack was stating that he would make displacement on Run 820 at 4:40 PM, which was imminent, but that he could not prove that he was an MBCR employee authorized to operate such trains, Officer Pavia reasonably perceived plaintiff's actions as a potential threat to the public safety, and his response – to require Mr. Carmack to leave North Station for 24 hours – was measured and objectively reasonable under all the circumstances. SMF ¶¶ 18-31. *See Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000) (emphasizing that police must make judgment

15

calls in determining a suspect's state of mind). "The Government need not wait until havoc is wreaked to restrict access to a non-public forum." *Cornelius*, 473 U.S. at 810.

## II. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE MBTA ON THE CLAIM UNDER THE STATE CIVIL RIGHTS ACT

Mr. Carmack's claim against the MBTA under the Massachusetts Civil Rights Act (MCRA), G.L. c. 12, § 11*I*, should be dismissed for several independent reasons.

First, the Authority is not a "person" subject to suit under Mass. G.L. c.12, § 11*I*, which provides a private cause of action only when "any *person or persons*, whether or not acting under color of law, interfere by threats, intimidation or coercion . . . with the exercise or enjoyment . . . of rights secured by the constitution or laws of the United States or of rights secured by the constitution or laws of the commonwealth . . ." (emphasis added).

It "is a widely accepted rule of statutory construction that general words in a statute such as 'persons' will not ordinarily be construed to include the State or political subdivisions thereof." *Hansen v. Commonwealth,* 344 Mass. 214, 219 (1962); *see also, e.g., Commonwealth v. Dowd,* 37 Mass. App. Ct. 164, 166 (1994). This rule is consistent with the Massachusetts statute that defines "person," for purposes of statutory construction, to include, "unless a contrary intention clearly appears," "corporations, societies, associations and partnerships" – a definition that conspicuously does *not* include the State or its political subdivisions such as the MBTA. Mass. G.L. c. 4, § 7.

The courts have clearly held, moreover, that "there is no indication in the MCRA that the word 'person' includes either the Commonwealth or any of its political subdivisions." *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 591-93 (2001); *see also Kelley v. LaForce,* 288 F.3d 1, 22 n.9 (1st Cir. 2002); *Parker v. Town of Swansea,* 270 F. Supp. 2d 92, 97 n.3 (D. Mass.

16

2003).[4]  It follows that the Authority, as a "political subdivision of the commonwealth," Mass. G.L. c. 161A, § 2, is not a "person" subject to suit under Mass. G.L. c. 12, § 11*I*.

Moreover, even if the MBTA *were* a "person" subject to suit under the MCRA (which it is not), it still would not be liable under the MCRA for the isolated action of an employee.  *See, e.g., Chaarbouni v. City of Boston*, 133 F. Supp.2d 93, 103 (D. Mass. 2001) (holding that the MCRA does not provide for vicarious liability of state political subdivisions); *Raymond v. City of Worcester*, 142 F. Supp.2d. 145, 149 (D. Mass. 2001) (same) (both pre-dating *Howcroft, supra*).  That is, the principles against *respondeat superior* liability would apply equally here as under the federal civil rights act, and under such circumstances, the points made in Argument I, *supra,* would equally foreclose an MCRA claim against the MBTA.

### III.  SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE MBTA ON THE FAILURE TO HIRE CLAIM UNDER THE REHABILITATION ACT

Plaintiff also claims that MBCR violated the Rehabilitation Act when it failed to hire him as a locomotive engineer in June 2003.  Although the MBTA was dismissed from Count X on September 20, 2006 and believes that such a claim technically has not been reinstated against it, the MBTA addresses this claim in light of the exception that this Court made, when otherwise adopting the Magistrate Judge's recommendation on November 27, 2007, for "the issue of whether the MBTA is a joint employer or whether MBCR was its agent."

First, as Mr. Carmack's flyer pointed out, his employment application was to MBCR [not the MBTA], and it was MBCR [not the MBTA] that did not award him a position.  Ex. 7 (Flyer),

---

[4]  The Superior Court has dismissed the MBTA as a defendant on an MCRA claim on this basis. *Cloud v. McCourt Construction Co.,* Suffolk Superior Court Civil Action No. 03-0034, Memorandum and Order on Defendant MBTA's Motion for Summary Judgment (May 9, 2005) (Gants, J.), at 2 (reproduced as Exhibit 15), appeal pending, Massachusetts Appeals Court No. 2007-P-0911.

at 1 (first two paragraphs). Mr. Carmack has not alleged that he made such an application to the MBTA or that the MBTA failed to hire him. The MBTA could be liable, accordingly, only if MBCR were liable *and* the MBTA was a joint employer or MBCR was its agent. Analytically, therefore, the first question is whether MBCR violated the plaintiff's rights under the Rehabilitation Act. If this Court concludes that MBCR is entitled to summary judgment on this claim, then it follows that the MBTA is entitled to summary judgment in its favor as well.

In any event, however, the Court should grant summary judgment to the MBTA because the undisputed facts demonstrate that the MBTA was *not* a joint employer with MBCR and that MBCR was *not* its agent.

In the employment context, a joint employer relationship has been found to exist only "where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment." *Rivera-Vega v. Conagra, Inc.*, 70 F.3d 153, 163 (1st Cir. 1995). Factors relevant to deciding whether joint employer status exists include: "supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime; and authority over the number of employees." *Id.; see, e.g., Orell v. UMass Mem. Med. Ctr.,* 203 F. Supp. 2d 52 (D. Mass. 2002) (finding no joint employment where "defendant did not supervise plaintiff's day to day activities, hire or fire employees, control work assignments, issue operating instructions or conduct any other activities commonly performed by employers").

Here, the MBTA-MBCR Operating Agreement provides that it is MBCR's responsibility to provide all contractor personnel, "none of whom shall be employees of the MBTA." Exhibit

2, § 11.6(a). "All Contractor Personnel shall be subject to the direction, supervision and control of [MBCR], and not the MBTA." *Id.* SMF ¶ 34. Under the Operating Agreement, and in fact, the MBTA was not involved in the hiring of firing of MBCR contractor personnel. SMF ¶ 35.

In particular, the MBTA was not involved in MBCR's decision whether or not to hire Mr. Carmack. SMF ¶ 36.

Finally, as the Operating Agreement provides, MBCR "is an independent contractor for, and not an agent of, the MBTA." SMF ¶ 33; Exhibit 2 (Operating Agreement), § 11.1; *see also* Exhibit 14 (Deposition of MBTA by John D. Ray) 153.

In short, the undisputed material facts demonstrate that the MBTA was *not* a joint employer, and that MBCR was *not* its agent. Accordingly, the Court should enter summary judgment in favor of the Authority on the failure-to-hire claim.

## **CONCLUSION**

For the reasons set forth above, summary judgment should be entered against the plaintiff and in favor of the Massachusetts Bay Transportation Authority, with prejudice, dismissing all the remaining claims against the Authority in this case.

Respectfully submitted,

*/s/ H. Reed Witherby*
H. Reed Witherby, BBO No. 531600
Sarah E. Lent, BBO No. 645156
Smith & Duggan LLP
Two Center Plaza
Boston, Massachusetts 02108
(617) 228-4400


*/s/ Todd M. Valicenti*
Todd M. Valicenti, BBO No. 632800
Assistant General Counsel
MBTA Legal Department
Ten Park Plaza, Suite 7760
Boston, Massachusetts 02116
(617) 222-4579

Dated: June 19, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system, to be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that I have caused a copy to be sent by first class mail, postage prepaid, to Joseph Carmack, Plaintiff, Pro Se, 592 Tremont Street, No. 5, Boston, MA 02118, as a non-registered participant on this 19th day of June, 2008.

*/s/ H. Reed Witherby*
H. Reed Witherby