UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOSEPH T. CARMACK,              )
          Plaintiff,            )
v.                              )
                                )     Civil Action No. 05-11430-PBS
MASSACHUSETTS BAY               )
TRANSPORTATION AUTHORITY and    )
MASSACHUSETTS BAY COMMUTER      )
RAILROAD COMPANY,               )
          Defendants            )
_____)
```

## MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, the Massachusetts Bay Transportation Authority (MBTA or the Authority) submits the following statement of undisputed material facts. Except where otherwise indicated, Exhibit references are to the Exhibits that are filed herewith and identified by number on the accompanying List of Exhibits.

1.    The Massachusetts Bay Transportation Authority is a "body politic and corporate and a political subdivision of the commonwealth" of Massachusetts, charged by its enabling statute with the authority and responsibility to provide public transportation services within the area of its member cities and towns.  Mass. G.L. c. 161A, §§ 2-3.

2.    Among the public transportation services that the MBTA provides is an extensive commuter rail service, with hubs in Boston's North and South Stations.  Exhibit 1 (Declaration of Nelson K. Chin, dated June 18, 2008), ¶ 2.

3.    While the MBTA owns the track and the rolling stock, it does not operate the commuter rail service itself.  From January 1, 1987, through June 30, 2003, the National

Railroad Passenger Corporation (Amtrak) operated the MBTA's commuter rail service pursuant to a contract between Amtrak and the MBTA. Prior to that time, the MBTA's commuter rail service was operated by the Boston & Maine Railroad pursuant to a contract with the MBTA. Exhibit 1 (Chin Declaration), ¶¶ 2-3.

4.     Pursuant to a public bidding process initiated in 2002, the MBTA, in February 2003, entered into a written contract with Massachusetts Bay Commuter Railroad Company, LLC (MBCR) for MBCR to operate the MBTA's commuter rail service commencing on July 1, 2003. A true and accurate copy of the Commuter Rail Operating Agreement Between Massachusetts Bay Transportation Authority and Massachusetts Bay Commuter Railroad Company, LLC is Exhibit A to the Chin Declaration. Exhibit 1 (Chin Declaration), ¶ 4; Exhibit 2 (MBTA-MBCR Operating Agreement).

5.     One of the two hubs of the commuter rail system is North Station in Boston, which services as the terminus for five commuter rail lines: Fitchburg, Haverhill, Lowell, Rockport, and Newburyport. On weekdays, in July 2003, there generally were 184 commuter rail trips into and out of North Station, carrying a total, on average, of about 50,000 passengers. Most of this activity took place during the morning and afternoon rush hours. Exhibit 1 (Chin Declaration), ¶ 5.

6.     Commuter rail train conductors prepare and submit ridership counts for each of their trips. Ridership reports with this data are made and kept in the regular course of the business of the commuter rail, and it is and has been the regular practice in the commuter rail to make and keep such records. A true and accurate copy of those reports for commuter rail trains arriving and departing North Station during the afternoon of July 1, 2003, is Exhibit B to the Chin Declaration. Exhibit 1 (Chin Declaration), ¶ 6; Exhibit 3 (Ridership Reports).

7.     On July 1, 2003, the lobby area of North Station, where departing commuters must wait before their trains are ready for boarding, was considerably smaller than it is today. The function of the lobby area adjacent to the commuter rail platforms is to permit ingress and egress from MBTA commuter rail trains and thereby to facilitate passenger commuter rail travel. Because of the crowded conditions in that area, the MBTA undertook a lobby expansion project, in which tracks and platforms that the MBTA had previously built were covered over to provide an expansion of the lobby area.  The project was commenced in 2006 and completed in 2007. Exhibit 1 (Chin Declaration), ¶ 7.

8.     In 2001, Mr. Carmack, who was employed by Amtrak as a locomotive engineer in that commuter rail operation, conveyed to his supervisor a package of materials that his supervisor perceived to contain a threat of workplace violence.  *Carmack v. National Railroad Passenger Corporation,* 486 F. Supp.2d 58, 67-73 (D. Mass. 2007) ("*Amtrak* Decision"); Exhibit 9 (National Mediation Board decision) (Ex. 22 to Deposition of Joseph T. Carmack); Exhibit 6: "Letters from Hell" (Exhibit 15 to Carmack Dep.) (excerpts).

9.     Mr. Carmack entitled these materials "Letters from Hell."  They included a letter to God from Lucifer and a Hamlet scenario in which Mr. Carmack assigned the role of Hamlet to himself and assigned to his supervisor and his union representative, respectively, the roles of Rosencrantz and Guildenstern, characters in Shakespeare's play who are murdered at Hamlet's request.  At the end of the scenario, Mr. Carmack wrote in capitals:  "ROSENCRANTZ AND GUILDENSTERN ARE DEAD."  Exhibit 6 ("Letters from Hell") (Exhibit 15 to Carmack Dep.) (excerpts); Exhibit 5 (Deposition of Joseph T. Carmack, vol. 3) at III: 42-47.

10.     Amtrak's Threat Assessment Response Team commenced an investigation. *Amtrak* decision, *supra*; Exhibit 22 (National Mediation Board decision); Exhibit 5 (Carmack Dep.) at III: 46-47.

11.     After Mr. Carmack refused to undergo a psychiatric evaluation, Amtrak discharged him on May 13, 2002. *Amtrak* decision, *supra*; Exhibit 9 (National Mediation Board decision); Exhibit 4 (Carmack Deposition, vol. 2) at II: 50-51; Exhibit 7 (Flyer) (Ex. 16 to Carmack Dep.) at 2, ¶ 4.

12.     The National Mediation Board, Special Board of Adjustment, upheld Mr. Carmack's termination by decision dated January 31, 2003. Exhibit 9 (National Mediation Board decision) (Ex. 22 to Carmack Dep.).

13.     On or about June 24, 2003, MBCR issued awards for its locomotive engineer positions, but did not award a position to Mr. Carmack. First Amended Complaint, ¶ 17.

14.     At about 3:55 PM on the afternoon of July 1, 2003, Mr. Carmack came to North Station with copies of a flyer that he had prepared. Exhibit 8 (Carmack Affidavit dated July 12, 2003), at ¶ 22; Exhibit 4 (Carmack Dep.) at II: 5, 27; *see* Ex. 7 (Flyer).

15.     Between 3:50 P.M. and 5:15 P.M. on July 1, 2003, about 7,011 individuals arrived at or departed from North Station on commuter rail trains. Calculations based upon Exhibit 3 (Ridership Reports for 7/01/03).

16.     Based upon Mr. Carmack's own testimony, his purpose in going to North Station was to solicit support from locomotive engineer union members who he knew. First Amended Complaint, ¶ 20; Exhibit 4 (Carmack Dep.) at II: 47-49, III: 15.

17.     Mr. Carmack spoke to several MBCR locomotive engineers he knew and gave copies of his flyer to a couple of them. Carmack Dep. II: 33-34.

18.     The flyer was a single sheet of paper printed on both sides.  It addressed Mr.

Carmack's history with Amtrak and his present personal employment situation with MBCR.

Exhibit 7 (Flyer).

19.     The flyer was replete with potential threats being made by Mr. Carmack. Among

other things, it stated:

> I have worked hard and paid dearly.  There is no
> turning back, now.  I will not be intimidated by
> anyone.  You can be for me or against me, but I will
> press on.  I have a job and I'm going to take it.
>
> *   *   *   *
>
> I'm reporting on July 1, 2003 to displace the job I own.
>
> *   *   *   *
>
> NOW HEAR THIS!          O'BRYAN IS LYIN!
>
> I'M BACK!                     LET'S ROCK!
>
> GUILDENSTERN IS DEAD!
>
> *   *   *   *
>
> J. Carmack will make displacement on
> Run 820 on July 1, 2003 at 4:40 PM.

Exhibit 7 (Flyer).

20.     An MBCR engineer soon alerted the MBCR trainmaster, Jackie Boumel, and

handed one of Mr. Carmack's flyers to her.  Exhibit 10 (Deposition of Jacqueline Boumel) at

213, 233.

21.     Ms. Boumel was aware that Mr. Carmack was not an MBCR employee and was

not authorized to operate a train.  Exhibit 10 (Boumel Dep.) at 216, 218, 233.

22.    Ms. Boumel was concerned, based upon the flyer, that Mr. Carmack intended to board and physically take over and run a commuter rail train at 4:40 PM on that day, only minutes away.  Exhibit 10 (Boumel Dep.) 214, 234, 238.

23.    Ms. Boumel called the Chief MBCR Train Dispatcher, who in turn called the MBTA Police.  Exhibit 10 (Boumel Dep.) 214, 236-38, 290-91.

24.    MBTA Police Officer (now Detective) Robert Pavia was dispatched to the scene at 4:16 PM to respond to a report of a disorderly male.  Officer Pavia arrived at North Station at approximately 4:24 PM.  Exhibit 11 (Deposition of Robert Pavia) 44-45; Exhibit 12 (MBTA Police Report) (Ex. 1 to Pavia Dep.).

25.    Upon his arrival, Officer Pavia was met by Trainmaster Boumel, who told him that an ex-Amtrak employee, Mr. Carmack, was attempting to disrupt service and passing out literature on Platform # 3.  Exhibit 11 (Pavia Dep.) 44-45, 50, 62; Exhibit 12 (MBTA Police Report).

26.    Ms. Boumel told him that Mr. Carmack was an ex-Amtrak employee who had been fired and was not employed by MBCR and was not authorized to run the trains, and that she was concerned that he was going to actually board and try to run a train.  Exhibit 10 (Boumel Dep.) 309-11; Exhibit 11 (Pavia Dep.) 49-50.

27.    Officer Pavia asked Mr. Carmack to show identification indicating that he was an MBCR employee.  Mr. Carmack was unable to provide to Officer Pavia with any sort of valid employee identification.  Pavia Dep. 52-54, 62-63.

28.    Officer Pavia concluded that the flyer contained potentially threatening statements implicating the safety of passengers and operation of the commuter rail trains.  Exhibit 11 (Pavia

Dep.) 50-53, 57-60.  [N.B. The flyer which was marked as Exhibit 16 at the Carmack Deposition and is submitted herewith as Exhibit 7, was also Exhibit 2 to the Pavia Deposition.]

29.    Based upon the threatening and inflammatory language in the flyer, the fact that Mr. Carmack was threatening to "make displacement" on a 4:40 train in conjunction with the fact that he was not an MBCR employee and the fact that it was only several minutes before 4:40 p.m., in a busy train station, Officer Pavia determined that Mr. Carmack should leave the premises of North Station.  Exhibit 11 (Pavia Dep.) 52-53, 56-58, 66, 68.

30.    Officer Pavia told Mr. Carmack to leave the premises and escorted him to the exit; there is no evidence that any physical contact or physical force was involved.  Exhibit 8 (Carmack Affidavit), at ¶ 39 (Officer Pavia "invited" Mr. Carmack to leave); Exhibit 11 (Pavia Dep.) 67-68 (Officer Pavia walked him to the exit).

31.    Officer Pavia told Mr. Carmack that if he were found on MBTA property during the following 24 hours he would be trespassing and would be subject to arrest.   Exhibit 11 (Pavia Dep.) 66-67; Exhibit 8 (Carmack Affidavit), ¶ 39.

32.    In July 2003, the MBTA had a policy on non-commercial expression activity, set forth in its Interim Guidelines.  Exhibit 13 (Interim Guidelines); Exhibit 11 ( Pavia Dep.) 74-75.

33.    The Operating Agreement provides that MBCR "is an independent contractor for, and not an agent of, the MBTA."  Exhibit 2 (Operating Agreement), § 11.1; *see also* Exhibit 14 (Deposition of MBTA by John D. Ray), 153.

34.    The Operating Agreement provides that it is MBCR's responsibility to provide all contractor personnel, none of whom shall be employees of the MBTA, § 11.6(a), that all MBCR personnel shall be subject to the direction, supervision and control of MBCR, and not the MBTA, *id.,* and that all MBCR personnel will be employees of MBCR, which will be "solely

responsible for the determination of and payment of wages and benefits and other terms and conditions of employment." *Id.,* § 11.6(b). Exhibit 2 (Operating Agreement); *see also* Exhibit 14 (MBTA/Ray Dep.) 153-55.

35.    Under the Operating Agreement and in fact, the MBTA was not involved in the hiring of firing of MBCR contractor personnel. Exhibit 2 (Operating Agreement); Exhibit 14 (MBTA/Ray Dep.) 155.

36.    The MBTA was not involved in the decision as to whether or not to hire Mr. Carmack to a position at MBCR in 2003. Exhibit 14 (MBTA/Ray Dep.) 155-56.

Respectfully submitted,

*/s/ H. Reed Witherby*
H. Reed Witherby, BBO No. 531600
Sarah E. Lent, BBO No. 645156
Smith & Duggan LLP
Two Center Plaza
Boston, Massachusetts 02108
(617) 228-4400

*/s/ Todd M. Valicenti*
Todd M. Valicenti, BBO No. 632800
Assistant General Counsel
MBTA Legal Department
Ten Park Plaza, Suite 7760
Boston, Massachusetts 02116
(617) 222-4579

Dated:  June 19, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system, to be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that I have caused a copy to be sent by first class mail, postage prepaid, to Joseph Carmack, Plaintiff, Pro Se, 592 Tremont Street, No. 5, Boston, MA  02118, as a non-registered participant on this 19th day of June, 2008.

*/s/ H. Reed Witherby*
H. Reed Witherby

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH T. CARMACK,              ) Plaintiff,             ) v.                           ) ) MASSACHUSETTS BAY       ) TRANSPORTATION AUTHORITY and ) MASSACHUSETTS BAY COMMUTER ) RAILROAD COMPANY,      ) Defendants          ) | Civil Action No. 05-11430-PBS |

**DECLARATION OF NELSON K. CHIN**

Nelson K. Chin declares as follows:

1.      I am Deputy Director of Railroad Operations for the Massachusetts Bay Transportation Authority (MBTA).  I have been employed by the MBTA for approximately 26 years.  I have personal knowledge of the matters addressed in this declaration.

2.      Among the public transportation services that the MBTA provides is its commuter rail passenger service.  The commuter rail system includes 13 commuter rail lines, serving an average of about 144,000 customers each weekday.  The MBTA owns 80 revenue service locomotives and 410 passenger coaches, 140 of which are double-decker cars.  The MBTA currently has approximately 670 miles of commuter rail track and 133 commuter rail stations. The Department of Railroad Operations oversees operations and scheduling of the MBTA commuter rail service.  Currently the commuter rail service consists of 494 weekday trips, 188 Saturday trips and 160 Sunday trips, with extra trains for special events.  The Department also monitors the maintenance and repair of rolling stock, railroad right-of-way, track and structures, bridges and related structures, and communication and signal systems.  Oversight responsibilities

also include input into rolling stock procurement, facility planning, and integration of rail extensions into the existing system.

3. From January 1, 1987, through June 30, 2003, the National Railroad Passenger Corporation (Amtrak) operated the MBTA's commuter rail service pursuant to a contract between Amtrak and the MBTA. Prior to that time, the MBTA's commuter rail service was operated by the Boston & Maine Railroad pursuant to a contract with the MBTA.

4. Pursuant to a public bidding process initiated in 2002, the MBTA, in February 2003, entered into a written contract with Massachusetts Bay Commuter Railroad Company, LLC (MBCR) for MBCR to operate the MBTA's commuter rail service commencing on July 1, 2003. A true and accurate copy of that Commuter Rail Operating Agreement Between Massachusetts Bay Transportation Authority and Massachusetts Bay Commuter Railroad Company, LLC is attached hereto as Exhibit A.

5. One of the two hubs of the commuter rail system is North Station in Boston, which services as the terminus for five commuter rail lines: Fitchburg, Haverhill, Lowell, Rockport, and Newburyport. On weekdays, in July 2003, there generally were 184 commuter rail trips into and out of North Station, carrying a total, on average, of about 50,000 passengers. Most of this activity took place during the morning and afternoon rush hours.

6. Commuter rail train conductors prepare and submit ridership counts for each of their trips. Ridership reports with this data are made and kept in the regular course of the business of the commuter rail, and it is and has been the regular practice in the commuter rail to make and keep such records. A true and accurate copy of those reports for commuter rail trains arriving or departing North Station during the afternoon of July 1, 2003, is attached hereto as Exhibit B.

7.     On July 1, 2003, the lobby area of North Station, where departing commuters must wait before their trains are ready for boarding, was considerably smaller than it is today. The function of the lobby area adjacent to the commuter rail platforms is to permit ingress and egress from MBTA commuter rail trains and thereby to facilitate passenger commuter rail travel. Because of the crowded conditions in that area, the MBTA undertook a lobby expansion project, in which tracks and platforms that the MBTA had previously built were covered over to provide an expansion of the lobby area.  That project was commenced in 2006 and completed in 2007.

Further your declarant sayeth not.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June, 2008, in Boston, Massachusetts.


   /s/ Nelson K. Chin
Nelson K. Chin
Deputy Director of Railroad Operations
Massachusetts Bay Transportation Authority


Certificate of Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system, to be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that I have caused a copy to be sent by first class mail, postage prepaid, to Joseph Carmack, Plaintiff, Pro Se, 592 Tremont Street, No. 5, Boston, MA 02118, as a non-registered participant on this 18th day of June, 2008.


   /s/ H. Reed Witherby
H. Reed Witherby

**COMMUTER RAIL OPERATING AGREEMENT BETWEEN**

**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY**

**AND**

**MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY, LLC**

TABLE OF CONTENTS

SECTION 1.   DEFINITIONS                                             1

SECTION 2.   GENERAL STATEMENT OF OBLIGATIONS.                      11

SECTION 3.   TERM OF AGREEMENT.                                     13

SECTION 4.   CUSTOMER SERVICES.                                     14

SECTION 5.   TRANSPORTATION SERVICES.                               14

SECTION 6.   ENGINEERING SERVICES.                                  14

SECTION 7.   MECHANICAL SERVICES.                                   14

SECTION 8.   INCIDENT MANAGEMENT AND NOTIFICATIONS.                 14

SECTION 9.   SERVICE PROPERTY, SERVICE EQUIPMENT, AND
             SUPPORT PROPERTY.                                      14

SECTION 10.  MAINTENANCE OBLIGATIONS.                               20

SECTION 11.  MANAGEMENT AND PERSONNEL.                              26

SECTION 12.  HIRING OF EXISTING WORKFORCE.                          33

SECTION 13.  LABOR OBLIGATIONS.                                     35

SECTION 14.  SECTION 13(c) OBLIGATIONS.                             35

SECTION 15.  TRAINING OF CONTRACTOR PERSONNEL.                      36

SECTION 16.  NEW SERVICE.                                           38

SECTION 17.  SERVICE CHANGES.                                       38

SECTION 18.  FORCE ACCOUNT WORK.                                    39

SECTION 19.  OTHER REQUIRED WORK.                                   42

SECTION 20.  REVENUE GROWTH INCENTIVE.                              43

SECTION 21.  COST OF SERVICES AND PAYMENTS.                         44

SECTION 22.  PENALTIES.                                             50

SECTION 23.  SPECIAL TRAINS.                                        54

SECTION 24.  EXCURSION TRAINS.                                      54

SECTION 25.  WRECK CLEARING.                                              54

SECTION 26.  QUALITY CONTROL.                                            55

SECTION 27.  REPORTING AND RECORDKEEPING REQUIREMENTS.                   55

SECTION 28.  AUDITS AND INSPECTIONS.                                     57

SECTION 29.  INFORMATION MANAGEMENT.                                     57

SECTION 30.  DRUG AND ALCOHOL TESTING REQUIREMENTS.                      64

SECTION 31.  SYSTEM SAFETY AND SECURITY.                                 64

SECTION 32.  PERFORMANCE AND PAYMENT BOND AND INSURANCE.                 67

SECTION 33.  INDEMNIFICATION AND LIABILITY.                              70

SECTION 34.  RIGHT TO SUBCONTRACT.                                       71

SECTION 35.  DISPUTE RESOLUTION.                                         72

SECTION 36.  COMPLIANCE WITH LAW.                                        74

SECTION 37.  DISADVANTAGED BUSINESS ENTERPRISES.                         78

SECTION 38.  MARKETING RESPONSIBILITIES.                                 80

SECTION 39.  THIRD PARTY ADVERTISING.                                    81

SECTION 40.  TERMINATION.                                                81

SECTION 41.  TRANSITION PROCESS.                                         83

SECTION 42.  FORCE MAJEURE.                                              86

SECTION 43.  REPLACEMENT SERVICES.                                       87

SECTION 44.  COORDINATION WITH OTHER RAIL CARRIERS.                      87

SECTION 45.  PICKETING.                                                  88

SECTION 46.  AMENDMENTS AND REVISED EXHIBITS.                            88

SECTION 47.  ASSIGNMENT.                                                 88

SECTION 48.  SUCCESSORS AND ASSIGNS.                                     89

SECTION 49.  OTHER CONTRACTOR AND THIRD PARTY ACCESS.                    89

GSDocs-1200282-6
3/4/2003 4:07 PM

SECTION 50.  NOTICE.                                    89

SECTION 51.  MISCELLANEOUS.                             90

GSDocs-1200282-6
3/4/2003 4:07 PM

# EXHIBITS

1. Customer Service Scope of Services
2. Transportation Scope of Services
3. Engineering Scope of Services
4. Mechanical Scope of Services
5. Information Management
6. Sample Software License Agreement
7. Labor provisions
8. Reports and Deliverables
9. Direct Costs Billable to MBTA
10. Penalties
11. Train Arrival Times
12. MBTA Customer Bill of Rights
13. Service Property, Service Equipment and Support Property
14. Service By Line
15. Employee Timetable, Rules, etc.
16. Service Equipment Requirements
17. Track Outage Request Form
18. Service Expansions
19. Excursion Trains
20. Sample Lease Agreement
21. Electrical Inspection and Test Procedures
22. Environmental Specifications
23. Major Permits for MBTA Facilities
24. Workmanship and Materials
25. Car Cleanliness Matrix
26. Service Equipment Maintenance Guidelines
27. Layover Facility Guidelines for Facilities Equipped with Electrical Layover Stations
28. Draft Attleboro Line Agreement
29. Required Subcontract Provisions
30. Contractor Proposal dated October 11, 2002 (two volume document on file with MBTA)
31. Forms of Required Bonds
32. Contractor Cost Proposal
33. Right to Know Law Certification
34. Certification of Tax Compliance
35. Child Care and Other Certifications
36. Contractor's Statement in Connection with M.G.L. c.7, §22C
37. MBTA Responses to Questions Submitted by Proposers During Procurement
38. Initial Inventory of Support Property and Support Inventory

-iv-

This OPERATING AGREEMENT (the "Agreement") is made and entered into on February 19, 2003, by the Massachusetts Bay Transportation Authority ("MBTA"), a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts, established under the provisions of General Laws, chapter 161A, as amended, and with a principal place of business at 10 Park Plaza, Boston, Massachusetts 02116, and Massachusetts Bay Commuter Railroad Company, LLC ("Contractor"), a limited liability corporation organized and existing under the laws of Delaware (together "the Parties").

WHEREAS, the MBTA is responsible for providing public transportation services in certain areas of the Commonwealth of Massachusetts; and

WHEREAS, the MBTA has elected to provide commuter rail service through a contract with a commuter rail operator and has conducted a comprehensive, multi-phase, open, fair and competitive selection process in order to identify Contractor best able to provide the services in a capable, cost-efficient manner; and

WHEREAS, Contractor submitted a Proposal ("Contractor's Proposal") dated October 11, 2002, in response to the MBTA's Request for Proposals for Commuter Rail Services; and

WHEREAS, the MBTA has determined that Contractor is capable of performing the services described in this Agreement in a cost-effective, reliable and competent manner; and

WHEREAS, the MBTA and Contractor desire to set forth their mutual rights and obligations in connection with the provision of commuter rail service by Contractor for the MBTA in accordance with the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the terms, conditions, and mutual promises hereinafter given, the MBTA and Contractor agree as follows:

## SECTION 1.  DEFINITIONS.

For purposes of this Agreement --

"AAR" means the Association of American Railroads.

"ACSES" means the Advanced Civil Speed Enforcement System.

"Actual Revenue" means all Commuter Rail Services Revenue collected, deposited in accordance with this Agreement, and reported as Commuter Rail Transit Revenue on the MBTA Statement of Revenue and Expenses Actuals in any given Agreement Year.

"A.D.A." means the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.

"Agreement" means this Operating Agreement, including all Exhibits and Appendices hereto, and all amendments hereafter entered into by the Parties.

"Agreement Services" means the Engineering, Mechanical, Transportation, Dispatching, Environmental, Information Management, Administrative and Financial, and Customer Services related to and necessary for the performance of the Commuter Rail Services, including without limitation the tasks described in the Scope of Services and other Exhibits, and all other tasks, functions and responsibilities Contractor is obligated to perform under this Agreement.

"Agreement Year" means a twelve-month period commencing July 1 and ending June 30.

"Amtrak" means the National Railroad Passenger Corporation.

"Annual Fixed Price" means the amount that MBTA agrees to pay Contractor each Agreement Year for the performance of Agreement Services. The Annual Fixed Price shall not include compensation for Force Account Work, which shall be reimbursed separately according to the provisions of this Agreement.

"APTA" means the American Public Transportation Association.

"Attleboro Line" means the MBTA rail line, previously acquired by the MBTA from the trustees of the Penn Central Transportation Company, running from South Station in the City of Boston to the Massachusetts-Rhode Island state line.

"Attleboro Line Agreement" means the agreement between the MBTA and Amtrak dated _____, a draft of which is attached hereto as Exhibit 28, Draft Attleboro Line Agreement.

"CETC" means the Centralized Electrification and Traffic Control facility located at South Station in Boston, Massachusetts.

"Change of Control" means any change in the ownership of the Contractor such that any "person" or "group" not currently controlling 51% of the Contractor (each as used in Sections 13(d)(3) and 14(d)(2) of the Securities Exchange Act of 1934, as amended from time to time) either (A) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Securities Exchange Act of 1934 as amended from time to time) directly or indirectly, of voting capital stock of the Contractor (or securities convertible into or exchangeable for such voting capital stock) representing 50.1% or more of the combined voting power of all voting capital stock of the Contractor on a fully-diluted basis; or (B) otherwise has the ability, directly or indirectly to elect a majority of the Board of Directors of Contractor; or (C) any person or two or more persons acting in concert shall have acquired by contract or otherwise or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence on the management or policies of Contractor.

2

"Commencement Date" means July 1, 2003.

"Commuter Rail Employee Positions" means those positions used in the provision of MBTA commuter rail services on March 1, 2002 that were or are subject to being filled through advertisement and award in accordance with applicable collective bargaining agreements.

"Commuter Rail Management Information System" (or "CRMIS") means the integrated network comprising the Computer Network, the Computer Services, the Computer Equipment, the Software, and additional hardware and software provided by the MBTA, all as described in Section 29 herein and Exhibit 5, Information Management, and including without limitation a reliable Internet based e-mail system, wireless communications devices, end-user computers, network servers, storage devices, backup devices, cabling, routers, switches, and incidentals that function together as a platform for the Contractor's performance of the Agreement Services.

"Commuter Rail Services" means the operation of commuter rail trains.

"Commuter Rail Services Revenue" means all funds received from customers for commuter rail service, including Special Trains, whether by cash, check, credit card, debit card or otherwise.

"Computer Equipment" means the hardware, firmware, and all related devices, articles, components, peripherals, materials and incidentals that are necessary for the continuous and proper operation, management and maintenance of the CRMIS.

"Computer Network" means a system of end-user computers, network servers, a network operating system, storage devices, backup devices, peripherals, cabling, routers, switches, wireless communications devices, and incidentals that function together as a platform for operating the CRMIS.

"Computer Services" means the services necessary to develop, operate, manage and maintain a fully operational CRMIS, including without limitation the services and work outlined in Section 29 and Exhibit 5, Information Management.

"Conduct Unbecoming an Employee" means conduct by Contractor Personnel that is not consistent with the objectives and standards established in this Agreement, including without limitation the specific conduct set forth in Section 11.8 herein.

"Contractor Computer Network" means the computer network used by Contractor for the performance of services other than the Agreement Services.

"Contractor General Manager" (or "CGM") means the current occupant of the position described in Section 11.3 herein.

"Contractor Personnel" means Eligible Union Employees and Eligible Management Employees who are hired by Contractor, and all other employees, agents, or subcontractors of

Contractor who are assigned to the performance of Agreement Services.  As used in this Agreement, and unless otherwise noted, the term "employee(s)" means Contractor Personnel.

"Contractor's Proposal" has the meaning set forth in the recitals hereto and is incorporated herein as Exhibit 30.

"CRMF" means the MBTA's Commuter Rail Maintenance Facility located at 70 Rear Third Avenue in Somerville, Massachusetts.

"CROCC" means the Commuter Rail Operations Control Center located at 32 Cobblehill Road in Somerville, MA.

"CSXT Boston & Albany Line" means the portion of the rail line owned by CSX Transportation and located between Framingham, Massachusetts and Worcester, Massachusetts.

"Customer(s)" means a commuter rail passenger or person on, preparing to enter onto, or leaving a commuter rail train, the Service Property or the Service Equipment.

"Customer Delay" means any delay or combination of delays that result in a commuter rail train arriving or departing at any station platform after its scheduled arrival or departure time.

"Customer Services" means, without limitation:  providing public information regarding schedules, routes, delays and other service disruptions, and all other aspects of Commuter Rail Services; staffing telephone and/or on-line information hotlines; responding to Customer complaints and suggestions for service improvements; all other aspects of communication with Customers; and all responsibilities necessary to assure that Customers experience efficient, high-quality, and courteous Commuter Rail Services; including without limitation all tasks and services described in the Customer Service Scope of Services, Exhibit 1.

"Data" means all records in any database, data record, or other information contained in the CRMIS or used in the performance of Agreement Services, all files generated by the Software and the Third Party Software, and any digital or hard copy reports or other outputs generated by records from any such database, or the results of queries of any such database, or the Software or Third Party Software.

"DBE" means Disadvantaged Business Enterprise, as further defined in 49 C.F.R. pt. 26.

"Delay Reports" means the reports described in the Transportation Scope of Services, Exhibit 2.

"Direct Costs" means direct expenses incurred by Contractor in providing the Agreement Services, associated employee benefits, materials, contracted services, and other costs incurred directly for the benefit of providing the Agreement Services, as more specifically described in Exhibit 9, Direct Costs Billable to the MBTA.

"Director of Railroad Operations" means the current occupant of that position at the MBTA, or the occupant of such other position with the MBTA, who becomes responsible for discharging the Director of Railroad Operations' responsibility for management and oversight of the MBTA's railroad operations or his or her designee.

"Dispatching Services" means, without limitation: control of all trains, track cars and other activities controlled from the MBTA Dispatch Centers, the maintenance and publication of NORAC compatible rule books and associated employee timetables and the provisions of rules and safety supervision services for all MBTA commuter rail lines, as more specifically described in the Transportation Scope of Services, Exhibit 2.

"DOT" means the U.S. Department of Transportation.

"Electrification System" means all equipment or facilities required to provide electric traction, including but not limited to power sources and control systems.

"Eligible Management Employee" means an individual who was employed as of March 1, 2002 on the existing MBTA commuter rail services by the current MBTA commuter rail services provider in a non-represented or exempt managerial or supervisory position below the level or grade of assistant general manager/division engineer or equivalent.

"Eligible Union Employee" means an individual who occupied a position on a commuter rail seniority roster as of the Notice to Proceed Date.

"Emergency" means an event that, in the sole discretion of the MBTA, involves or exposes the MBTA, Contractor Personnel, Customers, or the general public to the risk of service disruption, personal injury, property damage, liability for regulatory noncompliance, or environmental hazard. Emergency includes, but is not limited to (1) derailment; (2) fatality or other incident at a grade crossing; (3) a Customer or employee fatality, or a serious illness or injury to one or more Customers or employees requiring admission to a hospital; (4) an evacuation of a passenger train; (5) vandalism; (6) strike or work stoppage; (7) fire; (8) oil spill or threat of release of hazardous material; or (9) severe weather conditions.

"Engineering Services" means, without limitation and as further described in the Engineering Scope of Services, Exhibit 3: inspecting, managing, repairing, replacing, maintaining and reporting on all of the MBTA's railroad infrastructure except for certain track, signal, bridge, or electrical equipment infrastructure located on or within the Attleboro Line, for which Engineering Services will be performed by Amtrak pursuant to the Attleboro Line Agreement; inspecting, repairing and maintaining track, signals, communications equipment, train control equipment and railroad bridges, except on the Attleboro Line and the CSXT Boston and Albany Line; inspecting, maintaining, repairing and managing structures, buildings, stations and platforms; operating the MBTA's fleet of non-revenue rail vehicles and railroad work equipment vehicles; conducting surveys and track design and construction inspection; maintaining freight-only track and currently unused rights of way; operating and maintaining the MBTA's fleet of non-revenue non-rail vehicles; providing information management, materials management, performance analysis and reporting; maintaining a comprehensive and up-to-date

5

inventory control system; enforcing third-party warranties; performance of Environmental Services; and completing and undertaking Force Account Work Projects. Such in-progress Force Account Work Projects may include, without limitation: (i) various MHD bridge projects; (ii) Third Party projects involving the MBTA rights-of-way; and (iii) the Central Artery/Third Harbor Tunnel construction project interfaces with the MBTA rights-of-way.

"Engineering Services Plan" means the plan described in the Engineering Scope of Services, Exhibit 3.

"Environmental Services" means, without limitation, the operation, maintenance, and service of all Environmental Systems located throughout the Service Property; the maintenance of all environmental permits, certificates and licenses; the proper disposal of any waste or hazardous material; and all other services related to compliance with all applicable environmental laws and regulations, as further described in the Engineering Scope of Services, Exhibit 3, and Exhibits 22 and 23, Environmental Specifications and Major Permits for MBTA Facilities, respectively.

"Environmental Services Work Item" means any task included in the Engineering Scope of Services, Exhibit 3, and Exhibits 22 and 23, Environmental Specifications and Major Permits for MBTA Facilities, respectively.

"Environmental Subcontractor" means the entity providing certain environmental services as described in the Engineering Scope of Services, Exhibit 3, and Exhibit 22, Environmental Specifications.

"Environmental System" means any system or equipment on the Service Property that is operated or designed to improve environmental quality, or reduce the environmental impacts of MBTA Agreement Services, including but not limited to underground and aboveground tank systems, oil/water separator systems, catch basins, onsite subsurface disposal systems, wastewater pretreatment facilities and wastewater reuse facilities.

"EOTC" means the Massachusetts Executive Office of Transportation and Construction.

"EPA" means the U.S. Environmental Protection Agency.

"Event of Default" means the Contractor's failure to comply with any of the provisions of this Agreement, and its subsequent failure to cure such failure pursuant to the provisions of Section 40.3 of the Agreement.

"Excursion Train" means any train operated by Contractor pursuant to a lease agreement between the MBTA and Contractor.

"Force Account Work" means work that Contractor is obligated to perform as part of this Agreement, but is not included in the Annual Fixed Price, which the MBTA may direct Contractor to complete pursuant to Section 18 herein.

6

"Force Account Work Project" means any project initiated as Force Account Work pursuant to Section 18 herein.

"FRA" means the Federal Railroad Administration.

"FTA" means the Federal Transit Administration; formerly the Urban Mass Transit Administration or UMTA.

"Good Working Condition" means safe, fully functional, and meeting or exceeding the minimum threshold for MBTA standards or other applicable regulations or standards, as detailed in this Agreement.

"Information Management Plan" means the plan referred to in Section 29 herein.

"Initial Joint Audit" means the audit of the Service Property, Service Equipment, and Support Property performed jointly by the MBTA and Contractor and required by Section 9.3 of this Agreement.

"Management Fee" means the compensation for overhead and profit that is applied to Direct Costs of Force Account Work and Service Changes.

"Material Damage" means damage, other than normal wear and tear to Service Property, Service Equipment, or Support Property, excluding Contractor-owned or leased property or equipment which, in the aggregate for any occurrence, costs more than $25,000 to repair or reconstruct or, if such damage is not repairable, the property that is damaged costs more than $25,000 to replace or reconstruct.

"MBTA" means the Massachusetts Bay Transportation Authority as described in the Recitals herein, and its agents and contractors.

"MBTA Computer Network" means the computer network and CRMIS used by MBTA in conjunction with Agreement Services as well as other MBTA services, as more fully described in Exhibit 5, Information Management.

"MBTA Dispatch Centers" means the MBTA-owned dispatching facilities and towers located at South Station in Boston, Cobblehill Road in Somerville, and Waltham, and any other permanent or temporary control stations designated from time to time by the MBTA.

"MDEP" means the Massachusetts Department of Environmental Protection.

"MDTE" means the Massachusetts Department of Telecommunications and Energy, formerly the Massachusetts Department of Public Utilities or DPU.

"Mechanical Services" means, without limitation and as further described in the Mechanical Scope of Services, Exhibit 4: inspecting, maintaining and repairing of the MBTA commuter rail fleet of passenger coaches and locomotives; maintaining, operating and repairing

7

non-revenue rail vehicles; providing daily cleaning, inspection, fueling, servicing and repairs of revenue equipment; providing periodic overhauls, and minor upgrading work as required; enforcing Third Party warranties; operating and maintaining non-revenue vehicles; operating the rerailing crane; maintaining a comprehensive and up-to-date inventory control system; providing information management, material management, performance analysis and reporting; and completing and undertaking Force Account Work Projects, including projects in progress by the previous contractor.

"Mechanical Services Plan" means the plan described in the Mechanical Scope of Services, Exhibit 4.

"MHD" or "MassHighway" means the Massachusetts Highway Department.

"Mobilization Period" means the period beginning on the Notice to Proceed Date and ending June 30, 2003.

"Mobilization Services" means, without limitation and as more fully described in the Mobilization Services Agreement between the MBTA and Contractor, all preparation for the commencement of Agreement Services, including taking all steps necessary to establish a seamless transition; preparing all operational plans required by the MBTA; developing or procuring, and implementing the CRMIS; hiring and training Contractor Personnel; developing procedures and internal guidelines; and transitioning equipment and facilities from the previous contractor.

"Monthly Passes" means joint-use tickets honored for transportation on MBTA subways, buses, and harbor ferries as well as the MBTA commuter rail.

"New Service" means any Agreement Services resulting from incorporation of new lines or line extensions after the Commencement Date in to the Service Property by which the MBTA may direct Contractor to provide pursuant to Section 16 herein.

"NORAC" means the Northeast Operating Rules Advisory Committee.

"Notice to Proceed Date" means January 10, 2003, the date on which the MBTA issued to Contractor a Notice to Proceed regarding the performance of Mobilization Services.

"Off-Peak Commuter Periods" means those times not denoted as Peak Periods on the public timetables published by the MBTA.

"On-Time Performance" has the meaning set forth in the Transportation Scope of Services, Exhibit 2.

"Other Contractors" means any contractors hired by the MBTA other than Contractor, or Third Parties.

"Other Required Work" means work related to the Agreement Services that a Third Party desires to subcontract to Contractor, and that the MBTA directs Contractor to perform pursuant to the terms of Section 19 of this Agreement.

"Option Year" means an Agreement Year after the original five-year Term of this Agreement, which the Parties may provide for pursuant to Section 3 of the Agreement.

"Peak Commuter Period" means those times denoted as Peak Periods by shading or other means in the public timetable published by the MBTA.

"Penalty Delay" means any delay or combination of delays that result in a train arriving or departing any station platform more than four minutes and fifty-nine seconds (4:59) after its scheduled time.

"Revenue Target" means the dollar figure calculated in accordance with Section 20 herein.

"Right of Way Assets" means without limitation railroad rights of way, track and structures, surface, subsurface, and aerial property (including utilities), bridges and related structures, and communication and signal systems, which may be added or deleted by the MBTA during the Term of this Agreement, owned or controlled by the MBTA and used by Contractor in providing Agreement Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Change" means an MBTA-directed modification to the then-existing Agreement Services, as detailed in Section 17, but excluding New Service, which is detailed in Section 16 of this Agreement.

"Service Delay" means any occurrence of a train arriving or departing from a station stop ten (10) or more minutes after its scheduled arrival or departure time, which shall trigger the notification procedures detailed in Section 8 of this Agreement, and the Transportation Scope of Services, Exhibit 2.

"Service Disruption" means a delay to one or more trains due to the following causes: Emergencies, wrecks, derailments, fires, fatalities, injuries, serious mechanical problems, or other disruptions that cause a significant impact on service.

"Service Equipment" means the locomotives, rail passenger cars, and non-revenue rolling stock that are owned or controlled by the MBTA and made available for use by Contractor in providing the Agreement Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Property" means the Right of Way Assets, stations and platforms, yards, buildings and offices, parking lots, and other land and facilities, including improvements thereto, that are owned, controlled, or used by the MBTA or Contractor in providing the Agreement

Services, as more specifically described in Exhibit 13, Service Property, Service Equipment and Support Property.

"Service Schedules" means the MBTA's schedules for the arrival and departure times of commuter rail trains, as displayed in the public timetables.

"Software" means all custom software and all Third Party Software, including without limitation source code, data files and System Documentation necessary to operate, manage, maintain and, if necessary, regenerate, the integrated CRMIS.

"Southside S&I Facility" means the MBTA's commuter rail storage, inspection and maintenance facility located at Widett Circle in South Boston, Massachusetts.

"Special Train" means a train that is not regularly scheduled and that is operated for passenger service in accordance with Section 23 herein.

"Successor Contractor" means a successor contractor to the Contractor, as more fully described in Section 41 herein.

"Support Inventory" means spare parts, consumables, shop supplies, removed and rebuilt spare parts, capital spares, manuals, forms, keys and other property and materials that may be used or consumed in the provision of the Agreement Services.

"Support Property" means equipment, tools, machines (including the CRMIS, Computer Equipment, and Software), non-revenue vehicles (including automobiles, work equipment), Computer Equipment, and other equipment and materials (including Support Inventory) related to the maintenance of the Service Equipment and Service Property or otherwise used in the provision of the Agreement Services.

"System Documentation" means user documentation and user manuals related to the CRMIS, as more fully described in Section 29.9 herein.

"Termination Date" means the date that this Agreement expires pursuant to Section 3, or is terminated pursuant to Section 40.

"Third Party" means any individual or entity other than the MBTA, Contractor or Other Contractor.

"Third Party Software" means commercial, off-the-shelf software that is part of the integrated CRMIS.

"Transition Services" means all services necessary to ensure a seamless transition between Contractor and a Successor Contractor, as more fully detailed in Section 41 of the Agreement.

"Transportation Services" means, without limitation: staffing, management and operation of all MBTA Commuter Rail Services; train operations, train crew management, train crew and equipment scheduling; maintaining and publishing all applicable rule books and employee timetables; on-board revenue collection, revenue reporting and security and revenue accounting; service monitoring; information management; performance analysis and reporting; training; enforcing Third-Party warranties; all reporting required by DOT, FRA, U.S. Coast Guard, EPA, MDEP, MDTE, APTA, FTA and other applicable laws, rules and regulations; ticket office staffing, operation and maintenance; customer service, customer information, complaint management and station information; and Dispatching Services, as more fully detailed in the Transportation Scope of Services, Exhibit 2.

## SECTION 2.  GENERAL STATEMENT OF OBLIGATIONS.

2.1    **The Agreement**.  This Operating Agreement, together with the Exhibits incorporated herein, constitutes the entire agreement between the MBTA and Contractor with respect to the subject matter hereof.  The section headings in this Agreement are for convenience and reference only, and shall not be considered in construing this Agreement.

2.2    **Conflict Among Documents.**  If there is any conflict between or among this Agreement and any of the Exhibits hereto (including Contractor's Proposal), the Agreement shall govern.  In the event that any provision of the Agreement (including the Exhibits hereto), is ambiguous, relevant portions of the MBTA's written responses to questions submitted by Proposers during the procurement process that led to the selection of Contractor as the commuter rail services contractor may (among other appropriate evidence) be used to determine the meaning of the ambiguous provisions.  Such written responses are attached hereto as Exhibit 37.

2.3    **Overall Obligations of Contractor**.  Contractor shall provide all Agreement Services in accordance with the terms and conditions of this Agreement, including without limitation the Exhibits hereto.  Where this Agreement requires transmittals, submittals, approvals, notices, or other communications to or from the MBTA, the MBTA means the Director of Railroad Operations or his or her designee.

2.4    **General Representations and Warranties of Contractor**.  Contractor hereby represents and warrants as follows:

(a)    **Corporate Organization**.  Contractor is an entity duly organized, validly existing and in good standing under the laws of Delaware, with full power and authority to carry on its businesses as now conducted and to execute and deliver this Agreement and to carry out the terms hereof.

(b)    **Authorization of Contract**.  The execution and delivery of this Agreement by Contractor and the performance by Contractor of the obligations to be performed hereunder have been duly authorized by all necessary and appropriate corporate or other action. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with, or result in a breach of, or default under, or permit acceleration of any obligation under, any of the terms, conditions, or

provisions of any note, bond, mortgage, indenture, license, material contract or other material instrument or obligation (including without limitation its Certificate of Incorporation and By-laws) to which Contractor is a party, or by which it or any of its properties or assets may be bound or affected; or (ii) violate any order, writ, injunction, decree or statute, or any rule, regulation, permit, license or conditions thereto, the violation of which would have a material adverse consequence on Contractor. This Agreement is a valid and binding obligation of Contractor enforceable in accordance with its terms, subject to equitable principles and bankruptcy and other creditors' rights laws, regulations and rulings.

(c)    **Compliance with Laws**.  Neither Contractor nor, to its knowledge, any of its subcontractors, consultants, agents or suppliers has been charged with or is in material violation of any applicable federal, state and local statutory and common laws, rules, regulations, ordinances, codes and orders governing the operation of its business which have or could have a material adverse affect on the performance of Contractor's obligations hereunder or the performance of any of its subcontractors, consultants, agents or suppliers.  Contractor and its subcontractors, consultants, agents and suppliers have and will maintain throughout the Term of this Agreement all necessary rights, authorizations and licenses to provide all equipment, materials and services required by this Agreement.

(d)    **Litigation**.  Contractor hereby warrants there is no action, suit, proceeding at law or in equity by any person or entity, or any arbitration or any administrative or other proceeding by or before (or, to Contractor's knowledge, any investigation by) any governmental or other instrumentality or agency, pending, or to Contractor's knowledge, threatened against or contemplated by Contractor or any of its subcontractors, consultants, agents or suppliers which has or could have a material adverse affect on the performance of Contractor's obligations hereunder or the performance of any of its subcontractors, consultants, agents or suppliers.

(e)    **Insurance**.  Section 32 hereto lists the insurance policies which Contractor shall continuously maintain without interruption and in compliance with its obligations under Section 32 hereof for the term of the Agreement.

(f)    **Financial Statements**.  Contractor has previously furnished to the MBTA its balance sheets and profit and loss statements of its parent companies for their previous two (2) fiscal years (the "Financial Statements").  The Financial Statements were prepared in accordance with generally accepted accounting principles consistently applied, are true and correct and fairly present the financial position of Contractor's parent companies as of their respective dates and the results of their operations for the periods then ended.  There has been no material adverse change in the financial position or business operations of Contractor or its parent companies since the date of the Financial Statements.

(g)    **Bonds**.  Section 32 hereof lists all bonds which Contractor shall continuously maintain without interruption and in compliance with its obligations under Section 32, for the Term of this Agreement.

2.5 **Governing Law**. This Agreement, and the transactions to which it relates, will be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

# SECTION 3.  TERM OF AGREEMENT.

3.1 **Term and Option Years.**

This Agreement shall terminate five (5) years from the Commencement Date (the "Term") unless terminated sooner pursuant to the provisions hereof.  Subject to satisfactory performance by Contractor of the Agreement Services as determined by the MBTA, the MBTA may, in its sole discretion, elect to extend the Term of this Agreement for an additional five (5) Option Years, in two (2) increments, one of two years and one of three years, at the Annual Fixed Price for such additional years set forth in the following paragraph.  In the event that the MBTA decides to exercise either of the option terms, it shall provide Contractor with notice no less than six (6) months prior to the scheduled Termination Date.  The MBTA and Contractor may exercise an option term on shorter notice by their mutual consent.  The MBTA and Contractor may also mutually agree to extend the Agreement for a full five-year term from the original Termination Date (rather than the two and three year option terms described above) at the Annual Fixed Price described in Section 3.2 below.

3.2 **Annual Fixed Price for Option Years.**

If the MBTA chooses to extend the Agreement for one or more option terms, the Annual Fixed Price for the first Option Year (and any subsequent Option Years) will be based upon the Annual Fixed Price for the fifth (5th) year of the Agreement Services, increased or decreased, on a cumulative basis, by the same percentage by which the cost of labor and material, excluding fuel, as reflected in the Annual Indices of Charge-Out Prices and Wage Rates (1977=100), Table A – East, "Material prices, wage rates and supplements combined (excluding fuel)," Series RCR, included in "AAR Railroad Cost Recovery Index" and supplements thereto, issued by the Association of American Railroads, (or if such index ceases to be published, a generally recognized index which is substantially equivalent to same), has increased or decreased in the preceding calendar year.

3.3 **Extension to Avoid Service Interruption.**

In the event that the MBTA determines that a planned transition from Contractor to a subsequent commuter rail contractor threatens to interrupt the commuter rail service, the MBTA may, in its sole discretion, extend the Agreement for up to six (6) months beyond the original Termination Date or the termination date of any option period.  The MBTA shall provide Contractor with as much notice as practicable of its intention to exercise such extension, but in no event shall notify Contractor fewer than twenty (20) days prior to the Termination Date or the termination date of any option period.  If the MBTA exercises such option, Contractor shall be compensated according to the Annual Fixed Price in effect for the twelve (12) months preceding the Termination Date, increased or decreased by the index referenced in the preceding paragraph.

**SECTION 4.  CUSTOMER SERVICES.**

      **General Responsibility**.  Contractor shall perform all Customer Services provided for in this Agreement, including without limitation the Customer Services Scope of Services, Exhibit 1.

**SECTION 5.  TRANSPORTATION SERVICES.**

      **General Responsibility**.  Contractor shall perform all Transportation Services provided for in this Agreement, including without limitation the Transportation Scope of Services, Exhibit 2.

**SECTION 6.  ENGINEERING SERVICES.**

      **General Responsibility**.  Contractor shall perform all Engineering Services provided for in this Agreement, including without limitation the Engineering Scope of Services, as Exhibit 3.

**SECTION 7.  MECHANICAL SERVICES.**

      **General Responsibility**.  Contractor shall perform all Mechanical Services provided for in this Agreement, including without limitation the Mechanical Scope of Services, Exhibit 4.

**SECTION 8.  INCIDENT MANAGEMENT AND NOTIFICATIONS.**

      In the event of an incident that results in delays or disruptions to commuter rail services, Contractor shall follow those procedures described in the Transportation Scope of Services, Exhibit 2.  Responsibilities include but are not limited to notification of appropriate MBTA officials, notification to the public at stations and on-board trains, investigation of delays and disruptions, preparation of reports, and the provisions for substitute transportation, if required.

**SECTION 9.  SERVICE PROPERTY, SERVICE EQUIPMENT, AND SUPPORT PROPERTY.**

    9.1    **Right of Access.**

      (a)    The MBTA hereby grants Contractor and its employees, agents and subcontractors the right to enter upon and use the Service Property solely for the purposes of performing Contractor's obligations under this Agreement.

      (b)    The MBTA shall use reasonable efforts to ensure that Other Contractors or Third Parties do not unreasonably interfere with Contractor's performance of the Agreement Services and that access by Other Contractors or Third Parties to the Service Property is limited to the degree of access granted by the MBTA or necessary for the performance of the duties of such parties.

    9.2    **MBTA's Right to Inspect.**  The MBTA and its agents, contractors and subcontractors shall have the right to enter upon the Service Property at any time and without

notice for purposes of inspecting and examining the Service Property, the Service Equipment, or the Support Property, or otherwise monitoring compliance with the terms of this Agreement. The MBTA's representatives shall carry appropriate identification while on the Service Property. The MBTA shall also have the right to obtain any information related to the Agreement Services, or to the Service Property, Service Equipment, or Support Property promptly from any management employee of Contractor.

9.3     **Condition of Property.**  Pursuant to the schedule detailed in the Mobilization Plan provided for in the Mobilization Services Agreement, the MBTA and Contractor shall conduct an Initial Joint Audit of the Service Property, Service Equipment, and Support Property, including Support Inventory.  The purpose of such Initial Joint Audit shall be to identify and establish the condition of the Service Property, Service Equipment, and Support Property and the quantities and condition of the Support Inventory as of the date of the audit.  The MBTA shall in its sole discretion correct, remedy, acknowledge, or resolve any previously hidden defects, missing materials, damage to, or failure of the Service Property, Service Equipment, and Support Property revealed by the Initial Joint Audit so as to comply with applicable safety laws or regulations, provided however that if the results of the Initial Joint Audit determine that certain systemic conditions exist and are of a magnitude that require extraordinary maintenance or repair in order to ensure the normal operation of the Commuter Rail Services, Contractor shall propose an Extraordinary Maintenance and Repair Program to the MBTA for its review, and the Parties shall jointly determine the approach that Contractor shall take with regard to any such required maintenance and repair activities.  Contractor shall correct all other conditions in accordance with the Engineering Scope of Services, Exhibit 3, and the Mechanical Scopes of Services, Exhibit 4. Within ninety (90) days following the completion of each Initial Joint Audit, Contractor shall submit to the MBTA a "Repair Plan," which shall detail a schedule for Contractor to conduct repairs and upgrades necessary to bring the Service Property, Service Equipment and Support Property other than property as to which the Initial Joint Audit reveals the existence of a systemic condition, up to the standards detailed in the Engineering and Mechanical Scopes of Services.  Contractor shall submit such plan to the MBTA, which shall either approve such plan or direct reasonable changes to such plan within thirty (30) days.

9.4     **Alterations or Modifications**.  Contractor shall not materially alter or modify, except in accordance with this Agreement, any of the Service Property, Service Equipment, or Support Property without the prior written approval of the MBTA.  If Contractor determines that such alteration or modification is necessary, it shall notify the MBTA in writing at least thirty (30) days prior to the date Contractor believes such work should commence, and shall proceed as directed by the MBTA, consistent with Section 31.  Each request from Contractor must describe, in detail, the reason for the proposed modification, the scope of the work, the estimated cost, the labor, materials and equipment needed, and must contain a detailed schematic of the proposed work and a project schedule identifying the start date, completion date, and significant event dates.  At the completion of the work, Contractor shall submit to the MBTA appropriate documentation, including as-built drawings and any other documentation required by law or regulations.  The MBTA or its subcontractors may remove, at the sole cost and expense of Contractor, any unauthorized alteration or modification that is not removed by Contractor within twenty-four (24) hours after notice from the MBTA.

9.5    **Contractor's Duty of Care.**

(a)    During the Term of this Agreement, Contractor shall maintain the Service Property, Service Equipment, and Support Property in accordance with the requirements of this Agreement, the Scope of Services, applicable warranties, and applicable law.  Upon the termination of this Agreement, Contractor shall deliver the Service Property, Service Equipment, and Support Property to the MBTA in a condition consistent with the maintenance standards detailed in this Agreement, and subject to the damage provisions of Section 9.6.  Contractor shall reimburse the MBTA for the actual costs of any repairs to or maintenance of the Service Property, Service Equipment, or Support Property necessary to return the same to the condition, required by the standards detailed in this Agreement, excluding the replacement of obsolete Support Property or capital assets or scheduled overhauls of Service Equipment.

(b)    The MBTA shall have the right to reject any design, workmanship, or material which does not conform to accepted practice or design of the MBTA, OEM, or any vendor supplying materials or components, or to the standards as set forth in this Agreement. Any such rejection shall be corrected by Contractor to the satisfaction of the MBTA.  Repeated rejections may be cause for the MBTA to order discontinuance of all or a portion of the Agreement Services, without commensurate relief from applicable penalties, pending resolution satisfactory to the MBTA.  The currently accepted practice or design of Contractor, OEM, or any other vendor that, in the written opinion of the MBTA, represents a diminution of value to the user from a previous practice, or design, may be rejected by the MBTA.

(c)    Contractor shall not, without prior MBTA approval, post or affix any signs, notices, bumper stickers, advertisements or documents or materials of any kind that are not necessary for the performance of Agreement Services on the Service Property, Service Equipment or Support Property.  Contractor shall not post or affix any political notices or advertisements on the Service Property, Service Equipment, or Support Property, and shall immediately remove any such notices or advertisements.  Contractor shall post personal or union communications only on designated bulletin boards.

9.6    **Damage to Service Property, Service Equipment, and Support Property.**

(a)    Responsibility for Material Damage to the Service Property, Service Equipment, and Support Property shall be determined by the MBTA after joint inspection by the MBTA's Chief Mechanical Officer, Chief Engineer, or Chief Facilities Officer and the Contractor General Manager ("CGM") or his or her designee, and, at the discretion of the MBTA, representatives of Third Parties.  The determination of the MBTA pursuant to the procedures set forth in the immediately preceding sentence shall be final and binding, subject to the rights of Contractor pursuant to Section 35.  Material Damage that will be deemed to have been caused in whole or in part by acts or omissions of Contractor shall be repaired at the Contractor's sole expense, and shall include but not be limited to:  (1) mechanical, electrical, or engineering defects not found or not corrected by Contractor during the performance of its work in accordance with the Agreement; (2) improper, inadequate, or temporary repairs, adjustments, cleaning, inspections, and renewals carried out by Contractor; or (3) unfit, inferior, un-inspected, or non-compliant material and overhaul services obtained by Contractor.

(b)    In calculating the aggregate amount of damage from any occurrence to determine whether damage is Material Damage, the MBTA and Contractor and shall take into account damage to Service Property, Service Equipment and Support Property and other assets of the MBTA, and substitute transportation and all other costs estimated by the MBTA to be necessary or desirable in order to repair or replace property that has suffered Material Damage. Contractor shall submit to the MBTA within twenty-four (24) hours of the occurrence of any damage that Contractor believes may exceed $10,000 a preliminary report detailing the cause and extent of the damage and estimate of repair costs, and measures undertaken by Contractor to prevent future similar damage.  Within thirty (30) days of the occurrence of the damage, Contractor shall submit to the MBTA a report further detailing the final estimate of costs of repair of replacement.

(c)    Material Damage to the Service Property, Service Equipment, or Support Property not caused in whole or in part by Contractor's acts or omissions shall be repaired by Contractor at the MBTA's expense and shall be treated as Force Account Work.  The MBTA may, in its discretion, elect to have such work performed by Other Contractors, who may, at the MBTA's discretion, utilize any facility on the Service Property for the performance of such work.  Contractor shall not charge such Other Contractor for such use of facilities.  Support Property on hand at such facility and used by Other Contractors in the repair of Material Damage shall be replaced by the MBTA or Other Contractors or the appropriate adjustment shall be made to the inventory.  In the event that such Force Account Work by Other Contractors affects the Contractor's performance of the Agreement Services, or its use of the Service Property, Service Equipment, or Support Property such that Contractor is unable to comply with the requirements of this Agreement, the MBTA shall waive the penalty assessable as a result of Contractor's failure to comply.

(d)    In the event the MBTA retains Other Contractors to repair Material Damage to Service Equipment, the MBTA shall cause such repairs to be completed promptly.  In the event that such repairs are not completed within one (1) year of the date that Contractor notified the MBTA of the Material Damage, the MBTA may adjust the Service Requirements or direct Contractor to remove Service Equipment from storage, as more fully described in the Mechanical Scope of Services, Exhibit 4.

(e)    Contractor may inspect, at its sole discretion and cost, any repairs performed by Other Contractors.  In the event that, in the opinion of Contractor, repairs by Other Contractors are not performed in accordance with the standards required of Contractor under this Agreement, Contractor shall notify the MBTA in writing.  Any correction or repairs that the MBTA determines should be made by Contractor to Service Property, Service Equipment, and Support Property as a result of inadequate repairs by Other Contractors shall be performed by such Other Contractor at such Other Contractor's sole cost and expense, or performed by Contractor as Force Account Work at the MBTA's sole discretion.

(f)    Where damage to Service Property, Service Equipment, and Support Property does not constitute Material Damage, Contractor shall determine, to its best ability, the extent and cause of the damage, and provide a written report to the MBTA no later than the

17

business day following the date on which the MBTA determined that the damage does not constitute Material Damage. All damage reports filed pursuant to this paragraph must specify in detail the cause and extent of the damage and the measures taken by Contractor to prevent similar future damage. Unless otherwise directed by the MBTA, Contractor shall, within sixty (60) days following submission of a damage report, undertake repairs of the damaged Service Property, Service Equipment, or Support Property at Contractor's sole cost and expense. Contractor shall notify the MBTA upon completion of such repairs.

(g)     Contractor shall promptly repair any damage to the Service Property, Service Equipment, or Support Property caused by derailments, collisions, or Third Parties that materially affects Commuter Rail Services, without regard for cause or responsibility. Contractor shall maintain accurate cost records pertaining to these activities in the event they are eligible for any reimbursement.

(h)     The provisions of this Section do not apply to or otherwise affect the Contractor's obligation to perform routine maintenance as required by this Agreement and the Scope of Services. All costs related to such routine maintenance are included in the Annual Fixed Price.

9.7     **Support Property**.

(a)     Non-Revenue Vehicles used in the Agreement Services shall be subject to the provisions of Section 9.8 rather than this Section.

(b)     The MBTA shall provide to Contractor, on or before the Commencement Date, all existing Support Property. An initial identification of all Support Property is listed in Exhibit 13, Service Property, Service Equipment and Support Property. A complete identification of Support Property will occur at the Initial Inventory and Initial Audit. All Support Property (except for any Contractor-owned specialty equipment identified in Contractor's Proposal) whether in existence on the Commencement Date or hereafter acquired by the MBTA or Contractor, shall be the property of the MBTA. The MBTA may at its sole discretion provide additions to the Support Property during the Term of this Agreement.

(c)     **Replacement of Support Property.**

(1)     Items of Support Property with a replacement value of less than ten thousand dollars ($10,000) that for any reason become unavailable for use in the provision of Agreement Services shall be promptly replaced by Contractor, unless the same is, in the MBTA's reasonable judgment after consultation with Contractor, no longer necessary for the provision of the Agreement Services. The cost of any such replacement made pursuant to this section shall be included in the Annual Fixed Price.

(2)     If, as a result in whole or in part of Contractor's act(s) or omission(s), as determined by the MBTA, an item of Support Property with a replacement cost of ten thousand dollars ($10,000) or more is made unavailable for use in the provision of the

18

Agreement Services, Contractor shall replace such item or reimburse the MBTA for the replacement cost of such item.

(3)     If an item of Support Property with a replacement cost of ten thousand dollars ($10,000) or more is made unavailable for use in the provision of the Agreement Services as a result of causes other than an act or omission on the part of Contractor, the MBTA shall promptly replace such item unless the same is, in the MBTA's reasonable judgment after consultation with Contractor, no longer necessary for the provision of the Agreement Services.

(4)     In the event that Support Property becomes unavailable, as described in paragraphs (1), (2), and (3) above, Contractor shall submit reports to the MBTA within twenty-four (24) hours of the occurrence of such unavailability.

(5)     Contractor shall only use the MBTA's re-railing crane after receiving permission from the MBTA.

9.8     **Non –Revenue Vehicles**.

(a)     **Non-Revenue Vehicles Owned by the MBTA.**

(1)     The MBTA shall provide to Contractor, on or before the Commencement Date, the MBTA-owned Non-Revenue Vehicles identified in Exhibit 13, Service Property, Service Equipment, and Support Property, for Contractor's use in performing the Agreement Services, and may, in its discretion, provide additional vehicles during the Term of this Agreement.  The MBTA reserves the right to use MBTA-owned vehicles, or make them available to Other Contractors, if they are not being used for Agreement Services and such use does not interfere with the performance of Agreement Services.

(2)     The MBTA shall not be responsible for damage to MBTA-owned Non-Revenue Vehicles arising out of Contractor's operation of such vehicles, and Contractor shall reimburse the MBTA for any costs incurred by the MBTA.  Contractor shall bear full responsibility for repairing or replacing such vehicles.  Contractor shall exercise care to obtain the maximum useful life of each vehicle.

(3)     All costs associated with the use of MBTA-owned Non-Revenue Vehicles shall be included in the Annual Fixed Price.  The MBTA will replace, at its sole cost, all vehicles listed in Exhibit 13, Service Property, Service Equipment, and Support Property and identified as "Specialized Non-Revenue Vehicles," subject to the damage provisions of Section 9.6.  All other MBTA-owned Non-Revenue Vehicles shall be replaced on an as-needed basis over the Term of this Agreement, subject to MBTA approval, by vehicles to be purchased or otherwise acquired by Contractor subject to approval by the MBTA.  The cost of such replacement vehicles shall be included in the Annual Fixed Price, and title to such vehicles shall remain with Contractor subject to the provisions of paragraph (5) subsection 9.8(b) below.  Contractor shall return the retired vehicles to the MBTA for disposal.

(b)    **Non-Revenue Vehicles Acquired by Contractor**.

(1)    Contractor shall lease or otherwise acquire, on or before the Commencement Date, all other Non-Revenue Vehicles that Contractor decides are required to carry out the Agreement Services, other than those provided by the MBTA as listed in Exhibit 13, Service Property, Service Equipment and Support Property.  The quantity, style and use of such other Non-Revenue Vehicles shall be approved by the MBTA and consistent with standards for publicly funded vehicles.

(2)    Contractor shall be responsible for all damage to Non-Revenue Vehicles acquired under this Section or to the replacement vehicles described in paragraph 1 above, and shall maintain the necessary insurance on all such vehicles.

(3)    The cost of the lease or acquisition of the Non-Revenue Vehicles described in this Section shall be included in the Annual Fixed Price set forth in Exhibit 32 of this Agreement.

(4)    If any Non-Revenue Vehicle leased or otherwise acquired by Contractor is damaged, destroyed, or otherwise becomes unavailable for use during the Term of this Agreement, Contractor shall replace such vehicle at Contractor's sole cost, unless Contractor shall have determined in good faith, after consultation with the MBTA, that such Non-Revenue Vehicle is no longer necessary for the performance of the Agreement Services.

(5)    Any lease or other agreement entered into by Contractor to acquire Non-Revenue Vehicles shall provide that the MBTA may assume the lease or other agreement, and the MBTA may exercise any such provision of such lease or other agreement at any time. Contractor shall, at no cost to the MBTA, also transfer the title of Contractor-acquired vehicles upon direction by the MBTA.  Contractor shall retain the use of all such vehicles for the Term of this Agreement.

**SECTION 10.  MAINTENANCE OBLIGATIONS.**

10.1    **Maintenance Obligations.**

(a)    Contractor shall inspect, service, repair, and maintain the Service Property, Service Equipment and Support Property in accordance with this Agreement, including without limitation the Engineering Scope of Services, Exhibit 3, and the Mechanical Scope of Services, Exhibit 4, and other Exhibits.  Contractor shall, at all times, keep the Services Equipment, Service Property, and Support Property in Good Working Condition.

(b)    Contractor shall (i) comply fully with the terms of any manufacturer's warranty on the Service Property, Service Equipment and Support Property and any other property used in the provision of Agreement Services; (ii) cooperate with the MBTA regarding the fulfillment of any warranty obligations; (iii) administer such warranties on behalf of the MBTA; and (iv) provide the MBTA with any information necessary to the administration of any such warranties at the Termination Date of this Agreement.

(c)     Within sixty (60) days after the Notice to Proceed Date, Contractor shall develop and submit to the MBTA for approval an Engineering Services Plan and a Mechanical Services Plan, identifying both scheduled maintenance work and maintenance projects to be undertaken by Contractor, and detailing Contractor's specific maintenance schedule for accomplishing such work and projects during the Term of this Agreement, all as identified and further described in the Engineering Scope of Services, Exhibit 3, and the Mechanical Scopes of Services, Exhibit 4.  Contractor shall update such plans on an annual basis not later than February 1 of each Agreement Year and submit to the MBTA for approval, or more frequently as required by significant changes to the plans or as required by the MBTA's Director of Railroad Operations.  Contractor shall also submit for MBTA approval plans for specific service diversions required for maintenance projects.  In addition, the MBTA may request changes to any such plans, and Contractor shall make and agree to implement such proposed changes within ten (10) days of the MBTA's request, or shall suggest, within thirty (30) days of the MBTA's request**,** alternatives reasonably designed to meet MBTA's needs as stated in its request.  All maintenance activities of Contractor under this Agreement shall be conducted in accordance with the plans referred to in this Section.

(d)     Contractor shall comply with all applicable federal, state, local industry and MBTA safety requirements, regulations, or guidelines relating to the maintenance of the Service Property, Service Equipment, and Support Property including but not limited to safety, environmental and other requirements, regulations, standards, or guidelines promulgated by the FRA, U.S. Coast Guard, EPA, MDEP, APTA, MDTE, FTA, or DOT.

(e)     Contractor shall operate and maintain all Environmental Systems in existence on or in the Service Property or Support Property, as detailed in the Engineering Scope of Services, Exhibit 3.

10.2    **Materials Management Obligation.**

(a)     Contractor shall acquire, store, secure, issue, account for, control and manage the disposal of Support Property and Support Inventory necessary for the provision of Agreement Services.

(b)     Contractor shall manage the purchasing of all Support Property and Support Inventory required to perform the Agreement Services, as described herein.  All Support Property and Support Inventory purchased by Contractor in order to perform the Agreement Services shall be used solely for the purpose of providing the Agreement Services.  Contractor shall not sell, loan, give away or use for purposes other than Agreement Services, Support Property and Support Inventory purchased or obtained for the Agreement Services, without the express written consent of the MBTA.  Title and ownership of such Support Property and Support Inventory shall pass to the MBTA upon purchase by Contractor except as otherwise provided in this Agreement. The Support Property and Support Inventory shall be available for inspection by the MBTA at all times.

(c)     Contractor shall develop and institute, subject to the approval of the MBTA, a materials management process that will optimize efficiency and reduce inventory cost

through forecasting of replenishment requirements as well as control of all phases of the materials handling function, and that will assure that adequate levels of critical inventory (particularly long lead-time items) are maintained throughout the Term of this Agreement. Contractor shall use the Materials MIS to monitor levels of materials and inventory.

(d)    **Storage Location.**  Support Inventory must remain on MBTA property unless Contractor receives MBTA approval to store such Support Inventory elsewhere.

(e)    **Storage and Handling.**  All Support Property and Support Inventory shall be properly handled to prevent damage. Support Property and Support Inventory shall be protected properly during storage.  Due care shall be taken to protect Support Property and Support Inventory from the effects of precipitation, heat, sun, cold, damp, and other effects of time and weather.  Support Property and Support Inventory shall be stored so that it does not warp, twist, or otherwise distort during storage.  The MBTA may reject as non-compliant Support Inventory not stored in conformance with this Agreement.  Loss of value due to improper handling or storage of Support Property or Support Inventory shall be the responsibility of Contractor, pursuant to Section 9.6 and Section 9.7.

(f)    **Support Inventory Valuation.** The inventory value maintained in the Materials MIS shall be equal to the system average price based on the actual purchase price of the Support Inventory acquired for use in the Agreement Services, and shall be subject to audit and verification by the MBTA or their authorized representatives.  The inventory value shall be adjusted to reflect the results of the annual physical inventory described in this Section.  At no time during the Term of the Agreement shall the value of the Support Inventory fall below ninety percent (90%) of the value of the Support Inventory on the Commencement Date, unless the MBTA adjusts the inventory value to reflect inventory items that the MBTA adds, at its cost and expense, to the inventory, or removes from the inventory after removing obsolete or otherwise unused inventory items from the inventory.  In the event that the MBTA adjusts the total value of the inventory as described in the preceding sentence, Contractor shall ensure that at no time during the Term of the Agreement does the value of the Support Inventory fall below ninety (90%) of the adjusted value of the Support Inventory.

(g)    **Physical Inventory and Audit.**  Contractor shall conduct an initial physical inventory and annual physical inventory of the Support Inventory and an initial audit and annual audit of the Support Property.

(1)    No later than ten (10) days prior to the Commencement Date, the MBTA and Contractor shall complete an initial physical inventory of the Support Inventory and an initial audit of the Support Property to determine the quantities thereof.  Such initial inventory and audit shall serve, among other things, as the basis for determining Contractor's compliance with the provisions of Section 41 and MBTA's compliance with the provisions of Section 41. Upon completion of such initial physical inventory and initial audit, a listing of such Support Inventory and Support Property shall be attached to this Agreement as Exhibit 38.

(2)    Contractor shall conduct an annual physical inventory of all Support Inventory.  The MBTA shall, with the cooperation of Contractor, conduct or cause to be conducted an annual audit of the Support Property.

(h)      **Obsolete, Surplus and Scrap Support Property and Support Inventory.**  As part of the annual physical inventory and annual audit, and routinely in the course of performing the Agreement Services, Contractor shall identify any Support Property or Support Inventory that is to be considered obsolete, surplus or scrap, provided that the final determination of such status shall be made by the MBTA.

(1)      Obsolete material is Support Inventory that is no longer readily, economically, and commonly available to Contractor, is no longer in the catalog, is no longer a standard item supplied by an Original Equipment Manufacturer ("OEM"), or is made unnecessary by an action of the MBTA.  If an item of Support Inventory is deemed obsolete by the MBTA, it may continue to be utilized until depletion, unless the item has been determined to be inappropriate due to safety or other failure considerations.  Obsolete material shall be disposed of after approval is obtained from the MBTA.

(2)      Surplus material is Support Inventory for which the annual turnover is less than 0.20 for the past three (3) years, and for which there is more than a five (5) year supply.  The inventory in excess of the five (5) year supply may be disposed of with the prior written approval of the MBTA.

(3)      Scrap material is an item of Support Property or Support Inventory where the actual cost to repair or repair-and-return may exceed the economic cost to replace.  In such cases, Contractor may scrap the item of Support Property or Support Inventory if Contractor replaces it with a new or completely remanufactured item.  Contractor may also scrap-and-replace such units of Support Property and Support Inventory where and when it realizes operating economies from standardized configurations with the prior written approval of the MBTA.  For such standardization, Contractor shall use only new or completely remanufactured items.

(4)      Contractor shall, at least annually, dispose of any Support Property and Support Inventory identified as obsolete, surplus, or scrap.  Disposal of non-capitalized units of property shall be accomplished through sale by competitive bidding. Capitalized units of property must be disposed of in accordance with instructions from the MBTA.  Capitalized units of property include capital spares included with a Service Equipment purchase.  Disposal of any obsolete, surplus or scrap Support Property and Support Inventory shall be on a first-in, first-out (FIFO) basis.  All Support Property and Support Inventory retained shall be the most recently acquired.

(5)      The proceeds of sales of obsolete, surplus, or scrap Support Property and Support Inventory shall be deposited into an escrow account to be maintained by Contractor and, at the direction of the MBTA, either be remitted to the MBTA or used by Contractor to acquire other Support Property or Support Inventory to be utilized in providing the Agreement Services.  Should the disposal include sale to a division, joint partner, or subsidiary of Contractor, the price paid shall be the book value of the material disposed of unless a higher price is received.  Contractor shall submit a monthly report detailing all transactions to or from the escrow account.  The cost of selling or otherwise disposing of such items shall be included in the Annual Fixed Price for the Agreement Services set forth in Section  21.  Contractor shall also

23

credit to the escrow account the amount of any and all proceeds from the routine sale of used inventory items.

(i)    **Inventory Maintenance Plan.**  Within sixty (60) days after the Notice to Proceed Date, Contractor shall develop an Inventory Maintenance Plan.  The plan should detail the amount of inventory required to maintain the Service Equipment and Service Property.  The plan is subject to approval by the MBTA.    Such plan shall be updated annually and submitted to the MBTA as part of the corresponding Mechanical Services Plan and Engineering Services Plan.

(j)    **Minimum and Maximum Levels.**  Contractor shall determine, subject to MBTA approval, the minimum and maximum levels of each item of Support Inventory to be maintained.  The MBTA may, in its sole discretion after consulting with Contractor, direct Contractor to adjust minimum and maximum line item inventory levels.

(k)    **Stocking Levels.**  Contractor shall at all times maintain actual levels of Support Inventory that exceeds the MBTA-approved minimum inventory levels.  In the event that the MBTA determines that actual Support Inventory levels fall below such MBTA-approved minimum levels, and Contractor fails to correct such deficiency within thirty (30) days of receiving written notice of the deficiency from the MBTA, the MBTA may deduct from Contractor's next monthly payment the cost of acquiring the amount of Support Inventory necessary to bring the actual Support Inventory level up to the MBTA-approved minimum inventory level.  Contractor shall not deplete existing stocks to generate working capital for Contractor's benefit.  Consumption of existing stocks that results in replacement with consignment material is not permitted without prior written approval from the MBTA.

(l)    **Quality of Materials.**  Support Inventory material and services shall be selected to achieve or exceed performance requirements of the Agreement.  Services include repairing and overhauling components.  All Support Inventory materials to be used in the Agreement Services shall be first quality products and shall conform to OEM specifications.  If OEM specifications are not available, then other appropriate specifications or standards (such as AAR, AISI, Aluminum Association, ASTM, AWI, NEC, NFPA, SAE, ASME, or others) should be utilized, unless otherwise specified by the MBTA.  Contractor shall not acquire or use materials that would result in a reduction in durability, reliability, safety, regulatory compliance, or operating economy relative to the Service Equipment or Service Property original design or as modified through upgrades or improvements.

(1)    Contractor shall acquire Support Inventory that is identical to and interchangeable with parts, material, circuits, logic, ergonomics and dimensions on the existing MBTA Service Equipment and Service Property. Unless otherwise specified in this Agreement, the requirement for interchangeability shall apply to material used for repairs, maintenance, and replacements. Interchangeability shall be defined by form, fit, and function.  The cost, durability, delivery time and appearance are an integral part of function.

(2)    Contractor may recommend substitutions in or changes to configurations of material and spares, however such substitutions or changes shall not lessen the reliability, appearance, availability, operating economy, compliance, or safety of the Service

24

Equipment or Service Property.  Should the MBTA provide approval for such substitution or change, Contractor shall acquire sufficient spare materials for such substitution or change.

        (3)    Contractor shall not remove re-buildable components and replace them with earlier, superseded, obsolete, or discontinued models taken from other sources of Service Equipment, Service Property or supplier inventories.  Contractor shall pay particular care that its subcontractors and suppliers of UTEX, repair-and-return, and overhauled components, do not substitute such models of lesser value.  Service Equipment that has such substitutions incorporated shall be deemed as placed on Long-Term Hold until the correct component is installed.  Provisions regarding Long Term Holds are included in the Mechanical Scope of Services.

        (4)    All Support Inventory purchased for the Agreement Services shall comply with all local, state, and federal regulations.

        (m)    **Materials MIS.**  Contractor shall use the Materials MIS to monitor materials management activities.  These activities shall include, but not be limited to, maintaining an inventory of all existing materials and parts; optimizing stocking of materials and parts; calculating the costs of materials and parts used for work orders; controlling the ordering of materials and parts; and tracking specific materials, including materials for Force Account Work Projects, serialized components, budgets and project costs as detailed in Section 29.

        The system shall be fully operational and up-to-date within ninety (90) calendar days before the Commencement Date.  Contractor also shall ensure that existing MBTA materials management data is loaded into the Materials MIS prior to the Commencement Date.

        Contractor shall separately identify and track materials used for Force Account Work Projects in the Materials MIS.

        (n)    **Failure to Maintain Adequate Levels.**  In the event that Contractor fails to perform the necessary maintenance on the Service Property or Service Equipment within the allocated maintenance schedule due to Contractor's failure to maintain an adequate level of inventory, Contractor shall be held liable for the costs associated with such failure to perform such maintenance, including all applicable penalties.  Such penalties may include, but not be limited to, Penalties for Late or Cancelled Trains, Penalties for Speed Restrictions, and Penalties for Unavailable Equipment, as detailed in Section 22.

    10.3    **Fuel Purchasing.**

        (a)    **Bulk Locomotive Fuel.**  The MBTA shall select a locomotive fuel vendor(s) and pay for bulk locomotive fuel that is (i) delivered to the fuel storage tanks located at the Southside S&I Facility and the CRMF and (ii) used in Commuter Rail Services.  Contractor shall order and arrange for the delivery of such fuel from the MBTA-approved vendors. Contractor shall monitor, manage and maintain sufficient levels of such fuel, and monitor the quality of the fuel in the storage tanks by performing a chemical analysis thereof.  Contractor shall replace at its sole cost any such fuel that is degraded as a result of the Contractor's own conduct or omission(s).

(b)    **Other Fuel.**  Contractor shall provide or secure, at its own cost and expense, all fuel used by Contractor, including locomotive fuel delivered to outlying points, in the performance of Agreement Services other than fuel dispensed from the storage tanks described in Section 10.3.1 above.  All such fuel shall meet or exceed the fuel specifications of the original manufacturers of the equipment.

(c)    **Locomotive Fuel Usage.**  Contractor shall provide to the MBTA monthly reports showing fuel usage by locomotive by date, time of day, fueling location, and amount, and a monthly report of fuel purchases by Contractor.

10.4    **Massachusetts Sales Tax.**  The MBTA and Contractor agree that, pursuant to M.G.L. c. 64H(tt)(E), Contractor is exempt from Massachusetts Sales Tax on property it purchases that is required to perform Agreement Services.  In the event of a change in state law or any other duly authorized legislative, judicial, or regulatory determination that Contractor is required to pay sales tax on such property, the Parties shall enter into a Service Change that compensates Contractor for its increased costs resulting from such determination.  The Parties agree that, consistent with M.G.L. c. 64H(tt)(E), Contractor is not entitled to a sales tax exemption on the purchase of any property used to administer, oversee, supply, maintain, or control any of Contractor's own offices, facilities, workshops, vehicles, equipment or business operations.  Contractor is responsible for maintaining all appropriate and required records related to the purchase of property required to perform the Agreement Services and for compliance with all applicable tax laws.


**SECTION 11.  MANAGEMENT AND PERSONNEL.**

11.1    **In General.**  Contractor shall be solely responsible for the management of Contractor Personnel, subject to the terms of this Agreement.  In the performance of its obligations under this Agreement, Contractor is an independent contractor for, and not an agent of, the MBTA.

11.2    **Meetings with Contractor's Corporate Officers**.  Any Contractor corporate officer shall meet with the MBTA's Director of Railroad Operations or any member of the MBTA senior management within ten (10) days of the MBTA's reasonable request.

11.3    **Contractor General Manager.**

(a)    Contractor shall, subject to the prior approval of the MBTA, designate a Contractor General Manager ("CGM") who shall be resident in the Boston metropolitan area, and who shall have professional experience commensurate with the scope of the Agreement Services.  Contractor agrees that it will delegate to the CGM sufficient authority to make immediate decisions as necessary to maintain the safe and efficient daily performance of Agreement Services.  Contractor further agrees that the CGM shall be assigned exclusively to perform the Agreement Services and shall not perform functions in connection with any other Contractor service or contract.  The CGM shall have authority to enter into agreements with the

MBTA for Force Account Work Projects with a value up to $1 million per project, and have authority to approve purchases of up to $1 million within five (5) days. For Force Account Work or purchases in excess of $1 million, Contractor shall obtain the required corporate approval within ten (10) days of the MBTA's request for such approval.

(b)     The CGM shall, among other duties, (1) have principal responsibility for directing and coordinating Contractor's performance of its obligations under this Agreement; (2) serve as Contractor's principal liaison with the MBTA; (3) attend any meeting (including without limitation public meetings) with the MBTA's Director of Railroad Operations or other senior staff, as requested by the MBTA; and (4) be available at such other times as the MBTA may direct, to consult with representatives of the MBTA.

(c)     In the CGM's absence, Contractor will designate an Acting CGM who shall have full authority to discharge the responsibilities of the CGM. Contractor shall fill any vacancy or absence in the CGM's position on an interim basis within three (3) business days of the day on which such absence or vacancy began. In the event of an absence by the CGM in excess of thirty (30) calendar days, the Contractor will submit the name of the Acting CGM within two (2) business days of the date on which the initial absence or vacancy occurs to the MBTA for approval. A vacancy in the CGM position will be filled on a permanent basis, by an individual approved by the MBTA, within sixty (60) calendar days of the date on which the initial absence or vacancy occurs, unless such time period for approval is extended by the MBTA.

11.4     **Management Personnel.**

(a)     In order to perform the Agreement Services, Contractor shall provide senior managers reporting directly to the CGM, who shall be resident in the Boston metropolitan area, and who shall each be responsible for one of the following functions: (1) management of transportation; (2) management of equipment maintenance; (3) management of engineering services ("Contractor's Chief Engineer"); (4) management of finance, accounting, and administration; (5) management of customer service. Contractor shall also designate managers, who shall be resident in the Boston metropolitan area, and who shall report directly to the CGM, who shall be responsible for one or more of the following functions; (6) safety and training management; (7) management of compliance with the Americans with Disabilities Act of 1990; (8) environmental compliance management; (9) management of organizational diversity; (10) management of all warranty compliance; (11) management of quality control; and (12) management of labor relations. Contractor shall submit to the MBTA for approval the names of the individuals it proposes to discharge the functions described above at least thirty (30) days before each individual is to assume responsibility for such functions. An organizational chart of management personnel shall be submitted within sixty (60) days of the Notice to Proceed Date to the MBTA for approval.

(b)     Contractor shall, as stated in Section 11.4(a) above, designate a Customer Service Manager, who shall be resident in the Boston metropolitan area. The Customer Service Manager shall be responsible for oversight of the Contractor's customer service and public information efforts in conducting Agreement Services, as detailed in the Customer Service Scope

of Services, Exhibit 1.  The Customer Service Manager shall have sufficient authority and sufficient resources to promptly investigate and resolve customer complaints.  The Customer Service Manager shall maintain frequent contact and coordinate efforts with MBTA Railroad Operations and the MBTA's customer service departments.  The Customer Service Manager shall be assigned exclusively to address customer service issues.

(c)    The individual occupying each of the positions in Section 11.4(a) above shall have professional experience commensurate with his or her job responsibilities and the scope of Agreement Services.

(d)    Each manager referred to herein shall attend all meetings, including public meetings, requested by the MBTA.

11.5    **Changes in Management Personnel**.

(a)    Contractor and the MBTA agree that the stability of the management team responsible for the performance of Agreement Services is a critical element in successful contract performance.  To achieve that objective, Contractor agrees that it will not transfer the CGM or any other manager listed in Section 11.4 for two years after the Notice to Proceed Date, or the date of the MBTA's approval of such manager, whichever is later except (1) as required by any provision of this Agreement, after providing notice to the MBTA, (2) in the event that Contractor terminates such manager for cause, in which case Contractor shall promptly provide notice to the MBTA, or (3) with the prior written consent or at the request of the MBTA.

(b)    Contractor shall submit to the MBTA for approval the names of the individuals it proposes to fill any vacancy in a management position listed in Section 11.4 above at least one day before the individual is to assume interim responsibility for such function or functions, and at least thirty (30) days before the individual is to assume permanent responsibility for such function or functions.  In the event an absence or vacancy in any such position occurs, Contractor shall fill such vacancy on an interim basis within three (3) business days of the date on which the absence or vacancy began, and on a permanent basis within sixty (60) calendar days unless the MBTA approves in writing an extension of such time.

(c)    The MBTA reserves the right at any time and in the MBTA's sole discretion to direct that the CGM or the managers listed in Section 11.4 be removed from the performance of Agreement Services, or transferred to another position.  Except as detailed in paragraph (d) below, the MBTA shall not reimburse Contractor or any Contractor employee for the costs of such employee's termination, reassignment, or relocation.

(d)    In the event that a Contractor employee files a claim in connection with any action taken by Contractor at the MBTA's direction pursuant to paragraph (c) above, and a court of competent jurisdiction determines that the MBTA acted in violation of law in directing Contractor to take such action in relation to such employee, the MBTA shall indemnify and hold Contractor harmless from and against any damages, fines, or penalties arising from such determination.  Contractor shall notify the MBTA within twenty-four (24) hours of the filing of any such claim, and the MBTA may elect to participate in the defense of such claim.

11.6     **Contractor Personnel.**

(a)     Contractor shall, except as otherwise provided in this Agreement, provide and furnish all labor, including administrative, professional, and supervisory personnel, necessary for the performance of Agreement Services, none of whom shall be employees of the MBTA.  All Contractor Personnel shall be subject to the direction, supervision, and control of Contractor, and not the MBTA.  All such Contractor Personnel shall be assigned exclusively to the performance of Agreement Services and shall not perform functions in connection with any non-Agreement Services, except where Contractor has obtained MBTA's prior written approval to have employees perform other such services.  Contractor shall identify any Contractor Personnel who are temporarily reassigned to perform non-Agreement Services.  Contractor shall reimburse the MBTA for each day any Contractor Personnel is performing non-Agreement Services pursuant to Section 22 herein.

(b)     All Contractor Personnel will be employees of Contractor or of its subcontractors and, as such, Contractor (or its subcontractors) will be solely responsible for the determination of and payment of wages and benefits and other terms and conditions of employment, except as otherwise provided in this Agreement, and shall comply with any applicable mandatory Federal or State prevailing wage rates, or collective bargaining agreements, as applicable.

(c)     Contractor shall use reasonable efforts through the collective bargaining process to perform the Agreement Services in a manner that improves the cost-effectiveness and quality of the Agreement Services.

11.7     **Employment Laws and Regulations.**  Contractor shall be fully responsible for complying with applicable laws and regulations relating to employer's liability; worker's compensation; unemployment insurance; forms of social security or railroad retirement.  Except as otherwise provided in Section 33, Contractor will indemnify and hold harmless MBTA for any and all liability, damages, claims, costs (including reasonable attorneys' fees), and other expenses of whatever nature arising from alleged violations by Contractor or its subcontractors of such laws, regulations, rules or procedures.

11.8     **Contractor Personnel Conduct and Discipline.**

(a)     All Contractor Personnel shall be qualified for the work assigned to them and shall perform their duties in a courteous, efficient, safe, and competent manner.  Contractor Personnel who fail to meet such requirements shall be deemed to have engaged in Conduct Unbecoming an Employee.  Contractor Personnel engaged in the provision of Agreement Services shall not deface, damage, destroy, vandalize or litter rolling stock, station areas, or any other part of the Service Property and Service Equipment, and shall not, while engaged in the performance of Agreement Services, smoke, read personal material, watch or listen to television or other video devices, use other electronic devices (such as cellular phones or personal digital assistants) for personal reasons, sleep or appear to sleep, or fail to perform duties in a timely fashion as assigned.  Any such conduct is Conduct Unbecoming an Employee.  In addition,

Conduct Unbecoming an Employee shall include, but shall not be limited to, the following conduct or behavior:

(1)     Misconduct towards a Customer or other person on the Service Property, including without limitation abusive, hostile, argumentative, or demeaning behavior.

(2)     Failure to comply with customer service standards, as defined in the Customer Service Scope of Services, Exhibit 1.

(3)     Negligent performance of the Agreement Services.

(4)     Use or possession of illegal drugs or alcohol.

(5)     Use or possession of firearms or other weapons.

(6)     Dishonesty, including without limitation (i) theft, and (ii) the willful failure to accurately complete required reports.

(7)     Disorderly conduct.

(8)     Fighting.

(9)     Insubordination.

(10)     Criminal activity or reasonable suspicion of criminal activity.

(11)     Failure to comply with Contractor's System Safety Program or System Security Plan, or any other act evidencing disregard for safety.

(12)     Failure to collect customer fares on-board trains.

(13)     Vandalism or other intentional damage to Service Property, Service Equipment, Support Property or Third-Party property.

(14)     Failure to adhere to the following procedures:  Contractor Personnel shall not report to work more than sixty (60) minutes prior to the start of their scheduled work shift, and shall leave the Service Property no later than sixty (60) minutes after the end of their scheduled work shift, unless otherwise permitted or required by the MBTA.

(15)     Failure to comply with any regulation, rule, procedure or instructions required to comply with the A.D.A. or other accessibility law or regulation.

(b)      Contractor shall require all Contractor Personnel who interact with Customers or the public, including locomotive engineers who work on-board commuter rail trains, to conduct themselves with courtesy and decorum, dress appropriately for the provision of service to Customers, and wear a clearly visible identification badge containing the employee's first name and badge number at the breast pocket.  All Contractor Personnel who interact with Customers or the public, while on duty, shall not eat or drink and shall be clean and attired in uniforms that clearly indicate that they are providing Agreement Services on behalf of the MBTA.  Uniform designs for on-board Contractor Personnel must be approved by MBTA. Failure to comply with any requirement of this paragraph shall be deemed Conduct Unbecoming an Employee.

(c)      Contractor shall promptly investigate all reports of Conduct Unbecoming an Employee, and shall institute appropriate corrective measures, which shall include disciplinary action, barring such Contractor Personnel from the Service Property, removing such Contractor Personnel from the performance of Agreement Services, or transferring such Contractor Personnel to a job that does not require interaction with Customers or the public. Contractor shall also take steps to ensure that similar instances of Conduct Unbecoming an Employee will not occur in the future.

(d)      Contractor shall also, at the request of the MBTA, institute corrective measure identified in subparagraph (c) above for any Contractor Personnel who engages in Conduct Unbecoming an Employee, or who the MBTA deems unsatisfactory on any reasonable basis, from entering the Service Property.  Such reasonable basis may include the receipt by the MBTA or Contractor of more than three (3) verbal or written complaints regarding conduct of any Contractor Personnel.  Such complaints need not be documented by complainants in writing or in person if subsequent investigation by the MBTA or Contractor reveals credible evidence of the veracity of the complaint.  Any criminal conviction, or reasonable suspicion of criminal activity, that in the discretion of the MBTA or Contractor, indicates that any Contractor Personnel poses a threat to customers, MBTA employees or the Service Property or Service Equipment, shall constitute Conduct Unbecoming an Employee.

(e)      In the event any Contractor Personnel barred from the Service Property or the performance of Agreement Services pursuant to paragraphs (c) or (d) above disputes such action through arbitration or other authorized proceeding pursuant to a collective bargaining agreement or other authorized process, and such employee prevails in such proceeding, the MBTA shall pay due deference to the results of such proceeding and shall consult with Contractor regarding the appropriate resolution of such dispute, taking into account whether restoration of any such Contractor Personnel to the performance of certain Agreement Services may threaten the public safety, or the provision of customer service in a manner that is consistent with the requirements of this Agreement.

(f)      At all times, Contractor will satisfy its obligation to maintain adequate personnel to provide Agreement Services in conformance with the approved Staffing Plan, regardless of the number employees held out.

11.9     **Availability of Employee Records.**  Contractor shall maintain such records as may be necessary or desirable in order for the MBTA to determine Contractor's compliance with applicable laws and regulations, and to assist in future transitions to a Successor Contractor.  The Parties agree that as of the Notice to Proceed Date, such records consist of: (i) Contractor Personnel lists, including each employee's name, employee number, and badge number (where applicable); (ii) hire dates, (iii) wage and benefit records as to Contractor Personnel engaged in providing Agreement Services, and (iv) the records of all Contractor Personnel regarding drug and alcohol testing, competency tests, qualifications, training, and criminal violations that directly relate to the performance of the Agreement Services.  Unless Contractor demonstrates to the MBTA that applicable law or labor agreements prohibit granting the MBTA access to such records, all such records, or the relevant portions of such records, shall be available for inspection by the MBTA upon its request during Contractor's normal business hours.  Contractor shall provide to the MBTA on or before September 1 of each Agreement Year a report as to the matters referred to in (i), (ii) (iii) and (iv) above for the immediately preceding Agreement Year.  Contractor shall also submit to the MBTA a monthly employment report containing authorized headcount by function and current Contractor Personnel Lists as described in (i) above.  Any information received by the MBTA pursuant to this paragraph shall be accorded any confidential treatment required by law.

11.10     **Competency Tests.**  All employees hired by Contractor or its Subcontractors shall be qualified and experienced in the work for which they are engaged, and shall possess all necessary and current certifications from appropriate regulatory authorities.  No later than sixty (60) days before the Commencement Date, Contractor shall submit to the MBTA a Training Program, detailed in Section 15, that ensures that all Contractor Personnel are capable of performing the Agreement Services for which they are responsible.  All Contractor Personnel identified as deficient in required qualifications will complete necessary training prior to performing Agreement Services.  Contractor shall develop and establish appropriate competency tests and procedures for all Contractor Personnel.  Contractor shall determine, using competency tests or other procedures, that all Contractor Personnel are competent to perform the jobs to which they are assigned.  Contractor shall further require that an employee's promotion or advancement to a higher pay grade be contingent on the employee passing a competency test tailored to that higher pay grade and experience level.

11.11     **Work in Harmony.**  Contractor shall furnish labor that shall work in harmony with all other elements of labor employed in the provision of Agreement Services, and shall work in harmony with Other Contractors engaged in the provision of services to the MBTA in connection with its commuter rail operations, and shall use its reasonable efforts to minimize disputes between itself and such Other Contractors.  The MBTA shall use reasonable efforts to cause Other Contractors engaged by it to work in harmony with Contractor, and shall use reasonable efforts to minimize disputes between Contractor and Other Contractors engaged by the MBTA.  The Contractor acknowledges and agrees that all Contractor Personnel shall conduct themselves at all times in an orderly and proper manner so as not to annoy or offend Customers or other persons using the Service Property or employees of the MBTA, and, further, that the Contractor at the request of the MBTA shall prohibit from entering the Service Property any employee, agent, consultant, supplier, and/or subcontractor who should cause any annoyance or offense.

11.12  **Damage to MBTA Property**.  Contractor further covenants and agrees that, in the exercise of the right and privileges granted hereunder, its employees, agents, consultants, suppliers, subcontractors or representatives will not deface or damage the property of the MBTA. Contractor shall assume liability for all such action(s) on the part of its employees, agents, consultants, suppliers, subcontractors or representatives and shall indemnify and hold the MBTA harmless from and against all claims, damages, losses and expenses incurred by the MBTA arising out of such actions.

## SECTION 12.  HIRING OF EXISTING WORKFORCE.

12.1  **Establishment and Filling of Union Positions**.  Contractor shall establish employment positions for the provision of the Agreement Services equal to the number of Commuter Rail Employee Positions in existence on March 1, 2002 with the then current MBTA commuter rail services provider (the "Workforce Positions").  The number of Workforce Positions to be established by Contractor, by category, shall be as follows:

> (1)  Transportation - 509
> (2)  Mechanical - 536
> (3)  Engineering - 444
> (4)  Administration - 11
> (5)  CETC - 37
> (6)  South Station Information/Ticketing - 16
>       Back Bay Information/Ticketing - 8
> (7)  Attleboro Line Station Maintenance - 12

Contractor shall initially fill all Workforce Positions in seniority order from the rosters of Eligible Union Employees, and shall fill all vacancies (if Contractor elects to fill such vacancies) during the Term of the Agreement from the rosters of Eligible Union Employees if such rosters have not been exhausted.  In the event that Contractor exhausts such rosters or such rosters do not provide employees who are qualified to fill an initial position or a subsequent vacant position, Contractor may fill such positions with employees not on such rosters.  Beginning the fourth Friday after the Notice to Proceed Date, Contractor shall provide weekly written updates to the MBTA on the status and progress of the hiring process. Such weekly updates shall include, without limitation, a listing of the existing Amtrak workforce by employee, based on seniority rosters listing Eligible Employees, indicating the following information: whether the employee (a) applied for a position, (b) was interviewed for the position, (c) was offered the position, (d) was not offered a position based on failure of a physical or drug or alcohol testing, (e) accepted or declined the position, and (f) was given a general physical examination and the outcome of any such examination. Contractor shall also list and identify each individual who was offered and accepted a position on Contractor's workforce and who was not previously employed by Amtrak, including a complete and detailed explanation regarding why the position was not filled by an individual who belonged to the existing Amtrak workforce and was on a seniority roster.

Contractor shall keep all Amtrak commuter rail employees who are on disability due to work-related injuries at the time of the workforce transition on the roster of Eligible Union Employees for thirty-six (36) months starting on the Commencement Date.  If at any point during that thirty-six months the employee passes a physical and drug/alcohol test as described in Section 12.3(b) below, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position.  Contractor shall keep Amtrak commuter rail employees who are on disability due to non-work related injuries or illness at the time of the workforce transition on the roster of Eligible Union Employees for twelve (12) months from the Commencement Date.  If at any point during that twelve-month period the employee passes a physical and drug/alcohol test as described in Section 12.3(b) below, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position.

12.2.    **Hiring of Management Employees**.  Subject to subsection 12.3 of this Section, Contractor shall offer employment in supervisory and management commuter rail positions to Eligible Management Employees.  Each employee hired under this subsection shall be provided pay, health and welfare, retirement, and other benefits equal to those provided to such employee in his or her position with the current MBTA commuter rail services provider.  Contractor's obligation under this sub-Section is to afford employment to Eligible Management Employees for a twelve-month period beginning on the Commencement Date.  After such period, employment and retention shall be in accordance with the Contractor's personnel policies and procedures.

12.3.    **Workforce Management**.

(a)    The requirements of this Section shall not be construed to (1) impose a mandatory staffing level for the Agreement Services throughout the Term of the Agreement; (2) restrict Contractor's ability to manage the number of positions and size of workforce it determines to be necessary to perform the Agreement Services, as vacancies occur or as services are added or adjusted, during the Term of the Agreement; or (3) restrict Contractor's ability to dismiss employees for cause, during the Term of the Agreement.

(b)    Contractor shall not offer employment to any person who fails to successfully complete (1) drug and alcohol testing and (2) a physical examination tailored to the particular demands or requirements of the position being filled (e.g. a "color blind" condition would render a person ineligible to fill a position as a locomotive engineer). If an Eligible Union Employee or Eligible Management Employee who is not on disability due to a work related injury fails a physical examination during the Mobilization Period, and Contractor does not offer employment to such employee, such employee shall remain on the roster listing eligible employees for twelve (12) months following the Commencement Date.  If such employee passes the physical examination during said twelve-month period, Contractor shall follow the applicable seniority rules in force at the time to determine the employee's entitlement to a position.

(c)    Contractor shall not offer employment to any person, other than an Eligible Union Employee or Eligible Management Employee, who has been convicted, within the past five (5) years, of a felony.

34

**SECTION 13.  LABOR OBLIGATIONS.**

13.1  **General.**  Contractor shall establish its initial terms and conditions of employment in accordance with the mandatory labor terms and conditions set forth in Exhibit 7, Labor Provisions.

13.2  **Collective Bargaining**.  Contractor shall negotiate a collective bargaining agreement that includes, without limitation, the terms and conditions in Exhibit 7, Labor Provisions with each of the labor organizations identified in that Attachment, unless Contractor and a union agree to alternative terms.

13.3  **Initial Discussions.**  No later than ten (10) days after the  Notice to Proceed Date, Contractor shall (a) provide written notification to each union listed in Exhibit 7, Labor Provisions, that it has been selected as Contractor; (b) provide each such union with a copy of the mandatory labor terms and conditions set forth in Exhibit 7, Labor Provisions, and a written assurance of Contractor's intention to fully comply with those terms: and (c) commence negotiations with each union.

**SECTION 14.  SECTION 13(c) OBLIGATIONS.**

14.1  Except as provided in Section 14.2, the MBTA shall be administratively and financially responsible for claims and obligations arising under Section 13(c) of the Federal Transit Act (49 U.S.C. § 5333(b)).

14.2  Contractor shall have liability for any 13(c) claims or obligations concerning the commuter rail workforce that arise out of acts or omissions of Contractor that are not approved in writing by the MBTA or that are not otherwise directed by the MBTA.  Contractor shall cooperate with the MBTA (including, but not limited to, providing employee records and other requested information) in the resolution and defense of any 13(c) claims or disputes for which the MBTA has responsibility, and in the implementation of any 13(c) remedies.

14.3  Contractor shall not assist or encourage any Contractor Personnel to file or otherwise pursue a 13(c) claim against the MBTA, or take any action which is contrary to the interests of the MBTA under Section 13(c), relating to the termination or conclusion of services under this Agreement, any future transition from Contractor to another service provider, or any other action or event relating to this Agreement or commuter rail service.  If Contractor fails to comply with this obligation, Contractor shall be liable to the MBTA for all costs incurred by the MBTA (including attorneys' fees) associated with any 13(c) claims or disputes, or delays in the receipt of FTA grants.

**SECTION 15.  TRAINING OF CONTRACTOR PERSONNEL.**

15.1    **Training Programs**

(a)    Contractor will establish an Annual Training Program Plan to provide comprehensive ongoing training programs for all Contractor Personnel involved in providing Agreement Services, including, without limitation, any training required by the FRA for the performance of Agreement Services.  Such training shall include specific training related to Engineering, Maintenance, Transportation, and Customer Services.  Contractor shall identify in the Annual Training Program Plan, all legally required training and discretionary training for each functional area of the Agreement Services.

(b)    All Contractor Management Personnel involved in providing Agreement Services shall receive a copy of this Agreement and shall attend a four-hour briefing by Contractor regarding the terms of this Agreement no later than sixty (60) days after the Commencement Date**.**

(c)    Contractor shall provide its training programs within the MBTA's service area, unless it receives prior written approval from the MBTA to hold such training programs elsewhere.  Contractor shall schedule training activities so as to not interfere with its provision of Agreement Services, and in no event shall the number of employees performing Agreement Services in any functional area fall below the staffing levels provided in the MBTA-approved Staffing Plan for that functional area.  If Contractor provides training in excess of the training requirements for the performance of Agreement Services, Contractor Personnel attending such training shall be considered temporarily reassigned pursuant to Section 11.6 and subject to the Employee Performance Penalty.

(d)    Contractor's Safety and Training Manager shall have responsibility for formulating and coordinating all training activities, and who shall be available to meet with the MBTA to review all training needs, programs and reports.  Contractor shall notify the Director of Railroad Operations of all training for new hires, and the Director of Railroad Operations, or his or her designee, may address the new hires during such training.  The MBTA reserves the right to evaluate the effectiveness of Contractor training and retraining programs.

(e)    Contractor shall forward to the MBTA and post all training schedules prominently on the Service Property.  Contractor shall make ten (10) percent of the places in any Contractor-sponsored training program available for individuals employed by the MBTA, Other Contractors, or Third Parties and approved by the MBTA to attend such sessions.  The cost of training such individuals shall be included within the Annual Fixed Price.

15.2    **MBTA Approval.**  All training programs or portions thereof (including the annual training schedule of all Contractor Personnel) provided in connection with the Agreement Services shall be submitted for review and approval by the MBTA by August 1 of each Agreement Year, and will be designed, developed and implemented in accordance with Contractor's Proposal and established professional standards for performance-based instruction. Contractor shall provide MBTA with copies of course descriptions for training designated

specially for the Agreement Services.  MBTA shall have the right to inspect copies of all training programs used for Contractor Personnel who are performing Agreement Services.

15.3    **Costs**.  The costs of the approved training programs required for performance of the Agreement Services shall be included in the Annual Fixed Price.

15.4    **Failure to Complete Training.**  The failure of any Contractor Personnel to successfully complete legally required training included in the approved training schedule shall be the basis for removing such Contractor Personnel from further performance of the Agreement Services requiring such training until the employee successfully completes the required training.

15.5    **Reports.**  Contractor will provide the MBTA with a Monthly Training Report, which will list and describe each training session conducted during the month; the number of hours of training completed by each employee; and the names of each employee who participated in each such training session as well as the employee's test results.

15.6    **Operating Rules, Employee Timetable, Special Instructions, Safety Rules, and Dispatching Manual.**  Contractor shall develop, maintain, and publish a set of NORAC - compatible operating rule books ("Contractor's Book of Operating Rules") to be consistent with Exhibit 15, Employee Timetables, Special Instructions, Safety Rules, and Dispatching Manual, for all lines dispatched by Contractor under the Agreement Services.  Such operating rules shall be subject to review and approval by the MBTA, FRA and other regulatory bodies from time to time.  The set of rules and related materials must be approved, printed and ready for distribution to Contractor Personnel prior to the effective date of the materials.  Failure to comply with this deadline will result in a penalty to Contractor pursuant to Section 22, of $10,000 per day for every day that approved rules and related materials are not distributed to Contractor Personnel. Contractor shall provide three (3) dozen copies of the materials to the MBTA.

15.7    **Knowledge of Rules.**  Train and engine crews, engineering and mechanical personnel, dispatchers and other safety-sensitive personnel critical to safe commuter rail operations shall be qualified on the applicable sections of Contractor's Book of Operating Rules, the Employee Timetable, the Special Instructions, the Safety Rules, Dispatching Manual, Bulletin Notices, Division Safety Notices, the physical characteristics of the applicable routes, and every other document required for the safe operation of the railroad.  To be qualified as required herein, Contractor Personnel shall be tested as determined by the Contractor. Contractor Personnel whose familiarity and qualification are deemed acceptable by Contractor shall receive a written certification from Contractor.

15.8    **Operation Lifesaver.**  Contractor must provide two or more full-time Operation Lifesaver-qualified instructors who shall offer Operation Lifesaver training to the public, including "train the trainer" programs, to public safety officials, teachers, community groups, and others.

15.9    **Third Party Training.**  Contractor shall provide required safety training to Other Contractors or Third Parties who are approved by the MBTA to perform work on the Service Property.  The cost of all such safety training shall be included in the Annual Fixed Price.

Contractor shall be responsible for obtaining the recovery, if any, of its cost for such safety training from such Third Parties.

## SECTION 16.  NEW SERVICE.

16.1  **In General**.  The MBTA may, at any time during the Term of this Agreement, direct Contractor to implement New Service pursuant to the provisions of this Section and Section 21.3.

(a)    The MBTA shall notify Contractor of the New Service no fewer than ninety (90) days before the New Service is scheduled to commence.

(b)    Notwithstanding any provision of this Section, MBTA may direct Contractor to operate Agreement Services on the Greenbush Line pursuant to the provisions of Exhibit 18, Service Expansions.  The scope of work for the Greenbush service will be based upon such scope of work contained in Exhibit 18, Service Expansions.   The scope of work that is actually requested by MBTA may differ from the scope of work set forth in Exhibit 18, Service Expansions and therefore Contractor's compensation for the Greenbush service may differ from that set forth in Exhibit 32, Contractor Cost Proposal.  The MBTA and Contractor shall negotiate in good faith before Greenbush service commences, using Contractor Cost Proposal as the starting point for the negotiations.  The Parties anticipated during the RFP process that Greenbush Service would likely commence on July 1, 2005.  In the event such service is temporarily delayed or delayed substantially beyond July 1, 2005, the Parties shall in good faith negotiate appropriate changes to the Annual Fixed Price as a Service Change, notwithstanding anything to the contrary in Section 21.3(d) of this Agreement.  Such negotiations shall commence no later than January 1, 2005 and shall be conducted by taking into account, among other things, Exhibit 32, changes in level of service, changes in any cost factor being considered (including headcounts in particular classifications), Contractor efforts to create cost efficiencies, and other relevant facts that take place between the Commencement Date and July 1, 2005.

(c)    Contractor's compensation for any MBTA-directed New Service other than the Greenbush Service shall be calculated according to the provisions of Section 21.3.

16.2  **Separate Contracting**.  Notwithstanding any other provision of this Agreement, the MBTA reserves the right during the Term of this Agreement to contract separately for, or provide with its own personnel, any New Services that may commence during the Term of this Agreement.

## SECTION 17.  SERVICE CHANGES.

17.1  **General Authority.**  The MBTA may, at any time during the Term of this Agreement, direct Contractor to implement a Service Change.

17.2  **Initiation of Change.**  The MBTA shall notify Contractor of a Service Change and shall describe the same in detail, specifying the date on which the Service Change shall

commence (the "Implementation Date").  Such Implementation Date shall not be less than thirty (30) days after the date of such notice, unless otherwise agreed upon in writing by the Parties or where safety or budgetary constraints require implementation on shorter notice, as determined by the MBTA in its sole discretion.

17.3    **Contractor Response.**  Within fifteen (15) days after receiving the notice of Service Change under Section 17.2, Contractor shall provide the MBTA with:  (a) a written statement as to the anticipated impact of the Service Change on Contractor's ability to perform the Agreement Services, including any potential cost increase or decrease and any estimated increase or decrease in revenue; and (b) an auditable, itemized proposed budget for such Service Change to perform the Service Change in the most cost effective manner possible.  Any increase or reduction in compensation attributable to the Service Change will be governed by the terms of Section 21.3.  Notwithstanding the pendency of any negotiations or dispute resolution procedures, Contractor shall proceed to implement the Service Change and shall perform Agreement Services relating thereto in accordance with the implementation schedule established by the MBTA.

## SECTION 18.  FORCE ACCOUNT WORK.

18.1    **General Authority.**

(a)    The MBTA may at its discretion direct Contractor to perform Force Account Work.

(b)    All Force Account Work shall be performed in full and strict compliance with all applicable terms and conditions of this Agreement, including the Exhibits hereto and the Scope of Services.

(c)    Contractor shall perform Force Account Work using Contractor Personnel and others as may be necessary, without any impact to any Contractor obligation to provide other Agreement Services.  Contractor shall, at no additional cost to the MBTA, use the resources provided for the performance of the Agreement Services in the execution of Force Account Work to the extent that doing so does not interfere with the performance of other Agreement Services.

(d)    Contractor shall assign Contractor Personnel to perform Force Account Work, to the extent that such assignment does not adversely affect the provision of other Agreement Services.  If Contractor cannot assign Contractor Personnel to the performance of Force Account Work without adversely affecting the provision of other Agreement Services, Contractor may assign or hire non-Contractor Personnel to the performance of Force Account Work.  Compensation for use of Contractor Personnel for Force Account work shall conform to the provisions of Exhibit 9, Direct Costs Billable to the MBTA.

(e)    Contractor shall use available Service Equipment and Support Property for the performance of Force Account Work, as long as such use does not interfere with the performance of other Agreement Services.  This shall include such Service Equipment and

Support Property as is made available by relocating or rescheduling other work of a non-critical nature. Contractor shall only provide equipment other than Service Equipment or Support Property for the performance of a Force Account Work Project with prior written approval of the MBTA.

18.2    **MBTA Request.**

    (a)    The MBTA shall initiate Force Account Work Projects by delivering to Contractor a Project Initiation ("PI") and/or Change Order ("CO") form. The PI shall include a description of the work to be performed, as well as any plans, specifications and requirements that the MBTA determines should govern the Force Account Work Project.

    (b)    In the event of an Emergency or when, in the sole discretion of the MBTA, expeditious response is required, MBTA may orally direct Contractor to undertake necessary Force Account Work, and Contractor shall perform such work in the most expeditious manner possible. The MBTA shall deliver to Contractor written confirmation of the Force Account Work request within forty-eight (48) hours of issuing such oral directive and issue a PI or CO for the Force Account Work as soon as reasonably practicable thereafter.

18.3    **Contractor Response.**  Upon request by the MBTA, Contractor shall provide a comprehensive cost proposal for the Force Account Work Project including staffing plans, resource requirements, and itemized, auditable costs in a format approved by the MBTA and consistent with Exhibit 9, Direct Costs Billable to the MBTA. Contractor shall provide this cost proposal to the MBTA as quickly as possible, with a maximum response period of twenty-one (21) days from the date of the request. Contractor shall also provide a definitive schedule that includes important milestones for completing the Force Account Work Project. The costs of the preparation and production of the required cost proposals and schedules are included in the Annual Fixed Price. Contractor shall make every effort to comply with the cost proposals and schedules, and shall notify the MBTA immediately after Contractor becomes aware that a deviation from such proposal or schedule is likely.

18.4    **Initiation of Force Account Work Projects.**  Completion of the PI form and signature by Contractor's CGM or his or her authorized representative and the MBTA's duly authorized representative shall constitute an agreement to perform the requested Force Account Work. The cost estimate detailed in the PI shall constitute the amount Contractor is authorized to spend. This amount may only be increased through execution of a CO. Contractor shall perform the Force Account Work according to the schedule detailed in the PI, unless the Parties execute a CO revising such schedule.

18.5    **Changes to Force Account Work Projects.**  Changes to a PI for Force Account Work shall be initiated by execution of a CO form. Each proposed CO for a Force Account Work Project shall cite the number of the PI that the CO revises. Completion of the CO form and signature by an authorized representative of the MBTA shall constitute agreement regarding the change. No changes shall be made on the basis of oral requests, except in the event of an Emergency situation as set forth in Section 18.2(b) above.

18.6    **80% Expenditure Notice.**  Contractor shall promptly notify MBTA in writing when Contractor has spent or obligated eighty percent (80%) of the funds authorized for a Force Account Work Project.  Such notice shall include: a description of the incomplete work and the estimated cost of completing such work; a schedule update; and notice of any unsafe condition or impact on revenue service that may arise if work on the Force Account Work Project ceases before completion.  If the MBTA determines that the Force Account Work Project may exceed its approved cost or continue beyond its approved schedule, the MBTA may issue a CO authorizing Contractor to continue the Force Account Work Project based on the new estimate or schedule, or may direct Contractor to terminate the Force Account Work Project as promptly and inexpensively as feasible.  Contractor shall have no obligation to perform work on a Force Account Work Project after the cost limit specified in a PI (and any COs that modify such PI) has been reached, with the exception of work that is, in the determination of the MBTA, necessary to prevent or remedy any unsafe condition or to prevent disruption of revenue service.

18.7    **Force Account Work Project Costs.**  Contractor shall document all Direct Costs incurred in the performance of Force Account Work, separate from the records Contractor keeps for the costs of providing services included in the Annual Fixed Price.  All invoices for Force Account Work Projects submitted by Contractor to MBTA shall include the number of staff-hours and cost of labor expended; the costs of associated employee benefits; quantities and costs of materials consumed; the cost of subcontracted services; equipment usage and associated costs; and any other allowable Direct Costs for performing the Force Account Work Project.  To the extent that Contractor Personnel are used in performing Force Account Work Projects, Contractor's cost proposals and invoices shall indicate the number of hours worked by Contractor Personnel that are included in the Annual Fixed Price, and hours worked by Contractor Personnel outside the Annual Fixed Price.  Within the cost limit specified in the PI, MBTA shall compensate Contractor for all work actually performed pursuant to the PI, according to the provisions of Section 18 and Exhibit 9, Direct Costs Billable to MBTA.

18.8    **Project Completion**.  Upon completion of a Force Account Work Project, or earlier at the sole discretion of the MBTA, the MBTA will issue to Contractor a Project Completion Order.  Contractor shall submit all invoices of bills required for compensation under the terms of this Section within ninety (90) days of the date of such order.  All claims for compensation made after that time shall be waived by Contractor.

18.9    **Audit and Inspection.**

(a)    Contractor shall ensure that all Force Account Work conforms to all applicable laws, regulations and standards for the performance of Agreement Services, except where different standards are specified in the applicable PI.

(b)    The MBTA shall have the right to have its representative(s) present at the site of a Force Account Work Project for the purpose of inspecting work performed and to ensure that all work is progressing according to the agreed-upon schedule.  Inspections may be unannounced and conducted at any location at any time.

     (c)    The MBTA shall approve the quality and completeness of all Force Account Work performed by Contractor.  Measurement of the adherence to the requirements of this Agreement and the applicable PI shall be evaluated based on the results of inspections performed at the discretion of the MBTA, as described above.  Where the Force Account Work does not meet all applicable laws, regulations, or standards, or the applicable PI specifications, the Parties shall meet promptly to determine what additional work should be performed in order to satisfy those requirements.  Contractor shall remedy all unsatisfactory Force Account Work at no additional cost to the MBTA.

     18.10  **Completion of Force Account Work.**  Upon termination of this Agreement, Contractor shall continue to perform all incomplete Force Account Work only to the extent necessary to remedy any unsafe condition on the Service Property, except as otherwise agreed to by the Parties.

     18.11  **Subcontracts.**  Contractor may subcontract Force Account Work if it believes doing so is necessary or efficient.  All such subcontracts shall be in accordance with Section 34 of this Agreement.

     18.12.  **Annual Force Account Work Plan.**  Contractor shall submit to the MBTA, no later than February 1st of each Agreement Year, an Annual Force Account Work Plan which shall detail Contractor's Force Account Work Projects scheduled for the upcoming year.  Such plan shall include a schedule of Force Account Work Projects that the MBTA has directed Contractor to perform.  The Force Account Work Plan shall also recommend and prioritize Force Account Work Projects (which may include capital and non-capital projects) which, in Contractor's opinion, would improve the performance of the Agreement Services.  Contractor shall include in the Force Account Work Plan ongoing projects such as flagging and support for Third Party activities, such as mechanical support for vehicle advertisement wraps, environmental Force Account Work Project recommendations, and indicate how Contractor will deploy Contractor Personnel dedicated to Force Account Work Projects in the upcoming year.

## SECTION 19.  OTHER REQUIRED WORK.

     19.1  **General.**  In addition to the Agreement Services and Force Account Work, Contractor shall perform related work for Third Parties when directed to do so by the MBTA, such as third party training, wreck clearing, support, and support for utility companies working in the right of way.

     19.2  **Compensation**.  Contractor shall offer to perform Other Required Work for compensation that is equivalent to the compensation that the MBTA pays Contractor for Force Account Work, and Contractor shall be compensated by the Third Party according to the terms of the agreement between the parties.  In the event that the Third Party rejects Contractor's offer to perform the work terms equivalent to those governing Force Account Work, Contractor shall notify the MBTA of the Third Party's rejection of such terms.

**SECTION 20.  REVENUE GROWTH INCENTIVE.**

20.1    **In General**.  No later than ninety (90) days after the end of each Agreement Year, the MBTA shall pay to Contractor a Revenue Growth Incentive in accordance with this Section.

20.2    **Determining the Revenue Growth Incentive**.  The Revenue Growth Incentive shall be calculated and paid after the completion of each Agreement Year.  The MBTA shall at all times determine fares for all commuter rail service, including but not limited to periodic fare exemptions for special events, educational programs, and Emergencies.  Contractor shall collect all Commuter Rail Services Revenue in accordance with the provisions of the Transportation Scope of Services, Exhibit 2.  If Actual Revenue for any given Agreement Year exceeds the Revenue Target for that Agreement Year, MBTA will pay Contractor an amount equal to fifty percent (50%) of the difference between the Revenue Target and the Actual Revenue in accordance with the provisions of this Agreement.

20.3    **First Contract Year Revenue Target**.  Within ninety (90) days after Commencement Date, the MBTA shall inform Contractor of the Actual Revenue for the immediately preceding fiscal year.  The Revenue Target for the first Agreement Year shall be the preceding fiscal year's Actual Revenue plus three percent (3%).

20.4    **Subsequent Contract Years Revenue Target**.  The Revenue Target for each Agreement Year after the first Agreement Year shall be the greater of (a) the prior Agreement Year's Revenue Target plus three percent (3%) or (b) the prior Agreement Year's Actual Revenue plus three percent (3%).

20.5    **Railroad Tickets and Joint-Use Passes**.  Contractor shall charge and collect fares for commuter rail services, including Monthly Passes, according to the provisions of the Transportation Scope of Services, Exhibit 2.  Revenue from the sale of Monthly Passes shall be allocated between commuter rail and other MBTA services as follows:  Seventy percent (70%) of the pass value for Zone 1 and Zone 2 passes shall be allocated to commuter rail.  For all other joint-use passes, seven dollars ($7) shall be allocated to MBTA local transit services and the remaining amount shall be allocated to commuter rail.  All other commuter rail tickets, including one way, round trip, ten (10) and twelve (12) -ride tickets and Zone 1(A) and Zone 1(B) passes, are valid only for commuter rail use, and revenue from the sale of such tickets shall therefore be fully allocated to commuter rail.

20.6    **Reporting and Audits**.  Each month the Parties shall exchange reports concerning the Commuter Rail Services Revenue collected during the previous month.  The MBTA and Contractor may audit revenue accounts related to ticket sales to verify the revenue collected by each Party each month.  In the event an audit is required due to a failure to submit a complete report, the party that failed to submit the report shall reimburse the other party for the cost of the audit.

20.7    **Fare Increases**.  If the MBTA increases fares during any given Agreement Year, the Revenue Growth Incentive shall not include the increased revenue from the existing base ridership.  To estimate revenue from "pre-existing" riders, the MBTA shall determine what the

Revenue Target in the current year would be under the new fare structure.  Using available data, the MBTA shall determine the existing fare mix relative to the amount of revenue collected per ticket type.  The new fare structure shall then be applied to this fare mix and the equivalent revenue under the new structure shall be determined.  This value shall serve as the adjusted Revenue Target for the current year under the new fare structure.  These calculations shall assume no change in ridership as a result of a fare increase.

20.8    **New Service or Service Changes.**  Contractor and the MBTA agree to share growth in revenue above the overall Revenue Target that is derived from New Service or a Service Change that did not entail added operating or capital costs to the MBTA.  In the event that New Service or a Service Change requires an increase or decrease in the Annual Fixed Price, or that the New Service or Service Change results from an MBTA capital investment, the Revenue Target shall be adjusted by the CTPS ridership forecast multiplied by the projected fare.  The Revenue Growth Incentive will be based on the Actual Revenue for that year, which will include the increase or decrease in revenue for that year.

20.9    **No Claims for Adjustment.**  No provision of this Section shall any way inhibit or prevent the MBTA from changing, modifying, or creating any policies related to the performance of this Agreement.  In no event shall Contractor make any claim for an adjustment to the Revenue Growth Incentive based on any act by the MBTA, other than a fare increase or decrease or New Service or Service Change, which might result in a decrease in revenue from the amount of revenue that Contractor might have collected in the absence of such act.

**SECTION 21.  COST OF SERVICES AND PAYMENTS.**

21.1    **Elements of Contractor Compensation**.  Contractor's compensation pursuant to this Agreement shall consist of the following elements, as more fully detailed in this and other sections of this Agreement:

(a)    Annual Fixed Price (for Agreement Services other than Force Account Work), as adjusted by any Penalties, New Service, Service Changes, the operation of extra Special Trains, or other adjustments as provided in this Agreement, and including the snow removal allowance and allowance for maintaining unused rights of way detailed below;

(b)    Compensation for Force Account Work;

(c)    Revenue Growth Incentive, if applicable

21.2    **Annual Fixed Price.**

(a)    The MBTA shall pay Contractor the Annual Fixed Price for each Agreement Year, as specified in Exhibit 32, Contractor Cost Proposal.  The Annual Fixed Price includes compensation for all Agreement Services detailed in this Agreement, the Exhibits hereto, and the Scope of Services.  The MBTA shall reimburse Contractor separately for Force Account Work according to this Section, Section 18 and Exhibit 9, Direct Costs Billable to the MBTA.

(b)     The Annual Fixed Price shall include payment of all utilities related to Contractor's provision of the Agreement Services as provided in this subsection. In the case of water, gas, and electricity costs, Contractor shall pay such costs for the first Agreement Year.  If during the term of the Agreement the average annual unit cost (as shown on the respective bills) of such utilities for an Agreement Year increases or decreases by more than ten (10) percent from the average annual unit cost for the previous Agreement Year, the MBTA shall adjust the Annual Fixed Price for the year of the increase or decrease to reflect the amount of Contractor's actual utility costs resulting from the total utility cost increase or decrease that is in excess of a ten (10) percent increase.  For the purposes of this subsection, the costs of such utilities for the first Agreement Year will be compared to utility costs for FY 2003.

(c)     The MBTA has negotiated favorable electricity rates, and shall invoice Contractor for its electricity usage associated with the performance of Agreement Services.  In the event that Contractor determines that it can secure more favorable rates than those charged to the MBTA, Contractor may, after receiving MBTA approval, transfer utility service from the MBTA accounts to its own accounts and pay such charges directly.

(d)     Contractor shall include an annual allowance of $750,000 for snow removal overtime in the Annual Fixed Price.  To the extent that Contractor exceeds this amount, the MBTA will pay the differential as Force Account Work. To the extent that Contractor does not spend that amount, the MBTA receive a corresponding credit.

(e)     Contractor shall include an annual allowance of $100,000 for the costs of maintaining unused rights of way in the Annual Fixed Price.  To the extent that Contractor exceeds this amount, the MBTA will pay the differential as Force Account Work. To the extent that Contractor does not spend that amount, the MBTA receive a corresponding credit.

(f)     During the Term of this Agreement, Contractor shall submit monthly invoices for Agreement Services by the tenth (10th) day of each month for which such an installment of the Annual Fixed Price is due.  Each complete invoice shall include: (1) the number of commuter rail trains operated during that month; (2) any penalties to be assessed for operations during that month, along with the corresponding ROSS reports; (3) an itemization, with appropriate supporting documentation, of any charges for Service Changes or Force Account Work performed or to be performed in that month under Sections 21.3 or 21.4 respectively including the number of staff-hours and cost of labor expended; the costs of associated employee benefits; quantities and costs of materials consumed; the cost of subcontracted services; equipment usage and associated costs; and any other allowable Direct Costs for performing the Service Charge or Force Account Work Project; and (4) Contractor's compliance with the reporting requirements, as detailed in Exhibit 8, Reports and Deliverables, as demonstrated using a checklist of all required reports for that month.  In each such invoice, Contractor shall certify in writing that the information provided is factually accurate and verifiable.

(g)     The MBTA may withhold payment of a Contractor invoice if any required monthly report has not been submitted by the tenth (10th) day of each month for which such an installment of the Annual Fixed Price is due.  The MBTA shall notify the Contractor of any incomplete invoice or missing report by the fifteenth day (15th) of that month.  Once the missing report has been submitted by the Contractor, the MBTA shall within two business days of receipt of all such reports pay the amount of the invoice to the Contractor.

(h)     The MBTA shall review each Contractor invoice and shall make appropriate adjustments in the amount of the next monthly payment to Contractor to reflect the amount of any underpayment or overpayment for the month covered by such invoice, and to reflect the reconciliation of penalties payable for such month pursuant to Section 22.

(i)     The MBTA shall pay each such complete invoice by the fifteenth (15th) business day of the month for which such installment of the Annual Fixed Price is due.  Each installment of the Annual Fixed Price shall be equal to one twelfth ($1/12^{th}$) of the Annual Fixed Price for the applicable Agreement Year (or if the first Agreement Year is shorter than 365 days, a pro rata payment based on a fraction the numerator of which shall be one and the denominator of which shall be the number of 30-day periods in the first Agreement Year), as adjusted by any penalties.

(j)     In the event MBTA does not agree with any item in an invoice submitted by Contractor, it shall promptly notify Contractor of the item with which it disagrees, along with a statement of the reason for its disagreement and its view as to the correct amount payable.  Contractor shall immediately revise any invoice to correct errors identified by the MBTA.  The Parties shall promptly confer on any other items in an invoice to which the MBTA has taken exception.  In the event the Parties are unable to reach agreement, the MBTA shall pay the undisputed portion of such bill, but may withhold from its next monthly payment to Contractor the amount that the MBTA asserts is in excess of the amount that should have been paid.  Any amount withheld that is later determined to be due to Contractor shall bear interest at the Prime Rate as quoted in the "Money Rates" section of The Wall Street Journal (but not to exceed 12%), from the date of withholding to the date of payment.  The MBTA shall not pay interest on withheld payments if the withholding resulted from the Contractor's failure to provide sufficient documentation.

(k)     In the event Contractor does not agree with any item in a monthly payment made by the MBTA, it shall promptly notify the MBTA of the item with which it disagrees, along with a statement of the reason for its disagreement.  The Parties shall meet promptly thereafter to attempt to resolve such disagreement.

(l)     The MBTA shall withhold from the monthly payment for the last month of Agreement Services under this Agreement an amount which the MBTA believes, in good faith, to be sufficient to address any potential overpayments that need to be reconciled in connection with the final invoice, any outstanding Punch List Items, as defined in Section 41, and any outstanding payment issues in connection with Agreement close-out.  Upon termination of this Agreement, Contractor shall submit to the MBTA a final invoice setting forth the information required under paragraph (e) of this subsection, together with any other financial or accounting

46

information needed for Agreement close out.  The MBTA shall pay all amounts in such invoice not in dispute by wire transfer within thirty (30) days after the date of receipt.  The Parties shall meet promptly to attempt to resolve any remaining disputed costs or charges or other outstanding issues.  Any amount withheld that is later determined to be due to Contractor shall bear interest at the rate described in paragraph (i) from the date of withholding to the date of payment.  The MBTA shall not pay interest on withheld payments if the withholding resulted from the Contractor's failure to provide sufficient documentation.

(m)    In the event that the MBTA determines that Contractor's financial stability or ability to perform the Agreement Services during any given month is in doubt, the MBTA may notify Contractor that it will pay Contractor on a weekly or bi-weekly basis until the MBTA determines in its sole discretion that Contractor's financial stability or ability to perform the Agreement Services is no longer in doubt.  In such an event, Contractor shall continue to provide monthly invoices pursuant to the provision of this Section.

(n)    In the event of a failure to reach agreement on a disputed invoice or payment described in this Section, either Party may submit the matter to dispute resolution under Section 35 of this Agreement.

21.3    **Charges for New Service and Service Changes.**

(a)    In the event that the MBTA requires Contractor to implement New Service or a Service Change, Contractor shall provide MBTA with an auditable, itemized proposed budget that shows all anticipated changes to Contractor's Direct Costs and Commuter Rail Services Revenue that the Contractor estimates would result from such New Service or Service Change, as detailed in Sections 16 and 17, respectively.  In the event that the MBTA directs the Contractor to proceed with such New Service or Service Change, the MBTA shall pay the Contractor the actual additional Direct Costs of the New Service or Service Change, plus a management fee (which includes overhead an profit) of eight percent (8%) of all such additional Direct Costs other than locomotive fuel costs.

(b)    If the New Service or Service Change results in a reduction in Direct Costs, the amount of compensation payable by the MBTA shall be reduced by the amount of any Direct Costs eliminated by the New Service or Service Change, plus the associated eight percent (8%) management fee.  If New Service or a Service Change that results in a reduction in Direct Costs is subsequently re-instituted, the MBTA shall compensate Contractor in an amount equal to the amount of the original reduction in Direct Costs plus the associated management fee.

(c)    If the New Service or Service Change remains in place for more than ninety (90) days, the MBTA and Contractor shall agree on a revised Annual Fixed Price.  The ninety (90)-day history of actual Direct Costs incurred or reduced due to the New Service or Service Change shall provide the primary basis for determining the price of the New Service or Service Change.  The revised Annual Fixed Price shall be evidenced by the execution and delivery by the Parties hereto of an amended Exhibit 32, Contractor Cost Proposal, which shall be appended to this Agreement.

(d)     Contractor and the MBTA shall exercise good faith with respect to the determination of any revised Annual Fixed Price described in paragraph (c) above (with the exception of the Greenbush service), which adjustment to the Annual Fixed Price shall be determined pursuant to Section 16.  In the event the Parties are unable to agree on the revised Annual Fixed Price, the matter shall be submitted to the dispute resolution procedures provided for in Section 35.

(e)     The process and compensation method set forth in this subsection shall also apply in the event of any additional or reduced Direct Costs to Contractor that occur as a result of changes in local, State, or Federal law that may materially impact the cost of performing the Agreement Services.

21.4     **Charges for Force Account Work**.

(a)     The MBTA shall pay Contractor the Direct Cost of Force Account Work performed by Contractor pursuant to Exhibit 9, Direct Costs Billable to the MBTA, of this Agreement, plus a management fee (which includes overhead and profit) applied to Direct Costs in accordance with paragraph (b) below.

(b)     The management fee applicable to Force Account Work shall be two percent (2%) of the cost of bulk materials including, not limited to, locomotive fuel, ballast, ties and rail, eight percent (8%) of the Direct Costs other than bulk materials.

(c)     At the request of either Party, the MBTA and Contractor shall negotiate in good faith for purposes of establishing a  revised Annual Fixed Price for Force Account Work under subsection 21.3(c), in lieu of utilizing the methodology set forth in this subsection.

21.5     **Charges for Operation of Special Trains.**

(a)     The cost of operating fifty (50) Special Trains shall be itemized in Contractor's Proposal and included in the Annual Fixed Price for each Agreement Year. Contractor shall submit a monthly report indicating the number of Special Trains operated in the prior month, the dates and times of those trains, and the number of Special Trains operated year-to-date.

(b)     In the event that the MBTA directs Contractor to operate more than fifty (50) Special Trains in any Agreement Year, the cost of operating such additional Special Trains shall be included as Force Account Work according to the provisions of Section 21.4 above at the cost per Special Train listed in Exhibit 32, Contractor Cost Proposal.  At the conclusion of each MBTA fiscal year, the MBTA shall reimburse Contractor one fiftieth (1/50[th]) of the total Special Train price listed in Exhibit 32 for each Agreement Year for each such extra Special Train.

(c)     In the event that the MBTA directs Contractor to operate fewer than fifty (50) Special Trains in any Agreement Year, Contractor shall refund to the MBTA the cost for each Special Train not operated.  The refund for each Special Train not operated shall be

calculated as one-fiftieth (1/50[th]) of the total Special Train price listed in Exhibit 32, Contractor Cost Proposal for that Agreement Year.

     21.6   **Claims for Additional Compensation**.  Contractor shall notify the MBTA at the earliest possible date of any claim for compensation other than the compensation provided in this Agreement, and shall account for and document the potential costs of such claims.  Contractor shall make no claim for additional compensation for any service that Contractor is obligated to perform as part of the Annual Fixed Price pursuant to the terms of this Agreement.  Any dispute arising under this Agreement and regarding additional compensation shall be made in writing by the Contractor within sixty (60) days after the date the claiming Party knows, or should have known, of the existence of such claims.  Such written notice shall contain a description of the nature of the claim and an itemized estimate of any damages sustained.  After such written notice has been provided, if the MBTA denies or modifies the claim, Contractor may submit the issue to the dispute resolution procedures detailed in the dispute pursuant to Section 35 of this Agreement.  This provision shall not be deemed waived unless the Parties so agree by written agreement.

     21.7   **Overpayment.**

        (a)    In the event that an audit conducted pursuant to Section 28 results in a determination that an overpayment to Contractor was made, the MBTA shall notify Contractor of such overpayment.  Any such overpayment amount shall be deducted from future MBTA monthly payments, with interest at the rate described in Section 21.2 from the date the overpayment occurred until the date of the first subsequent payment from which such deduction can be taken.  In the event that a determination of overpayment is made after the termination of the Agreement, an equitable adjustment shall be made and Contractor shall promptly refund any such overpayment amount to the MBTA, with interest at the rate described in Section 21.2 from the date the overpayment occurred until the refund date.

        (b)    In the event the Parties are unable to reach agreement on an overpayment adjustment within fifteen (15) days after receipt by Contractor of the notice cited in Section 21.7(a), the MBTA may withhold from its next monthly payment to Contractor the amount that the MBTA asserts is in excess of the amount that should have been paid.  Any amount withheld that is later determined to be due to Contractor shall bear interest at the rate described in Section 21.2(i), from the date of withholding to the date of payment.

        (c)    In the event the Parties are unable to reach agreement with respect to any dispute arising in connection with the audit or inspection of invoices or records, either Party may invoke the dispute resolution procedures specified in Section 35 of this Agreement.

     21.8   **Contractor's Books and Records.**

        (a)    Contractor shall keep full and accurate accounting books and records as may be required from time to time by applicable laws and regulations of all revenues and expenses related to the provision of the Agreement Services, in accordance with generally accepted accounting principles, and shall furnish reports as requested by the MBTA, including

all reports listed in Exhibit 8, Reports and Deliverables. Contractor shall prepare the commuter rail portion of the MBTA's FTA Section 15 report, in the form required by the FTA, and submit this portion to the MBTA by September 1st of each Agreement Year. Contractor shall also maintain the financial information and data used by Contractor in preparation of supporting statements requesting payment. Contractor further agrees to make all said accounting books and records, and any other written or printed matter pertaining to the Agreement Services, available to the MBTA or its duly appointed representatives and to cause its officers or employees to cooperate fully with the MBTA in explanation of any and all areas therein. Contractor shall keep all records required herein for seven (7) years after the Termination of this Agreement.

(b)     Contractor, being bound by all applicable state and federal regulations, shall make restitution to the MBTA of such amounts of money as are withheld from the MBTA by state, federal, county, or local agencies or organizations due to Contractor's noncompliance with applicable state and federal law, and shall pay a penalty for every such withholding instance, as described in Section 22(g) below.

21.9    **Waiver.** Contractor shall waive any claims for reimbursement for expenses occurred during an Agreement Year that are not submitted to the MBTA within ninety (90) days after the close of such Agreement Year.

## SECTION 22. PENALTIES.

22.1    **Penalties**. The MBTA shall assess monthly performance penalties against Contractor in accordance with this Section and Exhibit 10, Penalties. Any penalties assessed to Contractor shall be deducted from the monthly payment paid by the MBTA to Contractor pursuant to Section 21. The MBTA shall not assess penalties under this Section during the first six (6) months of the Term of this Agreement. The MBTA also shall not assess, during the first eighteen (18) months of the Term of this Agreement, penalties that result from defects in the Service Property, Service Equipment or Support Property discovered during the Initial Joint Audit and that Contractor is required to repair or remedy at its own cost as part of its Repair Plan pursuant to Section 9.3. The total amount of penalties Contractor is obligated to pay under this Section during the twenty-four (24) month period starting January 1, 2004 shall not exceed one million, five hundred thousand dollars ($1,500,000) (the "Penalty Cap"). Starting January 1, 2006, the Penalty Cap for each twelve (12) month period for the remainder of the Term of the Agreement shall be two million dollars ($2 million). In the event that Contractor is assessed penalties in excess of the Penalty Cap during two consecutive years, the Penalty Cap shall be increased for the remaining years of the Agreement by an additional amount equal to the average of the excess penalties assessed during said two consecutive year period. Penalties shall be assessed, without limitation, in the following circumstances:

(a)     **Penalty For Late or Cancelled Trains.** Contractor will be assessed penalties for each unexcused late or cancelled train. Trains will be classified as either on-time, late or cancelled pursuant to Exhibit 11, Train Arrival Times. For each unexcused late or cancelled train, Contractor shall be assessed the following penalties:

| Type of Train | Category of Non-Performance | Penalty per Train |
|---|---|---|
| Peak | Late Train | $500 |
| Peak | Cancelled Train | $2,000 |
| Off-Peak | Late Train | $250 |
| Off-Peak | Cancelled Train | $1,000 |

(b)    **Penalty for Consist Compliance.**  For each train trip that fails to meet the requirements in the Mechanical Scope of Services, Exhibit 4, and Exhibit 16, Service Equipment Requirements, Contractor shall be assessed the following penalties:

| Type of Train | Penalty |
|---|---|
| Peak | $1,000 per train unavailable |
| Off-Peak | $500 per train unavailable |

(c)    **Employee Performance Penalty.**  Contractor will be assessed a penalty of $500 for every occurrence that is documented by the MBTA (1) in which Contractor Personnel fails to perform their job responsibilities in accordance with the standards set out in Section 11, including all violations of the standards relating to employee conduct or employee appearance; or (2) the unauthorized or temporary re-assignment of employees.

(d)    **Speed Restrictions and Track Outages Penalty.**  As detailed in the Engineering Scope of Services, Exhibit 3, Contractor will be assessed a penalty for allowing a temporary speed restriction or track outage to remain in force beyond the approved time window or schedule for its removal, as specified in the subsections below, provided that a penalty will not be assessed if the condition causing the restriction is beyond Contractor's control.

(i)    For each day that a temporary speed restriction or track outage is in force beyond the day on the MBTA-approved schedule for its removal, the MBTA shall assess a penalty of $1000 per day.

(ii)    For each day that a temporary speed restriction or track outage is in force beyond the time window approved by the MBTA for that day, the MBTA shall assess a penalty of $1000 per day.

(e)    **Penalty for Non-Compliance with Accessibility Laws and Policies.**  Contractor will be assessed a penalty of $1,000 for each instance documented by the MBTA of the Service Property not being maintained or operated in accordance with the requirements of the Americans with Disabilities Act of 1990 (ADA), Massachusetts state law, or MBTA accessibility policies, as detailed in Section 36.4.

(f)    **Inadequate Train Staffing Penalty.**  Contractor will be assessed penalties for each train trip that is not adequately staffed and for each failure to submit required reports on train staffing, according to the provisions of the Transportation Scope of Services, Exhibit 2.  Contractor's failure to fill the required staffing positions, as defined in the Train Staffing Plan, on any train for reasons other than Force Majeure events shall result in a $500

penalty for every on-board train staff position that is not staffed. Discovery by the MBTA or its agents of an unreported, unstaffed on-board train staff position shall result in a $10,000 penalty for each such unstaffed position. Failure by the Contractor to prepare and submit the required daily train staffing reports in a timely manner will result in a $5,000 penalty for each day that the report is delivered late or not delivered.

(g)     **Violations of Regulations or Rules.**  Contractor shall pay, and shall not be reimbursed for, any fine imposed on Contractor or its subcontractors, consultants, suppliers or agents by any government authority or regulatory agency as a result of actions or inactions of Contractor or its subcontractors or agents. Contractor shall notify the MBTA of any fine imposed by any government authority or regulatory agency within seven (7) calendar days of Contractor's receipt of notification of such fine. Discovery by the MBTA or its agents of an unreported fine imposed by a government authority or regulatory agency shall result in a $1,000 penalty for each unreported fine. In addition, should the MBTA be fined as a result of actions or inactions of Contractor or its agents, subcontractors, consultants or suppliers, the MBTA shall reduce its next monthly payment to Contractor by the amount of such fine plus a penalty of $1,000.

(h)     **Penalty for Defects in Mechanical Services Performance and Procedures.**  Contractor will be assessed a penalty in accordance with Exhibit 10, Penalties, for each occurrence documented by the MBTA of the following: (1) a defect in safety and reliability features; (2) a defect in amenities and comfort features; (3) the discovery by the MBTA of a dirty coach; (4) a "Contractor's Long-Term Hold" on any item of rolling stock; (5) unsatisfactory Mechanical Services procedures, practices, or repairs; or (6) failure to adequately fuel locomotive. Specific standards and guidelines in each of these areas are provided in the Mechanical Scope of Services, Exhibit 4, and other Exhibits.

(i)     **Penalty for Failure to Follow Incident Management Procedures.**  The MBTA shall assess a penalty of $500 per occurrence for failure to comply with Incident Management procedures, as specified in the Transportation Scope of Services, Exhibit 2. Contractor shall be assessed a penalty of $1,000 per occurrence for failure to deliver required reports on Service Disruptions, as specified in the Transportation Scope of Services, Exhibit 2.

(j)     **Penalty for Failure to Submit Required Reports or Deliverables or Make Required Information Available**.  The MBTA shall assess a penalty of $500 per occurrence for each report or deliverable specified in Exhibit 8, Reports and Deliverables, that was not delivered prior to the time and at the location specified. The MBTA shall also assess a penalty of $500 per occurrence if the required reports were not prepared using the CRMIS approved by the MBTA according to the terms of Section 29. The MBTA shall also assess a penalty of $500 for each instance (but only once per day) in which the MBTA conducts an electronic query for required information specified in Exhibit 8, Reports and Deliverables, using the CRMIS approved by the MBTA according to the terms of Section 29, and finds that the information is missing or out of date.

(k)     **Penalty for Failure to Prepare Operating Rules, Employee Timetable, Special Instructions Safety Rules, and Dispatching Manual**.  The MBTA shall assess a

penalty of $10,000 per day for failure to achieve the deadline for preparing and distributing Operating Rules, Employee Timetable, and Special Instructions Safety Rules, as specified in Section 15.

(l)    **Penalty for Failure to Complete an Environmental Services Work Item on Time.**  In the event that a work item in the Environmental Specification has not been substantially completed by the date stipulated in the Environmental Services Work Plan (or the MBTA approved completion date), as detailed in the Engineering Scope of Services, Exhibit 3, the MBTA shall assess a penalty of $1,000 per day until such time as the work item is completed.  In the event that the MBTA incurs a cost due to the Environmental Subcontractor's failure to complete any work item on time, including fines and penalties issued for failure to comply with any permit condition, the MBTA shall reduce its next monthly payment to Contractor by an amount equal to the cost incurred plus the applicable fine or penalty assessed pursuant to paragraph (g) of this section.

(m)    **Penalty for Failure to Adhere to Station Cleaning Schedule.**  MBTA shall assess a penalty of $500 per station per day for each day that Contractor fails to perform cleaning of such station in accordance with the approved schedule.

22.2    **Inflation Adjustment for Option Years**.  In the event that the MBTA exercises one or more Option Years, the amount of all penalties assessed during such year shall be increased or decreased, on a cumulative basis, by the same percentage by which the cost of  labor and material, excluding fuel, as reflected in the Annual Indices of Charge-Out Prices and Wage Rates (1977=100) Series RCR, included in "AAR Railroad Cost Recovery Index" and supplements thereto, issued by the Association of American Railroads, (or if such index ceases to be published, a generally recognized index which is substantially equivalent to same), has increased or decreased in the preceding calendar year.

22.3    **Penalties Resulting From Actions of Other Parties**.  Where Contractor documents to the MBTA's satisfaction that an event that would otherwise result in a penalty was caused in whole or in significant part by actions or omissions of a Third Party or Other Contractor over whom Contractor had no supervisory or other control, the MBTA shall waive the associated penalty in proportion to the degree to which the Third Party or Other Contractor was responsible for the penalizable event.

22.4    **Contractor Right to Dispute.**  The CGM shall notify the MBTA's Director of Railroad Operations of any disputed penalty and if not otherwise resolved, any dispute with respect thereto shall be resolved in accordance with the procedures set forth in Section 35.

22.5    **No Waiver**.  Failure by the MBTA to assess and collect a penalty pursuant to this Section shall not constitute a waiver of any future penalty for conduct of the same type, nor waive any other rights that MBTA may have with respect to the facts and circumstances surrounding the act or omission qualifying Contractor to be assessed a penalty.

**SECTION 23.  SPECIAL TRAINS.**

23.1    **Authority of MBTA**.  The MBTA may, at any time during the Term of this Agreement, direct Contractor to operate Special Trains, and Contractor shall be obligated to operate such Special Trains in accordance with this Section.  The MBTA shall, whenever possible, provide Contractor with forty-eight (48) hours notice of its need for Special Trains.

23.2    **Costs of Services**.  Contractor shall be expected to operate up to fifty (50) Special Trains each Agreement Year during the Term of this Agreement as part of the Annual Fixed Price, and shall be compensated according to the provisions of Section 21.5.

**SECTION 24.  EXCURSION TRAINS.**

(a)    Contractor may request authorization from the MBTA to use Service Equipment and Service Property for the operation of Excursion Trains.  The MBTA may grant such a request if it determines that (i) the operation of the proposed Excursion Train shall not adversely affect the Agreement Services; and (ii) the Service Equipment is available for use.

(b)    Contractor and the MBTA shall enter into a lease agreement for any Excursion Train operated pursuant to this Section, in a form similar to the lease agreement attached hereto as Exhibit 20, Sample Lease Agreement.  Such lease agreement shall provide that Contractor assumes all liability for any damages or claims arising out of such operations, and Contractor shall maintain all necessary insurance.  The lease agreement shall also establish the amount of reimbursement and payment terms for any such Excursion Train under the standard set forth in Exhibit 19, Excursion Trains, as amended or revised.

(c)    All Service Equipment used by the Contractor for the operation of an Excursion Train under this Section shall be returned to service clean, fully operational, and otherwise ready for use in providing the Agreement Services.  In the event that the MBTA deems that any unit of the Service Equipment used for the operation of the Excursion Train is not clean or otherwise not fully operational upon its return by Contractor, Contractor shall reimburse the MBTA an additional amount equal to the daily rental rate per unit of Service Equipment as provided for in the lease agreement for each day that any such unit of Service Equipment is deemed unfit for service.

**SECTION 25.  WRECK CLEARING.**

25.1    **General.**  Contractor shall clear wrecks that involve MBTA trains and restore to operation all affected Agreement Services.

25.2    **Specific Other Wrecks.**  The MBTA may direct Contractor to assist in clearing wrecks involving a foreign railroad operating on MBTA property.  The respective rights and obligations of the foreign railroad and the MBTA shall be governed by the terms and conditions of agreements, if any, between the MBTA and that railroad.  Contractor shall be responsible for coordinating with the dispatching railroad where a wreck occurs on territory dispatched by a Third Party.

25.3    **Provision of Alternate Transportation.**  Contractor shall arrange for and coordinate bus, shuttle, or other transportation for commuter rail Customers during Service Disruptions caused by wrecks, as more fully described in the Customer Service Scope of Service, Exhibit 1.

25.4    **Reimbursement.**

(a)    The MBTA shall reimburse Contractor for the Direct Costs incurred in clearing wrecks involving foreign railroads.  Such costs are not included in the Annual Fixed Price and shall be separately reimbursed as Force Account Work.  The MBTA shall not reimburse Contractor for any costs, including costs of alternate transportation, incurred in clearing wrecks caused in whole or in part by Contractor.  Where a wreck involves a foreign railroad operating on MBTA property and the MBTA directs Contractor to assist in clearing the property, Contractor shall support the MBTA's efforts to obtain reimbursement from such other railroad for expenses incurred in clearing the wreck.

(b)    Contractor is required to use wreck-clearing equipment owned by the MBTA and provided to the Contractor as part of the Agreement Services.  In the event that Contractor uses wreck-clearing equipment not owned by the MBTA, Contractor will not be reimbursed unless prior authorization is obtained by the MBTA.

## SECTION 26.  QUALITY CONTROL.

26.1    Contractor shall constantly monitor the quality of its work in all aspects of the Agreement Services.  The integrity of the quality control process shall be preserved via independent audits and by oversight from the Contractor senior manager responsible for quality control.

26.2    Contractor shall submit to the MBTA for approval an annual Quality Control Program that includes Contractor's guidelines for conducting quality control efforts.  The Quality Control Program shall include separate sections describing quality control guidelines and procedures for Engineering and Mechanical Services, which shall be included in the annual Engineering Services Plan and Mechanical Services Plan, respectively.  Contractor shall submit the first Mechanical Services Quality Control Plan on or before April 1, 2003, and the first Engineering Services Quality Control Plan on or before July 1, 2003.  Thereafter, Contractor shall submit to the MBTA for approval updates of the Quality Control Program and its individual components by February 1st of each Agreement Year.

## SECTION 27.  REPORTING AND RECORDKEEPING REQUIREMENTS.

27.1    **In General**.

(a)    Contractor shall keep, store, and maintain, during the Term of this Agreement, including any Option Years, and for seven (7) years after the termination or expiration of this Agreement, full and accurate records of all aspects of its provision of Agreement Services and other activities carried out under this Agreement.  Contractor shall

furnish to the MBTA, without limitation, all reports and records identified in or required by this Agreement, including Exhibit 8, Reports and Deliverables, according to the reporting schedules specified herein.

(b)     During the Term of the Agreement, including any exercised Option Years, Contractor shall keep all records in the Commonwealth of Massachusetts during the Term of the Agreement.

(c)     At the termination or expiration of the Agreement, Contractor shall notify the MBTA of the location at which it will keep all records relating to the provision of Agreement Services, or provide copies or originals of such documents to the MBTA.

27.2    **Financial Records and Reports.**  Contractor shall keep full and accurate accounting records, including source documentation, of all expenses and revenues related to the provision of Agreement Services.  All such records shall be prepared in accordance with Generally Accepted Accounting Principles.

27.3    **Required Reports.**  Contractor shall maintain and furnish to MBTA, in writing and in electronic format, the required reports set forth in this Agreement, including without limitation Exhibit 8, Reports and Deliverables, in accordance with the delivery schedules presented in this Section.  Monthly invoices shall not be considered complete if any required reports are missing.

(a)     Daily Reports as designated in Exhibit 8, Reports and Deliverables, that are required to be submitted by Contractor to the MBTA shall be received by the MBTA no later than 7:00 a.m. of the following day.

(b)     Weekly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than close of business on Monday of the following week.

(c)     Monthly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of the submission by Contractor of its monthly invoice to the MBTA.

(d)     Quarterly Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of the submission by Contractor of the monthly invoice to the MBTA for the first month of each subsequent quarter.  The first quarter of each Agreement Year shall begin on July 1st.

(e)     Annual Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than the date of Contractor's submission to the MBTA of Contractor's invoice for the first month of the subsequent MBTA fiscal year, unless otherwise specified in Exhibit 8, Reports and Deliverables.

(f)       As Occurs Reports as designated in Exhibit 8, Reports and Deliverables, shall be received by the MBTA no later than twenty-four (24) hours after the occurrence triggering a report.

(g)       On-Demand Reports as designated in Exhibit 8, Reports and Deliverables, shall be prepared by the MBTA, or by Contractor at MBTA's request, using the CRMIS.

27.4     **Annual Program Plans and Deliverables.**  Contractor shall deliver to the MBTA for approval all Annual Program Plans including, without limitation, those designated in Exhibit 8, Reports and Deliverables, and other deliverables specified by August 1st of each Agreement Year, or on such other schedule as specified.  Due dates for reports have been selected based on seasonal considerations, and to balance Contractor's work flow.   The MBTA shall review each such plan, and shall either approve such plan or, within thirty (30) days of its receipt, direct Contractor to revise such plan.  Contractor shall provide the MBTA with a plan revised accordingly within thirty (30) days of receipt of such revisions from the MBTA.  Initial program plans shall be delivered during the Mobilization Period on the schedule identified in Exhibit 8, Reports and Deliverables.

## SECTION 28.  AUDITS AND INSPECTIONS.

The MBTA may, at any time between 8:00 a.m. and 5:00 p.m. on any business day, conduct an audit and inspection of any and all records and reports kept by Contractor in connection with any aspect of the Agreement Services.  The MBTA shall provide reasonable notice of such audit where such notice is appropriate and practicable given the purposes of such audit.  Contractor shall also permit a designated representative of the MBTA, or at the MBTA's request, a representative of the DOT, the Comptroller General of the United States, or the Massachusetts Executive Office of Administration and Finance, the Massachusetts State Auditor or the Massachusetts Inspector General, to review and examine at any time any and all records kept by Contractor in connection with any aspect of the Agreement Services or to otherwise audit or inspect the quality of work being performed.  Such audits and inspections may be conducted for the Term of this Agreement and for seven (7) years thereafter.  In the event this Agreement is terminated prior to five (5) years from the Commencement Date, the MBTA shall have the right to examine and/or copy original records, as well as the right to take possession of copies of such records.

## SECTION 29.  INFORMATION MANAGEMENT.

29.1     **Commuter Rail Management Information System.**  Contractor shall operate, manage and maintain a Commuter Rail Management Information System ("CRMIS") for the performance of the Agreement Services.  Contractor shall be required to develop, procure and implement, as directed by the MBTA, the CRMIS.  The CRMIS shall be operated, managed and maintained in accordance with the terms of this Agreement, including without limitation Exhibit 5, Information Management.  All Computer Equipment, Software and Third Party Software provided under this Agreement shall comply in all material respects with Exhibit 5, Information Management, as it may be revised by the Parties from time to time.  All Software

57

and Third Party Software must be operated on Computer Equipment that is (a) owned by the MBTA and (b) located in the Commonwealth of Massachusetts.

29.2    **Information Management Plan.**  During the sixty (60) days after the Notice to Proceed Date, Contractor shall evaluate the Computer Equipment owned by the MBTA and in use by the then current commuter rail contractor, and the existing MBTA Computer Network, and submit a detailed and comprehensive Information Management Plan to the MBTA for approval.  The Information Management Plan shall provide, at a minimum, (i) an inventory of existing MBTA-owned computer equipment that will be continued in use or reused as part of the CRMIS, (ii) an itemized list of Computer Equipment that Contractor intends to purchase and a proposed schedule for purchase; (iii) an itemized list of all Software the Contractor intends to develop, procure, install and/or use in order to operate, manage and maintain the CRMIS and perform the Agreement Services; (iv) diagrams and specifications for the CRMIS; (v) details of Contractor's intellectual property security procedures; and (vi) resumes of Contractor Personnel responsible for the operation, management and maintenance of the CRMIS.  Within thirty (30) days of its receipt, the MBTA shall review and approve the Information Management Plan or provide Contractor with an itemized list of items or issues that Contractor must revise.  Contractor shall provide the MBTA with a revised Information Management Plan within thirty (30) days of its receipt of the MBTA's comments.  Contractor shall update the information Management Plan annually and submit to the MBTA for approval no later than August 1st of each Agreement Year.  The Parties shall revise Exhibit 5 as appropriate to conform to the Information Management Plan, as it may be revised from time to time.

29.3    **Operational Requirements.**

    (a)    <u>By Contractor</u>.  Contractor shall use the CRMIS:

        (1)    on a day-to-day basis for the input, storage and retrieval of information related to the Agreement Services;

        (2)    to produce reports required as part of the Agreement Services as described in Section 27 and Exhibit 8, Reports and Deliverables;

        (3)    to allow and provide real-time access to Data related to the Agreement Services by MBTA staff and computers specifically identified by the Director of Railroad Operations.  See Exhibit 5, Information Management; and

        (4)    for all other tasks and services related to the provision of the Agreement Services as the Contractor sees fit or as contemplated or required in Exhibit 5, Information Management.

    For purposes of this Agreement, "real-time access" means that the Contractor must input into the CRMIS, and the CRMIS must make available to the MBTA, information regarding each day's activities or occurrences in the manner described in Exhibit 5, Information Management, as soon as practicable, but no later than twenty-four (24) hours after the activity or occurrence takes place.

    (b)    <u>By the MBTA</u>.  The MBTA shall use the CRMIS:

        (1)    to review, inspect and audit Data;

        (2)    to have real-time access to Data; and

        (3)    for all other purposes necessary to fulfill or maintain the MBTA's rights and obligations with regard to the Commuter Rail System.

29.4    **Staffing and Technical Support.**  Contractor shall provide staff who are dedicated solely to Agreement Services and qualified to manage and maintain the CRMIS, including without limitation the performance of all software installation, configuration, operation, maintenance, network administration, data management, disaster recovery, training and end user support necessary to fulfill Contractor's obligations under this Agreement.  Such technical support staff shall work on-site Monday through Friday from 6 a.m. to 7 p.m., except for holidays on which the MBTA does not run full commuter rail service.  During all other hours, a member of the technical support staff shall be on-call and available to respond to technical issues by telephone or remote access, and shall arrive on-site within one hour if necessary.  Contractor may, with the prior approval of the MBTA, subcontract one or more CRMIS tasks, which approval shall not be unreasonably withheld.

29.5    **Backup and Disaster Recovery.**

    (a)    Contractor shall develop, provide, implement, and periodically test a disaster recovery and backup procedure for the CRMIS.  Contractor shall restore Data and network operations in the event of a failure or other occurrence related to the CRMIS that delays or prevents the availability of accurate Data on a real-time basis at all times during the Term of this Agreement in accordance with the standards established in Exhibit 5, Information Management.  Contractor shall, when necessary, restore or regenerate all Software and Data in order to seamlessly operate and maintain the CRMIS.

    (b)    Contractor shall continue to meet reporting and deliverable requirements as described in Section 27 and Exhibit 8, Reports and Deliverables, without regard to the operational statue of the CRMIS or any component thereof.

29.6    **Ownership of Hardware, Software and Data.**

    (a)    Title and ownership of the Computer Equipment and the right to possess and use the Software and Third Party Software shall pass to the MBTA upon purchase by Contractor.  All costs related to implementation of the Information Management Plan shall be paid through the Mobilization Fee.  All other costs shall be included in the Annual Fixed Price.

    (b)    All Software and Third Party Software provided or used by Contractor to perform the Agreement Services, including without limitation custom software developed by or on behalf of Contractor, shall be licensed to the MBTA through the Software License Agreement

incorporated herein as Exhibit 6, Sample Software License Agreement, or on such other terms and conditions as Third Party Software licensors may require.

      29.7    **Warranties.**

      (a)    <u>System Warranties</u>.  Subject to the provisions of this Section 29.7, Contractor hereby warrants CRMIS, as a whole, for the Term of this Agreement (the "CRMIS Warranty Period"), as follows:

      (1)    The CRMIS shall comply in all material respects with Exhibit 5, Information Management, as it may be revised from time to time, and shall perform its intended purposes as described in Exhibit 5, Information Management.

      (2)    The CRMIS as a whole will be free from any defects in materials or workmanship and shall remain in Good Working Condition, provided, however, that Contractor does not provide any warranty with respect to any component of the CRMIS provided by third parties that are not vendors, suppliers or agents of Contractor, including without limitation dispatching technology provided by Amtrak.

      (3)    The CRMIS as a whole does not infringe upon or violate any patent or copyright or trade secret or proprietary right of any other party.

      (b)    <u>Equipment Warranties</u>.  Contractor shall use commercially reasonable efforts to obtain manufacturer's warranties for the Computer Equipment on terms and conditions that are standard in the industry, as follows:

      (1)    The Computer Equipment is free of any defects in materials or workmanship.  Contractor shall maintain the Computer Equipment in Good Working Condition deliver and integrate replacement equipment for any Computer Equipment found to be defective during the Term of this Agreement, within five (5) business days of Contractor's becoming aware of such defect.

      (2)    The Computer Equipment complies in all material respects with Exhibit 5, Information Management, and is fit for its intended purposes as described in Exhibit 5, Information Management.

      (3)    The Computer Equipment does not infringe upon or violate any patent or copyright or trade secret or proprietary right of any other party.

(c)    Software Warranties.  Contractor shall use commercially reasonable efforts to obtain vendor warranties for the Software and Third Party Software on terms and conditions that are standard in the industry as follows:

(1)    The Software and the Third Party Software are free of any defects. Contractor shall maintain the Software and Third Party Software in Good Working Condition.

(2)    The Software License Agreement grants to the MBTA, as applicable, all rights necessary to operate and maintain the CRMIS free and clear of any rights of any other parties.

(3)    The Software and Third Party Software shall comply in all material respects with Exhibit 5, Information Management, and shall be fit for their intended purposes as described in Exhibit 5, Information Management.

(4)    Neither the Software, the Third Party Software nor any portion thereof infringes upon or violates any patent or copyright or trade secret or proprietary right of any other party.

(5)    The Software shall operate in accordance with the System Documentation.

(d)    Exclusions.  The warranties provided for in this Section  do not apply (i) if the CRMIS is subject to damage or misuse due to fault or negligence of the MBTA or Third Parties; (ii) to the extent maintenance, modifications or repairs are provided with respect to the CRMIS by the MBTA or Third Parties without Contractor's approval and such services cause damage to the CRMIS or cause Contractor to be unable to perform the services hereunder or to be able to perform the services only at additional costs to Contractor which are not reimbursed by the MBTA, or (iii) to the extent provided in any such warranties..

(e)    Remedies for Breach of Warranty.  The MBTA shall notify the Contractor in writing of any breach of any manufacturer's or vendor's warranty.  Contractor shall repair or replace at no cost to the MBTA the relevant articles, items, components or materials constituting Computer Equipment and/or Software and Third Party Software so that the CRMIS Computer Equipment, Software and Third Party Software comply with any relevant warranties.. Contractor's duty to repair or replace shall be MBTA's sole and exclusive remedy for any breach of warranty, except that the provisions of this Section shall not restrict or limit the MBTA from exercising any other remedies under this Agreement.

29.8    **Escrow Agreement.**  In the event Contractor develops Software for the CRMIS at any time during the term of this Agreement, Contractor and the MBTA shall enter into an Escrow Agreement in a form to be agreed upon by the Parties (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, Contractor will deposit, in CD-ROM version without charge to the MBTA, all information necessary to maintain, operate, update and improve such Software as part of the CRMIS (collectively, "System Information"), all as described in this

Agreement and Exhibit.  All System Information will be deposited with an escrow agent chosen by the MBTA (the "Escrow Agent").  System Information shall include all information and specifications obtainable by Contractor from Computer Equipment vendors (to the extent available to Contractor) and in Contractor's possession relating to the Computer Equipment and spare parts; all intellectual property of Contractor relating to the design, manufacture, performance, function, operation and maintenance of the CRMIS, including without limitation all Software object code and Software source code on industry standard media, and source code listings in human readable form of all Software including logic equations for programmable array logic integrated circuits (as well as the compiler or assembler and associated software tools and utilities for said source code so that it may be examined and is executable and modifiable), all design documents, specifications, flow charts, data flow diagrams and other materials or documents which explain the design, performance, function, operation or maintenance of individual software programs and the interaction of software programs within the CRMIS, all test specifications and scripts, test procedures and protocols, test plans and test data for the CRMIS; all maintenance manuals and procedures; all operator manuals; all flowcharts and other design documentation relevant to the design, performance, function, operation or maintenance of the Computer Equipment, the Software, Third Party Software and the CRMIS; parts lists containing sufficient information to procure all Computer Equipment and Third Party Software, all password security codes and any other information and documents necessary to maintain, operate, update and improve the CRMIS.

If Contractor revises or supplements any of the System Information deposited or creates additional System Information, Contractor shall deposit a complete set of such revised, supplemented or additional System Information with the Escrow Agent within thirty (30) days of such revision, supplementation or creation and Contractor shall indicate with each deposit which documents and which pages have been revised, supplemented or added since the last deposit. The Escrow Agreement shall have a term that is coterminous with this Agreement, and Contractor shall be responsible for payment of all costs arising in connection with the maintenance of the escrow referred to in this Section during the term of the Escrow Agreement.

29.9  **System Documentation.**  Contractor shall provide the MBTA with copies of user documentation and user manuals with respect to the CRMIS, including all Computer Equipment, Software and Third Party Software (collectively "System Documentation") which are sufficient for the MBTA to use, operate, and maintain the CRMIS.  The MBTA, at its own expense, may make additional copies of the System Documentation for its use in operating and maintaining the CRMIS.

29.10  **Restrictions on Use of Data.**  All Data used in the performance of the Agreement Services shall become property of the MBTA.  Contractor shall not copy, distribute, alter, sell or re-use any Data that is input into or stored on MBTA-owned computer to meet the requirements of this Agreement unless it is for the sole purpose of performing the Agreement Services.  Any action taken with such Data outside of normal day-to-day operation shall be done only at the direction of the MBTA.

29.11  **MBTA Proprietary Information.**  The MBTA retains all right, title and interest in and to all proprietary data, documentation and copies thereof furnished by it to Contractor

hereunder, including all copyright and other proprietary rights therein ("MBTA Proprietary Information").  Contractor, its employees, subcontractors consultants, agents and suppliers shall hold all such information confidential and shall not, without the prior written consent of the MBTA, use, disclose or offer, sell or license or otherwise transfer to others any MBTA Proprietary Information or disclose any MBTA Proprietary Information.  Notwithstanding the foregoing, Contractor may provide MBTA Proprietary Information in response to any proper governmental or court demand therefor.

29.12  **Contractor Inventions.**  The Contractor hereby grants to the MBTA a perpetual, non-exclusive, irrevocable, royalty-free license to use any and all features of the CRMIS that are developed by Contractor or its employees, subcontractors, consultants, agents or suppliers for the MBTA in accordance with this Agreement (including all patent, copyright, trade secret and other proprietary rights) ("Contractor Inventions").

29.13  **Contractor Indemnification.**  Contractor shall indemnify and hold harmless the MBTA, its members, officers, employees and agents from and against any and all claims, demands, causes of action, debts, or other liabilities (including attorneys' fees and expert fees) (a "Claim") made against or owed by the MBTA (which shall be deemed to include its officers, employees, subcontractors, consultants and agents) in any way relating to infringement of or inducement to infringe, patents, copyrights, trademarks, trade secrets or any other third party proprietary rights, arising as a result of the MBTA's use of, or Contractor's supplying, the CRMIS, or any component or components thereof, including the Computer Equipment, Software, or Third Party Software.  Contractor shall defend any Claim with counsel designated by the MBTA, provided Contractor has no reasonable objection to such counsel.

29.14  **Contractor Cures for Infringement.**  Without limiting the generality of the foregoing or limiting any other remedies of the MBTA, if the CRMIS or any item of Computer Equipment, Software, or Third Party Software or any portion thereof is held to constitute an infringement and its use is or may be enjoined, Contractor shall, at the option of the MBTA:  (i) modify (or require that the applicable subcontractor, consultant, agent or supplier modify) the alleged infringing portion of the CRMIS, Computer Equipment, Software or Third Party Software, at Contractor's sole expense, without materially impairing the functionality or performance of the CRMIS, at the option of the MBTA; or (ii) procure for the MBTA, without any cost to the MBTA, a license to use the infringing portion of the CRMIS item of Computer Equipment, Software or Third Party Software.

29.15  **Contractor Notice of Infringement.**  Contractor shall immediately inform the MBTA in writing if any subcontractor, consultant, agent or supplier providing goods or services to the MBTA on Contractor's behalf is a party to any actual or threatened litigation involving patent or copyright infringement, trademark violation, antitrust or other trade regulation or proprietary rights claim or is or may become subject to any injunction which may prohibit it from providing Computer Equipment, Software, or Third Party Software.  The MBTA may reject any Computer Equipment, Software, or Third Party Software that is the subject to any such litigation or injunction if, in the MBTA's judgment, use thereof would delay the implementation of the CRMIS or be unlawful.

29.16  **Information Management Policies and Procedures.**  Contractor Personnel or any other performing any Agreement Services related to the operation, management or maintenance of the CRMIS or the MBTA Computer Network shall comply with the MBTA Data Security Policy, as amended.  The MBTA Network Administrator shall be the person designated by the Director of Railroad Operations to interpret information policies and procedures, including determining what software is acceptable to be installed on the CRMIS.

## SECTION 30.  DRUG AND ALCOHOL TESTING REQUIREMENTS.

30.1  **Federal Requirements.**  Contractor shall establish appropriate drug and alcohol testing programs for all Contractor Personnel in full compliance with the most stringent interpretation of applicable Federal regulations governing control of drug use and alcohol abuse in railroad and/or transit operations.  Contractor shall submit to the MBTA its guidelines for drug and alcohol testing at least sixty (60) days prior to the Commencement Date.  Contractor shall update such guidelines annually, and submit to the MBTA for approval, no later than August 1st of each Agreement Year.

30.2  **Additional Testing.**  Contractor shall, upon reasonable suspicion and consistent with the MBTA's drug and alcohol testing policy, conduct drug and alcohol testing of any Contractor Personnel not governed by Federal regulations governing drug and alcohol abuse in railroad and/or transit operations.

30.3  **Drug and Alcohol-Free Workplace.**  All Contractor Personnel, vendors, visitors, volunteers and subcontractors are to be free of the effects of illegal drugs, alcohol, controlled substances or other prohibited substances when they are on MBTA property or performing Agreement Services.  In addition, all such parties are prohibited from using, possessing, selling or distributing any drugs, alcohol, controlled substances or other prohibited substances when they are on the Service Property, MBTA property or performing Agreement Services.  Contractor shall advise its employees of this requirement and ensure that employees meet this "fitness for duty" standard.  Contractor shall remove violators of this policy immediately from MBTA property and such employee shall, pursuant to Section 11 be held out of performing Agreement Services or any other MBTA contract.  Contractor shall immediately assign the disciplined employee's job responsibilities to another qualified employee.  Contractor shall furnish the MBTA with a written report documenting the actions taken with regard to any Contractor Personnel who violate this policy within thirty (30) days of the violation.  The Contractor hereby accepts all liability arising from violation of this policy by its employees.

## SECTION 31.  SYSTEM SAFETY AND SECURITY.

31.1  **General Obligations.**  In performing the Agreement Services, Contractor shall at all times conduct its operations in a safe manner.  Contractor shall, at its own expense, promptly take all precautions which are reasonable or necessary to safeguard against risks, and shall make regular safety and security inspections of Service Property, Service Equipment and Support Property, consistent with the System Safety Program detailed herein, and shall keep records of all such inspections.

31.2  **System Safety Program**.

      (a)    Contractor shall establish an MBTA-approved System Safety Program Plan based on appropriate FRA, FTA, MDTE, APTA and MBTA regulations, standards and guidelines, which will identify, eliminate, minimize, and control safety hazards and their attendant risks. Such plan shall meet all applicable federal and other legal requirements and regulations, and must be provided to the MBTA no less than ninety (90) days before the Commencement Date. Such plan shall include procedures for responding to emergency medical conditions experienced by customers or personnel on-board trains, in stations, or on other Service Property, as well as plans for responding to other incidents that threaten the safety or security of customers or personnel. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA. Contractor shall update such plan annually, and deliver to the MBTA for approval by October 1st of each Agreement Year. Contractor shall also submit triennially to an APTA audit, and shall implement recommended changes as directed by the MBTA.

      (b)    To implement such System Safety Program, Contractor shall establish appropriate policies and procedures, lines of authority, levels of responsibility and accountability, and methods of documentation. Upon request by the MBTA, Contractor shall cooperate with any audit of Contractor's System Safety Program Plan conducted by the MBTA or a Third Party acting on behalf of the MBTA.

      (c)    Contractor's Safety and Training Manager shall attend quarterly meetings, and other meetings as directed by the MBTA, with the MBTA Safety Department and the Director of Railroad Operations to discuss recent safety-related incidents and concerns, and Contractor's compliance with the System Safety Program. In the event that Contractor becomes aware of an unsafe, non-secure, or potentially unsafe or non-secure condition on the Service Property or Service Equipment, or otherwise related to the Agreement Services, Contractor shall immediately take all actions required to cure such condition, notwithstanding any other provision of this Agreement that requires or permits notice or any other interim measure.

31.3  **System Security Plan.** Contractor shall provide to the MBTA a System Security Plan that shall be updated annually by October 1st of each Agreement Year and shall detail Contractor's security policies, procedures and programs. The System Security Plan shall provide for, without limitation, an identification badge system for Contractor employees; a vehicle control system for Contractor employee vehicles on the Service Property; and a plan for restricting access to stations and facilities. The initial plan shall meet all applicable federal and other legal requirements, regulations, and standards, and must be provided to the MBTA not less than ninety (90) days before the Commencement Date. The Director of Railroad Operations shall, in consultation with the MBTA Police Department, review such System Security Plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

31.4    **Emergency Preparedness Plan.**

(a)    Contractor shall provide to the MBTA a draft of its initial Emergency Preparedness Plan, which shall be consistent with FRA requirements for such plan, no later than ninety (90) days before the Commencement Date. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

(b)    Contractor shall provide to the MBTA drafts of any subsequent Emergency Preparedness Plans, as any subsequent amendments or proposed amendments to such plan, no less than forty-five (45) days before such plan or amendments are submitted to the FRA. The Director of Railroad Operations shall, in consultation with the MBTA Safety Department, review such plan, and shall either approve the plan or shall, within thirty (30) days, direct Contractor to revise such plan. Contractor shall revise such plan accordingly within thirty (30) days of receipt of such revisions from the MBTA.

(c)    Contractor shall cooperate and participate in two (2) MBTA mock accident drills each Agreement Year, at times to be determined by the MBTA.

31.5    **Emergency Response Plan.** Contractor shall, at least ninety (90) days before the Commencement Date, prepare and submit to the MBTA for approval an Emergency Response Plan to effectively address conditions resulting from major storms and other natural occurrences that could disrupt Commuter Rail service. Contractor shall prepare the plan in coordination with the Environmental Services Subcontractor, shall update the plan annually, and shall provide it to the MBTA for approval no later than August 1st of each Agreement Year. The Emergency Response Plan shall detail the specific use and assignment of all resources available and Contractor shall provide additional resources as necessary.

31.6    **Contingency Plan.** No more than sixty (60) days after the Commencement Date, Contractor shall develop and provide to the MBTA for approval (through briefings or other appropriate means) a written contingency plan describing in detail measures to be taken by it to assure continued and uninterrupted performance of the Agreement Services in the event of any strike or work stoppage engaged in by Contractor's employees. Contractor shall update such plan annually, and submit to the MBTA for approval, no later than August 1st of each Agreement Year.

31.7    **Violations.** Contractor shall be solely responsible for the discovery, determination and correction of any and all violations of the System Safety Program, System Security Plan or any other safety or security violation related to the Agreement Services.

31.8    **Employee Non-Compliance.** The failure of any Contractor Personnel to comply with the System Safety Program or System Security Plan, or to otherwise comply with applicable safety requirements, shall be considered Conduct Unbecoming an Employee pursuant to this Agreement.

31.9     **Jurisdiction of the MBTA Police Department.**  Contractor acknowledges that the MBTA Police Department has primary responsibility for public safety, security, and law enforcement for the Agreement Services, including all property and vehicles owned, operated or utilized by the MBTA or its agents or independent contractors or representatives.  Contractor shall ensure that its public safety policies and operations are reviewed by and coordinated with the MBTA Police Department.  Contractor is not required to provide its own police force, and any police force provided by Contractor shall be at its sole cost and expense.

## SECTION 32.  PERFORMANCE AND PAYMENT BOND AND INSURANCE.

32.1     **Performance and Payment Bond Requirement.**  Contractor shall secure prior to the Commencement Date a Performance Bond in an amount not less than $15 million ($15,000,000.00), and a Payment Bond of not less than $5 million ($5,000,000.00), or a combined Performance and Payment Bond with such amounts, and shall maintain such bonds during the Term of this Agreement and until the MBTA determines that the contract close-out has occurred.  The Performance Bond and Payment Bond shall be in the form set forth in Exhibit 31, Forms of Required Bonds, and shall be secured through an insurance company or companies authorized to do business in the Commonwealth of Massachusetts or approved by the MBTA.  In lieu of the Performance and Payment Bonds described in this Section, Contractor may secure and maintain "clean and irrevocable" standby letter(s) of credit, provided that such letter(s) of credit grant the MBTA the same security offered by the Performance and Payment Bonds, and that the MBTA approves, in its sole discretion, the form of such letter(s) of credit before such instruments become effective.

32.2     **Contractor Liability Insurance.**  Contractor shall procure and maintain in full force and effect at its sole cost and expense during the Term of this Agreement (including any Option Years) with financially sound and reputable insurance companies, policies of insurance, which shall name the MBTA as an additional insured, and which shall include the following coverages:

(a)     FELA/Workers' Compensation Insurance:  Contractor and each Subcontractor shall procure and maintain FELA or Worker's Compensation Insurance as applicable in accordance with federal or state law.

(b)     Automobile Liability Insurance for bodily injury and property damage with a combined single limit of not less than $5 million covering vehicles owned or leased by Contractor.

(c)     Pollution Liability Insurance of not less than $25 Million per occurrence.

In the case of FELA/Workers' Compensation Insurance, Contractor may, either before the Commencement Date or during the Term of this Agreement, submit to the MBTA for approval a proposal pursuant to which Contractor would self-insure in lieu of securing the insurance policy described in paragraph (a) above.  The MBTA shall review such proposal, including information relevant to Contractor's financial stability and ability to discharge and satisfy any FELA or Workers' Compensation claims for which Contractor is responsible

67

pursuant to this Agreement.  The MBTA shall either approve such proposal, such approval not to be unreasonably withheld, or reject such proposal and provide a description of the reasons for such rejection.  At no time during the Term of this Agreement shall Contractor fail to maintain either a FELA/Workers' Compensation insurance policy or an MBTA-approved self-insurance plan.

32.3    **Insurance Policies.**  The insurance specified in this Section shall be secured through insurance companies authorized to do business in the Commonwealth of Massachusetts or approved by the MBTA, and shall be in force on or before the Commencement Date and kept in effect until all work required to be performed under the terms of this Agreement is satisfactorily completed.  The MBTA shall be given a minimum of thirty (30 days) notice in the event of any change to or cancellation of any insurance required under this Section. The MBTA shall be listed as an "additional insured" on the policies of insurance referred to in Section 32.2, and worker's compensation policies shall include a waiver of subrogation against the MBTA.  Such insurance shall be primary to and non-contributory to any insurance or self-insurance maintained by the MBTA.  The FELA insurance policy referred to in Section 32.2 (a) shall be subject to a self-insured retention of not less than two hundred and fifty thousand dollars per occurrence.   Contractor shall have its insurance companies mail complete copies of the policies required by Section 32.2 to the MBTA within thirty (30) days of such request.  All such insurance as is required of the Contractor shall be required of and provided by or on behalf of all subcontractors to cover their work and services.  The Contractor shall be held responsible for any modifications, deviations or omissions in the compliance with these insurance requirements by its subcontractors.

32.4    **Period of Coverage.**  Contractor's Insurance under Section 32.2 shall apply to any liability arising on or after the Commencement Date, and shall extend beyond the Termination Date with respect to any event occurring or liability arising during the Term of this Agreement (including any Option Years).

32.5    **Certificates.**  Contractor shall furnish the MBTA with Certificates of Insurance (and, upon request, copies of all required insurance policies, including endorsements and declarations) evidencing compliance with the requirements set forth in Section 32.2 prior to the execution of this Agreement, and annually thereafter.  The policies shall be endorsed to (i) provide that the policy shall not be canceled or coverage reduced without thirty (30) days prior to written notice of cancellation to the MBTA; and (ii) name the MBTA and its directors, officers and employees, as additional insureds with respect to occurrences relating to the performance of the Agreement Services.

32.6    **Replacement Policies.**  In the event any insurance policy required by Section 32.2 to be maintained by the Contractor is canceled for any reason or has its aggregate limits impaired by twenty-five percent (25%) or more, then the Contractor shall replace such policy or reinstate the aggregate limits during the notification period with another policy in like amount and coverage protection.

32.7    **Material Breach.**  The Contractor's failure to procure or maintain insurance required under this Section constitutes a material breach of the Agreement and an Event of Default.

32.8    **MBTA Liability Insurance/Cost Sharing re: Self Insurance.**  The MBTA shall procure and maintain in full force and effect during the Term of the Agreement (including any Option Years), at its own cost and expense, excess liability insurance, which shall name Contractor as an additional insured and shall cover Third Party claims against and liabilities of MBTA and Contractor for property damage, bodily injury, personal injury and death arising out of the operation of Agreement Services, with a combined single limit of $75,000,000 per occurrence annually and $75,000,000 in the aggregate annually, including a self-insured retention of not more than $7,500,000 per occurrence. The MBTA may, during the Term of this Agreement, increase the self-insured retention to an amount not more than $10,000,000 per occurrence, and shall provide Contractor with written notice of any such increase.  The MBTA shall compensate Contractor for its increased costs associated with the increase in the self-insured retention from $7,500,000 through a Service Changes.  Such insurance shall not cover liability for injury, damage to or death of any Contractor Personnel. Contractor and the MBTA shall share equally the cost of all liabilities falling within and paid from the self-insured retention on an equal, "fifty/fifty" basis.

32.9    **Claims Filing.**  The MBTA and Contractor agree to cooperate fully with one another in the filing of claims with and recovering payments due from insurers in connection with the Agreement Services.

32.10    **Insurance Review Process.**  In consultation with each Party's risk management consultants or insurance brokers, the MBTA and Contractor shall, no later than January 1, 2005, conduct an evaluation of the insurance approach to risk management contained in this Agreement.  Such evaluation shall, among other things, consider whether changes in the approach to insurance coverage enhance Contractor accountability, establish a more equitable allocation of risk for both Contractor and the MBTA, and be cost-effective.  At any time after the parties have begun such evaluation, if either Party so requests, the MBTA and Contractor shall, instead of engaging their own consultants, jointly procure and share the cost of an independent risk management consultant to conduct the evaluation described below.  The MBTA and Contractor shall make modifications to the Operating Agreement and the approach to insurance based upon the recommendations of either their own consultants or insurance brokers or the independent consultants named above, for implementation effective the twenty-fifth (25th) month following the Commencement Date.

32.11    **Property Insurance**.  The MBTA shall procure and maintain in full force and effect during the Term of this Agreement (including any Option Years), at its own cost and expense, Property Insurance, which shall name Contractor as an additional insured subject to the terms and conditions of the policy, subject to a current limit of $500,000,000, various sublimits, and a $100,000 per occurrence deductible except for earthquake, flood and wind losses which are subject to a $100,000 per location deductible subject to a maximum of $500,000 per occurrence. The MBTA Property Policy specifically excludes loss or damage caused by or resulting from any collision, upset, impact or derailment of any vehicle, including rolling stock.  Contractor shall

bear full responsibility for all losses to Service Property, Service Equipment or Support Property that is damaged while in Contractor's care, custody and/or control in the performance of the Agreement Services, except (a) to the extent otherwise provided in Section 9.6(c) herein, and (b) to the extent that such losses are not recovered from the MBTA's Property Insurance policy for any reason, including but not limited to the application of coverage terms and conditions, deductibles, exclusions, etc.  Copies of the MBTA's Property Insurance policy will be made available to Contractor upon request.

32.12  **Terrorism Insurance**.  The MBTA may, at its sole discretion, purchase and maintain optional Terrorism Insurance coverage, either in response to the Terrorism and Risk Insurance Act 2002, or otherwise.  The MBTA shall name Contractor as an additional insured on any such Terrorism Insurance coverage.  The MBTA shall notify Contractor not more than thirty (30) days after the date on which such Terrorism Insurance coverage becomes effective, and shall notify Contractor not less than thirty (30) days before the termination of any such Terrorism Insurance coverage in effect.  The MBTA shall make any such Terrorism Insurance coverage documentation available to Contractor for review upon request.

**SECTION 33.  INDEMNIFICATION AND LIABILITY.**

33.1  **Environmental Conditions.**  MBTA agrees to indemnify, defend, and hold Contractor harmless from and against any claims, causes of action, damages, fines or penalties arising with respect to any adverse environmental conditions or environmental impairment which existed in or on the Service Property as of the Commencement Date, or which arise due to events that occurred prior to the Commencement Date, or which arise after the Commencement Date as a result of acts or omissions of the MBTA or any of its directors, officers, agents or subcontractors (other than Contractor).  Contractor agrees to indemnify, defend, and hold the MBTA harmless from and against any claims, causes of action, damages, fines or penalties with respect to any adverse environmental conditions or environmental impairment (a) arising after the Commencement Date but before the Termination Date or after the Termination Date but due to events that occurred after the Commencement Date but before the Termination Date, and (b) created by acts or omissions of Contractor (including its subcontractors or agents), including without limitation acts of vandalism in, on, or about the Service Property.

33.2  **FELA Liability/Workers' Compensation.**  Contractor shall have administrative and financial responsibility for preventing, processing, managing, defending, and discharging all FELA or any other state or federal Workers' Compensation claims arising during the Term of this Agreement and arising either directly or indirectly from the performance of the Agreement Services.  Contractor's responsibility for such claims shall continue after the termination date of this Agreement if such claims arose out of an event occurring during the Term of this Agreement.  The costs of Contractor's compliance with this Section shall be included in the Annual Fixed Price.  Contractor agrees to indemnify, defend, and hold harmless the MBTA, its directors, officers, employees, agents and subcontractors without regard to negligence or fault, from any and all liability for all claims brought by Contractor's employees under FELA or any other Workers' Compensation statute; provided that the aggregate amount paid by Contractor within the deductible or pursuant to a self insurance plan for claims (including defense costs) incurred during each year of the Term of this Agreement shall not exceed $4 million annually

except as detailed in the following sentence.  To the extent that the aggregate amount paid by Contractor within the deductible or pursuant to a self insurance plan for claims (including defense costs) incurred during each year of the Term of this Agreement exceeds $4 million for each such year, the MBTA shall reimburse Contractor for such amounts in excess of $4 million. The MBTA's obligation to make any payments to which Contractor may be entitled under this Section 33.2 shall survive the termination of this Agreement.

33.3    **Claims Service.**

(a)    MBTA shall investigate, administer, settle and pay all claims for injury, death, or damage arising out of the performance of this Agreement, except for those claims for which Contractor (or any of its subcontractors) is responsible for obtaining insurance under Section 32.  In the case of a claim asserted against both Contractor and the MBTA, either Party, in resolving the claim against itself, may in its agreement with the claimant release the other Party from all liability.

(b)    The MBTA and Contractor shall jointly determine, prior to the Commencement Date, practices and procedures for the handling and administering of claims, including the process of selection of counsel and authority to settle claims.

33.4    **Costs Included**.  The duties and the indemnities given pursuant to this Agreement shall include the responsibility to pay all legal fees, medical costs, investigative expenses, expert witness fees, and other payments to Third Parties in connection with the handling or resolution of claims.

33.5    **Notice to MBTA.**  Contractor shall notify the MBTA's Director of Railroad Operations and General Counsel (c/o the MBTA Law Department Claims Attorney) in writing by Registered Mail within twenty-four (24) hours of learning of any claim to which the MBTA is a party.  Such written notice shall describe the nature of the claim and shall itemize an estimate of any damages involved.

33.7    **No Consequential Damages**.  In no event shall either Party have any liability to the other on account of consequential damages, lost profits, or punitive damages, whether arising under contract or by virtue of a claim in tort.

## SECTION 34.  RIGHT TO SUBCONTRACT.

34.1    **In General.**

(a)    Contractor may employ subcontractors to perform any of its obligations under this Agreement, except as otherwise stated in this Section; provided, however, that prior written notice  to the MBTA shall be required as to each subcontract with the exception of: (1) subcontracts with subcontractors identified in Contractor's Proposal; (2) subcontracts with vendors previously approved by the MBTA; and (3) subcontracts under which the aggregate amount payable to the subcontractor in any twelve-month period is less than $250,000.

Contractor shall remain solely responsible for any work under this Agreement for which it employs subcontractors, and MBTA shall have no obligation to such subcontractors whatsoever.

   (b) All subcontractors shall perform their work in accordance with the applicable terms and conditions of this Agreement, including but not limited to compliance with all health, safety, EEO, and MBTA insurance requirements. All subcontractors shall include the provisions listed in Exhibit 29.

   (c) In the event that the Contractor terminates a subcontractor, the MBTA shall not be liable to Contractor or to such subcontractor for any damages, whether direct, consequential, incidental, liquidated or otherwise, resulting from the termination of such subcontractor. Each subcontract between Contractor and any subcontractor shall include a waiver by the subcontractor of any right to assert any claim against the MBTA on account of such termination.

   (d) Contractor may not subcontract the performance of Commuter Rail Services carried out under this Agreement or the operation of Special Trains or Excursion Trains.

  34.2 **Subcontracting for Environmental Services, Hazardous Waste Disposal and Pest Control.** Contractor shall subcontract for the provision of Environmental Services, Hazardous Waste Disposal, and Pest Control Services. In no event shall Contractor or its agents, parent company, or subsidiaries provide such services, except in the case of an Emergency or with the prior written approval of the MBTA.

**SECTION 35. DISPUTE RESOLUTION.**

  35.1 **Settlement of Disputes.**

  (a) The Parties shall resolve all disputes relating to the subject matter of this Agreement according to the procedures set forth in

  (b) Both Parties to this Agreement shall make every reasonable effort to settle any dispute concerning the interpretation, application or enforcement of this Agreement by prompt and diligent discussions and negotiations.

  35.2 **Informal Consideration by the Parties.** Any dispute that cannot be resolved pursuant to Section 35.1 within thirty (30) business days after it arises (or such other time as the Parties may agree in writing) may be submitted at the written request of either Party to the MBTA's Director of Railroad Operations and the Contractor General Manager. These individuals shall discuss and attempt to resolve the dispute. In the event that the dispute remains unresolved twenty (20) business days after its submission (or such other time as the Parties may agree), the matter may be referred in writing by either Party to the General Manager of the MBTA and Contractor's Chief Executive Officer for consideration. If the dispute still remains unresolved thirty (30) calendar days after its referral to the General Manager and Chief Executive Officer, the matter (a) may be submitted in writing to mediation under Section 35.3 by

72

agreement of the MBTA and Contractor or (b) either Party may commence litigation by filing an action with the Superior Court for Suffolk County, Massachusetts.

35.3    **Mediation.**  As an alternative to litigation, the MBTA and Contractor may jointly agree to submit any unresolved dispute to an independent mediator under this Section.

(a)    The MBTA and Contractor shall jointly select an independent mediator within twenty-one (21) calendar days after the submittal of a dispute under this paragraph.  The independent mediator shall be properly qualified in the subject matter of the dispute.  In the event the Parties are unable to agree upon a mediator, the mediator shall be selected by alternative strikes by each Party from a list of five mediators provided by the American Arbitration Association.

(b)    The independent mediator shall meet with the Parties within twenty-one (21) calendar days after his or her selection to attempt to mediate and resolve the dispute.  If mediation efforts are unsuccessful after sixty (60) days, the mediator shall, after consideration of the Parties' positions and written submittals (if so requested), issue written recommendations for resolution of the dispute.  Any such written submittals shall be postmarked by the 10th calendar day after the Parties' last meeting with the mediator.  The recommendations of the independent mediator shall be issued within thirty (30) calendar days after the later of the conclusion of mediation or the submittal of written positions.  All meetings and proceedings shall be held in Boston, Massachusetts, at a time and location acceptable to both Parties.

(c)    If a Party rejects the recommendations issued, either Party may pursue all legal remedies available to it by filing an action with the Superior Court for Suffolk County, Massachusetts.  All offers, documents and statements, whether oral or written, made or produced in the course of mediation by either of the Parties, their agents, experts or attorneys, or by the mediator, shall be treated as confidential and inadmissible for any purpose, including impeachment of witnesses, in any litigation or other proceeding involving the Parties, provided that evidence which is discovered by means other than documents and statements made or produced in the course of mediation shall not be rendered inadmissible or non-discoverable.

(d)    The costs and expenses of the independent mediator shall be shared equally by the MBTA and Contractor.  The provisions of this Section may be enforced by any court of competent jurisdiction.

35.4    **Injunctive Relief.**  Notwithstanding any contrary provisions of this Agreement, if either the MBTA or Contractor believes that the other Party has failed to perform any covenant or obligation under this Agreement regarding a matter of substantial importance which, if not promptly corrected, will cause irreparable injury, the aggrieved Party may take such legal action as it deems appropriate and may file immediately any and all pleadings in any state or federal court located in Massachusetts to secure an injunction of such action or inaction pending resolution of the matter pursuant to the dispute resolution procedures set forth in this Section. The Parties agree and acknowledge that any conduct, action, or failure to act by the Contractor that results in a Service disruption for a period longer than twenty-four (24) hours, or conduct, action, or failure to act that in the sole judgment of the MBTA poses a real or potential threat to

73

Customer or public safety shall be irreparable harm to the MBTA and contrary to the public interest.

35.5    **Interest.**  Where the time period during which interest accrues regarding a matter in dispute is specifically established elsewhere in this Agreement, that time period shall apply for purposes of disputes under this Section.  For any other dispute under this Section, interest shall accrue from the date of the filing of the claim.  Any such interest shall be at the rate described in Section 21.2 of this Agreement.

## SECTION 36.  COMPLIANCE WITH LAW.

36.1    **In General.**  At all times, Contractor will provide Agreement Services in accordance with all local, state, and federal laws, standards, codes, rules, and regulations applicable to the Agreement Services, including without limitation all such standards, codes, rules and regulations relating to safety, as are in existence from time to time, and pursuant to the terms of this Agreement.  MBTA shall not be responsible or liable for Contractor's violations of such laws or regulations.  Contractor shall promptly comply with any specific safety instructions or directions given by any duly authorized agency.  In the event a law or regulation is enacted after the date of Contractor's Proposal which materially increases Contractor's cost of performance of the Agreement Services, Contractor and MBTA shall enter into good faith negotiations in order to amend this Agreement in order to reflect such increased costs, subject in every such case to MBTA's right to terminate this Agreement for convenience pursuant to Section 40.  During the pendency of such negotiations, Contractor shall comply with such recently enacted law or regulation.

36.2    **Compliance with Laws and Regulations.**  Contractor shall keep fully informed and shall comply with the provisions of applicable Federal, State and local laws, standards, codes, rules and regulations which in any manner affect this Agreement and those engaged in the performance of, or employed in connection with, the Agreement Services.  Contractor shall, except as provided in Section 33, indemnify, protect, defend and save harmless the MBTA and its officers, agents and employees from all fines or penalties imposed upon the MBTA or any such person under any such laws, rules, and regulations by any public agency, authority or court having jurisdiction over the Parties hereto, when the imposition of same is attributable to the failure of Contractor to keep fully informed and to comply with its obligations in this regard.

36.3    **Equal Employment Opportunity.**

(a)    <u>Fair Employment Practices</u>.  During the Term of this Agreement the Contractor agrees:

(1)    that it will not discriminate against any employee or applicant for employment because of race, religion, creed, color, sex, national origin, age, disability or sexual orientation.  The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, religion, creed, color, sex, national origin, age, disability or sexual orientation.  Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or

recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

(2)    that it will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, creed, color, sex, national origin, age, disability or sexual orientation.

(3)    that it will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided advising such labor union or workers' representatives of the Contractor's commitments under this Section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)    that it will comply with applicable provisions of Title VI of the Civil Rights Act, as amended, 42 U.S.C. §2000e and Federal transit laws at 49 U.S.C. §5332, as well as all applicable equal employment opportunity requirements or regulations of the U.S. Department of Labor, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," 41 C.F.R. Parts 60 et seq. (which implement Executive Order no. 11246 "Equal Employment Opportunity," as amended by Executive Order no. 11375; 42 U.S.C.§2000e note), and with any applicable Federal statutes, executive orders, regulations or policies that may in the future affect activities undertaken in the course of the Agreement Services.

(5)    that it will comply with §4 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §623 and federal transit law at 49 U.S.C. §5332, Contractor agrees to refrain from discrimination against present and prospective employees for reason of age.  In addition, Contractor agrees to comply with any implementing requirements relating to age discrimination that FTA may issue.

(6)    that it will permit access to its books, records, and accounts by the MBTA and the United States Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders pertaining to fair employment practices.  In the event of Contractor's noncompliance with the nondiscrimination clauses of this Agreement or with any of the said rules, regulations or orders, this Agreement may be canceled, terminated, or suspended pursuant to the provisions of Section 40.

(b)    Subcontracts.  Contractor shall insert provisions in each subcontract, except subcontracts for standard commercial supplies, raw materials or construction that state the Equal Employment Opportunity policies provided in this Section.

75

36.4    **Accommodation of People with Disabilities.**

(a)    Title I Responsibilities.  Contractor shall be solely responsible, at its sole cost and expense, for compliance with the applicable provisions of Title I of the A.D.A. in its employment activities under this Agreement.  In the event that capital improvements or additions to the Service Property, Service Equipment or Support Property are necessary in order for Contractor to achieve such compliance, Contractor shall pay the reasonable costs of such capital improvements or additions as part of the Annual Fixed Price.  Any such capital improvements or additions made by Contractor shall be subject to the prior approval of the MBTA.

(b)    Title II Responsibilities.  The MBTA shall be responsible for compliance with the applicable provisions of Title II of the ADA and its implementing regulations pertaining to the provision of accessible Service Equipment and accessible Service Property, and with any requirement imposed under any agreement between the MBTA and the Massachusetts Architectural Barriers Board, provided that to the extent capital improvements or additions to the Service Property, Service Equipment or Support Property are necessary in order for Contractor to achieve such compliance, the MBTA shall pay the reasonable costs of such capital improvements or additions.  Any such capital improvements or additions made by Contractor shall be subject to the prior approval of the MBTA.  Contractor shall be responsible for operating and maintaining the Service Property and the Service Equipment in compliance with all such ADA and state requirements, and shall be solely responsible for all costs of complying with Title II of the ADA other than the capital improvements or additions discussed above.

(c)    Equal Opportunity.  In accordance with §102 of the Americans with Disabilities Act, as amended, 42 U.S.C. §12112, Contractor agrees that it will comply with the requirements of the U.S. Equal Employment Opportunity Commission, "Regulations to Implement the Equal Employment Provisions of the American with Disabilities Act," 29 C.F.R. Part 1630, pertaining to employment of persons with disabilities.  In addition, Contractor agrees to comply with any implementing requirements relating to disabilities that FTA may issue.

(d)    State and Local Requirements.  Contractor shall be solely responsible for compliance with all applicable state and local access statutes, rules, and regulations.

36.5    **Compliance with Other Specific Laws and Regulations.**  Contractor shall comply without limitation with the following regulations and guidelines:

(a)    Mandatory standards and policies relating to energy efficiency which are contained in the Massachusetts energy conservation plan issued in compliance with the Energy Policy and Conservation Act.

(b)    All applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§1251 et seq., and the Clean Air Act, as amended, 42 U.S.C. §§7401 et seq. Contractor agrees to report to the MBTA each violation thereof that it is required to report to the Environmental Protection Agency and understands and agrees that the MBTA will, in turn, report each such violation as required to assure notification to the FTA and the appropriate regional office of the Environmental

Protection Agency. Contractor also agrees to include such requirements in each permitted subcontract for the performance of the Agreement Services that exceeds $100,000 financed in whole or in part with Federal Assistance provided by the FTA.

(c)     All applicable FTA and FRA regulations, policies, procedures and directives, including without limitation those listed directly or by reference in this Agreement, as the same may be amended or promulgated from time to time during the Term of this Agreement as well as all applicable APTA standards.

(d)     The provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. §§3801 et seq., and the U.S. Department of Transportation regulations entitled "Program Fraud Civil Remedies," 49 C.F.R. Part 31. Upon execution of this Agreement, Contractor shall be deemed to have certified or affirmed the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to this Agreement or the Agreement Services. In addition to other penalties that may be applicable, Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious or fraudulent claim, statement, submission or certification the U.S. government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on Contractor to the extent the U.S. government deems appropriate. Contractor also acknowledges that if it makes, or causes to be made, a false, fictitious or fraudulent claim, statement, submission or certification to the U.S. government under this Agreement, the U.S. government reserves the right to impose the penalties provided for in 18 U.S.C. §1001 and 49 U.S.C. §5307(n)(1) on Contractor, to the extent the U.S. government deems appropriate. Contractor agrees to include the provisions of this Section in each permitted subcontract relating to the Agreement Services, and that such provisions shall not be modified except to identify the subcontractor that will be subject to such provisions.

(e)     The following federal civil rights laws, where applicable: (i) Title VI of the Civil Rights Act, as amended, 42 U.S.C. §2000d, (ii) section 303 of the Age Discrimination Act of 1975, as amended, 42 U.S.C. §6102, (iii) section 202 of the Americans with Disabilities Act of 1990, 421 U.S.C. §12132, (iv) federal transit law at 49 U.S.C. §5332.

(f)     The MBTA has implemented an asbestos abatement program. Contractor shall comply with such program, and ensure that asbestos-containing materials not be employed in future constructions, vehicle renovations, repair and maintenance projects unless it can be proved unequivocally by the manufacturer or contractor that no suitable asbestos-free product exists.

36.6     **Federal Government Not a Party.** The MBTA and Contractor acknowledge and agree that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of the underlying contract, absent the express written consent by the Federal Government, the Federal Government is not a Party to this Agreement and shall not be subject to any obligations or liabilities to the MBTA, Contractor or any other Party (whether or not a Party to this Agreement) pertaining to any matter resulting from this Agreement. Contractor agrees to include the foregoing clause in each permitted subcontract for the performance of the Agreement Services financed in whole or in part with Federal assistance provided by the FTA. Contractor

further agrees that such clause shall not be modified, except to identify the Subcontractor that
will be subject to its provisions.

## SECTION 37.  DISADVANTAGED BUSINESS ENTERPRISES.

37.1    **MBTA DBE Policy.**  The MBTA has adopted a Disadvantaged Business
Enterprise Policy in accordance with Federal regulations issued by the U.S. Department of
Transportation (49 C.F.R. Part 23)  Contractor shall comply with this policy, which provides that
Disadvantaged Business Enterprises (DBEs) will be afforded every practicable opportunity to
participate in the performance of contracts relating to the MBTA's construction, procurement
and professional service activities.

37.2    **Procedures Manual/Other Obligations.**  Contractor shall develop and
implement a Comprehensive Organizational Diversity Operations and Procedures Manual.
Contractor shall submit a draft Manual to the MBTA within forty-five (45) days of the Notice to
Proceed Date.  MBTA shall make such reasonable changes as it deems appropriate and return to
Contractor not more than thirty (30) days after its submittal.  Contractor may notify the MBTA if
it disagrees with any of the changes.  MBTA will consider Contractor's objections and exercise
reasonable judgment in revising the MBTA's requirements.

The Manual will include Contractor's plans, procedures and goals for the implementation
of its Affirmative Action/Equal Opportunity Employment obligations as set out in Section 36.3.
The Manual will include but not be limited to the following:

- Description of Boston area employment pool analyzed by age, gender,
  race disability, sexual orientation and national origin.
- Description of the existing Workforce, including without limitation
  managers, by age, gender, race disability, sexual orientation and national
  origin.
- Goals for improvement and maintenance the diversity of the workforce in
  both management and the rank and file.
- Approach and plans for promotion from within and external recruitment
  to improve and maintain the diversity of the entire workforce.
- Approach and plans for maintaining the diversity of the workforce should
  Contractor plan a reduction in force through attrition or at any time a
  reduction in force be required pursuant to Section 12.3.
- Training program and training schedule for managers on managing a
  diverse workforce, particularly respecting the fair assessment of
  discipline.
- Training program and training schedule for workforce on working in a
  diverse workplace.
- Requirement that the Civil Rights Unit track discipline by age, gender,
  race disability, sexual orientation and national origin; that a representative
  of the Civil Rights Unit be present in discipline proceedings; and that a
  copy of all discipline be forwarded to the Civil Rights Unit.
- Format for electronic transmittal of the monthly statistical report.

- Staffing plan and organizational chart for the Civil Rights Unit.

In addition, Contractor shall develop a professional Civil Rights Unit to oversee personnel compliance and provide monthly statistical reports highlighting the workforce profile, hiring and promotion activity and minority and related procurement information. The monthly statistical reports shall include but not be limited to the following:

- Description of Boston area employment pool analyzed by age, gender, race disability, sexual orientation and national origin.

- Description of the existing Workforce as of Commencement Date, including rank and file and managers, by age, gender, race disability, sexual orientation and national origin and the changes in each that have occurred since Commencement Date.
- Progress report on the goals for improvement and maintenance the diversity of the workforce.
- Actual implementation of approach and plans for promotion from with and external recruitment to improve and maintain the diversity of the workforce.
- Actual implementation of approach and plans for maintaining the diversity of the workforce should Contractor plan a reduction in force through attrition or at any time a reduction in force be required pursuant to Section 12.3.
- Progress report on the training program for managers on managing a diverse work force, particularly respecting the fair assessment of discipline.
- Progress report on the training program for rank and file on working in a diverse workplace.
- Analysis of all discipline issued in the report period  by age, gender, race disability, sexual orientation and national origin; documentation of the presence of a representative of the Civil Rights Unit at each discipline proceedings.
- Status report on the staffing and organizational chart for the Civil Rights Unit.

37.3    **Contractor Obligation.**

(a)    In the performance of this Agreement, Contractor shall participate fully with the MBTA in meeting commitments and goals with regard to the maximum utilization of DBEs.

(b)    Both Parties understand and agree that it is the policy of the U.S. Department of Transportation that DBEs as defined in 49 C.F.R. part 23 shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with Federal funds.  Consequently, the DBE requirements of 49 C.F.R. part 23 apply to this Agreement as long as the requirements remain in effect.

(c)    Contractor agrees to ensure that DBEs as defined in 49 C.F.R. part 23 have the maximum opportunity to participate in the performance of contracts and subcontracts. In this regard Contractor shall take all necessary and reasonable steps in accordance with 49 C.F.R. part 23 to ensure that DBEs have the maximum opportunity to compete for and perform contracts of not less than eleven and one half percent (11 ½%) of the total cost of subcontracts, goods and services purchased or entered into.

37.4    <u>**Sanctions for Violations.**</u>

If at any time the MBTA believes that Contractor is in violation of its obligation under this Section, or has otherwise failed to comply with this Section, the MBTA may, in addition to pursuing any other available legal remedy, commence proceedings which may include sanctions. Such sanctions may include, but are not limited to, one or more of the following:

(a)    The suspension of any payment, in whole or in part, due the Contractor until such time as the issues concerning the Contractor's DBE compliance are resolved.

(b)    The MBTA may determine that such violation is an Event of Default, and in the event that Contractor fails to cure such default in accordance with the provisions of Section 40.3 , the MBTA may terminate the Agreement in whole or in part.

37.5    <u>**Records and Reports.**</u>

(a)    Contractor shall maintain records of all subcontracts entered into with certified DBE firms, and records of all materials and services purchased from certified DBE suppliers.  Such records shall show, at a minimum, the name and business address of such DBE firms and the total dollar amount actually paid to each DBE firm by Contractor.  The MBTA may incorporate such reports into requests for MBTA Board of Directors actions and performance reports to such Board.

(b)    Contractor shall submit monthly DBE contract compliance reports documenting DBE utilization.

## SECTION 38.  MARKETING RESPONSIBILITIES.

38.1    <u>**MBTA Responsibilities.**</u>

(a)    Neither Contractor nor any of its subcontractors, consultants, agents, supplies, and employees shall market the MBTA commuter rail service through advertisements or other public promotions, unless directed in writing to do so by the MBTA.

(b)    Contractor shall support the MBTA in its efforts to inform the public about its commuter rail service.  Incident Management and notification of Service Disruptions and Delays are not considered marketing activities, and Contractor shall bear responsibility for such notification pursuant to Section 8 and the Transportation Scope of Services, Exhibit 2.

      (c)     The MBTA shall have sole responsibility for communicating with the media, except where the MBTA directs Contractor to support such media communication.

     38.2   **Contractor Responsibilities.**  The MBTA hires Other Contractors to install and maintain promotional materials or public information notices on the Service Property and Service Equipment.  As part of the Annual Fixed Price, the MBTA may direct Contractor to install MBTA-approved promotional materials or public information notices on the Service Property and Service Equipment pursuant to procedures established by the MBTA.

## SECTION 39.  THIRD PARTY ADVERTISING.

     The MBTA shall have the sole and exclusive right to utilize or authorize the utilization of stations, rights of way, and the exterior and interior of Service Equipment used or operated in Agreement Services for the display of any written or printed advertising, promotional material, or public information notices.  Any revenues from such advertisements, whether or not such advertisements are properly authorized, shall belong exclusively to the MBTA. The MBTA may hire Other Contractors to install and maintain advertising materials on the Service Property and Service Equipment.

## SECTION 40.  TERMINATION.

     40.1   **For Convenience/Change of Control.**

        (a)     This Agreement may be terminated for convenience at any time by the MBTA in accordance with this Section.  The MBTA may also terminate this Agreement at any time upon a Change of Control if, in the MBTA's sole determination, it is in its interests to do so.  Any such termination shall be effected by delivery of a notice of termination specifying the date upon which such termination becomes effective, which shall be at least six (6) months after the date of such notice.

        (b)     In the event of a termination of this Agreement by the MBTA pursuant to this Section, the MBTA shall pay to the Contractor its actual Direct Costs of closing out the Agreement Services, and any other amounts due and payable to Contractor under this Agreement.  Contractor shall promptly submit any claim for reimbursement pursuant to this Section to the MBTA.

     40.2   **By Mutual Agreement.**  This Agreement may be terminated by mutual agreement of the Parties, upon such terms and condition as the Parties may mutually agree to.  Such termination shall be effective in accordance with a written agreement by the Parties.  Termination under this section shall not constitute a waiver of the rights of either Party to damages or other remedies related to this Agreement, except to the extent that the agreement terminating this Agreement so specifies.

     40.3   **For an Event of Default**.  MBTA may, by thirty (30) day advance written notice of an Event of Default to Contractor, (except in the case of (c) or (d) below, in which case no

prior notice of termination need be given) terminate this Agreement in any one of the following circumstances:

(a)     If Contractor fails to comply with any of the provisions of this Agreement in accordance with its terms or within the time specified for performance herein, and does not cure an Event of Default within three (3) calendar days if such failure involves any interruption in Commuter Rail Services, or within thirty (30) days for other such failures, or such greater period as the MBTA may authorize in writing, after receipt of notice specifying such failure, and indicating that a failure to remedy the same may result in termination of this Agreement;

(b)     If the MBTA determines that Contractor has obtained any payment hereunder on the basis of a representation that is false in any material respect; or

(c)     If Contractor files a petition for reorganization under Chapter 11 or Chapter 7 of Title 11, United States Code, or if any involuntary petition under either such Chapter is filed against the Contractor and is not dismissed within thirty (30) days, or if Contractor shall become insolvent within the meaning set forth in Section 101 of such title whether or not such a petition is filed by or against Contractor but provided that the MBTA provides thirty (30) days notice of its determination that Contractor is insolvent, or if Contractor makes an assignment or trust mortgage for the benefit of its creditors or if a receiver is appointed for all or a substantial part of the assets of the Contractor or if Contractor is enjoined by any court or regulatory authority from performing any material part of the Agreement Services, or if Contractor's operations are suspended or terminated by an Act of Congress; or

(d)     If the MBTA determines that continued provision of the Agreement Services by Contractor would result in danger, or the potential of danger, to the health or safety of Customers or the general public.

40.4     **Authority to Procure.**   In the event that the MBTA terminates this Agreement pursuant to Section 40.3 above, the MBTA may procure, upon such terms and in such manner as the MBTA may deem appropriate, services or supplies similar to those so terminated, and Contractor shall be liable to the MBTA for any reasonable and necessary excess costs for such similar supplies or services.

40.5     **Termination by Contractor.**   Contractor may terminate this Agreement:

(a)     If MBTA fails to make payment of undisputed amounts properly due hereunder to Contractor for a period of thirty (30) days after the date when due, and such failure continues for thirty (30) days after receipt by the MBTA of written notice from Contractor specifying such failure; or

(b)     If the MBTA fails to perform any of its other obligations under this Agreement and such failure prevents the Contractor from performing the Agreement Services for a period of forty-five (45) days and continues for forty-five (45) days after receipt by the MBTA of written notice from Contractor specifying such failure.

40.6    **Termination Process.**

(a)    Upon receipt of a notice of termination from MBTA, and except as otherwise directed by the MBTA, Contractor shall (1) stop work under the Agreement on the date and to the extent specified in the notice of termination; (2) place no further orders or enter into any subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under the Agreement as is not terminated; (3) terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the notice of termination; (4) assign to the MBTA in the manner, at the times, and to the extent directed by the MBTA, all of the rights, titles and interests of Contractor under the orders and subcontracts so terminated; (5) settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts, with the approval or ratification of the MBTA, to the extent the MBTA may require, which approval or ratification shall be final for all the purposes of this Section; (6) transfer title to the MBTA and deliver in the manner, at the times, and to the extent, if any, directed by the MBTA, the fabricated and unfabricated parts, work in progress, completed work, supplies and other material produced as a part of, or acquired in connection with the performance of, the work terminated, and the completed or partially completed plans, drawings, information and other property which, if this Agreement had been completed, would have been required to be furnished to the MBTA; (7) use its reasonable efforts to sell in the manner, at the times, to the extent and at the prices directed or authorized by the MBTA, any property of the types referred to above, provided, however, that Contractor shall not be required to extend credit to any purchaser and may acquire any such property under the conditions prescribed by and at the prices approved by the MBTA, and provided further, that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by the MBTA to Contractor under this Agreement or shall otherwise be credited to the price or cost of the work covered by this Agreement or paid in such other manner as the MBTA may direct; and (8) take such action as may be necessary, or as the MBTA may direct, for the protection and preservation of the property related to this Agreement which is in the possession of Contractor and in which the MBTA has or may acquire an interest.

(b)    Contractor shall, upon termination of this Agreement for any reason, including expiration of its Term as the same may be extended from time to time, cooperate with the MBTA in the transition to a future provider of Agreement Services.

40.7    **Settlement of Claims.**    Except as otherwise provided, settlement of claims by Contractor under this termination clause shall be in accordance with the provisions set forth in 48 C.F.R. Part 49, as amended from time to time.

## SECTION 41.  TRANSITION PROCESS.

41.1    **In General.**    The MBTA may be required to conduct a Request For Proposals ("RFP") process prior to the expiration or termination of this Agreement to select a contractor with which MBTA will enter into a new services contract ("Successor Contractor") to provide the Agreement Services commencing upon the expiration of this Agreement.  Although Contractor might be the Successor Contractor, the MBTA requires that prospective proposers other than Contractor be provided with the information necessary to prepare complete and competitive bids.  To this end, Contractor shall fully cooperate with the MBTA and the

prospective Successor Contractor(s) that are participating in the RFP process in accordance with this Section.

   41.2    **Third Party Review of Documents.**  Contractor shall make available to prospective Successor Contractors for review at the Service Property and/or the MBTA's offices, copies of such documents and records as the MBTA shall request, provided that such documents relate to the performance of the Agreement Services.  Contractor shall not be required to provide documents relating to the financial relationship or financial transactions between Contractor and its parent companies.  The MBTA shall reimburse Contractor as Force Account Work for the reasonable reproduction costs incurred in connection with this Section provided that Contractor has given MBTA prior written notice of the estimated costs and the MBTA has issued written approval for such costs.  Contractor shall invoice the MBTA for these costs as Force Account Work.

   41.3    **Third Party Inspections of the Service Property.**  Prospective Successor Contractor(s) shall have access to the Service Property, Service Equipment, and Support Property during the RFP process for the purposes of inspecting same so as to understand, without limitation, the operation, maintenance, repair and condition of the Service Property, Service Equipment, and Support Property.  The MBTA shall schedule and conduct the site visits by the Successor Contractor(s) of the Service Property, Service Equipment, and Support Property after consulting with Contractor.  Contractor shall fully cooperate with the MBTA during such site visits and shall make available such personnel and records as the MBTA requests.  Contractor shall permit prospective Successor Contractors to question such Contractor Personnel about the Service Property, Service Equipment, and Support Property, and to examine such records.  Services under this Section are included in the Annual Fixed Price.  The MBTA reserves the right to direct Contractor to conduct the site visits as an additional cost to be invoiced as Force Account Work.

   41.4    **Transition Plan.**  The following obligations apply in the event that Contractor is not selected as the Successor Contractor:

       (a)    **Successor Contractor Access.**  Contractor shall provide the Successor Contractor full and complete access to the Service Property, Service Equipment, and Support Property in accordance with this Agreement.  Such access shall commence six (6) months prior to the expiration or termination of this Agreement in conjunction with the Successor Contractor's mobilization period, and may include, without limitation, the Successor Contractor having one or more representatives on-site until the expiration or termination of this Agreement.

       (b)    **Employment of Existing Personnel.**  Contractor shall provide a list, and resumes, if available, to the MBTA and the Successor Contractor at least six (6) months prior to the expiration or termination of this Agreement.  Contractor shall allow the Successor Contractor to interview any Contractor Personnel for employment purposes.  Contractor agrees that the Successor Contractor has the right to offer employment to any of Contractor Personnel that are on the list prior to the expiration or termination of this Agreement.

41.5.   **Turnover Requirements.**

(a)   **Operation & Maintenance Records, Manuals, Information Systems and Drawings.**  A minimum of six (6) months prior to the expiration of this Agreement, or, in the event of termination pursuant to Section 40 of this Agreement, within thirty (30) days of the MBTA's notification to Contractor of its intent to terminate the Agreement, Contractor shall provide to the MBTA a complete and accurate inventory of all categories of documents related to the Agreement Services including but not limited to drawings, specifications, calculations, manuals, procedures, reports, databases, and the like.

(b)   **Support Inventory, Spare Parts and Consumables.**  Upon termination or expiration of this Agreement, Contractor shall remit to the MBTA all Support Inventory, spare parts, and consumables related to the Agreement Services.  The Support Inventory, spare parts and consumables shall be in Good Working Condition.  Prior to the termination or expiration of this Agreement, Contractor shall move to MBTA-owned Service Property and store in a secure manner all Support Inventory, spare parts and consumables, if any, that are not located on the Service Property prior to the expiration of this Agreement.  Contractor shall provide a list of repair and return items not located on MBTA-owned Service Property.

(c)   **Office Equipment and Supplies.**  Upon expiration or termination of this Agreement, Contractor shall remit to the MBTA all office equipment and supplies maintained on the Service Property and used in performing the Agreement Services.  The office equipment shall be in Good Working Condition.

(d)   **Service Property, Service Equipment, and Support Property.**  Upon expiration or termination of this Agreement, Contractor shall transfer possession of the Service Property, Service Equipment and Support Property to the MBTA in Good Working Condition.  Upon the expiration or termination of this Agreement, Contractor shall return to the MBTA Support Property that is equivalent in type, value, and condition to the Support Property provided to Contractor by the MBTA under this Agreement, as adjusted by sales or acquisitions pursuant to the Agreement.  Contractor shall pay to the MBTA the fair market value, as determined by the MBTA, of any Support Property not returned to the MBTA in accordance with this paragraph.  The MBTA shall accept the entire inventory and reimburse Contractor for any reasonable increase in the inventory size relative to the limited physical inventory or amount in excess of the Support Property held by the MBTA as of the date of the Initial Joint Audit, as adjusted during the Term of this Agreement pursuant to Section 9.3.  Any Support Property that the MBTA in its discretion determines is in excess of any such reasonable increase in Support Inventory shall become the property of Contractor and shall not be compensated by the MBTA.  Contractor shall compensate MBTA for any decrease in inventory size relative to the initial physical inventory, as adjusted during the Term of the Agreement pursuant to Section 9.3.

(e)   **Permits.**  All of the existing permits for providing the Agreement Services shall be transferred to the Successor Contractor as of the date such contractor begins providing Agreement Services.

41.6    **Agreement Close-Out Requirements of Final Inspection/Review.**  The MBTA may conduct an inspection to determine the status of the requirements for close-out.  Within thirty (30) days of such inspection, the MBTA shall deliver in writing to Contractor a list of items where deficiencies were found ("Punch List").  Contractor shall correct such deficiencies within thirty (30) days of receipt of the Punch List.  The MBTA may exercise its rights under Contractor's Performance Bond if it determines that Contractor has not complied with the provisions of this Section.

## SECTION 42.  FORCE MAJEURE.

42.1    **General.**  Each Party will be excused from performance of any of its obligations to the other under this Agreement, where such non-performance is caused by any event beyond the non-performing Party's control which shall include, without limitation, any order, rule, or regulation of any federal, state, or local government body, agency, or instrumentality (other than orders relating to the correction by Contractor of its non-compliance with applicable laws and regulations applicable to the performance of the Agreement Services); natural disaster; or civil disorder, provided, however, that the Party excused hereunder shall use all reasonable efforts to minimize its non-performance and to overcome, remedy, or remove such event in the shortest practical time.  Contractor shall use all reasonable efforts to undertake and complete the repair, restoration, or replacement of any property which is necessary for the provision of Agreement Services in accordance with established train schedules, and shall resume normal Agreement Services and performance of its other obligations under this Agreement as soon as reasonably possible.  In the event either Party fails or refuses to use all reasonable efforts as aforesaid, the continuation of an event beyond the control of such Party shall not be deemed an excuse for non-performance hereunder.

42.2    **Labor Disputes.**  A strike, work stoppage or other labor dispute shall not constitute an event beyond Contractor's control if the Contractor fails as soon as reasonably possible to proceed to obtain an order of a court or administrative agency of competent jurisdiction to prevent the continuation of the same or if Contractor fails to continue to obtain such order or pursue other means of ending such strike, work stoppage or labor dispute if the court or administrative agency initially denies Contractor's or the MBTA's request for such order.

42.3    **Weather Conditions not Force Majeure Events.**  Conditions caused by a storm or other weather condition shall not constitute an event beyond the Parties' control for the purposes of this section.  The obligations of the Parties in the event of a winter storm shall be in accordance with the provisions of the Engineering Scope of Services, Exhibit 3.

42.4    **Excluded Events.**  The events described in paragraphs 42.1 and 42.2 above shall not constitute force majeure events if Contractor knew or should have known about the event or the reasonable possibility of such event in advance of its occurrence, and failed to take preventative or remedial measures to avoid or lessen the impact of such events.

**SECTION 43.  REPLACEMENT SERVICES.**

43.1    **General.**  If Contractor is excused from performing its obligations under this Agreement for any of the reasons listed in Section 40, or in the event of any interruption of commuter rail service resulting from a breach by Contractor of any of its obligations hereunder or any labor disputes involving Contractor Personnel, the MBTA may provide notice to Contractor of its intent to begin providing the Agreement Services, and may provide those services itself with its own or other personnel without liability to Contractor ("Replacement Services").  The MBTA may utilize Replacement Services as a substitute for all or any part of the Agreement Services that Contractor is prevented from performing by virtue of a force majeure event as described in Section 42 or fails or refuses to perform in breach of any provision of this Agreement, and may maintain such Replacement Services in effect until the Contractor is able to resume performance of the Agreement Services in full compliance with this Agreement. In the event that Replacement Services are implemented due to a breach of this Agreement, Contractor shall be liable to the MBTA for the costs of such services.  The MBTA shall notify Contractor in writing at least twenty-four (24) hours prior to implementing Replacement Services.

43.2    **Coordination with Contractor's Personnel.**  In the event the MBTA elects to provide Replacement Services, it shall take such steps as may be reasonably necessary in order to coordinate the activities of its subcontractors and in-house personnel with the activities of the Contractor Personnel.

43.3    **Pro Rata Reduction in Annual Fixed Price.**  During the period in which the MBTA utilizes Replacement Services, Contractor shall be entitled to compensation only for Agreement Services that it actually provides, and the Annual Fixed Price for any month in which the MBTA utilizes Replacement Services shall be reduced on a pro rata basis to reflect that percentage of the total Agreement Services performed as Replacement Services.  The MBTA shall determine the pro rata share of Agreement Services actually performed, and shall submit such determination to Contractor.  In the event that Contractor disputes the MBTA's determination, the Parties shall resolve such dispute according to the procedures detailed in Section 35.

**SECTION 44.  COORDINATION WITH OTHER RAIL CARRIERS.**

44.1    **Coordination with Amtrak.**

(a)    Contractor acknowledges that the MBTA and Amtrak have entered into or will enter into an Agreement for Use and Maintenance of the MBTA Attleboro Line (the "Attleboro Agreement"), attached as Exhibit 28.  Contractor agrees that it shall perform the Agreement Services in a manner consistent with the Attleboro Agreement.

(b)    Contractor acknowledges that Amtrak intercity dispatching and management staff may be stationed in CETC to dispatch trains operating on the Attleboro Line and trains operating on Amtrak lines in Rhode Island, Connecticut and Western Massachusetts controlled by the CETC facility.

        (c)     Contractor shall directly coordinate with Amtrak intercity staff as necessary to operate and protect MBTA and Amtrak services.  Amtrak intercity staff and Contractor senior management shall be prepared and available to meet daily at the CETC dispatching office to discuss matters of mutual interest in the previous days operation, and to plan operations for the current and subsequent days, and MBTA may attend such meetings at its discretion.  Amtrak intercity staff and Contractor shall meet at least once every thirty (30) days to discuss operations over the last month and plan for ongoing and future projects and issues requiring coordination, and MBTA may attend such meetings at its discretion.

        44.2   **Coordination with Other Rail Carriers.**  Contractor agrees that it will comply and cooperate with all agreements between the MBTA and other rail carriers operating on the Service Property.  The MBTA shall consult with Contractor before amending any existing agreements with other rail carriers or entering into new agreements when such amendments or new agreements would have a material impact on Contractor's performance of Agreement Services.  In the event that such amendments or new agreements directly increase Contractor's costs of providing the Agreement Services, the MBTA shall compensate Contractor for its increased costs associated with such amendments or new agreements through a Service Change.

## SECTION 45.  PICKETING.

        Contractor shall use all reasonable, legal and practicable means to (i) ensure that all collective bargaining agreements between Contractor and representatives of its employees and those of subcontractors and related companies include provisions prohibiting strikes or other work stoppages, (ii) enforce such provisions, and (iii) promptly obtain judicial or administrative relief in the event of any strike or work stoppage, whether or not in violation of the terms of any collective bargaining agreement.   If employees of Contractor, its subcontractors, or related companies picket or otherwise disrupt facilities of the MBTA in connection with a labor dispute between such employees and Contractor, and if Contractor, at the written request of the MBTA, is unable to terminate the picketing or disruption within six (6) hours of receiving such written request, Contractor shall reimburse the MBTA for legal and related expenses incurred by the MBTA in its efforts to terminate such picketing or disruption.

## SECTION 46.  AMENDMENTS AND REVISED EXHIBITS.

        This Agreement, including the Scope of Services and all other Exhibits and Appendices hereto and thereto may be amended by written agreement of the Parties from time to time during the Term of this Agreement.  All amendments shall be numbered in ordinal sequence and titled accordingly.

## SECTION 47.  ASSIGNMENT.

        Contractor's rights, duties and obligations under this Agreement may not be assigned, transferred, or delegated without the prior written approval of the MBTA.  If Contractor makes any such assignment, pledge or other such transfer without the prior written consent of the MBTA, this Agreement shall be voidable, at the election of the MBTA.  Contractor shall at all

times remain liable for the performance of its obligations hereunder notwithstanding its use of employees, agents, consultants, suppliers, contractors, and subcontractors to perform the same, with or without the approval of the MBTA in any instance.

**SECTION 48.  SUCCESSORS AND ASSIGNS.**

This Agreement shall be binding upon, and inure to the benefit of any authorized successors and assigns of the Parties hereto.  For this purpose, any Party hereunder entering into an agreement shall obligate any successor or assign to all the terms and conditions of this Agreement.  Any Party hereto, shall remain liable jointly and severally with any successor or assign for any breach of this Agreement which occurred, and any charges or obligations which accrued, prior to the date of the assignment notwithstanding the assumption by the successor or assign of such liabilities, charges, or obligation.

**SECTION 49.  OTHER CONTRACTOR AND THIRD PARTY ACCESS.**

49.1   **Permit to Enter.**  The MBTA shall enter into a standard "permit to enter" agreement with any Other Contractor or Third Party to enter on the Service Property.  No Other Contractor or Third Party shall be allowed to enter onto the Service Property without first executing such a permit to enter and without the MBTA or such Third Party notifying Contractor of the proposed activities of such Other Contractor or Third Party.  The MBTA may, in entering into any such agreement with such Other Contractor or Third Party, place reasonable conditions or restrictions on Other Contractors or Third Parties that exceed the normal conditions and restrictions contained in the standard permit to enter.  If the MBTA and Contractor are unable to agree upon a standard permit to enter, then the MBTA may allow Other Contractors or Third Parties access to the Service Property upon such terms and conditions as the MBTA may establish.

49.2   **Government Authorities.**  Contractor shall grant access to the Service Property, Service Equipment, or Support Property to any duly authorized government authorities. Contractor shall immediately notify an appropriate MBTA official when any state or Federal inspector, law enforcement or emergency personnel enters the Service Property.  In addition, Contractor shall provide the MBTA with copies of all reports furnished to Contractor by any regulatory agency concerning the Agreement Services, within twenty-four (24) hours of Contractor's receipt of such reports.

**SECTION 50.  NOTICE.**

All notices pursuant to this Agreement shall be in writing and shall be deemed effective: (a) on the date given if delivered by hand or by facsimile if receipt of such notice is acknowledged by the recipient on a weekday during normal business hours, or on the next succeeding weekday if not given on a weekday, (b) one weekday after delivery to a reputable overnight courier service, and (c) five days after having been deposited with the U.S. Postal Service, postage prepaid.  Notice shall be given:

to the MBTA:

Anna M. Barry
Director of Railroad Operations
MBTA
45 High Street
Boston, MA  02110

to Contractor:

James F. O'Leary
Massachusetts Bay Commuter Railroad Company
148 State Street, Suite 1100
Boston, MA  02109

## SECTION 51.  MISCELLANEOUS.

51.1     **No Waiver.**  No failure on the part of either Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  A waiver of any right or remedy on any one occasion shall not constitute a bar to the exercise or waiver of any such right or remedy on any future occasion. The remedies of the Parties provided herein are cumulative and not exclusive of any remedies provided for by law.

51.2     **Survival.**  The indemnification obligations of Contractor and the MBTA hereunder and all other obligations that arise but which are not satisfied during the Term of this Agreement shall survive the satisfaction of Contractor's obligation to perform the Agreement Services and the termination or expiration of this Agreement.

51.3     **Severability.**  If any term, condition, provision, paragraph, exhibit or amendment hereof shall be held to be invalid, illegal or unenforceable, or shall be held to be pre-empted by federal law or regulation, then, at the option of the MBTA, the remaining terms, conditions, provisions, paragraphs, exhibits or amendments hereof shall remain in full force and effect and their enforceability shall not be impaired by any such invalidity, illegality, unenforceability or pre-emption and the remaining provisions hereof shall nevertheless be binding with the same effect as if the invalid, illegal, pre-empted or unenforceable term, condition, provision, paragraph, exhibit or amendment was not contained therein.

51.4     **No Third Party Beneficiaries.**  Nothing in this Agreement shall be deemed to create any right in any person not a Party hereto other than permitted successors and assigns of a Party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of a Third Party except as aforesaid.

51.5     **No Individual Liability.**  No recourse shall be had by either Party for any claim against any officer, director, stockholder, employee or agent of any other Party alleging personal

liability on the part of such person with respect to performance of the MBTA's or Contractor's obligations under this Agreement.

51.6   **Performance During Disputes.**  During the pendency of any dispute between the Parties, the business and the operations to be conducted under this Agreement, to the extent that they are the subject of any such dispute, shall continue to be transacted and used in the manner and form existing prior to the arising of any such controversy.

51.7   **No Benefit to Elected Officials.**  The Parties agree that no member of or delegate to the Congress of the United States shall be admitted to any share or part of this Contract or to any benefit arising therefrom.  The Parties agree that no member, officer, or employee of the MBTA, the EOTC, or any state or local public body of any city or town within the MBTA's service area, as the same may be expanded from time to time, during his or her tenure shall have any interest direct or indirect, in this Agreement or the proceeds thereof.  Contractor hereby certifies that it is not on the U.S. Comptroller General's consolidated list of persons or firms currently debarred for violations of various public contracts incorporating labor standard provisions.

IN WITNESS WHEREOF, the MBTA and Contractor have executed this Agreement on the date above first written.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY


By: _____

Approved as to Form:


By: _____

MASSACHUSETTS BAY COMMUTER RAILROAD COMPANY, LLC


By: _____



MBCR

## Daily Ridership
### Trip Date Tuesday 07/01/2003

### Western Route Main Line

#### Inward

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| 266 | 07/01/2003 | On Time | 09:58 AM | | | 560 | 126 | | | |
| 218 | 07/01/2003 | On Time | 10:23 AM | | | 674 | 265 | | | |
| 274 | 07/01/2003 | On Time | 02:58 PM | | | 594 | 31 | | | |
| 238 | 07/01/2003 | On Time | 08:23 PM | | | 560 | 50 | | | |
| 282 | 07/01/2003 | On Time | 05:32 PM | | | 721 | 55 | | | |
| 244 | 07/01/2003 | On Time | 11:30 PM | | | 599 | 48 | | | |
| 206 | 07/01/2003 | On Time | 06:30 AM | | | 721 | 647 | | | |
| 204 | 07/01/2003 | On Time | 06:05 PM | | | 599 | 488 | | | |
| 258 | 07/01/2003 | On Time | 07:38 AM | | | 599 | 501 | | | |
| 262 | 07/01/2003 | On Time | 08:36 AM | | | 721 | 120 | | | |
| 214 | 07/01/2003 | On Time | 08:43 AM | | | 599 | 225 | | | |
| 220 | 07/01/2003 | On Time | 12:03 PM | | | 599 | 294 | | | |
| 226 | 07/01/2003 | Late | 02:48 PM | 6 | | 599 | 300 | | | |
| 280 | 07/01/2003 | On Time | 04:30 PM | | | 716 | 36 | | | |
| 288 | 07/01/2003 | On Time | 07:50 PM | | | 560 | 11 | | | |
| 292 | 07/01/2003 | On Time | 10:14 PM | | | 716 | 3 | | | |
| 202 | 07/01/2003 | On Time | 05:31 AM | | | 599 | 458 | | | |
| 212 | 07/01/2003 | On Time | 07:25 AM | | | 674 | 763 | | | |
| 222 | 07/01/2003 | On Time | 01:16 PM | | | 594 | 66 | | | |
| 284 | 07/01/2003 | On Time | 06:13 PM | | | 560 | 20 | | | |
| **Inward Totals** | | | | 6 | 0 | 12564 | 4507 | 0 | 0 | 0 |

#### Outward

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| 215 | 07/01/2003 | On Time | 12:20 PM | | | 594 | 66 | | | |
| 217 | 07/01/2003 | On Time | 01:20 PM | | | 599 | 255 | | | |
| 269 | 07/01/2003 | On Time | 02:20 PM | | | 594 | 101 | | | |
| 281 | 07/01/2003 | On Time | 05:30 PM | | | 560 | 500 | | | |
| 245 | 07/01/2003 | On Time | 11:59 PM | | | 594 | 131 | | | |

*Selection Criteria: Division = Northern Division, Route = Western Route Main Line, Route = Western Route Via Wildcat*

*Printed on 06/17/2008*



*Page 2*

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Western Route Main Line** | | | | | | | | | | |
| *Outward* | | | | | | | | | | |
| 291 | 07/01/2003 | On Time | 09:35 PM | | | 716 | 21 | | | |
| 233 | 07/01/2003 | On Time | 05:52 PM | 5 | | 721 | 496 | | | |
| 235 | 07/01/2003 | On Time | 06:15 PM | | | 721 | 594 | | | |
| 231 | 07/01/2003 | On Time | 05:15 PM | | | 674 | 875 | | | |
| 243 | 07/01/2003 | On Time | 10:52 PM | | | 560 | 130 | | | |
| 257 | 07/01/2003 | On Time | 07:55 AM | | | 721 | 92 | | | |
| 209 | 07/01/2003 | On Time | 08:55 AM | | | 674 | 49 | | | |
| 261 | 07/01/2003 | On Time | 09:15 AM | | | 560 | 40 | | | |
| 213 | 07/01/2003 | On Time | 10:35 AM | | | 599 | 148 | | | |
| 223 | 07/01/2003 | On Time | 03:00 PM | | | 711 | 180 | | | |
| 275 | 07/01/2003 | On Time | 03:50 PM | | | 716 | 184 | | | |
| 227 | 07/01/2003 | On Time | 04:25 PM | | | 584 | 580 | | | |
| 279 | 07/01/2003 | On Time | 04:50 PM | | | 721 | 402 | | | |
| 287 | 07/01/2003 | On Time | 07:10 PM | | | 560 | 220 | | | |
| 239 | 07/01/2003 | On Time | 08:32 PM | 5 | | 599 | 290 | | | |
| 253 | 07/01/2003 | On Time | 07:00 AM | | | 599 | 114 | | | |
| | | | **Outward Totals** | 10 | 0 | 13377 | 5468 | 0 | 0 | 0 |
| | | | **Western Route Main Line Totals** | 16 | 0 | 25941 | 9975 | 0 | 0 | 0 |

*Selection Criteria: Division = Northern Division, Route = Western Route Main Line, Route = Western Route Via Wildcat*

*Printed on 06/17/2008*

## Daily Ridership
### Trip Date Tuesday 07/01/2003



**Western Route Via Wildcat**

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inward** | | | | | | | | | | |
| 236 | 07/01/2003 | On Time | 06:00 PM | | | 584 | 140 | | | |
| 208 | 07/01/2003 | On Time | 06:55 AM | | | 726 | 598 | | | |
| 232 | 07/01/2003 | On Time | 04:30 PM | | | 711 | 185 | | | |
| 3702 | 07/01/2003 | On Time | 01:20 AM | | | 599 | | | | |
| **Inward Totals** | | | | 0 | 0 | 2620 | 923 | 0 | 0 | 0 |
| **Outward** | | | | | | | | | | |
| 3701 | 07/01/2003 | On Time | 04:00 AM | | | 599 | 220 | | | |
| 237 | 07/01/2003 | Late | 06:55 PM | 9 | | 560 | 86 | | | |
| 205 | 07/01/2003 | On Time | 07:19 AM | 5 | | 599 | | | | |
| **Outward Totals** | | | | 14 | 0 | 1758 | 306 | 0 | 0 | 0 |
| **Western Route Via Wildcat Totals** | | | | 14 | 0 | 4378 | 1229 | 0 | 0 | 0 |
| **Grand Total** | | | | 30 | 0 | 30319 | 11204 | 0 | 0 | 0 |



MBCR

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Eastern Route Main Line** | | | | | | | | | | |
| **Inward** | | | | | | | | | | |
| 154 | 07/01/2003 | On Time | 05:55 AM | | | 594 | 480 | | | |
| 64 | 07/01/2003 | On Time | 09:10 AM | | | 716 | 226 | | | |
| 68 | 07/01/2003 | On Time | 05:40 PM | | | 594 | 39 | | | |
| 152 | 07/01/2003 | Late | 05:27 AM | 7 | | 560 | 500 | | | |
| 158 | 07/01/2003 | On Time | 07:00 AM | | | 716 | 727 | | | |
| 162 | 07/01/2003 | On Time | 07:55 AM | | | 594 | 494 | | | |
| 164 | 07/01/2003 | On Time | 09:36 AM | | | 716 | 210 | | | |
| 168 | 07/01/2003 | On Time | 11:06 AM | | | 594 | 270 | | | |
| 172 | 07/01/2003 | On Time | 01:06 PM | | | 594 | 230 | | | |
| 176 | 07/01/2003 | Late | 02:48 PM | 9 | | 642 | 150 | | | |
| 178 | 07/01/2003 | Late | 04:35 PM | 6 | | 721 | 325 | | | |
| 182 | 07/01/2003 | On Time | 05:46 PM | 3 | | 594 | 110 | | | |
| 186 | 07/01/2003 | On Time | 08:39 PM | | | 584 | 49 | | | |
| 198 | 07/01/2003 | On Time | 07:37 AM | | | 560 | 402 | | | |
| 62 | 07/01/2003 | Late | 08:10 AM | 10 | | 594 | 350 | | | |
| 98 | 07/01/2003 | On Time | 10:45 AM | 2 | | 589 | 8 | | | |
| 156 | 07/01/2003 | On Time | 06:30 AM | | | 716 | 684 | | | |
| 72 | 07/01/2003 | Annulled | | | | | 51 | | | |
| 66 | 07/01/2003 | Late | 04:25 PM | 6 | | 674 | 56 | | | |
| | | | **Inward Totals** | **43** | **0** | **11352** | **5361** | **0** | **0** | **0** |
| **Outward** | | | | | | | | | | |
| 67 | 07/01/2003 | On Time | 04:45 PM | | | 594 | 221 | | | |
| 185 | 07/01/2003 | On Time | 06:45 PM | | | 599 | 546 | | | |
| 187 | 07/01/2003 | On Time | 07:30 PM | | | 584 | 251 | | | |
| 151 | 07/01/2003 | On Time | 06:30 AM | | | 594 | 12 | | | |
| 61 | 07/01/2003 | On Time | 07:15 AM | | | 594 | 67 | | | |
| 153 | 07/01/2003 | On Time | 08:05 AM | | | 716 | 206 | | | |

*Selection Criteria: Division = Northern Division, Route = Eastern Route Main Line*

*Printed on 06/17/2008*



MBCR

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Eastern Route Main Line** | | | | | | | | | | |
| *Outward* | | | | | | | | | | |
| 165 | 07/01/2003 | On Time | 11:15 AM | | | 594 | 118 | | | |
| 169 | 07/01/2003 | Late | 01:15 PM | 41 | | 594 | 200 | | | |
| 175 | 07/01/2003 | On Time | 03:15 PM | | | 721 | 323 | | | |
| 177 | 07/01/2003 | Late | 04:30 PM | 10 | | 594 | 610 | | | |
| 181 | 07/01/2003 | Late | 05:10 PM | 6 | | 674 | 562 | | | |
| 161 | 07/01/2003 | On Time | 09:45 AM | | | 594 | 77 | | | |
| 97 | 07/01/2003 | On Time | 11:30 PM | | | 589 | 40 | | | |
| 65 | 07/01/2003 | On Time | 03:30 PM | | | 674 | 125 | | | |
| 63 | 07/01/2003 | On Time | 08:20 AM | | | 716 | 18 | | | |
| 189 | 07/01/2003 | On Time | 09:30 PM | 4 | | 589 | 302 | | | |
| 183 | 07/01/2003 | On Time | 05:37 PM | | | 788 | 714 | | | |
| 69 | 07/01/2003 | Annulled | : | | | | 533 | | | |
| 191 | 07/01/2003 | On Time | 06:44 AM | | | 560 | 62 | | | |
| | | | **Outward Totals** | 61 | 0 | 11368 | 4987 | 0 | 0 | 0 |
| | | | **Eastern Route Main Line Totals** | 104 | 0 | 22720 | 10348 | 0 | 0 | 0 |
| | | | **Grand Total** | 104 | 0 | 22720 | 10348 | 0 | 0 | 0 |

*Selection Criteria: Division = Northern Division, Route = Eastern Route Main Line*

*Printed on 06/17/2008*



MBCR

*Page 1*

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fitchburg Main Line** | | | | | | | | | | |
| *Inward* | | | | | | | | | | |
| 422 | 07/01/2003 | On Time | 01:05 PM | | | 711 | 149 | | | |
| 424 | 07/01/2003 | On Time | 03:05 PM | | | 726 | 170 | | | |
| 466 | 07/01/2003 | Late | 04:55 PM | 34 | | 599 | 135 | | | |
| 468 | 07/01/2003 | On Time | 05:07 PM | | | 594 | 149 | | | |
| 472 | 07/01/2003 | On Time | 06:40 PM | | | 584 | 317 | | | |
| 434 | 07/01/2003 | On Time | 07:00 PM | | | 716 | 41 | | | |
| 404 | 07/01/2003 | On Time | 05:45 AM | | | 642 | 525 | | | |
| 408 | 07/01/2003 | On Time | 06:20 AM | | | 721 | 684 | | | |
| 410 | 07/01/2003 | On Time | 06:55 AM | | | 674 | 796 | | | |
| 412 | 07/01/2003 | On Time | 07:20 AM | 1 | | 584 | 536 | | | |
| 454 | 07/01/2003 | On Time | 08:41 AM | 3 | | 599 | 325 | | | |
| 456 | 07/01/2003 | On Time | 09:25 AM | | | 726 | 89 | | | |
| 418 | 07/01/2003 | On Time | 10:27 AM | 3 | | 599 | 397 | | | |
| 420 | 07/01/2003 | Late | 11:24 AM | 6 | | 594 | 142 | | | |
| 436 | 07/01/2003 | On Time | 08:22 PM | | | 594 | 66 | | | |
| 438 | 07/01/2003 | On Time | 10:25 PM | | | 711 | 24 | | | |
| | | | **Inward Totals** | 47 | 0 | 10374 | 4545 | 0 | 0 | 0 |
| *Outward* | | | | | | | | | | |
| 437 | 07/01/2003 | On Time | 08:45 PM | 3 | | 711 | 113 | | | |
| 453 | 07/01/2003 | On Time | 07:27 AM | | | 599 | 95 | | | |
| 455 | 07/01/2003 | On Time | 08:17 AM | | | 726 | 151 | | | |
| 435 | 07/01/2003 | On Time | 07:35 PM | | | 560 | 169 | | | |
| 419 | 07/01/2003 | On Time | 09:40 AM | 2 | | 594 | 80 | | | |
| 421 | 07/01/2003 | On Time | 11:20 AM | 4 | | 711 | 160 | | | |
| 423 | 07/01/2003 | On Time | 01:20 PM | | | 726 | 15 | | | |
| 465 | 07/01/2003 | On Time | 03:00 PM | | | 599 | 126 | | | |
| 467 | 07/01/2003 | On Time | 04:00 PM | | | 594 | 322 | | | |

*Selection Criteria Division = Northern Division. Route = Fitchburg Main Line*

*Printed on 06/17/2008*



MBCR

**Daily Ridership**
Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fitchburg Main Line** | | | | | | | | | | |
| *Outward* | | | | | | | | | | |
| 429 | 07/01/2003 | On Time | 04:50 PM | | | 721 | 668 | | | |
| 431 | 07/01/2003 | On Time | 05:20 PM | | | 716 | 628 | | | |
| 471 | 07/01/2003 | On Time | 05:30 PM | | | 584 | 501 | | | |
| 433 | 07/01/2003 | On Time | 06:15 PM | | | 594 | 505 | | | |
| 439 | 07/01/2003 | On Time | 10:40 PM | | | 594 | 79 | | | |
| 401 | 07/01/2003 | On Time | 12:10 AM | | | 674 | 14 | | | |
| 417 | 07/01/2003 | On Time | 08:55 AM | 4 | | 599 | 248 | | | |
| | | | **Outward Totals** | 13 | 0 | 10302 | 3874 | 0 | 0 | 0 |
| | | | **Fitchburg Main Line Totals** | 60 | 0 | 20676 | 8419 | 0 | 0 | 0 |
| | | | **Grand Total** | 60 | 0 | 20676 | 8419 | 0 | 0 | 0 |

Selection Criteria: Division = Northern Division, Route = Fitchburg Main Line
Printed on 06/17/2008

Page 2

MBCR

*Page 1*

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| **Gloucester Branch** | | | | | | | | | | |
| *Inward* | | | | | | | | | | |
| 102 | 07/01/2003 | On Time | 05:08 AM | | 345 | 594 | 243 | | | |
| 106 | 07/01/2003 | On Time | 06:10 AM | | 574 | 560 | 495 | | | |
| 110 | 07/01/2003 | Late | 07:25 AM | 13 | 574 | 721 | 302 | | | |
| 114 | 07/01/2003 | On Time | 09:07 AM | 2 | 460 | 560 | 380 | | | |
| 126 | 07/01/2003 | On Time | 03:40 PM | 3 | 345 | 716 | 231 | | | |
| 142 | 07/01/2003 | On Time | 10:47 PM | | | 584 | 59 | | | |
| 94 | 07/01/2003 | On Time | 06:45 PM | | | 716 | 28 | | | |
| 130 | 07/01/2003 | On Time | 05:22 PM | 1 | 345 | 560 | 216 | | | |
| 108 | 07/01/2003 | On Time | 06:48 AM | | 805 | 584 | 770 | | | |
| 116 | 07/01/2003 | Late | 10:00 AM | 7 | 345 | 788 | 340 | | | |
| 120 | 07/01/2003 | On Time | 12:00 PM | 3 | 345 | 599 | 287 | | | |
| 124 | 07/01/2003 | Late | 02:00 PM | 6 | 345 | 716 | 166 | | | |
| 136 | 07/01/2003 | On Time | 07:40 PM | | | 589 | 154 | | | |
| | | | **Inward Totals** | 35 | 4483 | 8287 | 3671 | 0 | 0 | 0 |
| *Outward* | | | | | | | | | | |
| 113 | 07/01/2003 | On Time | 10:15 AM | | | 599 | 213 | | | |
| 117 | 07/01/2003 | On Time | 12:15 PM | | | 716 | 405 | | | |
| 125 | 07/01/2003 | On Time | 02:15 PM | | | 716 | 302 | | | |
| 137 | 07/01/2003 | On Time | 08:00 PM | | | 584 | 201 | | | |
| 143 | 07/01/2003 | On Time | 10:40 PM | | | 584 | 136 | | | |
| 109 | 07/01/2003 | On Time | 08:30 AM | | | 788 | 135 | | | |
| 127 | 07/01/2003 | On Time | 04:00 PM | | | 560 | 401 | | | |
| 129 | 07/01/2003 | On Time | 05:00 PM | | | 642 | 500 | | | |
| 131 | 07/01/2003 | On Time | 05:25 PM | | | 716 | 703 | | | |
| 133 | 07/01/2003 | On Time | 06:10 PM | | | 589 | 500 | | | |
| 95 | 07/01/2003 | On Time | 07:31 PM | | | 716 | 74 | | | |
| 103 | 07/01/2003 | On Time | 07:35 AM | | | 560 | 115 | | | |



*Selection Criteria: Division = Northern Division, Route = Gloucester Branch*

*Printed on 06/17/2008*



MBCR

## Daily Ridership
### Trip Date Tuesday 07/01/2003

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---------|------|--------|-----------|-----------|---------------|---------------|------------|----------|-------|----------|
| **Gloucester Branch** | | | | | | | | | | |
| *Outward* | | | | | | | | | | |
| 145 | 07/01/2003 | On Time | 12:10 AM | 0 | | 594 | 101 | | | |
| | | | *Outward Totals* | 0 | | 8364 | 3786 | 0 | 0 | 0 |
| | | | *Gloucester Branch Totals* | 35 | 4483 | 16651 | 7457 | 0 | 0 | 0 |
| | | | *Grand Total* | 35 | 4483 | 16651 | 7457 | 0 | 0 | 0 |

Selection Criteria: Division = Northern Division, Route = Gloucester Branch

Printed on 06/17/2008



MBCR

## Daily Ridership
### Trip Date Tuesday 07/01/2003

### New Hampshire Main Line

**Inward**

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| 338 | 07/01/2003 | On Time | 07:25 PM | | | 594 | 26 | | | |
| 302 | 07/01/2003 | On Time | 05:35 AM | | | 594 | 400 | | | |
| 334 | 07/01/2003 | On Time | 05:45 PM | | | 599 | 117 | | | |
| 342 | 07/01/2003 | On Time | 09:30 PM | | | 560 | 33 | | | |
| 304 | 07/01/2003 | On Time | 06:20 AM | | | 599 | 520 | | | |
| 326 | 07/01/2003 | On Time | 03:10 PM | | | 721 | 89 | | | |
| 328 | 07/01/2003 | On Time | 04:15 PM | 4 | | 788 | 288 | | | |
| 336 | 07/01/2003 | On Time | 06:25 PM | | | 726 | 48 | | | |
| 312 | 07/01/2003 | On Time | 08:25 AM | | | 642 | 545 | | | |
| 316 | 07/01/2003 | On Time | 10:07 AM | | | 594 | 115 | | | |
| 318 | 07/01/2003 | On Time | 11:07 AM | | | 589 | 500 | | | |
| 320 | 07/01/2003 | On Time | 12:07 PM | | | 726 | 86 | | | |
| 322 | 07/01/2003 | On Time | 01:07 PM | | | 716 | 89 | | | |
| 324 | 07/01/2003 | On Time | 02:07 PM | | | 589 | 141 | | | |
| 330 | 07/01/2003 | On Time | 05:10 PM | | | 589 | 204 | | | |
| 344 | 07/01/2003 | On Time | 10:35 PM | | | 594 | 17 | | | |
| 306 | 07/01/2003 | On Time | 06:50 AM | | | 711 | 725 | | | |
| 308 | 07/01/2003 | On Time | 07:22 AM | | | 788 | 870 | | | |
| 310 | 07/01/2003 | On Time | 07:50 AM | | | 594 | 597 | | | |
| 340 | 07/01/2003 | On Time | 08:30 PM | | | 726 | 51 | | | |
| 3802 | 07/01/2003 | On Time | 06:43 PM | | | 788 | | | | |
| 3804 | 07/01/2003 | On Time | 11:34 PM | | | 726 | | | | |
| 3806 | 07/01/2003 | On Time | 12:53 AM | | | 594 | | | | |
| 314 | 07/01/2003 | On Time | 09:07 AM | | | 711 | 325 | | | |
| **Inward Totals** | | | | 4 | 0 | 15858 | 5786 | 0 | 0 | 0 |

**Outward**

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| 333 | 07/01/2003 | On Time | 05:45 PM | | | 788 | 783 | | | |

Selection Criteria: Division = Northern Division. Route = New Hampshire Main Line
Printed on 06/17/2008

## Daily Ridership
### Trip Date Tuesday 07/01/2003

**New Hampshire Main Line**

**Outward**

| Train # | Date | Status | Departure | Mins Late | Req. Capacity | Act. Capacity | Passengers | Disabled | Bikes | Standees |
|---|---|---|---|---|---|---|---|---|---|---|
| 3805 | 07/01/2003 | On Time | 06:35 AM | | | 788 | | | | |
| 311 | 07/01/2003 | On Time | 09:10 AM | | | 594 | 111 | | | |
| 315 | 07/01/2003 | On Time | 10:10 AM | | | 589 | 100 | | | |
| 319 | 07/01/2003 | On Time | 12:10 PM | 2 | | 716 | 138 | | | |
| 325 | 07/01/2003 | On Time | 03:10 PM | | | 788 | 312 | | | |
| 329 | 07/01/2003 | On Time | 04:40 PM | | | 599 | 525 | | | |
| 331 | 07/01/2003 | On Time | 05:10 PM | | | 726 | 720 | | | |
| 337 | 07/01/2003 | On Time | 07:30 PM | | | 726 | 279 | | | |
| 343 | 07/01/2003 | On Time | 10:40 PM | | | 726 | 100 | | | |
| 345 | 07/01/2003 | On Time | 11:59 PM | | | 599 | 105 | | | |
| 317 | 07/01/2003 | On Time | 11:10 AM | | | 726 | 67 | | | |
| 321 | 07/01/2003 | On Time | 01:10 PM | | | 589 | 156 | | | |
| 323 | 07/01/2003 | On Time | 02:10 PM | | | 721 | 168 | | | |
| 327 | 07/01/2003 | On Time | 04:10 PM | | | 589 | 558 | | | |
| 339 | 07/01/2003 | On Time | 08:30 PM | | | 560 | 230 | | | |
| 341 | 07/01/2003 | On Time | 09:40 PM | | | | 271 | | | |
| 3801 | 07/01/2003 | On Time | 04:40 AM | | | 594 | | | | |
| 3803 | 07/01/2003 | On Time | 05:25 AM | | | 599 | | | | |
| 307 | 07/01/2003 | On Time | 07:27 AM | | | 642 | 165 | | | |
| 335 | 07/01/2003 | On Time | 06:25 PM | | | 594 | 485 | | | |
| 301 | 07/01/2003 | On Time | 05:45 AM | | | 711 | 421 | | | |
| 305 | 07/01/2003 | On Time | 06:35 AM | | | 594 | 30 | | | |
| 309 | 07/01/2003 | On Time | 08:05 AM | | | 711 | 87 | | | |
| | | | **Outward Totals** | 2 | 0 | 15269 | 5811 | 0 | 0 | 0 |
| | | | **New Hampshire Main Line Totals** | 6 | 0 | 31127 | 11597 | 0 | 0 | 0 |



Selection Criteria : Division = Northern Division, Route = New Hampshire Main Line

Printed on 06/17/2008

1

Exhibits:    2
Volume:      II
Pages:       77

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11430-PBS

JOSEPH T. CARMACK,
                    Plaintiff,

vs.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
and MASSACHUSETTS BAY COMMUTER RAILROAD
COMPANY,
                    Defendants.

ORIGINAL

DAY 2 - CONTINUED DEPOSITION OF JOSEPH T.

CARMACK, taken pursuant to Notice under the applicable

provisions of the Federal Rules of Civil Procedure on

behalf of the Defendant, Massachusetts Bay

Transportation Authority, before Karen-Marie Fahey, PVR

and Notary Public, in and for the Commonwealth of

Massachusetts, at Smith & Duggan LLP, Two Center Plaza,

Boston, Massachusetts, 02108, on Tuesday, April 29,

2008, commencing at 3:45 p.m.

**NEAL A. SALLOWAY - COURT REPORTERS**
**FIVE CARDIGAN ROAD**
**WEST PEABODY, MA 01960**
**781-581-3993 - 978-535-0313 - FAX  978-536-3142**

4

1              S T I P U L A T I O N S

2           It is hereby stipulated and agreed by and between

3       counsel for the respective parties that all objections,

4       except as to form, are reserved until the time of trial,

5       including motions to strike.

6           It is further stipulated and agreed that the

7       reading and signing of the deposition are not waived and

8       to be read and signed under the pains and penalties of

9       perjury.

10          It is further stipulated and agreed that the filing

11      and sealing of the deposition are waived.

12

13                      JOSEPH T. CARMACK

14          A witness called on behalf of the Defendant,

15      Massachusetts Bay Transportation Authority, having been

16      satisfactorily identified by the production of his

17      Massachusetts Identification Card (S00317760) and duly

18      sworn, under oath, by the Court Reporter and Notary

19      Public, was examined and testified as follows:

20

21

22

23

5

1    <u>DIRECT EXAMINATION</u>

2    Q.    **(By Mr. Witherby)** Good afternoon, Mr. Carmack.

3    A.    Good afternoon.

4    Q.    I would like you to turn your attention to July 1,

5    2003.  Were you at North Station on that date?

6    A.    I did go to North Station on July 1, 2003.

7    Q.    Did you go there to speak to anyone in particular?

8    A.    No, I don't think so.  I didn't know, you know, who

9    would be there when.  I just knew that there would be

10    Brotherhood of Locomotive Engineers members there.

11    Q.    So it's fair to say you went there to speak to BLE

12    engineers?

13    A.    Yes.

14    Q.    And when did you arrive?

15    A.    I'm not sure, but I'm going to guess 3:30ish,

16    maybe.  I'm not 100 percent sure.

17    Q.    Okay.  And who did you speak with?

18    A.    A number of people.  I can't remember a lot of

19    specific names.

20    Q.    Do you remember any?

21    A.    Yes.  I think -- I remember Chuck Trotter coming

22    by; I probably spoke to him, maybe, five seconds.  Dennis

23    Hardy; he was not a BLE member.  I think I spoke with Sue

27

1    copy of the grievance that I had prepared for Mr. Lydon after

2    I had spoken with Dennis Coffey on several occasions, and --

3    I mean, it was prepared after I had spoken with Dennis Coffey

4    and after I had spoken with Christa Cuppernall.

5              I had been trying to contact Mr. O'Malley, and

6    so I may have had it with me that day and given it to Tommy.

7        Q.   On July 1?

8        A.   On July 1, 2003.  And whether or not I gave him the

9    document that you just handed to me, I'm not sure.  It -- And

10   the reason is is that he was in such a bad mood.  I just

11   didn't want to get very pushy with him, and I thought that --

12   Although now, -- Now, I think that that grievance was very

13   sloppy, it was better to do something than nothing.

14             I -- I thought that -- that he would respond

15   more -- I mean, that he -- that he would -- That's something

16   he would respond to, and that it would help him understand

17   what my position was; that I wasn't trying to get -- I wasn't

18   just leaning -- you know, being Kenney's slave as it were.

19       Q.   So on July 1, 2003, it's fair to say that you

20   brought some copies of this flyer that has been marked as

21   Exhibit No. 16 to North Station, wouldn't it?

22       A.   That's a definite yes, because I -- I prepared this

23   in, you know, like, five minutes.

33

1     A.   I think he just started walking; we started

2  talking.  He wanted to talk about what was happening to me,

3  you know, just in general and all that stuff, and he talked a

4  little bit about the -- the leaflet, though I don't think he

5  understood it.  And --

6     Q.   You handed him the leaflet?

7     A.   I think he already had it.  He might have gotten it

8  from me; I'm not sure.  But when we -- By the time we were

9  talking, he already had it.  He had already looked at it.

10     Q.   How would that have come about; were you

11  distributing leaflets to the public, generally?

12     A.   No.  He would have gotten it from another engineer,

13  or he might have gotten it from me.  I'm not sure.

14     Q.   So were you distributing the leaflets to BLE

15  engineers?

16     A.   No.  I'd give it to people who talked to me, people

17  who I knew.

18     Q.   Just --

19     A.   People who I thought might know something about it.

20     Q.   Okay.  So you weren't giving it to the general

21  public?

22     A.   No.

23     Q.   And you weren't giving it to people who you knew

34

1   worked for the carrier unless you knew them, personally, --

2       A.    Yeah.

3       Q.    -- and they knew your situation?

4       A.    Yeah.  I mean, I didn't think that anybody else

5   would be interested in it.  And not even -- A lot of them

6   wouldn't be.

7       Q.    So how many of these leaflets do you think you

8   passed out during the time you were in North Station?

9       A.    It was very few.  I know.  Maybe between 10 and 20;

10  probably closer to 10.

11      Q.    Do you have a specific memory of giving a leaflet

12  to any particular person?

13      A.    Trotter.  Trotter.  Like I said, I may have given

14  it to Dennis Hardy; he may have gotten it from somebody else.

15  I'm not sure if I gave one to Stagnone.  I assume that I did.

16  I don't remember the act.  I don't remember the act with

17  anyone.

18              And in some cases, I may have just showed it

19  to them rather than giving it to them.  So Chuck Trotter is

20  the only one that I think I, actually, gave it to because he

21  was in a hurry, and he took it.

22              Hardy may have been a case.  I think that

23  Letourneau and Morin took one because -- Yes, because Morin

47

1     A.   He said, "Hello," first.

2     Q.   He said, "Hello," and you said, "Are you an

3 engineer?"

4     A.   Yeah.  I said, "Are you an engineer?"  And I think

5 I asked him if he wanted one of the leaflets.

6     Q.   I see.  And was the reason --

7     A.   He probably said, "No."

8     Q.   You asked him if he was an engineer because you

9 wanted to give the leaflets to engineers?

10     A.   Yeah.

11     Q.   And you think he said, no, he didn't want a

12 leaflet?

13     A.   Yeah.

14     Q.   Is there anybody else that you talked with before

15 the police officer arrived?

16     A.   No specific names that I can remember right now.

17     **MR. WITHERBY:**  Okay.  Let's take a five-minute

18 break.

19     **(Break takes place at 4:52 p.m.)**

20     **(Back on the record at 4:56 p.m.)**

21     A.   Are we on the record?

22     Q.   Yes.

23     A.   Okay.  I just want to mention something.  First of

48

1   all, I'm objecting to the form of your question, was he an

2   engineer, and then when you said that I asked him, was he an

3   engineer.  I didn't -- I never said that I asked him that, I

4   don't think, or intended to say that.  What I had asked him

5   was he a BLE member, not an engineer.

6           And also, I'm not sure I called what I had in

7   my hands a leaflet.  I had a tendency to refer to these

8   things as sort of this -- most of this stuff that I had

9   addressed to union members as open letters; and I,

10  originally, intended this to be like an open letter, but

11  it's -- I mean, I -- That's -- That's just what -- the way I,

12  normally, communicate to union members, and it says, "Open

13  Letter," on it.

14      Q.   Okay.  So you -- When you're referring to Exhibit

15  16, --

16      A.   Exhibit 16, yeah.

17      Q.   -- your view of what that is is an open letter?

18      A.   Yes.

19      Q.   And when you were talking about Mr. Leavitt, you

20  asked him if he was a BLE member?

21      A.   Yes.

22      Q.   And the reason why is you wanted to give the open

23  letter to the BLE members?

49

1      A.    Yeah, yeah.  But, I mean, I was being -- I was --
2  I -- I -- I was trying to -- What's the word for it -- scope
3  him out, kind of, in terms of his attitudes towards the BLE
4  because he had, at one time, had a representation for, you
5  know, high level of union consciousness.

6            And that had -- He also had a reputation of
7  that changing, but I don't -- I think, in many ways, Mr.
8  Enigma -- I mean, Mr. Leavitt was an enigma to a lot of
9  people.

10     Q.    I'm going to hand you a document and ask if you can
11 identify that?  There may be two copies.  **(Indicating)**

12     A.    Yes.  I identify this as part of -- You know, --
13 Okay.  This is something that was prepared after 2003.  It's
14 an affidavit -- After July 1, 2003, rather, that I prepared
15 for -- to be a record of what happened, my specific memory of
16 everything that had happened.  **(Indicating)**

17            In fact, I think I had made notes.  This is
18 about the encounter with the police officer, the MBTA police
19 officer, and I was, generally, in the habit of important
20 events at the time, of writing things down.  **(Indicating)**

21            And this -- this was, probably, made -- Well,
22 obviously, it was made on July 12, but I wanted to put it
23 on -- you know, in typewritten form.  **(Indicating)**

50

1    Q.    Is that your signature on the last page?

2  (Indicating)

3    A.    That's my signature on the last page.  (Indicating)

4    Q.    Okay.  And you dated that July 12, 2003?

5  (Indicating)

6    A.    Yes.

7    Q.    And your testimony is that you, actually, signed

8  that on July 12, 2003?

9    A.    That's correct.

10        MR. WITHERBY:  Okay.  I would like to mark that as

11  Exhibit 17.

12            (Whereupon the Court Reporter marked as

13        Exhibit No. 17 - Affidavit.)

14    Q.    I'd just like to take you through some of the

15  statements in this affidavit in connection with the events

16  that took place on July 1.  Could you read out loud Paragraph

17  5 of the affidavit?

18    A.    "In May 2002, Plaintiff was terminated from

19  employment with Amtrak in his capacities as locomotive

20  engineer."

21    Q.    Is that a true statement?

22    A.    Well, again, I'm just going to talk about what my

23  view of that type of termination is.

51

1       Q.   No.  I'd just like to ask you:  Is that a true

2  statement or not; is it true or false?

3       A.   Yeah, you could say that it's true.  Yes.

4       Q.   Okay.

5       A.   Not false.  It's definitely not false.

6       Q.   Okay.  And then I'd like to turn to Paragraph 15;

7  and that says, "Plaintiff ultimately submitted a grievance

8  concerning the matter, Exhibit D."  My copy of this document

9  doesn't have any exhibits attached.

10              Now, do you have a memory of what Exhibit D

11  was?

12      A.   No, I don't.  I might have been thinking of giving

13  this to the ACLU and sent it to the ACLU with a copy of --

14  with an exhibit on it.

15      Q.   All right.  Your testimony is you sent this

16  affidavit to the ACLU?

17      A.   I'm not certain, but I might have.

18      Q.   Well, when you say you might have, what causes you

19  to think that you might have?

20      A.   Because I was communicating with the ACLU.

21      Q.   Who?

22      A.   Sarah Wunsch.

23      Q.   And when did that communication start?

# C E R T I F I C A T I O N

ORIGINAL

I, KAREN-MARIE FAHEY, PVR and Notary Public within
and for the Commonwealth of Massachusetts, duly
commissioned, qualified and authorized to administer
oaths and to take and certify depositions, do hereby
certify that heretofore, to wit, on the 29th day of
April 2008, personally appeared before me Joseph T.
Carmack, at Smith & Duggan LLP, Two Center Plaza,
Boston, Massachusetts, in the aforecaptioned cause
pending in the United States District Court, District of
Massachusetts; that the witness was by me duly sworn to
testify to the truth, the whole truth and nothing but
the truth; that thereupon and while said witness was
under oath, the within deposition was taken down by me
audiographically at the time and place herein named and
was thereafter reduced to computer transcription under
my supervision.  I further certify that I am not
interested in the event of the action.


IN WITNESS WHEREOF, I have hereunto subscribed my
hand and affixed my seal of office this 20th day of
_____, 2008.



_____
Karen-Marie Fahey
PROFESSIONAL VERBATIM REPORTER


My Commission expires March 10, 2011

```
                                      Exhibits:   8
                                      Volume:     III
                                      Pages:      143
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11430-PBS

JOSEPH T. CARMACK,
          Plaintiff,

ORIGINAL

vs.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
and MASSACHUSETTS BAY COMMUTER RAILROAD
COMPANY,
          Defendants.

DAY 3 - CONTINUED DEPOSITION OF JOSEPH T.

CARMACK, taken pursuant to Notice under the applicable

provisions of the Federal Rules of Civil Procedure on

behalf of the Defendant, Massachusetts Bay

Transportation Authority, before Karen-Marie Fahey, PVR

and Notary Public, in and for the Commonwealth of

Massachusetts, at Smith & Duggan LLP, Two Center Plaza,

Boston, Massachusetts, 02108, on Wednesday, April 30,

2008, commencing at 2:36 p.m.

**NEAL A. SALLOWAY - COURT REPORTERS**
**FIVE CARDIGAN ROAD**
**WEST PEABODY, MASSACHUSETTS 01960**
**781-581-3993 - 978-535-0313 - FAX 978-536-3142**

A P P E A R A N C E S


JOSEPH T. CARMACK, PRO SE


H. REED WITHERBY, ESQ.
SARAH E. LENT, ESQ.
SMITH & DUGGAN LLP
TWO CENTER PLAZA
BOSTON, MA 02108
      REPRESENTS THE DEFENDANT, MASSACHUSETTS BAY
      TRANSPORTATION AUTHORITY


ROBERT K. BLAISDELL, ESQ.
DONOGHUE BARRETT & SINGAL, P.C.
ONE BEACON STREET - SUITE 1320
BOSTON, MA 02108
      REPRESENTS THE DEFENDANT, MASSACHUSETTS BAY
      COMMUTER RAILROAD COMPANY

4

1                    S T I P U L A T I O N S

2              It is hereby stipulated and agreed by and between

3          counsel for the respective parties that all objections,

4          except as to form, are reserved until the time of trial,

5          including motions to strike.

6              It is further stipulated and agreed that the

7          reading and signing of the deposition are not waived and

8          to be read and signed under the pains and penalties of

9          perjury.

10             It is further stipulated and agreed that the filing

11         and sealing of the deposition are waived.

12

13                       **JOSEPH T. CARMACK**

14             A witness called on behalf of the Defendant,

15         Massachusetts Bay Transportation Authority, having been

16         satisfactorily identified by the production of his

17         Massachusetts Identification Card (S00317760) and duly

18         sworn, under oath, by the Court Reporter and Notary

19         Public, was examined and testified as follows:

20

21             **The following exhibit was premarked per Attorney**

22         **Witherby:**

23                 **(Whereupon the Court Reporter marked as**

11

1      Q.   In light of the fact that you're, in my view,

2   anyway, changing your testimony, I'd like you to read that

3   whole document which is three or four pages long and identify

4   for me anything in there that you think was not an accurate

5   statement. **(Indicating)**

6               **(Ms. Lent leaves the room.)**

7               **(Ms. Lent reenters the room.)**

8      A.   **(Reviewing document)** The question I think you asked

9   was if anything is in there an inaccurate statement?

10     Q.   Yes.

11     A.   No.

12     Q.   Now, this document is a document that you prepared

13  on or about July 12, 2003; is that correct? **(Indicating)**

14     A.   Yeah.

15     Q.   And you've prepared it for the purpose of

16  presenting to the American Civil Liberties Union in support

17  of a possible claim against the MBTA; is that correct?

18     A.   I'm not 100 percent certain about that, that --

19  that -- that was the reason.  I think I did give this to

20  Sarah Wunsch, a copy of this to Sarah Wunsch, but I'm not

21  sure that that's the reason that I created this document

22  other than to make a record of it.

23     Q.   Well, why did you give it to Sarah Wunsch?

1      A.    To tell her what happened, you know, because she

2   wanted to know exactly what happened, and I wanted to talk

3   about what my rights were and how to rectify the situation.

4      Q.    Okay.  And if in order to enable her to advise you

5   about what your rights were, I assume you wanted to tell a

6   complete story of what happened; is that fair to say?

7      A.    Yeah, I would say that's a fair statement.

8      Q.    You say this was your effort to present, in

9   writing, a complete story of the incident that happened on

10  July 1 as you perceived it.

11     A.    An accurate story I would say.  I don't know what

12  you mean by, "Complete."  Nothing's really complete, but an

13  accurate story.

14     Q.    An accurate story that contained all the important

15  facts?

16     A.    Yeah.

17     Q.    Okay.

18     A.    What I thought might be important.  My concern --

19  Well, never mind.

20     Q.    It is true, is it not, that Ms. Boumel thought you

21  were going to get on the train and take it out of North

22  Station?

23     A.    I didn't know that at the time.  I mean, I know you

1    Q.   Yes.

2    A.   You know, we're going to -- It sounds like we're

3  going to dance around this horse again.  I -- As -- Just --

4  My statement here says, I thought at the time, and I think

5  now, that no termination was, "'final and binding.'"  It says

6  that in Exhibit 17.

7    Q.   Okay.  I'll take that.

8    A.   Paragraph 6.  You had pointed yesterday to

9  Paragraph 5 where it says, "In May 2002, plaintiff was

10  terminated from employment with Amtrak in his capacities as

11  locomotive engineer."

12        Then -- You know, that is in context with

13  Paragraph 6 which says, "Termination was not 'final and

14  binding', and was still open to dispute resolution under the

15  terms of the Railway Labor Act and the Amtrak BLE agreement."

16        That is my position, if you will, over the

17  nature of my employment relationship in Commuter Rail.

18    Q.   Okay.  Is it true that you were passing out

19  literature on Platform No. 3 as the report says?

20    A.   I handed out some literature, which is in exhibit,

21  to some other employees of Amtrak -- that were now, on that

22  date, -- former employees of Amtrak that were, on that date,

23  employees of MBCR who knew me.

1    the BLE agreement.  Just for clarity, are you're referring to

2    the Amtrak agreement with the BLE?

3           **THE WITNESS:**  Yeah.  The Amtrak -- Rule 21 of the

4    Amtrak Brotherhood of Locomotive Engineers agreement.

5           **MR. BLAISDELL:**  Thank you.

6           **THE WITNESS:**  You're welcome.

7        Q.   And I'm going to draw your attention to the end of

8    the next-to-last paragraph when Mr. Kenney says to you,

9    "Placing this case before SBA 928 for adjudication is the

10   last and binding step of appeal in accordance with the

11   collectively-bargained disciplinary process."

12       A.   Uh-huh.

13       Q.   And that is what it says; right?

14       A.   Yeah.

15       Q.   Okay.

16       A.   That's what it says.

17       Q.   I'm going to put another document in front of you

18       and ask if you can identify that document.  **(Indicating)**

19       A.   **(Reviewing document)** This is the award letter.

20       Q.   Let her --

21           **MR. WITHERBY:**  Could you mark that as Exhibit 22?

22           **(Whereupon the Court Reporter marked as**

23       **Exhibit No. 22 - Award Letter.)**

43

1      Q.    That is Exhibit No. 22, and you said this is the

2  award letter.  What were you talking about?

3      A.    The award letter from System -- Special Board of

4  Adjustment 928.

5      Q.    Okay.  And this -- What is your understanding of

6  the content of this decision? **(Indicating)**

7      A.    That's kind of a vague question.

8      Q.    Okay.  Is it fair to say that this decision upheld

9  the Amtrak termination of you as an employee?

10      A.    No, it is not fair to say that.

11      Q.    Okay.  Did this decision state that Amtrak

12  dismissed you from service on May 13, 2002?  And I'm

13  paraphrasing towards the end of the first page.

14      A.    It says, "Carrier advised claimant that he had been

15  found guilty of the charges and dismissed from service."

16          **MR. BLAISDELL:**  I'm sorry.  Where were you reading

17  from, Mr. Carmack?

18          **THE WITNESS:**  From the Exhibit 22, System Board of

19  Adjustment, the second-to-last sentence of the last

20  paragraph -- Well, the last sentence of the -- Excuse me --

21  the last sentence beginning on the second-to-last line of the

22  second-to-last paragraph.

23      Q.    That sentence that starts, "On May 13, 2002"?

1    A.    Right.

2    Q.    Is there anything inaccurate about that sentence in

3 your view?

4    A.    The essence of it is not inaccurate.

5    Q.    Okay.  I'm going to ask you to turn to the next

6 paragraph.  **(Indicating)**

7    A.    **(Reviewing document)** Uh-huh.

8    Q.    All right.  And it starts by saying that, "On April

9 11, a Division Road Foreman found a packet of 40 to 50 pages

10 on his desk entitled, 'Letters from Hell.'"  Who is the Road

11 Foreman, the Division Road Foreman?

12    A.    It doesn't say who it is.  There's more than one.

13    Q.    Okay.

14    A.    But you know, I can tell you that Jerry Demodena,

15 on April 11, 2001, said that he found a document entitled,

16 "Letters from Hell," on his desk.

17    Q.    And it says on the top of the second page that,

18 "The Road Foreman was cast as Rosencrantz."  And these,

19 "Letters from Hell," are Exhibit No. 15 to this deposition,

20 are they not?

21    A.    They are.

22    Q.    And do they cast Mr. Demodena as Rosencrantz?

23    A.    Well, it says -- I think it said that he's a

45

1    player.

2         Q.    This is a page in it about two-thirds of the way

3    through Exhibit 15 which starts with the words, "Dear God."

4         A.    Uh-huh.

5         Q.    And it has a list of characters and players.

6         A.    Yeah.   It's called a dramatis persona, but it's

7    also -- The dramatis persona is in the context of a letter

8    from Lucifer written to God, addressed to God.

9         Q.    I understand that.   And it says, "Rosencrantz, G.

10   L. Demodena."   Is that the Road Foreman we're talking about

11   in this National Mediation Board decision?

12        A.    You'll have to ask Mr. Malin that, but I assume it

13   is.

14        Q.    Were you at the disciplinary hearing that preceded

15   this arbitration?

16        A.    There was a disciplinary hearing, a series of

17   hearings, in the -- April and May of 2002.

18        Q.    And I asked:   Were you at them?

19        A.    Yes.

20        Q.    And did Mr. Demodena testify at any of those

21   hearings?

22        A.    Did Mr. Demodena -- Yes, he did.

23        Q.    And did he testify that on or about April 11, 2001,

46

1  he found a packet of, "Letters from Hell," on his desk?

2      A.    Yeah, he wrote it in a report.  That's what I was

3  just saying.

4      Q.    Okay.  Well then, is it fair to conclude that when

5  the National Mediation Board said the Division Road Foreman

6  found the packet on his desk, that it was referring to Mr.

7  Demodena?

8      A.    Sure.

9      Q.    Okay.  And the, "Letters from Hell," cast him as

10 Rosencrantz, and the Local Chairman was cast as Guildenstern;

11 is that true?

12     A.    In Exhibit 15, it says -- on one side, it says,

13 "Characters, Rosencrantz," and on the other side -- These are

14 two columns -- is a column that says, "Players, G. L.

15 Demodena."

16     Q.    And I'm asking about Guildenstern.

17     A.    What about Guildenstern?  Guildenstern lines up

18 with the name Michael J. O'Bryan as a player.

19     Q.    And that is the Local Chairman; is that right?

20     A.    Yes.

21     Q.    Okay.  Now, at the end of this paragraph, it says,

22 "The Road Foreman interpreted the packet as a threat against

23 him and reported the matter to the Threat Assessment and

1  Response Team." Do you see that?

2       A.    Yeah.  Well, I don't see it, but I'm hearing it.

3       Q.    Well, do you see it on --

4       A.    Page 3?

5       Q.    -- Page 2 of Exhibit 22?

6       A.    It's Page 3.

7       Q.    Oh.

8       A.    It's, actually, Page -- Oh.  Okay.  That's right.

9  The top says, "Page 3."

10      Q.    It is marked 3 of 5 on the top.  It was, actually,

11 the second page of Exhibit 22.

12      A.    Okay.

13      Q.    I'm reading the last sentence of the run over

14 paragraph.

15      A.    Yes.  That's what it says.

16      Q.    Okay.  So what this is saying is Mr. Demodena,

17 "Interpreted this as a threat against him and reported the

18 matter to the Treat Assessment and Response Team"?

19      A.    Yes.  That's what it says.

20      Q.    Okay.  And do you believe it was unreasonable for

21 Mr. Demodena to interpret the packet as a threat against him?

22      A.    Well, I think the question is asking me --

23      Q.    No?

# C E R T I F I C A T I O N

ORIGINA

I, KAREN-MARIE FAHEY, PVR and Notary Public within and for the Commonwealth of Massachusetts, duly commissioned, qualified and authorized to administer oaths and to take and certify depositions, do hereby certify that heretofore, to wit, on the 30th day of April 2008, personally appeared before me Joseph T. Carmack, at Smith & Duggan LLP, Two Center Plaza, Boston, Massachusetts, in the aforecaptioned cause pending in the United States District Court, District of Massachusetts; that the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon and while said witness was under oath, the within deposition was taken down by me audiographically at the time and place herein named and was thereafter reduced to computer transcription under my supervision.  I further certify that I am not interested in the event of the action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this _____ day of _____, 2008.

_____

Karen-Marie Fahey

PROFESSIONAL VERBATIM REPORTER

My Commission expires March 10, 2011

E 5



EXHIBIT
Carnack
15
4/28/08 S.E.

# Letters
## from
## Hell

EXHIBIT
tabbies
Boumel 4
4-2-08 A.v

All is not as it appears
theres more to what
you see and hear.

Dear God:

I hear a fat lady singing.

Very, very
**_truthfully_** yours,

Lucifer

Prince of Darkness

Dear God,

We're putting on a play down here. Wanna help us fill out all the parts?

The Tragedie of
HAMLET
Prince of Commuter Rail

| Characters | Players |
|---|---|
| Claudius, King of Commuter Rail | J. Flaherty (M. O'Malley alternate) |
| Hamlet, son to the late and nephew to the present king | J. Carmack |
| Polonius, lord chamberlain | W. Gagne |
| Horatio, friend to Hamlet | ? (too bad GD couldn't play this) |
| Laertes, son to Polonius | D. Leavitt |
| Rosencrantz | G. L. DeModena |
| Guildenstern | M. J. O'Bryan |
| Fortinbras, prince of Norway | K. Lydon |
| Gertude, queen of Commuter Rail, and mother to Hamlet | A. Berry |
| Ophelia, daughter to Polonius | J. Peals |
| Ghost of Hamlet's Father | W. C. Laxton |

---

If you were in control, perhaps we'd have the history plays. Most likely you would have ended up with Henry IV parts I and II leading into Henry the V. But since the fall of Adam, I'm in charge and this play has a messy ending more to my liking
Sinisterly,

Lucifer, prince of darkness

Act III. Scene II

Why, look you now, how unworthy a thing you make of me! You would play upon me;
you would seem to know my stops; you would pluck out the heart of my mystery; you
would sound me from my lowest note to the top of my compass: and there is much music,
excellent voice, in this little organ; yet cannot you make it speak. 'Sblood, do you think I
am easier to be played on than a pipe? Call me what instrument you will, though you can
fret me, yet you cannot play upon me.

Act IV, Scene II

The body is with the king, but the king is not with the body. The king is a thing-

Scene III

King: How dangerous is it that this man goes loose! Yet must not we put the strong law
on him: He's loved of the distracted multitude, who like not in their judgement, but their
eyes: And where 'tis so, the offender's scourge is weigh'd, But never the offense.

---

ROSENCRANTZ AND GILDENSTERN ARE DEAD!

OPEN LETTER TO DIVISION 57
BIRNAM WOOD REMOVES TO DINSINANE!

This is to advise you that I own an MBCR position in accordance with the MBCR/BLE agreement. I own a job. I'm not asking for one.

My application to MBCR was accepted and I participated in the bidding process according to the agreement. Having done so, I am now an "eligible employee" as legally defined by the MBCR/BLE agreement in accordance with the Railway Labor Act USCA 45 SS 151 et. seq.. I own a job; MBCR simply failed to publish an award.

The agreement doesn't allow the carrier to accept Amtrak discipline. So, my former association with Amtrak is irrelevant. I am returning from a Medical Leave of Absence as per the 2001 Amtrak/BLE roster. O'Bryan is taking me for a fool and Kenny thinks he's tricked me. This is a big opportunity for me. I have worked hard and paid dearly. There is no turning back, now. I will not be intimidated by anyone. You can be for me or against me, but I will press on. I have a job and I'm going to take it.

Not because its a good job, but because its a union job and as long as I'm willing to fight for it, I'll make it a good job. But its hard with all the carrier agents around. I have been putting in valid time claims, but O'Bryan ignores them and tries to justify it by quoting DePhillips. Whose side do you think he's on? This Division has a responsibility to me and I expect to be paid. I can only be paid, if this Division mandates through division action that my time claims be processed in accordance with the MBCR/BLE agreement to the General Committee where I know they will be honored.

I'm reporting on July 1, 2003 to displace the job I own.

I WILL NOT BE DENIED BY O'BRYAN WILL TRY TO TELL YOU I DON'T HAVE RIGHTS OR THAT I'M NOT A UNION MEMBER.

NOW HEAR THIS!                         O'BRYAN IS LYIN!

I'M BACK!                        LET'S ROCK!

GUILDENSTERN IS DEAD!

YOUR BROTHER,

JOE CARMACK
NO TITLE NECESSARY

# BLE ALERT!

## ATTN. ALL LOYAL UNION EMPLOYEES OF MBCR IN ANY UNION!

### RELEVANT FACTS TO THIS MATTER

1. Joseph T. Carmack has been a loyal BLE member since 1998.
2. On May 4, 2001 Amtrak medically disqualified engineer Joseph T. Carmack without ever advising Engineer Carmack of medical basis for disqualification.
3. Engineer Carmack was placed on Medical Leave of Absence as indicated on Amtrak/BLE Seniority Roster 2001 and 2002.
4. On May 13, 2002 Amtrak terminated Engineer Carmack for insubordination.
5. On September 23, 2002 System Board of Adjustment 926 heard Engineer Carmack's case no. 382.
6. System Board of Adjustment 926 rendered its decision no earlier that January 31, 2003.
7. Award for SBA-926 was not rendered within 30 days as per BLE Rule 21.
8. On or before May 15, 2003 Massachusetts Bay Commuter Railroad (MBCR) received Application from Engineer Carmack as per part I of MBCR/BLE agreement.
6. On or before May 28, 2003 MBCR received completed Bid from Engineer Carmack as per Part I of MBCR/BLE agreement.
7. MBCR failed to award position to Engineer Carmack as an "eligible employee" in accordance with Seniority Rights established as per rules 5 of AMTRAK/BLE agreement.
8. Effective July 1, 2003 Engineer Carmack must exercise his seniority or lose all rights in accordance with MBCR/BLE agreement.
9. J. Carmack will make displacement on Run 820 on July 1, 2003 at 4:40 PM.
10. MBCR has failed to respond to discussion attempts by Mr. Carmack on this matter.
11. BLE Division 57 assistance in this matter will be greatly appreciated.

Joe Carmack
Passenger Engineer
BLE Division 57

## PLEASE POST AND DISTRIBUTE!

```
* * * * * * * * * * * * * * * * * * * *
                                     *
   In Re: Joseph T. Carmack          *
                                     *
          v.                         *
                                     *
                                     *
   Massachusetts Bay Transportation  *
              Authority              *
                                     *
* * * * * * * * * * * * * * * * * * * *
```

EXHIBIT

AFFIDAVIT

## INTRODUCTION

1. Joseph T. Carmack, hereinafter referred to as plaintiff is resident of Massachusetts residing at 592 Tremont Street Apt. 5, Boston, MA 02118.

2. The Massachusetts Bay Transportation Authority (MBTA, also hereinafter referred to as defendant) is a state agency which owns and operates public transportation throughout eastern Massachusetts.

3. Massachusetts Bay Commuter Rail (MBCR, also herinafter referred to as the "carrier") is a private agency contracted by the defendant to operate commuter rail transportation in Massachusetts beginning July 1, 2003.

4. The Brotherhood of Locomotive Engineers is a collective bargaining organization representing commuter rail locomotive engineers, including plaintiff, on the Massachusetts commuter rail system in accordance with the Railway Labor Act (USCA 45 ss. 151 et. seq.)

## BACKGROUND

5. In May 2002 plaintiff was terminated from employment with Amtrak in his capacities as Locomotive Engineer.

6. Termination was not "final and binding" and was still open to dispute resolution under the terms of the Railway Labor Act and the Amtrak BLE agreement.

7. With knowledge that plaintiff was continuing to seek union assistance in his case, on August 20, 2002, Amtrak sent plaintiff a warning that he would be charged with trespassing if he was to enter any employee areas at North or South Stations (Exhibit A)

8. On August 31, 2002, Plaintiff sent a response to Amtrak (Exhibit B) claiming legal right to "public access" in North and South stations and rights of "freedom of association" with other union members as per the Railway Labor Act (USCA 45 ss. 151 et. seq.).

9. In early May 2003, the Brotherhood of Locomotive Engineers ratified a collective bargaining agreement with MBCR in preparation for MBCR to begin operating commuter rail service on July 1, 2003.

10. The new MBCR/BLE agreement, in combination with the existing Amtrak/BLE agreement, is to cover commuter rail engineers who had been employed by Amtrak, including the plaintiff.

11. Plaintiff was considered an "eligible employee" in accordance with the MBCR/BLE agreement.

12. Plaintiff successfully completed the requirements of agreement which included completing an application, medical questionnaire and completing a "bid" or list of job preferences to be awarded by seniority in accordance with MBCR/BLE agreement (Exhibits $C_1$, $C_2$ and $C_3$)

13. When publishing awards, MBCR failed to award plaintiff in accordance with seniority as per MBCR/BLE and Amtrak/BLE agreements.

14. Plaintiff began attempting to contact MBCR officials when bids were published beginning on or about June 19, 2003.

15. Plaintiff ultimately submitted a grievance concerning the matter (Exhibit D).

## FACTS OF COMPLAINT

16. On July 1, 2003, MBCR began operating Massachusetts commuter rail and plaintiff managed to contact MBCR officials by phone to discuss his grievance and right to a job.

17. After several phone conversations in which officials revealed that they did not take issue with plaintiff's agreement rights, the Labor Relations officer advised plaintiff that MBCR had made an agreement with defendant which required that employees resolve issues with Amtrak prior to assuming positions on MBCR.

18. Plaintiff felt this position clearly qualified him for payment and cause to file "time claims" in accordance with BLE agreements.

19. The BLE union representative was refusing to assist plaintiff.

20. In order to protect his rights, plaintiff felt it important to report to North Station to go on record with other union members as available for duty and needing

assistance to file "time claims" for rightful compensation in accordance with BLE agreements.

21. Plaintiff prepared and photocopied an announcement (or leaflet) printed in single sheets on both sides to hand to engineers at North Station (Exhibit E).

22. Plaintiff arrived at North Station approximately 3:55 PM on July 1, 2003 to talk to other union employees and distribute his announcement.

23. At approximately 4:15 PM plaintiff was approached by a white male of approximately 5'7", approximately 230 lb. and wearing an MBTA police uniform with a "buzz" haircut. Said white male is hereinafter referred to as "Officer Pavia" for purposes of this report and in accordance with MBTA Police report Journal No. 03019163 (Exhibit F).

24. Officer Pavia asked plaintiff what plaintiff was doing.

25. Plaintiff explained that he was handing leaflets to other union members.

26. Officer Pavia asked plaintiff; "And what makes you think you can do that here?"

27. Plaintiff: "This is a place of public access".

28. Officer Pavia: "No, actually, it's not. The station is owned by the MBTA."

29. Officer advised plaintiff he was trespassing, asked plaintiff to give officer Pavia a leaflet and asked plaintiff for identification. Officer Pavia specifically complained about the language on the leaflet and mentioned particularly the word "displacing".

30. Officer Pavia asked Plaintiff if plaintiff was an employee and Plaintiff explained that plaintiff is an employee in accordance with the plaintiff's collective bargaining agreement, but that it was an issue of contention.

31. Plaintiff assumed that Officer Pavia was becoming increasingly angry and assured the officer that the plaintiff would comply with whatever the officer asked of him, but that plaintiff wanted to answer his questions honestly.

32. Officer Pavia announced to plaintiff that Officer Pavia was going to give plaintiff a trespass order, insisted that plaintiff stand in a certain spot and asked plaintiff; "When was the last time you were arrested?"

33. Plaintiff answered: "The 1983 bus strike" as officer walked away and entered and exited several offices.

34. After a period of time, Officer Pavia returned to the plaintiff with trainmaster Boumel and began complaining about the words in the leaflet again, but officer Pavia seemed unsure what was precisely objectionable. Finally, Officer Pavia reiterated his previous claim that plaintiff was creating a disturbance.

35. Plaintiff was beginning to feel that a written report would substantiate that the carrier was preventing plaintiff from resolving grievances, time claims and disputes in

accordance with the Railway Labor Act. This would particularly be so if a written report mentioned Ms. Boumel.

36. In order to reassure her, Plaintiff explained to Ms. Boumel; "I'm OK with everything he's doing, Jackie, he's just making my point for me".

37. Although plaintiff was not pleased with having to leave the station or desist from leafleting or communicating with other union members, he felt it important that all parties understand that plaintiff was not being confrontational.

38. Ms. Boumel seemed pleased with the reassurance and shrugged her shoulders and went back into the office.

39. Officer Pavia invited plaintiff to walk with him toward the exit and officer Pavia explained that plaintiff was banned from all MBTA stations for 24 hours. Officer Pavia advised plaintiff that if plaintiff returned plaintiff could be arrested, plaintiff could be charged with trespassing and plaintiff could be served with a restraining order and/or an injunction. Officer Pavia explained that if plaintiff had a problem with any of the officer's orders, plaintiff would have to file a complaint in court. Officer Pavia advised Plaintiff that it was okay to hand out leaflets outside the MBTA stations off of station property, but if any leaflets ended up on MBTA property, plaintiff would be "responsible". When plaintiff asked what plaintiff could do about it if he wasn't allowed to enter the station, Officer Pavia merely repeated the statement.

40. Plaintiff left the station without receiving any written document.

41. Plaintiff called MBTA headquarters and asked for a copy of the report.

42.  MBTA advised plaintiff he could retrieve a copy from the station after 24 hours.

43.  After a failed attempt to retrieve such a report, plaintiff called the MBTA Police station again and the MBTA police finally sent a report in the mail which arrived on July 9, 2003.

I hereby certify that the above statement is a true statement recording events that I have witnessed.

Affiant _Joseph T. Carmack_ Joseph T. Carmack

Date: _July 12, 2003_

NATIONAL MEDIATION BOARD

SPECIAL BOARD OF ADJUSTMENT NO. 928

BROTHERHOOD OF LOCOMOTIVE ENGINEERS ⟩
⟩ Case No. 382
and ⟩
⟩ Award No. 382
NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) ⟩

Martin H. Malin, Chairman & Neutral Member
M. B. Kenny., Employee Member
L. C. Hriczak, Carrier Member

Hearing Date: September 23, 2002

STATEMENT OF CLAIM:

    Claim of Amtrak Passenger Engineer J. T. Carmack for the rescinding of the discipline imposed of "Dismissal in all capacities effective immediately" as stated in the decision letter of May 13, 2002 under the signature of Assistant General Manager-Commuter Operations Francis J. O'Connor, Jr., and restoration to service with full seniority and vacation rights unimpaired, with full compensation for time lost, full credit toward vacation entitlement, health and welfare benefits during the period held out of work, and clearing Claimant's personal records of any reference to the alleged violation.

FINDINGS:

    Special Board of Adjustment No. 928, upon the whole record and all the evidence, finds and holds that Employee and Carrier are employee and carrier within the meaning of the Railway Labor Act, as amended; and, that the Board has jurisdiction over the dispute herein; and, that the parties to the dispute were given due notice of the hearing thereon and did participate therein.

    On September 10, 2001, Claimant was directed to report for an investigation on September 17, 2001. The notice charged Claimant with violating Amtrak's Standards of Excellence, Professional and Personal Conduct, by failing to comply with the direction of the Director of Operations to appear for and cooperate with a fitness for duty evaluation on August 27, 2001.

    The hearing was postponed to and begun on April 4, 2002. The hearing continued on April 23 and 24, 2002, and was completed on May 7, 2002. On May 13, 2002, Carrier advised Claimant that he had been found guilty of the charges and dismissed from service.

    The record reflects that on April 11, 2001, the Division Road Foreman found a packet of


EXHIBIT
Carmack
22
4/30/08

40 - 50 pages on his desk that was entitled, "Letters from Hell." Claimant was the apparent author of most of the material in the packet, including a parody of Shakespeare's Hamlet, in which the Road Foreman was cast as Rozencrantz and the Local Chairman was cast as Guildenstern, two characters who were killed. The packet also included a letter addressed, "Dear God," which stated, "I hear a fat lady singing," and was closed by "Lucifer, Prince of Darkness." The packet also contained correspondence and related material concerning a dispute Claimant had with Carrier concerning a prior disciplinary action taken against him and material critical of the Local Chairman. The Road Foreman interpreted the packet as a threat against him and reported the matter to the Threat Assessment and Response Team (TART).

The Director of Labor Relations, in his capacity as a member of the TART, determined that the documents should be reviewed by Carrier's Medical Department. He forwarded a small portion of the packet, approximately five pages, consisting of the pages that the Road Foreman had found threatening, to the Medical Department. Carrier's Medical Officer for the Northeast Corridor reviewed the documents and determined that Claimant should be medically disqualified pending a fitness for duty examination.

By letter dated May 4, 2001, the Director of Operations notified Claimant that he had been medically disqualified pending a fitness for duty exam and that he was being withheld from service with pay. By letter dated May 17, 2001, the Director of Operations instructed Claimant to appear for a fitness for duty exam with a Boston doctor on June 4, 2001. The doctor appears, from the record, to be board certified in psychiatry and neurology.

Claimant canceled the June 4, 2001, appointment and refused to reschedule it. By letter dated June 8, 2001, the Director of Operations notified Claimant that, in light of his actions, his status was changed to medically disqualified without pay, and ordered him to contact the Medical Department by June 15, 2001, to reschedule the fitness for duty exam. The letter warned Claimant that his failure to do so would subject him to "charges of insubordination, which, if proved, could result in your permanent dismissal from service."

On June 27, 2001, Claimant appeared at the doctor's office with the Local Chairman. Claimant refused to submit to a psychiatric examination. The doctor notified Carrier's Medical Officer by letter dated July 16, 2001. By letter dated July 24, 2001, the Director of Operations advised Claimant that he was making "one last effort to resolve this matter," and directed Claimant to schedule another appointment with the doctor. The letter further warned Claimant, "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate this evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly other contrary activities."

Claimant and the doctor agreed to an appointment for August 27, 2001. However, by letter dated August 28, 2001, received by Carrier's Medical Department on September 4, 2001, and conveyed to the Director of Operations on September 5, 2001, the doctor advised that Claimant refused to present for the evaluation. Claimant apparently refused to participate in the

-2-

evaluation because Claimant objected to the doctor sharing the results with Carrier's Medical Officer on the ground that such action would breach physician-patient confidentiality.

There is no question that Claimant did not comply with the Director of Operation's order of July 24, 2001. Although Claimant testified that he complied by scheduling another appointment with the doctor, it is clear that the order went beyond literally scheduling another appointment and also required Claimant to appear, cooperate with the doctor and not frustrate the evaluation. Claimant clearly did not cooperate and did frustrate the evaluation.

The Organization's position is two fold. First, the Organization contends that the charges were not timely. Second, the Organization maintains that Claimant was not obligated to comply with the order.

Rule 21.d.1 of the Agreement provides, in relevant part:

A Passenger Engineer directed to attend a formal investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven days from the date of the act or occurrence or in cases involving stealing or criminal offense within seven days from the date the Carrier becomes aware of such act or occurrence.

We agree with the Organization that Rule 21.d.1 clearly distinguishes between stealing and criminal offenses on the one hand and all other disciplinary acts or occurrences on the other. It is only in cases of the former that the time limit for providing notice of the charges runs from the date of Carrier's knowledge. Insubordination is not stealing and it is not criminal. Therefore, the time limit starts to run with the act of occurrence, not with Carrier's knowledge of it.

However, we do not agree with the Organization's argument that the charge in the instant case was untimely. The critical question is when was the act or occurrence completed. The Organization maintains that the act or occurrence was complete on August 27, 2001, when Claimant refused to submit to the fitness for duty examination. We do not agree.

Insubordination is a very serious offense that usually results in dismissal. The essence of the offense is not only the failure to comply with an instruction but also the belligerent affront to supervisory authority. Indeed, it is the affront to supervisory authority, the "in your face" character of the offense, that is the source of its seriousness and the justification for the severity of the discipline usually imposed. The affront to authority cannot occur until the supervisor who issued the order is notified of the subordinate's refusal to comply. Had Claimant called the Director of Operations on August 27, 2001, and told the Director he would not cooperate with the examination, the time limits would have run from that date. However, the affront to the Director's authority did not occur until the Director was notified that Claimant had not cooperated with the examination; thus the offense was not complete until September 5, 2001. Accordingly, we conclude that the charge was timely.

-3-

Much of the Organization's contention that Claimant's refusal to comply with the order was not insubordinate consisted of an attack on the order itself. The Organization argued that the Road Foreman overreacted to a humorous parody and noted that the Local Chairman did not consider the parody threatening. The Organization complained that the Medical Director decided to disqualify Claimant and have him examined based on only five pages of a much longer packet that were taken out of context. The Organization further contended that after the Medical Officer disqualified Claimant, Claimant's personal physician wrote that Claimant was qualified for service, thus triggering Rule 25's procedure for a mutually selected third doctor to examine Claimant, rather than a referral to a doctor unilaterally selected by Carrier's Medical Office.

None of these arguments provide a defense to the charge of insubordination. The general rule in labor relations is that an employee, confronted with a directive that he believes violates the Agreement or is otherwise improper, must obey now and grieve later. Claimant deliberately failed to do so.

There is an exception to this general rule which is recognized in Carrier's Standards of Excellence as "when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property." The Organization introduced several letters from Claimant's doctor that stated that submission to the fitness for duty exam would have been medically harmful to Claimant. Claimant's doctor did not testify and the record contains no evidence of the basis for her opinion. The Hearing Officer discounted the probative value of the letters and we find that she acted properly in doing so.

Accordingly, we conclude that Carrier proved the charge by substantial evidence. The claim must be denied.

### AWARD

Claim denied.

_____
Martin H. Malin, Chairman

_____
L. C. Hriczak,
Carrier Member

_____  4-21-03
M. B. Kenny,
Employee Member

Dated at Chicago, Illinois, January 31, 2003.

-4-

**Copy of Transcript**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

       Plaintiff,

    VS                          CIVIL ACTION NUMBER:
                                      05-11430-PBS

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY AND MASSACHUSETTS BAY
COMMUTER RAILROAD CO.,

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**JACQUELINE M. BOUMEL**

April 2, 2008
10:08 a.m.

Jack Daniel Court Reporting & Video Services, Inc.
100 Franklin Street
Boston, Massachusetts

Ayako Odanaka, Notary Public, Certified Shorthand Reporter and Registered
Professional Reporter within and for the Commonwealth of Massachusetts.



Technologies you can use • Experience you can Trust

100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

213

1    A.  Yes.

2    Q.  You just said that, right?

3    A.  Yes.

4    Q.  From Amtrak.  It was the first day

5  that MBCR took over the service.

6         Now, wouldn't that day stick out to

7  you because it was the first day you

8  worked as MBCR employee?

9    A.  Yes, it does.

10   Q.  Mm-hmm.  What happened that day?

11  Do you remember going to work that day?

12   A.  I remember going to work that day.

13  I remember working that day.  I remember

14  an engineer coming in and telling me you

15  were passing out leaflets in the station

16  saying you were going to displace

17  somebody.

18   Q.  Okay.  And what engineer was that?

19   A.  I don't remember which engineer it

20  was.

21   Q.  But you're sure it was an engineer.

22   A.  Yes.

23   Q.  And what did you have to say about

24  that?  Did you say anything to the



JACK DANIEL
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston. Massachusetts 02110

214

1  engineer?

2      A.  I don't remember saying anything to

3  the engineer.  I remember calling the

4  chief train dispatcher.

5      Q.  What about?

6      A.  That you were there passing things

7  out saying you were going to displace the

8  job.  And with a quick glance at it,

9  thought you were actually going to board

10  the train at 4:40 in the afternoon.

11      Q.  So you thought that I was going to

12  board a train.

13      A.  (Deponent nodding).

14      Q.  Why did you think that?

15      A.  Because I believed the leaflet I

16  had said something about displacing a job

17  at 4:40 p.m.

18      Q.  Why would that mean I would board a

19  train?

20      A.  Because that's what time the job

21  would start.

22      Q.  But why would I have to board a

23  train?

24      A.  Because you were going to displace


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

216

1    A.  Like I just said, I believed the

2  things -- the paper said you were going to

3  displace such and such a job at 4:40 p.m.

4    Q.  Mm-hmm.  Did it say that I was

5  going to board a train?

6    A.  No.

7    Q.  It did not say that I was going to

8  board a train.

9    A.  No.

10    Q.  And you know that displacing a job

11  means calling a crew dispatcher.

12    A.  Yes.

13    Q.  Okay.  So why wouldn't I just call

14  the crew dispatcher?

15    A.  Because you weren't employed there.

16    Q.  Are you sure?

17    A.  Well, according to run sheets I

18  had, you weren't.  You weren't on any run

19  -- You weren't on any run sheet.

20    Q.  If I didn't have -- If I had a

21  displacement, I wouldn't necessarily be on

22  a run sheet, would I?

23    A.  No, but you probably wouldn't be

24  handing out letters either saying you were



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

218

1  not?  It says that -- It's a letter it

2  says that Joe Carmack is going to do --

3  displace a run, make a displacement.  And

4  your understanding is that it would be in

5  accordance with seniority rules and he

6  would call a dispatcher.

7      A.  No.  My accordance [sic] was you

8  were not employed there and you didn't

9  have a right to make the displacement.

10      Q.  So I -- But that's your opinion.

11      A.  (Deponent nodding).

12      Q.  Right?

13              MR. BLAISDELL:  Objection.

14      A.  Yeah.

15      Q.  Where is this information coming

16  from that I don't have a right to?  I

17  mean, if you -- you were unassigned

18  yourself, you've made displacements as

19  somebody who's unassigned.

20          Now, you said that I wasn't on your

21  run sheet --

22      A.  (Deponent shaking head).

23      Q.  -- which means I wasn't assigned,

24  so I'm coming in to displace somebody, to



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

233

1  on that day on a certain train.

2      A.  Yes.

3      Q.  And that an engineer had that

4  leaflet.

5      A.  Yes.

6      Q.  What's wrong with that?

7      A.  Like I've said, to my knowledge,

8  you were not entitled to make a

9  displacement.

10     Q.  What difference does it make?  He's

11 contacting an engineer about making a

12 displacement, he's not contacting Jackie

13 Boumel.

14     A.  They contacted me.

15     Q.  Who did?

16     A.  The engineer that handed me --

17     Q.  What did the engineer say?

18     A.  Handed me the leaflet.

19     Q.  Said that Joe Carmack is handing

20 out leaflets.

21     A.  (Deponent nodding).

22     Q.  So why is that important?

23             MR. BLAISDELL:  Objection.

24             MS. LENT:  Objection.



**J**ack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

234

```
1            BY MR. CARMACK:

2      Q.  Okay.  Is that important to you?

3      A.  It was important to me because I

4  thought you were going to get on a train

5  and take it out of North Station.

6      Q.  Right.  Again, so why would you

7  assume that?

8                 MR. BLAISDELL:  Objection.

9                 MS. LENT:  Objection.  She

10 has answered.

11                MR. CARMACK:  Okay.  All

12 right.  Fine.  It's fine.

13                MR. BLAISDELL:  She's

14 answered several times.

15                MR. CARMACK:  It's fine.

16          BY MR. CARMACK:

17     Q.  Okay.  The fact of the matter is,

18 isn't it, Ms. Boumel, that I contacted an

19 engineer about making a displacement and

20 then he told you about it and you reacted?

21     A.  Yes.

22     Q.  Right.  You reacted to my

23 contacting an engineer about a --

24 seniority rights.
```



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

236

1        BY MR. CARMACK:

2     Q.  Who told you that I was going to

3  board a train, Ms. Boumel?

4     A.  Nobody told me you were going to

5  board a train.

6     Q.  Right.  So you assumed it.

7     A.  Yes.

8     Q.  You assumed that I was going to

9  board a train.

10         What did you assume that I was

11  going to do when I boarded a train?

12     A.  Run the train.

13     Q.  Did you come out and ask me if

14  that's what I was going to do?

15     A.  No, I did not.

16     Q.  Did you, at every time -- at any

17  time get any information from me

18  indicating that I was going to do that?

19     A.  No, I did not.

20     Q.  So what did you do?

21     A.  I called the train dispatcher and

22  asked them what I should do.

23     Q.  What did the train dispatcher say?

24     A.  I believe that's when we decided to


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

237

1  call the police and ask them to ask you

2  to leave.

3       Q.  And why would you do that?

4       A.  You weren't just contacting one

5  engineer, you were handing out leaflets to

6  all engineers --

7       Q.  Okay.

8       A.  -- as they were coming off trains.

9       Q.  And that's a problem.

10      A.  Yes.

11      Q.  Why is that a problem?

12      A.  Because you're not supposed to be

13  handing -- in the station handing out

14  leaflets without a permit.

15      Q.  Are you sure of that?

16      A.  I'm pretty sure of that.

17      Q.  Mm-hmm.  Now, you said that I was

18  handing out leaflets to engineers.

19      A.  (Deponent nodding).

20      Q.  That's not necessarily arbitrarily

21  handing out leaflets.

22            MR. BLAISDELL:  Objection.

23      BY MR. CARMACK:

24      Q.  Is that arbitrarily handing out



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

238

1    leaflets?

2        A.    I don't know.

3        Q.    But your concern when you called

4    the dispatcher and talked about calling

5    the police is because I was handing out

6    leaflets to engineers.

7        A.    No.

8                   MR. BLAISDELL:    Objection.

9        A.    My concern was you were going to

10   board a train.

11       Q.    That I was going to board a train.

12       A.    (Deponent nodding).

13       Q.    Mm-hmm.    And you never asked me if

14   I was going to do that.

15       A.    No, I did not.

16       Q.    You were concerned that I was going

17   to board a train so you called police.

18   What would be wrong with me boarding a

19   train?

20       A.    Boarding a train in the sense that

21   you were going to go up into the engine

22   and run the train.

23       Q.    Mm-hmm.    What indication did you

24   have that -- did you have that I was



Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

290

1   discussion about what the objection is and

2   then adopt that.

3                   MR. CARMACK:    -- 'cuz you're

4   objecting to my phrasing of the question.

5                   MR. BLAISDELL:   Right.   So

6   rephrase it.   That's all.

7           BY MR. CARMACK:

8       Q.   Tell me again what happened when

9   you called the dispatcher after the -- you

10  verified that I was in the station and the

11  engineer gave you the leaflet.

12      A.   I believe we spoke about the fact

13  that you were terminated and handing out

14  leaflets in the station.   And I don't

15  know --

16      Q.   Then what happened?

17      A.   -- why it was -- why it was

18  decided to call the police.   I don't know

19  -- I don't remember what the decision was,

20  why --

21      Q.   Good.

22      A.   -- the police -- we decided to

23  call.

24      Q.   Who called the police?



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

291

1      A.   The chief train dispatcher would

2  have called the police.

3      Q.   You didn't call the police.

4      A.   No, I did not.   Generally, I never

5  -- That's why I would call the chief or a

6  train dispatcher.

7              MR. CARMACK:   We have an

8  exhibit from another deposition here.   Can

9  I enter this exhibit with that number from

10 the other exhibit or do you want --

11             MR. BLAISDELL:   No, that's

12 fine.   Just a new number here would be

13 helpful, though.

14             MR. CARMACK:   Okay.   It may

15 not be necessary.   I'll see about that in

16 a minute.

17         BY MR. CARMACK:

18     Q.   Okay.   So somebody called the

19 police and you think it was the

20 dispatcher, right?

21     A.   Yeah.

22     Q.   So who decided to call the police?

23     A.   I just said I don't remember why it

24 was decided to call the police.



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

309

1      A.  No.

2      Q.  Do you remember telling the

3  policeman that I created a disturbance?

4      A.  No.

5      Q.  You only told the policeman, then,

6  that -- or that -- you only told the

7  policeman that if you told him -- Did you

8  tell the policeman at all that I was

9  handing out leaflets?

10     A.  I believe it was just the leaflets

11  and the fact -- like I said, about you --

12  I was more afraid that you were going to

13  physically get on a train.

14     Q.  So you did say that you were afraid

15  that I was going to get on a train.

16     A.  I wasn't -- I was not afraid that

17  you were going to physically hurt somebody

18  or, you know, that kind -- no.

19     Q.  You were afraid that I was going to

20  get on a train.

21     A.  Yes.

22     Q.  So would there have been a problem

23  with me getting on a train?

24     A.  Getting on a train and running the



Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

310

1  train, not getting -- You can board all

2  the trains you want and be a passenger all

3  you'd like.

4      Q.  So what was -- So the purpose of a

5  policeman being there, then, was -- Tell

6  me.

7                  MR. BLAISDELL:  Objection.

8                  MR. CARMACK:  Why?

9                  MR. BLAISDELL:  How would

10  she know if she didn't ask the policeman

11  to be there.

12                  MR. CARMACK:  Well...

13      BY MR. CARMACK:

14      Q.  The purpose of your calling the

15  dispatcher then was because you were

16  afraid that I was going to get on a

17  train.  And you gave no indication to the

18  policeman that I was causing a

19  disturbance.  Did you give any indication

20  to the policeman that I might board the

21  train?

22      A.  I probably did.

23      Q.  And you told him that --

24      A.  I showed him this (indicating) and


**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

311

1   thought that you'd displace -- you were

2   going to actually go up and try to run

3   the train.

4       Q.  But you didn't tell them that I had

5   threatened anybody.

6       A.  No.

7       Q.  So that was your sole concern, that

8   based on that leaflet, you thought that I

9   might board a train and try to run it.

10      A.  Yes.

11      Q.  Mm-hmm.  But you don't remember me

12  talking to the policeman at all about

13  whether or not I did run that train -- or

14  try to run that train or wanted to try to

15  run that train.

16      A.  No.

17      Q.  So then the bottom line is you

18  don't really know why I was given a no

19  trespass order -- or do you?

20      A.  No.  That was between -- with the

21  police.  I didn't ask for the no trespass

22  order.

23      Q.  So for some reason or another, that

24  policeman decided that I should leave the



JACK DANIEL
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

334

DEPOSITION ERRATA SHEET

RE:                    Jack Daniel Court Reporting
File No.               3576
Case Caption:          Joseph T. Carmack, Vs.
Massachusetts Bay Trans. Authority, et al.

Deponent:              **Jacqueline M. Boumel**
Deposition Date: April 2, 2008
To the Reporter:
I have read the entire transcript of my
Deposition taken in the captioned matter or
the same has been read to me.  I request
that the following changes be entered upon
the record for the reasons indicated.  I
have signed my name to the Errata Sheet and
authorize you to attach to the original
transcript.

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____



Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:    866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

## Deposition of Jacqueline M. Boumel

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

Page No. _____ Line No. _____ Change to: _____

_____

Reason for change: _____

_____ ✓ No changes made to the Errata Sheet

_____ I am returning this signed Errata Sheet with changes noted.

Under penalties of perjury, I declare that I have read the foregoing transcript and that the facts stated in it are true.

SIGNATURE: _Jacqueline M. Boumel_ DATE: 5-2-2006

Jacqueline M. Boumel



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

1

NUMBER OF PAGES: 81

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * *

JOSEPH T. CARMACK          *

VS.                        *          CIVIL ACTION NO:

MASSACHUSETTS BAY          *          05-11430-PBS

TRANSPORTATION AUTHORITY   *

VS.                        *

MASSACHUSETTS BAY          *

COMMUTER RAILROAD CO.      *

* * * * * * * * * * * * * * * * * * * * * * * * *

A DEPOSITION OF ROBERT PAVIA, a WITNESS, taken on

behalf of the PLAINTIFF, pursuant to applicable

provisions of the Massachusetts Civil Procedure, before

Jacquelyn Healey, a Court Reporter and Notary Public in

and for the Commonwealth of Massachusetts at the offices

of Smith & Duggan, LLP, Two Center Plaza, Suite 620,

Boston, Massachusetts, on February 21, 2008, commencing

at  11:05 a.m.

J&K COURT REPORTING SERVICES

P.O. BOX 321, SWAMPSCOTT, MASSACHUSETTS 01907 (781) 593-3950

44

1    Q    Now, you understand that you're called here because of

2         events that happened in North Station on July 1, 2003,

3         correct?

4    A    Yes.

5    Q    Describe those events for me.

6              MR. WITHERBY:  Can you ask a somewhat specific

7         question, please.  I'm going to object to the form of the

8         question

9              MR. CARMACK:  Well, he understands --

10             MR. WITHERBY:  I'm going to object to the form

11        of the question because it's so incredibly open-ended.

12             MR. CARMACK:  I can change it.

13   Q    What happened on July 1, 2003, that it resulted in your

14        being called to testify here today?

15   A    At approximately 16:16, which is 4:16 in the afternoon I

16        was dispatched to the North Station Commuter Rail lobby

17        for a report of a disorderly male.  Upon my arrival I was

18        met by Trainmaster Boumel who stated that an ex-Amtrak

19        employee, who was later identified as Joseph Carmack,

20        yourself, was attempting to disrupt service and was

21        passing out literature on platform three.

22             MR. CARMACK:  Okay, let the record show that

23        Detective Pavia is now reading from a police report, an

24        MBTA police report to describe the events of July 1.

45

```
 1              I would like to submit that as an exhibit.
 2              (Exhibit No. 1 marked; MBTA Incident Report 7/1/03)
 3              Do you need a copy of that, Mr. Blaisdell?
 4                  MR. BLAISDELL:  Sure.  Are you going to refer
 5          to it during your deposition?
 6                  MR. CARMACK:  Yes.  Do you have one, do you
 7          need one?
 8                  MR. WITHERBY:  I can use my own.
 9    Q     Now, you said that you were dispatched to North Station,
10          where were you before then?
11    A     I don't remember
12    Q     Do you remember whether or not you would have been in the
13          environs of the station?
14    A     I don't believe so.  Looking at the time, from the time I
15          was dispatched till the time that I arrived, talking
16          eight minutes.  So, I would guess not.  But, I don't
17          remember where I was or where I responded from.
18    Q     Is there an office that you report to when you first go
19          to North Station and are dispatched there?
20    A     I don't work -- I didn't work out of North Station.  I
21          worked out of our headquarters.  That's where I reported
22          to work.
23    Q     Do you recall there being any offices in North Station on
24          that day?
```

49

```
 1          who you were looking for?

 2    A     I believe I was sent to -- I believe I walked straight to

 3          that office.  I don't know if I, over the radio, was told

 4          to go directly there, what.  I don't remember what

 5          brought me directly to her.

 6    Q     Okay.  So, when you were dispatched, what does that mean

 7          to be dispatched?

 8    A     They call you over the radio and tell you to respond

 9          somewhere and why you're responding there.

10    Q     So, you don't remember where you were when you got this

11          call over the radio?

12    A     No.

13    Q     But, you went to North Station.

14          Tell me what the first thing was you did when you

15          entered the station?

16    A     I made contact with Jackie Boumel.

17    Q     So, you talked to Ms. Boumel -- is the first person --

18          was that you talked to?

19    A     Correct.

20    Q     What did you say to her?

21    A     I don't remember exact words.  I believe I asked her what

22          was the problem.  As far as exact wording I have no idea.

23    Q     Do you remember what she said?

24    A     She explained that an ex-Amtrak employee, yourself, was
```

50

```
 1              at -- been on track three passing out pamphlets that

 2              were, I believe -- and that she had asked, I believe she

 3              said she had asked you to leave the property.

 4    Q    Are you sure she asked me, Joseph Carmack, to leave the

 5         property?

 6    A    No.

 7    Q    But, she told you that I was passing out literature,

 8         pamphlets?

 9    A    Yes.  And that you were attempting to disrupt service.

10              MR. CARMACK:  Let the record show that

11         Detective Pavia is looking at the MBTA police department

12         incident report to say that -- to answer that question.

13              MR. WITHERBY:  No, in the course of answering

14         that question.

15              MR. CARMACK:  In the course of answering that

16         question.

17    Q    Did she say specifically what it was that I was doing

18         that was disrupting service?

19    A    I don't remember exactly.

20    Q    Did she describe how I was passing out pamphlets?

21    A    I believe she said they were threatening in -- the

22         pamphlets themselves were threatening in nature.

23    Q    Do you know how they were threatening?

24    A    I do after reading them.
```

51

```
 1    Q    How were they threatening?

 2    A    Well, there's several things that I would find, myself, I

 3         would find threatening.

 4    Q    What are the threatening things that you saw?

 5    A    There's a -- your name, I don't know if it's your

 6         signature on it but this is actually a copy of what you

 7         had handed me that day where ----

 8              MR. BLAISDELL:  Can I interrupt for a second.

 9         Mr. Carmack, do you intend to introduce this as an

10         exhibit?

11              MR. CARMACK:  I will, I will, I'm going to

12         pass ----

13              MR. BLAISDELL:  It might be better to put it

14         in now.

15              MR. CARMACK:  Okay, that's fine.

16              MR. BLAISDELL:  That way we know what he's

17         reading off of.

18              MR. CARMACK:  Okay.

19              MR. BlAISDELL:  Thank you.

20              MR. WITHERBY:  So, this is Exhibit 2?

21         (Exhibit No. 2 marked; Pamphlet)

22    A    I don't know which side as far as if you want to refer to

23         side one or side two.  So, you can follow ----

24    Q    I just want to know what's threatening.
```

52

1    A    Well, I want to make sure that that's the same as what

2         I'm -- got from you that day.

3              MR. WITHERBY:  She's marked -- the sticker is

4         on that side.

5              MR. CARMACK:  We'll call that side one.

6              MR. WITHERBY:  Call it side one.

7              MR. CARMACK:  Uh-huh.

8    Q    Do you want to look at the exhibit?

9    A    Well, I just want to make sure it's the same as what I

10        saw that day.

11   Q    Why don't you look at the exhibit and we'll swap copies,

12        I'll look at yours while you look at the exhibit.

13   A    The side with the sticker on it, on that side on item

14        number nine, it says "J. Carmack will make displacement

15        on run 820 on July 1, 2003, at 4:40 p.m." which is about

16        15, 16 minutes after I arrived at the station.  That

17        itself to me, 4:40 in the afternoon on a weekday, you're

18        in rush hour, displacement, I have no idea as far as how

19        you're going to make a displacement run.  To me it sounds

20        threatening in one way and at the same time if nothing

21        else I would find it threatening toward the existing crew

22        that was to operate the train.

23             At the time you're not an employee, you had no

24        identification saying that you were a MBCR employee.  I

53

1       had no idea if you were qualified to perform the duties

2       that you were saying you had a right to perform.  And I

3       wasn't going to risk public safety by letting you even

4       enter that train like you said you were -- you had

5       intentions of doing.

6           On the back side of that page there's other things

7       that you state in the pamphlet that you were passing out

8       that are very, what I would find threatening.  I'm just

9       trying to -- "I will not be denied by O'Bryan".  "Now

10      hear this, Guildenstern is dead.  Let's rock".  I find it

11      all very, although vague, very threatening.  You had,

12      like I said, you had no -- nothing to prove that you were

13      an employee, that you had a right to be there.  I have a

14      current MBCR employee or trainmaster, I believe, was her

15      position saying that you were not an employee and at the

16      same time I have you saying that you were going to get on

17      this train and after these threats I never would have let

18      you anywhere near that train.

19  Q   Where does it say I'm going to get on a train?

20  A   I don't know -- or disrupt or however it is.  But, I

21      don't see how you would -- whatever displacement is on

22      run 820 would have to had -- do something with the train,

23      at least that's the way I would look at it.

24  Q   What exactly did Ms. Boumel say to you?

56

1              MR. BLAISDELL:  Mr. Carmack, before you go to

2         that, just want to make it clear on the record that he

3         was just reading from a document, he is not adopting

4         these statements as his own, or at least that's my

5         understanding.

6              Thank you, Mr. Carmack.

7              MR. CARMACK:  You're welcome.

8    Q    Where does it say that I'm going to get on a train?

9    A    It doesn't.

10   Q    What is run 820?

11   A    To me, I interrupted as a trip that was going to be

12        leaving out of North Station.

13   Q    But you don't know.

14   A    I'd have to go back and look at a schedule or -- but,

15        with the way workplace violence and school place violence

16        is I wasn't going to take a chance on waiting to see and

17        find out what it exactly was that you were going to do at

18        4:40 p.m.

19   Q    Did you ask me?

20   A    I don't remember.  I don't remember the exact

21        conversation we had.  I remember seeing this, finding

22        this threatening and explaining to you that you could not

23        pass these out at the station and that you were going to

24        have to leave the MBTA property.

57

```
1    Q    So, in your mind just tell me what item nine means?

2    A    I think it sounds like you were going to enter the train

3         and somehow exercise what you called your seniority but

4         you were no longer and employee and attempt to work or

5         perform the duties you use to perform when you were an

6         employee seemed confrontational and I wasn't going to

7         risk either a problem with you and the crew that had the

8         right to be there and also risk the public safety of the

9         rider ship who would have been on this train.

10   Q    Now, when you were just telling me about that you

11        mentioned that I would exercise my seniority ----

12             MR. WITHERBY:  Objection.

13             MR. CARMACK:  He mentioned it.

14             MR. BLAISDELL:  I think he said seniority as

15        you understood it.  I don't think he said you were

16        exercising your seniority.

17             MR. CARMACK:  Okay, that's fine.

18   Q    What does that mean to exercise seniority?

19   A    If you were in fact an MBCR employee and you had a

20        position there and you had seniority where maybe --

21        usually it means an earlier date of hire than somebody

22        else, then you would have seniority.  But, because you

23        were not an MBCR employee you did not have seniority or

24        the right to operate or -- I don't even know what your
```

58

1          position was prior to you -- when you worked for Amtrak.

2          But -- I don't know if you were a conductor or what.

3          But, you had no right to perform any duties on that

4          train.

5     Q    So, then, you understand that this document is talking

6          about rights to seniority, rights to seniority.

7                    MR. BLAISDELL:  Objection.

8     A    I wasn't concerned with anything that had to do with --

9          your union issues were your union issues.  Whatever was

10         going on as far as that goes, that was your thing.  This

11         wasn't the forum for this.  The commuter rail lobby or

12         the tracks, the platform, wasn't the place for this.

13         What I was there for, I was dispatched there because

14         somebody called, said that somebody was being disorderly

15         and passing out threatening pamphlets.  That's what I was

16         there for.  When I looked at the pamphlets and I found

17         them, that they could definitely be interpreted as

18         threatening it was at that time that I decided that you

19         were going to have to leave the property and stop passing

20         out these pamphlets.  That's what I was there for.

21              I wasn't concerned about your union issues.  Your

22         unions were something you needed to deal with, but not in

23         that forum.  My concern was with the public safety and

24         the safe and efficient transportation of the rider ship.

59

```
 1    Q    So, are you saying that exercising seniority is

 2         threatening?

 3    A    In this format, yes.

 4    Q    What is that format?

 5    A    Like I said, I've explained, like, item nine, the way you

 6         worded it.  Very clearly on the backside of that where,

 7         "let's rock, Guildenstern is dead", I think the majority

 8         of the people and I think it would be very easy to get

 9         most people to say, I could find that threatening.  I

10         did.

11    Q    What did you think I was doing wit it?

12    A    I didn't know.  But, if you're passing it out to people

13         which is what I was told you were doing then I could find

14         it very -- that somebody could be placed in fear and I

15         was not going to let that continue.

16    Q    So, Ms. Boumel told you that I was passing it out to

17         people?

18    A    Yes.  She said you were passing out pamphlets.  I can't

19         imagine that you'd be passing out to anything but people.

20    Q    And that's the only thing that you based that on,

21         correct?

22    A    After I read it.  I said, I would find this, even if

23         whether it was a regular person riding or whether it was

24         an employee walking by I think they also could find it
```

60

```
 1        threatening.  But, like I said, I wasn't going to take

 2        the chance of letting you remain on the property with

 3        knowing what this says.

 4    Q   So, specifically, then, the way you're interpreting the

 5        word displacement ----

 6    A   Let's rock and Guildenstern is dead, I find that

 7        threatening.

 8    Q   How is that threatening?

 9    A   I don't know who Guildenstern is dead but it very easily

10        could mean, I'm going after somebody.

11    Q   Isn't that past history?

12    A   I have no idea.

13    Q   That's what it says?

14    A   No, it could be forward, too.  You're dead.  That

15        person's dead.

16    Q   Did you ask me about that?

17    A   I don't recall but looking at this I don't believe so.

18        Let's rock.  Like I said, there's a lot of different

19        stuff.  Now hear this.  It seemed like you're trying to

20        strong arm people, and like I said, to me it's very

21        threatening and that's about it.

22    Q   Is there anything else that you can think of that would

23        indicate I was creating a disturbance?

24            MR. WITHERBY:  You mean other than the contents
```

66

1    Q    Did you see me pass it to anyone?

2    A    I don't recall.  I really don't.

3    Q    Is there anything else that you talked to me about?

4    A    I believe I talked to you about the fact that you were

5         going to have to leave the property.  I issued a verbal

6         trespass warning and explained to you that if you came

7         back on MBTA property within 24 hours that you could be

8         subject to arrest for trespassing.  I believe walked with

9         you till you exited the station.

10   Q    Is there anything else?

11   A    Not that I can remember.

12   Q    What is trespassing?

13   A    Trespassing, I'd have to have, I mean, for -- the statute

14        in front of me but to give you the legal definition but

15        when you're on private property or and have been either

16        gotten there by ill means, whether it's by climbing a

17        fence or by passing a locked gate or once you're asked to

18        leave by somebody who has the right to leave and you

19        remain there you're trespassing.

20   Q    Was I trespassing?

21   A    If you came back you would have been.  You had just been

22        asked to leave.

23   Q    So, do I understand you correctly when you say that

24        because I had been asked to leave by you if I came back I

67

```
 1          would be trespassing?

 2     A    You would have been trespassing.

 3     Q    Now, you mentioned trespassing as being on private

 4          property, was I on private property?

 5     A    You were on MBTA property.  As an authority with the MBTA

 6          I have the authority to ask you to leave.

 7     Q    You have the authority to ask me or anyone else to leave

 8          North Station, right?

 9               MR. WITHERBY:   Objection.

10     Q    Do you have the authority to ask me or anybody else to

11          leave North Station?

12     A    If there's a reason, yes.

13     Q    So, there has to be a reason to ask me to leave North

14          Station.

15     A    Like passing out threatening flyers, something like that.

16                              (RECESS)

17     Q    You just mentioned, quickly again, what were the

18          limitations that you described on my activities,

19          prescribed on my activities when we left the station?

20     A    That you were going to have to leave and you could not

21          come back onto MBTA property for 24 hours.

22     Q    And what was the reason?

23     A    Because of the threatening flyers that you were passing

24          out.
```

68

| | | |
|---|---|---|
| 1 | Q | So, I couldn't come back at all for 24 hours? |
| 2 | A | Correct. |
| 3 | Q | So, do I understand correctly it was because of the |
| 4 | | leaflets -- |
| 5 | A | Correct. |
| 6 | Q | -- specifically, nothing else, it was just because of |
| 7 | | what the leaflet said that I was being asked to leave the |
| 8 | | station? |
| 9 | | MR. WITHERBY:  No, I don't -- I think he |
| 10 | | testified it was because of all of those. |
| 11 | A | The combination of things as far as you were out in an |
| 12 | | area passing them out where you can't be pass -- doing, |
| 13 | | like I said, that's not the forum for what you were |
| 14 | | doing.  It's 4:40 or whatever, 4:24 in the afternoon or |
| 15 | | 4:15, it's rush hour. |
| 16 | Q | Passing out leaflets and you said, I think ---- |
| 17 | A | That's an area for passengers to get to and from the |
| 18 | | train on the platform which is where I was told you were |
| 19 | | originally on platform three.  It was a combination of |
| 20 | | that and the fact that you weren't an employee, you |
| 21 | | couldn't produce anything to say you were an employee and |
| 22 | | -- which was contradictory to what you were claiming. |
| 23 | | So, it was a combination of those things that made |
| 24 | | me give you the trespass warning and asking you to leave. |

74

1    happening and he says that time and again.  I don't know,

2    I don't remember, you know.  So, you know, the questions

3    that I have are related to what we know happened or what

4    can be shown to have been -- to have happened and what he

5    does know.  And then exploring his statements for

6    consistency, that's all.  That's all.  He has a job to

7    do.  We want that to be described and we want to know how

8    he was doing his job on July 1, 2003, don't we?

9                MR. WITHERBY:  Go ahead and ask your next

10   question.

11   Q    I'm going to hand Detective Pavia a document, asking him

12        if he's ever seen it before.  It says, at the top of it,

13        Special Bulletin Number 94-30.

14   A    Yes, I believe so.

15               MR. CARMACK:  I'm going to submit it as

16        evidence, then.

17               (Exhibit No. 3 marked; Special Bulletin Number 94-

18               30)

19   Q    When did you first see that document?

20   A    I don't remember the exact day.

21   Q    Did what's in this document have any effect on your

22        conduct that day?

23   A    Yes.  I'd have to review it for a couple seconds.

24   Q    I'm going to ask you not to review it.

75

| 1  | A | Oh. |
|----|---|-----|

1   A   Oh.

2   Q   What's in that document that you know of without

3       reviewing it -- how does that document impact on what you

4       did that day?

5   A   Without reviewing it?

6   Q   Yeah.  You said you recognized the document.

7   A   Do you want me to answer the question?

8   Q   Yes, please.

9   A   It's a document that has some of the rules, what defines

10      commercial and non-commercial activity on the MBTA

11      property and what's allowed and what's not allowed.  As

12      to the specifics I'd need to read it.  But, very clearly,

13      what we consider disorderly or threatening behavior would

14      be a prohibited activity that would cause you to be

15      issued a trespass warning and ejected from the property.

16  Q   You mentioned commercial and non-commercial activity?

17      What's commercial and non-commercial activity?

18  A   Non-commercial would be where people are out there, say,

19      soliciting signatures or something like that.  Maybe

20      public awareness, that type of stuff, charity type stuff

21      where money is not involved.

22      And then commercial would be like vendors and

23      people selling stuff where you have to have permits and

24      there's money involved.

76

```
 1    Q    How does that apply to what you did on July 1, 2003,

 2         regarding me?

 3    A    I believe I just explained that because what would be

 4         considered prohibited behavior would be putting somebody

 5         in fear or being disorderly.  That had already occurred,

 6         otherwise I wouldn't have called there.  Then also the

 7         fact that I had an MBTA or -- not MBTA, a MBCR employee

 8         who had already stated that you were on the platform

 9         three and I think it's very clear that in these -- in

10         this, you can't be within 15 feet of a platform.  So, you

11         had also violated that.

12    Q    Did you tell me that?

13    A    I had already told you that you were -- by then you were

14         already leaving.

15    Q    So, you never told me that I could be in the ----

16    A    No, you were already in a violation of that.  You had

17         already passed out the flyers that were found

18         threatening.  I also found them threatening and you were

19         already being told to leave.

20    Q    Just tell me what a trespassing order is.  What is a

21         trespassing order?

22    A    Like I explained to you, I believe, already earlier was

23         as an official of the MBTA I have the right to tell you

24         that you have to leave.  If you don't leave you're
```

80

1                                    SIGNATURE

2

3            J, the undersigned, _Robert C. Paris_____do

4       hereby certify that I have read the foregoing and that to

5       the best of my knowledge said Deposition is true and

6       accurate (with the exception of the following desired

7       changes listed below);

8            PAGE              LINE              CHANGE

9

10

11

12

13

14

15

16

17

18

19       _____

20                      DEPONENT'S SIGNATURE

21

22       Subscribe and sworn before me this _26th_ day of _March_,20_08_

23       Date_____NOTARY PUBLIC_____

24

| Journal No. 03019163 | **MBTA POLICE DEPARTMENT** *Journal Incident Report* | | | | ORI No. MA013250 |
|---|---|---|---|---|---|

| Incident **DISORDERLY** | Date Reported **07/01/03** | Date Occurred **07/01/03** | Day of Week **TUESDAY** | Time Occurred **16:15** | Status **EXCEPTIONALLY CLEARED** |
|---|---|---|---|---|---|

| Location **NORTH STATION CR** | Area **ZS** | Line **COMMUTER RAIL** | County **SUFFOLK** | City/Town **BOSTON** | Bus Line |
|---|---|---|---|---|---|

| Victim T Employee? **NO** | Disposition **PERSON(S) EJECTED** | Remarks **395/TRAIN MASTER RE DISORD/OFF ISSUED TRESPASS NOT** |
|---|---|---|

| Unit | Officer 1 | Officer 2 | Received | Dispatched | Arrived | Cleared |
|---|---|---|---|---|---|---|
| T511 | (511) PAVIA, ROBERT | | 16:15 | 16:16 | 16:24 | 16:43 |
| T320 | (297) FITZGERALD D | | 16:35 | 16:35 | 17:41 | 17:41 |

### INVOLVED PERSONS

| Type **UNKNOWN** | Name (Last, First, Middle Initial) **CARMACK, JOSEPH T.** | Sex **MALE** | Race **WHITE** | D.o.B. **12/08/55** | Age **47** |
|---|---|---|---|---|---|

| Address **592 TREMONT ST APT 5** | City/Town, State, Zip **ROXBURY, MA 02118** |
|---|---|

| Home Telephone **617-536-0772** | Work Telephone | Remarks **DISORDERLY** |
|---|---|---|

| Type **T EMPLOYEE** | Name (Last, First, Middle Initial) **BOUMEL, JACKIE** | Sex **FEMALE** | Race **WHITE** | D.o.B. | Age |
|---|---|---|---|---|---|

| Address **CR NORTH STATION** | City/Town, State, Zip |
|---|---|

| Home Telephone **617-222-3656** | Work Telephone | Remarks **TRAINMASTER** |
|---|---|---|

### NARRATIVE

AT THE ABOVE DATE AND TIME T511 WAS DISPATCHED TO THE NORTH STATION CR LOBBY FOR A REPORT OF A DISORDERLY MALE. UPON MY ARRIVAL I WAS MET BY TRAINMASTER BOUMEL WHO STATED THAT AN EX- AMTRAK EMPLOYEE (WHO WAS LATER IDENTIFIED AS CARMACK, JOSEPH) WAS ATTEMPTING TO DISRUPT SERVICE AND PASSING OUT LITERATURE ON PLATFORM # 3. I THEN MADE CONTACT WITH CARMACK AND TOLD HIM HE NEEDED TO LEAVE THE PROPERTY AND GAVE HIM A TRESPASS ORDER.

T511/PAVIA



| Investigating Officer **(511) PAVIA, ROBERT** | Printed from terminal **Crime Analyst - Manuela DeSouza (6) on 11/27/07 at 16:39** | Page 1 of 1 |
|---|---|---|

TO:       ALL SUBWAY OPERATIONS PERSONNEL

SUBJECT:  INTERIM GUIDELINES FOR NONCOMMERCIAL EXPRESSIVE ACTIVITY
          ON MBTA PROPERTY

In order to provide equal access to all persons desiring to engage
in noncommercial expressive activity in MBTA facilities while
protecting the safety and convenience of MBTA patrons and providing
safe and efficient transportation, the MBTA will authorize
noncommercial expressive activities in MBTA stations as follows:

I. DEFINITIONS

   For purposes of this regulation, the following definitions
   will apply:

   (1)  Commercial Activity – Any enterprise oR venture by groups
        or individuals for the purpose of promoting or selling
        products or services to transit patrons at a fee,
        including distribution of goods and materials for free or
        soliciting contributions from transit passengers or the
        public.

   (2)  Noncommercial Expressive Activity – Conducting any of the
        following activities for political or non-profit purposes
        as defined by G.L. c.180, section 4 and G.L. c.55,
        section 1: solicitation of signatures; distribution of
        printed materials; or publicly addressing transit patrons
        at a noise level greater than 85 decibels.

   (3)  Prohibited Conduct – The following conduct is prohibited:

        (a)  unlicensed commercial activity;

        (b)  distribution of food or drink;

        (c)  posting any signs, advertisements, circulars, or
             printed material;

        (d)  setting up any tables or other portable equipment;

        (e)  carrying any signs or placards that are more than 2
             feet by 2 feet or are affixed to a pole;

        (f)  affixing any material to any part of the MBTA
             structure;

        (g)  discarding or leaving leaflets or other printed
             material unattended;

        (h)  producing or amplifying sound to a level greater
             than 95 decibels.



EXHIBIT
Pavia
3
2/21/08   ph

II. PROHIBITION IN EMERGENCY:

Noncommercial expressive activity may be prohibited for a reasonable period of time because of emergency, storm, accident, power failure, strike, or because of any event creating a dangerous condition or unduly interfering with the rights of transit patrons using the MBTA or unduly interfering with or impeding the operations of the MBTA.

III. LOCATION:

All noncommercial expressive activities are to take place at a distance greater than fifteen (15) feet from any elevator, escalator, stairwell, turnstile, kiosk, busway, collector's booth or fare card machine, the edge of any platform, any retail or food concession area, or any area under construction. No noncommercial expressive activities may take place on MBTA vehicles or in any paid or platform areas of the station or other areas, tunnels or corridors less than fifteen (15) feet in width. No noncommercial expressive activities may obstruct the pedestrian traffic flow in the usual egress and ingress to the station, to the fare collector's booth, to the turnstile, or to vehicles.

IV. STANDARDS OF CONDUCT:

(1) Interference with Transit Riders, the Public, and Other Activities - The performance of noncommercial expressive activities shall not unduly interfere with the safety of transit riders or the public, the safe and efficient operation of the transit system, or other activities being conducted on Authority property.

(2) Littering - The presence of discarded paper or other materials resulting from noncommercial expressive activity may constitute a safety hazard to MBTA patrons which cannot be remedied by normal MBTA station maintenance procedures. Accordingly, persons engaging in noncommercial expressive activities are directed to deposit in appropriate trash containers any trash resulting from such activities.

V. VIOLATION OF REGULATIONS:

If the Authority determines that any organization or individual is conducting noncommercial expressive activity in violation of these Guidelines or any statute, ordinance or law, the Authority shall so notify the violator and the noncommercial expressive activity shall either be conducted in the authorized or lawful manner, or the activity shall cease and the violators shall immediately leave the Authority property. Failure to cease the noncommercial expressive activity in violation of these regulations when so requested may constitute a trespass and the violators may be arrested and subject to fine or imprisonment in accordance with G.L. c.161, section 95 or other applicable criminal laws and ordinances.

Each person engaging in noncommercial expressive activity does
so at his or her own risk and the MBTA assumes no liability by
the grant of this authorization.

Wednesday, July 6, 1994
RHP

Robert H. Prince
Assistant General Manager
for Subway Operations

cc:  J.E. Rooney          M.S. Francis
     J. Requa             J.J. Curtin
     P.A. Lucas           E. Dickinson
     W.H. Bregoli         District Superintendents
     J.T. Brown           Maintenace Superintendents
     A.H. Castaline       Night/Weekend Supervisors
     R. Diggs             W.F. McCoy
     J.R. Killgoar        K.J. Doyle
     A.Y. Herzenberg      T. Moriello
     B. Kluge             W.M. Donovan
     M.H. Mulhern         D.M. Marcinow
     D.A. Smith           Dispatchers
     J.R. O'Donovan       Power Dispatchers
     F.C. Goodine         Judith Dupille - DPU
     F.X. McDonough       J.E. Lydon (Local 589)
     R.F. Stephan         R.J. Breen (Local 600)
                          M.L. Daly (OTA)

**Copy of Transcript**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH T. CARMACK,

      Plaintiff, *Pro Se*

    Vs.                            CIVIL ACTION NUMBER:
                                      05-11430-PBS
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,
    and
MASSACHUSETTS BAY COMMUTER RAILROAD CO.

      Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**30 (b)(6) DEPOSITION OF MBTA**

**GIVEN BY JOHN D. RAY**

April 30, 2008
9:10 a.m.

Jack Daniel Court Reporting and Video
100 Franklin Street
Boston, Massachusetts

Amanda Stevens, Notary Public and Certified Shorthand Reporter
within and for the Commonwealth of Massachusetts



Technologies you can use • Experience you can Trust

100 Franklin Street, Boston, Massachusetts 02110
Phone: 617.557.0039 • Toll Free: 866.814.0039 • Toll Free Fax: 866.557.0041
www.jackdanielreporting.com

4

1                  S T I P U L A T I O N S :

2           It is hereby stipulated by and

3     between counsel for the respective parties

4     that the sealing, certification and filing

5     of the deposition are waived; that the

6     deponent will read and sign the deposition

7     transcript within 30 days of receipt

8     thereof; and that all objections, except

9     as to the form of the question, and all

10    motions to strike are reserved until the

11    time of trial.

12

13

14

15

16

17

18

19

20

21

22

23

24

**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

5

1      3 0 ( b ) ( 6 )   D E P O S I T I O N   O F   T H E   M B T A

2      G I V E N   B Y   J O H N   D .   R A Y

3      A P R I L   3 0 ,   2 0 0 8

4      P R O C E E D I N G S :

5      *JOHN D. RAY*, the deponent, having

6      been satisfactorily identified and duly

7      sworn by the Notary Public, was examined

8      and testified as follows:

9      MR. WITHERBY:  I'd like to

10      make a statement at the beginning --

11      MR. CARMACK:  Okay.

12      MR. WITHERBY:  -- if I may.

13      This is a deposition of the

14      Massachusetts Bay Transportation Authority

15      under Rule 30(b)(6), and there were a

16      number of topics identified in the

17      deposition notice.

18      I took the position with Mr.

19      Carmack that the court had authorized

20      inquiry into only two topics:  One being

21      the relationship between the MBTA and MBCR

22      relative to MBCR employees; and the other

23      being federal grants, and whether federal

24      moneys were received by MBCR through the


Jack Daniel
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

148

1    exhibit that was actually handed out?

2                    MR. WITHERBY:   No.   That's

3    in the original which was marked, but --

4                    MR. BLAISDELL:   And that

5    will be copies.

6                    MR. WITHERBY:   -- what was

7    handed out was only a portion, so we're

8    going to have to make full copies of this

9    for the exhibit.

10                   MR. BLAISDELL:   Thank you.

11       BY MR. WITHERBY:

12       Q.   Is that also stated in Exhibit 3?

13       A.   Yes, it is.

14       Q.   Okay.   Now, Mr. Ray, what is your

15   position with the MBTA?

16       A.   I'm a director of railroad

17   operations.

18       Q.   And the scope of your

19   responsibilities, in general?

20       A.   The commuter rail operation.

21       Q.   You're in charge of that for the

22   MBTA.

23       A.   Yes.

24       Q.   Is it part of your responsibility



Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

153

1      A.  I don't.

2      Q.  Mr. Ray, Mr. Carmack asked you a

3  number of questions about the operating

4  agreement between MBCR and MBTA that was

5  entered into in early 2003.  I'd like to

6  ask you some more questions about that

7  agreement.

8           Do you know whether -- what the

9  relationship between MBTA and MBCR is, as

10  defined by that agreement?

11      A.  That MBCR is an independent

12  contractor to the MBTA.

13      Q.  Do you know whether that agreement

14  provides whether or not MBCR is an agent

15  of the MBTA?

16           MR. CARMACK:  I'm going to

17  object to that question.

18           MR. WITHERBY:  You may

19  answer.

20      A.  I believe it says that they are not

21  an agent of the MBTA.

22      Q.  Do you know who is required to

23  supply the personnel for operating the

24  commuter rail service under the agreement?



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

154

```
 1      A.  MBCR is.
 2      Q.  Do you know whether the operating
 3 agreement provided that those personnel
 4 would or would not be employees of the
 5 MBTA?
 6      A.  I think it prohibits them from
 7 being employees of the MBTA.
 8      Q.  Under the agreement, does the MBTA
 9 have any involvement in hiring or firing
10 of contract or personnel of MBCR?
11      A.  No.
12      Q.  Does --
13              MR. CARMACK:  I'm going to
14 object to the question.
15              MR. WITHERBY:  What's the
16 basis of your objection?
17              MR. CARMACK:  Well, I
18 essentially asked that question already.
19              MR. WITHERBY:  I don't think
20 you did.
21              MR. CARMACK:  I asked it in
22 the context of a document that you didn't
23 want me to ask him about.  But that's
24 fine.  I'm just telling you I'm objecting.
```



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

155

1          MR. WITHERBY:  Well, you

2 asked him whether he was familiar with

3 that particular document and he said he

4 wasn't.

5          MR. CARMACK:  Okay.  Go

6 ahead.

7      BY MR. WITHERBY:

8      Q.  I'm asking him if he -- if the

9 MBTA under the agreement and -- or, in

10 fact, has involvement in the hiring or

11 firing of MBCR contracting personnel --

12 contractor personnel.

13      A.  No, the MBTA doesn't.

14      Q.  Does the MBTA have supervisory

15 authority over the MBCR's contractor

16 personnel?

17      A.  No.

18      Q.  Did the MBTA have any involvement

19 with whether or not the plaintiff in this

20 action, Mr. Carmack who has been

21 questioning you, was hired to a position

22 at MBCR in 2003?

23      A.  Could you ask that again?

24      Q.  Did the MBTA have any involvement



Jack Daniel
Court Reporting & Video Services
Technologies you can use • Experience you can Trust

Direct Dial:    617.557.0039
Toll Free:      866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

156

1  in the MBCR's decision as to whether to

2  hire Mr. Carmack or not in 2003?

3      A.  No, they didn't.

4              MR. WITHERBY:  I have no

5  further questions.

6              MR. CARMACK:  I'm objecting

7  to the question because we already talked

8  about the contract and elements of the

9  contract; the operating agreement that did

10  require the MBCR to do certain things.  It

11  was regarding, you know, fulfilling

12  positions, so also -- but I'm going to

13  have to --

14              MR. WITHERBY:  But normally

15  what we do is we ask if Mr. Blaisdell has

16  any questions.

17              MR. CARMACK:  Okay.  Go

18  ahead.

19              MR. BLAISDELL:  No questions

20  at this time.  Thank you.

21              MR. CARMACK:  All right.

22          **FURTHER EXAMINATION**

23          **BY-MR.CARMACK:**

24      Q.  Does the MBTA hold the MBCR



**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:     617.557.0039
Toll Free:       866.814.0039
Toll Free Fax:   866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

163

1          **COMMONWEALTH OF MASSACHUSETTS**

2

3       I, AMANDA STEVENS, a Certified

4    Shorthand Reporter and Notary Public in

5    and for the Commonwealth of Massachusetts,

6    do hereby certify that the witness whose

7    deposition is hereinbefore set forth was

8    duly sworn, and that such deposition is a

9    true record of the testimony given by the

10   witness.

11       I further certify that I am neither

12   related to or employed by any of the

13   parties in or counsel to this action, nor

14   am I financially interested in the outcome

15   of this action.

16       In witness whereof, I have hereunto set

17   my hand and seal this 9th day of May

18   2008.

19

20   *Amanda Stevens*

21   Amanda Stevens, CSR

22   Notary Public

23   My commission expires November 3, 2011

24

**Jack Daniel**
Court Reporting & Video Services
Technologies you can use  •  Experience you can Trust

Direct Dial:      617.557.0039
Toll Free:        866.814.0039
Toll Free Fax:  866.557.0041
www.jackdanielreporting.com

100 Franklin Street
Boston, Massachusetts 02110

# COMMONWEALTH OF MASSACHUSETTS

3(

SUFFOLK, SS.
                                                    SUPERIOR COURT
                                                    CIVIL ACTION
                                                    NO. 03-0034

## LEEVON CLOUD,
### Plaintiff

### vs.

## McCOURT CONSTRUCTION COMPANY et al.,
### Defendants

# MEMORANDUM AND ORDER ON DEFENDANT MBTA'S MOTION FOR SUMMARY JUDGMENT

According to the plaintiff Leevon Cloud ("Cloud"), on November 2, 2002, he was driving

a leased taxicab on Brigham Circle in Boston when Ron Apodaca, an employee of the defendant

McCourt Construction Company ("McCourt Construction"), allegedly kicked and dented his cab.

When Cloud left his cab to inspect the damage, Apodaca and another McCourt Construction

employee, John Ogren, allegedly assaulted him. MBTA Police Officer William Smith, Jr.

("Officer Smith"), who was working a paid detail for McCourt Construction, arrived on the

scene, broke up the altercation, separated Apodaca and Ogren from Cloud, and spoke privately

with Apodaca and Cloud. Apodaca yelled at Officer Smith to demand Cloud's license,

registration, and insurance card. Officer Smith told him he would take care of it and approached

Cloud. Officer Smith ran a check on Cloud's license and registration, and told Cloud that the

Registry of Motor Vehicles had revoked the taxicab's registration for failure to pay insurance.

Officer Smith then called a tow truck and had Cloud's cab towed, refusing Cloud's request that

Officer Smith wait fifteen minutes for the owner to arrive with proof of the cab's insurance.

Officer Smith did not issue Cloud a criminal citation to give to the cab owner for having an

unregistered and uninsured taxicab; nor did he arrest Cloud. In the police report that Officer

Smith prepared, he described Cloud as Asian, when he is a black African-American.

Cloud later filed suit against, among others, McCourt Construction, Apodaca, Ogren, the Massachusetts Bay Transportation Authority ("MBTA"), and three MBTA officials in their official capacity: James Scanlon (MBTA's Chairman), Michael Mulhern (MBTA's General Manager), and William Fleming (MBTA's Chief of Police) (collectively, "the MBTA Defendants"). He has not filed suit against Officer Smith. The MBTA Defendants now move for summary judgment as to the three counts brought against them in the Amended Complaint. After hearing, the MBTA's motion for summary judgment is **ALLOWED**.

## DISCUSSION

This Court will address each of the three counts in turn.

1. __Violation of G.L. c. 93, § 102 - the Massachusetts Equal Rights Act__

Cloud contends that the MBTA Defendants violated his right under G.L. c. 93, § 102, the Massachusetts Equal Rights Act ("MERA") to the same right "to make and enforce contracts" enjoyed by white male citizens, regardless of his race. Cloud cannot prevail on this count for two reasons. First, MERA's protection of the right "to make and enforce contracts" has been narrowly defined to be limited to work-related rights: (1) the right to enter into an employment agreement and (2) the right to enforce the terms of an employment agreement upon termination. Greaney v. Heritage Hospital, 1995 WL 1146185 (Mass. Super. Ct.) (Sosman, J.) and Rathore v. Kelly, 2002 WL 31082045 (Mass. Super. Ct.) (Brassard, J.), each citing Patterson v. McLean Credit Union, 491 U.S. 164, 176-178 (1989). While Cloud contends that the tow of his cab denied him the opportunity to make contracts with those who wished him to drive them somewhere in return for the fare, this Court finds that this interpretation falls outside the narrow

Suffolk Civil Action                    -3-                      No. 03-0034

scope of the definition given the right "to make and enforce contracts."

Second, even if that term were more broadly interpreted, Cloud's claim would fail on a

substantive point that is not in dispute. While Cloud contends that Officer Smith wrongly towed

his cab because of his race to punish him for defending himself from the assault initiated by

Apodaca and Ogren and that the cab, in fact, was insured, there is no dispute that the Registry of

Motor Vehicle records reflect that, on August 8, 2002, the registration was indefinitely suspended

for a payment default and that this suspension was not lifted until November 2, 2002, when

payment was made to obtain the return of the towed cab. Consequently, there can be no

reasonable dispute that Officer Smith had a justifiable basis to tow Cloud's cab when he did,

even if the Registry's records were in error. Therefore, even if the MBTA were responsible for

Officer Smith's towing of the cab, Cloud could still not prevail on this claim.

2.    <u>Violation of G.L. c. 12, § 11I - the Massachusetts Civil Rights Act</u>

Cloud contends that the MBTA Defendants also violated G.L. c. 12, § 11I, the

Massachusetts Civil Rights Act ("MCRA"). This claim fails because the MBTA "was

established as 'a body politic and corporate and a political subdivision of the [C]ommonwealth,'

see G.L. c. 161A, § 2, as appearing in St.1999, c. 127, § 151." <u>Clifton</u> v. <u>MBTA</u>, 62 Mass. App.

Ct. 164, 178 (2004). "[T]here is no indication in the MCRA that the word 'person' includes

either the Commonwealth or any of its political subdivisions." <u>Howcroft</u> v. <u>City of Peabody</u>, 51

Mass. App. Ct. 573, 592 (2001). Since the MBTA is a political subdivision of the

Commonwealth and therefore not a "person" within the scope of MCRA, neither the MBTA nor

those MBTA officials sued in their official capacity may be liable under MCRA. <u>Id.</u> at 592-593.

28

3.    Common Law Torts of Intentional or Negligent Infliction of Emotional Distress

Nor can Cloud prevail on either of these common law claims. To prevail on a claim of

intentional infliction of emotional distress, he must show that the defendant's conduct was

"extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a

civilized community, ... [and] ... that the emotional distress suffered by the plaintiff was severe

and of such a nature that no reasonable person could be expected to endure it." Payton v. Abbott

Labs, 386 Mass. 540, 555 (1982). The evidence in the summary judgment record, even viewed

in the light most generous to Cloud, is insufficient to establish either of these elements.

To prevail on a negligent infliction of emotional distress claim, the plaintiff must prove

seven elements: (1) negligence; (2) emotional distress; (3) causation; (4) objective evidence

corroborative of emotional distress; (5) that a reasonable person would have suffered emotional

distress under the circumstances of the case; (6) a close relationship to the person injured; and (7)

that the emotional injuries were suffered as a result of witnessing the accident or coming upon

the third person soon after the accident. See Sullivan v. Boston Gas Co., 414 Mass. 129, 132,

137-139 (1993); Migliori v. Airborne Freight Corp., 426 Mass. 629, 632-633 (1998). Here,

there is insufficient evidence of the fourth and seventh elements.

"A successful negligent infliction of emotional distress claim ... must do more than allege

'mere upset, dismay, humiliation, grief and anger.'" Sullivan v. Boston Gas Co., 414 Mass. at

137, quoting Corso v. Merrill, 119 N.H. 647, 653, 406 A.2d 300 (1979), which quotes Comment,

Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases,

35 U.Chi.L.Rev. 512, 517 (1968). "Rather, plaintiffs must corroborate their mental distress

claims with enough objective evidence of harm to convince a judge that their claims present a

29

Suffolk Civil Action                    -5-                    No. 03-0034

sufficient likelihood of genuineness to go to trial." Sullivan v. Boston Gas Co., 414 Mass. at

137-138. Here, there is not sufficient corroboration of Cloud's emotional distress claim.

Moreover, this claim makes no sense in the context of a claim of a wrongful tow of

Cloud's cab. "Only a bystander plaintiff who is closely related to a third person directly injured

by a defendant's tortious conduct, and suffers emotional injuries as the result of witnessing the

accident or coming upon the third person soon after the accident, states a claim for which relief

may be granted." Migliori v. Airborne Freight Corp., 426 Mass. at 632.

### ORDER

For the reasons stated above, this Court **ORDERS** that:

1.   The MBTA Defendants' motion for summary judgment is **ALLOWED**.

2.   In view of the allowance of the MBTA Defendants' motion for summary judgment,
     Cloud's motion to compel discovery from the MBTA Defendants is **DENIED**.

Ralph D. Gants
Justice of the Superior Court

DATE:  May 9, 2005

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                          )
JOSEPH T. CARMACK,                        )
              Plaintiff,                  )
v.                                        )
                                          )         Civil Action No. 05-11430-PBS
MASSACHUSETTS BAY                         )
TRANSPORTATION AUTHORITY and              )
MASSACHUSETTS BAY COMMUTER                )
RAILROAD COMPANY,                         )
              Defendants                  )
_____)

**LIST OF EXHIBITS**
**TO MASSACHUSETTS BAY TRANSPORTATION**
**AUTHORITY'S MOTION FOR SUMMARY JUDGMENT**

Exhibit 1        Declaration of Nelson Chin dated June 18, 2008

Exhibit 2        Operating Agreement (Exhibit A to Chin Declaration)

Exhibit 3        Ridership Reports (Exhibit B to Chin Declaration)

Exhibit 4        Deposition of Joseph T. Carmack, vol. 2 (April 29, 2008) (excerpts)

Exhibit 5        Deposition of Joseph T. Carmack, vol. 3 (April 30, 2008) (excerpts)

Exhibit 6        "Letters from Hell" (Ex. 15 to Carmack Deposition) (excerpts)

Exhibit 7        Flyer (July 1, 2003) (Exhibit 16 to Carmack Deposition)

Exhibit 8        Carmack Affidavit dated July 12, 2003 (Ex. 17 to Carmack Deposition)

Exhibit 9        National Mediation Board decision (Ex. 22 to Carmack Deposition)

Exhibit 10       Deposition of Jacqueline M. Boumel (April 2, 2008) (excerpts)

Exhibit 11       Deposition of Robert Pavia (February 21, 2008) (excerpts)

Exhibit 12       MBTA Police Report (7/01/03) (Ex. 1 to Pavia Deposition)

1

Exhibit 13     MBTA Interim Guidelines (Ex. 3 to Pavia Deposition)

Exhibit 14     Deposition of MBTA by John D. Ray (April 30, 2008) (excerpts)

Exhibit 15     *Cloud v. McCourt Constr. Co.,* Suffolk Superior Court (May 9, 2005)

Respectfully submitted,

*/s/ H. Reed Witherby*
H. Reed Witherby, BBO No. 531600
Sarah E. Lent, BBO No. 645156
Smith & Duggan LLP
Two Center Plaza
Boston, Massachusetts 02108
(617) 228-4400

*/s/ Todd M. Valicenti*
Todd M. Valicenti, BBO No. 632800
Assistant General Counsel
MBTA Legal Department
Ten Park Plaza, Suite 7760
Boston, Massachusetts 02116
(617) 222-4579

Dated:  June 19, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system, to be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that I have caused a copy to be sent by first class mail, postage prepaid, to Joseph Carmack, Plaintiff, Pro Se, 592 Tremont Street, No. 5, Boston, MA  02118, as a non-registered participant on this 19th day of June, 2008.

*/s/ H. Reed Witherby*
H. Reed Witherby

2