UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Joseph T. Carmack<br>　　　　Plaintiff, Pro Se<br><br>　　v.<br><br>Massachusetts Bay Transportation Authority<br><br>　　and<br><br>Massachusetts Bay Commuter Railroad Co.<br><br>　　　　Defendants | )<br>)<br>)<br>)　Civil Action No. 05-11430-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS SHOWING**

**A GENUINE ISSUE FOR TRIAL IN SUPPORT OF OPPOSITION TO**

**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Joseph T. Carmack ("plaintiff") hereby submits this statement of

undisputed material facts showing a genuine issue for trial in the above captioned case.

This statement of undisputed material facts is submitted in support of plaintiff's

opposition to defendants' motions for summary judgment. In the interest of judicial and

practical economy this statement is issued in support of opposition against both

defendants: the Massachusetts Bay Transportation Authority ("MBTA") and

Massachusetts Bay Commuter Railroad Co. ("MBCR"). The plaintiff hereby refers only

1

to facts that: directly challenge specific facts asserted by defendants; or, in any case, supplement the context of material facts as presented by defendants.

## I.    PARTIES

1.    The Massachusetts Bay Commuter Railroad Company, LLC, MBCR, is
      constituted as a partnership including Alternate Concepts, Inc. Bombardier
      Transit Corporation and Veolia North America, Inc. Plaintiff's Exhibit 1[1]
      Commuter Rail Mobilization Services Agreement between MBTA and MBCR
      ("Mob. Agreement")[2]

## II.   PLAINTIFF'S DISABILITY

2.    In 1985, Plaintiff was diagnosed with depression and dysthymia. Plaintiff was
      suffering long episodes of depression and insomnia. Plaintiff's symptoms
      included racing thoughts, headaches, chronic insomnia, an inability to concentrate
      and an inability to care for himself. Plaintiff required a six-month leave of
      absence for treatment. In the interim, Amtrak required medical documentation
      that the plaintiff's doctor, Martha Stark. M.D., provided. PE3, 1985
      correspondence between Plaintiff, Amtrak and Doctor.

3.    In 1995, during an episode of severe migraine headaches that resulted in a two to
      three week absence from work as a Train Dispatcher with Amtrak, plaintiff again
      consulted with Dr. Stark. During the episode, Mr. Carmack was extremely
      sensitive to light and bedridden. PE4, Declaration of Anne Gurian, M.D.
      ("Gurian Statement") ¶ 2

4.    Plaintiff initially consulted only his primary care physician for treatment of his

---

[1] Hereinafter "PE" for Plaintiff's Exhibit (e.g. Plaintiff's Exhibit 1 ("PE1").
[2] Connex became Veolia Transport, North America in 2006. PE2, Transcript of Deposition of Jacqueline M. Boumel, 164:12.

2

migraine episode, but, when plaintiff's primary care physician examined plaintiff for migraines and they had exhausted somatic treatment, plaintiff again consulted Dr. Stark. Dr. Stark referred plaintiff to Dr. Anne Gurian, a psychiatrist certified by the Massachusetts Board of Registration in Medicine in the practice of psychiatric medicine. After initial evaluations and treatment, the migraines began to subside. Nonetheless, the plaintiff continued to present with chronic insomnia, agoraphobia, a paranoid fear of relationships, heart palpitations, mind-racing, difficulty organizing his thoughts, difficulty organizing daily tasks and difficulty organizing his meals. The plaintiff averaged only about 3 hours of sleep each day, but some days the plaintiff did not sleep at all. Some weeks he would continue for two or three days without sleep. The plaintiff began skipping meals and would go for entire days without eating.

Ibid ¶¶ 1 and 3.

5.  On the whole, plaintiff presents with: a long history of dysthymia that probably first manifested in teenage years; chronic depression, that emerged about 1983; and Post Traumatic Stress Disorder that first manifested with plaintiff's migraine episode in 1995. Plaintiff had a history of treatment for these conditions beginning in 1983. Id. ¶ 4

6.  In 1995, in Dr. Gurian's evaluation of the plaintiff, Dr. Gurian recommended 5 to 10 years of psychotherapeutic treatment for the plaintiff that would vary in intensity over the course of the treatment. At times, the plaintiff required extended periods with 4 to 5 sessions per week. Treatment resulted in slow, but regular, improvement. The plaintiff's anxiety concerning work relationships

3

decreased to a manageable level and the plaintiff succeeded at work with a promotion to locomotive engineer in October, 1996, that included a very demanding and, for the plaintiff, anxiogenic training period that exacerbated the plaintiff's symptoms. The plaintiff needed intensive treatment in order to manage the debilitating effects of his symptoms. Id ¶ 5, Defendant's Statement of Undisputed Material Facts in Support of its motion for Summary Judgment, ("MBCR SMF") ¶ 1.

7. The plaintiff pursued activities in his union to help himself find greater security in his relationships. The plaintiff focused on union and train operation procedures to help manage his concentration and thought processes. In addition, the plaintiff began working on music compositions and studying literature. The result was slow, but notable, progress. Although plaintiff's insomnia continued, plaintiff was sleeping more often. Success in his work life helped him to become more focused and relaxed. PE4, Gurian Statement ¶ 6.

8. In the summer of 2000, plaintiff began to experience an intense resurfacing of uncontrollable childhood memories and emotions. All of plaintiff's symptoms increased. Plaintiff experienced increased mind-racing and uncontrollable thoughts. Plaintiff had greater problems with concentration. Plaintiff's insomnia increased again and he again began having episodes when he did not sleep for days. Psychotherapy was again increased to multiple weekly sessions. Ibid. ¶ 7

9. In October of 2000 Dr. Gurian recommended a leave of absence for the plaintiff. During the leave of absence, the plaintiff worked on music compositions to focus and control his thought processes and emotions. Computerized recordings of

progress on music compositions were used as an aid to psychological progress.
The plaintiff pursued treatment very intensively. In the beginning of January,
plaintiff began to relax and sleep more. By the middle of January, plaintiff was
able to return to work. Id ¶ 8.

10.  In order to return to work, the plaintiff was required to report for a company
physical. For the physical, the plaintiff reported to Dr. Brian Morris at Health
Resources in Boston. Id. ¶ 9. Health Resources is an organization that provides
medical services to corporations. Health Resources employs doctors for routine
internal medical care. Health Resources contracts to different corporations to, in
effect, be their medical provider. Id. ¶ 9. PE5, Transcript of Deposition of Russell
Vasile, M.D. ("Vasile Transcript") 47:16-17, 48:8-13.

11.  The plaintiff did not feel comfortable talking to Dr. Morris about plaintiff's
therapy. The Plaintiff asked Dr. Gurian to speak to Dr. Morris. Dr. Gurian
received a call from Dr. Morris on or about January 20, 2001. Dr. Gurian
discussed the plaintiff's return to work with Dr. Morris. On or about January 20,
2001, Dr. Gurian spoke to Dr. Morris about the plaintiff's medical condition and
fitness-for-duty. The plaintiff returned to work at Amtrak the following week.
PE4, Gurian Statement ¶ 9. PE6, Memorandum from Marianne Letterio, RN,
BSN dated 1/23/2001 and Amtrak Return to Service Evaluation from health
Resources. PE17, Notes of Dr. Ann Gurian dated 01/17/2001, 05/30/2001,
07/30/2001, 4/4/2002 ("Gurian Notes").

## III.   PLAINTIFF'S MEDICAL DISQUALIFICATION

12.  On or about March 11, 2001, Michael J. O'Bryan, a Local Chairman of

5

plaintiff's union, distributed an argumentative political open letter concerning the plaintiff to other employees on MBTA property and posted the letter on MBTA property in various locations. PE6, Letter from Carmack to O'Bryan dated March 11, 2001.

13. On or about April 4, 2001, at the encouragement of other union members, plaintiff responded to Mr. O'Bryan's open letter with a collection of documents entitled Letters From Hell. The collection included: a 10-Page response to O'Bryan; creative accoutrements (including a parody of Hamlet in the form of a letter to 'God' from "Lucifer, Prince of Darkness"); company documents; and company correspondence. PE7, Letters From Hell. PE8, Hamlet Satire.[3]

14. The Letters From Hell compilation includes a cartoon which includes a disclaimer as follows:

WARNING! THIS IS ONLY A POLITICAL CARTOON!

THERE ARE NO REAL MONSTERS!

ONLY UNION BUREAUCRATS!

PE7, Letters From Hell.

15. On or about April 10, 2001, a night supervisor at Amtrak placed a copy of Letters From Hell on the desk of Amtrak Road Foreman, Gerard L.DeModena.

16. On or about the morning of April 11, 2001 Amtrak Road Foreman DeModena reported that he found a copy of the Letters From Hell in the Road Foreman office on his desk. Subordinate employees, including the plaintiff, had no access to Mr. DeModena's office. Mr. DeModena's office was always locked. PE10, Selected

---

[3] PE8, the Hamlet Satire was a double-sided page in Letters From Hell. It is included as a separate exhibit to facilitate discussion.

pages from calendar log of Gerard L. DeModena ("DeModena Calendar").  PE11,

Amtrak Workplace Violence Report ("Workplace Violence Report").  PE16,

Amtrak hearing Testimony Transcript ("Hearing Transcript") at 297.

17.  Mr. DeModena proceeded to contact a number of managers, including Labor

Relations Manager, Lou DePhillips, and Amtrak Police Detective, Robert Smith,

to get support for a claim of Workplace Violence against the plaintiff because

Plaintiff's "writings are work of a mentally imbalanced (sic) individual and a

threat of violence".  PE10, DeModena Calendar.  DeModena also contacted the

BLE union representative Michael J. O'Bryan to convince Mr. O'Bryan to file a

separate workplace violence report.  PE16, Hearing Transcript at 294-295.

18.  On or about April 13, 2001, Mr. DePhillips distributed an E-Mail to other

Managers, including Suzanne Alan, Manager of Human Recourses and Detective

Smith, and outlined a "scenario" whereby plaintiff would be accused of a "refusal

to cooperate" that would be "grounds for gross insubordination and a removal

from service."  PE12, E-Mail from DePhillips to Managers and Supervisors dated

5/3/2001 ("DePhillips E-Mail").

19.  On May 3, 2001, Ms. Alan copied Mr. DePhillip's E-Mail to Marianne Letterio,

RN, BSN, Manager of Health Services.  Ms. Letterio, in turn, advised Dr. Timmie

Pinsky, Amtrak's Director of Health Services, of Mr. DePhillip's desire to instruct

plaintiff to undergo a psychiatric evaluation.  PE13, Memo from Marianne

Letterio to Amtrak's Medical Director Dr. Timmie Pinsky dated 5/3/2001.

20.  On that same day, Dr. Pinsky instructed Ms. Letterio to contact O'Malley,

DePhillips, Alan and DeModena to instruct them that they would have to remove

plaintiff from service for an examination. Ibid. Ms. Letterio promptly complied

to convey Dr. Pinsky's instructions. PE14, E-Mail from Marianne Letterio to

O'Malley dated 5/3/2001.

21. Amtrak Medical Protocols and Procedures require physicians to:

> … use your clinical judgment in rendering medical determinations
> based upon objective information for each evaluation. This is
> particularly relevant with respect to reviewing the appropriate job
> description of the applicant/employee being examined and other
> applicable regulations (such as ADA, OSHA, FRA, FFMCSA,
> DOT, etc). PE18, Amtrak Medical Protocols and Procedures,
> ("Amtrak Medical Protocols")

> …

> In rendering your opinion as to the individual's ability to work at
> their job, it is important that you focus on objective medical
> findings rather than simply subjective complaints. All relevant
> findings from the history, medical exam, and diagnostic tests must
> be fully addressed in writing with respect to Amtrak standard
> levels. Ibid at 5.

> …

> Notification to the employee/applicant of any relevant
> abnormalities that require follow-up with their personal physician.
> Id.

22. The Amtrak Job Description for Health Services Manager includes "…will ensure

that all programs and services adhere to appropriate Federal and State regulations

and Amtrak policies and procedures…ADA… Develops and oversees the

network of contracted providers, clinics, hospitals and other vendors that provide

medical services. PE19, Amtrak Job Description for Health Services Manager.

23. Amtrak Policies and Procedures regarding maintenance and disclosure of

employee personnel and medical information include:

8

C.  Personal data that is unrelated to employee performance
will be accessible only to employee and appropriate Amtrak Personnel
staff members.

D.  Access to official medical records will be limited to those individuals the
employee designates on a signed release form provided by the Medical
Department, and to Amtrak's Legal Department (see Appendix A)

E.  Upon reasonable notice employees may review their official personnel
record and/or their medical record. A. Personnel or Medical Department
representative will be present during the employee's review of their
records. Employees will be allowed to attach their own position statement
to disputed materials in both their official and department personnel file;
and the employee will be notified in writing whether the disputed material
has been corrected.

PE21, Amtrak Policies and Procedure Manual, Section Pers-28 ("PERS-
28") at 3.

24.  In May, June and July of 2001, Mr. Michael O'Malley, the plaintiff's supervisor,

ordered the plaintiff to undergo a psychiatric evaluation and medical testing with

Doctor Russell Vasile that would not be confidential at all. The evaluation that

the plaintiff was ordered to undergo would not be governed by any confidentiality

protocols whatsoever. Dr. Vasile wanted the right to reveal any medical

information from the evaluation and testing to anyone of Dr. Vasile's choosing.

All the information from the psychiatric evaluation of the plaintiff was to be given

to Mr. Michael J. O'Malley, Mr. Lou F. DePhillips and Mr. Gerard L. DeModena.

Under the terms of the examination, the results could be revealed to anyone.

PE26, Letters of O'Malley to Plaintiff dated 5/4/2001, 5/17/2001, 6/8/2001 and

July 24, 2001. PE16, Amtrak Hearing Transcript, pp. 302, 331. PE5, Vasile

Transcript at 146, PE22, Carmack Decl. III, ¶ 13.

9

25. Mr. O'Malley placed plaintiff on a medical leave of absence.[4] PE26, Letters of O'Malley to Plaintiff dated 5/4/2001, 5/17/2001, 6/8/2001 and July 24, 2001. PE27, Amtrak Engineer rosters.

26. On or about Monday, May 7, 2001, O'Bryan, a union Local Chairman, with no waiver from the Plaintiff, called Amtrak Medical Director Dr. Timmie Pinsky in Philadelphia. Dr. Pinsky told O'Bryan that the Godzilla Cartoon and the Lucifer Document "raised the index of suspicion of a severe psychiatric disorder" such as "Personality Disorder, Bi-Polar disorder, etc." PE21, Memorandum from Dr. Timmie Pinsky dated 5/7/2001. PE16, Amtrak Hearing Testimony Transcript ("Amtrak Transcript") at 386. PE22, Declaration of Joseph T. Carmack dated 7/16/2008. (Carmack Decl. III") ¶ 5.

27. Plaintiff explained to O'Malley that he did not want to talk about medical matters to anyone but the medical department. PE23, Letter from Carmack to O'Malley dated June 14, 2001.

28. Plaintiff and O'Bryan both informed O'Malley on numerous occasions that the medical department at Amtrak was not communicating with the plaintiff. DE16, Amtrak Transcript at 326-329. PE24, Letters from Plaintiff to Pinsky.

29. On or about May 17, 2001, Marianne Letterio contacted Dr. Russell Vasile of 25 Bay State Road, in Boston to schedule an independent evaluation of the Plaintiff. The evaluation was scheduled for June 4, 2001. Ms. Letterio's letter describes the

---

[4] The cover page of the roster for 2001 (dated November 30, 2001) reads "The enclosed roster is the official Amtrak BLE roster. The key for the roster lists "MLA" as Medical "Leave of Absence". The plaintiff's name is at No. 1334. The roster denotes that plaintiff is a "CS1" engineer, (Commuter Services, Zone 1) on a Medical Leave of Absence effective July 24, 2001. see PE28, Transcript of Deposition of Christa Cuppernull Phillips, at 143:14-19.

job related purpose of the exam. PE25, Letter from Marianne Letterio to Dr. Russell Vasile of May 17, 2008.

30. Mr. Carmack was the first Amtrak employee that Dr. Vasile was ever contracted to evaluate. PE5, Transcript of Deposition of Dr. Russell G. Vasile dated 4/22/2008 ("Vasile Transcript") at 44.

31. In general, Dr. Vasile believes that his task, when he is contracted to perform an employee fitness-for-duty evaluation is to offer an assessment of psychiatric diagnosis, prognosis and guidance as to whether there is sufficient disease or defect that would put the individual or the public or co-workers at risk. Ibid at 23.

32. Dr. Vasile understood that Amtrak consulted Dr. Vasile to perform an evaluation with psychological testing of the plaintiff because Amtrak "experienced" a veiled threat from a 'poem' that the plaintiff had written. Dr. Vasile understood the veiled threat had somehow involved a poem and two characters from a Shakespeare play, Guildenstern and Rosencrantz. Dr. Vasile does not recall receiving any documents from Amtrak nor does he recall any of the details. Ibid. at 56 to 60.

33. On or about June 27, 2001, the plaintiff arrived at Dr. Vasile's office at 25 Bay State Road for psychiatric evaluation. Plaintiff was accompanied by union Local Chairman Mr. O'Bryan. Ibid 54 to 63.

34. Dr. Vasile told the plaintiff and Mr. O'Bryan that Dr. Vasile was going to tell Amtrak to get another doctor. PE22, Carmack Decl. III ¶ 7.

35. Dr. Vasile told the plaintiff and Mr. O'Bryan that Dr. Vasile was going to call

Amtrak to see if some other resolution could be found. Ibid ¶ 8. PE16, Amtrak
Transcript at 358.

36.  The Plaintiff never refused to undergo an evaluation by Dr. Vasile, nor does Dr.
     Vasile recall that the plaintiff stated any refusal. Dr. Vasile only recalls
     that the plaintiff stated an opinion that an evaluation would be inappropriate.
     PE22, Carmack Decl. III ¶ 9, PE5, Vasile Transcript at 74, 76, 78, 80 and 81.

37.  In a telephone conversation with Dr. Vasile on or about August 15, 2001, Plaintiff
     stressed to Dr. Vasile that plaintiff needed the evaluation. The plaintiff asked Dr.
     Vasile to call the plaintiff's treating psychiatrist, Dr. Gurian. PE22, Carmack
     Decl. III ¶ 9

38.  During a conversation with the plaintiff on or about August 15, 2001, Dr. Vasile
     announced to the plaintiff that Dr. Vasile made an appointment for the plaintiff to
     be examined. After making the announcement, Dr. Vasile then made some
     comments, including, but not limited to, the statement that "nothing is
     confidential". Dr. Vasile also asked the plaintiff some questions. At the end of
     the conversation Dr. Vasile stated that he was going to tell Amtrak to get another
     doctor. Dr. Vasile told the plaintiff that Dr. Vasile had decided that Dr. Vasile
     was going to use the appointment for someone else. The plaintiff never canceled
     any appointment. Ibid ¶ ¶ 10-11.

39.  Dr. Vasile interpreted the "spirit of the interaction" between Dr. Vasile and the
     plaintiff to be an objection, but he can't recall that the plaintiff ever refused to
     undergo an evaluation. PE5, Vasile Transcript. 47:11-18.

40.  Dr. Vasile refused to conduct the evaluation of the plaintiff because the plaintiff

felt that the plaintiff had been "wronged by being required" to undergo an
evaluation. Ibid at 102. PE35, Letter from Vasile to O'Malley dated 4/2/2002.

41. Dr. Vasile was also concerned that the Plaintiff's psychiatrist objected to the
    evaluation for medical reasons. PE5, Vasile Transcript. at 119.

42. On or about August 22, Dr. Vasile called Dr. Pinsky at Amtrak and told Dr.
    Pinsky that the plaintiff had canceled an appointment with Dr. Vasile. Dr. Pinsky
    asked Dr. Vasile to send Dr. Pinsky "documentation" regarding these events. On
    or about August 23, 2001, Dr. Vasile called the Plaintiff and told the plaintiff that
    Dr. Vasile was going to call Amtrak to tell Amtrak to get another doctor. PE38,
    Amtrak Health Services, Medical Progress Notes prepared by Dr. Timmie Pinsky
    dated August 22, 2001. PE22, Carmack Decl. III ¶ 12.

43. Dr. Anne Gurian, plaintiff's treating psychiatrist, is familiar with the compilation
    of documents with the cover page entitled "Letters From Hell". Dr. Gurian
    recalls that the plaintiff showed Dr. Gurian the compilation when the plaintiff
    prepared it in April of 2001. Dr. Gurian discussed the compilation with the
    plaintiff during treatment sessions. Dr. Gurian also reviewed the 'Hamlet'
    document, specifically. Dr. Gurian saw the Hamlet document several months
    before the Letters From Hell document was prepared. Dr. Gurian recalls Mr.
    Carmack telling Dr. Gurian that the plaintiff sent a copy of the Hamlet page to
    plaintiff's union representative Mr. Mike O'Bryan. PE4 ¶ 10.

44. Plaintiff does not have violent tendencies. Dr. Gurian states that, as a professional
    standard, the primary indicator of violence is a history of violence. There is no
    indication of violent behavior from the plaintiff's symptoms or in his fantasies.

13

There is no indication that plaintiff has a history of violent behavior. Dr. Gurian
has worked with the plaintiff for fifteen years and Dr. Gurian has never witnessed
any threat suggesting violent behavior. The plaintiff is very committed to
cooperation and moral respect between people. Dr. Gurian has not witnessed the
plaintiff expressing any threatening attitude towards others. Ibid ¶ 11.

45.    The Plaintiff discussed the plaintiff's interactions at work with Dr. Gurian
including interactions with plaintiff's supervisor, Mr. DeModena. The Plaintiff
has never expressed any threat or threatening attitude towards Mr. DeModena.
Dr. Gurian notes a positive attitude towards Mr. DeModena. According to Dr.
Gurian, the plaintiff's apparent friendship with Mr. DeModena was one example
of progress with plaintiff's social interactions. Ibid ¶ 12.

46.    According to Dr. Gurian, neither the Hamlet document specifically, nor the
Letters From Hell documents generally, reveal any symptoms indicating a threat
towards fellow employees. The Hamlet and Letters From Hell documents don't
reveal any symptoms indicating a threat towards Mr. G. L. DeModena. The
plaintiff has a lively and gadfly-like sense of humor. The plaintiff's creative
associations expressed in the Hamlet or Letters From Hell documents are neither
indicators of symptom nor indicators of violence. There is no medical basis for
the assumption that the plaintiff's writings show symptomatic or violent behavior.
Ibid ¶ 13.

47.    There is no medical basis for Amtrak's medical disqualification of the plaintiff.
The plaintiff's writings reveal no symptoms that would prevent the plaintiff from
working safely. Ibid ¶ 14.

48. In spite of the plaintiff's debilitating medical condition, the plaintiff could have kept working for the time period from January, 2001 through May, 2002 as long as the plaintiff continued treatment. The plaintiff's symptoms could be monitored and managed through treatment as they had been since 1995. Ibid ¶ 15.

49. In May of 2001 and April of 2002 Dr. Gurian stated in notes provided by the plaintiff to Amtrak that "a forced, non-confidential psychiatric consultation would be inadvisable for medical reasons" and that "I advised Mr. Carmack that a forced, non-confidential psychiatric consultation, because of its coercive and intrusive nature, would be medically harmful to him and ethically suspect." Ibid ¶ 16.

50. If the plaintiff underwent an evaluation without any of the standard medical protocols, the plaintiff's medical condition would be undermined. The terms of the fitness-for-duty examination, as explained to the plaintiff by Dr. Vasile, constituted a threat to the plaintiff's health and the viability of the plaintiff's therapy because it would impair trust in the therapeutic alliance. There were no confidentiality protocols imposed on the proposed examination nor were there any limits on the nature of the examination. The conditions of the examination ordered by Amtrak would have devastating psychological consequences for the plaintiff. PE4, Gurian Statement ¶ 18-19.

51. The plaintiff and the plaintiff's doctor had been successfully monitoring the plaintiff's fitness-for-duty since 1995. The plaintiff and the plaintiff's doctor have collaborated with Dr. Brian Morris over the plaintiff's fitness-for-duty. The

correct medical approach for Amtrak was to contact the plaintiff's doctor and work with the plaintiff's doctor around the plaintiff's fitness-for-duty.

52.  Dr. Gurian initially supported a fitness-for-duty evaluation for the plaintiff with Dr. Vasile. Doctor Gurian's initial assumption of the evaluation with Dr. Vasile was that Dr. Vasile would explain to the plaintiff the limits of confidentiality of this examination – that Dr. Vasile would tell a specific person, probably Dr. Timmie Pinsky at Amtrak, whether Dr. Vasile thought the plaintiff was fit-for-duty or not (and some information about why, but that irrelevant intimate detail would be held confidential), that the information given to Dr. Pinsky by Dr. Vasile would be held confidential (except in the fit-for-duty/not fit-for-duty dimension), and that all other information gathered by Dr. Vasile would be kept confidential by Dr. Vasile. Dr. Gurian also assumed that Dr. Vasile, with the plaintiff's permission, would contact Dr. Gurian. Dr. Gurian changed her mind about the fitness-for-duty evaluation when Dr. Gurian learned that Dr. Vasile had said he needed a full exam, including psychological testing, and that nothing was confidential (i.e. there would be no limits on how the information could be shared). PE4, Gurian statement ¶ 21.

53.  A leave of absence is not required for engineers on Amtrak or MBCR when engineers are absent due to a bona fide illness. PE2, Boumel Transcript 86:7-11, 128, 130: 20-22, 134:23 to 136:22. PE28, Transcript of Deposition of Christa Cuppernull Phillips ("Cuppernull Transcript") 77:12-78:2.

54.  On or about September 10, 2001, the Amtrak Manager of Operations, Mr.

Michael J. O'Malley, charged the plaintiff with violation of Amtrak's 'Standard

of Excellence', under the section titled '*Professional and Personal Conduct*',

specifically Teamwork, which reads in pertinent part:

> [F]ollowing instructions ...you must comply with all company and
> departmental policies, procedures and rules as well as all instructions,
> directions and orders from supervisors and managers.
>
> The only exception to the above requirement arises when compliance with a
> particular instruction would cause a clear immediate danger to you, your
> fellow employees, our customers, the public or company property.

PE29, Letter of September 10, 2001 from M. J. O'Malley to plaintiff, 'NOTICE

OF FORMAL INVESTIGATION'. PE30, Amtrak Standards of Excellence,

*Professional and Personal Conduct.*

55.  The basis of O'Malley's charge against the plaintiff was that the plaintiff

"allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile."

PE29, Letter of September 10, 2001 from M. J. O'Malley to plaintiff, 'NOTICE

OF FORMAL INVESTIGATION'.

56.  An investigation was held over four days in the months of April and May 2002.

On or about May 13, 2002, the hearing officer for the case found that the "Carrier

proved the charges" against the plaintiff. Defendant MBCR Exhibit 7, ("MBCR

Ex.")[5] Decision Letter ¶ 13. The hearing officer denied that the danger presented

by a non-confidential psychiatric evaluation was "the type of clear and imminent

harm contemplated under the Standards of Excellence." The hearing officer

claimed that she had "no basis to determine the type of harm" because Dr.

Gurian's opinion "seems based upon incomplete information." Ibid.

---

[5] Defendant MBCR Exhibits for MBCR's "Statement of Undisputed Material Facts" will be indicated in abbreviation: "MBCR Ex.").

17

57.  Although Plaintiff acknowledges that he has referred to Amtrak's 'termination' of plaintiff, plaintiff usually adds the caveat that, pursuant to the Collective Bargaining Agreement[6] between National Railroad Passenger Corporation ("Amtrak") and the Brotherhood of Locomotive Engineers ("BLE"), Amtrak's termination of plaintiff was not final and binding. <u>MBCR Ex. 1</u>. Affidavit of Joseph Carmack dated July 12, 2003.[7] ¶ 6.

58.  Pursuant to the terms of the Amtrak/BLE CBA, and the Railway Labor Act[8] the plaintiff appealed Amtrak's decision to terminate plaintiff to a Special Board of Adjustment No. 928 ("SBA", SBA 928" or "the Board") of the National Mediation Board ("NMB"). As a result of the appeal, the Board issued Award No.382 (<u>Defendant Exhibit 6.</u>"Award Letter") dated April 21, 2003 and denied the plaintiff's claim on basis substantial evidence proven by Amtrak. <u>MBCR Ex 6</u>. Decision of National Mediation Board Special Board of Adjustment No. 928 on Case No. 382 ("Award Letter") at 4.

59.  Pursuant to the terms of the CBA, Award No. 382 of SBA 928 was not "final and binding". In order to be final and binding, the Board award must be issued within 30 days.[9] Appeal hearing was held on or about September 23, 2000. The Award was issued on April 21, 2003,[10] which is almost seven months later. The decision should have been expunged.[11]

---

[6] "Amtrak/BLE CBA" or "CBA", <u>PE31</u>
[7] MBCR's list of exhibits erroneously dates <u>MBCR Ex 1</u>. as 6/12/03.
[8] 45 U.S.C. § 151 et. seq.
[9] "The Board will render a final and binding decision as promptly as possible, but not later than 30 days after the case is presented before the Board." CBA Rule 21 ¶ k.4. <u>PE31</u> at 39.
[10] Award is effective when the last member signs it. <u>PE28</u>, Transcript of Deposition of Christa Cuppernall Phillips, Dated April 22, 2008 119:13 to 121:1.
[11] "If the decision on the appeal is not rendered within the time limits set forth in this Rule or as extended, the discipline assessed will be expunged." CBA Rule 21¶ l.2. Ibid at 40.

60. In Award No. 382, SBA 928 recognized that there is a general defense to a charge of insubordination as indicated in Amtrak's Standards of Excellence "when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property." The Board stated that the Hearing Officer was justified in discounting the probative value of letters from Dr. Gurian because the "claimant's doctor did not testify and the record contains no evidence of the basis for her opinion. MBCR Ex. 6, Award Letter at 4.

61. Pursuant to Rule 21 of the Collective Bargaining Agreement the deficiency of the unions defense can be met after the fact with testimony from Dr. Gurian that would contain substantive medical basis for Dr. Gurian's opinion. PE31, CBA Rule 21e.3.[12]

## IV.    MOBILIZATION OF MBCR CONTRACT WITH MBTA

62. The MBTA receives federally funded grants from the Federal Transit Administration ("FTA") to finance commuter rail projects, including, but not limited to, some commuter rail operations. MBTA received FTA grants to finance mobilization of a commuter rail operating agreement between MBTA and MBCR.

63. On or about January 10, 2003, the MBTA, with approval from the MBTA's Board of Directors, entered into a Mobilization Services Agreement ("Mobilization Agreement") with MBCR. The mobilization governs Mutual rights and

---

[12] "If either the Passenger Engineer or the Corporation officer is of the opinion that the testimony of the unavailable principal(s) or witness(es) is necessary for the final determination of the facts and discipline has been assessed against the Passenger Engineer as a result of the investigation, such discipline will be reviewed when the testimony of the missing principal(s) or Witness(es) is available."

19

obligations between MBTA and MBCR from the date of the agreement until July 1, 2003, when the term of an Operating Agreement was scheduled to commence. PE1, Mobilization Agreement at 2.

64. The MBTA and MBCR define the services that MBCR is contracted to provide for the MBTA as "Agreement Services" or all service, including transportation, necessary for the operation of MBTA's Commuter Rail Services, including services as defined in Commuter Rail Operating Agreement Between MBTA and MBCR. PE1, Mobilization Agreement § 1.0 at 2. PE32, Commuter Rail Operating Agreement Between MBTA and MBCR. ("Operating Agreement") § 1 at 2.

65. Operation of Commuter Rail services is directed and managed by the MBTA through an MBTA "Director of Railroad Operations". PE1, Mobilization Agreement § 1 at 3. PE32, Operating Agreement § 1 at 5.

66. Scope of MBTA mobilization includes, without limitation, "assembling the commuter rail workforce, including hiring Contractor Personnel and managing the labor relations as required by the Operating Agreement".[13] PE1, Mobilization Agreement § 2.2(a)(4) at 5.

67. Security on MBTA commuter rail property is provided by MBTA police. Ibid. §5.5 at 11.

68. MBTA insures MBTA property and names MBCR in its policies as additional insured. Id. § 7 at 13 and 14.

---

[13] At § 2.2(a)(9) of PE1, Mobilization Agreement p. 5, the agreement states that mobilization services "as compensated by the Mobilization Fee in the MBTA's written responses to questions received from Proposers during the procurement and relating to the Request for Proposals, the letter from Robert A. Johnson to James O'Leary dated September 19, 2002 and attached as Exhibit 2 and 3 respectively" Exhibits 2 and 3 were not included in response to plaintiff's request for production of documents.

## V. COMPLIANCE WITH LAW

69.    The terms of the Mobilization Agreement include the requirement that the
contractor (MBCR) will not discriminate against any employee because of
disability.  The Mobilization Agreement includes the requirement that MBCR will
take affirmative action and treat employees without regard to disability.  "Such
action shall include, but not be limited to the following: employment, upgrading,
demotion, or transfer; recruitment or recruitment advertising; layoff or
termination; rates of pay or other forms of compensation; and selection for
training, including apprenticeship."  Id. § 12.3(a)(1) at 21.

70.    The Mobilization Agreement requires the MBCR to comply with "Federal transit
laws at 49 U.S.C. §5332, as well as all applicable equal employment opportunity
requirements or regulations of the U.S. Department of Labor, 'Office of Federal
Contract Compliance Programs, Equal Employment Opportunity, Department of
Labor," 41 C.F.R. parts 60 et. seq.".  Id. § 12.3(a)(4) at 22.

71.    The Mobilization Agreement requires the MBCR to accommodate people with
disabilities in accordance with: § 102 of the Americans with Disabilities Act,
("ADA") as amended, 42 U.S.C. § 12112; the requirements of the U.S. Equal
Employment Opportunity Commission, "Regulations to implement the Equal
Employment Provisions of the American with Disabilities Act," 29 C.F.R. Part
1630, pertaining to employment of persons with disabilities; and any
implementing requirements relating to disabilities that FTA may issue.  Id. §
12.4(b) at 23.

## VI.    MBTA CONTROL OVER COMMUTER RAIL EMPLOYEES

21

72. MBTA provides specific rules and regulations governing the conduct of commuter rail employees. MBTA retains the right to discipline MBTA commuter rail employees unilaterally. PE32, Operating agreement § 11.8 at 29-31.

73. MBTA requires the MBCR to fill all union workforce positions with Amtrak commuter rail employees on Amtrak workforce rosters. Ibid, § 12.1 at 33-34.

74. MBTA requires MBCR to retain "Amtrak commuter rail employees who are on disability due to non-work related injuries or illness at the time of the workforce transition on the roster of Eligible Union Employees for twelve (12) months from the Commencement Date. Ibid, at 33.

75. MBTA accepts liability for 13(c)[14] claims against MBCR other than claims that result from MBCR's actions or omissions that are not approved by the MBTA. Ibid, § 14 at 35.

## VII. DEFENDANTS' REFUSAL TO HIRE PLAINTIFF

76. Pursuant to the requirement to hire Amtrak employees on disability due to non-work related injuries or illness; MBCR made plaintiff a conditional offer of employment. MBCR Ex. 14, Letter from Kevin Lydon to Joseph Carmack, dated May 6, 2003 ("Lydon Letter").

77. Plaintiff completed application for employment pursuant to the terms required by MBCR agreement and the Lydon Letter. Ibid.

78. Plaintiff made several attempts to contact MBCR Human Resources and MBCR Labor Relations, including, but not limited to Dennis Coffey and Christa Cuppernull Phillips concerning the plaintiff's application for instructions in order

---

[14] Claims for failure to provide employee protection in transition between contractors as required by the Federal Transit Act Section 13(c). 42 U.S.C § 5333(b).

to complete a medical examination. <u>MBCR Ex. 12</u>, Declaration of Dennis Coffey ("Coffey Statement") ¶ 12 <u>PE28</u>, "Cuppernull Transcript", 141:18 to 142:2.

79. Ms. Phillip's positions in Commuter Rail with both Amtrak and MBCR entailed advising administrators on labor contracts and writing correspondence. <u>Ibid</u>, 15 to 20.

80. Ms. Phillips states that there is a union agreement provision called a displacement by which employees can choose to be assigned to positions assigned to junior employees. Ms. Phillips describes the right of displacement as one that can be used when an individual employee is returning from an extended leave of absence, including absences due to illness. <u>Id</u>. 30:16-32:5.

81. Ms. Phillips understands that the plaintiff was charged with insubordination. Ms. Phillips understands that the charge of insubordination involved a "doctor's appointment". Ms. DePhillips understands that the doctor's appointment was one that Mr. Michael J. O'Malley ordered the plaintiff to submit to. <u>Id</u>. 69:22-71:1.

82. Ms. Phillips is not aware that employees would be directed to go for a medical exam when employees are on inactive status. <u>Id</u>. 77:9-78:2.

83. Ms. Phillips states that plaintiff was medically disqualified from service in 2001 and "removed from service for reasons of insanity". Ms. Phillips states that she understood the terms and issues she was referring to when making the statement and she understood that they involved the doctor's appointment that resulted in an insubordination charge and termination from employment. <u>PE31</u>, E-Mail from Christa Cuppernull Phillips to John Humes. <u>PE28</u>, Cuppernull Transcript. 125:23-127:21.

84. Ms. Phillips is familiar with the conditional offer of employment made to the plaintiff by MBCR. Ibid. 137:11-139:11.

85. On or about May 15, 2003 Mr. Dennis Coffey, MBCR Human Resources officer, received an employment application from the plaintiff in response to MBCR's offer of employment. MBCR Ex. 14, Lydon Letter at second page, PE32, Return Receipts for Certified Mail # 7001 1940 0005 7197 9945 received by MBCR Human Resources on May 15, 2003.

86. During the month of May or June 2003, Mr. Dennis Coffey of MBCR's Human Resources contacted Ms. Christa Cuppernull Phillips, MBCR's Manager of Labor Relations, to ask if plaintiff was eligible for an engineer's position on MBTA Commuter Rail. MBCR Ex. 12, Coffey Statement ¶ 13. PE28, Cuppernull Transcript 151:2-15.

87. Ms. Cuppernull Phillips, MBCR Manager of Labor Relations instructed MBCR's Human Resources officer, Mr. Dennis Coffey that Plaintiff was not eligible for a Locomotive Engineer position in MBTA commuter rail because plaintiff was medically disqualified and terminated from Amtrak "for reasons of insanity". PE28, Cuppernull Transcript 69:22-71:1, 125:23-127:21. PE31, E-Mail from Christa Cuppernull Phillips to John Hunes.

## VIII. PLAINTIFF'S EVICTION FROM NORTH STATION

88. Knowing that plaintiff was continuing to seek union assistance regarding his termination from Amtrak, Mr. O'Malley, Amtrak Manager of Operations, sent plaintiff a warning that plaintiff would be charged with trespassing if plaintiff was

to enter any employee areas at North or South Stations.  PE36, Letter from
O'Malley to Plaintiff dated 8/20/2002 and plaintiff's response dated 8/31/2002.

89.  On July 1, 2003, plaintiff again called Dennis Coffey at MBCR Human Resources
and Christa Cuppernull Phillips at MBCR Labor Relations to find out why
plaintiff was not awarded a job on MBTA commuter rail.  Neither Coffey nor
Phillips had a definitive answer.  PE28, Cuppernull Transcript 69:22-71:1

90.  In order to protect plaintiff's seniority rights on MBTA commuter rail, plaintiff
needed to report to North Station on July 1, 2003 to go on record as available for
duty and requesting union assistance.  Plaintiff prepared an open letter for union
members to hand to members he contacted.  MBCR Ex. 1,  Carmack Aff. ¶ 20.

91.  Plaintiff arrived at North Station at approximately 3:55 PM.  Plaintiff spoke to
about 4 or 5 union members whom he knew and gave some of them a copy of his
open letter.  MBCR Ex. 22,  MBTA Police Department Journal Incident Report
Journal No. 03019163. ("Police Report").  PE22, Carmack Decl. III ¶

92.  The MBCR trainmaster on duty at North Station in Boston at 3:55 PM was
Jacqueline Boumel.  MBCR Ex. 22, Police Report.

93.  Ms. Boumel was hired by Amtrak in the year 1990 as an MBTA coach cleaner at
the Boston Engine Terminal, an MBTA service facility.  PE2,  Boumel Transcript
15:9-12

94.  In the year 1995 Ms. Boumel was promoted to Assistant Conductor.  In the year
1995 Ms. Boumel also qualified as a conductor.  Ibid. 26:2-5

95.  The conductor has organizational authority over all other employees on the train,
including the engineer.  Ibid. 74:3-75:18.

25

96. As a Conductor, Ms. Boumel had occasions to work with the Plaintiff on train crews with Boumel serving as Conductor and the plaintiff serving as Engineer. Ibid. 112:4-113:16.

97. The Plaintiff cooperated with Ms. Boumel's instructions when working with Ms. Boumel whether Ms. Boumel was working as a Conductor or as a Trainmaster. Ms. Boumel states that she "never had a problem" with the plaintiff. Ibid. 112:4-113:16 and 118:6-15.

98. Ms. Boumel has an understanding of "job protection" and seniority rights for union members. Id. 27:4-20

99. Ms. Boumel understands the term 'displacement' as a term referring to seniority among employees and the right of employees to claim the right to work a particular job that is being worked by a 'junior' employee with lesser seniority, thereby 'displacing' the junior employee. Id. 30:5-38:24.

100. Ms. Boumel has exercised seniority as a conductor on two occasions to displace other employees. Id. 82:2-83:24

101. Ms. Boumel had heard that plaintiff had been dismissed as a Locomotive Engineer in commuter rail but didn't know precisely why other than that the plaintiff was dismissed because the plaintiff is crazy. She only knows that dismissal had something to do with Shakespeare. Id. 166:14-167:23.

102. Ms. Boumel had heard that the plaintiff had been terminated because the plaintiff is crazy and that Road Foreman Gerry DeModena banned the plaintiff from the MBTA property. Id. 325:3-326:23.

103. Ms. Boumel did not know about any workplace violence claim against the

26

plaintiff. Nor did she know of the plaintiff ever being violent or threatening anyone. Id. 329:8-23

104. The only confirmation that Ms. Boumel had that the plaintiff might have been terminated was that the plaintiff's name wasn't listed on a list of MBCR jobs awarded to Amtrak employees. Ms. Boumel did not have any precise information that the plaintiff had been dismissed. Id. 218:1-220:20, 228:2-23.

105. Ms. Boumel understands that an employee returning from a leave of absence may need union assistance to protect seniority. Id. .

106. Ms. Boumel understands that the plaintiff may have needed union assistance exercise his seniority and displace a position. Id.

107. Ms. Boumel understands that a union employee can displace a position without actually working it on the day the employee displaces the job. Id. 279:9-280:24.

108. On July 1, 2003, a Locomotive Engineer working in MBTA commuter rail entered the office where Ms. Boumel was working and handed Ms. Boumel a leaflet. Id. 232:2-233:18.

109. When Ms. Boumel saw the leaflet that the engineer handed to her, Ms. Boumel assumed that the plaintiff was going to board and run a train. Based on that assumption Ms. Boumel called train dispatcher to ask what she should do. The dispatcher and Ms. Boumel decided to call the police to ask the police to ask the plaintiff to leave:

BY MR. CARMACK

Q: Who told you that I was going to board a train, Ms. Boumel?

A. Nobody told me you were going to board a train.

27

Q:  Right.  So you assumed it.

A:  Yes.

Q:  You assumed that I was going to board a train.

  What did you assume that I was going to do when I boarded a train?

A:  Run the train.

Q:  Did you come out and ask me if that's what I was going to do?

A:  No, I did not.

Q.  Did you, at every time – at any time get any information from me

  indicating that I was going to do that?

A:  No I did not.

Q:  So, what did you do?

A:  I called the train dispatcher and asked them what I should do.

Q:  What did the train dispatcher say?

A:  I believe that's when we decided to call the police and ask them to ask

  you to leave.

Id. 236:1-237:2

110.  Ms. Boumel understood that an engineer could displace a job without working the

  job.  Ms. Boumel understood that for an engineer to displace a job it would not

  necessarily mean that the engineer was going to get on the train.  Id. 279:14-

  281:4.

111.  Ms. Boumel understood that the leaflet that she read on July 1, 2003 did not mean

  that the plaintiff would board the train or operate any train.

        BY MR. CARMACK:

Q: Can you turn the - - turn [the leaflet] over?

A: (Deponent complying)

Q. Read the - - Before it says, "I'm reporting on July 1st, 2003, to displace the job I own," read the two sentences before - - three sentences before that.

A. Two or three?

Q. The two sentences before that.

A. (Deponent viewing document). "This division has a responsibility to me - - to me, and I expect to be paid. I can only be paid if this division mandates through division action that my time claims be processed in accordance with the MBCR – BLE agreement to the general committee where I know they will be honored."

Q. Okay. Continue reading the next sentence.

A. (Deponent viewing document). "I'm reporting on July 1st, 2003 to displace the job I own."

Q. Okay. Now, I want to ask you about when you - - when you contact a dispatcher - - a crew dispatcher to displace a job - -

A. Yes

Q. - - is it possible that you had displaced a job, but not necessarily work it that day?

A. Yes.

Q. So just because someone is displacing a job doesn't necessarily mean that they're getting on a train.

A. No, it does not.

Q. It just means that they're displacing a job that they want to contact

   somebody to let them know that they're displacing that job.

A. True.

Q. Mm – hmm. But you assumed that Mr. Carmack was going to get on a

   train.

A. Yes, I did.

Id.

112. Although Ms. Boumel assumed that the plaintiff was going to board a train, Ms. Boumel does not know why the dispatcher called the police. Ms. Boumel states that she believes she spoke to the dispatcher about the plaintiff's dismissal and "handing out leaflets in the station". Id. 290:7-291:24.

113. Ms. Boumel did not speak to the plaintiff. Ms. Boumel stated that she was not afraid that the plaintiff was going to hurt anyone. Ms. Boumel stated that she was not concerned about the plaintiff being in the station. Id. 305:4-311:22.

114. Ms. Boumel states that on July 1, 2003, she spoke to the MBCR Chief Train Dispatcher to report that the plaintiff was in North Station and handing out leaflets that said that plaintiff was going to displace an MBCR Engineer Position. Id. 236:1-237:14.

115. Ms. Boumel and the Dispatcher decided to call the police. Ibid.

116. Between approximately 4:15 PM and 4:20 PM plaintiff was approached by Officer Robert Pavia of the MBTA police. MBCR Ex. 1, Carmack Aff. ¶ 20

117. Officer Robert Pavia, currently assigned as a Detective with the MBTA police,

was assigned as an MBTA patrolman on July 1, 2003. PE37. Transcript of Deposition of MBTA Police Detective Robert Pavia ("Pavia Transcript"). 6:22, 36:13-14.

118. Officer Pavia made an individual choice to join the MBTA Police Patrolman's association. Officer Pavia has a copy of the Patrolman Association's by laws, agreement with the MBTA and contract. Officer Pavia has been a member of the union for 8 years. PE37. Ibid. 10:17-11:15

119. Officer Pavia understands the concept of union seniority and union seniority "displacement" or "bumping". Id. 18:16-20:2-12.

120. The MBTA Police provide law enforcement to protect the "ridership" of the MBTA, including commuter rail. The MBTA police have jurisdiction throughout the commonwealth to enforce the laws of the commonwealth. Id. 36:15-39:22.

121. The MBTA police have authority over the activities of employees on trains (whether they're MBTA trains or not) if the employees on trains are engaged in criminal activity. Id. 42:21-23.

122. At. North Station, Boston, on the afternoon of July 1 2003, Officer Pavia approached the plaintiff and challenged the plaintiff's presence and actions by asking the plaintiff: "What makes you think you can do that here?" Officer Pavia then demanded one ot the plaintiff's leaflets and identification. MBCR Ex. 1. Carmack Aff. ¶¶ 27-29. PE37. Pavia Transcript. 54:21-22. Officer Pavia didn't see plaintiff hand any literature to anyone. Ibid. 66:1-2.

123. Officer Pavia also demanded the plaintiff's Amtrak Pass. After searching his

wallet to see if he had the pass, the plaintiff handed Officer Pavia the plaintiff's

Amtrak Pass. PE22. Carmack Decl. III ¶ 17.

124. Plaintiff assured Officer Pavia that plaintiff would comply with whatever the

officer asked of the plaintiff. MBCR Ex.1. ¶ 31.

125. Officer Pavia demanded that plaintiff stand and remain at a certain spot in the

center of the station on platform next to the operations office where Ms. Boumel

was working. Officer Pavia then entered the office. Ibid. ¶ 34.

126. Ms. Boumel states that shortly after her phone conversation with the MBCR Chief

Train Dispatcher an MBTA police officer arrived at her office and told Ms.

Boumel that the officer had confiscated the plaintiff's Amtrak ID and issued a "no

trespass order".[15] PE2. Boumel Transcript 293:2-294:15.

---

[15] Although Officer Pavia claims that Ms. Boumel told him that the plaintiff was attempting to "disrupt service" he could not recall her saying that;

Q:  What did you say to her?

A:  I don't remember exact words. I believe I asked her what was the problem. as far as

    exact wording I have no idea.

Q:  Do you remember what she said?

A:  she explained that an ex-Amtrak employee, yourself, was at—been on track 3 passing

    out pamphlets that were, I believe – and that she had asked, I believe she said she had

    asked you to leave the property.

Q:  Are you sure she asked me, Joseph Carmack, to leave the property?

A:  No.

…

Q:  Did she say specifically what it was that I was doing that was disrupting service?

A:  I don't remember exactly

PE37.  Pavia Transcript 49:20-24, 50:1-6 and 17-19.

127. Officer Pavia returned from the office with Ms. Boumel and asked the plaintiff if the plaintiff was an employee. The plaintiff then explained to Officer Pavia that the plaintiff was employee in accordance with the collective bargaining agreement, but that the plaintiff's status was an issue of contention. Officer Pavia contended that the leaflet states that plaintiff is an "eligible employee" which is not the same as an employee. The plaintiff then explained to Officer Pavia that the collective bargaining agreement refers to all MBTA commuter rail employees with seniority as "eligible employees" while they are unassigned. After this discussion, Officer Pavia told the plaintiff that the plaintiff was creating a disturbance. PE22. Plaintiff Decl. ¶ 16. MBCR Ex. 1. Carmack Aff. ¶ 34

128. Officer Pavia understands that to exercise seniority means to claim a date of hire and a right to a position of employment. PE37. Pavia Transcript. 57:18-24

129. Officer Pavia does not believe that the MBTA station was a place where the plaintiff could go to seek union assistance.[16]

---

[16] I wasn't concerned with anything that had to do with – your union issues were your union issues. Whatever was going on as for as that goes that was your thing. This wasn't the forum for this. The commuter rail lobby or the tracks, the platform, wasn't the place for this. What I was there for, I was dispatched there because somebody called, said that somebody was being disorderly and passing out threatening pamphlets. That's what I was there for. When I looked at the pamphlets and I found them, that they could definitely be interpreted as threatening it was at that time that I decided that you were going to have to leave the property and stop passing out these pamphlets. That's what I was there for.

I wasn't concerned about your union issues. Your unions were something you needed to deal with, but not in that forum. My concern was with the public safety and the safe and efficient transportation of the rider ship.

33

130. Ms. Boumel states that the plaintiff did not seem upset with Ms. Boumel or the police officer. Ms. Boumel states that the plaintiff did not seem upset or agitated. PE2. Boumel Transcript 305:4-306:15.

131. Ms. Boumel states that the plaintiff was in the station for less than ten minutes after the MBTA police officer first spoke to her on July 1, 2003. Id. 300:2-6.

132. Officer Pavia believes that on July 1, 2003, plaintiff was a threat to the station, employees of MBCR and passengers because plaintiff was at the station to ask union members for assistance in exercising his seniority. PE37. Pavia Transcript 59:1-3

133. Officer Pavia does not believe that the MBTA station was a place where the plaintiff could go to seek union assistance.[17] Officer Pavia states that as an "authority with the MBTA" Officer Pavia has the right to tell the plaintiff to leave MBTA stations. Ibid. 67:5-6.

---

PE37. Pavia Transcript. 58:8-24

[17] A:   I wasn't concerned with anything that had to do with – your union issues were your union issues. Whatever was going on as for as that goes that was your thing. This wasn't the forum for this. The commuter rail lobby or the tracks, the platform, wasn't the place for this. What I was there for, I was dispatched there because somebody called, said that somebody was being disorderly and passing out threatening pamphlets. That's what I was there for. When I looked at the pamphlets and I found them, that they could definitely be interpreted as threatening it was at that time that I decided that you were going to have to leave the property and stop passing out these pamphlets. That's what I was there for.

I wasn't concerned about your union issues. Your unions were something you needed to deal with, but not in that forum. My concern was with the public safety and the safe and efficient transportation of the rider ship.

34

130. Ms. Boumel states that the plaintiff did not seem upset with Ms. Boumel or the police officer. Ms. Boumel states that the plaintiff did not seem upset or agitated. <u>PE2</u>. Boumel Transcript 305:4-306:15.

131. Ms. Boumel states that the plaintiff was in the station for less than ten minutes after the MBTA police officer first spoke to her on July 1, 2003. <u>Id</u>. 300:2-6.

132. Officer Pavia believes that on July 1, 2003, plaintiff was a threat to the station, employees of MBCR and passengers because plaintiff was at the station to ask union members for assistance in exercising his seniority.  <u>PE37</u>. Pavia Transcript 59:1-3

133. Officer Pavia does not believe that the MBTA station was a place where the plaintiff could go to seek union assistance. Officer Pavia states that as an "authority with the MBTA" Officer Pavia has the right to tell the plaintiff to leave MBTA stations. <u>Ibid</u>. 67:5-6.

134. When Officer Pavia  reiterated that plaintiff was creating a disturbance, Officer Pavia escorted the plaintiff from North Station. Officer Pavia told the plaintiff that he was "banned" from all MBTA station for 24 hours. Officer Pavia advised plaintiff that if plaintiff returned to North Station, plaintiff could be arrested. Officer Pavia told the plaintiff that plaintiff would need a court order to return to North Station. <u>MBCR Ex. 1</u>. ¶ 39.

Date: July 23, 2008

Respectfully submitted,

Joseph T. Carmack,  Plaintiff, Pro Se
592 Tremont Street, #5
Boston, MA  02118 W: 617/727-2310
ext. 7045  Mobile: 617/504-0075.

<u>PE37</u>. Pavia Transcript. 58:8-24

34