UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2008 AUG 15  P 5: 48

DISTRICT COURT
DISTRICT OF MASS.

```
                                          )
Joseph T. Carmack                         )
                 Plaintiff, Pro Se        )
                                          )   Civil Action No. 05-11430-PBS
        v.                                )
                                          )
Massachusetts Bay Transportation Authority)
                                          )
        and                               )
                                          )
Massachusetts Bay Commuter Railroad Co.   )
                                          )
                 Defendants               )
                                          )
```

# PLAINTIFF JOSEPH T. CARMACK'S MEMORANDUM IN SUPPORT OF

# OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 56 (f)(2)

Plaintiff Joseph t. Carmack ("plaintiff") hereby submits this memorandum in

support of Opposition to Defendants' Motions for Summary Judgment pursuant to

F.R.C.P. Rule 56 (f)(2). The plaintiff submits that the Defendants have not responded

properly to discovery requests and further good faith discovery or motions to compel are

necessary for plaintiff to be permitted fair process in this case. The plaintiff submits this

memorandum to put evidence obtained in context of the plaintiff's complaint and

Statement of Material Facts to permit this Honorable Court to evaluate the degree to

which further discovery may be required prior to disposition of Defendants Motions.

## I. INTRODUCTION

1

The plaintiff brings this action against the Massachusetts Bay Transportation

Authority ("MBTA"), the joint employer with the plaintiff's former employer, The

National Railroad Passenger Corporation ("Amtrak") and the Massachusetts Bay

Commuter Railroad Company ("MBCR") who is the successor contractor to the

plaintiff's former employer. The plaintiff has filed complaints alleging a number of

labor, employment and privacy claims that were also brought against the plaintiff's

former employer, Amtrak.[1] In addition, the plaintiff has brought civil rights claims

pursuant to 42 U.S.C. § 1983 ("Section 1983") and a Rehabilitation Act claim against the

current defendants concerning events that occurred regarding the plaintiff's treatment by

the Defendants in North Station in Boston on July 1, 2003 and the Defendants' failure to

hire the plaintiff on the same date. All but the final two counts, the Section 1983 claim

and the Rehabilitation Act claim have been dismissed. This memorandum discusses the

Defendants Motions for Summary Judgment on the two remaining counts.

## II. LEGAL STANDARD

Pursuant to Federal Rules of Federal Procedure Rule 56 (e)(2), when a motion for

Summary Judgment is submitted against a party, that party is obligated to respond. The

"response must—by affidavits or as otherwise provided in this rule—set out specific facts

showing a genuine issue for trial." Pursuant to Rule 56 (f), if the party "shows by

affidavit that for specified reasons, it cannot present facts essential to justify its

opposition, the court may: (1) deny the motion; (2) order a continuance to enable

affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order." The plaintiff submits that the defendants have not been

responsive to legitimate discovery requests for depositions and production of documents.

---

[1] Civil Action 03-12488

2

Therefore, the plaintiff will prays that this Honorable Court for an order: denying
Motions for Summary Judgment; permitting further discovery; requiring motions to
compel; or requiring other discovery that the court may require to fairly adjudicate the
motion. As grounds for this opposition, plaintiff submits the following argument.

## I. ARGUMENT

### BACKGROUND OF COMPLAINT

The plaintiff is a former MBTA Locomotive Engineer in commuter rail who was
terminated from his employment in commuter rail in May of 2002. In April of 2001, the
plaintiff's supervisor, Gerard DeModena, began promoting the idea that the plaintiff was
"amentally imbalanced individual and a threat of violence"[2] *Plaintiff's Statement of
Undisputed Material Facts in Showing a Genuine Issue for Trial in Support of
Opposition of Defendants' Motions for Summary Judgment,* ("*PSMF*") ¶ 16. In May of
2001, as a result of DeModena's efforts, the plaintiff was removed from MBTA
commuter rail service and ordered to undergo a comprehensive non-confidential medical
exam with psychological testing.[3] *PSMF* ¶ 26. The general understanding among
MBTA commuter rail Human Resources personnel and Managers was that the plaintiff
was "removed from service for reasons of insanity". *PSMF* ¶¶ 17, 18, and 83. By July of
2003, it was the common understanding among the union workforce that the plaintiff was
crazy.[4] *PSMF* ¶ 102. MBTA had been promoting the idea that the plaintiff was banned
from MBTA stations since August of 2002.[5] *PSMF* ¶ 88. Ultimately, Amtrak, terminated

---

[2] *Plaintiff's Exhibit 10* ("*PE*10" hereinafter Plaintiff's Exhibits will be abbreviated with *PE* and the Exhibit
Number. DeModena Calendar.
[3] *PE*26 Letters of O'Malley to Plaintiff dated 5/4/2001,5/17/2001, 6/8/2001 and July 24, 2001. *PE*16,
Amtrak Hearing Transcript, pp. 302,331. *PE*5 Vasile Transcript at 146, *PE*22, Carmack Decl. III ¶ 13.
[4] *PE*2 Boumel Transcript 325:3-326:23.
[5] *PE*36 Letter from O'Malley to Plaintiff dated 8/20/2002 and plaintiff's response dated 8/31/2002. *PE*39
E-Mail of G. L. DeModena to M. J. O'Malldy dated 8/16/2002. *PE*40 E-Mail of G. L. DeModena to M. J.

3

the plaintiff when Amtrak's contracted psychiatrist refused to examine the plaintiff.

Pursuant to the terms of the *Collective Bargaining Agreement* ("*CBA*")Plaintiff's

termination wasn't final and binding. When judgment on appeal was untimely, plaintiff's

termination should be expunged. In the meantime, on July 1, 2003, Defendant MBCR

was the contractor replacing Amtrak as joint employer with MBTA governing the

plaintiff's engineer position. *PSMF* ¶¶ 56 to 59. When plaintiff's application for re-

employment with MBCR was ignored, the plaintiff went to North Station to contact other

union members for assistance.

## A.    SUMMARY JUDGMENT SHOULD NOT BE GRANTED IN FAVOR OF MBTA ON COUNT I BECAUSE DEFENDANTS VIOLATED PLAINTIFF'S CIVIL RIGHTS

Summary judgment against the plaintiff on Count I should not be granted because

Defendants MBTA and MBCR are mutually responsible for a violation of plaintiff's civil

rights. MBCR purposely acted with the MBTA under color of M.G.L. 161A and

Massachusetts trespassing laws to have the MBTA police remove the plaintiff from North

Station and prohibit the plaintiff from soliciting union assistance for union grievances.

Evidence shows that Defendants' actions were purposeful and intentional to prevent

plaintiff's union activities. Plaintiff was neither engaging in disorderly conduct nor

threatening behavior. The evidence shows that plaintiff was merely attempting to contact

fellow union members for union assistance. The defendants also threatened to arrest the

plaintiff if plaintiff attempted to contact union members in the future.

In their Motion for Summary Judgment, MBCR has reiterated the Court's analysis

of the Section 1983 portion of Count I of the complaint as presented by this Honorable

---

O'Malley dated 8/21/2002. *PE*41 E-Mail of g.L. DeModena to Amtrak Police Captain R. Smith dated 8/23/2002.

4

Court in the Court's *Report and Recommendation on Defendant MBCR's Motion to Dismiss*, Docket No. 38 dated 9/22/06 and adopted 10/11/06 ("*MBCR R&R*"). In the interest of brevity, the plaintiff does not reiterate the entire analysis again here. The plaintiff does, instead, refer to that analysis in the context of this rebuttal of MBCR's factual presentation.

Count 1 of the 2nd Amended Complaint alleges violations of plaintiff's constitutional and civil rights pursuant to 42 U.S.C. § 1983. As MBCR quotes from the *MBCR R&R*, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere confereed," MBCR R&R 09/22/06, at 10 (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)(quotations and citation omitted).[6] Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United Statees or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983.

### 1. MBTA and MBCR conjointly acted under color of state law as state actors as required for a liability showing pursuant to 42 U.S.C. § 1983.

As MBCR states, in order to prevail on a Section 1983 claim, the plaintiff must show that the actions of MBCR are fairly attributable to the state. The actions of MBCR attributable to the state as alleged in the complaint center around the actions of MBCR Trainmaster Jacqueline Boumel in concert with the actions of MBTA Police Officer Robert Pavia at North Station in Boston, MA on July 1, 2003. Specifically, as alleged in

---

[6] *Defendant Massachusetts Bay Commuter Railroad, Company's Memorandum in support of its motion for summary Judgment ("MBCR MSJ"). at 2.*

paragraph 40 of the plaintiff's Second Amended Complaint, "MBCR Transportation Manager, Jacqueline Boumel called MBTA police to have plaintiff removed from the public access areas at North Station." *Second Amended Complaint and Demand for Jury Trial* ("*2nd Amended Complaint*") ¶ 40 Attachments 1 and 2 to Docket 49 *Plaintiff's Motion to Amend 1st Amended Complaint*. Pursuant to the Judge Magistrates Report and Recommendations, *MBCR R&R*, these allegations, if proved, "could give rise to a finding of indirect state action" by MBCR. *MBCR R&R* at 13. However, such a finding is contingent upon a showing that Ms. Boumel, as an agent of MBCR, was performing a "public function" in connection with MBCR'S removal of the plaintiff from North Station.

### a. MBCR performed a "Public Function" in Connection when it removed the plaintiff from North Station.

In order for the plaintiff to prove that MBCR performed a "public function" when Ms. Boumel had MBTA Police Officer Pavia remove the plaintiff from the station on July 1, 2003, the plaintiff must show that MBCR performs a function that is "exclusively reserved to the State" [7] *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19. Plaintiff hereby submits that the evidence establishes that the MBCR does, indeed perform such a public function and that MBCR was performing that public function when (in concert with the MBTA police) MBCR removed the plaintiff from the station and threatened the plaintiff with arrest if he returned at any time to contact union members.

Pursuant to the Massachusetts General Laws Chapter 161A § 3, the MBTA is granted the power: "To hold operate and manage the mass transportation facilities and

---

[7] *MBCR R&R* at 14 and *MBCR MSJ* at 5

6

equipment acquired by the authority"[8]; and "To enter into agreements with other parties, including, without limiting the generalities of the foregoing,...railroads, and other concerns, providing...for construction, use and operation of any mass transportation facility and equipment held or later acquired by the authority...".[9] MBTA did, in fact, enter into an agreement with MBCR to provide MBTA services acting as the MBTA. As MBTA has stated, the MBCR is contracted directly to "provide, as opposed to operate, commuter rail services for the MBTA". *Answer and Jury Demand of Massachusetts Bay Transportation Authority ("MBTA Answer")* ¶ 3. It is not an MBCR service that MBCR is providing: it is an MBTA service. The MBTA and MBCR define the services that MBCR is contracted to provide for the MBTA as "Agreement Services" or all service, including transportation, necessary for the operation of MBTA's Commuter Rail Services and services as defined in the Commuter Rail Operating Agreement Between MBTA and MBCR.[10] *Plaintiff's SMF* ¶ 65. Although MBTA does permit MBCR some immediate authority over the workforce, the ultimate authority over the commuter rail workforce is the exclusive reserve of the MBTA. PE32, Operating Agreement § 11.8 at 29-31. *Plaintiff's SMF* ¶¶ 72-75.

### b. MBCR's public function is intertwined with MBCR's symiotic relationship with MBTA.

Alternatively to showing that MBCR was a state actor by showing the MBCR served a public function in its treatment of the plaintiff, the plaintiff may also show that there is a symbiotic relationship linking the MBCR to the state. The plaintiff has shown

---

[8] *M.G.L. c. 161A § 3(c)*

[9] *M.G.L. c. 161A § 3(f)*

[10] PE1, Mobilization Agreement § 1.0 at 2. PE32, Commuter Rail Operating Agreement Between MBTA and MBCR. ("Operating Agreement") § 1 at 2.

7

both a public function for MBCR and a symbiotic relationship between MBCR and the MBTA. Without reiterating thei Honorable Court's entire analysis of a symbiotic relationship between a private and public entity the plaintiff emphasizes the Court's recognition that the test showing that the acts of a private entity are attributable to the state when "the government 'has so far insinuated itself into a position of interdependence with (the private entity) that it must be recognized as a joint participant in the challenged activity'". *MBCR R&R* at 17 citing *Perkins, 196 F.3d at 21*(quoting *Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S. Ct. 856, 862, 6 l>Ed. 2d 45 (1961)*).

As reiterated above, the MBCR provides as opposed to operates the MBTA commuter rail service. The purpose of this distinction is that the authority to operateMBTA commuter rail services is retained by the MBTA as the MBTA's exclusive reserve and in its oversight of the MBCR. MBTA maintains complete control over the MBCR's collections of revenues, control of commuter rail employees (including the right to discipline and hire), work rules, training of employees and authority over all aspects of commuter rail management.[11] MBCR management personnel report to the MBTA Director of Railroad Operations. The MBTA subjects MBCR to internal audits of commuter rail services and revenues at the MBTA's discretion.[12] All services that MBCR performs are at the behest, discretion and in place of the MBTA. In effect, MBCR represents MBTA services. MBCR is completely interdependent with MBTA in the provision of commuter rail services. Although the MBTA may not always exercise it at every moment, pursuant to the Operating Agreement, MBTA retains the right of

---

[11] *MBCR Ex. 3 Operating Agreement* § 15.

[12] *Ibid* §§ 17 and 18.

8

complete administrative control over the commuter rail services as provided by MBCR. It makes no difference whether MBTA or MBCR refer to the MBCR as an 'agent' of MBTA, MBCR is MBTA's surrogate providing MBTA commuter rail services. A rose is a rose is a rose. *PSMF* §§ IV to VI ¶¶ 62 to 75.

### 2. MBTA and MBCR acted in concert to violate plaintiff's civil rights of free speech and equal access.

The facts show that Ms. Boumel acted on MBTA orders that had been in effect since August 2002 to limit the plaintiff's access to MBTA stations and prevent plaintiff from contacting fellow union members. Ms. Boumel was aware that the plaintiff's supervisor, Gerard DeModena, had taken action to have the plaintiff banned from MBTA stations because the plaintiff is "crazy". [13] *Plaintiff's SMF* ¶ 102. In fact, Mr. DeModena had contacted the commuter rail manager of operations, Michael J. O'Malley, and Captain Smith of the Amtrak Police to have plaintiff banned from MBTA property. In response, Mr. O'Malley sent a letter to the plaintiff warning the plaintiff that he would be charged with trespassing if plaintiff were in North or South Stations. [14] *PSMF* ¶ 88. It would be a standard procedure for O'Malley and DeModena to notify the Chief Train Dispatcher of the plaintiff's status. The Chief Train Dispatcher ("The Chief") is the central coordinator of all MBTA commuter rail operations at all times. MBTA has a manager on duty for the Chief to report to 24 hours a day. MBTA management personnel (whether or not they are compensated by MBTA directly or through MBCR) give any directions for procedure to the Chief Train Dispatcher. Mr. O'Malley would have given any trespassing order concerning the plaintiff to the Chief Train Dispatcher.

---

[13] *PE2* Boumel Transcript 325:3-326:23
[14] *PE36* and *Plaintiff's Exhibits 39 to 41.*

On July 1, 2003, when Ms. Boumel, the MBCR Trainmaster on duty at North Station, heard that the plaintiff was in the station, she immediately called the Chief Train Dispatcher to consider an action to take against the plaintiff.    Ms. Boumel called the Chief Train Dispatcher and together Ms. Boumel and the Chief "decided to call the police and have them ask [the plaintiff] to leave."[15]  They engaged the instructions of Mr. O'Malley and Mr. DeModena to have the plaintiff removed from the station.

Even if they didn't have any direct instructions, it was generally accepted that the plaintiff was banned from stations because the plaintiff was crazy.  Ms. Boumel and the Chief Train Dispatcher acted on that basis.  *PSMF* ¶ 102.

Even if Ms. Boumel were making the decisions without any instructions from any manager on duty or written instructions on file, Ms. Boumel and the Chief Train Dispatcher nonetheless were acting in their capacities as MBCR employee agents of the MBTA. Ms. Boumel and the Chief Train Dispatcher were employed to provide MBTA commuter rail service.  Regardless of what reason MBCR might give to justify their actions, when they decided to remove the plaintiff from the station, "MBCR was not acting simply as a private contractor operating commuter trains, but was deciding who could use the public access areas of the commuter rail station and the circumstances under which they could use those areas."[16]  As an agent of the MBTA, managing the MBTA station and providing MBTA commuter rail service, the MBCR was acting as a state actor (the MBTA) performing a public function and prohibiting the plaintiff's access and use of the commuter rail station.

---

[15] *Plaintiff's SMF* ¶ 102 *PE2* Boumel Transcript 236:1-237:2
[16] *MBCR R&R* at 16

The MBTA police officer that responded to MBCR's call was Officer Robert

Pavia. When Officer Pavia arrived at North Station at approximately 4:15 PM on July 1,

2003, he had very specific intentions: to evict someone from North Station for "passing

out literature". Officer Pavia had a report from MBCR of a former employee being

disorderly at North Station and passing out literature. Upon Officer Pavia's arrival he

made contact with the plaintiff and asked the plaintiff what the plaintiff was doing.

When the plaintiff told Officer Pavia that the plaintiff was handing some leaflets to other

MBTA commuter rail employees, Officer Pavia decided that the plaintiff was the

individual that MBCR wanted to remove from the station. Without even seeing a copy of

the plaintiff's leaflet, and prior to making contact with Trainmaster Boumel, Officer

Pavia told the plaintiff that the plaintiff was trespassing.[17] *PSMF ¶ 122 to 126.*

In its Motion for Summary Judgment, MBCR claims that "MBCR had no

involvement with the Plaintiff's removal and no trespass order."[18] However, the

substantial corroborated evidence belies that claim. As indicated above, MBCR called

the MBTA police: to "have them ask the [plaintiff] to leave" North Station. In order to

accomplish the goal of removing the plaintiff from the station, the Chief Train Dispatcher

---

[17] *MBCR Exhibit* 22 MBTA Police Department Jounal Incident Report Jounal No. 03019163. Although
Officer Pavia states in his report that he made contact with Boumel before he identified the plaintiff, Ms.
Boumel contradicted his claim. *PSMF ¶ 126. PE2* Boumel Transcript 293:2-294:15. It is obvious, based
upon the fact timeline and the combined factual evidence that Officer Pavia got the report of an ex-
employee handing out literature from the MBTA police dispatcher and not from Trainmaster Boumel. If it
is true that: 1. Officer Pavia's police report states that the plaintiff was issued a trespassing order after
Boumel reported that "an ex-employee was attempting to disrupt service and passing out literature on track
#3.; 2. Officer Pavia told the plaintiff that the plaintiff was trespassing after Officer Pavia ascertained that
the plaintiff handed out some leaflets *MBCR Ex.* 1 Carmack Aff ¶¶ 29 to 34.; and 3. Officer Pavia only
talked to Ms. Boumel after Officer Pavia told the plaintiff that the plaintiff was trespassing; then Officer
Pavia had information that an "ex-employee was attempting to disrupt service and passing out literature"
before Officer Pavia entered the station or spoke to Ms. Boumel. Officer Pavia acted on that information as
soon as he entered the station without making prior contact with Trainmaster Boumel. Therefore, MBCR
reported to the MBTA Police dispatcher that "an ex-employee was attempting to disrupt service and
passing out literature on track #3".
[18] *MBCR MSJ* at 8.

reported to the MBTA police dispatcher that there was "a disorderly male" at North Station. There is no evidence to indicate that Ms. Boumel at any time indicated that the plaintiff was being disorderly. Ms. Boumel stated that she and the Chief Train Dispatcher decided to have the police ask the plaintiff to leave. The Chief Train Dispatcher may have told the MBTA Police dispatcher that the plaintiff was being disorderly in order to justify their desire to have the plaintiff removed from the station. In any case, The MBTA police officer who responded to MBCR's call did not see the plaintiff hand out any leaflets nor did the officer tell the plaintiff that plaintiff was being disorderly.[19] Once the officer identified the plaintiff as the individual "passing out literature", the officer only told the plaintiff that the plaintiff was trespassing. *PSMF* ¶¶ 122 to 126. The officer told the plaintiff that the plaintiff was trespassing before the officer asked the plaintiff for a copy of the plaintiff's leaflet.[20]

MBCR and MBTA have asserted that their actions are justified because, inter alia, they were concerned about the ability to conduct commuter operations as scheduled. In addition, they assert that the plaintiff's presence at North Station represented "the prospect of a disruption in operations". These claims are pretenses manufactured after events to justify their actions. In contrast, the bare facts of the occurrences of July 1, 2003 show that the defendants' sole concern was to prevent the plaintiff from communicating with fellow union members. The offensive action that Ms. Boumel identified on July 1, 2003 was that the plaintiff handed a notice advertising the plaintiff's

---

[19] Although *Plaintiff's Statement of Material Facts* states that Officer Pavia "reiterated that plaintiff was creating a disturbance" (*Plaintiff's SMF* ¶ 134), careful review of the facts belies that statement and a correction of the statement is in order. The facts show that Officer Pavia merely told the plaintiff that the plaintiff was trespassing when the plaintiff told Officer Pavia that the plaintiff was handing leaflets to other union members. *DE1* ¶¶ 24 to 29.

[20] *DE1* Carmack Aff. ¶ 29.

request for union assistance to a fellow Locomotive Engineer and union member. There is no evidence that Ms. Boumel ever told anyone that she was concerned that the plaintiff was going to take any action on any train. The evidence shows that Ms. Boumel only wanted to remove the plaintiff from the station because the plaintiff gave an engineer a leaflet publicizing plaintiff's appeal for assistance. The evidence also shows that the MBTA police officer had the exact same concerns.

Ms. Boumel's testimony shows that she understood that the plaintiff was in North Station on July 1, 2003 seeking union assistance. Ms. Boumel also states that she understood that the plaintiff needed to go to the station to seek union assistance in order to exercise the plaintiff's seniority or "displace" a position. Ms. Boumel also knew that the plaintiff had been on a medical leave of absence and the plaintiff needed union assistance to return to work.[21] *PSMF* ¶¶ 104 to 106. Ms. Boumel understands that a union employee can displace a position without actually working it on the day the employee displaces the job.[22] *PSMF* ¶ 107. On July 1, 2003, a Locomotive Engineer working in MBTA commuter rail entered the office where Ms. Boumel was working and handed Ms. Boumel a leaflet.[23] *PSMF* ¶108. Ms. Boumel claims that when she saw the leaflet that the engineer handed to her, Ms. Boumel assumed that the plaintiff was going to board and operate a train. Ms. Bopumel claims that based on that assumption, Ms. Boumel called MBTA/MBCR Chief Train Dispatcher to ask what she should do. The dispatcher and Ms. Boumel decided to call the police to remove the plaintiff from North Station. The evidence shows that Ms. Boumel's claim that she was concerned about what she assumed the plaintiff might do are not supported by the evidence.

---

[21] *PE2* Boumel Transcript 218:1-220:20, 228:2-23.

[22] *PE2* Boumel Transcript 279:9-280:24.

[23] *PE2* Boumel Transcript 232:2-233:18.

13

Ms. Boumel admits that nothing in the leaflet that she saw gave her any reason to assume that the plaintiff was going to board and operate a train. Ms. Boumel's sole reason for assuming that the plaintiff would board and operate a train without authorization is that Ms. Boumel heard that the plaintiff was crazy. Ms. Boumel had been told that the plaintiff had been banned from MBTA stations because the plaintiff is crazy. MBTA had been promoting the idea that the plaintiff is crazy for over two years by the time Ms. Boumel saw the leaflet in July of 2003.

MBCR claims that MBCR's sole concern on July 1, 2003 was its ability to conduct commuter rail operations as scheduled. [24] This claim is not supported by the record. MBCR claims that on July 1, 2003 they called the MBTA police to alert them to the "potentially harmful actions" of the plaintiff. But there were no such actions to report. Ms. Boumel did not speak to the plaintiff on July 1, 2003. Ms. Boumel stated that she was not afraid that the plaintiff was going to hurt anyone. Ms. Boumel stated that she was not concerned about the plaintiff being in the station.[25] *PSMF* ¶ 113. According to her testimony, Ms. Boumel called the Chief Train dispatcher because the plaintiff was in the station handing leaflets to fellow union employees to notify them that the plaintiff was seeking union assistance. That is what she told the Chief Train Dispatcher when she asked the Chief Train Dispatcher what she should do.

Q. So what did you do?

A. I called the train dispatcher and asked them what I should do.

Q. And what did the train dispatcher say?

A. I believe that's when we decided to call the police and ask them

---

[24] *MBCR MSJ* at 9.

[25] *PE2* Boumel Transcript 305:4-311:22.

14

       to ask you to leave.

Q. And why would you do that?

A. You weren't just contacting one engineer. You were handing

    Out leaflets to all engineers - -

Q. And that's a problem.

A. Yes.

Q. Are you sure of that?

A. I'm pretty sure of that.[26]

Ms. Boumel's testimony makes it clear that MBCR called the MBTA police to prevent the plaintiff from communicating to fellow union employees.

    The purpose of the leaflet was simply to communicate the plaintiff's appeal for union assistance. Ms. Boumel understood the issues presented by the leaflet. Ms. Boumel understood that an engineer could displace a job without working the job. Ms. Boumel understood that for an engineer to displace a job it would not necessarily mean that the engineer was going board a train. Ms. Boumel also understood that the leaflet that she read on July 1, 2003 did not mean that the plaintiff would board a train or operate any train.[27] *PSMF* ¶¶ 110 to 111. Ms. Boumel states that on July 1, 2003, she spoke to the MBCR Chief Train Dispatcher to report that the plaintiff was in North Station and handing out leaflets that said that plaintiff was going to displace an MBCR Engineer Position.[28] *PSMF* ¶ 114. Based on that information, Ms. Boumel and the Chief Train Dispatcher decided to call the MBTA police to report a disorderly male and have the plaintiff removed from the station. Ms. Boumel admits that the leaflet gave her no basis

---

[26] *PE2* Boumel Transcript 236:20 to 237:16.

[27] *PE2* Boumel Transcript 279:14-281:4, 236:1-237:2.

[28] *PE2* Boumel Transcript 236:1-237:14.

15

on which to assume that the plaintiff was going to board or operate a train.[29] *PSMF* ¶¶ 111 to 115.

MBCR wanted the MBTA police to remove the plaintiff from the station for handing leaflets to engineers that the plaintiff knew as fellow engineers. The Officer that the MBTA dispatched proceeded immediately to North Station to identify the individual with leaflets and remove him from the station. Prior to making contact with Ms. Boumel, Officer Pavia made the decision to tell the plaintiff that the plaintiff was trespassing. Officer Pavia did not identify any threatening or violent behavior on the part of the plaintiff. In his police report, Officer Pavia vaguely states that the plaintiff was "attempting to disrupt service", but he does not indicate how. Officer Pavia did not tell the plaintiff that the plaintiff was being removed from the station because the plaintiff had threatened anybody or attempted to disrupt service. When Officer Pavia ascertained that the plaintiff had handed leaflets to some other union employees, Officer Pavia merely asked the plaintiff; "What makes you think you can do that here?" When the plaintiff stated that the plaintiff understood that North Station was a place of public access, Officer Pavia told the plaintiff that the plaintiff was trespassing. Other than telling the plaintiff that the plaintiff was trespassing, Officer Pavia only challenged the plaintiff's status as an employee. Officer Pavia's questions about the plaintiff's leaflet only concerned the union issues it represented. At no point did Officer Pavia tell the plaintiff that Officer Pavia thought the plaintiff's leaflet was threatening. Neither did Officer Pavia tell the plaintiff that Officer Pavia thought that the plaintiff was planning on boarding and operating a train. The plaintiff explained to the officer that the plaintiff had a right to pursue the plaintiff's seniority rights. Officer Pavia knows what displacement

---

[29] *PE2* Boumel Transcript 279:14-281:4.

16

means. His an agreement employee. He knew what the plaintiff was doing.[30] *PSMF* ¶¶
118 to 119.

The Defendants falsely claim; that the plaintiff's leaflet "contained potentially
threatening statements implicating the safety of passengers and operation of the
commuter rail trains"; and that the plaintiff "was threatening to make displacement on a
4:40 train". The Defendants focus on a statement in the leaflet that states that the
plaintiff must make use of the plaintiff's seniority to claim an engineer position. "Run
820" is the catalogue number of an engineer position used on a "run sheet" that railroads
use to advertise engineer positions pursuant to union contracts. It is not a train number.
The report time of the position is listed as 4:40 PM, but it doesn't involve running a train
at 4:40 PM. Ms. Boumel was completely aware that the plaintiff had no intention of
boarding or operating any train. Ms. Boumel also knew that the plaintiff was solely
concerned with processing grievances. The Defendants and Officer Pavia also know that.
The assertion that the plaintiff was going to "physically take over and run a commuter
rail train at 4:40 PM on that day, only minutes away" is utterly deceitful. MBCR's
defense is purely designed to distort the facts and prejudice the plaintiff in the eyes of this
Honorable Court by portraying the plaintiff as a violent, dangerous, threatening and
unstable individual. Every assertion that the plaintiff threatened the service or any person
or that the plaintiff is in any way threatening or violent should be stricken from the record
or treated as evidence of intent to discriminate on the basis of a disability.

### 3. MBCR and MBTA acted in concert by "Threats, Coercion and Intimidation.

---

[30] *PE*37 Pavia Transcript 10:17-11:15, 18:16-20:12.

MBCR denies that they acted to interfere with the plaintiff's rights or in violation of the Massachusetts Civil Rights Act ("MCRA"). Specifically, MBCR denies that they violated the MCRA because: 1. MBCR claims that the plaintiff's actions are not protected by the 1st Amendment of the United States Constitution; and 2. MBCR denies that they acted by threat, coercion or intimidation. In opposition, the plaintiff claims that the defendants acted in concert to prevent plaintiff from exercising constitutionally protected rights.

The defendants removed the plaintiff from North Station under the threat of arrest because the plaintiff handed an open letter appealing for union assistance to a locomotive engineer that spoke to the plaintiff. When MBCR contacted the police, they wanted to have the plaintiff removed from the station. Officer Pavia removed the plaintiff by threatening the plaintiff with arrest. Officer Pavia also told the plaintiff that the plaintiff would need a court order of the plaintiff wanted to return.

The plaintiff was only in the station talking to people whom he knew after they talked to the plaintiff. In the time the plaintiff was in the station, the plaintiff only talked to about 4 or 5 people at the most. The plaintiff did not give a leaflet to all the people he talked to. The plaintiff only moved with egress and ingress of foot traffic and avoided crowded areas. The plaintiff was not disruptive or obstructing.

MBTA claims that the plaintiff has not articulated a policy or custom that the MBTA was operating under. The policy that the defendants operated under articulated in Mr. O'Malley's letter of August 20, 2002 and Mr. DeModena's E-Mails. The policy is to consider the plaintiff a trespasser in North and South Stations. The plaintiff's former supervisors had established a policy to have the plaintiff removed from stations. That

policy was specifically designed to prevent the plaintiff from contacting employees and processing grievances. The plaintiff was threatened that if the plaintiff did not obtain a court order against the MBTA's policy regarding the plaintiff as a trespasser, the plaintiff would be arrested if the plaintiff returned to MBTA stations to contact engineers. This was especially the case if the plaintiff handed another engineer any written materials. Although, Mr. O'Malley only specifies that the plaintiff is trespassing if plaintiff is in an area where he could make contact with employees.

The Defendants are fond of quoting the language of the leaflet to insinuate that the plaintiff had disruptive motives. The language is purposely demanding to make a point. It is not threatening just because it is demanding. The leaflet was targeted toward a specific group of individuals that the plaintiff knew. The language was the language of the group, and the group, union members, including Ms. Boumel, understood it. The plaintiff was targeting individuals that he knew who could be of assistance to the plaintiff. The leaflet was only used to facilitate a direct communication. No policy, including MBTA's interim guidelines, is reasonable when it prevents citizens (especially a specific individual) from contacting fellow union members that might assist him.

**B.     SUMMARY JUDGMENT SHOULD NOT BE GRANTED IN FAVOR OF MBTA ON COUNT X BECAUSE THE DEFENDANTS WITHELD PRODUCTION OF DOCUMENTS AND WITNESSES REGARDING MBTA'S RECEIPT OF FEDERAL FUNDS.  MBTA's FEDERAL TRANSIT ACT REQUIREMENTS LISTED IN ITS OPERATING AGREEMENTS INDICATE BOTH DEFENDANTS BENEFIT FROM FEDERAL FUNDING.**

Summary judgment should not be allowed on Count X because neither defendant has been forthcoming with discovery requests. Plaintiff as requested documents from both defendants relative to: Petitions and orders relative to railroad certifications from the

19

Surface Transportation Board, petitions and orders relative to Federal Transit Act Grants to the MBTA, orders and communications from the U.S. Secretary of Labor regarding federal grants to MBTA commuter rail. In spite of the fact that these requests are covered by the Massachusetts Public Records Act, the defendants have not been forthcoming.

It is obvious from the compliance requirements in the Operating Agreement and the Mobilization Agreement that the defendants benefit from Federal Transit Act grants for Massachusetts Commuter Rail. MBTA requires in its agreements that the MBCR and Amtrak comply with orders regarding employment and labor from the Federal Transit Administration, the Federal Transit Act and the U.S. Department of Labor. There must be communications from these agencies which would specify the nature of Federal Transit Act or other types of federal funding and the plaintiffs rights and benefits relative to that funding.

Furthermore, MBCR has submitted evidence in a communication with the Surface Transportation Board. The Defendant have withheld these documents claiming that they are irrelevant. The Surface Transportation Board certifies the business relationship between the defendants and compliance with federal rail labor protections. This Honorable Court has issued orders allowing the plaintiff to develop a record relative to the business relationship between the defendants and federal funding. The plaintiff should be permitted the opportunity to resolve these discovery matters prior to Summary Judgment orders.

The Defendants have submitted evidence in their motions from the MBTA Rule 30 (B)(6) deponents. Both of the deponents admitted that they were not knowledgeable

of the matters in the discovery notices. The intentionally submitted witnesses whose

ignorance would support their defenses. The plaintiff deserves the right to depose

deponents involved in the matters at issue.

The plaintiff also has the right to depose the defendant witnesses, including

Dennis Coffey, who were subject to deposition notices that were also the subject of the

plaintiff's Opposition to Defendant MBCR's Motion for a Protective Order. In spite of

many good faith attempts to resolve the matter, Defendants refuse to submit these

witnesses to deposition.

The actions of the defendants in this case have prevented the plaintiff from

developing a proper record.

WHEREFORE, the plaintiff hereby prays for an order denying the defendants

motions for summary judgment.


**Respectfully submitted,**


Date: August 15, 2008

Joseph T. Carmack
Plaintiff, Pro Se
592 Tremont Street#5
Boston, MA 02118-1669
Work: 617/727-2310 ext. 7045
Mobile: 617/504-0075


21